**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| ANNIE LOIS GRANT; QUENTIN T. HOWELL; ELROY TOLBERT; THERON BROWN; TRIANA ARNOLD JAMES; EUNICE SYKES; ELBERT SOLOMON; and DEXTER WIMBISH,<br><br>    Plaintiffs,<br><br>  v.<br><br>BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State; SARA TINDALL GHAZAL, in her official capacity as a member of the State Election Board; ANH LE, in her official capacity as a member of the State Election Board; EDWARD LINDSEY, in his official capacity as a member of the State Election Board; and MATTHEW MASHBURN, in his official capacity as a member of the State Election Board,<br><br>    Defendants. | CIVIL ACTION FILE NO. 1:22-CV-00122-SCJ |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................1

BACKGROUND ...................................................................................2

    I.    The General Assembly enacted new legislative maps that do not reflect Georgia's growing minority communities. ...........................................2

    II.    SB 1EX and HB 1EX subvert fair representation by packing and cracking Black voters. ...........................................................................5

LEGAL STANDARD................................................................................6

ARGUMENT .........................................................................................7

    I.    Plaintiffs are substantially likely to prove that SB 1EX and HB 1EX violate Section 2. ................................................................................7

        A.    *Gingles* One: Additional, compact majority-Black State Senate and House districts can be drawn in the Atlanta metropolitan area and the Black Belt. ......................................................................8

        B.    *Gingles* Two: Black Georgians are politically cohesive...........10

        C.    *Gingles* Three: White Georgians engage in bloc voting to defeat Black-preferred candidates. ......................................................11

        D.    Under the totality of circumstances, SB 1EX and HB 1EX deny Black voters equal opportunity to elect their preferred candidates to the General Assembly..........................................................13

            1.    Senate Factor One: Georgia has an ongoing history of official, voting-related discrimination. ...........................14

            2.    Senate Factor Two: Georgia voters are racially polarized. ........................................................................18

3.      Senate Factor Three: Georgia's voting practices enhance the opportunity for discrimination. .................................18

4.      Senate Factor Four: Georgia has no history of candidate slating for legislative elections. ......................................19

5.      Senate Factor Five: Georgia's discrimination has produced severe socioeconomic disparities that impair Black Georgians' participation in the political process..20

6.      Senate Factor Six: Both overt and subtle racial appeals are prevalent in Georgia's political campaigns. ..................23

7.      Senate Factor Seven: Black candidates in Georgia are underrepresented in office and rarely succeed outside of majority-minority districts. .............................................27

8.      Senate Factor Eight: Georgia is not responsive to its Black residents. .......................................................................28

9.      Senate Factor Nine: The justifications for the new legislative maps are tenuous. .........................................29

II.    Plaintiffs and other Black Georgians will suffer irreparable harm absent a preliminary injunction. ...................................................................30

III.   The balance of equities and the public interest favor injunctive relief. ........................................................................................31

CONCLUSION ...................................................................................31

# INTRODUCTION

In undertaking the latest round of redistricting following the 2020 decennial census, the Georgia General Assembly diluted the growing electoral strength of the state's Black community. Georgia has a Black population sufficiently large and geographically compact to create three additional majority-Black Georgia State Senate and five additional majority-Black Georgia House of Representatives districts, all of which can be drawn without reducing the number of existing districts in the enacted maps in which Black voters have the opportunity to elect their candidates of choice. The creation of these additional majority-Black legislative districts is not only a fair and equitable reflection of the growth of the state's minority population—it is also required by federal law.

But despite the mandates of Section 2 of the Voting Rights Act of 1965, the General Assembly chose to dilute the votes of Black citizens by "packing" and "cracking" them throughout the state, most notably in the Atlanta metropolitan area and the central Georgia Black Belt region. This is precisely the scenario that Section 2 was enacted to prevent. The failure to draw additional legislative districts in which Black Georgians like Plaintiffs have equal access to the political process—combined with the state's extreme racially polarized voting, severe socioeconomic disparities between Black and white Georgians, and the ongoing effects of a tragic history of

discrimination and racial appeals in campaigns—constitutes a clear violation of Section 2.

This Court's intervention is required to ensure that the 2022 legislative elections are not held under unlawful State Senate and House maps. Absent immediate injunctive relief, Georgia will subject its Black citizens to unlawful dilution of their voting rights—an injury for which no compensation exists. Because Plaintiffs are highly likely to succeed on the merits of their Section 2 claims, and because the balance of equities and public interest indisputably support the vindication of the fundamental right to vote for all Georgians, Plaintiffs respectfully request that the Court preliminarily enjoin implementation of the new State Senate and House maps and ensure the creation of additional majority-Black legislative districts as required by federal law.

## BACKGROUND

## I.  The General Assembly enacted new legislative maps that do not reflect Georgia's growing minority communities.

Over the past decade, Georgia's population increased by more than 1 million people—growth that was entirely attributable to an increase in the state's minority population. *See* Ex. 1 ¶¶ 13–15.[1] While Georgia's white population has decreased

---

[1] The exhibits are attached to the Declaration of Jonathan P. Hawley, filed concurrently with this motion.

since 2010, its Black community has grown by over 15 percent and now comprises 33 percent of the state's total population. *Id.* ¶¶ 14–15. The Atlanta metropolitan area and the central Georgia Black Belt region—a band of counties running from southwest Georgia to the South Carolina border—are home to a high percentage of the state's Black population. *Id.* ¶¶ 17–18.

Despite the increases in Georgia's minority communities, the General Assembly enacted new legislative districting plans that prevent Georgians of color— Black Georgians in particular—from participating equally in the political process.

