IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| COAKLEY PENDERGRASS et al.,<br><br>　　Plaintiffs,<br><br>　　v.<br><br>BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State, et al.,<br><br>　　Defendants. | CIVIL ACTION FILE<br>NO. 1:21-CV-05339-SCJ |
| ANNIE LOIS GRANT et al.,<br><br>　　Plaintiffs,<br><br>　　v.<br><br>BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State, et al.,<br><br>　　Defendants. | CIVIL ACTION FILE<br>NO. 1:22-CV-00122-SCJ |

**PLAINTIFFS' RESPONSE TO COORDINATED ORDER**

In response to the Court's coordinated order of February 7, 2022, asking the parties "to discuss whether this Court should continue to hold the current hearing regarding Plaintiffs' motions for preliminary injunction" in light of the U.S. Supreme Court's stay order in *Merrill v. Milligan*, Nos. 21A375, 21A376 (U.S. Feb.

7, 2022), the plaintiffs in the above-captioned cases (collectively, "Plaintiffs") submit this additional argument and supporting evidence.

At the outset, Plaintiffs emphasize that the *Milligan* order has no binding effect on this or any other court. "Orders granting stays are not precedential decisions. Like most other judicial orders of one or two sentences, they do not extend beyond the case in which they are entered." *Schwab v. Sec'y, Dep't of Corr.*, 507 F.3d 1297, 1301 (11th Cir. 2007) (per curiam). And certainly a *concurrence* to a stay order cannot be considered binding or authoritative in any sense—nor should it invite speculation as to what the Supreme Court *might* eventually decide in a completely different matter. As the Court itself has made clear:

> [W]e do not hold[] that other courts should conclude our more recent cases have, by implication, overruled an earlier precedent. We reaffirm that "[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."

*Agostini v. Felton*, 521 U.S. 203, 237 (1997) (third alteration in original) (quoting *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989)). Even Justice Kavanaugh's *Milligan* concurrence observed that "[t]he stay order does not make or signal any change to voting rights law." Slip op. at 2 (Kavanaugh, J., concurring). In other words, the Supreme Court has admonished district and appellate courts to refrain from reading between the lines of opinions in search of

phantom holdings—an instruction echoed by Justice Kavanaugh in his *Milligan* concurrence. Indeed, the need for caution is all the more urgent when considering a nonbinding stay order issued on mandatory review in another case.

Moreover, Justice Kavanaugh's concurrence demonstrated that his analysis of the equities in the Alabama redistricting case is mere reverie and not meant to carry the weight of authority. He first observed—correctly—that the Court's dictate in *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam), is *not* "absolute" and is instead simply "a sensible refinement of ordinary stay principles for the election context." *Id.* at 5 (Kavanaugh, J., concurring). He then noted that "[a]lthough the Court has not yet had occasion to fully spell out all of its contours, *I would think* that the *Purcell* principle thus *might* be overcome even with respect to an injunction issued close to an election if a plaintiff establishes" four elements. *Id.* at 5 (Kavanaugh, J., concurring) (emphasis added). The concurrence thus provides two justices' meditations as to how the *Purcell* principle might be applied in some cases—nothing more.[1]

---

[1] It is worth noting that *Purcell* itself contained expressed and implied limitations on its general application. The *Purcell* Court explicitly described the risk that "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls." 549 U.S. at 4–5. The Court did *not* base its decision on general concerns about election machinery or administrative inconvenience. And while the Court noted that "[a]s an

Even if the *Agostini* principle and Justice Kavanaugh's own disclaiming language could permit a court to read the concurrence as establishing a new legal standard for issuing injunctive relief in election cases—and to be sure, it cannot be read as such—the evidence that is already in the record and will soon be adduced by the parties demonstrates why injunctive relief *is* appropriate in *Pendergrass* and *Grant*. Justice Kavanaugh outlined four equitable considerations that might guide a court's application of *Purcell*:

> (i) the underlying merits are entirely clearcut in favor of the plaintiff;
> (ii) the plaintiff would suffer irreparable harm absent the injunction;
> (iii) the plaintiff has not unduly delayed bringing the complaint to court; and (iv) the changes in question are at least feasible before the election without significant cost, confusion, or hardship.

*Milligan*, slip op. at 5 (Kavanaugh, J., concurring). Each of these elements supports injunctive relief in these cases.

