**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| ALPHA PHI ALPHA FRATERNITY INC., et al.,<br>    Plaintiffs,<br><br>v.<br><br>BRAD RAFFENSPERGER,<br>    Defendant. | CIVIL ACTION<br><br>FILE NO. 1:21-CV-05337-SCJ |
| COAKLEY PENDERGRASS, et al.,<br>    Plaintiffs,<br><br>v.<br><br>BRAD RAFFENSPERGER, et al.,<br>    Defendants. | CIVIL ACTION<br><br>FILE NO. 1:21-CV-05339-SCJ |
| ANNIE LOIS GRANT, et al.,<br>    Plaintiffs,<br><br>v.<br><br>BRAD RAFFENSPERGER, et al.,<br>    Defendants. | CIVIL ACTION<br><br>FILE NO. 1:22-CV-00122-SCJ |

## DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

### INTRODUCTION

Because Section 2 cases involve mixed questions of fact and law, Ga. State

Conference of the NAACP v. Fayette Cty. Bd. of Comm'rs, 775 F.3d 1336, 1343

(11th Cir. 2015); <u>Ala. State Conference of the NAACP v. Alabama</u>, No. 2:16-CV-731-WKW [WO], 2020 U.S. Dist. LEXIS 18938, at *21 (M.D. Ala. Feb. 5, 2020), there will be some overlap between the findings of fact and conclusions of law to avoid needless repetition. Each proposed finding is set out with particularity.

Further, because each of these cases was coordinated for purposes of the preliminary injunction hearing and share many facts in common, Defendants submit this single set of proposed findings of fact and conclusions of law and will file the same document in all three cases, recognizing that not every fact applies to each case, but the overlap is significant enough that it should assist the Court to have a single document instead of three overlapping documents.

These proposed findings and conclusions are being provided only for the purpose of resolving the preliminary injunction motions and Defendants are not bound by these proposed findings for other purposes as these cases proceed.

For reference, the following citations are used for support for each of the findings below:

| Citation | Document Type |
|---|---|
| APA Doc. No. [ ] | Docket entry from <u>Alpha Phi Alpha</u> |
| Grant Doc. No. [ ] | Docket entry from <u>Grant</u> |
| Pendergrass Doc. [ ] | Docket entry from <u>Pendergrass</u> |

| Citation | Document Type |
|---|---|
| Tr. Vol. ___ | Transcript of the preliminary injunction hearing held February 7–14, 2022 in all three cases and filed at APA Doc. Nos. [106–117]; Grant Doc. Nos. [68–79]; Pendergrass Doc. Nos. [73–75, 77–85]. |
| DX | Defendants' Exhibits |
| APAX | Alpha Phi Alpha Plaintiffs' Exhibits |
| GPX | Grant/Pendergrass Plaintiffs' Exhibits |
| APA Stip. | Alpha Phi Alpha joint stipulated facts filed at APA Doc. No. [94] |
| Grant Stip. | Grant joint stipulated facts filed at Grant Doc. No. [56] |
| Pendergrass Stip. | Pendergrass joint stipulated facts filed at Pendergrass Doc. No. [63] |

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

## I.     PROCEDURAL HISTORY

1.     Between December 30, 2021 and January 11, 2022, the three above-captioned cases were filed against Georgia state officials, alleging violations of Section 2 of the Voting Rights Act in the statewide redistricting plans adopted in 2021.

2.     The Alpha Phi Alpha v. Raffensperger case, No. 1:21-cv-05337-SCJ (Alpha) challenges the state Senate and state House districts adopted by the General Assembly in 2021 and signed by the Governor.

3.      Alleged harms of vote dilution are "district specific." <u>Gill v. Whitford</u>, 138 S. Ct. 1916, 1930 (2018). Specifically, the <u>Alpha</u> Plaintiffs challenge Senate Districts 16, 17, and 23 on the 2021 adopted state Senate plan and House Districts 74, 114, 117, 118, 124, 133, 137, 140, 141, 149, 150, 153, 154, and 155 on the 2021 adopted state House plan as violations of Section 2 of the Voting Rights Act. APA Doc. No. [1] ¶¶ 64–66, 70–74.

4.      The <u>Grant v. Raffensperger</u> case, No. 1:22-cv-00122-SCJ (<u>Grant</u>) likewise challenges the state Senate and state House districts adopted by the General Assembly in 2021 and signed by the Governor.

5.      Alleged harms of vote dilution are "district specific." <u>Gill</u>, 138 S. Ct. at 1930. Specifically, the <u>Grant</u> Plaintiffs challenge Senate Districts 10, 16, 17, 23, 24, 25, 28, 30, 34, 35 on the 2021 adopted state Senate plan and House Districts 61, 64, 69, 74, 75, 78, 117, 133, 142, 143, 144, 145, 147, and 149 on the 2021 adopted state House plan as violations of Section 2 of the Voting Rights Act. Grant Doc. No. [1] ¶¶ 41–44.

6.      The <u>Pendergrass v. Raffensperger</u> case, No. 1:21-cv-05339-SCJ (<u>Pendergrass</u>) challenges the 2021 adopted congressional plan adopted by the General Assembly in 2021 and signed by the Governor.

7.      Alleged harms of vote dilution are "district specific." Gill, 138 S. Ct.
at 1930. Specifically, the Pendergrass Plaintiffs challenge congressional Districts 3,
6, 11, 13, and 14 on the 2021 adopted congressional plan as violations of Section 2
of the Voting Rights Act. Pendergrass Doc. No. [1] ¶ 35.

8.      Due to the serious time exigencies surrounding the fair and timely
resolution of these cases, including the provisions of Georgia's election law that
set various deadlines applicable to the upcoming 2022 elections to be conducted
using the electoral maps that are the subject of these actions, the Court moved
expeditiously to hold a Rule 16 Status Conference on January 12, 2022. APA Doc.
No. [8]; Pendergrass Doc. No. [15].

9.      Following the Status Conference, the Court set the following schedule
for briefing on motions to dismiss in all three matters: Motions to Dismiss were
due by 5:00 PM EST on January 14, 2022; Responses were due by 5:00 PM on
January 18, 2022; Replies were due by 5:00 PM on January 20, 2022. APA Doc. No.
[37]; Grant Doc. No. [14]; Pendergrass Doc. No. [33].

10.     The Court also set an expedited schedule for briefing on any motions
for preliminary injunction in all three matters: Motions for preliminary injunction
were due by 5:00 PM EST on January 13, 2022; Responses were due by 5:00 PM

EST on January 18, 2022; Replies were due by 5:00 PM EST on January 20, 2022. APA Doc. No. [36]; Grant Doc. No. [15]; Pendergrass Doc. No. [35].

11.     The Court then scheduled a six-day preliminary injunction hearing with deadlines for exchange of witnesses and exhibits, objections to witnesses and exhibits, and stipulated facts to streamline the hearing process. APA Doc. No. [55]; Grant Doc. No. [44]; Pendergrass Doc. No. [41].

12.     The coordinated hearing on the preliminary injunctions in all three cases was held from February 7 through February 14, 2022. APA Doc. Nos. [106–117]; Grant Doc. Nos. [68–79]; Pendergrass Doc. Nos. [73–75, 77–85].

## II.     PARTIES TO THE CASES

### a. Defendants

13.     Brad Raffensperger is the Georgia Secretary of State and is named as a defendant in his official capacity in all three cases. He is the chief election official in the State of Georgia. APA Stip. ¶ 36; Grant Stip. ¶ 25; Pendergrass Stip. ¶ 19.

14.     Sara Tindall Ghazal is a member of the State Election Board and is named as a defendant in her official capacity in Grant and Pendergrass. Grant Stip. ¶ 26; Pendergrass Stip. ¶ 20.

15.     Janice Johnston is a member of the State Election Board and is named as a defendant in her official capacity in <u>Grant</u> and <u>Pendergrass</u>. Grant Stip. ¶ 27; Pendergrass Stip. ¶ 21.

16.     Edward Lindsey is a member of the State Election Board and is named as a defendant in his official capacity in <u>Grant</u> and <u>Pendergrass</u>. Grant Stip. ¶ 28; Pendergrass Stip. ¶ 22.

17.     Matthew Mashburn is a member of the State Election Board and is named as a defendant in his official capacity in <u>Grant</u> and <u>Pendergrass</u>. Grant Stip. ¶ 29; Pendergrass Stip. ¶ 23.

### b. <u>Alpha</u> Plaintiffs

18.     Alpha Phi Alpha Fraternity, Inc. has thousands of members in Georgia, including Black Georgians who are registered voters who live in Senate Districts 16, 17, and 23 under the 2021 Senate Plan, as well as in House Districts 74, 114, 117, 128, 133, 134, 171, and 173 under the 2021 House Plan. APA Stip. ¶¶ 1–2.

19.     Harry Mays is a member of Alpha Phi Alpha Fraternity, Inc., lives in House District 117 on the 2021 House Plan and would reside in a new majority-Black House District under <u>Alpha</u> Plaintiffs' illustrative maps. APA Stip. ¶¶ 4–6.

20.     Sixth District of the African Methodist Episcopal Church ("Sixth District AME") is a nonprofit religious organization with more than 500 member

churches and thousands of members across Georgia. APA Stip. ¶¶ 7–10; Tr. Vol. III 137:18–138:5.

21.     Churches in the Sixth District AME are located in located in Senate Districts 16, 17, and 23 under the 2021 Senate Plan as well as in House Districts 74, 114, 117, 128, 133, 134, 171, and 173 under the 2021 House Plan. Those members include Phil S. Brown and Janice Stewart. APA Stip. ¶¶ 11, 13–14.

22.     Eric T. Woods is a Black registered voter from Tyrone, Georgia who lives in State Senate District 16 under the 2021 State Senate plan and would reside in a new majority-Black district under Alpha Plaintiffs' illustrative plans. APA Stip. ¶¶ 15–19.

23.     Katie Bailey Glenn is a Black registered voter from McDonough, Georgia who lives in State Senate District 17 under the 2021 State Senate plan and State House District 117 under the 2021 State House plan. She would reside in a new majority-Black House district under Alpha Plaintiffs' illustrative plans. APA Stip. ¶¶ 20–25.

24.     Phil S. Brown is a Black registered voter from Wrens, Georgia who lives in State Senate District 23 under the 2021 State Senate plan and would reside in a new majority-Black State Senate district under Alpha Plaintiffs' illustrative plans. APA Stip. ¶¶ 26–30.

25.     Janice Stewart is a Black registered voter from Thomasville, Georgia who lives in State House District 173 under the 2021 State House plan and would reside in a new majority-Black House district under <u>Alpha</u> Plaintiffs' illustrative plans. APA Stip. ¶¶ 31–35.

### c. <u>Grant</u> Plaintiffs

26.     Annie Louis Grant is a Black registered voter from Union Point, Georgia who lives in State Senate District 24 and House District 124 on the 2021 enacted plans. Grant Stip. ¶¶ 1–3.

27.     Quentin T. Howell is a Black registered voter from Milledgeville, Georgia who lives in State Senate District 25 and House District 133 on the 2021 enacted plans. Grant Stip. ¶¶ 4–6.

28.     Elroy Tolbert is a Black registered voter from Macon, Georgia who lives in State Senate District 18 and House District 144 on the 2021 enacted plans. Grant Stip. ¶¶ 7–9.

29.     Theron Brown is a Black registered voter from Warner Robins, Georgia who lives in State Senate District 26 and House District 145 on the 2021 enacted plans. Grant Stip. ¶¶ 10–12.

30.     Triana Arnold James is a Black registered voter from Villa Rica, Georgia who lives in State Senate District 30 and House District 64 on the 2021 enacted plans. Grant Stip. ¶¶ 13–15.

31.     Eunice Sykes is a Black registered voter from Locust Grove, Georgia who lives in State Senate District 25 and House District 117 on the 2021 enacted plans. Grant Stip. ¶¶ 16–18.

32.     Elbert Solomon is a Black registered voter from Griffin, Georgia who lives in State Senate District 16 and House District 117 on the 2021 enacted plans. Grant Stip. ¶¶ 19–21.

33.     Dexter Wimbish is a Black registered voter from Griffin, Georgia who lives in State Senate District 16 and House District 74 on the 2021 enacted plans. Grant Stip. ¶¶ 22–24.

### d. **Pendergrass** Plaintiffs

34.     Coakley Pendergrass is a Black registered voter from Cobb County, Georgia who lives in Congressional District 11 on the 2021 enacted plan. Pendergrass Stip. ¶¶ 1–3.

35.     Triana Arnold James is a Black registered voter from Douglas County, Georgia who lives in Congressional District 3 on the 2021 enacted plan. Pendergrass Stip. ¶¶ 4–6.

36.     Elliott Hennington is a Black registered voter from Cobb County, Georgia who lives in Congressional District 14 on the 2021 enacted plan. Pendergrass Stip. ¶¶ 7–9.

37.     Robert Richards is a Black registered voter from Cobb County, Georgia who lives in Congressional District 14 on the 2021 enacted plan. Pendergrass Stip. ¶¶ 10–12.

38.     Jens Rueckert is a Black registered voter from Cobb County, Georgia who lives in Congressional District 14 on the 2021 enacted plan. Pendergrass Stip. ¶¶ 13–15.

39.     Ojuan Glaze is a Black registered voter from Cobb County, Georgia who lives in Congressional District 13 on the 2021 enacted plan. Pendergrass Stip. ¶¶ 16–18.

## III.  EXPERTS

### a.  Defendants' Experts

40.     John Morgan is a professional demographer and redistricting expert with decades of experience drawing redistricting plans. DX 1, 2, 3. Defendants retained Mr. Morgan to provide analysis of the demographic characteristics of the illustrative plans submitted in these cases. DX 1, 2, 3.

41.     John Alford is a professor of political science at Rice University and holds a Ph.D. in Political Science from the University of Iowa. DX 42. Defendants retained Dr. Alford to respond to the reports of Drs. Handley and Palmer and provide expert opinions about the nature of the polarized voting in Georgia. DX 42.

42.     Gina Wright is the Executive Director of the Legislative and Congressional Reapportionment Office (LCRO), a joint office of the Georgia General Assembly. DX 41. Defendants retained Ms. Wright to analyze Plaintiffs' illustrative plans and opine about their design. DX 41.

43.     Lynn Bailey is the former director of the Richmond County Board of Elections and has decades of experience as a county election official. DX 38. Defendants retained Ms. Bailey to provide opinions about the election calendar and the potential impact of moving any dates currently set for the 2022 elections. DX 38.

44.     Mr. Morgan, Dr. Alford, Ms. Wright, and Ms. Bailey are experts who offered testimony that assisted the Court in considering the issues involved in this litigation. Morgan: Tr. Vol. V 119:2–134:10, 178:4–255:8, Tr. Vol. VI 5:23–26:19; Alford: Tr. Vol. V 139:15–177:10; Wright: Tr. Vol. V 24:12–117:8; Bailey: Tr. Vol. V 6:22–77:13.

45.     Plaintiffs only objected to Ms. Wright's testimony as an expert and the Court overruled the objection. Tr. Vol. V 20:10–24:8. Plaintiffs did not object to any other of Defendants' experts.

### b. Alpha Plaintiffs' Experts

46.     Mr. Bill Cooper is a professional demographer and mapdrawer. Alpha Plaintiffs retained Mr. Cooper to draw illustrative plans for use in this case. APAX A1, A2.

47.     At the preliminary-injunction stage, Defendants did not raise a Daubert or other objections to Mr. Cooper but rely on this Court to give his testimony only the weight it is due.

48.     Dr. Adrienne Jones is an assistant professor at Morehouse College. She holds a Ph.D. in political science from the City University of New York Graduate Center. APAX 5 ¶ 3; Tr. Vol. IV 168:16–169:4. Alpha Plaintiffs retained Dr. Jones to prepare an expert report regarding the history of racial discrimination in Georgia and to specifically opine on Senate Factors 1, 3, 6, and 7. APAX A5 ¶ 4; Tr. Vol. IV 172:12–14.

49.     At the preliminary-injunction stage, Defendants did not raise a Daubert or other objections to Dr. Jones but rely on this Court to give her testimony only the weight it is due.

50.     Dr. Lisa Handley is a redistricting consultant and founder of the Frontier International Electoral Consulting. Tr. Vol. IV 79:5–15. <u>Alpha</u> Plaintiffs retained Dr. Handley to opine about polarized voting in Georgia. APAX A3, A4.

51.     At the preliminary-injunction stage, Defendants did not raise a <u>Daubert</u> or other objections to Dr. Handley but rely on this Court to give her testimony only the weight it is due.

52.     Dr. Jason Morgan Ward is a professor of history at Emory University. He holds a Ph.D. in history from Duke University. He has been retained by <u>Alpha</u> Plaintiffs to prepare an expert report on the history of voter intimidation in Georgia. APAX A7 ¶ 2. Defendants stipulated to introducing Dr. Ward's report into evidence without his testimony.