On November 9, 2021, the State Senate passed the Georgia Senate Redistricting Act of 2021 ("SB 1EX"), which revised that chamber's district boundaries, on a party-line vote; the House in turn passed SB 1EX on a near-party-line vote on November 15. *See* Exs. 13–14. The House revised its own district boundaries on November 10 with near-party-line passage of the Georgia House of Representatives Redistricting Act of 2021 ("HB 1EX"), which the State Senate then passed on a near-party-line vote on November 12. *See* Exs. 15–16.

Both SB 1EX and HB 1EX were criticized for their substance and the process that produced them. Lawmakers and activists from across the political spectrum questioned the speed with which the General Assembly undertook its redistricting efforts, observing that the haste resulted in unnecessary divisions of communities

and municipalities. *See, e.g.*, Ex. 17. The Republican majority's refusal to draw districts that reflected the past decade's growth in the state's minority communities was also noted by lawmakers. Commenting on the new State Senate map, Senator Michelle Au observed, "It's our responsibility to ensure the people in this room are a good reflection of the people in this state. This map before us does not represent the Georgia of today. It does not see Georgia for who we have become." Ex. 18. Senator Elena Parent remarked, "This map is designed to shore up the shrinking political power of the majority. As proposed, it fails to fairly reflect Georgians['] diversity." *Id.* Minority lawmakers in the House also objected to their chamber's new map, noting that it packed minority voters and diluted their voting strength. *See, e.g.*, Ex. 19.

Governor Brian Kemp signed SB 1EX and HB 1EX into law on December 30, 2021. As *The Atlanta Journal-Constitution* noted, "[w]hile there was never a doubt that Kemp would sign the redistricting bills, he waited over a month since they passed the General Assembly. The delay stalled legal action until the new maps were written into state law." Ex. 20.

4

**II.    SB 1EX and HB 1EX subvert fair representation by packing and cracking Black voters.**

Both SB 1EX and HB 1EX dilute the votes of Black Georgians by packing and cracking them in the Atlanta metropolitan area and the Black Belt, including the area in and around Bibb County.

SB 1EX packs some Black voters into the southern Atlanta metropolitan area and cracks others into rural-reaching, predominantly white State Senate districts. Black voters in the southwestern Atlanta metropolitan area are packed into Senate Districts 34 and 35 and cracked into Senate Districts 16 and 28. In the southeastern Atlanta metropolitan area, Black voters are packed into Senate Districts 10 and 44 and cracked into Senate Districts 17 and 25. SB 1EX also cracks Black voters in the Black Belt among Senate Districts 23, 24, and 25. Three additional majority-Black State Senate districts could be drawn in these areas without reducing the total number of existing minority-opportunity districts in the new map.

HB 1EX similarly packs Black voters into the southern and western Atlanta metropolitan area and cracks others into predominantly white districts. Black voters in the western Atlanta metropolitan area are packed into House District 61 and cracked into House District 64, while Black voters in the southern Atlanta metropolitan area are packed into House Districts 69, 75, and 78 and cracked into House Districts 74 and 117. HB 1EX further packs Black voters into two House

districts anchored in Bibb County—House Districts 142 and 143—even though two additional majority-Black House districts could be drawn in this area by uncracking House Districts 133, 145, 147, and 149, all without reducing the total number of existing minority-opportunity districts in the enacted House map.

Plaintiffs are Black citizens of Georgia and registered voters who live in these areas and face personal harm to their voting rights because of SB 1EX and HB 1EX, which dilute their voting power and prevent them and other members of their community from electing their representatives of choice to the General Assembly. *See* Exs. 5–12.

## LEGAL STANDARD

"A preliminary injunction may be entered when a plaintiff establishes four elements: '(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury to the plaintiff outweighs the potential harm to the defendant; and (4) that the injunction will not disserve the public interest.'" *Friedenberg v. Sch. Bd.*, 911 F.3d 1084, 1090 (11th Cir. 2018) (quoting *Palmer v. Braun*, 287 F.3d 1325, 1329 (11th Cir. 2002)).

**ARGUMENT**

**I.    Plaintiffs are substantially likely to prove that SB 1EX and HB 1EX violate Section 2.**

Section 2 of the Voting Rights Act prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). This includes the

> manipulation of district lines [to] dilute the voting strength of politically cohesive minority group members, whether by fragmenting the minority voters among several districts where a bloc-voting majority can routinely outvote them, or by packing them into one or a small number of districts to minimize their influence in the districts next door.

*Johnson v. De Grandy*, 512 U.S. 997, 1007 (1994).

To prevail on their Section 2 claims, Plaintiffs must show that (1) the minority group is "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) the minority group "is politically cohesive"; and (3) "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Thornburg v. Gingles*, 478 U.S. 30, 50–51 (1986). Once Plaintiffs have made this threshold showing, the Court must then examine "the totality of circumstances"—including the nine factors identified in the Senate report that accompanied the 1982 amendments to the Voting Rights Act—to determine whether "the political processes leading to nomination or election in the

State or political subdivision are not equally open to participation" by members of the minority group. 52 U.S.C. § 10301(b); *see also Gingles*, 478 U.S. at 43–44.

### A. *Gingles* One: Additional, compact majority-Black State Senate and House districts can be drawn in the Atlanta metropolitan area and the Black Belt.