**The underlying merits are entirely clear cut in favor of Plaintiffs.** Because "[t]he stay order does not make or signal any change to voting rights law," *id.* at 2 (Kavanaugh, J., concurring), the legal standards applicable to Plaintiffs' Section 2

---

election draws closer, that risk will increase," *id.* at 5, the *Purcell* opinion was issued on October 20, 2006—less than *three weeks* before that year's midterm elections. Although subsequent Court activity broadened application of the *Purcell* principle beyond these limitations, no case—and certainly none of the cases cited by Justice Kavanaugh, *see Milligan*, slip op. at 4 (Kavanaugh, J., concurring)—involved a challenge to an unlawful districting plan considered *nine months* before a general election, or even three months before a primary election.

4

claims are the same as when they filed their motions for preliminary injunction: *Thornburg v. Gingles*, 478 U.S. 30 (1986), and its progeny. As Plaintiffs have maintained, the Georgia General Assembly's new congressional and legislative districting plans constitute textbook Voting Rights Act violations. The *Gingles* preconditions are readily satisfied and the Senate Factors that guide the totality of circumstances analysis uniformly support findings of unlawful vote dilution. This hearing should continue until a complete factual record is developed reflecting Plaintiffs' overwhelming evidence.

**Plaintiffs would suffer irreparable harm absent the injunction.** "Courts routinely deem restrictions on fundamental voting rights irreparable injury." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014). There can be no dispute that dilution of the voting power of Black Georgians constitutes an injury for which "there can be no do-over and no redress." *Id.*

**Plaintiffs did not unduly delay in bringing their complaints to court.** The *Pendergrass* plaintiffs filed their complaint mere hours after Governor Brian Kemp signed the new plans into law, and the *Grant* plaintiffs followed less than two weeks later.

**Implementation of remedial maps is feasible before the election.** Despite Defendants' exaggerated concerns about administrative inconvenience and the

impossibility of new maps, no evidence in the record supports their repeated contention that it is too late to implement maps to remedy ongoing violations of federal law. Indeed, Defendants' witnesses have confirmed that such remediation has been required in past Georgia redistricting cycles and has been implemented without disrupting election calendars. Plaintiffs will present the testimony of election administrators who will confirm that it is possible to conduct the work needed for the 2022 midterm elections if new congressional and legislative maps are introduced in the coming weeks—even without changes to accompanying deadlines and the May 24 primary.

Plaintiffs nevertheless emphasize that the Court retains the power to move the candidate qualification period or even the primary election itself as necessary to afford relief. *See, e.g.*, *Sixty-Seventh Minn. State Senate v. Beens*, 406 U.S. 187, 201 n.11 (1972) ("[T]he District Court has the power appropriately to extend [election-related] time limitations imposed by state law."); *United States v. New York*, No. 1:10-cv-1214 (GLS/RFT), 2012 WL 254263, at *2 (N.D.N.Y. Jan. 27, 2012) (moving primary date to ensure UOCAVA compliance); *Quilter v. Voinovich*, 794 F. Supp. 760, 762 (N.D. Ohio 1992) (three-judge court) (noting that court ordered rescheduling of primary election to permit drawing of remedial legislative plans); *Busbee v. Smith*, 549 F. Supp. 494, 519 (D.D.C. 1982) (adopting special election

calendar).² This Court's exercise of its inherent power to adjust the election calendar would allow the State to "easily . . . make the change" to Georgia's congressional and legislative maps "without undue collateral effects." *Milligan*, slip op. at 4 n.1 (Kavanaugh, J., concurring). The feasibility of a revised calendar is underscored by the fact that, until 2014, Georgia's primary election fell in July of election years—and, in years following the release of census data, even later. *See* H.B. 310, 152d Gen. Assemb., 2d Sess. (Ga. 2014).