53.     At the preliminary-injunction stage, Defendants did not raise a <u>Daubert</u> or other objections to Dr. Ward but rely on this Court to give his testimony only the weight it is due.

54.     Dr. Traci Burch is an associate professor of political science at Northwestern University. She holds a Ph.D. in Government and Social Policy from Harvard University. <u>Alpha</u> Plaintiffs retained Dr. Burch to prepare an expert report regarding the effects of racial discrimination in Georgia on various

14

socioeconomic areas. APAX A6 ¶ 3. Defendants stipulated to introducing Dr. Burch's report into evidence without her testimony.

55.     At the preliminary-injunction stage, Defendants did not raise a Daubert or other objections to Dr. Burch but rely on this Court to give her testimony only the weight it is due.

### c. **Grant Plaintiffs' Experts**

56.     Mr. Blakeman Esselstyn is a professional demographer and mapdrawer. Grant Plaintiffs retained Mr. Esselstyn to prepare illustrative plans for use in this case. GPX 3, 4.

57.     At the preliminary-injunction stage, Defendants did not raise a Daubert or other objections to Mr. Esselstyn but rely on this Court to give his testimony only the weight it is due.

58.     Dr. Maxwell Palmer is an associate professor of political science at Boston University. Tr. Vol. IV 45:22–23. Grant Plaintiffs retained Dr. Palmer to conduct a racial polarization analysis and testify on the issue of polarized voting. GPX 6.

59.     At the preliminary-injunction stage, Defendants did not raise a Daubert or other objections to Dr. Palmer but rely on this Court to give his testimony only the weight it is due.

15

60.     Dr. Orville Vernon Burton is a professor at Clemson University. He holds a Ph.D. in American History from Princeton University. GPX 9 ¶ 3; Tr. Vol. IV 5:5–12. <u>Grant</u> Plaintiffs retained Dr. Burton to prepare an expert report on the history of racial discrimination in Georgia. GPX 7 ¶ 2; Tr. Vol. IV 7:23–8:1. Dr. Burton's supplemental report was also entered into evidence. GPX 10.

61.     At the preliminary-injunction stage, Defendants did not raise a <u>Daubert</u> or other objections to Dr. Burton but rely on this Court to give his testimony only the weight it is due.

62.     Dr. Loren Collingwood is an associate professor of political science at the University of New Mexico. He holds a Ph.D. in political science from the University of Washington. <u>Grant</u> Plaintiffs retained Dr. Collingwood to prepare an expert report regarding the effects of racial discrimination in Georgia on various socioeconomic areas. GPX 12 ¶ 2–3. Defendants stipulated to introducing Dr. Collingwood's report into evidence without appearing for live testimony.

63.     At the preliminary-injunction stage, Defendants did not raise a <u>Daubert</u> or other objections to Dr. Collingwood but rely on this Court to give his testimony only the weight it is due.

### d. __Pendergrass__ Plaintiffs' Experts

64.     Mr. Bill Cooper is a professional demographer and map drawer. __Pendergrass__ Plaintiffs retained Mr. Cooper to prepare illustrative plans for use in this case. GPX 1, 2.

65.     At the preliminary-injunction stage, Defendants did not raise a __Daubert__ or other objections to Mr. Cooper but rely on this Court to give his testimony only the weight it is due.

66.     Dr. Maxwell Palmer is an associate professor of political science at Boston University. Tr. Vol. IV 45:22–23. __Pendergrass__ Plaintiffs retained Dr. Palmer to conduct a racial polarization analysis and testify on the issue of polarized voting. GPX 5.

67.     At the preliminary-injunction stage, Defendants did not raise a __Daubert__ or other objections to Dr. Palmer but rely on this Court to give his testimony only the weight it is due.

68.     Dr. Orville Vernon Burton is a professor at Clemson University. He holds a Ph.D. in American History from Princeton University. GPX 7 ¶ 3; Tr. Vol. IV 5:5–12. __Pendergrass__ Plaintiffs retained Dr. Burton to prepare an expert report on the history of racial discrimination in Georgia. GPX 7 ¶ 2; Tr. Vol. IV 7:23–8:1. Dr. Burton's supplemental report was also entered into evidence. GPX 8.

69.     At the preliminary-injunction stage, Defendants did not raise a Daubert or other objections to Dr. Burton but rely on this Court to give his testimony only the weight it is due.

70.     Dr. Loren Collingwood is an associate professor of political science at the University of New Mexico. He holds a Ph.D. in political science from the University of Washington. Pendergrass Plaintiffs retained Dr. Collingwood to prepare an expert report regarding the effects of racial discrimination in Georgia on various socioeconomic areas. GPX 11 ¶ 2–3. Defendants stipulated to introducing Dr. Collingwood's report into evidence without appearing for live testimony.

71.     At the preliminary-injunction stage, Defendants did not raise a Daubert or other objections to Dr. Collingwood but rely on this Court to give his testimony only the weight it is due.

## IV.   REDISTRICTING PROCESS AND MAPS

### a.  Changes in Georgia demographics.

72.     From 2010 to 2020, Georgia's population grew by over 1 million people to 10.71 million, up 10.6% from 2010. APA Stip. ¶ 77; Grant Stip. ¶ 34; Pendergrass Stip. ¶ 26.

18

73.     On the 2020 Census, any-part Black Georgians are 33.03% of the total population in Georgia. APA Stip. ¶ 82; Grant Stip. ¶ 40; Pendergrass Stip. ¶ 32.

74.     Per the 2020 Census, Georgia has a total voting age population of 8,220,274, of whom 2,607,986 (31.73%) are any-part Black and 30.27% are single-race Black. APA Stip. ¶ 83; Grant Stip. ¶ 41; Pendergrass Stip. ¶ 33.

75.     Any-part Black will always be equal to or higher than single-race Black because any-part Black includes everyone who identifies as single-race Black in addition to those who identify as other racial categories and Black. Tr. Vol. I 181:19–182:13; Tr. Vol. III 213:13–25.

76.     As a proportion of the population, the increase in Black individuals in Georgia was slower between 2010 and 2020 than between 2000 and 2010. Tr. Vol. I 180:1–18; APAX 1 ¶ 43.

77.     The growth in any-part Black individuals of voting age as a proportion of the population in Georgia was 1.5 points over the period from 2010 to 2020. Tr. Vol. I 179:17–180:3; APAX 1 ¶ 43.

78.     The total estimated citizen voting age population in Georgia in 2019 is 33.8% any-part Black and 32.9% single-race Black. APA Stip. ¶ 84; Grant Stip. ¶ 42; Pendergrass Stip. ¶ 34.

79.     It is possible for Black population to grow in a jurisdiction, but the overall proportion of the Black population to decrease in the same jurisdiction due to growth in other demographic groups. Tr. Vol. I 81:7–19.

### b.  The 2001 redistricting cycle in Georgia

80.     During the 2001 redistricting cycle, the state Senate and state House plans drawn in 2001 and 2002 were used in the 2002 elections. Larios v. Cox, 300 F. Supp. 2d 1320, 1326–27 (N.D. Ga. 2004).

81.     During the 2001 redistricting cycle, the congressional plan drawn in 2001 was used in the 2002 elections. Larios, 300 F. Supp. 2d at 1335.

82.     After the 2002 elections, the state Senate and state House plans drawn in 2001 and 2002 were found unconstitutional. Larios, 300 F. Supp. 2d at 1356.

### c.  The 2011 redistricting cycle in Georgia

83.     There are 56 state Senate Districts in Georgia. APA Stip. ¶ 59.

84.     The previous 2014 state Senate plan contained 15 majority-Black Senate districts at the time it was enacted. APA Stip. ¶ 61.

85.     The 2014 state Senate plan contained 13 majority-Black districts using 2020 Census data, plus a 14th district with a Black voting age population of 49.76%. APA Stip. ¶ 62; Grant Stip. ¶ 30.

86.     There are 180 state House districts in Georgia. APA Stip. ¶ 64.

87.     The previous 2015 state House plan contained 47 majority-Black House districts at the time it was enacted. APA Stip. ¶ 66.

88.     The 2015 state House plan contained 47 majority-Black districts using 2020 Census Data. APA Stip. ¶ 67; Grant Stip. ¶ 31.

89.     The 2012 congressional plan contained three majority-Black districts using any-part Black voting age population at the time it was enacted. Grant Doc. No. [62-1], p. 5.

90.     The 2011 cycle state Senate, state House, and congressional plans as drawn by the majority Republican legislature were precleared by the U.S. Department of Justice on their initial submission. Tr. Vol. IV 27:22–28:5.

### d.  The 2021 redistricting cycle in Georgia

91.     Redistricting is an inherently political process and decisions about where to place district lines can have a political impact. Tr. Vol. IV 159:9–22.

92.     To prepare for redistricting, the Georgia General Assembly held nine in-person and two virtual joint committee meetings beginning on June 15, 2021, to gather input from voters. APA Stip. ¶ 40; Grant Stip. ¶ 45; Pendergrass Stip. ¶ 38.

93.     The joint redistricting committees released an educational video about the redistricting process at their June 15, 2021 meeting. APA Stip. ¶ 41; Grant Stip. ¶ 46; Pendergrass Stip. ¶ 39.

94.     The General Assembly created an online portal for voters to offer comments on redistricting plans and received more than 1,000 comments from voters in at least 86 counties. APA Stip. ¶ 42; Grant Stip. ¶ 47; Pendergrass Stip. ¶ 40.

95.     On August 21, 2021, the Census Bureau released the detailed population counts that Georgia used to redraw districts. APA Stip. ¶ 44; Grant Stip. ¶ 33; Pendergrass Stip. ¶ 25.

96.     The joint committees held a meeting to hear from interested groups on August 30, 2021. APA Stip. ¶ 45; Grant Stip. ¶ 48; Pendergrass Stip. ¶ 41.

97.     The National Conference of State Legislatures, American Civil Liberties Union of Georgia, Common Cause, Fair Districts GA, the Democratic Party of Georgia, and Asian-Americans Advancing Justice – Atlanta presented at the August 30, 2021 joint meeting. APA Stip. ¶ 46; Grant Stip. ¶ 49; Pendergrass Stip. ¶ 42.

98.     Prior to drawing redistricting plans, the House Legislative and Congressional Reapportionment Committee and the Senate Reapportionment and Redistricting Committee adopted guidelines for the redistricting process. APA Stip. ¶¶ 37–38; Grant Stip. ¶¶ 50–51; Pendergrass Stip. ¶¶ 43–44.

99.   The guidelines provide the following principles for drafting congressional plans: (1) total population deviation of plus or minus one person from the ideal district size; (2) compliance with Section 2 of the Voting Rights Act; (3) comply with the U.S. and Georgia constitutions; (4) contiguous geography; (5) consider counties and precincts, compactness, and communities of interest; (6) make efforts to avoid the unnecessary pairing of incumbents; and (7) any other principles or factors the Committee deems appropriate. APA Doc. Nos. [26-17], [26-18], [39-17], [39-18].

100.   The guidelines provide the following principles for drafting legislative plans: (1) total population that is substantially equal as practicable, considering the other principles; (2) compliance with Section 2 of the Voting Rights Act; (3) compliance with the U.S. and Georgia constitutions; (4) contiguous geography; (5) no multi-member districts; (6) consider counties and precincts, compactness, and communities of interest; (7) make efforts to avoid the unnecessary pairing of incumbents; and (8) any other principles or factors the Committee deems appropriate. APA Doc. Nos. [26-17], [26-18], [39-17], [39-18].

101.   Drafts of the 2021 Senate and House Plans were first released on November 2, 2021. APA Stip. ¶ 47.

102.   The General Assembly's special session to consider the draft Senate and House Plans (and other specified topics) began on November 3, 2021. APA Stip. ¶ 48.

103.   After the special session convened, the House and Senate redistricting committees held multiple meetings prior to voting on proposed redistricting plans. APA Stip. ¶ 49; Grant Stip. ¶ 52.

104.   The House and Senate redistricting committees received public comment on plans during committee meetings held in the special session. APA Stip. ¶ 50; Grant Stip. ¶ 52.

105.   On November 9, 2021, the Georgia Senate passed SB 1EX, which contained the 2021 adopted state Senate Plan. The Georgia House of Representatives passed SB 1EX on November 15, 2021. APA Stip. ¶ 56; Grant Stip. ¶ 53.

106.   On November 10, 2021, the Georgia House of Representatives passed HB 1EX, which contained the 2021 adopted state House Plan. The Senate passed HB 1EX on November 12, 2021. APA Stip. ¶ 56; Grant Stip. ¶ 54.

107.   On November 22, 2021, the Georgia General Assembly passed SB 2EX, which contained the 2021 adopted congressional plan. Pendergrass Stip. ¶ 46.

108.   Governor Kemp signed SB 1EX, SB 2EX, and HB 1EX into law on December 30, 2021. APA Stip. ¶ 58; Grant Stip. ¶ 55; Pendergrass Stip. ¶ 47.

### e.   Senate plans considered by the General Assembly

109.   The only state Senate plans introduced by legislation or amendment during the special legislative session were introduced by (1) the Senate committee chair or (2) the Senate Democratic Caucus. APA Stip. ¶ 52.

110.   The 2021 adopted state Senate plan contains 14 majority-Black districts and splits 29 counties. APA Stip. ¶¶ 60, 69.

111.   The 2021 adopted state Senate plan has six districts with more than 65% any-part Black voting age population and two districts with 50% to 55% any-part Black voting age population. DX 1 ¶ 10.

112.   The 2021 adopted state Senate plan pairs no incumbents who are running for reelection. DX 1 ¶ 15.

113.   The Democratic state Senate plan contains 15 majority-Black districts. DX 1 ¶ 10.

114.   The Democratic state Senate plan has six districts with more than 65% any-part Black voting age population and five districts with 50% to 55% any-part Black voting age population. DX 1 ¶ 10.

### f.   House plans considered by the General Assembly

115.    The only House of Representative plans introduced by legislation or amendment during the special legislative session were introduced by (1) the House committee chair or (2) the House Democratic Caucus. APA Stip. ¶ 51.

116.    The 2021 adopted state House plan contains 49 majority-Black districts and splits 69 counties. APA Stip. ¶¶ 65, 70.

117.    The 2021 adopted state House plan has 18 districts with more than 65% any-part Black voting age population and 12 districts with 50% to 55% any-part Black voting age population. DX 1 ¶ 12.

118.    The 2021 adopted state House plan pairs four sets of incumbents (eight total) who are running for reelection. DX 1 ¶ 15.

119.    The Democratic state House plan contains 45 majority-Black districts. DX 1 ¶ 12.

120.    The Democratic state House plan has 20 districts with more than 65% any-part Black voting age population and 13 districts with 50% to 55% any-part Black voting age population. DX 1 ¶ 12.

### g.   The 2021 adopted congressional plan

121.    The 2021 adopted congressional plan contains two majority-Black districts using the any-part Black voting age population metric and four majority-

Black districts using the non-Hispanic Black citizen voting-age population metric. Pendergrass Stip. ¶ 48.

122.    The 2021 adopted congressional plan contains five majority-non-white districts based on voting age population. DX 3 ¶ 9.

123.    Districts 3, 4, 6, 8, 10, 11, 13, and 14 on the 2021 adopted congressional plan split 12 counties and 44 voting precincts. DX 3 ¶ 15.

124.    Districts 3, 4, 6, 8, 10, 11, 13, and 14 on the 2021 adopted congressional plan maintain at least half of the district cores of the prior (2012) congressional plan. DX 3 ¶ 12.

### h.  The Cooper illustrative state Senate plan in <u>Alpha</u>

125.    Mr. Cooper began drawing his illustrative state Senate plan for the <u>Alpha</u> case before the legislature convened in special session in 2021, using the prior district plans as his starting point. Tr. Vol. I 165:24–166:7.

126.    Mr. Cooper was tasked with determining whether he could draw additional majority-Black districts over the plans used in the 2011 cycle. Tr. Vol. I 174:23–175:12.

127.    Mr. Cooper paid more attention to non-majority-Black districts and agreed that the compactness of his Senate District 18 could be better. Tr. Vol. I 149:3–24; 150:13–154:2; 167:23–168:12. He also agreed that his District 18 needs

more work to comply with traditional redistricting principles and that he "failed" to follow at least one traditional principle in drawing it. Tr. Vol. I 161:20–162:1l; 200:8–16. A copy of Mr. Cooper's Senate District 18 is reproduced below. DX 21.



Cooper Senate Illustrative 2 - (18)

128.   Mr. Cooper also agreed that it was "borderline" whether his illustrative state Senate plan could be used as a remedy. Tr. Vol. I 162:4–15. He also

identified other changes that needed to be made to districts that he drew that could be considered a "packed" district.[1] Tr. Vol. I 192:21–193:15.