Plaintiffs readily satisfy the first *Gingles* precondition because it is possible to "creat[e] more than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 430 (2006) (plurality op.) ("*LULAC*") (quoting *De Grandy*, 512 U.S. at 1008). The numerosity requirement of this precondition involves a "straightforward," "objective, numerical test: Do minorities make up more than 50 percent of the voting-age population in the relevant geographic area?" *Bartlett v. Strickland*, 556 U.S. 1, 18 (2009) (plurality op.).

Expert demographer Blakeman B. Esselstyn has offered illustrative plans that unequivocally satisfy the first *Gingles* precondition, demonstrating that the Black communities in the Atlanta metropolitan area and central Georgia Black Belt region are sufficiently large and geographically compact to comprise more than 50 percent of the voting-age population in three additional State Senate districts (two in the southern Atlanta metropolitan area and one in the Black Belt) and five additional House districts (two in the southern Atlanta metropolitan area, one in the western

Atlanta metropolitan area, and two in the Black Belt, anchored in Bibb County). *See* Ex. 1 ¶¶ 12, 24–27, 39–42, 50. Notably, the average compactness measures of Mr. Esselstyn's illustrative plans are almost identical—if not identical—to the average compactness measures of the enacted maps. *Id.* ¶¶ 31 & Table 2, 46 & Table 5. They also comply with other traditional redistricting principles, including population equality, contiguity, and respect for political subdivision boundaries, *see id.* ¶¶ 30, 32–33 & Table 3, 45, 47–48 & Table 6—all of which were guidelines adopted by the General Assembly during this redistricting cycle. *See* Ex. 21–22.

Moreover, Dr. Maxwell Palmer confirmed that Black voters would be able to elect their preferred candidates in Mr. Esselstyn's illustrative majority-Black State Senate and House districts. In all three illustrative State Senate districts and three of the five illustrative House districts, Black-preferred candidates would have won all 31 statewide races from 2012 through 2021. Ex. 2 ¶ 22. In the remaining two illustrative House districts, Black-preferred candidates would have won all 19 statewide elections since 2018. *Id.* Plaintiffs therefore satisfy the first *Gingles* precondition. *See Davis v. Chiles*, 139 F.3d 1414, 1425 (11th Cir. 1998) (first *Gingles* factor requires "an electoral district, consistent with traditional districting principles, in which minority voters could successfully elect a minority candidate").

**B.** *Gingles* **Two: Black Georgians are politically cohesive.**

Plaintiffs also satisfy the second *Gingles* precondition because Black voters in Georgia are politically cohesive. *See* 478 U.S. at 49. "Bloc voting by blacks tends to prove that the black community is politically cohesive, that is, it shows that blacks prefer certain candidates whom they could elect in a single-member, black majority district." *Id.* at 68.

Dr. Palmer analyzed political cohesion and racially polarized voting in five focus areas composed of the enacted State Senate and House districts from which Mr. Esselstyn's illustrative majority-Black districts were drawn. *See* Ex. 2 ¶¶ 9–11. To perform his analysis, Dr. Palmer used precinct-level election results and voter turnout by race as compiled by the State of Georgia and a widely accepted methodology called ecological inference analysis. *See id.* ¶¶ 12, 14–15; *see also Wright v. Sumter Cnty. Bd. of Elections & Registration*, 301 F. Supp. 3d 1297, 1305 (M.D. Ga. 2018) (recognizing ecological inference as "the 'gold standard' for use in racial bloc voting analyses"), *aff'd*, 979 F.3d 1282 (11th Cir. 2020); *accord Ala. State Conf. of NAACP v. Alabama*, No. 2:16-CV-731-WKW, 2020 WL 583803, at *29 n.27 (M.D. Ala. Feb. 5, 2020).

Dr. Palmer found "strong evidence of racially polarized voting across all five focus areas" and "within the districts comprising the five focus areas," concluding

that "Black voters are extremely cohesive." Ex. 2 ¶¶ 6, 17–18. In the 31 electoral contests between 2012 and 2021 that he analyzed, Dr. Palmer reported that Black Georgians in the focus areas voted as a bloc for the same candidates with at least 95.2 percent of the vote. *Id.* ¶¶ 16–17. Plaintiffs therefore satisfy the second *Gingles* precondition. *See* 478 U.S. at 56 (noting that "[a] showing that a significant number of minority group members usually vote for the same candidates is one way of proving the political cohesiveness necessary to a vote dilution claim").[2]

### C. *Gingles* Three: White Georgians engage in bloc voting to defeat Black-preferred candidates.

Finally, Plaintiffs satisfy the third *Gingles* precondition because, in the areas where Mr. Esselstyn proposes new majority-Black State Senate and House districts, "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." 478 U.S. at 51.

Dr. Palmer found high levels of white bloc voting in opposition to the candidates whom Black voters cohesively supported. In the same 31 elections

---

[2] Dr. Palmer's results confirm federal caselaw recognizing that Black voters in various parts of Georgia vote cohesively. *See, e.g.*, *Wright*, 301 F. Supp. 3d at 1313 (noting that, in ten elections for Sumter County Board of Education with Black candidates, "the overwhelming majority of African Americans voted for the same candidate"); *Lowery v. Deal*, 850 F. Supp. 2d 1326, 1329 (N.D. Ga. 2012) ("Black voters in Fulton and DeKalb counties have demonstrated a cohesive political identity by consistently supporting black candidates.").