Moreover, mapping expert Blakeman B. Esselstyn attested that, among other things, limiting the extent to which a remedial plan affects existing districts and counties and splits precincts helps ensure expeditious implementation. Here, the *Pendergrass* plaintiffs' illustrative congressional map drawn by William S. Cooper alters only eight of Georgia's 14 districts and splits only five more precincts than the enacted plan—only 49 voting tabulation districts ("VTDs") out of the state's 2,698,

---

² *Larios v. Cox*, 305 F. Supp. 2d 1335 (N.D. Ga. 2004) (per curiam) (three-judge order), is particularly instructive. There, the three-judge court observed that it "has broad equitable power to delay certain aspects of the electoral process if necessary" to ensure the implementation of remedial legislative plans in a malapportionment case. *Id.* at 1342. It then explained that "there is no reason why the court could not extend [the candidate qualification] period if this proves to be necessary to ensure constitutional elections," noting in particular that, at that time, "the Georgia General Assembly contemplated precisely that scenario for elections immediately following the redistricting process, establishing a qualifying period for the election year subsequent to redistricting that is substantially later than any dates" that the court contemplated. *Id.* at 1343.

and in just 12 of the state's 159 counties. *See* Decl. of William S. Cooper ¶ 11, Ex. M-1, *Pendergrass*, ECF No. 34-1.[3] The *Grant* plaintiffs' illustrative plans similarly limit the number of split VTDs: in Mr. Esselstyn's illustrative State Senate map, 49 VTDs are split in only 18 counties, while his illustrative House plan includes 192 split VTDs in just 45 counties. *See* Second Suppl. Expert Report of Blakeman B. Esselstyn ¶¶ 3–4 & Figs. 1–2.[4] Mr. Esselstyn's illustrative plans also minimize the number of altered districts: his illustrative State Senate map leaves unchanged 34 of 56 districts, while his House plan contains 154 unaltered districts out of 180 total. *See id.* ¶ 5 & Figs. 3–4.

\*   \*   \*

As Justice Kavanaugh himself recognized, *Purcell* was never intended to entirely foreclose federal courts from remedying clear violations of the law in election years. And nothing in the *Milligan* stay order—and certainly nothing in Justice Kavanaugh's concurrence—diminishes Plaintiffs' likelihood of success on the merits of their Section 2 claims or the equitable factors that uniformly weigh in favor of preliminary injunctive relief.

---

[3] Plaintiffs note a typographical error in Mr. Cooper's expert report. Although Figure 11 reports that his illustrative plan contains 47 VTD splits, Exhibit M-1 clarifies that the correct number is 49.

[4] Mr. Esselstyn's second supplemental expert report is attached as Exhibit 1 to the Declaration of Jonathan P. Hawley, filed concurrently with this Response.

Dated: February 9, 2022

By: **Adam M. Sparks**
Joyce Gist Lewis
Georgia Bar No. 296261
Adam M. Sparks
Georgia Bar No. 341578
**KREVOLIN & HORST, LLC**
One Atlantic Center
1201 West Peachtree Street, NW,
Suite 3250
Atlanta, Georgia 30309
Telephone: (404) 888-9700
Facsimile: (404) 888-9577
Email: JLewis@khlawfirm.com
Email: Sparks@khlawfirm.com

Kevin J. Hamilton*
**PERKINS COIE LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101
Phone: (206) 359-8000
Facsimile: (206) 359-9000
Email: KHamilton@perkinscoie.com

Respectfully submitted,

Abha Khanna*
Jonathan P. Hawley*
**ELIAS LAW GROUP LLP**
1700 Seventh Avenue, Suite 2100
Seattle, Washington 98101
Phone: (206) 656-0177
Facsimile: (206) 656-0180
Email: AKhanna@elias.law
Email: JHawley@elias.law

Daniel C. Osher*
Christina A. Ford*
Graham W. White*
Michael B. Jones
Georgia Bar No. 721264
**ELIAS LAW GROUP LLP**
10 G Street NE, Suite 600
Washington, D.C. 20002
Phone: (202) 968-4490
Facsimile: (202) 968-4498
Email: DOsher@elias.law
Email: CFord@elias.law
Email: GWhite@elias.law
Email: MJones@elias.law

*Counsel for Plaintiffs*

*Admitted pro hac vice*

9

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing Plaintiffs' Response to Coordinated Order has been prepared in accordance with the font type and margin requirements of LR 5.1, NDGa, using font type of Times New Roman and a point size of 14.

Dated: February 9, 2022　　　　　　　　**Adam M. Sparks**
　　　　　　　　　　　　　　　　　　　*Counsel for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that I have on this date caused to be electronically filed a copy of the foregoing PLAINTIFFS' RESPONSE TO COORDINATED ORDER with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to counsel of record.

Dated: February 9, 2022　　　　　　　　**Adam M. Sparks**
　　　　　　　　　　　　　　　　　　　*Counsel for Plaintiffs*