129.    Mr. Cooper did not consider any public comments or redistricting hearings in creating his illustrative state Senate plan. Tr. Vol. I 184:18–185:7. He also did not defer to any policy choices made by the legislature in drawing the 2021 adopted plans. Tr. Vol. I 240:6–10.

130.    In designing the "regions" Mr. Cooper considered, he excluded white counties that would not likely be drawn with a majority-Black district. Tr. Vol. I 186:3–187:3.

131.    Mr. Cooper's illustrative state Senate plan contains no districts that match completely to districts on the 2021 adopted state Senate plan. DX 1 ¶ 19.

132.    Mr. Cooper's illustrative state Senate plan contains 19 majority-Black districts, an increase of five over the 2021 adopted state Senate plan. APA Stip. ¶ 64; Tr. Vol. I 114:5–11.

133.    Mr. Cooper's illustrative state Senate plan has two districts with more than 65% any-part Black voting age population and 12 districts with 50% to 55% any-part Black voting age population. DX 1 ¶ 10.

---

[1] Mr. Esselstyn does not have a bright line definition of packing, because he believes it is dependent on the context. Tr. Vol. III 269:18–25.

134.    Mr. Cooper's illustrative state Senate plan has the highest number of majority-Black districts of any map he drew. Tr. Vol. I 173:10–21.

135.    The two additional majority-Black districts in Gwinnett County Mr. Cooper drew are already electing Black voters' candidates of choice as non-majority-Black districts. Tr. Vol. I 172:1–173:5.

136.    While Mr. Cooper's illustrative state Senate plan has five more majority-Black districts than the 2021 adopted state Senate plan, Plaintiffs are only advocating that three specific districts should have been drawn that were not: illustrative state Senate Districts 17, 23, 28. Tr. Vol. I 170:25–171:25; APA Doc. No. [1] ¶¶ 64–66.

137.    Mr. Cooper's illustrative Senate plan splits 33 counties, which is four more than the 2021 adopted state Senate plan. APA Stip. ¶¶ 71, 69; Tr. Vol. I 168:13–22.

138.    Mr. Cooper's original illustrative state Senate plan pairs two sets of incumbents (four total) who are running for reelection. DX 1 ¶ 15. Mr. Cooper's second illustrative state Senate plan pairs one set of incumbents (two total) who are running for reelection. APAX A2 ¶ 12; Tr. Vol. I 207:6–22

139.    The 2021 adopted state Senate plan is more compact on average than Mr. Cooper's illustrative state Senate plan. Tr. Vol. I 206:20–1.

140.   Mr. Cooper's illustrative Senate District 28 combines two non-majority Black counties in Fayette and Spalding counties with heavily Black Clayton County to create a new district. Tr. Vol. I 189:10–191:8. Mr. Cooper could not identify similarities between Clayton County and South Fayette County. Tr. Vol. I 192:1–6. Ms. Wright confirmed that there is no connection between Jonesboro and the eastern side of Spalding County, and the only apparent purpose in the design of the district was racial. DX 41 ¶ 12; Tr. Vol. V 28:19–30:9. Mr. Cooper's Senate District 28 from his report is reproduced below.

**Figure 15:** *Illustrative District 28 and vicinity*



141.    Unlike the 2021 adopted state Senate plan and the Democratic Senate plan, Mr. Cooper's illustrative districts in Clayton County did not maintain the same county boundaries. Tr. Vol. I 194:22–195:16.

142.    Mr. Cooper's illustrative Senate District 28 is only 50.77% single-race Black voting age population and 48.26% Black registered voters. DX 44.

143.    Mr. Cooper's illustrative Senate District 17 connects parts of Henry, Rockdale, and DeKalb Counties to create a majority-Black district, moving outside of the five-county region Mr. Cooper used to analyze the area. Tr. Vol. I 196:22–197:4. While Mr. Cooper claimed that there were connections between Stonecrest and McDonough, Ms. Wright was unable to identify any such connections. Tr. Vol. I 199:10–200:16; Tr. Vol. V 31:5–32:12; DX 41 ¶ 13. The illustrative Senate District 17 also splits a large neighborhood in Lake Haven. DX 41 ¶ 13. Mr. Cooper's Senate District 17 from his report is reproduced below.

**Figure 17**: *Illustrative District 17 and Vicinity*



144.   Mr. Cooper's illustrative Senate District 17 contains 60.19% single-race Black voting age population and 55.60% Black registered voters. DX 44.

145.   Mr. Cooper's illustrative Senate District 23 connects voters in Houston County with voters in Augusta-Richmond County, to achieve a district that is 50.54% any-part Black voting age population, 49.37% single-race Black voting age population, and 49.20% Black registered voters. DX 44. The configuration also reduces the Black percentages in District 22 and 26 and takes District 22 outside of its traditional boundaries in Richmond County. Tr. Vol. I

200:17–22; DX 41 ¶ 11. Mr. Cooper's Senate District 23 from his report is reproduced below.



**Figure 19:** *Illustrative District 23 and Vicinity*

146.   Mr. Cooper could not identify any commonalities between Warner Robins and Augusta and needed to include one precinct in Houston County to make his illustrative District 23 majority-Black on voting age population. Tr. Vol. I 202:15–201:5. Ms. Wright agreed that there was no reason to connect Augusta and Warner Robins if not for the race of the individuals in those areas. DX 41 ¶ 11.

147.   Several of the reasons Mr. Cooper identified for connecting Milledgeville and Augusta, including the Milledgeville micropolitan area, were also included on the 2021 adopted state Senate plan. Tr. Vol. I 204:14–205:19.

148.   Unlike Mr. Cooper's illustrative Senate plan, the 2021 adopted state Senate plan and the Democratic Senate plan both left District 22 wholly within Richmond County. Tr. Vol. I 205:2–5; 205:20–23.

149.   The Democratic Senate plan did not draw District 23 as a majority-Black district and configured District 26 more like the 2021 adopted state Senate plan. Tr. Vol. I 205:24–206:11.

150.   Ms. Wright concluded that the additional state Senate districts drawn by Mr. Cooper were drawn primarily based on race. DX 41 ¶ 14.

151.   Districts 17, 23, and 28 all currently have Republican incumbents. Tr. Vol. V 27:21–28:18; 32:13–22.

### i. The Cooper illustrative state House plan in <u>Alpha</u>

152.   Mr. Cooper began drawing his illustrative state House plan before the legislature convened in special session in 2021, using the prior district plans as his starting point. Tr. Vol. I 165:24–166:7; 208:13–17.

153.    Mr. Cooper was tasked with determining whether he could draw additional majority-Black districts over the plans used in the 2011 cycle. Tr. Vol. I 174:23–175:12.

154.    Mr. Cooper did not consider any public comments or redistricting hearings in creating his illustrative state House plan. Tr. Vol. I 184:18–185:7. He also did not defer to any policy choices made by the legislature in drawing the 2021 adopted plans. Tr. Vol. I 240:6–10.

155.    In designing the "regions" Mr. Cooper considered, he excluded white counties that would not likely be drawn with a majority-Black district. Tr. Vol. I 186:3–187:3.

156.    Mr. Cooper's illustrative state House plan contains only one district that matches completely to a district on the 2021 adopted state House plan. DX 1 ¶ 19.

157.    Mr. Cooper's illustrative state House plan contains 54 majority-Black districts, an increase of five over the 2021 adopted state House plan. APA Stip. ¶ 68; Tr. Vol. I 210:10–13.

158.    Mr. Cooper's illustrative state House plan has 14 districts with more than 65% any-part Black voting age population and 18 districts with 50% to 55% any-part Black voting age population. DX 1 ¶ 12.

36

159.    While Mr. Cooper's illustrative state House plan has five more majority-Black districts than the 2021 adopted state House plan, Plaintiffs are only advocating that four specific districts should have been drawn that were not: illustrative state House Districts 72, 110, 144 and 153. Tr. Vol. I 210:10–18; 213:15–214:9; APA Doc. No. [1] ¶¶ 70–74.

160.    Mr. Cooper's illustrative House plan splits 74 counties, which is five more than the 2021 adopted state House plan. APA Stip. ¶¶ 70, 72; Tr. Vol. I 218:13–16.

161.    Mr. Cooper's original illustrative state House plan pairs 13 sets of incumbents (26 total) who are running for reelection. DX 1 ¶ 17. Mr. Cooper's second illustrative state House plan pairs seven set of incumbents (14 total) who are running for reelection. APAX A2 ¶ 13.

162.    Several districts on Mr. Cooper's illustrative state House plan are far less compact than the same district numbers on the 2021 adopted House plan. DX 1 ¶ 24.

163.    Mr. Cooper's illustrative House District 73 connects portions of Clayton County, Henry County, and Spalding County, which connects Clayton County with part of Griffin. Tr. Vol. I 210:14–24. Like the Senate district in the same area, the district crosses out of the five-county focus area to include heavily Black

Clayton County instead of maintaining the borders of Clayton County like the 2021 adopted state House plan. Tr. Vol. I 210:25–211:5. The Democratic House plan likewise maintained the border of Clayton County. Tr. Vol. I 211:10–212:1; DX 41 ¶ 16; Tr. Vol. V 36:11–37:17. Mr. Cooper's House District 73 from his report is reproduced below.

**Figure 28:** *Illustrative Plan District 73 and Vicinity*



164.    Mr. Cooper was unable to identify any connection between Clayton County and the Hampton area of Henry County. Tr. Vol. 211:6–9. Ms. Wright agreed that the breaking of county boundaries was apparently in service of a racial

goal. DX 41 ¶ 16. Mr. Cooper's illustrative House District 73 also required significant changes to surrounding districts, resulting in additional areas connected that do not share a common interest. DX 41 ¶ 16; Tr. Vol. V 35:20–36:10.

165.    Mr. Cooper's illustrative state House District 73 is 58.28% single-race Black voting age population and 55.88% Black voter registration. DX 45.

166.    Mr. Cooper's illustrative House District 110 connects the Locust Grove area with Griffin. Tr. Vol. I 212:5–9. When asked the reason for connecting those areas, Mr. Cooper was only able to identify a racial reason of growing Black population along with general population growth. Tr. Vol. I 212:13–18. Mr. Cooper's House District 110 from his report is reproduced below.

**Figure 30**: *Illustrative Plan: District 110 and vicinity*



167.   The configuration of illustrative House District 110 also results in a four-way split of Spalding County. Tr. Vol. I 212:19–22. This is a change from its prior configuration of only two districts in Spalding County. DX 41 ¶ 17; Tr. Vol. V 39:3–9. The illustrative House District 110 also requires the significant reconfiguration of surrounding districts, some apparently based on race. DX 41 ¶ 17; Tr. Vol. V 39:15–24.

168.   Mr. Cooper's illustrative House District 110 contains only 50.60% single-race Black and 48.11% Black registered voters. DX 45.

169.   Mr. Cooper designed his illustrative House District 144 by connecting Black populations in Eatonton and Milledgeville with other majority-Black counties. Tr. Vol. I 214:10–215:25. Despite this effort, the district is still only barely majority-Black, with a 50.41% any part Black voting age population, 49.52% single-race Black voting age population, and 52.42% Black voter registration. DX 45. Mr. Cooper's House District 144 from his report is reproduced below.

**Figure 32**: *Illustrative Plan: District 144 and Vicinity*



170.   The illustrative House District 144 unites disparate communities and separates Twiggs and Wilkinson counties for racial purposes. DX 41 ¶ 18; Tr. Vol.

V 42:16–43:18. The illustrative House District 144 divides the Milledgeville micropolitan area. Tr. Vol. I 220: 3–5. Mr. Cooper's illustrative House District 144 so precisely includes Black individuals from disparate areas that removing Eatonton or Milledgeville would drop the district below 50%. Tr. Vol. I 216:10–13.

171.   Mr. Cooper was only able to identify socioeconomic factors that connect illustrative House District 144 that no map drawer testified they would use when drawing districts. Tr. Vol. I 219:19–220:2; Tr. Vol. III 211:5–9; Tr. Vol. V 114:17–2, 132:11–13. Mr. Cooper did not conduct a comprehensive analysis of socioeconomic factors, but instead looked at the American Community Survey data after he finished drawing the districts. Tr. Vol. I 221:23–225:15.

172.   Mr. Cooper's illustrative House District 153 reconfigures southwest Georgia in significant ways. DX 41 ¶ 19. The resulting configuration means that no district is wholly within Dougherty County on the illustrative plan. Tr. Vol. I 217:2–10. The only link that Mr. Cooper could identify was a transportation corridor between Albany and Thomasville and Mr. Cooper could not explain how a regional commission would show a common interest. Tr. Vol. I 217:11–23. There is no common interest between Albany and Thomasville. Tr. Vol. V 44:12–45:2. Mr. Cooper's House District 153 from his report is reproduced below.

**Figure 34:** *Illustrative Plan: District 153 and vicinity*



173. The changes in this area also connect communities that have nothing in common and split Sumter County three ways. DX 41 ¶ 19.

174. The additional majority-Black House districts on Mr. Cooper's illustrative plan do not comply with traditional redistricting principles. DX 41 ¶ 9.

### j. The Esselstyn illustrative state Senate plan in <u>Grant</u>

175. Mr. Esselstyn has never drawn redistricting maps for any jurisdiction in Georgia and has never drawn a statewide plan that was used in an election. Tr. Vol. II 112:13–18; Tr. Vol. III 195:18–196:2.

176.    Mr. Esselstyn was tasked with determining whether he could draw additional majority-Black districts over the plans used in the 2021 cycle. Tr. Vol. III 202:15–25.

177.    Mr. Esselstyn's main goal in drawing his illustrative legislative plans was adding majority-Black districts. Tr. Vol. III 203:1–4.

178.    Mr. Esselstyn did not consider any public comments, any redistricting hearings, or speak with anyone in Georgia in the process of creating his illustrative state Senate plan. Tr. Vol. III 208:20–209:5.

179.    The only communities of interest that Mr. Esselstyn considered were information contained on layers in Maptitude, larger historical multi-county communities, and general geometric patterns. Tr. Vol. III 209:6–211:4. Since he viewed his illustrative plans as merely an initial process, he did not see a need to get into the added complexity of considering other communities of interest. Tr. Vol. III 210:16–211:4.

180.    Mr. Esselstyn's illustrative state Senate plan changes 22 of the 56 2021 adopted state Senate districts in the process of creating three additional majority-Black districts. DX 2 ¶ 19.

181.   Mr. Esselstyn's illustrative state Senate plan contains 17 majority-Black districts, an increase of three over the 2021 adopted state Senate plan. Grant Stip. ¶ 61; Tr. Vol. III 215:16–21.

182.   Mr. Esselstyn's illustrative state Senate plan has three districts with more than 65% any-part Black voting age population and six districts with 50% to 55% any-part Black voting age population. DX 2 ¶ 10.

183.   Mr. Esselstyn's illustrative state Senate plan has the highest number of majority-Black districts of any map he drew. Tr. Vol. III 211:21–212:6.

184.   Mr. Esselstyn's illustrative Senate plan splits 34 counties, which is five more than the 2021 adopted state Senate plan. Grant Stip. ¶¶ 58, 75; Tr. Vol. III 203:18–21; DX 2 ¶ 21.

185.   One reason Mr. Esselstyn's illustrative Senate plan splits more counties is because of his effort to draw additional majority-Black districts. Tr. Vol. III 204:9–19, 236:22–24.

186.   Mr. Esselstyn's illustrative Senate plan has higher deviations than the 2021 adopted state Senate plan. Tr. Vol. III 205:8–14.

187.   Mr. Esselstyn's illustrative state Senate plan pairs two sets of incumbents (four total) who are running for reelection. DX 2 ¶ 15.

188.    On the Reock and Schwartzberg scores, the 2021 adopted state Senate plan is more compact on average than Mr. Esselstyn's illustrative state Senate plan. Tr. Vol. III 235:10–25. Several districts on the Esselstyn remedial Senate plan are far less compact than the 2021 adopted state Senate plan. DX 2 ¶ 24.

189.    The 2021 adopted state Senate plan divides fewer precincts than Mr. Esselstyn's illustrative state Senate plan. Tr. Vol. III 205:23–25, 236:25–237:1.

190.    While drawing his legislative plans, Mr. Esselstyn used shading and labels on his mapping system to display information about the racial makeup of various levels of geography. Tr. Vol. III 207:10–208:11. He also displayed racial information about individual Census blocks when he was splitting a precinct. Tr. Vol. III 208:8–19.

191.    To draw Mr. Esselstyn's illustrative Senate District 23, he looked for areas with higher and lower overall Black populations to include to create a district that is 50.43% any-part Black voting age population. Tr. Vol. III 216:12–217:18. Mr. Esselstyn's District 23 from his report is reproduced below.