between 2012 and 2021 discussed above, white voters in the focus areas overwhelmingly opposed Black voters' candidates of choice: in no election did white support exceed 17.7 percent. Ex. 2 ¶ 17. Accordingly, "Black-preferred candidates are largely unable to win elections in the non-Black-majority districts in the focus areas." *Id.* ¶ 7; *see also id.* ¶¶ 19–20. Black voters' candidates of choice are consistently defeated in the focus areas by white bloc voting, except where Black voters make up a majority of eligible voters—thus satisfying the third *Gingles* precondition. *See* 478 U.S. at 68 ("Bloc voting by a white majority tends to prove that blacks will generally be unable to elect representatives of their choice.").[3]

---

[3] Once again, these results are consistent with courts' findings in previous cases from across the state. *See, e.g.*, *Whitest v. Crisp Cnty. Bd. of Educ.*, No. 1:17-CV-109 (LAG), 2021 WL 4483802, at *3 (M.D. Ga. Aug. 20, 2021) ("African Americans in Crisp County are politically cohesive in elections for members of the Board of Education, but the white majority votes sufficiently as a bloc to enable it to defeat the candidates preferred by Black voters in elections for members of the Board of Education."), *appeal docketed sub nom. Postell v. Crisp Cnty. Sch. Dist.*, No. 21-13268 (11th Cir. Sept. 21, 2021); *Wright*, 301 F. Supp. 3d at 1317 (finding that "[t]he third *Gingles* factor is satisfied" after concluding that "there can be no doubt black and white voters consistently prefer different candidates" and that "white voters are usually able to the defeat the candidate preferred by African Americans").

**D.**     **Under the totality of circumstances, SB 1EX and HB 1EX deny Black voters equal opportunity to elect their preferred candidates to the General Assembly.**

Considering the "totality of circumstances," SB 1EX and HB 1EX deny Black Georgians an equal opportunity to elect their preferred legislative representatives. 52 U.S.C. § 10301(b). "[I]t will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* [preconditions] but still have failed to establish a violation of § 2 under the totality of the circumstances." *Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1342 (11th Cir. 2015) (quoting *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1135 (3d Cir. 1993)). This is not an unusual case.

The factors outlined in the Senate Judiciary Committee report accompanying the 1982 Voting Rights Act amendments—the "Senate Factors"—are "typically relevant to a § 2 claim" and guide this analysis. *LULAC*, 548 U.S. at 426; *see also Gingles*, 478 U.S. at 36–37 (listing Senate Factors). They are not exclusive, and "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *Gingles*, 478 U.S. at 45 (quoting S. Rep. No. 97-417, at 29 (1982)).

13

Here, each of the relevant Senate Factors confirms that the new legislative maps drawn by SB 1EX and HB 1EX deny Black voters equal electoral opportunities.

### 1.    Senate Factor One: Georgia has an ongoing history of official, voting-related discrimination.

"Georgia electoral history is marked by too many occasions where the State, through its elected officials, enacted discriminatory measures designed to minimize black voting strength." *Brooks v. State Bd. of Elections*, 848 F. Supp. 1548, 1572 (S.D. Ga. 1994); *see also, e.g.*, *Fair Fight Action, Inc. v. Raffensperger*, No. 1:18-CV-5391-SCJ, slip op. at 41 (N.D. Ga. Nov. 15, 2021), ECF No. 636 (taking judicial notice of fact that "prior to the 1990s, Georgia had a long sad history of racist policies in a number of areas including voting"). As the Eleventh Circuit has similarly acknowledged, "[t]he voting strength of blacks has historically been diminished in Georgia in numerous ways, including property ownership requirements, literacy tests, and the use of the county unit system which undermined the voting power of counties with large black populations." *Brooks v. Miller*, 158 F.3d 1230, 1233 (11th Cir. 1998). These discriminatory actions have evolved over the years, but they have persisted. As a result of the centuries-long effort to marginalize and disenfranchise Black Georgians, they still lack equal access to the state's political processes today.

As described in detail in the attached expert report of Dr. Orville Vernon Burton, Georgia's history features a sordid and recurring pattern: after periods of increased nonwhite voter registration and turnout, the State finds methods to disfranchise and reduce the influence of minority voters. Ex. 3 at 2, 8–9. This history goes back to the Reconstruction era: even after the Fifteenth Amendment ostensibly granted Black men in Georgia the right to vote, the state's registration laws, poll taxes, and white-only primary system ensured that they could not effectively cast ballots. *See id.* at 8–20. During the first half of the 20th century, the county-unit system also functionally prohibited Georgia's Black voters from exercising political power. *See id.* at 20–24. And even after federal courts invalidated many of these practices, Georgia and its local jurisdictions turned to more subtle electoral devices to prevent Black voters from electing their preferred candidates, including majority-vote requirements and at-large districts. *See id.* at 24–32.

While the passage of the Voting Rights Act changed Georgia's trajectory, it did not stop the State from attempting to prevent the exercise of Black political power. *See id.* at 32–40. Between 1965 and 1980, nearly *30 percent* of the Department of Justice's objections to voting-related changes under Section 5 were attributable to Georgia alone. *Id.* at 2–3, 36–37. When Congress reauthorized the

Voting Rights Act in 1982, it specifically cited systemic abuses by Georgia officials to obstruct Black voting rights. *See id.* at 39–40.