**Figure 5: Map of eastern Black Belt region of illustrative plan with majority-Black State Senate districts indicated.**

c

192.   Mr. Esselstyn's illustrative Senate District 23 splits a number of counties and reduces the any-part Black voting age population of District 22 to 50.84%. DX 41 ¶ 21; Tr. Vol. III 218:18–23; GPX 3 ¶ 24, Table 1.

193.   Mr. Esselstyn's illustrative Senate District 23 includes counties that may or may not be part of the Black Belt. Tr. Vol. III 219:23–220:25. He also could not identify other communities or shared characteristics uniting the counties he included in his illustrative Senate District 23. Tr. Vol. III 221:1–222:17. Mr. Esselstyn believed that Augusta and Milledgeville shared a connection by being

part of the Fall Line, but did not apply that principle to every city along the Fall Line. Tr. Vol. III 222:18–223:18.

194.   Mr. Esselstyn's illustrative Senate District 23 splits McDuffie County to include Black population in the city of Thompson and makes other specific splits to Greene County and Wilkes County to include Black population. Tr. Vol. V 46:1–23.

195.   Mr. Esselstyn's illustrative Senate District 23 is only 49.27% single-race Black voting age population and 48.57% Black voter registration. DX 46.

196.   Given the county splits, the shape of the district, and the low Black voting age population, Mr. Esselstyn's illustrative Senate District 23 has the appearance of being drawn with a racial goal in mind. DX 41 ¶ 21.

197.   Mr. Esselstyn's illustrative Senate District 25 is a majority-Black district that includes parts of Clayton and Henry Counties, although Mr. Esselstyn's report misidentifies Clayton County as Fayette County. Tr. Vol. III 227:11–228:24. Mr. Esselstyn was not sure whether the district would remain majority-Black without Clayton County. Tr. Vol. III 228:18–24. Mr. Esselstyn's District 25 from his report is reproduced below.

**Figure 6: Map of eastern Metro Atlanta area of illustrative plan with majority-Black State Senate districts indicated.**



198.    The Democratic Senate plan maintained a district in a similar location wholly within Henry County without crossing into Clayton County. DX 13; Tr. Vol. III 228:25–229:3.

199.    The configuration of Mr. Esselstyn's illustrative Senate District 25 also has significant effects on adjoining districts. For example, it requires District 10 to run from Stonecrest down to the Butts-Monroe line for racial purposes. DX 41 ¶ 23.

200.    Mr. Esselstyn's illustrative Senate District 25 is 56.51% single-race Black voting age population and only 52.71% Black voter registration. DX 46.

201.    Mr. Esselstyn's illustrative Senate District 28 connects pieces of Clayton, Coweta, Fayette, and Fulton counties to create a district that is majority-Black. Tr. Vol. III 229:4–7. To create this district, Mr. Esselstyn has to double the traditional number of Senate districts in Clayton County from two to four and cut into Coweta County to reach a sizeable Black population in Newnan. DX 41 ¶ 22; Tr. Vol. III 229:23–230:16. Mr. Esselstyn's District 28 from his report is reproduced below.



**Figure 7: Map of western Metro Atlanta area of illustrative plan with majority-Black State Senate districts indicated.**

202.   Unlike the Democratic Senate plan and 2021 adopted state Senate plan that kept Coweta County whole, Mr. Esselstyn's Senate District 28 splits Coweta County three ways. DX 13; DX 10; Tr. Vol. III 231:8–17.

203.   The additional majority-Black Senate districts on Mr. Esselstyn's illustrative plan do not comply with traditional redistricting principles. DX 41 ¶ 9.

204.   Mr. Esselstyn did not offer any opinion about the compactness of any community. Tr. Vol. III 271:24–272:2.

### k.  The Esselstyn illustrative state House plan in <u>Grant</u>

205.    Mr. Esselstyn has never drawn redistricting maps for any jurisdiction in Georgia and has never drawn a statewide plan that was used in an election. Tr. Vol. II 112:13–18; Tr. Vol. III 195:18–196:2.

206.    Mr. Esselstyn was tasked with determining whether he could draw additional majority-Black districts over the plans used in the 2021 cycle. Tr. Vol. III 202:15–25.

207.    Mr. Esselstyn's main goal in drawing his illustrative legislative plans was adding majority-Black districts. Tr. Vol. III 203:1–4.

208.    In drawing his illustrative state House plan, Mr. Esselstyn took in particular populations with the goal of achieving 50% Black voting age population in districts. Tr. Vol. III 253:3–255:18. He believed that 50% plus a single person was a "floor" for <u>Gingles</u> 1, and split precincts while working to achieve that amount of population in District 149 at least. Tr. Vol. III 256:22–258:5.

209.    While drawing his legislative plans, Mr. Esselstyn used shading and labels on his mapping system to display information about the racial makeup of various levels of geography. Tr. Vol. III 207:10–208:11. He also displayed racial information about individual Census blocks when he was splitting a precinct. Tr. Vol. III 208:8–19. His racial data was always visible and he watched the racial

information as he clicked in various pieces of geography for House District 149. Tr. Vol. III 259:12–260:5.

210.    Mr. Esselstyn did not consider any public comments, any redistricting hearings, or speak with anyone in Georgia in the process of creating his illustrative state House plan. Tr. Vol. III 208:20–209:5.

211.    The only communities of interest that Mr. Esselstyn considered were information contained on layers in Maptitude, larger historical multi-county communities, and general geometric patterns. Tr. Vol. III 209:6–211:4. Since he viewed his illustrative plans as merely an initial process, he did not see a need to get into the added complexity of considering other communities of interest. Tr. Vol. III 210:16–211:4.

212.    Mr. Esselstyn's illustrative state House plan changes 26 of the 180 2021 adopted House districts in the process of creating five additional majority-Black districts. DX 2 ¶ 19.

213.    Mr. Esselstyn's illustrative state House plan contains 54 majority-Black districts, an increase of five over the 2021 adopted state House plan. Grant Stip. ¶ 60; Tr. Vol. III 211:10–15.

214.    Mr. Esselstyn's illustrative state House plan has 15 districts with more than 65% any-part Black voting age population and 21 districts with 50% to 55% any-part Black voting age population. DX 2 ¶ 12.

215.    Mr. Esselstyn's illustrative House plan splits 70 counties, which is one more than the 2021 adopted state House plan. Grant Stip. ¶¶ 59, 76; Tr. Vol. III 267:4–7; DX 2 ¶ 22.

216.    One reason Mr. Esselstyn's illustrative House plan splits more counties is because of his effort to draw additional majority-Black districts. Tr. Vol. III 204:9–19, 236:22–24.

217.    Mr. Esselstyn's illustrative House plan has higher deviations than the 2021 adopted House plan. Tr. Vol. III 264:3–6.

218.    Mr. Esselstyn's illustrative state House plan pairs eight sets of incumbents (16 total) who are running for reelection, which is twice as many as the 2021 adopted state House plan. DX 2 ¶¶ 17, 18.

219.    On the Schwartzberg and Cut Edges scores, the 2021 adopted state House plan is more compact on average than Mr. Esselstyn's illustrative state House plan. Tr. Vol. III 265:24–7. Of the 26 districts changed on Mr. Esselstyn's illustrative state House plan, 16 are less compact on the Reock measurement and 15 are less compact on the Polsby-Popper measurement. DX 2 ¶ 24.

220.    The 2021 adopted state House plan divides fewer precincts than Mr. Esselstyn's illustrative state House plan. Tr. Vol. III 265:8–266:7. Mr. Esselstyn's illustrative state House plan splits six Baldwin County precincts in the same area where his District 149 is located. Tr. Vol. III 265:8–266:7.

221.    Unlike Mr. Cooper, Mr. Esselstyn did not create a new majority-Black state House district in southwest Georgia. Tr. Vol. III 238:5–8. Mr. Esselstyn also created a majority-Black state House district in the western suburbs of Atlanta that Mr. Cooper did not create. Tr. Vol. III 240:11–17. Likewise, Mr. Cooper only created a single new majority-Black state House district in middle Georgia, while Mr. Esselstyn created two. Tr. Vol. III 240:18–21.

222.    The changes made to create Mr. Esselstyn's illustrative House districts 145 and 149 resulted in changes to other middle Georgia districts, including Districts 142 and 143 in Macon. Tr. Vol. III 238:9–24. Mr. Esselstyn's Districts 145 and 149 from his report are reproduced below.

**Figure 13: Map of central Black Belt region of illustrative plan with majority-Black House districts indicated.**



223.    As a result of Mr. Esselstyn's changes, all the majority-Black districts in middle Georgia are below 50% on single-race Black voting age population and three of the four are below 50% on Black voter registration, as indicated on the following chart drawn from data in DX 46:

| Illustrative House District | % AP Black VAP | % single-race Black VAP | % Black voter registration |
|---|---|---|---|
| 142 | 50.14% | 49.08% | 48.78% |
| 143 | 50.64% | 49.06% | 47.51% |
| 145 | 50.38% | 48.58% | 49.59% |
| 149 | 50.02% | 48.94% | 51.00% |

224.   Mr. Esselstyn's illustrative state House District 149 splits Baldwin County between three state House districts in a way that does not make sense. DX 41 ¶ 25; Tr. Vol. III 252:9–14.

225.   Mr. Esselstyn's goal in creating his illustrative House District 149 was to see if the district could be drawn over 50% Black. Tr. Vol. III 253:9–254:18. While splitting Baldwin County precincts to draw District 149, Mr. Esselstyn had racial information available to him to watch as he tried various configurations. Tr. Vol. III 258:3–5; 259:12–260:5.

226.   Mr. Esselstyn could not identify other goals for his creation of Districts 145 and 149 besides keeping Mercer University whole and a mistaken belief that there was only one state House district wholly within Bibb County on the 2021 adopted state House plan. Tr. Vol. III 261:19–263:21.

227.   Mr. Esselstyn's configuration of District 145 and its surrounding districts resulted in the division of downtown Macon and is inconsistent with public testimony regarding how residents of Bibb County asked to be treated in state House redistricting. DX 41 ¶ 26; Tr. Vol. V 84:24–85:11.

228.   To create his illustrative District 64 as a majority-Black district, Mr. Esselstyn connected communities in Fulton County with communities in Paulding County and made significant changes to other districts, including District 61. DX

41 ¶ 28; Tr. Vol. III 242:8–243:14. Mr. Esselstyn's District 64 from his report is reproduced below.



Figure 11: Map of western Metro Atlanta area of illustrative plan with majority-Black House districts indicated.

229.    Even with these efforts, illustrative District 64 is only 48.30% single-race Black voting age population and 46.14% Black voter registration.

230.    Mr. Esselstyn's illustrative House Districts 74 and 117 unite communities in Clayton, Fayette, and Henry Counties, similar to Mr. Cooper's configuration of this area. DX 41 ¶ 27. Mr. Esselstyn was endeavoring to keep the

Census-designated place ("CDP") called Irondale whole in District 74 but did not

realize that Irondale is not a municipality in Georgia. Tr. Vol. III 244:2–11; Tr. Vol.

V 51:25–52:2. Mr. Esselstyn's Districts 74 and 117 from his report are reproduced

below.



**Figure 12: Map of southern Metro Atlanta area of illustrative plan with majority-Black House districts indicated.**

231.   Mr. Esselstyn did not consider any specific connections between

Clayton and Fayette Counties when creating his District 74. Tr. Vol. III 244:12–16.

The only other goal besides a racial goal that Mr. Esselstyn could identify in

creating District 74 was the mistaken belief that the CDP of Irondale should be kept whole. Tr. Vol. III 246:23–247:5.

232.   The shapes of the Clayton County districts are unusual in Mr. Esselstyn's configuration of Clayton County and the 2021 adopted state House plan districts in that area are more compact than Mr. Esselstyn's illustrative state House plan. Tr. Vol. III 247:20–249:10; DX 18; DX 29.

233.   Mr. Esselstyn's illustrative state House District 117 involves a configuration of District 116 crossing an interstate that Ms. Wright believed had racial implications for both districts, but about which Mr. Esselstyn was not sure. DX 41 ¶ 27; Tr. Vol. III 250:22–251:13.

234.   Mr. Esselstyn's illustrative state House District 74 is only 51.90% single-race Black voting age population and 48.51% Black voter registration. DX 46.

235.   Mr. Esselstyn's illustrative state House District 117 is 49.41% single-race Black voting age population and 45.6% Black voter registration. DX 46.

236.   Mr. Esselstyn did not offer any opinion about the compactness of any community. Tr. Vol. III 271:24–272:2.

### l.   The Cooper illustrative congressional plan in <u>Pendergrass</u>

237.   Mr. Cooper specifically reviewed the 2021 adopted congressional plan to determine whether an additional majority-Black district could be drawn Atlanta metropolitan area. GPX 1 ¶ 8; Tr. Vol. I 74:24–75:12. He did not attempt to determine whether that additional majority-Black district could be drawn in the area covered by existing District 7 instead. Tr. Vol. I 75:13–75:16.

238.   Mr. Cooper modified the boundaries of eight of the 14 congressional districts in Georgia to create an additional majority-Black district. GPX 1 ¶ 46.

239.   Mr. Cooper did not determine whether fewer existing districts could be modified to draw an additional majority-Black district. Tr. Vol. I 76:8–21.

240.   Mr. Cooper's new majority-Black district is District 6, and it is only 50.23% any-part Black voting age population and 50.69% non-Hispanic Black citizen voting age population. GPX 2 ¶ 5. To create the new District 6, Mr. Cooper reduced the any-part Black voting age population in District 13 from 66.75% to 51.40%. GPX 2 ¶ 5; Tr. Vol. I 88:23–89:11. The non-Hispanic Black citizen voting age population in District 13 on the illustrative plan is 50.05%. GPX 2 ¶ 5. Mr. Cooper's District 6 from his report is reproduced below.



241.    Mr. Cooper's District 6 reduces other racial metrics below 50%. It is only 48.01% single-race Black voting age population and 48.05% Black registered voters. DX 43. The configuration of Mr. Cooper's District 13 is likewise 49.41% single-race Black voting age population and 47.37% Black registered voters. DX 43.

242.    To make District 6 a majority-Black district, Mr. Cooper moved it from its 2012 and 2021 core in northern metro Atlanta to a district in the western suburbs. DX 3 ¶ 12. Mr. Cooper's District 6 maintains less than five percent of the population from the 2012 congressional district map, while the 2021 adopted plan

District 6 retains more than half of the population from the prior District 6. DX 3 ¶ 12.

243.   Mr. Cooper's District 6 has no population in common with the 2021 adopted congressional District 6. DX 3 ¶ 13.

244.   The 2021 adopted congressional District 6 is a heavily Republican district, so much so that the incumbent Democratic Congresswoman chose to run in a different district. Tr. Vol. IV 159:23–160:22. Configuring District 6 as a majority-Black district means the district would likely no longer elect a Republican. Tr. Vol. IV 160:23–161:2.

245.   Mr. Cooper's illustrative congressional plan splits more counties and precincts than the 2021 adopted congressional plan. DX 3 ¶ 15; Tr. Vol. I 91:6–10.

246.   The eight districts in Mr. Cooper's illustrative plan are less compact as an average than same eight districts on the 2021 adopted congressional plan. DX 3 ¶ 17; Tr. Vol. I 90:8–23. More of the individual eight districts Mr. Cooper modified are more compact on the 2021 adopted plan than on his illustrative plan. DX 3 ¶ 18.

247.   Mr. Cooper's District 6 contains a racially diverse area of Fayette County and may not be a majority-Black district without that portion of Fayette included. Tr. Vol. I 82:6–83:7. The portion of Fayette County included in District 6

splits three or four different voting precincts and does not follow reasonable geography. Tr. Vol. V 53:2–13.

248.    Mr. Cooper's District 6 splits Cobb County by going into Acworth and Kennesaw to take in population that Mr. Cooper knew was more racially diverse, to make a district that is only barely majority-Black. Tr. Vol. I 84:24–86:20. The district juts upward in an unusual-looking way. Tr. Vol. V 53:14–23.

249.    Mr. Cooper never analyzed whether Acworth, Kennesaw, and north Fayette County shared any connections when drawing his plan. Tr. Vol. I 92:17–93:5.

250.    The division of Newton County in Mr. Cooper's District 13 does not make geographic sense. Tr. Vol. V 54:3–16.

251.    Mr. Cooper used his software to display racial data on the screen at times while drawing District 6. Tr. Vol. I 100:24–101:2.

## V.    POLARIZED VOTING IN GEORGIA

### a.  Palmer analysis

252.    Dr. Palmer was asked to offer an expert opinion on two topics: (1) the extent to which voting is racially polarized; and (2) evaluating the performance of the new black majority districts in the Plaintiffs' illustrative maps. Tr. Vol. IV 47:21–48:2; GPX 5, 6.