Georgia's discrimination has also extended to its redistricting efforts. Even after the county-unit system was invalidated, the state's districting maps have been plagued by vote dilution and racial discrimination. Federal courts have invalidated Georgia's redistricting plans for voting rights violations several times. *See Georgia v. United States*, 411 U.S. 526, 541 (1973) (affirming that Georgia's 1972 reapportionment plan violated Section 5 of Voting Rights Act in part because it diluted Black vote in Atlanta-based congressional district to ensure election of white candidate); *Busbee v. Smith*, 549 F. Supp. 494, 517 (D.D.C. 1982) (three-judge panel) (denying preclearance based on evidence that Georgia's redistricting plan was product of purposeful discrimination in violation of Voting Rights Act), *aff'd*, 459 U.S. 1166 (1983); *Larios v. Cox*, 300 F. Supp. 2d 1320 (N.D. Ga. 2004) (per curiam) (three-judge panel) (invalidating state legislative plans that reduced number of majority-minority districts). And for four decades in a row, the Department of Justice objected to reapportionment plans submitted by Georgia because the maps diluted Black voting strength. *See* Ex. 3 at 37–38, 40–41; *see also*, e.g., Ex. 23 (1992 objection letter from Department of Justice asserting that "the submitted [congressional] plan minimizes the electoral potential of large concentrations of

black population in several areas of the state"); Ex. 24 (1982 objection letter from Department of Justice asserting that "the proposed [congressional] plan divides an apparently cohesive black community of Fulton and DeKalb Counties").

Ultimately, as this Court has noted, "Georgia has a history chocked full of racial discrimination at all levels. This discrimination was ratified into state constitutions, enacted into state statutes, and promulgated in state policy. Racism and race discrimination were apparent and conspicuous realities, the norm rather than the exception." *Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 950 F. Supp. 2d 1294, 1314 (N.D. Ga. 2013) (quoting *Brooks*, 848 F. Supp. at 1560), *aff'd in part, rev'd in part on other grounds*, 775 F.3d 1336 (11th Cir. 2015). But racial discrimination in voting is not consigned to history books; efforts to dilute the political power of Black Georgians persist today.

During the past decade—and after the U.S. Supreme Court effectively barred enforcement of the Section 5 preclearance requirement in *Shelby County v. Holder*, 570 U.S. 529 (2013)—Georgia has slashed polling places by the hundreds, primarily in Black communities; increased voter purges and challenges against minority voters; and launched state-sponsored investigations of minority voting groups. See Ex. 3 at 40–50. In just the past year, the State enacted Senate Bill 202, a law that the Department of Justice could no longer halt under preclearance but that it has

17

nevertheless alleged was passed with the intent and effect of limiting Black Georgians' voting power. *See id.* at 50–53. Georgia's efforts to discriminate against Black voters simply has not stopped. This factor thus weighs heavily in favor of Plaintiffs' Section 2 claim.

### 2.     Senate Factor Two: Georgia voters are racially polarized.

Courts have repeatedly found that voting in Georgia is racially polarized. *See, e.g.*, *Fayette Cnty.*, 775 F.3d at 1340 (noting that Fayette County "[v]oters' candidate preferences in general elections were racially polarized"); *Ga. State Conf. of NAACP v. Georgia*, 312 F. Supp. 3d 1357, 1360 (N.D. Ga. 2018) (three-judge panel) (concluding that "voting in Georgia is highly racially polarized"); *Wright*, 301 F. Supp. 3d at 1319 (finding "Sumter County's voters to be highly polarized"). These findings were confirmed in the focus areas by Dr. Palmer's analysis discussed above, *see supra* Sections I.B–C, which concluded that there is "strong evidence of racially polarized voting across all five focus areas" and "within the districts comprising the five focus areas." *See* Ex. 2 ¶¶ 17–18.

### 3.     Senate Factor Three: Georgia's voting practices enhance the opportunity for discrimination.

As discussed above, Georgia has employed a variety of voting practices that have discriminated against Black voters. *See supra* Section I.D.1; Ex. 3 (describing Georgia's use of majority-vote requirements, at-large districts, numbered posts, and

other discriminatory tactics). In particular, even though the U.S. Supreme Court has specifically explained that the use of majority-vote requirements is meaningful evidence of ongoing efforts to discriminate against minority voters, *see Gingles*, 478 U.S. at 45, Georgia continues to impose a majority-vote requirement in general elections, including for elections to the General Assembly. *See* Ex. 3 at 31, 35; O.C.G.A. § 21-2-501. The combination of a majority-vote requirement and racially polarized voting ensures that Black voters cannot elect candidates of their choice when they are a minority of a jurisdiction's population, even when the white vote is split. *See* Ex. 3 at 31, 35; *see also City of Port Arthur v. United States*, 459 U.S. 159, 167 (1982) (describing how such circumstances "permanently foreclose a black candidate from being elected").[4]

### 4. Senate Factor Four: Georgia has no history of candidate slating for legislative elections.

Because Georgia's legislative elections do not use a slating process, this factor has no relevance to Plaintiffs' claim.

---

[4] In *City of Rome v. United States*, the U.S. Supreme Court explained the pernicious effect of a majority-vote requirement on a hypothetical Black candidate: "even if he gained a plurality of votes in the general election, [he] would still have to face the runner-up white candidate in a head-to-head runoff election in which, given bloc voting by race and a white majority, [he] would be at a severe disadvantage." 446 U.S. 156, 184 (alterations in original) (quoting *City of Rome v. United States*, 472 F. Supp. 221, 244 (D.D.C. 1979) (three-judge panel)).

**5.** **Senate Factor Five: Georgia's discrimination has produced severe socioeconomic disparities that impair Black Georgians' participation in the political process.**

Georgia's Black community continues to suffer as a result of the state's history of discrimination. The findings of previous courts, *see, e.g.*, *Wright*, 301 F. Supp. 3d at 1320–21, have been confirmed by Dr. Loren Collingwood.