253.    Dr. Palmer defines racial polarization when voters of different racial or ethnic groups vote cohesively amongst themselves, but the candidates of choice are different as between the respective racial or ethnic groups. Tr. Vol. IV 48:24–29:4.

254.    Dr. Palmer's report examined 31 general elections dating from the year 2012 to 2021. Tr. Vol. IV 51:16–19.

255.    He estimates more than 98% of Black voters support the same candidate in each of those election contests, and only 11%–11.5% of white voters support those same candidates. Tr. Vol. IV 52:17–22.

256.    Dr. Palmer cites this disparity in candidate preference as evidence of a very high level of polarization in every election he looked at in his reports. Tr. Vol. IV 53:18–21; 54:11–15.

257.    Dr. Palmer conducted an extremely similar analysis for the reports for both Pendergrass and Grant Plaintiffs, utilizing the exact same data sources, the exact same methodology, and the same ecological inference algorithm. Tr. Vol. IV 59:13–20.

258.    Although Dr. Palmer reports generally finding strong evidence of racially polarized voting, his examination of the state Senate contests revealed no evidence of racial polarization in Senate District 39 and questionable evidence in

Senate District 44. Additionally, in 18 of the 31 elections, he found that white voters did not have a clear candidate of choice. Tr. Vol. IV 62:4–12.

259.    Dr. Palmer acknowledges that his analysis doesn't try to understand the reasons behind why people vote the way they do. Tr. Vol. IV 65:8–19; 74:10–21.

260.    Dr. Palmer's reports show that Black voters are incredibly cohesive in supporting Democratic candidates in general elections. Tr. Vol. IV 73:22–24.

261.    Dr. Palmer's reports show white voters are incredibly cohesive in supporting Republican candidates. Tr. Vol. IV. 73:25–74:2.

262.    Dr. Palmer's reports indicate that the race of the candidate generally does not affect the partisan preference of voters in the polarized contests he examines. Tr. Vol. IV 74:3–9.

263.    Dr. Palmer did not consider or analyze partisanship as part of his analysis in the Grant and Pendergrass reports. Tr. Vol. IV 74:22–75:3.

264.    Dr. Palmer agreed that partisanship could explain the voter behavior he found in his reports. Tr. Vol. IV 74:22–75:9.

265.    Dr. Palmer considers Ecological Inference the best form of analysis in determining racial polarization in election contests.  Tr. Vol. IV 50:23–25; 70:25–71:2.

266.    Dr. Palmer's Ecological Inference analysis of the various election contests uniformly includes confidence intervals because they more precisely explain the results of the analysis. Tr. Vol. IV 71:21–72:12.

267.    And Dr. Palmer agreed that the smaller the group being examined, the wider the confidence intervals are likely to be. Tr. Vol IV. 72:25–73:5.

**b. Handley analysis**

268.    Dr. Handley prepared an initial expert report and subsequent rebuttal report in order to analyze voting patterns by race and to evaluate the Plaintiffs' illustrative plans to explore whether they created additional districts in which Black voters have the opportunity to elect their candidate of choice in certain specified areas within the State of Georgia. Tr. Vol. IV 81:20–25.

269.    Dr. Handley found that voting was starkly polarized in general elections she analyzed, both for statewide contests and those in the focus area proposed by Plaintiffs. Tr. Vol. IV 82:9–11.

270.    Dr. Handley defines racial polarization differently from Dr. Palmer, saying she finds polarization where the outcome would be different if the election were held only among black voters compared to only among white voters. Tr. Vol. IV 83:9–14.

271.   Dr. Handley used three statistical techniques for her analysis of racial polarization: Homogenous Precinct Analysis, Ecological Regression, and Ecological Inference. Tr. Vol. IV. 83:21–23.

272.   Dr. Handley used an iterative form of Ecological Inference. Affidavit of Dr. Lisa Handley ("Handley Aff.") APA Doc. No. [118-2] ¶ 1.

273.   Unlike Dr. Palmer, Dr. Handley did not include any confidence intervals for her Ecological Inference analysis in her reports. Tr. Vol. IV 85:5–8.

274.   Dr. Handley's reports analyzed Democratic primary and general elections in 2016, 2018, and 2020 as well as the runoff elections in early 2021. Tr. Vol. IV 86:1–4.

275.   While Dr. Handley used primary elections as part of her analysis, Dr. Palmer considers primaries less useful than general elections for conducting a racially polarized voting analysis. Tr. Vol. IV 68:12–69:13.

276.   Each of the election contests analyzed by Dr. Handley included a black candidate, except for the general election of Jon Ossoff, which included only white candidates. Tr. Vol. IV 86:21–87:3.

277.   Ecological Regression analysis is an older methodology for analyzing racial polarization and can produce estimates outside of the possible, where vote share is over 100% or under 0%. Tr. Vol IV 90:1–7.

278.    Homogenous Precinct Analysis is only available where a precinct is overwhelmingly made up of a single race. Tr. Vol IV. 90:12–15.

279.    Dr. Handley's report details that where voters have no candidate to choose from and must only select a party through which to cast a vote, Black voters in Georgia pick the Democratic Party 97.7% of the time. APAX A4, p. 1 n.2.

280.    Dr. Handley did not consider whether partisanship could be the driving force behind voter behavior in her analysis. Tr. Vol. IV 100:17–20.

281.    Dr. Handley's analysis of Democratic primaries and general elections reveals that polarization in voting is less stark within the Democratic primaries as compared to the general election contests. Tr. Vol. IV 101:20–23.

282.    Although Dr. Handley did not include confidence intervals in either of her reports, she did agree that confidence intervals would be generally wider in the primaries she analyzed than they would be in the general elections. Tr. Vol. IV 106:13–18.

283.    Some of the contests that Dr. Handley analyzed had overlapping confidence intervals. Tr. Vol. IV 105:15–16.

### c. **Alford analysis**

284.    Dr. Alford testified that it is not possible, given the analysis done by Plaintiffs' experts on the issue of racial polarization, to separate partisan polarization from racial polarization. Tr. Vol. V 143:4–10.

285.    Dr. Palmer does not present any evidence that partisan polarization could better explain the candidate preference of Black voters as opposed to the race of the candidate they vote for. Tr. Vol. V 143:22–144:6.

286.    Black Democratic candidates are not positioned any differently than white Democratic candidates in terms of the likelihood that they will receive highly cohesive Black voter support. Tr. Vol. V 144:14–18.

287.    White voters cohesively support Republican candidates and, therefore, do not provide much support for Democratic candidates whether the candidate is Black or white. Tr. Vol. V 144:19–145:4.

288.    Polarization in primary elections, to the extent seen at all, is much less extreme and is highly variable depending on the election. Tr. Vol. V 147:1–11.

289.    In Dr. Handley's analysis of primaries, there are multiple instances where her estimates do not show cohesion among voters, with a potentially wide but unknown confidence interval because Dr. Handley failed to report it. Tr. Vol.

V 149:16–150:14. As a result, social scientists would not assign a preferred candidate in those situations. Tr. Vol. V 149:16–150:14.

## VI.    FACTS ABOUT THE TOTALITY OF THE CIRCUMSTANCES

### a. Factor 1: History of discrimination

290.    Defendants do not deny Georgia's past history of official, state-sponsored racism. Tr. Vol. VI 150:18–20.

291.    Dr. Burton agreed that the examples of state-sponsored racism provided in his expert report dated as far back as the Reconstruction era and into the early the 1980s, more than 40 years ago. Tr. Vol. IV 25:16–25.

292.    The examples in Dr. Jones' report included poll taxes, literacy and understanding tests, the white primary, and the county unit system. APAX A5 ¶ 8–9.

293.    Dr. Jones agreed that a poll tax in Georgia was enacted 143 years ago. Tr. Vol. IV 194:1–9.

294.    Dr. Jones agreed that literacy and understanding tests were last used more than 57 years ago. Tr. Vol. IV 195:10–19.

295.    Dr. Jones agreed that all the all-white primary was enacted 112 years ago. Tr. Vol. IV 195:21–196:1.

296.   Dr. Jones agreed that the county unit system was invalidated by the Supreme Court in 1973, 49 years ago. Tr. Vol. IV 196:2–11.

297.   Plaintiffs' experts cited only a handful of examples they contend are state-sponsored discrimination after the 1980s. Both Dr. Jones and Dr. Burton testified regarding Georgia's exact match policy and voter-list maintenance (referred to as "voter purges" in their expert reports). Tr. Vol. IV 28:6–29:7, 196:16–197:13.

298.   Dr. Burton was unaware that the database matching process he calls "exact match" is currently an open question this Court is to decide soon in other Georgia election cases. Tr. Vol. IV 28:10–17.

299.   Dr. Jones testified that she has been retained as an expert in the Fair Fight Action case currently set for trial in April. However, despite her knowledge as an expert in that case, she was unaware that the challenge to the database matching process she calls "exact match" would be decided in proceedings set for trial in April. Tr. Vol. IV 197:2–13.

300.   Dr. Burton agreed that he was aware that in a separate case, plaintiffs had challenged voter-list maintenance. However, he was unaware that those claims had been previously dismissed in December 2019. Tr. Vol. IV 28:18–29:7.

301.    Dr. Jones testified that although challenges to the voter–list maintenance process was dismissed in December 2019 by this court, "that doesn't make them not discriminatory." Tr. Vol. IV 197:18–24.

302.    Dr. Jones and Dr. Burton both referenced Senate Bill 202, the 2021 Georgia elections bill, in their expert reports, claiming it was an example of voting discrimination. APAX A5 ¶ 26–27; GPX 7 ¶¶ 50–53; GPX 9 ¶¶ 50–53.

303.    Dr. Burton agreed that Senate Bill 202 is currently being litigated in a separate case and is not at issue in the current matter. Tr. Vol. IV 29:8–30:5.

304.    Dr. Jones also agreed that Senate Bill 202 is currently being litigated in a separate case and is not at issue in the current matter. Tr. Vol. IV 198:25–199:12.

### b.  Factor 2: Racially polarized voting

305.    All of the analysis of this Senate factor duplicates the analysis provided above based on the reports and testimony of Drs. Palmer, Handley, and Alford.

### c.  Factor 3: Discriminatory voting practices

306.    In discussing Factor 3, Dr. Jones' expert report has a subsection titled "Time and Place Restrictions" where she analyzed voter registration and voting locations to determine discriminatory practices. APAX A5 ¶ 22.

307.   During her testimony, Dr. Jones admitted that the two laws she references in the "Time and Place Restrictions" subsection of her report "are at least 62 years old and date as far back as 149 years ago[.]" Tr. Vol. IV 198:7–13.

308.   Dr. Burton provided a chart in his expert report titled, "Representative Discriminatory Voting Tactics in Georgia." It depicted various jurisdictions throughout Georgia where discriminatory practices had previously been employed. Each practice corresponded with a particular date that the jurisdiction implemented it. GPX 7 ¶ 55–58; GPX 9 ¶ 55–58. Dr. Burton agreed that the most recent date listed in his chart was 1981, more than 40 years ago. Tr. Vol. IV 35:25–36:15.

309.   Dr. Burton testified that, following the Shelby County decision, then-Secretary of State Brian Kemp sent a memo to local election officials "recommend[ing] [that counties] close polling places." Tr. Vol. IV 40:24–41:3. Dr. Burton later admitted to the error in his report and testimony in using "recommend" as attributable to then-Secretary Kemp. Tr. Vol. IV 43:12–15. In fact, the quote by then-Secretary Kemp in the memo reads, "[a]s a result of the Shelby v. Holder Supreme Court decision, counties are no longer required to submit polling place changes to the Department of Justice for preclearance." GPX 7 ¶ 46; GPX 9 ¶ 46.

310.    In her testimony, Dr. Jones was aware of Georgia's automatic voter registration process that was put in place by then-Secretary of State Brian Kemp in 2016. Tr. Vol. IV 200:22–201:10. However, despite her training and educational background, Dr. Jones testified that she was not aware that this practice has provided Georgia with one of the highest voter registration rates of eligible individuals in the nation. Tr. Vol. IV 201:11–15.

### d.  Factor 4: Candidate slating process

311.    There is no candidate slating process in Georgia and thus this is not a factor the Court needs to review.

### e.  Factor 5: Effects of discrimination on ability to participate in political process

312.    Dr. Jones also opined about the record–breaking Black voter turnout in the 2020 general election. She wrote that, "[t]urnout was unprecedented in the November 2020 election, arguably fueled by some degree by the increased access[.]" APAX A5 ¶ 25.

313.    Dr. Jones agreed during her testimony that despite the alleged discriminatory restrictions outlined in her report, "the 2020 election saw tremendous Black voter turnout." Tr. Vol. IV 198:18–21. She further agreed that the 2020 Black voter turnout numbers were "unprecedented." Tr. Vol. IV 198:22–24.

### f. Factor 6: Racial appeals in campaigns

314.    Dr. Jones' expert report provided reports providing examples of what she called overt and implicit racial appeals used in political campaigns. APAX A5 ¶ 27–31.

315.    Dr. Jones' report states that prior to 1966, overt racial appeals were used on every Georgia gubernatorial election, and since 1970, more implicit appeals have been used. APAX A5 ¶ 27. Dr. Jones agreed during her testimony that 1966 was 56 years ago. Tr. Vol IV 202:17–22.

316.    As it relates to implicit racial appeals in campaigns, Dr. Jones agreed that there is no technical definition. The method she used in compiling her report was her own personal definition. Tr. Vol. IV 203:11–204:3.

317.    Dr. Jones' expert report discusses a comment former Congressman Doug Collins acting as a campaign surrogate for former Senator Kelly Loeffler. The quote was regarding Senator Raphael Warnock's pro–choice views when Congressman Collins said, "There is no such thing as a pro–choice pastor. What you have is a lie from the bed of Hell. It is time to send it back to Ebenezer Baptist Church." APAX A5 ¶ 29. When asked during her testimony as to what was the implicit racial appeal, Dr. Jones stated, "the 'it,' not the anti pro–choice." Tr. Vol. IV 204:20–23.

318.   Dr. Jones agreed that this comment was made approximately 11 months before the redistricting maps at issue were drawn and that former Congressman Collins was not a member of the General Assembly who ultimately voted on the 2021 redistricting maps. Tr. Vol. IV 205:19–25.

319.   Dr. Jones also testified that she was aware that Senator Raphael Warnock ultimately won his race; and therefore, the candidate against whom the alleged implicit racial appeals were used to attack ultimately won. Tr. Vol. IV 183:17–20.

320.   Dr. Burton's supplemental report referenced "subtle racial appeal[s]" used by President Ronald Reagan in his 1980 presidential campaign. GPX 8 ¶ 4, GPX 10 ¶ 4. However, during his testimony he was unable to provide the technical definition or scientific methodology he used to determine a "subtle racial appeal." Tr. Vol. IV 30:20–32:13.

### g.  Factor 7: Extent of election of minority candidates

321.   Dr. Jones agreed that she used no scientific methods to determine underrepresentation of minority candidates. Tr. Vol. IV 206:8–17.

322.   Dr. Jones agreed that approximately one-third Black elected officials currently serve in each chamber of the Georgia General Assembly, which closely

mirrors the 33% of the population in Georgia that is Black as reported by the 2020 Census results. Tr. Vol. IV 206:18–207:7.

323.   Dr. Jones testified that she was aware that Georgia currently has five Black members of Congress who have been elected from southwest Georgia, Atlanta, and metro Atlanta. Tr. Vol. IV 207:8–13.

324.   Dr. Jones agreed that Senator Raphael Warnock is a Black candidate who was elected statewide in early 2021 to represent Georgia in the United States Senate. Tr. Vol. IV 207:14–18.

325.   Dr. Jones also agreed that there would be two Black, statewide candidates running as Republicans in the upcoming 2022 elections — Public Service Commission Fitz Johnson and Herschel Walker. Tr. Vol. IV 207:19–208:6.

### h.  Additional Factor: Lack of responsiveness of officials

326.   Plaintiffs provided reports presenting evidence of the socioeconomic standing of Black voters as provided by Dr. Traci Burch and Dr. Loren Collingwood. APAX A6; GPX 12.

327.   Plaintiffs chose to provide no evidence of lack of responsiveness at the hearing, instead relying on the declarations. Plaintiffs provided evidence in their reports of political disputes, not clearly demonstrating that elected officials

in Georgia have been failing to respond to particularized needs of the Black community. Tr. Vol. VI 153:9–16.

328.    Dr. Burton's report copied findings provided by a scorecard compiled by the NAACP on the voting record of Georgia Members of Congress. Specifically, Dr. Burton's chart is titled "Pro–Civil Rights Votes Among Georgia's Congressional Delegation, 2017–2019 Congressional Session." GPX 7 ¶ 7; GPX 9 ¶ 7.