Dr. Collingwood concluded that, "[o]n every metric, Black Georgians are disadvantaged socioeconomically relative to non-Hispanic White Georgians," disparities that "have an adverse effect on the ability of Black Georgians to participate in the political process, as measured by voter turnout and other forms of political participation." Ex. 4 at 3. While "the burden is not on the plaintiffs to prove" that these disparities are "causing reduced political participation," *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1569 (11th Cir. 1984), Dr. Collingwood has concluded that this is in fact the case, explaining that "[t]he data show a significant relationship between turnout and disparities in health, employment, and education; as health, education, and employment outcomes increase, so does voter turnout in a material way." Ex. 4 at 3.

The disparities and disadvantages experienced by Black Georgians impact nearly every aspect of daily life:

20

- "The unemployment rate among Black Georgians (8.7%) is nearly double that of White Georgians (4.4%)." *Id.* at 4.

- "White households are twice as likely as Black households to report an annual income above $100,000." *Id.*

- Black Georgians are more than twice as likely as white Georgians to live below the poverty line—and Black children more than *three times* as likely. *Id.*

- Black Georgians are nearly three times more likely than White Georgians to receive SNAP benefits. *Id.*

- Black adults are more likely than white adults to lack a high school diploma—13.3 percent as compared to 9.4 percent. *Id.*

- Thirty-five percent of white Georgians over the age of 25 have obtained a bachelor's degree or higher, compared to only 24 percent of Black Georgians over the age of 25. *Id.*

Ultimately, Dr. Collingwood concluded that "the numbers convey consistent racial disparities across economics, health, employment, and education"—disparities that "hold across nearly every county in the state." *Id.* at 4–5.

The evidence strongly suggests that the socioeconomic disparities imposed on Black Georgians impacts their levels of political participation. As Dr. Collingwood explained, "[t]here is vast literature in political science that demonstrates a strong

and consistent link between socio-economic status [] and voter turnout. In general, voters with higher income and education are disproportionately likely to vote and participate in American politics." *Id.* at 6. This pattern can certainly be seen in Georgia. Dr. Collingwood found that, in elections between 2010 and 2020, Black Georgians consistently turned out to vote at lower rates than white Georgians—a gap of at least 3.1 percent (during the 2012 general election) that reached its peak of 12.6 percent during the 2020 general election. *Id.* at 6–7. This trend can be seen at the local level as well: during each general election, white voters exceeded the turnout rates of Black voters in all but a handful of Georgia's 159 counties, and of 1,957 precincts analyzed, white voters had higher rates of turnout in 79.2 percent of precincts. *See id.* 7–12. Rates of voter turnout in the Atlanta metropolitan area and the Black Belt are "very similar to the overall Georgia trend." *Id.* at 12–16.

Comparing rates of Black voter turnout with educational attainment, Dr. Collingwood found that "each 10 percentage-point increase in the size of the Black population without a high school degree decreases Black turnout by 3.5 percentage points" and that "Black turnout rises 2.3 percentage points for each 10 percentage-point increase in percent Black 4-year degree." *Id.* at 16–17. The pattern holds between voter turnout and poverty: "Black turnout falls 4.9 percentage points for each 10 percentage-point increase in percent Black below the poverty line," *id.* at

18, confirming the link between socioeconomic disadvantage and depressed political participation.[5]

### 6. Senate Factor Six: Both overt and subtle racial appeals are prevalent in Georgia's political campaigns.

Federal courts have found evidence of racial appeals being deployed in Georgia political campaigns, *see, e.g.*, *Cofield v. City of LaGrange*, 969 F. Supp. 749, 777 (N.D. Ga. 1997), and evidence of such appeals abounds even today.

In 2016, Tom Worthan, then-Chair of the Douglas County Board of Commissioners, was caught on video making racist comments aimed at discrediting his Black opponent, Romona Jackson-Jones, and a Black candidate for sheriff, Tim Pounds. During the recorded conversation with a Douglas County voter, Worthan asked, "[D]o you know of another government that's more black that's successful? They bankrupt you." Ex. 25. Worthan also stated, in reference to Pounds, "I'd be afraid he'd put his black brothers in positions that maybe they're not qualified to be in." *Id.*

---

[5] This effect extends beyond voter turnout: Dr. Collingwood further found that white Georgians are more likely than Black Georgians to participate in a range of political activities, including attending local meetings, demonstrating political participation through lawn signs and bumper stickers, working on campaigns, attending protests and demonstrations, contacting public officials, and donating money to campaigns and political causes. Ex. 4 at 19–23.

In the 2017 special election for Georgia's Sixth Congressional District—a majority-white district that had over the previous three decades been represented by white Republicans Newt Gingrich, Johnny Isakson, and Tom Price—the husband of the eventual Republican victor, Karen Handel, shared an image over social media that urged voters to "[f]ree the black slaves from the Democratic plantation." Ex. 26. The image also stated, "Criticizing black kids for obeying the law, studying in school, and being ambitious as 'acting white' is a trick the Democrats play on Black people to keep them poor, ignorant and dependent." *Id.* The image was then shared widely by local and national media outlets. *See, e.g.*, *id.*

During that same election, Jere Wood—the Republican Mayor of Roswell, Georgia's eighth-largest city—insinuated that voters in the Sixth Congressional District would not vote for Democratic candidate Jon Ossoff because "[i]f you just say 'Ossoff,' some folks are gonna think, 'Is he Muslim? Is he Lebanese? Is he Indian?' It's an ethnic-sounding name, even though he may be a white guy, from Scotland or wherever." Ex. 27. On a separate occasion, State Senator Fran Millar alluded to the fact that the Sixth Congressional District was gerrymandered in such a way that it would not support candidate Ossoff—specifically, because he was formerly an aide to a Black member of Congress. State Senator Millar said, "I'll be very blunt. These lines were not drawn to get Hank Johnson's protégé to be my

representative. And you didn't hear that. They were not drawn for that purpose, OK? They were not drawn for that purpose." Ex. 28.