329.    Dr. Burton admitted to having no knowledge as to how the NAACP compiled its scorecard on Georgia congressional members. Tr. Vol. IV 32:25–34:13.

### i.   Additional Factor: Tenuous policy underlying redistricting plans

330.   Plaintiffs provided evidence to show political disputes and disagreements, not clear evidence to demonstrate any tenuous policy underlying the redistricting plans passed in 2021 by the Georgia General Assembly. Tr. Vol. 6, 153:9–16.

331.    Dr. Burton testified as to prior redistricting cycles regarding the submission of prior redistricting plans that were submitted to the Department of Justice. Tr. Vol. IV 26:5–28:5.

332.   Dr. Burton agreed that the redistricting plans submitted in 1981, 1991, 2001 were all initially denied preclearance by the Department of Justice, stating in

his report, "[f]or the fourth decade in a row, the Georgia General Assembly passed redistricting plans that would not survive preclearance." GPX 7 ¶ 40; GPX 9 ¶ 40. He further acknowledged that each of these plans were submitted during time periods when the Democratic Party maintained control of state government. Tr. Vol. IV 26:5–27:6.

333.    Dr. Burton testified that the maps drawn by Republican majorities in 2005 and 2011 were precleared by the Department of Justice. Tr. Vol. IV 27:16–28:5.

## VII.   THE 2022 ELECTION TIMELINE

### a.   Timeline considerations for 2022 elections

334.    The election timeline is tight in a normal year, but it is even more challenging this year because of late-arriving Census data and an earlier general primary. DX 38 ¶ 8; Tr. Vol. III 8:21–9:2.

335.    The General Assembly's process of drawing redistricting maps took several months, even though the special session itself was only a few weeks long. Tr. Vol. V 114:9–15.

336.    Election officials generally set their polling places at the beginning of the year, and the date of the general primary and other associated elections are on church calendars and community centers that are used as polling locations. Tr. Vol. III 9:16–25, 89:1–14.

337.   Many counties have already secured their polling locations for the May primary. Tr. Vol. III 94:15–19, 111:20–25, 119:3–5.

338.   The election calendar generally works backwards from an election day. DX 38 ¶ 12. January 13, 2022 was the earliest day a candidate could circulate a nominating petition for the General Election. O.C.G.A. § 21-2-170(e). February 23, 2022 is the deadline for calling special elections to be held in conjunction with the May primary and the deadline for setting polling places outside of precincts. DX 38 ¶¶ 13, 14; Tr. Vol. III 118:6–12. Qualifying is set to begin on March 7, 2022. O.C.G.A. § 21-2-153(c)(1)(A). Absentee ballots must be sent to overseas and military voters by April 9, 2022. O.C.G.A. § 21-2-384(a)(2).

### b. Process of reallocating voters

339.   In Georgia's voter-registration database, county election officials have to update each individual street segment manually to update district numbers for voters on that street segment. Tr. Vol. III 17:5–18:9, 32:1–25.

340.   County election officials engage in a manual review of maps to identify where each street segment is located on the new district plans. Tr. Vol. III 20:14–21:9; DX 38 ¶ 9; Tr. Vol. III 81:7–20.

341.   To begin the data-entry process, the county registrar notifies the Secretary's office that they are ready to enter the redistricting module, which

prevents the registrar from engaging in normal activity in the system, such as adding new voters. Tr. Vol. III 20:4–11; DX 7, p. 31.

342.   County election officials are already updating the voter-registration database with new district information. Tr. Vol. III 41:24–42:10. It took Fulton County four weeks to update its street segments. Tr. Vol. III 83:12–19.

343.   After counties complete updating their street segments, the next step is to request precinct cards from the voter-registration system to notify voters about their new districts. DX 7, p. 49.

344.   Mr. Esselstyn's testimony about the feasibility of implementing his plans was based on his belief that Georgia's voter-registration system allowed the mass assignment of all voters in a single precinct to a particular district. Tr. Vol. II 123:15–124:16. Mr. Esselstyn was mistaken on that point, as several county election officials attested, and thus his testimony on feasibility of relief does not provide the Court with any assistance. Tr. Vol. III 17:21–18:9, 81:11–24; 117:15–21.

### c. Process of creation of ballot combinations

345.   Ballot combinations account for every possible combination of political districts in the state and includes all races from U.S. Congress down to county commission and school board. Tr. Vol. II 67:11–68:2. There is at least one

ballot combination per precinct, so the total is more than 2,000 ballot combinations or styles in the state of Georgia. Tr. Vol. II 67:24–68:2; DX 4 ¶ 9.

346.   Ballot combinations must be programmed manually to create elections databases that are used to program the voting equipment and generate proofs of ballots. Tr. Vol. II 68:3–19; DX 4 ¶ 11.

347.   In Georgia, the Center for Election Systems undertakes the manual process of building the ballot combinations. Tr. Vol. II 68:3–9.

348.   After county registrars complete the process of updating all of the street segments in a county with new district numbers, the Center for Election Systems can begin creating ballot combinations for use in the election. DX 4 ¶¶ 8, 11; Tr. Vol. II 68:10–19; DX 38 ¶ 12.

349.   State officials cannot build ballot combinations until after county registrars have entered all updated information into the voter-registration database. Tr. Vol. III 92:16–19.

350.   The Secretary of State set a February 18, 2022 deadline for all county registrars to complete their updates to the voter-registration database with new district information. DX 4 ¶ 15; Tr. Vol. II 73: 20–74:1; DX 38 ¶ 12. Even with that deadline, the Center for Election Systems will be on an incredibly tight timeline to

finish building ballot combinations before qualifying begins on March 7. Tr. Vol. II 74:2–12.

351.   The Center for Election Systems has already started building election projects for use in the 2022 primary election for counties that already know their districts. Tr. Vol. II 70:4–7.

352.   Once qualifying occurs, the Center for Election Systems adds candidate names to the relevant contests and begins preparing proofing packages to send to counties. DX 4 ¶ 12; Tr. Vol. II 70:8–71:2.

353.   County election officials then proof those drafts, identify errors, and return those to the Center for Election Systems to corrections to the databases. Tr. Vol. II 71:3–6, 82:4–18, 118:16–24; DX 38 ¶¶ 15, 16. The Center for Election Systems then makes those corrections, generates a revised proofing package, and then creates print files for absentee ballots and final project files for programming the voting machines. Tr. Vol. II 71:7–23.

354.   This entire process occurs for all 159 counties between the close of qualifying on March 11 and the deadline for sending ballots for overseas voters on April 9. Tr. Vol. II 71:24–4, 87:14–88:8.

355.   This is the first time Georgia has built ballot combinations for the Dominion system after redistricting and extra election projects have to be built this

year because of the addition of ranked-choice voting for overseas and military voters. Tr. Vol. II 72:8–20.

356.   If all of the ballot combinations are not ready by qualifying, then no ballot proofing can occur because the office cannot generate a proofing package without both the ballot combinations and candidate information. Tr. Vol. II 72:21–73:19.

### d.   Impact of moving qualifying date without moving primary election

357.   If the qualifying dates for the 2022 primary elections were moved without moving the election, the work of the Center for Election Systems and counties becomes incredibly compressed, risking the accuracy of the election. Tr. Vol. II 74:13–75:16. Without candidate names after qualifying, no ballot proofs can be completed, meaning that the Center for Election Systems cannot send proofing packages and counties cannot begin proofing ballots. Tr. Vol. II 75:17–76:7.

358.   Reduced time for proofing ballots can also lead to errors in information that could result in less voter confidence in the election system. Tr. Vol. II 102:8–103:15.

359.   Delaying qualifying without delaying the primary would limit the time election officials have to engage in the quality-assurance checks necessary to ensure the election is accurate. Tr. Vol. III 8:13–9:9:15; DX 41 ¶ 18.

360.   Delaying qualifying without delaying the primary while also imposing new district lines would require election officials to simultaneously input new district information while conducting other tasks related to elections, reducing the opportunity to check for errors. DX 41 ¶ 21.

### e.  Impact of moving primary election date

361.   Voters are already being notified of their districts and polling locations for the May primary election. Tr. Vol. III 10:13–11:11.

362.   If the primary election date were changed by this Court and then that order was stayed by a higher court, there would be chaos and confusion for local election officials and voters. Tr. Vol. III 12:22–13:14:3; DX 41 ¶ 19.

363.   Unlike in 2020 when the primary was delayed, facilities used as polling locations have other events on their calendars this year. DX 41 ¶¶ 19, 20; Tr. Vol. III 9:16–24, 27:15–23. For example, churches have often scheduled Vacation Bible School around the planned election dates and may not be available as polling locations if the date of the election changed. Tr. Vol. III 68:5–19, 119:6–18.

364.   Election officials have scheduled pollworkers and pollworker training around the existing election calendar for the May primary. Tr. Vol. III 121:7–10.

365.   Finding new polling facilities is challenging not only because of scheduling but also because of electrical power needs of Georgia's voting machines. Tr. Vol. III 73:17–74:5, 75:15–20.

366.   When the 2020 primary elections were delayed, county officials in Fulton County lost access to polling locations. Tr. Vol. III 95:10–24. The resulting loss of access meant voters were combined in voting locations. Tr. Vol. III 95:25–14. Voters in Fulton County waited in line for hours during the June 9 primary at locations where polling places had to be combined. Tr. Vol. III 96:18–97:9. A number of the voters who had to wait in long lines on June 9 due to combined precincts were voters of color. Tr. Vol. III 97:10–22.

367.   Voter confidence can be adversely affected by long lines and moving polling locations causes confusion for voters. Tr. Vol. III 98:9–23, 144:21–23.

368.   In fact, Bishop Jackson has referred to closing and moving polling locations, which would be likely if the primary election were delayed, as a "tactic of voter suppression." Tr. Vol. III 139:8–16.

369.   While a number of Georgia election officials requested a change in the primary election schedule in the summer of 2021, the General Assembly did not make that change during the special session, as requested. Tr. Vol. III 54:1–23. If the changes had been made during the special session, election officials could have

planned for the 2022 election cycle in light of those changed dates. Tr. Vol. III 56:23–57:6. But without the schedule change, election officials proceeded to plan for the election by contacting polling places and taking other steps based on the established election calendar. Tr. Vol. III 57:6–25.

370.   The change in Georgia law from nine-week runoffs to four-week runoffs is currently being challenged in three of the consolidated cases challenging provisions of SB 202. New Georgia Project v. Raffensperger, Sixth District AME v. Raffensperger, and Concerned Black Clergy v. Raffensperger, Consolidated Case No. 1:21-mi-55555-JPB (N.D. Ga.).

### f.   Other cases where maps were used but later found illegal

371.   There are a number of situations where maps or election processes were found to be unconstitutional or illegal but were used in an election to avoid the disruption that would otherwise result. For example, Larios v. Cox, 300 F.Supp.2d 1320, 1326–27 (N.D. Ga. 2004), the 2001 cycle legislative maps were used in the 2002 elections but later found unconstitutional. Id. at 1356.

372.   Muscogee County has a provision of its charter that it uses its prior maps if new maps are not place six months before the election. Tr. Vol. III 115:13–116:13.

373.    Similarly, in <u>Ely v. Klahr</u>, 403 U.S. 108, 113 (1971), <u>Upham v. Seamon</u>, 456 U.S. 37, 44 (1982), and <u>Kilgarlin v. Hill</u>, 386 U.S. 120, 121 (1967), courts found maps violated the law but that it was too late to alter the election schedule.

374.    In more recent cases, the court found that it would not delay the election in <u>Covington v. North Carolina</u>, 316 F.R.D. 117, 177 (M.D. N.C. 2016) due to the considerable confusion, inconvenience, and uncertainty among voters, candidates, and election officials that would result.

## VIII.  STANDARD OF REVIEW

### a.  Preliminary injunction

375.    This Court cannot grant a preliminary injunction "unless the movant clearly established the burden of persuasion as to the four requisites." <u>McDonald's Corp. v. Robertson</u>, 147 F. 3d 1301, 1306 (11th Cir. 1998) (cleaned up). Plaintiffs must show that: (1) they have a substantial likelihood of success on the merits of their claims; (2) they will likely suffer irreparable harm in the absence of an injunction; (3) the balance of equities tips in Plaintiffs' favor; and (4) an injunction is in the public interest. <u>Winter v. Nat. Res. Def. Council, Inc.</u>, 555 U.S. 7, 20 (2008). "The burden of persuasion in all of the four requirements is at all times upon the plaintiff." <u>NE Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville</u>, 896 F.2d 1283, 1286 (11th Cir. 1990) (quotations omitted).

376.    A preliminary injunction is never granted as a matter of right, even if a plaintiff can show a likelihood of success on the merits. Benisek v. Lamone, 138 S. Ct. 1942, 1943–44 (2018). While it is already a form of extraordinary relief, that relief is even more drastic in the context of elections, because of the public interest in orderly elections and election integrity. Purcell v. Gonzalez, 549 U.S. 1, 4–5 (2006).

377.    Further, when "an impending election is imminent and a State's election machinery is already in progress," equitable considerations justify a court denying an attempt to gain immediate relief. Reynolds v. Sims, 377 U.S. 533, 585 (1964); see also Repub. Nat'l Comm. v. Dem. Nat'l Comm., 140 S. Ct. 1205, 1207 (2020). This is because "Court orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls." Purcell, 549 U.S. at 4–5.

### b. Claims under Section 2 of the VRA

378.    Section 2 of the Voting Rights Act prohibits jurisdictions from diluting the strength of minority voters through a "standard, practice, or procedure" "which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). Proof of illegal vote

dilution is established through a "totality of the circumstances" analysis. 52 U.S.C. § 10301(b).

379.   To prove a violation of Section 2 in a vote-dilution case, a plaintiff bears the burden of first proving each of the three Gingles preconditions: "(1) that the minority group is 'sufficiently large and geographically compact to constitute a majority in a single-member district'; (2) that the minority group is 'politically cohesive'; and (3) that sufficient racial bloc voting exists such that the white majority usually defeats the minority's preferred candidate." Nipper v. Smith, 39 F. 3d 1494, 1510 (11th Cir. 1994). After a plaintiff establishes the three preconditions, a court then reviews the so–called "Senate Factors" to assess the totality of the circumstances. Id. at 1512; Thornburg v. Gingles, 478 U.S. 30, 79 (1986); Johnson v. De Grandy, 512 U.S. 997, 1011 (1994). Failure to establish one of the Gingles preconditions is fatal to a Section 2 claim because each of the three prongs must be met. Johnson v. DeSoto Cnty. Bd. of Comm'rs, 204 F. 3d 1335, 1343 (11th Cir. 2000); Burton v. City of Belle Glade, 178 F. 3d 1175, 1199 (11th Cir. 1999); Brooks v. Miller, 158 F. 3d 1230, 1240 (11th Cir. 1998); Negron v. City of Miami Beach, Fla., 113 F. 3d 1563, 1567 (11th Cir. 1997).

380.   Further, when considering a challenge under Section 2, this Court must determine whether the alleged vote dilution is "on account of race or color,"

52 U.S.C. § 10301(a), or caused by some other factor. This is because "[u]nless courts 'exercise extraordinary caution' in distinguishing race–based redistricting from politics–based redistricting, they will invite the losers in the redistricting process to seek to obtain in court what they could not achieve in the political arena." Cooper v. Harris, 137 S. Ct. 1455, 1490 (2017) (Alito, J., concurring in part) (quoting Miller v. Johnson, 515 U.S. 900, 916 (1995)).

## IX.    PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS

381.    Plaintiffs are not likely to succeed on the merits of their claims because they cannot demonstrate any of the Gingles preconditions. Even if they could, they cannot demonstrate based on the totality of the circumstances that the challenged redistricting maps cause vote dilution on account of race or color in violation of Section 2.

### a.  Plaintiffs have not offered a valid remedy (Gingles 1)

382.    The Eleventh Circuit prohibits the separation of the first prong of liability under Gingles and the potential remedy. Nipper, 39 F. 3d at 1530–31; see also Burton, 178 F. 3d at 1199 ("We have repeatedly construed the first Gingles factor as requiring a plaintiff to demonstrate the existence of a proper remedy."); accord Wright v. Sumter Cty. Bd. of Elections & Registration, 979 F. 3d 1282, 1302 (11th Cir. 2020). Whatever plan is used to demonstrate a violation of the first prong

of <u>Gingles</u> must also be a remedy that can be imposed by the Court. <u>Nipper</u>, 39 F. 3d at 1530–31. In short, if a plaintiff cannot show that the plan used to demonstrate the first prong can also be a proper remedy, then the plaintiff has not shown compliance with the first prong of <u>Gingles</u>. <u>Wright</u>, 979 F. 3d at 1302.