Earlier in 2017, Tommy Hunter, a member of the board of commissioners in Gwinnett County—the second-most populous county in the state—called the late Black Congressman John Lewis "a racist pig" and suggested that his reelection to the U.S. House of Representatives was "illegitimate" because he represented a majority-minority district. Ex. 29.

Racist robocalls targeted the Democratic candidate for governor in 2018, referring to former House Minority Leader Stacey Abrams as "Negress Stacey Abrams" and "a poor man's Aunt Jemima." Ex. 30. The Republican candidate, now-Governor Kemp, posted a statement on Twitter on the eve of the election alleging that the Black Panther Party supported Ms. Abrams's candidacy. Ex. 31. Governor Kemp also ran a controversial television advertisement during the primary campaign asserting that he owned "a big truck, just in case [he] need[s] to round up criminal illegals and take 'em home [him]self." Ex. 32.

The 2020 campaigns for Georgia's two U.S. Senate seats were also rife with racial appeals. In one race, Republican incumbent Kelly Loeffler ran a paid advertisement on Facebook that artificially darkened the skin of her Democratic opponent, now-Senator Raphael Warnock. Ex. 33. In the other race, Republican

incumbent David Perdue ran an advertisement against Democratic nominee Ossoff that employed a classic anti-Semitic trope by artificially enlarging now-Senator Ossoff's nose. Ex. 34. Senator Perdue later mispronounced and mocked the pronunciation of then-Senator Kamala Harris's first name during a campaign rally, even though the two had been colleagues in the Senate since 2017. Ex. 35.

Racial appeals were apparent during local elections in Fulton County even within the last few months. City council candidates in Johns Creek and Sandy Springs pointed to Atlanta crime and protests that turned violent to try to sway voters, publicly urging residents to vote for them or risk seeing their cities become home to chaos and lawlessness. Ex. 36. *The Atlanta Journal-Constitution* quoted Emory University political scientist Dr. Andra Gillespie, who explained that although the term "law and order" is racially neutral, the issue becomes infused with present-day cultural meaning and thoughts about crime and violence and thus carries racial undertones. *Id.*

These are just a few—and, indeed, only among the more recent—examples of the types of racially charged political campaigns that have tainted elections in Georgia throughout the state's history.

> 7.   **Senate Factor Seven: Black candidates in Georgia are underrepresented in office and rarely succeed outside of majority-minority districts.**

As a consequence of Georgia's history of voter suppression and racial discrimination, Black Georgians have struggled to win election to public office.

At the time of the Voting Rights Act's passage, Black Georgians constituted 34 percent of the voting-age population, and yet the state had only *three* elected Black officials. Ex. 3 at 32. By 1980, Black Georgians comprised only 3 percent of county officials in the state, the vast majority of whom were elected from majority-Black districts or counties. *Id.* at 38–39.

That particular trend has not changed: while more Black Georgians have been elected in recent years, those officials are almost always from near-majority- or outright-majority-Black districts. In the most recent General Assembly elections, for example, none of the House's Black members was elected from a district where white voters exceeded 55 percent of the voting-age population, and none of the State Senate's Black members was elected from a district where white voters exceeded 47 percent of the voting-age population. *See id.* at 53–54. Overall, although Black Georgians comprise 33 percent of the state's population, the Georgia Legislative Black Caucus has only 14 members in the State Senate—25 percent of that chamber—and 41 members in the House—less than 23 percent of that chamber. *See*

Ex. 37. In early 2021, one news outlet reported that Georgia had a total of only 66 Black legislators—less than 28 percent of the General Assembly. *See* Ex. 38; *see also* Ex. 39.

Black officials have been underrepresented across Georgia's statewide offices as well. Including the incumbent, the state has had 77 governors, none of whom has been Black. *See* Exs. 40–41. Most recently, former House Minority Leader Abrams lost to Governor Kemp in the 2018 gubernatorial election. And although Georgia recently elected a Black U.S. senator, Senator Warnock is the *first* Black Georgian to hold that office—after more than 230 years of white senators. *See* Ex. 42.

In many areas of Georgia—including the focus areas at issue in this case—racially polarized voting continues to obstruct Black candidates' election to office. Of the 31 contests analyzed by Dr. Palmer, 13 included a Black candidate who ran against a white candidate. *See* Ex. 2 ¶ 24. These Black candidates were "defeated in almost every election in the non-Black-majority districts." *Id.*

### 8. Senate Factor Eight: Georgia is not responsive to its Black residents.

Although the Eleventh Circuit has noted that "[u]nresponsiveness is considerably less important under" a Section 2 results claim, *see Marengo Cnty. Comm'n*, 731 F.2d at 1572, it is nonetheless true that Georgia has long neglected the needs of its Black residents. On numerous issues, the State has refused to take actions

that would have demonstrably bettered the lives—and thus increased the political power—of its Black community. To give some examples of these ongoing disparities, Black Georgians are more than twice as likely as white Georgians to be denied unemployment benefits. *See* Ex. 43. The pregnancy-related mortality rate for Black women in Georgia is more than three times the rate for white women. *See* Ex. 44. And despite this and the other disparities in health care and outcomes between Black and white Georgians, *see supra* Section I.D.5, Georgia's decision to forego Medicaid expansion has left hundreds of thousands of Georgians without health insurance because they earn too much to qualify for Medicaid but too little to qualify for health insurance subsidies—an estimated 60 percent of whom are Black or Hispanic. *See* Ex. 45. On these issues, as with those discussed above, the State has refused to take responsive steps to meet the needs of—and remedy the ills borne by—Georgia's Black community.