383.    Plaintiffs' illustrative plans fail to cross the threshold for remedies that can be imposed by the Court.

384.    First, the boundaries of the majority-Black districts on all five of the illustrative plans are "unexplainable other than on the basis of race," which is unconstitutional. <u>Miller</u>, 515 U.S. at 910. In creating the illustrative plans on which Plaintiffs rely, both experts testified to their focus on race in creating the plans because their purpose was adding majority-Black districts. Both experts utilized racial shading, dots, and labels in their software to identify Black population while drawing districts. Both experts drew districts that were barely majority-Black on the any-part Black voting age population number, splitting other communities in the process.

385.    While both of Plaintiffs' experts indicated their race-consciousness in drawing redistricting plans, neither was able to adequately explain how they utilized "traditional districting principles such as maintaining communities of interest and traditional boundaries." <u>League of United Latin Am. Citizens v. Perry</u>,

548 U.S. 399, 433 (2006) ("LULAC") (quoting Abrams v. Johnson, 521 U.S. 74, 92 (1997)). The Voting Rights Act does not ask merely whether more majority–Black districts can be drawn—it asks whether reasonably compact majority–Black districts can be drawn if all other factors are also met. Shaw v. Hunt, 517 U.S. 899, 913 (1996).

386.    Plaintiffs' experts only asked if they could draw more majority–Black districts if they focused primarily on race. But "[Section] 2 does not require a State to create, on predominantly racial lines, a district that is not 'reasonably compact.'" Bush v. Vera, 517 U.S. 952, 979 (1996). And "[f]ailure to maximize cannot be the measure of § 2." De Grandy, 512 U.S. at 1017.

387.    Plaintiffs did not provide evidence that the legislature failed to consistently follow its own guidelines. Instead, they provided maps that only unite disparate communities based on race, which is prohibited. LULAC, 548 U.S. at 433.

388.    Plaintiffs argue that Section 2 permits a focus on race at the Gingles prong 1 stage. But even in this situation, racial gerrymanders can meet strict scrutiny only where they satisfy a "compelling state interest" and are narrowly tailored. Shaw, 517 U.S. at 908. Plaintiffs cannot demonstrate a "strong basis in evidence" for why they have drawn their maps. Cooper, 137 S. Ct. at 1464. As a

result, they have failed to show there is any compelling interest that supports their racial focus.

389.   Even in the most generous reading of Supreme Court precedent, Section 2 could allow race-conscious relief only <u>after</u> Plaintiffs have established that the redistricting plans "result[ed] in a denial or abridgement of the right . . . to vote on account of race or color." 52 U.S.C. § 10301(a).

390.   Plaintiffs cannot racially gerrymander as a sword to show a Section 2 violation, then use that newly found Section 2 violation as a shield to protect their improper racial redistricting.

391.   Further, Plaintiffs' mapdrawers did not undertake any analysis of the geographic compactness of the minority communities, instead relying on the districts they drew to support a finding of geographic compactness.

392.   Plaintiffs must do more than just draw a district—they must demonstrate connections between the disparate geographic communities they unite that go beyond race. <u>LULAC</u>, 548 U.S. at 433; <u>Vera</u>, 517 U.S. at 997. By relying solely on compactness scores of the districts, they miss the requirement of compactness of the underlying community.

393.   The Section 2 analysis of compactness is not centered on "the relative smoothness [and contours] of the district lines," but rather the compactness of the

minority population itself. LULAC, 548 U.S. at 432–433. The inquiry, therefore, is whether "the minority group is geographically compact." Id. at 433 (quoting Shaw, 517 U.S. at 916).

394.   A review of each proposed new majority-Black district illustrates why the district as drawn does not support a conclusion that the minority community is sufficiently numerous and geographically compact for purposes of the first prong of Gingles.

### i.   The House of Representative plans

395. For the illustrative plans drawn for the state House of Representatives, Plaintiffs' experts disagreed about where additional majority-Black districts should be located. Mr. Cooper's illustrative plans drew an additional district in southwest Georgia that was not drawn by Mr. Esselstyn, and Mr. Esselstyn drew an additional district in the western suburbs of Atlanta that Mr. Cooper did not draw. Similarly, Mr. Esselstyn drew two majority-Black districts in middle Georgia while Mr. Cooper only drew one. This fact raises significant questions about Plaintiffs' clear entitlement for relief as to the first prong of Gingles because the conflict between maps demonstrates that neither is a "narrowly tailored" remedy.

396.    Mr. Esselstyn's illustrative plan in <u>Grant</u> proposes five new majority–Black state House districts, specifically Districts 64, 74, 117, 145, and 149. None of these districts can be ordered as remedies by the Court nor do they demonstrate the geographic compactness of the minority community.

397.    Mr. Esselstyn's House Districts 145 and 149 have the hallmarks of being drawn primarily based on race. Not only does District 149 extend a finger to include Black population in Milledgeville, it only achieves two-hundredths of one percent over 50% on the any-part Black voting age population metric.

398.    In addition, the reconfiguration of middle Georgia is in direct conflict with public testimony about the city of Macon, divides downtown Macon into four districts, and results in Districts 142, 143, 145, and 149 all being below 50% Black on every metric except for any-part Black voting age population. District 149 would likewise be the only district showing as majority-Black on voter registration.

399.    The Court finds that the configuration of Districts 145 and 149, along with the surrounding districts, results in a maximization of majority-Black districts in middle Georgia without considering other redistricting principles. Instead of providing a district for a geographically compact community, the reconfiguration of middle Georgia divides a minority community in service of adding majority-

Black seats. As a result, these districts are not appropriate remedies and cannot satisfy Plaintiffs' burden under the first prong of Gingles.

400.    Mr. Esselstyn's Districts 74 and 117 are more compact, but still unite communities based on race. District 74 connects parts of heavily Black Clayton County with south Fayette County, and Mr. Esselstyn testified that he could not identify a reason for doing so beyond the goal of creating an additional majority–Black district. District 117 likewise includes disparate areas and dramatically reconfigures surrounding districts. Each of these districts does not have a majority of Black voters using voter-registration data and barely cross the 50% threshold on several Census metrics. Neither of these districts demonstrate that Black voters in the areas encompassed by those districts are "geographically compact" and thus do not support Plaintiffs' efforts to show compliance with Gingles prong 1. LULAC, 548 U.S. at 433.

401.    Finally, Mr. Esselstyn's proposed House District 64 likewise unites disparate communities in Fulton and Paulding Counties, and still barely clears the 50% threshold on any-part Black voting-age population. It is below 50% on single-race Black voting-age population and Mr. Esselstyn could not identify any consistent principle supporting its creation.

402.   Mr. Esselstyn's illustrative state House plan is less compact than the 2021 adopted state House plan, splits more jurisdictions, and pairs more incumbents. The Court finds that the General Assembly can reasonably follow these traditional principles in creating district plans. Again, the fact that the General Assembly did not maximize the number of Black districts is not the measure of a Section 2 violation. De Grandy, 512 U.S. at 1017.

403.   Plaintiffs in Grant have not shown that the illustrative plan for the state House is a remedy the Court can impose and have not shown that the Black communities in the areas covered by these districts are geographically compact.

404.   Mr. Cooper's illustrative state House plan in Alpha proposes four new majority-Black districts: District 73, 110, 144, and 153. None of these districts can be ordered as remedies by the Court nor do they demonstrate the geographic compactness of the minority community.

405.   Further, Mr. Cooper's illustrative state House plan shares only one district in common with the 2021 adopted state House plan, making it impossible to utilize as a remedy because it does not defer to any policy choices made the legislature in creating the 2021 adopted state House plan. Wise v. Lipscomb, 437 U.S. 535, 539 (1978).

406.   Mr. Cooper's District 72 connects disparate communities in Clayton County and Griffin without a consistent explanation. It also breaks the county boundary of Clayton County in ways that differ from both the 2021 adopted plan and the Democratic proposed plan. The district also requires a massive reconfiguration of the surrounding districts.

407.   Mr. Cooper's District 110 also connects rural areas in ways that are not supported by traditional redistricting principles. It barely clears 50% on single-race Black voting age population and is below 50% on Black voter registration. Mr. Cooper was unable to explain why it connected disparate areas in the way that it did and this district requires massive reconfiguration of the surrounding districts.

408.   Mr. Cooper testified that he specifically drew Black population out of Eatonton and Milledgeville to connect those populations with other majority-Black counties to create District 144. The district contains outcroppings that are used for his racial goal and barely reaches majority-Black status using the any-part Black voting age population metric. It is below 50% on single-race Black voting age population. This district unites disparate communities based on race. LULAC, 548 U.S. at 433.

409.   Finally, Mr. Cooper's District 153 connects Albany and Thomasville, two communities that share little in common, and results in no House district

wholly located in Dougherty County. It also requires significant reconfiguration of surrounding districts, including splitting Sumter County three ways. The shape and lack of connection lead to the conclusion that this district was drawn primarily based on race. LULAC, 548 U.S. at 433.

410.   Mr. Cooper's illustrative state House plan is less compact than the 2021 adopted state House plan, splits more jurisdictions, and pairs more incumbents. The Court finds that the General Assembly can reasonably follow these traditional principles in creating district plans. Again, the fact that the General Assembly's did not maximize the number of Black districts is not the measure of a Section 2 violation. De Grandy, 512 U.S. at 1017.

411.   Plaintiffs in Alpha have not shown that the illustrative plan for the state House is a remedy the Court can impose and have not shown that the Black communities in the areas covered by these districts are geographically compact.

### ii.  The state Senate illustrative plans

412.   Mr. Esselstyn's illustrative state Senate plan in Grant proposes three new majority-Black state Senate districts, specifically Districts 23, 25, and 28. None of these districts can be ordered as remedies by the Court nor do they demonstrate the geographic compactness of the minority community in those areas.

413.   Mr. Esselstyn's state Senate District 23 splits a number of counties on racial grounds, including McDuffie and Baldwin, and still only achieves 50.43% any-part Black voting age population status. It is under 50% on single-race Black voting age population and only contains 48.57% Black registered voters. The configuration also requires District 22 to move out of its traditional boundaries in Richmond County. Mr. Esselstyn was unable to explain any consistent basis for the creation of this district beyond its racial characteristics and used racial data in creating the district.

414.   Mr. Esselstyn's state Senate District 25 is more compact than some other districts, but still crosses the county line in Clayton County and divides Clayton County three ways. The significant reconfiguration of adjoining districts, including District 10 taking in Butts County, is a departure from how this area of the state has been drawn in the past. Mr. Esselstyn was unable to explain the traditional redistricting principles governing the creation of his illustrative Senate District 25 and used racial data in creating the district.

415.   Mr. Esselstyn's District 28 takes pieces of four counties, including a split to add Black voters in Newnan. Mr. Esselstyn was unable to explain his basis for including these various communities and could not identify a non-racial reason for his split of Coweta County and used racial data in creating the district.

416.   Mr. Esselstyn's illustrative state Senate plan is less compact than the 2021 adopted state Senate plan, splits more jurisdictions, and pairs more incumbents. The Court finds that the General Assembly can reasonably follow these traditional principles in creating district plans. Again, the fact the General Assembly did not maximize the number of majority-Black districts is not the measure of a Section 2 violation. De Grandy, 512 U.S. at 1017.

417.   Plaintiffs in Grant have not shown that the illustrative plan for the state Senate is a remedy the Court can impose and have not shown that the Black communities in the areas covered by these districts are geographically compact.

418.   Like Mr. Esselstyn, Mr. Cooper's illustrative state Senate plan in Alpha proposes three new majority-Black state Senate districts, specifically Districts 17, 23, and 28. None of these districts can be ordered as remedies by the Court nor do they demonstrate the geographic compactness of the minority community in those areas.

419.   Further, Mr. Cooper's illustrative state Senate plan shares only no districts in common with the 2021 adopted state Senate plan, making it impossible to utilize as a remedy because it does not defer to any policy choices made the legislature in creating the 2021 adopted state Senate plan. Wise, 437 U.S. at 539.

420.    Mr. Cooper's state Senate District 17 connects urban areas of Stonecrest and South DeKalb County with rural areas in Henry County. It also requires significant reconfigurations of adjoining districts, such as District 44, which became more elongated and connects Griffin with Clayton County. Mr. Cooper was unable to explain any traditional principles governing the configuration of this district.

421.    Mr. Cooper's state Senate District 23 runs halfway across the state, connecting Augusta with Warner Robins. Mr. Cooper was unable to explain any consistent feature about this configuration, which also requires significant changes to District 22. Even with all of the efforts on this district, it is still only 50.54% any-part Black voting age population and below 50% on single–race Black voting age population (49.37%) and Black registered voters (49.20%).

422.    Mr. Cooper's state Senate District 28 connects parts of Fayette, Spalding, and Coweta Counties to create a majority-Black district. In so doing, it divides Coweta County three ways and connects parts of Clayton County that share little in common with rural areas of Fayette and Spalding Counties. Further, the district would not be a majority-Black district without including Clayton County, which does not demonstrate compactness of the minority community in this district.

423.    Mr. Cooper's illustrative state Senate plan is less compact than the 2021 adopted state Senate plan, splits more jurisdictions, and pairs more incumbents. The Court finds that the General Assembly can reasonably follow these traditional principles in creating district plans. Again, the fact the General Assembly did not maximize the number of Black districts is not the measure of a Section 2 violation. De Grandy, 512 U.S. at 1017.

424.    Plaintiffs in Alpha have not shown that the illustrative plan for the state Senate is a remedy the Court can impose and have not shown that the Black communities in the areas covered by these districts are geographically compact.

### iii.   The illustrative congressional plan

425.    Mr. Cooper also drew an illustrative congressional plan in Pendergrass that adds one majority-Black congressional district, District 6. This district cannot be ordered as a remedy by the Court nor does it demonstrate the geographic compactness of the minority community in the area it covers.

426.    Mr. Cooper was unable to explain the geography he included in Fayette and Cobb Counties based on any traditional redistricting principles. He agreed District 6 would be more compact if he had taken another part of Cobb County and he split multiple precincts in Fayette County. Even after that effort, his illustrative District 6 is still only 50.23% any-part Black voting age population

and below majority on both single-race Black and Black registered voters. The reconfiguration of District 6 also pushed District 13 into rural areas in the east and reduced its any-part Black voting age population to 51.40%, pushing its single-race Black and Black voter registration numbers below 50%.

427.    Mr. Cooper's illustrative congressional plan is less compact than the 2021 adopted congressional plan and splits more jurisdictions. The Court finds that the General Assembly can reasonably follow these traditional principles in creating district plans. Again, the fact the General Assembly did not maximize the number of Black districts is not the measure of a Section 2 violation. De Grandy, 512 U.S. at 1017.

428.    Plaintiffs in Pendergrass have not shown that the illustrative plan for Georgia congressional districts is a remedy the Court can impose and have not shown that the Black communities in the areas covered by this district are geographically compact.

### b. Plaintiffs have not established that voting in Georgia is polarized by race and not on some other basis (Gingles 2 and 3)

429.    Plaintiffs are also not likely to succeed on their Section 2 claims because they have not shown causation behind polarized voting—they have only showed that voting is polarized.

430.   In order to succeed, Plaintiffs do not just have to show that voting is racially polarized—they have to prove that electoral losses are "on account of race or color" and not partisan voting patterns. 52 U.S.C. § 10301(a); Solomon v. Liberty County, 221 F. 3d 1218, 1225 (11th Cir. 2000) (en banc); see also League of United Latin Am. Citizens v. Clements, 999 F. 2d 831, 854 (5th Cir. 1993) (en banc) ("failures of a minority group to elect representatives of its choice that are attributable to 'partisan politics' provide no grounds for relief").

431.   This matters because "what appears to be bloc voting on account of race may, instead, be the result of political or personal affiliation of different racial groups with different candidates." Solomon, 221 F. 3d at 1225. This is why Section 2 claims present an "often–unstated danger": "Unless courts 'exercise extraordinary caution' in distinguishing race–based redistricting from politics-based redistricting, they will invite the losers in the redistricting process to seek to obtain in court what they could not achieve in the political arena." Cooper, 137 S. Ct. at 1490 (Alito, J., concurring in part) (quoting Miller, 515 U.S. 916) (cleaned up).

432.   The testimony and reports of Drs. Handley and Palmer carefully avoided any causal determination. In contrast, the testimony and report of Dr. Alford indicated that partisanship explains voter behavior better than race. In

every general election contest analyzed, the only determining factor for whether the Black and white voters supported a candidate was the party of the candidate.

433.   Further, an interpretation of Section 2 that requires partisan outcomes in the redistricting process would raise significant questions about the constitutionality of that law. City of Boerne v. Flores, 521 U.S. 507, 530 (1997).

434.   For purposes of this emergency motion, Plaintiffs have not clearly established they are likely to succeed on Gingles prongs 2 and 3 because they have not shown that the polarized voting that is occurring is "on account of race or color" as required by Section 2.