> ### 9. Senate Factor Nine: The justifications for the new legislative maps are tenuous.

Finally, no legitimate governmental interest justifies denying Black Georgians the ability to elect candidates of their choice. Both SB 1EX and HB 1EX were met with resounding opposition from Black voters and legislators across the state, resulting in this suit and others. *See, e.g.*, Exs. 18–19; *see also, e.g.*, Complaint, *Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, No. 1:21-CV-05337-SCJ (N.D.

Ga. Dec. 30, 2021), ECF No. 1. The map-drawers and advocates of SB 1EX and HB 1EX did not and cannot justify the refusal to draw additional majority-Black legislative districts in the Atlanta metropolitan area and the Black Belt. Nor could they: drawing districts to account for the numerosity and compactness of Georgia's Black community, including in this case's focus areas, is required by the Voting Rights Act.

## II.   Plaintiffs and other Black Georgians will suffer irreparable harm absent a preliminary injunction.

Plaintiffs are likely to suffer irreparable harm absent preliminary injunctive relief. The candidate qualification period for the 2022 congressional elections is scheduled to begin on March 7, 2022, with the primary election following on May 24. *See* O.C.G.A. § 21-2-132(d)(2); Ex. 46. If this deadline and the elections that follow occur under unlawful legislative maps, then Black Georgians' voting rights will be unlawfully diluted—a violation of their fundamental rights for which there is no adequate remedy. "[O]nce the election occurs, there can be no do-over and no redress" for voters whose rights were violated. *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014). Accordingly, "[c]ourts routinely deem restrictions on fundamental voting rights irreparable injury." *Id.* (citing *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012); *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986)).

### III.   The balance of equities and the public interest favor injunctive relief.

The balance of the equities and the public interest, which "merge when the Government is the opposing party," *Nken v. Holder*, 556 U.S. 418, 435 (2009), also strongly favor injunctive relief. As the Eleventh Circuit and this Court have recognized, the "cautious protection of . . . franchise-related rights is without question in the public interest." *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1355 (11th Cir. 2005); *see also Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 118 F. Supp. 3d 1338, 1348–49 (N.D. Ga. 2015) ("[T]he public interest is best served by ensuring not simply that more voters have a chance to vote but ensuring that all citizens . . . have an equal opportunity to elect the representatives of their choice."). And the public interest would most certainly be disserved by an election conducted under an unlawful districting scheme. *See Larios v. Cox*, 305 F. Supp. 2d 1335, 1344 (N.D. Ga. 2004) (per curiam) (three-judge panel).

## CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court preliminarily enjoin implementation of SB 1EX and HB 1EX and ensure the creation of two additional majority-Black State Senate districts in the southern Atlanta metropolitan area, one additional majority-Black State Senate district in the central Georgia Black Belt region, two additional majority-Black House districts in the southern Atlanta

31

metropolitan area, one additional majority-Black House district in the western Atlanta metropolitan area, and two additional majority-Black House districts in the Black Belt, anchored in Bibb County. Plaintiffs further request that the Court expedite its consideration of this motion, including the scheduling of any hearings, to ensure that necessary remedies are timely adopted and lawful legislative maps are in place before the deadlines for this year's midterm elections.

Dated: January 13, 2022

By: **Adam M. Sparks**
Joyce Gist Lewis
Georgia Bar No. 296261
Adam M. Sparks
Georgia Bar No. 341578
**KREVOLIN & HORST, LLC**
One Atlantic Center
1201 West Peachtree Street, NW,
Suite 3250
Atlanta, Georgia 30309
Telephone: (404) 888-9700
Facsimile: (404) 888-9577
Email: JLewis@khlawfirm.com
Email: Sparks@khlawfirm.com

Kevin J. Hamilton*
**PERKINS COIE LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101
Phone: (206) 359-8000
Facsimile: (206) 359-9000
Email: KHamilton@perkinscoie.com

Respectfully submitted,

Abha Khanna*
Jonathan P. Hawley*
**ELIAS LAW GROUP LLP**
1700 Seventh Avenue, Suite 2100
Seattle, Washington 98101
Phone: (206) 656-0177
Facsimile: (206) 656-0180
Email: AKhanna@elias.law
Email: JHawley@elias.law

Daniel C. Osher*
Christina A. Ford*
Graham W. White*
Michael B. Jones
Georgia Bar No. 721264
**ELIAS LAW GROUP LLP**
10 G Street NE, Suite 600
Washington, D.C. 20002
Phone: (202) 968-4490
Facsimile: (202) 968-4498
Email: DOsher@elias.law
Email: CFord@elias.law
Email: GWhite@elias.law
Email: MJones@elias.law

*Counsel for Plaintiffs*

**Pro hac vice* application pending

33

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION has been prepared in accordance with the font type and margin requirements of LR 5.1, NDGa, using font type of Times New Roman and a point size of 14.

Dated: January 13, 2022

**Adam M. Sparks**
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that I have on this date caused to be electronically filed a copy of the foregoing PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to counsel of record, and by electronic mail to Bryan P. Tyson, Esq. at btyson@taylorenglish.com, who has informed the undersigned that he will represent all Defendants in the above-styled action.

Dated: January 13, 2022

**Adam M. Sparks**
*Counsel for Plaintiffs*