### c. Plaintiffs have not established that the totality of the circumstances clearly favors a finding of vote dilution.

435.   Only after Plaintiffs show the first three Gingles requirements does the Court "consider[] whether, 'on the totality of circumstances,' minorities have been denied an 'equal opportunity' to 'participate in the political process and to elect representatives of their choice.'" Abrams, 521 U.S. at 91 (quoting Section 2); De Grandy, 512 U.S. at 1011 (Gingles factors are not "sufficient in combination" to prove a violation of Section 2).

436.   Further, "[t]he inability to elect representatives of their choice is not sufficient to establish a violation unless, under the totality of circumstances, it can

also be said that the members of the protected class have less opportunity to participate in the political process." <u>Chisom v. Roemer</u>, 501 U.S. 380, 397 (1991). Because "in a majoritarian system, numerical minorities lose elections." <u>Holder v. Hall</u>, 512 U.S. 874, 901 (1994) (Thomas, J., concurring).

437.    Even though Plaintiffs have failed to show the first three prongs of <u>Gingles</u>, their claims still fail on the present record if the Court were to continue to the weigh the totality of the circumstances because the record before the Court does not indicate that the 2021 adopted redistricting plans present "an unequal opportunity for minority voters to participate in the political process and to elect representatives of their choosing as compared to other members of the electorate." <u>Ga. State Conference of the NAACP v. Fayette Cty. Bd. of Comm'rs</u>, 775 F. 3d 1336, 1342 (11th Cir. 2015).

438.    This case is also unusual in its efforts to conduct an entire Section 2 case on an emergency basis. Generally, the totality is weighed after significant discovery and a bench trial. Even grants of summary judgment to plaintiffs in Section 2 cases after discovery are "unusual." <u>Fayette Cty. Bd. of Comm'rs</u>, 775 F. 3d at 1345. This is because "[n]ormally," Section 2 claims "are resolved pursuant to a bench trial." <u>Id</u>. at 1343. Ordering relief earlier in the case is problematic "due to the fact–driven nature of the legal tests required by the Supreme Court and

[Eleventh Circuit] precedent." Id. at 1348. This remains true even when the parties agree on many basic facts at stages before a bench trial. See Burton, 178 F. 3d at 1187 (citing Clemons v. Dougherty Cty., Ga., 684 F. 2d 1365, 1369 (11th Cir. 1982)).

439.    This Court is required to conduct an "intensely local appraisal" of the facts, which is not generally amenable to resolution as a matter of law or on an emergency basis. De Grandy, 512 U.S. at 1020–21 (no statistical shortcuts to determining vote dilution); Gingles, 478 U.S. at 45, 78 (stating that courts must conduct a "searching practical evaluation of the 'past and present reality'" of the challenged electoral system and whether vote dilution is present is "a question of fact"); White v. Regester, 412 U.S. 755, 769–70 (1983) (assessing the impact takes place "in light of past and present reality, political and otherwise").

440.    The Gingles court listed the Senate factors as follows:

"1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

"2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

"3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti–single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

"4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

"5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

"6. whether political campaigns have been characterized by overt or subtle racial appeals;

"7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

"Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

"whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

"whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous."

Gingles, 478 U.S. at 36–37

441.   The Court assess the Senate Factors based on the evidence before it as follows.

442.   First, the history of discrimination. All parties agree that Georgia has a terrible past history of state-sponsored racism. But the Eleventh Circuit has cautioned against "allowing the old, outdated intentions of previous generations

to taint [a jurisdiction's] ability to enact voting legislation." <u>Greater Birmingham Ministries v. Sec'y of Ala.</u>, 992 F.3d 1299, 1332 (11th Cir. 2021). Despite providing voluminous declarations from experts, Plaintiffs can point to few examples in recent history that are relevant to the redistricting plans before the Court. As a result, this factor does not weigh clearly in favor of either party at this stage.

443.   Second, racially polarized voting. As discussed above under <u>Gingles</u> prongs two and three, this factor does not favor Plaintiffs because of the lack of evidence of whether the polarized voting is due to partisanship or some other factor. Plaintiffs must prove that vote dilution is "on account of race or color" and the evidence before the Court at this stage only demonstrates that voting is polarized in Georgia. Plaintiffs' strategic decision not to analyze causation as a part of their experts' analysis does not give rise to an inference in their favor.

444.   Third, historical voting practices that discriminate. While Georgia has several practices that have been used as discriminatory devices in the past, it is unclear how these apply in the present. For example, the majority-vote requirement operated in the 2020 general election to create an opportunity to the Black-preferred U.S. Senate candidates to win. Thus, this factor does not strongly favor either party at this stage.

445.   Fourth, Georgia does not have a candidate slating process, so this factor does not apply.

446.   Fifth, the extent to which minority group members bear the effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process. Plaintiffs presented several expert declarations on this point, but their experts also testified about record-breaking Black voter turnout in the 2020 election. Given that Black voters do not appear to be hindered from participating in the electoral process based on any disparities in education, employment, and health, this factor does not weigh clearly in favor of either party at this stage.

447.   Sixth, racial appeals in campaigns. Plaintiffs presented several examples of racial appeals which regrettably are still part of political discourse. But most of these appeals came from unsuccessful candidates and a few scattered examples does not demonstrate that these kinds of appeals <u>characterize</u> Georgia campaigns, which limits their value to weighing the totality of the circumstances. As a result, this factor weighs in favor of Defendants at this stage.

448. Seventh, the extent of election of Black officials. Georgia has had few non-judicial statewide elected Black officials,[2] but the relevant comparison is for the State or political jurisdiction. 52 U.S.C. § 10301(b). Plaintiffs' expert agreed that roughly one-third of the members of the state House and state Senate are Black, which is proportional to the total Black population of the state. Tr. Vol. IV 206:18–207:7. Thus, this factor does not weigh clearly in favor of either party at this stage.

449. While Plaintiffs have offered some evidence on responsiveness, many of the items identified underscore the partisan nature of a possible dispute over a racial one. One of the particular issues about which Plaintiffs complain — maternal mortality — was an issue that Plaintiffs' own exhibit demonstrated that the General Assembly was studying. GPX 62. And Plaintiffs have not shown the policy decisions of the General Assembly regarding the design of the redistricting plans is tenuous. Thus, neither of these factors clearly favor Plaintiffs at this stage.

450. One additional factor as part of the totality of the circumstances is a proportionality analysis for the 2021 adopted congressional plan.

451. In De Grandy, the Supreme Court concluded that "proportionality . . . is obviously an indication that minority voters have an equal opportunity . . . to

---

[2] The Court notes the upcoming statewide election for incumbent Public Service Commissioner Fitz Johnson and the reported political success thus far of Herschel Walker, which could alter this dynamic after the 2022 election.

participate in the political process and to elect representatives of their choice." 512 U.S. at 1020 (cleaned up). Because Section 2 does not require a State to maximize the number of "safe" minority districts in an area, id. at 1016–1017, the Supreme Court found that, when the minority group in question enjoyed "rough proportionality," there was no Section 2 violation. Id. at 1023.

452.    The Supreme Court gave further direction in LULAC, finding that the relevant geographic area for a proportionality analysis is the entire state. 548 U.S. at 437. In LULAC, the Supreme Court explained that the proportionality inquiry entails "comparing the percentage of total districts that are [African–American] opportunity districts with the [African–American] share of the citizen voting–age population." 548 U.S. at 436.

453.    While proportionality is not a safe harbor for a jurisdiction, LULAC, 548 U.S. at 436, it is an extremely relevant factor to consider whether an equal opportunity to participate in the political process exists. See, e.g., African Am. Voting Rights Legal Def. Fund v. Villa, 54 F. 3d 1345, 1355 (8th Cir. 1995) (evidence of "persistent proportional representation" sufficient to support grant of summary judgment to jurisdiction); Fairley v. Hattiesburg Miss., 662 F. App'x 291, 301 (5th Cir. 2016) (same).

454.    Georgia's voting age population is 31.73% any–part Black and 30.27% single–race Black. APA Stip. ¶ 83; Grant Stip. ¶ 41; Pendergrass Stip. ¶ 33.

455.    With five districts that are majority non–white on the 2021 adopted congressional plan, DX 3 ¶ 9, if Black voters are able to elect their candidates of choice in all five districts, their candidates of choice will hold 35.7% of the districts in the state (5 districts divided by 14 total districts). Similarly, there are currently five Black members of Congress from Georgia. Tr. Vol. IV 207:8–13. Thus, there is at least a significant basis for finding "rough proportionality" that would indicate no violation of Section 2. De Grandy, 512 U.S. at 1023. At this early stage, the lack of evidence on proportionality does not weigh clearly in favor of Plaintiffs.

456.    Thus, the Senate factors do not weigh in favor of Plaintiffs at this stage in the proceedings and they have not shown a substantial likelihood of success on the merits as to their Section 2 claims.

**X.    PLAINTIFFS HAVE NOT SUFFERED AN IRREPARABLE HARM.**

457.    Because Plaintiffs are not likely to succeed on the merits, they are also not likely to suffer any irreparable harm. The lack of any certainty of vote dilution means that Plaintiffs will not certainly be harmed. The individual voter plaintiffs further will be entitled to vote in the upcoming elections, even if the candidates they support are not as favored in the current district configurations.

## XI.  THE EQUITIES AND PUBLIC INTEREST DO NOT FAVOR THE PLAINTIFFS.

458.  Even if this Court finds Plaintiffs are likely to succeed on the merits and have irreparable harm, this Court would still deny Plaintiffs' motions.

459.  The election calendar is a finely calibrated process that can result in significant upheaval and voter confusion if changes are made late in the process. Ultimately, voters are not well served by a "chaotic, last–minute reordering of . . . districts. It is best for candidates and voters to know significantly in advance of the petition period who may run where." Favors v. Cuomo, 881 F. Supp. 2d 356, 371 (E.D.N.Y. 2012) (three-judge court) (citing Diaz v. Silver, 932 F. Supp. 462, 466–68 (E.D.N.Y. 1996) (three-judge court)).

460.  This Court heard extensive testimony from election officials about the impact of moving various deadlines in the election process.

461.  Moving the date for qualifying without moving the date of the primary election risks the accuracy of the primary because of the tight timelines for building ballot combinations, proofing draft ballots, and preparing ballots for printing by the deadline for overseas and military voters.

462.  Likewise, moving the primary election date would upend months of planning by local election officials. Multiple county election officials testified that

they already selected polling places for all election dates in 2022 and changing those dates could entail locating new polling places on short notice. Fulton County's experience in June 2020 showed that consolidating polling places at the last minute can lead to long lines for voters. And several witnesses testified to the voter confusion that would occur if last-minute changes were required.

463.   In response, Plaintiffs put forward no evidence that their changes could be implemented. At most, Plaintiffs argued that the election date could be changed, but even the proposed schedule does not account for another Judge on this Court considering eliminating the nine-week runoff timeline. Further, the potential for "whiplash" between competing orders of this Court and appellate courts could create even more voter confusion and loss of confidence in the election system.

464.   Further, while Plaintiffs insisted their maps could be utilized as remedies, this Court would be required to first give the General Assembly the opportunity to draw new district plans based on this Court's findings. "When a federal court declares an existing apportionment scheme unconstitutional, it is therefore, appropriate, whenever practicable, to afford a reasonable opportunity for the legislature to meet constitutional requirements by adopting a substitute

measure rather than for the federal court to devise and order into effect its own plan." <u>Wise</u>, 437 U.S. at 540.

465.   The proposed illustrative plans also change a significant number of the 2021 adopted plan districts in service of adding majority-Black districts. Other remedial plans have not changed nearly as many districts after adverse findings. Tr. Vol. VI 21:15–22:18.

466.   Even if this process were to continue through a court-drawn redistricting plan, at least one expert recommends "[a]llowing one month for the drawing of a plan and an additional month for hearings and potential modifications to it should build in enough of a cushion so that all concerned can proceed in a nonfrenzied fashion." Nathaniel Persily, <u>When Judges Carve Democracies: A Primer on Court-Drawn Redistricting Plans</u>, 73 Geo. Wash. L. Rev. 1131, 1148 (2005). This is because "[a] quick plan . . . is not necessarily a good plan." <u>Id</u>. at 1147.

467.   While the Court proceeded with this case as quickly as practicable in light of the complicated issues involved, the "greatest public interest must attach to adjudicating these claims fairly—and correctly." <u>Favors</u>, 881 F. Supp. 2d at 371.

468.   Given the massively complex factual issues combined with the timeline of qualifying set to begin in days, it would not serve the public interest or

the candidates, pollworkers, and voters to enjoin the 2021 adopted redistricting plans and begin the process of putting new plans in their place.

469.   Plaintiffs have not shown that they are clearly entitled to an injunction based on the public interest and equities prongs of a preliminary injunction.

## XII.   PLAINTIFFS HAVE NOT SHOWN A CLEAR ENTITLEMENT TO OVERCOME PURCELL.

470.   While not precedential, the Court is also aware of the ruling on Alabama's motion to stay in Merrill v. Milligan at the U.S. Supreme Court. APA Doc. No. [97]; Grant Doc. No. [59]; Pendergrass Doc. No. [65]. Given the similarity of the claims (both are Section 2 claims seeking at least one additional majority-Black district) and the timeline (both involve a May 24 primary election), the Court also briefly evaluates the standards explained by Justice Kavanaugh in his concurrence whereby a plaintiff could possibly overcome Purcell and obtain relief even close to an election. The same two prerequisites that Justice Kavanaugh found applied to the Alabama case apply here.

471.   First, as discussed above, Plaintiffs have not demonstrated that the underlying merits are "entirely clearcut in favor of" their claims. The facts in this case are challenging and the law is less than clear on what is required. Further, unlike Alabama, Georgia argues that its plans are more compact, that it is

impossible to draw a new plan on the timeline, and that it was not on notice of the ability to draw the districts Plaintiffs' experts did here.

472.   Second, the testimony of the election officials unanimously confirmed that significant cost, confusion, and hardship would attend any changes in election timelines at this point. Qualifying begins 17 days from February 18, 2022. Unlike the Alabama case, this Court has the benefit of a well-developed record on the massive impact to Georgia voters and election officials if election timeline were altered at this late date.

473.   Election officials are incredibly hardworking and yet constantly vilified public servants. They are already under tremendous pressure to administer the 2022 elections and changing the date for qualifying and/or the primary election would result in extreme difficulty and "chaos" in the administration of elections in Georgia. Further, voters would suffer confusion with last–minute changes. Voter confidence is paramount and an injunction is inappropriate "because of the great difficulty of unwinding and reworking a state's entire electoral process." Favors, 881 F. Supp. 2d at 371.

474.   The Court recognizes and Defendants agree that Plaintiffs did not unduly delay in bringing these actions to the Court. But this Court must weigh the public interest. The State of Georgia has significant interests in "in conducting an

efficient election [and] maintaining order," because "'[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy.'" New Ga. Project v. Raffensperger, 976 F.3d 1278, 1284 (11th Cir. 2020) (quoting Purcell, 549 U.S. at 4). Those interests would be significantly undermined by altering the election calendar at this point.

475.   As a result, the Court also concludes that there is no reason to disregard Purcell given the progress of Georgia's election machinery towards the 2022 election. This factor also weighs heavily against injunctive relief.

## XIII.  CONCLUSION

Plaintiffs make serious charges against Georgia's 2021 redistricting plans. Those charges should be fully heard, but on a non-emergency timeline. Despite the efforts of the parties to establish an extensive record on a very short timeline, there is not enough information before the Court to conclude that Plaintiffs have shown they are clearly entitled to relief.

As a result, this Court **DENIES** Plaintiffs' Motions for Preliminary Injunction in Alpha Phi Alpha, Grant, and Pendergrass. This is not the end of the case, however, which will continue on a normal discovery track for resolution before the 2024 elections.

This 18th day of February, 2022.

Respectfully submitted,

Christopher M. Carr
Attorney General
Georgia Bar No. 112505
Bryan K. Webb
Deputy Attorney General
Georgia Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
Georgia Bar No. 760280
Charlene McGowan
Assistant Attorney General
Georgia Bar No. 697316
**State Law Department**
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*/s/ Bryan P. Tyson*
Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@taylorenglish.com
Frank B. Strickland
Georgia Bar No. 678600
fstrickland@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Loree Anne Paradise
Georgia Bar No. 382202
lparadise@taylorenglish.com
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200

Atlanta, Georgia 30339
(678) 336–7249

*Counsel for Defendants*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to L.R. 7.1(D), the undersigned certifies that the foregoing Proposed Findings of Fact and Conclusions of Law have been prepared in Book Antiqua 13, a font and type selection approved by the Court in L.R. 5.1(B).

<u>*/s/ Bryan P. Tyson*</u>
Bryan P. Tyson