IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| ANNIE LOIS GRANT; QUENTIN T. HOWELL; ELROY TOLBERT; THERON BROWN; TRIANA ARNOLD JAMES; EUNICE SYKES; ELBERT SOLOMON; and DEXTER WIMBISH, | CIVIL ACTION FILE NO. 1:22-CV-00122-SCJ |
| Plaintiffs, | |
| v. | |
| BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State; SARA TINDALL GHAZAL, in her official capacity as a member of the State Election Board; JANICE JOHNSTON, in her official capacity as a member of the State Election Board; EDWARD LINDSEY, in his official capacity as a member of the State Election Board; and MATTHEW MASHBURN, in his official capacity as a member of the State Election Board, | |
| Defendants.* | |

**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

---

\* Pursuant to Federal Rule of Civil Procedure 25(d), Plaintiffs have automatically substituted Janice Johnston, in her official capacity, for Anh Le, in her official capacity, based on recent changes to the composition of the State Election Board.

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................... 1

PROPOSED FINDINGS OF FACT.......................................................... 3

    I.    Plaintiffs ....................................................................................... 3

    II.    Defendants .................................................................................... 5

    III.    Likelihood of Success on the Merits ........................................ 5

        A.    First Gingles Precondition: Numerosity and Compactness ............ 6

            1.    Numerosity ........................................................... 7

                a.    Demographic Developments........................................ 8

                b.    Previous State Senate and House Plans ................... 11

                c.    2021 State Senate and House Plans ........................... 11

                d.    Illustrative State Senate Plan ..................................... 12

                e.    Illustrative House Plan .............................................. 17

            2.    Geographic Compactness ...................................... 22

                a.    Population Equality ..................................................... 24

                b.    Contiguity .................................................................. 26

                c.    Compactness ............................................................... 26

                d.    Preservation of Political Subdivisions....................... 32

                e.    Preservation of Communities of Interest ................. 37

                f.    Core Retention .......................................................... 41

                g.    Racial Considerations ................................................. 44

B.    Second Gingles Precondition: Political Cohesion ........................... 48

C.    Third Gingles Precondition: Bloc Voting ......................................... 51

D.    Totality of Circumstances ............................................................... 53

    1.    Senate Factor One: History of Voting-Related Discrimination ................................................................................. 54

        a.    Political Violence Against Black Georgians ............. 54

        b.    Pre-Voting Rights Act .................................................. 56

        c.    Post-Voting Rights Act ................................................ 58

        d.    Redistricting-Related Discrimination ....................... 61

    2.    Senate Factor Two: Racially Polarized Voting .................... 63

    3.    Senate Factor Three: Discriminatory Voting Procedures .... 66

    4.    Senate Factor Four: Candidate Slating ................................. 67

    5.    Senate Factor Five: Contemporary Socioeconomic Disparities ................................................................................. 67

    6.    Senate Factor Six: Racial Appeals in Georgia Campaigns ... 70

    7.    Senate Factor Seven: Underrepresentation of Black Georgians in Elected Office ................................................... 73

    8.    Senate Factor Eight: Official Nonresponsiveness ............... 75

    9.    Senate Factor Nine: Absence of Justification for SB 1EX and HB 1EX ................................................................................. 76

IV.    Irreparable Harm ............................................................................... 77

V.    Balance of Harms ............................................................................... 78

A.    Harm to Defendants ........................................................................ 79

        1.      The 2022 Election Calendar ....................................................79

        2.      The Voter Reallocation Process .............................................79

        3.      Implementation of New Maps .............................................81

        4.      Primary Delay ......................................................................85

    B.      Harm to Voters and Candidates......................................................88

        1.      Voters ...................................................................................88

        2.      Candidates ...........................................................................89

VI.     Public Interest .........................................................................................91

PROPOSED CONCLUSIONS OF LAW ........................................................96

I.      Plaintiffs are substantially likely to succeed on the merits of their Section 2
        claims........................................................................................................96

    A.      Plaintiffs have satisfied the first Gingles precondition because
            additional, compact majority-Black State Senate and House districts
            can be drawn in the Atlanta metropolitan area and Black Belt. .....99

        1.      The Black populations in the Atlanta metropolitan area and
                Black Belt are sufficiently numerous to form additional
                majority-Black State Senate and House districts...............101

        2.      The Black populations in the Atlanta metropolitan area and
                the Black Belt are sufficiently compact to form additional
                majority-Black State Senate and House districts...............103

    B.      Plaintiffs have satisfied the second Gingles precondition because
            Black Georgians are politically cohesive. .....................................111

    C.      Plaintiffs have satisfied the third Gingles precondition because white
            Georgians engage in bloc voting to defeat Black-preferred
            candidates. .....................................................................................113

iv

D.      The totality of circumstances demonstrates that SB 1EX and HB 1EX deny Black Georgians equal opportunity to elect their preferred candidates to the General Assembly. ............................................ 114

     1.      Senate Factor One: Georgia has an ongoing history of official, voting-related discrimination. ............................................ 118

     2.      Senate Factor Two: Georgia voters are racially polarized. 119

     3.      Senate Factor Three: Georgia's voting practices enhance the opportunity for discrimination. ........................................... 124

     4.      Senate Factor Four: Georgia has no history of candidate slating for legislative elections. ........................................... 124

     5.      Senate Factor Five: Georgia's discrimination has produced severe socioeconomic disparities that impair Black Georgians' participation in the political process. ................................. 124

     6.      Senate Factor Six: Both overt and subtle racial appeals are prevalent in Georgia's political campaigns. ....................... 126

     7.      Senate Factor Seven: Black candidates in Georgia are underrepresented in office and rarely succeed outside of majority-minority districts ................................................ 126

     8.      Senate Factor Eight: Georgia is not responsive to its Black residents. ............................................................................. 127

     9.      Senate Factor Nine: The justifications for SB 1EX and HB 1EX are tenuous. ..................................................................... 127

E.      Defendants' additional legal arguments lack merit. .................... 128

     1.      Section 2 confers a private right of action. ......................... 128

     2.      This case is properly before a single-judge district court. . 129

II.      Plaintiffs and other Black Georgians will suffer irreparable harm absent a preliminary injunction. ............................................................................. 129

III.    The balance of equities and the public interest favor injunctive relief. ... 130

IV.    Any remedial plan must contain three additional State Senate districts and five additional House districts in which Black voters have demonstrable opportunities to elect their candidates of choice ..................................... 131

PROPOSED ORDER GRANTING INJUNCTIVE RELIEF ............................................. 132

## INTRODUCTION

Pursuant to the Court's coordinated order of February 14, 2022, <u>see</u> Doc. No. 66, Plaintiffs respectfully submit the following proposed findings of fact, conclusions of law, and proposed order granting preliminary injunctive relief.

This case presents a straightforward application of Section 2 of the Voting Rights Act of 1965. Plaintiffs have demonstrated that the Black populations in the Atlanta metropolitan area and central Georgia Black Belt are sufficiently large and compact to form three additional majority-Black Georgia State Senate districts and five additional majority-Black Georgia House of Representatives districts. They have further shown that Georgia's pronounced racially polarized voting deprives Black voters in majority-white legislative districts of an opportunity to elect their candidates of choice. The totality of circumstances makes clear that the Georgia Senate Redistricting Act of 2021 ("SB 1EX") and the Georgia House of Representatives Redistricting Act of 2021 ("HB 1EX") deny Black voters an equal opportunity to participate in the state's political processes and elect their preferred candidates to the Georgia General Assembly. To prevent the irreparable harm of vote dilution for Plaintiffs and all Black Georgians, this Court can and should remedy these violations of federal law and provide preliminary injunctive relief in advance of the 2022 midterm elections.

1

In response, Defendants have attempted to confound the proceedings by manufacturing additional hurdles that they claim Plaintiffs must clear to secure relief—for example, drawing illustrative plans without consideration of race, or proving that racially polarized voting is the result of race and not partisanship. But the Eleventh Circuit has clearly disclaimed such requirements. Make no mistake: Plaintiffs have proven the merits of their Section 2 claims under the law as it exists today, even if that is not the law that Defendants would prefer.

There is ample time in advance of the May 24 primary election for either the General Assembly or this Court to implement remedial State Senate and House plans that comply with the Voting Rights Act—and if the Court deems otherwise, it may reschedule the primary election, consistent with Georgia's previous election calendar, to afford sufficient time for a remedy. The State should not be allowed to evade judicial review of SB 1EX and HB 1EX, especially where Governor Brian Kemp delayed final enactment of the maps—refusing to take any action on the maps for over a month—in an attempt to forestall timely relief. Simply put, diluting the voting strength of Georgia's Black voters would impose significantly greater irreparable harm than requiring the implementation of lawful legislative plans—whatever administrative inconvenience might result. For these reasons

and those that follow, the Court should grant Plaintiffs' motion for preliminary injunction.

## PROPOSED FINDINGS OF FACT

### I.    Plaintiffs

1.      Plaintiff Annie Lois Grant is a Black resident of Union Point, Georgia, who is registered to vote and intends to vote in future legislative elections. PX19 ¶¶ 2, 4–5; Doc. No. 56 ¶¶ 1–2.[1] Under the enacted legislative plans, Ms. Grant resides in Senate District 24 and House District 124. PX19 ¶ 4; Doc. No. 56 ¶ 3.

2.      Plaintiff Quentin T. Howell is a Black resident of Milledgeville, Georgia, who is registered to vote and intends to vote in future legislative elections. PX20 ¶¶ 2, 4–5; Doc. No. 56 ¶¶ 4–5. Under the enacted legislative plans, Mr. Howell resides in Senate District 25 and House District 133. PX20 ¶ 4; Doc. No. 56 ¶ 6.

3.      Plaintiff Elroy Tolbert is a Black resident of Macon, Georgia, who is registered to vote and intends to vote in future legislative elections. PX21 ¶¶ 2, 4–

---

[1]  Citations to Plaintiffs' preliminary injunction hearing exhibits are designated as "PX." Citations to Defendants' preliminary injunction hearing exhibits are designated as "DX." Citations to preliminary injunction hearing exhibits filed by the plaintiffs in <u>Alpha Phi Alpha Fraternity Inc. v. Raffensperger</u>, No. 1:21-CV-05337-SCJ (N.D. Ga.), are designated as "AX."

5; Doc. No. 56 ¶¶ 7–8. Under the enacted legislative plans, Mr. Tolbert resides in Senate District 18 and House District 144. PX21 ¶ 4; Doc. No. 56 ¶ 9.

4.     Plaintiff Theron Brown is a Black resident of Warner Robbins, Georgia, who is registered to vote and intends to vote in future legislative elections. PX22 ¶¶ 2, 4–5; Doc. No. 56 ¶¶ 10–11. Under the enacted legislative plans, Ms. Brown resides in Senate District 26 and House District 145. PX22 ¶ 4; Doc. No. 56 ¶ 12.

5.     Plaintiff Triana Arnold James is a Black resident of Villa Rica, Georgia, who is registered to vote and intends to vote in future legislative elections. PX23 ¶¶ 2, 4–5; Doc. No. 56 ¶¶ 13–14. Under the enacted legislative plans, Ms. James resides in Senate District 30 and House District 64. PX23 ¶ 4; Doc. No. 56 ¶ 15.

6.     Plaintiff Eunice Sykes is a Black resident of Locust Grove, Georgia, who is registered to vote and intends to vote in future legislative elections. PX24 ¶¶ 2, 4–5; Doc. No. 56 ¶¶ 16–17. Under the enacted legislative plans, Ms. Sykes resides in Senate District 25 and House District 117. PX24 ¶ 4; Doc. No. 56 ¶ 18.

7.     Plaintiff Elbert Solomon is a Black resident of Griffin, Georgia, who is registered to vote and intends to vote in future legislative elections. PX25 ¶¶ 2, 4–5; Doc. No. 56 ¶¶ 19–20. Under the enacted legislative plans, Mr. Solomon resides in Senate District 16 and House District 117. PX25 ¶ 4; Doc. No. 56 ¶ 21.

8.    Plaintiff Dexter Wimbish is a Black resident of Griffin, Georgia, who is registered to vote and intends to vote in future legislative elections. PX26 ¶¶ 2, 4–5; Doc. No. 56 ¶¶ 22–23. Under the enacted legislative plans, Mr. Wimbish resides in Senate District 16 and House District 74. PX26 ¶ 4; Doc. No. 56 ¶ 24.

## II.    Defendants

9.    Defendant Brad Raffensperger is the Georgia Secretary of State and is named in his official capacity. Doc. No. 56 ¶ 25.

10.    Defendant Sara Tindall Ghazal is a member of the State Election Board and is named in her official capacity. Doc. No. 56 ¶ 26.

11.    Defendant Janice Johnston is a member of the State Election Board and is named in her official capacity. Doc. No. 56 ¶ 27.

12.    Defendant Edward Lindsey is a member of the State Election Board and is named in his official capacity. Doc. No. 56 ¶ 28.

13.    Defendant Matthew Mashburn is a member of the State Election Board and is named in his official capacity. Doc. No. 56 ¶ 29.

## III.    Likelihood of Success on the Merits

14.    Plaintiffs are substantially likely to succeed on the merits of their Section 2 claims.

A.   **First __Gingles__ Precondition: Numerosity and Compactness**

15.     Plaintiffs' mapping and demographics expert, Mr. Blakeman B. Esselstyn, demonstrated that the Black populations in the Atlanta metropolitan area and the central Georgia Black Belt are sufficiently large and geographically compact to form a majority of the voting-age population in three additional Georgia State Senate districts and five additional Georgia House of Representatives districts.

16.     The Court has accepted Mr. Esselstyn in this case as qualified to testify as an expert in redistricting and census data. Feb. 8, 2022, Afternoon Tr. 111:18–112:1. The Court finds Mr. Esselstyn credible, his analysis methodologically sound, and his conclusions reliable. The Court credits Mr. Esselstyn's testimony and conclusions.

17.     Mr. Esselstyn's illustrative legislative plans contain two additional majority-Black State Senate districts in the southern Atlanta metropolitan area, one additional majority-Black State Senate district in the Black Belt, one additional majority-Black House district in the western Atlanta metropolitan area, two additional majority-Black House districts in the southern Atlanta metropolitan area, and two additional majority-Black House districts in the Black Belt anchored in Bibb County. The plans comply with the traditional districting principles

adopted by the Georgia General Assembly to guide its redistricting efforts during 2021. See PX39–PX40.

18.     Mr. John B. Morgan, one of Defendants' two mapping experts, does not meaningfully dispute that Mr. Esselstyn's illustrative plans adhere to traditional districting principles. Instead, he merely confirms the accuracy of Mr. Esselstyn's reported data and statistics as to preservation of political subdivisions and compactness without ever suggesting that Mr. Esselstyn's illustrative plans fail to comply with these (or any other) criteria. See DX2.

19.     Ms. Gina Wright, Defendants' other mapping expert, offers only conclusory criticisms of Mr. Esselstyn's illustrative maps that assign purportedly improper motivations to race-neutral mapping decisions. See DX41. Ms. Wright has not demonstrated that Mr. Esselstyn's illustrative maps fail to comply with traditional districting principles.

20.     In sum, the Court credits the analysis and conclusions of Mr. Esselstyn and concludes that his findings demonstrate that Plaintiffs have satisfied the factual predicates of the first Gingles precondition.

### 1.     Numerosity

21.     The Court concludes that Mr. Esselstyn has established that the Black populations in the Atlanta metropolitan area and central Georgia Black Belt are

sufficiently numerous to comprise a majority of the voting-age population in three additional State Senate districts and five additional House districts.

### a.    Demographic Developments

22.    The U.S. Census Bureau releases data to the states after each census for use in redistricting. This data includes population and demographic information for each census block. Doc. No. 56 ¶ 32.

23.    The Census Bureau provided initial redistricting data to Georgia on August 12, 2021. Doc. No. 56 ¶ 33.

24.    From 2010 to 2020, Georgia's population grew by over 1 million people to 10.71 million, up 10.6 percent from 2010. Doc. No. 56 ¶ 34; PX3 ¶ 13; Feb. 9, 2022, Afternoon Tr. 152:17–24.

25.    From 2010 to 2020, Georgia's Black population increased by almost half a million people, up almost 16 percent since 2010. Doc. No. 56 ¶ 36; PX3 ¶ 14; Feb. 9, 2022, Afternoon Tr. 152:25–153:13.

26.    Between 2010 and 2020, 47.26 percent of the state's population gain was attributable to Black population growth. Doc. No. 56 ¶ 37.

27.    As a matter of total population, any-part ("AP") Black Georgians comprise the largest minority population in the state (at 33.03 percent). Doc. No. 56 ¶ 40; PX3 ¶ 14; Feb. 9, 2022, Afternoon Tr. 153:19–23.

28.     From 2010 to 2020, Georgia's white population decreased by 51,764, or approximately 1 percent. Doc. No. 56 ¶ 38; PX3 ¶ 15; Feb. 9, 2022, Afternoon Tr. 153:24–154:2.

29.     Georgia's Black population has increased in absolute and percentage terms since 1990, from about 27 percent in 1990 to 33 percent in 2020. Over the same time period, the percentage of the population identifying as non-Hispanic white has dropped from 70 percent to 50 percent. Doc. No. 56 ¶ 39.

30.     The non-Hispanic White population still constitutes a majority of Georgia's population, but only barely, at 50.1 percent; in 2010, this group constituted 55.9 percent of the state's population. PX3 ¶ 15.

31.     Georgia has a total voting-age population of 8,220,274, of whom 2,607,986 (31.73 percent) are AP Black. Doc. No. 56 ¶ 41; PX3 ¶ 16.

32.     The statewide Black voting-age population ("BVAP") grew at a rate of approximately 21 percent between 2010 and 2020. Feb. 9, 2022, Afternoon Tr. 153:14–18.

33.     The non-Hispanic SR white voting-age population has decreased from 59.0 percent of the voting age population to 52.8 percent. PX3 ¶ 16.

34.     The total estimated citizen voting-age population in Georgia in 2019 was 33.8 percent AP Black. Doc. No. 56 ¶ 42.

35.     The Atlanta Metropolitan Statistical Area ("MSA") consists of the following 29 counties: Barrow, Bartow, Butts, Carroll, Cherokee, Clayton, Cobb, Coweta, Dawson, DeKalb, Douglas, Fayette, Forsyth, Fulton, Gwinnett, Haralson, Heard, Henry, Jasper, Lamar, Meriwether, Morgan, Newton, Paulding, Pickens, Pike, Rockdale, Spalding, and Walton. Doc. No. 56 ¶ 43.

36.     Just about half of Georgia's Black population lives in six counties in the Atlanta MSA. Those six counties are, in order of decreasing Black population, Fulton, DeKalb, Gwinnett, Cobb, Clayton, and Henry. PX3 ¶ 17.

37.     Under the 2000 Census, the population in the 29-county Atlanta MSA was 29.29 percent AP Black, increasing to 33.61 percent in 2010, and increasing further to 35.91 percent in 2020. Since 2000, the Black population in the Atlanta MSA has grown from 1,248,809 to 2,186,815 in 2020. Doc. No. 56 ¶ 44.

38.     In addition to the Atlanta metropolitan area, the state's Black population is particularly concentrated in the central Georgia Black Belt, a belt of counties (many of which are rural) that constitutes a wide band from the southwest corner of the state to the central part of the South Carolina border near Richmond County. PX3 ¶ 18 & fig. 1; Feb. 9, 2022, Afternoon Tr. 154:3–25 (Mr. Esselstyn's testimony describing distribution of state's Black population).

**b.      Previous State Senate and House Plans**

39.     The 2014 Georgia State Senate plan contained 13 majority-Black districts using the AP BVAP metric when the 2020 Census data was applied. Doc. No. 56 ¶ 30.

40.     The 2015 Georgia House of Representatives plan contained 47 majority-Black districts using the AP BVAP metric when the 2020 Census data was applied. Doc. No. 56 ¶ 31.

**c.      2021 State Senate and House Plans**

41.     The Georgia State Senate map consists of 56 districts. PX3 ¶ 20; Feb. 9, 2022, Afternoon Tr. 169:13–14.

42.     The enacted State Senate plan contains 14 majority-Black districts using the AP BVAP metric. Doc. No. 56 ¶ 56; PX3 ¶ 21; Feb. 9, 2022, Afternoon Tr. 169:8–12. Ten of those districts are in the Atlanta metropolitan area and four are in the Black Belt. PX3 ¶ 21 & fig. 3.

43.     The enacted State Senate plan splits 29 counties. Doc. No. 56 ¶ 58.

44.     The Georgia House of Representatives map consists of 180 districts. PX3 ¶ 35; Feb. 9, 2022, Afternoon Tr. 178:10–12.

45.     The enacted House plan contains 49 majority-Black districts using the AP BVAP metric. Doc. No. 56 ¶ 57; PX3 ¶ 36; Feb. 9, 2022, Afternoon Tr. 178:17–

19. Thirty-four of those districts are in the Atlanta metropolitan area, 13 are in the Black Belt, and two small districts are within Chatham (anchored in Savannah) and Lowndes Counties (anchored in Valdosta) in the southeastern part of the state. PX3 ¶ 36 & fig. 9.

46.     The enacted House plan splits 69 counties. Doc. No. 56 ¶ 59.

### d.     Illustrative State Senate Plan

47.     Analyzing these demographics and the enacted State Senate map, Mr. Esselstyn concluded that "[i]t is possible to create three additional majority-Black districts in the State Senate plan . . . while still adhering to other traditional redistricting principles." PX3 ¶ 12; see also id. ¶ 50; Feb. 9, 2022, Afternoon Tr. 151:1–8.

48.     Mr. Esselstyn drew an illustrative State Senate plan that includes 17 majority-Black districts using the AP BVAP metric. Doc. No. 56 ¶ 60; PX3 ¶ 24 & table 1; Feb. 9, 2022, Afternoon Tr. 169:20–22. Those 17 illustrative districts are:

**Table 1: Illustrative Senate plan majority-Black districts with BVAP percentages**

| District | BVAP% | District | BVAP% | District | BVAP% |
|---|---|---|---|---|---|
| 10 | 61.10% | 26 | 52.84% | 39 | 60.21% |
| 12 | 57.97% | 28 | 57.28% | 41 | 62.61% |
| 15 | 54.00% | 34 | 60.19% | 43 | 58.52% |
| 22 | 50.84% | 35 | 54.05% | 44 | 71.52% |
| 23 | 50.43% | 36 | 51.34% | 55 | 65.97% |
| 25 | 58.93% | 38 | 66.36% | | |

49.     Because Mr. Esselstyn's illustrative State Senate plan used the enacted plan as a starting point, many of the districts are the same. Only 22 districts were modified, leaving the other 34 unchanged. PX3 ¶ 23; Feb. 9, 2022, Afternoon Tr. 176:13–19. Overall, out of Georgia's 159 counties, only 69—less than half—would be affected by Mr. Esselstyn's illustrative State Senate map, while the other 90 counties would be unaffected. Feb. 9, 2022, Afternoon Tr. 162:1–9.

50.     Regarding the districts in the enacted State Senate plan, Mr. Esselstyn testified, "I tried to keep them unchanged, where possible. . . . It was not my sole goal to reduce the changes to the enacted plan but I certainly was not trying to change more districts than I had to, given, you know, the other guidelines and

13

principles I was trying to consider. So . . . a majority of the districts did not change." Feb. 9, 2022, Afternoon Tr. 175:25–176:12.

51.    Mr. Esselstyn's additional majority-Black State Senate district in the Black Belt region (illustrative Senate District 23) includes all of Burke, Glascock, Hancock, Jefferson, Screven, Taliaferro, Warren, and Washington Counties and parts of Baldwin, Greene, McDuffie, Richmond, and Wilkes Counties. Doc. No. 56 ¶ 62; PX3 ¶ 25 & fig. 5; Feb. 9, 2022, Afternoon Tr. 170:11–20.

52.    Mr. Esselstyn's illustrative Senate District 23 has an AP BVAP over 50 percent. Doc. No. 56 ¶ 63; PX3 ¶ 24 & table 1; Feb. 9, 2022, Afternoon Tr. 170:21–23.

53.    Mr. Esselstyn's additional majority-Black State Senate district in the southeastern Atlanta metropolitan area (illustrative Senate District 25) is composed of portions of Clayton and Henry Counties. Doc. No. 56 ¶ 64; PX3 ¶ 26 & fig. 6; Feb. 9, 2022, Afternoon Tr. 171:17–23, 228:10–13.

54.    Mr. Esselstyn's illustrative Senate District 25 has an AP BVAP over 50 percent. Doc. No. 56 ¶ 65; PX3 ¶ 24 & table 1; Feb. 9, 2022, Afternoon Tr. 171:24–172:8.

55.    Mr. Esselstyn's additional majority-Black State Senate district in the southwestern Atlanta metropolitan area (illustrative Senate District 28) is

composed of portions of Clayton, Coweta, Fayette, and Fulton Counties. Doc. No. 56 ¶ 66; PX3 ¶ 27 & fig. 7; Feb. 9, 2022, Afternoon Tr. 172:11–17.

56.     Mr. Esselstyn's illustrative Senate District 28 has an AP BVAP over 50 percent. Doc. No. 56 ¶ 67; PX3 ¶ 24 & table 1; Feb. 9, 2022, Afternoon Tr. 172:18–20.

57.     Neither Mr. Morgan nor Ms. Wright disputes that Mr. Esselstyn's three additional majority-Black State Senate districts have AP BVAPs over 50 percent. See DX2 ¶ 11 (Mr. Morgan's expert report confirming that Mr. Esselstyn's illustrative State Senate plain contains 17 majority-Black districts); Feb. 11, 2022, Afternoon Tr. 191:21–25 (Mr. Morgan's testimony agreeing that Mr. Esselstyn's illustrative State Senate plan includes three additional majority-Black districts); DX41 ¶ 20 (Ms. Wright's expert report noting that "[t]he Esselstyn Senate plan also adds majority-Black districts above the adopted Senate plan when using the any-part Black voting age population Census metric"); Feb. 11, 2022, Morning Tr. 78:13–22, 80:23–81:24 (Ms. Wright's testimony acknowledging that AP BVAPs of Mr. Esselstyn's additional majority-Black State Senate districts exceed 50 percent).

58.     Mr. Morgan's expert report included a chart demonstrating that Mr. Esselstyn's illustrative State Senate plan contains three fewer districts with AP BVAPs above 65 percent compared to the enacted plan. See DX2 ¶ 10 & chart 1. As

Mr. Esselstyn explained in his supplemental expert report, "[o]ne reason that the enacted plans have fewer majority-Black districts than the illustrative plans is that more Black voters were unnecessarily concentrated into certain Metro Atlanta districts in the enacted plans. By unpacking these districts, the illustrative plans contain fewer packed districts—and, consequently, additional majority-Black districts." PX4 ¶ 4.

59.     Although Ms. Wright claimed that Mr. Esselstyn's illustrative Senate District 23 "is below 50% Black voter registration" (DX41 ¶ 21), she admitted during the hearing that more than 8 percent of registered voters are of unknown race and that this qualifying information was not included in her expert report. Feb. 11, 2022, Morning Tr. 71:10–78:12.

60.     Notably, Mr. Esselstyn's illustrative State Senate plan does not reduce the number of preexisting majority-Black districts in the enacted State Senate plan. PX3 ¶ 24.

61.     Mr. Esselstyn testified that his illustrative State Senate plan is sufficiently refined and finalized to be adopted as a remedial map in its current form. Feb. 9, 2022, Afternoon Tr. 275:18–276:5.

62.     Based on the expert reports and testimony provided in this case, the Court concludes that Mr. Esselstyn's illustrative State Senate plan contains three additional majority-Black districts.

### e.     Illustrative House Plan

63.     Analyzing the aforementioned demographics and the enacted House map, Mr. Esselstyn concluded that "[i]t is possible to create . . . five additional majority-Black districts in the State House plan while still adhering to other traditional redistricting principles." PX3 ¶ 12; <u>see also</u> <u>id.</u> ¶ 50; Feb. 9, 2022, Afternoon Tr. 151:1–8.

17

64.     Mr. Esselstyn drew an illustrative House plan that includes 54 majority-Black districts using the AP BVAP metric. Doc. No. 56 ¶ 61; PX3 ¶ 39 & table 4. Those 54 illustrative districts are:

**Table 4: Illustrative House plan majority-Black districts with BVAP percentages**

| District | BVAP% | District | BVAP% | District | BVAP% | District | BVAP% |
|---|---|---|---|---|---|---|---|
| 38 | 54.23% | 69 | 62.73% | 91 | 60.01% | 137 | 52.13% |
| 39 | 55.29% | 74 | 53.94% | 92 | 68.79% | 140 | 57.63% |
| 55 | 55.38% | 75 | 66.89% | 93 | 65.36% | 141 | 57.46% |
| 58 | 63.04% | 76 | 67.23% | 94 | 69.04% | 142 | 50.14% |
| 59 | 70.09% | 77 | 76.13% | 95 | 67.15% | 143 | 50.64% |
| 60 | 63.88% | 78 | 51.03% | 113 | 59.53% | 145 | 50.38% |
| 61 | 64.87% | 79 | 71.59% | 115 | 53.77% | 149 | 50.02% |
| 62 | 72.26% | 84 | 73.66% | 116 | 51.95% | 150 | 53.56% |
| 63 | 69.33% | 85 | 62.71% | 117 | 51.56% | 153 | 67.95% |
| 64 | 50.24% | 86 | 75.05% | 126 | 54.47% | 154 | 54.82% |
| 65 | 55.32% | 87 | 73.08% | 128 | 50.40% | 165 | 50.33% |
| 66 | 50.64% | 88 | 63.35% | 129 | 54.87% | 177 | 53.88% |
| 67 | 58.92% | 89 | 62.54% | 130 | 59.91% | | |
| 68 | 55.75% | 90 | 58.49% | 132 | 52.34% | | |

65.     Because Mr. Esselstyn's illustrative House plan used the enacted plan as a starting point, many of the districts are the same. Only 26 districts were modified, leaving the other 154 unchanged. PX3 ¶ 38; Feb. 9, 2022, Afternoon Tr. 187:24–188:2. Overall, out of Georgia's 159 counties, only 40—one-quarter—would be affected by Mr. Esselstyn's illustrative House map, while the other 119 counties would be unaffected. Feb. 9, 2022, Afternoon Tr. 162:10–14. If both Mr. Esselstyn's

illustrative State Senate map <u>and</u> his illustrative House map were implemented, only 74 counties would be affected in total, leaving the remaining 85 counties unaffected. <u>Id.</u> at 162:15–25.

66.     Mr. Esselstyn's additional majority-Black House district in the western Atlanta metropolitan area (illustrative House District 64) is composed of portions of Douglas, Fulton, and Paulding Counties. Doc. No. 56 ¶ 68; PX3 ¶ 40 & fig. 11; Feb. 9, 2022, Afternoon Tr. 184:8–14.

67.     Mr. Esselstyn's illustrative House District 64 has an AP BVAP over 50 percent. Doc. No. 56 ¶ 69; PX3 ¶ 39 & table 4; Feb. 9, 2022, Afternoon Tr. 184:15–17.

68.     Mr. Esselstyn's additional majority-Black House districts in the southern Atlanta metropolitan area (illustrative House Districts 74 and 117) are composed of portions of Clayton, Fayette, and Henry Counties. Doc. No. 56 ¶ 70; PX3 ¶ 41 & fig. 12; Feb. 9, 2022, Afternoon Tr. 185:12–18.

69.     Although House District 117 is only partially in Henry County in the enacted House map, Mr. Esselstyn's illustrative House District 117 is contained entirely within Henry County. Feb. 9, 2022, Afternoon Tr. 185:16–22.

70.     Mr. Esselstyn's illustrative House Districts 74 and 117 have AP BVAPs over 50 percent. Doc. No. 56 ¶ 71; PX3 ¶ 39 & table 4; Feb. 9, 2022, Afternoon Tr. 185:23–186:5.

71.     Mr. Esselstyn's additional majority-Black House districts in the central Black Belt region (illustrative House Districts 145 and 149) are composed of portions of Baldwin, Bibb, and Houston Counties, as well as all of Twiggs and Wilkinson Counties. Doc. No. 56 ¶ 72; PX3 ¶ 42 & fig. 13; Feb. 9, 2022, Afternoon Tr. 179:5–11.

72.     Mr. Esselstyn's illustrative House plan includes two districts (illustrative House Districts 142 and 143) that are wholly contained in Bibb County and two (illustrative House Districts 145 and 149) that are only partially in Bibb County. Doc. No. ¶ 74.

73.     Mr. Esselstyn's illustrative House Districts 145 and 149 have AP BVAPs over 50 percent. Doc. No. 56 ¶ 73; PX3 ¶ 39 & table 4; Feb. 9, 2022, Afternoon Tr. 187:7–13.

74.     Neither Mr. Morgan nor Ms. Wright disputes that Mr. Esselstyn's five additional majority-Black House districts have AP BVAPs over 50 percent. See DX2 ¶ 13 (confirming that Mr. Esselstyn's illustrative House plain contains 54 majority-Black districts); DX41 ¶ 24 (Ms. Wright's expert report noting that "[t]he

Esselstyn House plan adds majority-Black districts above the adopted House plan when using the any-part Black voting age population Census metric"); Feb. 11, 2022, Morning Tr. 81:25–82:16 (Ms. Wright's testimony acknowledging that AP BVAPs of Mr. Esselstyn's additional majority-Black House districts exceed 50 percent).

75.     Mr. Morgan's expert report includes a chart demonstrating that Mr. Esselstyn's illustrative House plan contains three fewer districts with AP BVAPs above 65 percent compared to the enacted plan. See DX2 ¶ 12 & chart 2. As Mr. Esselstyn explained in his supplemental expert report, "[o]ne reason that the enacted plans have fewer majority-Black districts than the illustrative plans is that more Black voters were unnecessarily concentrated into certain Metro Atlanta districts in the enacted plans. By unpacking these districts, the illustrative plans contain fewer packed districts—and, consequently, additional majority-Black districts." PX4 ¶ 4.

76.     Although Ms. Wright claims that Mr. Esselstyn's illustrative House Districts 64, 74, and 117 are "below 50% Black on voter registration" (DX41 ¶¶ 27–28), she admitted during the hearing that more than 8 percent of registered voters are of unknown race and that this qualifying information was not included in her expert report. Feb. 11, 2022, Morning Tr. 71:10–78:12.

77.    Notably, Mr. Esselstyn's illustrative House plan does not reduce the number of preexisting majority-Black districts in the enacted House plan. See PX3 ¶ 39.

78.    Mr. Esselstyn testified that his illustrative House plan is sufficiently refined and finalized to be adopted as a remedial map in its current form. Feb. 9, 2022, Afternoon Tr. 275:18–276:5.

79.    Based on the expert reports and testimony provided in this case, the Court concludes that Mr. Esselstyn's illustrative House plan contains five additional majority-Black districts.

### 2.    Geographic Compactness

80.    Plaintiffs' illustrative plans demonstrate that the Black populations in the Atlanta metropolitan area and central Georgia Black Belt are sufficiently geographically compact to constitute a voting-age majority in three additional State Senate districts and five additional House districts.

81.    The Court also finds that the illustrative plans are consistent with traditional redistricting principles.

82.    The redistricting guidelines adopted by the General Assembly to guide its redistricting efforts included population equality, compactness, contiguity, respect for political subdivision boundaries and communities of

interest, and compliance with Section 2 of the Voting Rights Act. PX 39, PX40. Mr. Esselstyn's illustrative legislative maps adhere to these and other neutral districting criteria. See PX3 ¶¶ 29–33, ¶¶ 44–48 (Mr. Esselstyn's expert report describing adherence to General Assembly's redistricting criteria).

83.    As Mr. Esselstyn explained in his supplemental expert report and during his testimony at the hearing, applying these traditional districting principles often required balancing. See PX4 ¶ 14. As he described the process, "It's a balancing act. So . . . often the criteria will be [in tension] with each other. It may be that you are trying to just follow precinct lines and not split . . . precincts, but the precincts have funny shapes. So that means you either are going to end up with a less compact shape that doesn't split precincts or you could split a precinct and end up with a more compact shape. And some of the county shapes are highly irregular as well. So sometime[s] you can have a decision about splitting counties as well. So that's the example of where there's no one clear right answer and I'm trying to sort of find the best balance that I can." Feb. 9, 2022, Afternoon Tr. 157:14–25.

84.    Mr. Esselstyn's illustrative House District 149 provides an example of how multiple principles informed the creation of a single district. As he explained in his supplemental expert report, "House District 149 in the enacted House plan

is an elongated district that spans more than 80 miles north to south along a bending string of four counties, plus about half of a fifth. The corresponding district in the illustrative plan, which is centered on Twiggs and Wilkinson Counties, is, by contrast, closer to rectangular in shape, stretching about 50 miles north to south and about 40 miles east to west. . . . Further, the district generally follows the orientation of the Georgia Fall Line geological feature, which brings with it shared economic, historic, and ecological similarities. Macon and Milledgeville, parts of which are in illustrative House District 149, are both characterized as 'Fall Line Cities.'" PX4 ¶ 14 (footnote omitted).

85.    Mr. Esselstyn's illustrative House District 149 also provides an example of how compactness can interact with preservation of voting districts ("VTDs"). Because Baldwin County includes "highly irregular precinct shapes in the central part of that county," "[s]triving to preserve the intactness of such precincts while also attempting to keep a district boundary smooth presents a challenge, and sometimes the best possible result requires either the division of precincts or a less compact area of a district." PX4 ¶ 15.

### a.    Population Equality

86.    The Court finds that Mr. Esselstyn's illustrative legislative maps comply with the one-person, one-vote principle.

87.     There is no factual dispute on this front. Mr. Esselstyn's expert report demonstrates that his illustrative State Senate plan contains minimal population deviation. In both the enacted and illustrative State Senate plans, most district populations are within ±1 percent of the ideal, and a small minority are between ±1 and 2 percent. None has a deviation of more than 2 percent. For the enacted plan, the relative average deviation is 0.53 percent, and for the illustrative plan, the relative average deviation is 0.68 percent. PX3 ¶ 30; see also id. at 49–52, 54–55 (Mr. Esselstyn's expert report listing population statistics for enacted and illustrative State Senate maps); id. at 66 (similar); Feb. 9, 2022, Afternoon Tr. 158:4–22, 176:20–177:5, 188:4–12 (Mr. Esselstyn's testimony describing compliance with population equality).

88.     Mr. Esselstyn's expert report further demonstrates that his illustrative House plan contains minimal population deviation. In both the enacted and illustrative House plans, most district populations are within ±1 percent of the ideal, and a small minority are between ±1 and 2 percent. None has a deviation of more than 2 percent. For the enacted plan, the relative average deviation is 0.61 percent, and for the illustrative plan, the relative average deviation is 0.64 percent. PX3 ¶ 45; see also id. at 97–106, 108–13 (Mr. Esselstyn's expert report listing population statistics for enacted and illustrative House maps); id. at 121 (similar).

**b.    Contiguity**

89.    The Court finds that Mr. Esselstyn's illustrative legislative maps contain contiguous districts.

90.    Again, there is no factual dispute on this issue. <u>See</u> Feb. 9, 2022, Afternoon Tr. 160:11–13 (Mr. Esselstyn's testimony confirming that his illustrative districts are contiguous).

**c.    Compactness**

91.    The Court finds that Mr. Esselstyn's illustrative legislative maps have comparable compactness scores to Georgia's enacted 2021 legislative plans.

92.    As Defendants' mapping expert Mr. Morgan explained, "[g]enerally speaking, . . . the compactness scores are usually useful in comparing one plan to another . . . . I wouldn't designate a single number that way but when you do a lot of comparisons, you can see some cases where things are considerably less compact than others." Feb. 11, 2022, Afternoon Tr. 225:18–226:11.

93.    Mr. Esselstyn reported the average compactness scores for both the enacted plans and his illustrative legislative plans using five measures—Reock, Schwartzberg, Polsby-Popper, Area/Convex Hull, and Number of Cut Edges. PX3 ¶¶ 31, 46 & tables 2, 5; <u>see also</u> Feb. 9, 2022, Afternoon Tr. 158:23–160:1 (Mr. Esselstyn's testimony describing common measures of compactness).

94.     The Reock test is an area-based measure that compares each district to a circle, which is considered to be the most compact shape possible. For each district, the Reock test computes the ratio of the area of the district to the area of the minimum enclosing circle for the district. The measure is always between 0 and 1, with 1 being the most compact. PX3 at 63.

95.     The Schwartzberg test is a perimeter-based measure that compares a simplified version of each district to a circle, which is considered to be the most compact shape possible. For each district, the Schwartzberg test computes the ratio of the perimeter of the simplified version of the district to the perimeter of a circle with the same area as the original district. This measure is usually greater than or equal to 1, with 1 being the most compact. PX3 at 63.

96.     The Polsby-Popper test computes the ratio of the district area to the area of a circle with the same perimeter: $4\pi \text{Area}/(\text{Perimeter}^2)$. The measure is always between 0 and 1, with 1 being the most compact. PX3 at 63.

97.     The Area/Convex Hull test computes the ratio the district area to the area of the convex hull of the district (minimum convex polygon which completely contains the district). The measure is always between 0 and 1, with 1 being the most compact. PX3 at 63.

98.     The Cut Edges test counts the number of edges removed ("cut") from the adjacency (dual) graph of the base layer to define the districting plan. The adjacency graph is defined by creating a node for each base layer area. An edge is added between two nodes if the two corresponding base layer areas are adjacent—which is to say, they share a common linear boundary. If such a boundary forms part of the district boundary, then its corresponding edge is cut by the plan. The measure is a single number for the plan. A smaller number implies a more compact plan. PX3 at 63–64; see also Feb. 9, 2022, Afternoon Tr. 236:2–16 (Mr. Esselstyn's testimony describing Cut Edges measurement).

99.     Mr. Esselstyn concluded that the average compactness measures for the enacted State Senate plan and his illustrative plan "are almost identical, if not identical." PX3 ¶ 31 & table 2; see also id. at 66–79 (Mr. Esselstyn's expert report providing detailed compactness measures for enacted and illustrative State Senate maps); Feb. 9, 2022, Afternoon Tr. 160:2–10, 177:6–19, 188:13–17 (Mr. Esselstyn's testimony describing compliance with compactness principle); Feb. 22, 2022, Afternoon Tr. 223:23–224:3 (Mr. Morgan's testimony confirming that overall compactness scores of Mr. Esselstyn's illustrative State Senate map and enacted map are similar). Mr. Esselstyn reported those measures as follows:

**Table 2: Compactness measures for enacted and illustrative State Senate plans.**

|  | Reock (average) | Schwartzberg (average) | Polsby-Popper (average) | Area/Convex Hull (average) | Number of Cut Edges |
|---|---|---|---|---|---|
| Enacted | 0.42 | 1.75 | 0.29 | 0.76 | 11,005 |
| Illustrative | 0.41 | 1.76 | 0.29 | 0.75 | 10,998 |

100.   Mr. Esselstyn further concluded that the average compactness measures for the enacted House plan and his illustrative plan "are almost identical, if not identical." PX3 ¶ 46 & table 5; see also id. at 121–52 (Mr. Esselstyn's expert report providing detailed compactness measures for enacted and illustrative House maps); Feb. 9, 2022, Afternoon Tr. 160:2–10 (Mr. Esselstyn's testimony describing compliance with compactness principle); Feb. 22, 2022, Afternoon Tr. 224:4–7 (Mr. Morgan's testimony confirming that overall compactness scores of Mr. Esselstyn's illustrative House map and enacted map are similar). Mr. Esselstyn reported those measures as follows:

**Table 5: Compactness measures for enacted and illustrative House plans.**

|  | Reock (average) | Schwartzberg (average) | Polsby-Popper (average) | Area/Convex Hull (average) | Number of Cut Edges |
|---|---|---|---|---|---|
| Enacted | 0.39 | 1.80 | 0.28 | 0.72 | 22,020 |
| Illustrative | 0.39 | 1.82 | 0.28 | 0.72 | 22,475 |

101.    Notably, House Districts 117, 145, and 149 all outscore their counterparts in the enacted House map on the Schwartzberg and Area/Convex Hull measures. PX4 ¶ 12.

102.    Mr. Morgan's expert report confirmed the accuracy of Mr. Esselstyn's compactness statistics without suggesting that Mr. Esselstyn's illustrative maps fail to comply with this districting principle. See DX2 ¶¶ 23–24 & chart 5. Moreover, his report demonstrated that most of the additional majority-Black districts in Mr. Esselstyn's illustrative plans outperform their precursors in the enacted plans according to the Polsby-Popper compactness measure, with Senate District 25 and House District 149 performing better according to that measure and the Reock measure:

**Chart 5. Compactness score summary**

| New Black-Majority District | Adopted Plan Reock | Esselstyn Remedial Plan Reock | Adopted Plan Polsby-Popper | Esselstyn Remedial Plan Polsby-Popper |
|---|---|---|---|---|
| Senate 23 | **0.37** | 0.34 | 0.16 | **0.17** |
| Senate 25 | 0.39 | **0.57** | 0.24 | **0.34** |
| Senate 28 | **0.45** | 0.38 | **0.25** | 0.19 |
| House 64 | **0.37** | 0.22 | **0.36** | 0.22 |
| House 74 | **0.50** | 0.30 | **0.25** | 0.19 |
| House 117 | **0.41** | 0.40 | 0.28 | **0.33** |
| House 145 | **0.38** | 0.34 | 0.19 | **0.21** |
| House 149 | 0.32 | **0.42** | 0.22 | **0.23** |

103.   Mr. Morgan offered no opinion on the compactness of Mr. Esselstyn's illustrative plans and at no point offered any opinion or conclusion that Mr. Esselstyn's illustrative plans are not reasonably compact. See Feb. 11, 2022, Afternoon Tr. 222:4–225:21, 229:1–230:11.

104.   Mr. Morgan conceded that there is no minimum compactness threshold for districts under Georgia law. See Feb. 11, 2022, Afternoon Tr. 228:3–16.

105.   Although Plaintiffs' other mapping expert, Ms. Gina Wright, opined in her expert report that "[t]he three-way division of Baldwin [County] makes no sense and is not at all compact" (DX41 ¶ 25), she admitted at the hearing that this assertion was unsupported by any compactness measures or specific comparisons to the enacted plan. See Feb. 11, 2022, Morning Tr. 17:2–20, 19:16–21. Moreover, Mr. Esselstyn explained that "Baldwin County was already divided in two" and that the inclusion of a portion of Baldwin County in his illustrative House District 149 was needed for population equality: "the part of Bibb that I had included as well as Twiggs and Wilkinson were not enough to meet the ideal district population so I was looking at Baldwin County. And as it happens, that population in Baldwin County is concentrated in a sort of vertical column up through the middle of the county. So in order to obtain the population needed to

get the ideal population, those precincts where the population was, were in the middle part of the county." Feb. 9, 2022, Afternoon Tr. 189:25–191:7; see also id. at 252:15–23 (Mr. Esselstyn's testimony explaining configuration of illustrative House District 149). Ultimately, Mr. Esselstyn's illustrative House District 149 is more compact than the enacted House District 149 using both the Reock and Polsby-Popper measures. Id. at 189:8–11.

106.   After reviewing the compactness measures supplied by the expert reports received in this case and listening to the expert testimony provided at the preliminary injunction hearing, the Court concludes that the districts in Mr. Esselstyn's illustrative legislative plans are reasonably compact.

107.   The Court finds that Mr. Esselstyn's illustrative legislative plans are consistent with the traditional districting principle of compactness.

### d.   Preservation of Political Subdivisions

108.   Based on the record, the Court concludes that Mr. Esselstyn's illustrative legislative plans comply with the districting criterion of respecting political subdivision boundaries.

109.   Mr. Esselstyn testified that it was "not always possible" to preserve political subdivisions because, for example, "the ideal population for a House district is around 60,000 people, and there are going to be counties that have way

more than 60,000 people. So you are going to have to divide that county up into multiple districts." Feb. 9, 2022, Afternoon Tr. 160:14–25. Similarly, "a typical precinct size is in the neighborhood typically around a few thousand people," and "[s]o often to get the best shape . . . , it's often practical to divide precincts." Id. at 161:1–8.

110.    Mr. Esselstyn concluded that "[w]hile the creation of three additional majority-Black State Senate districts involved the division of additional counties and VTDs, the differences are marginal." PX3 ¶¶ 32–33 & table 3; see also id. at 80–91 (Mr. Esselstyn's expert report providing political subdivision splits for enacted and illustrative State Senate maps); Feb. 9, 2002, Afternoon Tr. 161:9–11 (Mr. Esselstyn's testimony stating that "the numbers of divided counties and precincts in the illustrative plans are similar, slightly higher than those for the enacted plans"); id. at 177:20–25, 188:18–24 (Mr. Esselstyn's testimony describing preservation of political subdivisions). He reported the splits in the enacted and illustrative State Senate maps as follows:

**Table 3: Political subdivision splits for enacted and illustrative State Senate Plans**

|              | Intact Counties | Split Counties | Split VTDs |
|--------------|-----------------|----------------|------------|
| Enacted      | 130             | 29             | 47         |
| Illustrative | 125             | 34             | 49         |

111.    Mr. Esselstyn further concluded that "[w]hile the creation of five additional majority-Black House districts involved the division of one additional county and a handful of VTDs, the differences are marginal." PX3 ¶¶ 47–48 & table 6; see also id. at 153–85 (Mr. Esselstyn's expert report providing political subdivision splits for enacted and illustrative House maps); Feb. 9, 2002, Afternoon Tr. 161:9–11 (Mr. Esselstyn's testimony stating that "the numbers of divided counties and precincts in the illustrative plans are similar, slightly higher than those for the enacted plans"). He reported the splits in the enacted and illustrative House maps as follows:

**Table 6: Political subdivision splits for enacted and illustrative House plans.**

|              | Intact Counties | Split Counties | Split VTDs |
|--------------|-----------------|----------------|------------|
| Enacted      | 90              | 69             | 185        |
| Illustrative | 89              | 70             | 192        |

112.    Notably, the number of county splits in Mr. Esselstyn's illustrative State Senate and House plans are lower than the number of such splits in the legislative plans used in the most recent elections (which is to say, Georgia's 2014 State Senate and 2015 House plans). PX4 ¶ 11 & table 1; Feb. 9, 2022, Afternoon Tr. 178:1–5, 188:25–4.

113.    Out of 2,698 VTDs statewide, only 49 are split in Mr. Esselstyn's illustrative State Senate plan, and in only 18 of Georgia's 159 counties. Doc. No.

61-1 ¶ 3 & fig. 1; Feb. 9, 2022, Afternoon Tr. 163:17–20, 166:5–9. Some of these VTD splits are inherited from the enacted State Senate map because Mr. Esselstyn's illustrative map leaves a majority of districts untouched. Feb. 9, 2022, Afternoon Tr. 164:23–165:4. Mr. Esselstyn's second supplemental report included a histogram depicting the VTD splits in his illustrative State Senate plan by county:

**Figure 1: VTD splits in illustrative State Senate plan by County**



114.   Similarly, out of 2,698 VTDs statewide, only 192 are split in Mr. Esselstyn's illustrative House plan, and in only 45 of Georgia's 159 counties. Doc. No. 61-1 ¶ 4 & fig. 2; Feb. 9, 2022, Afternoon Tr. 164:13–15, 166:10–11. Some of these VTD splits are inherited from the enacted House map because Mr. Esselstyn's illustrative map leaves a vast majority of districts untouched. Feb. 9, 2022,

Afternoon Tr. 165:5–6. Mr. Esselstyn's second supplemental report included a histogram depicting the VTD splits in his illustrative House plan by county:

**Figure 2: VTD splits in illustrative State House plan by County**



115.    Across both the illustrative State Senate and House maps, only 47 of Georgia's 159 counties have split VTDs. Feb. 9, 2022, Afternoon Tr. 166:15–21.

116.    Mr. Morgan's report confirmed Mr. Esselstyn's statistics for political subdivision splits without opining that Mr. Esselstyn's illustrative maps fail to comply with this districting principle. See DX2 ¶¶ 20–22; see also Feb. 11, 2022, Afternoon Tr. 220:15–221:20 (Mr. Morgan's testimony confirming Mr. Esselstyn's reported figures and conceding that his expert report offers no opinion on issue of split geographies).

117.   The Court finds that Mr. Esselstyn's illustrative legislative plans respect the boundaries of political subdivisions.

### e.   Preservation of Communities of Interest

118.   Based on the record, the Court concludes that Mr. Esselstyn's illustrative legislative plans comply with the districting criterion of respecting communities of interest.

119.   Mr. Esselstyn testified regarding his definition of a community of interest: "[C]ommunity of interest could be something as large as the Black Belt. As large as Metro Atlanta. Can span multiple counties. And . . . it could also be as small as a neighborhood. So it can be an area that is large or larger geographically but the basic idea is you are looking at areas that have a shared characteristics or where the people have a shared interest." Feb. 9, 2022, Afternoon Tr. 167:1–11. Although sometimes such communities "can be delineated on [a] map"—such as municipalities, college campuses, or military bases—at other times "they don't have clearly defined boundaries." Id. at 167:18–168:9; see also Feb. 11, 2022, Morning Tr. 90:5–91:12 (Ms. Wright's testimony broadly defining communities of interest).

120.   In drawing his illustrative maps, Mr. Esselstyn sought to preserve communities of interest where possible. Feb. 9, 2022, Afternoon Tr. 168:13–16.

Notably, this does not necessarily mean that each illustrative district is homogenous; as Mr. Esselstyn explained, "I don't believe that the communities of interest principle[] requires every two communities in a given district to have commonalities. I don't think that's what the principle stands for. . . . [M]y focus on communities of interest is trying to keep them intact, when possible." Feb. 9, 2022, Afternoon Tr. 221:1–222:11. Accordingly, the absence of "some shared characteristic" does not necessarily indicate "a failure to meet the communities of interest criteria or any other [] traditional redistricting principle." Id. at 222:12–17.

121.    Although Ms. Wright's expert report points to purported instances where disparate communities are included in the same district (DX41 ¶¶ 22–23, 26, 28), such claims do not undermine Mr. Esselstyn's conclusion that his illustrative districts preserve communities of interest in line with his approach described above.

122.    Commenting on Mr. Esselstyn's illustrative Senate District 25, Jason Carter, a former member of the State Senate and candidate for Governor of Georgia during the 2014 election, noted that it "includes virtually all of Henry County in a single district," which "helps in some context for sure. . . . [I]f there were really differing aspects in Henry County that needed to be divided, up that would be one thing but . . . Henry County is a fast-growing, multi-racial community that . . .

would seem like [] the kind of place that can be kept together . . . if you can make it coherent, it would seem that that would be great." Feb. 10, 2022, Afternoon Tr. 138:9–139:6.

123.    Commenting on Mr. Esselstyn's illustrative Senate District 28, Mr. Carter described the communities of interest contained in the district: "[T]hat is . . . to me, a cohesive community and . . . Newnan certainly has more in common with that part of South Fulton than it does with . . . Franklin, Georgia, because of the issues that it confronts from an infrastructure standpoint and those other issues[.]" Feb. 10, 2022, Afternoon Tr. 139:18–140:19.

124.    Commenting on Mr. Esselstyn's illustrative Senate District 23, Mr. Carter confirmed that it unites Black Belt communities with shared interests: "this is a rural area with Augusta as one of the anchors . . . if you are drawing a Senate district, you have to get to the right population, so you are going to have to have a big map with lots of counties in it, but between [Milledgeville], Hancock County, Washington County, down to Screven County, you are talking about an area . . . that has been confronting these multiracial rural issues for hundreds of years and as those have changed over time." Feb. 10, 2022, Afternoon Tr. 140:20–142:11; see also id. at 142:14–143:16 (Mr. Carter's testimony describing common interests between Richmond County and Milledgeville).

125.   As described above, Mr. Esselstyn's illustrative House District 149 "generally follows the orientation of the Georgia Fall Line geological feature, which brings with it shared economic, historic, and ecological similarities. Macon and Milledgeville, parts of which are in illustrative House District 149, are both characterized as 'Fall Line Cities.'" PX4 ¶ 14 (footnote omitted).

126.   Although Ms. Wright opined that "connecting a small portion of Milledgeville with Macon in a single House district lacks any coherent community" (DX41 ¶ 25), Mr. Esselstyn emphasized the connections between these communities as Fall Line Cities and noted that Ms. Wright herself advocated for the inclusion of Twiggs and Wilkinson Counties together in a single district, which his illustrative House District 149 achieves. Feb. 9, 2022, Afternoon Tr. 191:12–192:21; see also DX41 ¶ 18 (Ms. Wright's expert report asserting that "Twiggs and Wilkinson counties . . . have historically been in the same district as they constitute a single community of interest"). Mr. Esselstyn also testified that his illustrative House District 149 preserves Mercer University and the Ocmulgee Mounds National Historical Park in a single district. Feb. 9, 2022, Afternoon Tr. at 192:22–193:2.

127.   Mr. Esselstyn's additional majority-Black State Senate district in the Black Belt, illustrative Senate District 23, also preserves the Fall Line Cities

community of interest that includes cities like Milledgeville and Augusta. Feb. 9, 2022, Afternoon Tr. 222:18–223:4.

128.    Regarding the House districts in Bibb County, Mr. Wright noted that "[w]e had testimony in Macon at that hearing specifically asking to keep their districts with an eastern district and a western district, which is how those two districts where those incumbents that live there are currently drawn. And they asked we maintain it the same way." Feb. 11, 2022, Morning Tr, 50:3–51:5. Mr. Esselstyn's illustrative House plain maintains House Districts 142 and 143 within Bibb County as eastern and western districts. PX3 ¶ 42 & fig. 13; see also Feb. 11, 2022, Morning Tr. 84:15–18 (Ms. Wright's testimony confirming that Mr. Esselstyn's illustrative House Districts 142 and 143 are still wholly within Bibb County).

129.    The Court finds that Mr. Esselstyn's illustrative legislative plans respect communities of interest.

### f.    Core Retention

130.    Preservation of existing district cores was not an enumerated districting principle adopted by the General Assembly. See PX39–PX40.

131.    As Mr. Esselstyn explained in his supplemental expert report, "One of the guiding principles in the creation of my illustrative plans was to keep

changes to a minimum while adhering to other neutral criteria. Modifying one district necessarily requires changes to districts adjacent to the original modification, and harmonizing those changes with traditional redistricting criteria (such as population equality and intactness of counties) often inescapably results in cascading changes to other surrounding districts. While the illustrative plans are—intentionally—a departure from the enacted plans, most of the plans' districts remain intact. In the case of the illustrative House plan, for example, 86% of the districts are unchanged from the enacted House plan." PX4 ¶ 9; see also Feb. 9, 2022, Afternoon Tr. 267:20–268:4 (Mr. Esselstyn's testimony: "One of the other considerations for me was not trying to make more changes that I have to.").

132.   Indeed, the number of unchanged districts "constitute significant majorities" in Mr. Esselstyn's illustrative legislative maps. PX4 ¶ 8. Mr. Morgan's expert report only served to confirm the number of unchanged districts in Mr. Esselstyn's illustrative plans. See DX2 ¶ 19 (Mr. Morgan's expert report noting that Mr. Esselstyn changed 22 districts in State Senate plan and 26 districts in House plan); see also Feb. 11, 2022, Afternoon Tr. 214:16–215:17, 217:8–18 (Mr. Morgan's testimony confirming numbers of unchanged districts in Mr. Esselstyn's illustrative legislative plans); id. at 218:5–220:14 (Mr. Morgan's testimony further

confirming accuracy of Mr. Esselstyn's reported statistics and conceding that his

expert report offers no opinion or analysis on issue of core retention).

133.   Mr. Esselstyn's second supplemental expert report contained maps

depicting the unchanged districts in his illustrative State Senate and House maps

(Doc. No. 61-1 ¶¶ 5 & figs. 3–4):



Figure 3: Changed and unchanged districts in illustrative State Senate plan      Figure 4: Changed and unchanged districts in illustrative House plan

134.   Although Mr. Morgan's report contains analysis of core retention

(DX2 ¶ 19), he admitted at the hearing that he compared Mr. Esselstyn's

illustrative maps only to the enacted maps and not to the previously enacted

benchmark maps. Feb. 11, 2022, Afternoon Tr. 208:9–209:5. Mr. Morgan agreed that

the enacted maps have been in place for less than six weeks and that, to his

knowledge, no Georgia voters have cast ballots under the new legislative maps. Id. at 210:4–211:1.

135.   During his testimony at the hearing, Mr. Morgan conceded that illustrative plans are necessarily different from enacted plans. Feb. 11, 2022, Afternoon Tr. 214:1–3.

136.   The Court concludes that Mr. Esselstyn's illustrative legislative plans comply with traditional districting principles, including those adopted by the General Assembly.

### g.    Racial Considerations

137.   The Court further concludes that Mr. Esselstyn did not subordinate traditional districting principles in favor of race-conscious considerations.

138.   Mr. Esselstyn was asked "to determine whether there are areas in the State of Georgia where the Black population is 'sufficiently large and geographically compact' to enable the creation of additional majority-Black legislative districts relative to the number of such districts provided in the enacted State Senate and State House of Representatives redistricting plans from 2021." PX3 ¶ 8 (footnote omitted); see also Feb. 9, 2022, Afternoon Tr. 150:11–19 (Mr. Esselstyn's testimony confirming what he was asked to do in this case). Mr.

Esselstyn testified that he was not asked to maximize the number of majority-Black districts in the State Senate or House map. Feb. 9, 2022, Afternoon Tr. 150:23–25.

139.   Mr. Esselstyn testified that it was necessary for him to consider race as part of his analysis because, under Section 2, "the key metric is whether a district has a majority of the Any Part Black population. So that means it has to be over 50 percent. And that means looking at a column of numbers in order to determine, to assess whether a district has that characteristic. You have to look at the numbers that measure the percentage of the population is Black." Feb. 9, 2022, Afternoon Tr. 155:15–156:2.

140.   Mr. Esselstyn emphasized that he took other considerations into account as well when drawing his illustrative plans, including population equality, compliance with the federal and state constitutions, contiguity, and other traditional districting principles. Feb. 9, 2022, Afternoon Tr. 156:10–157:9; see also id. at 275:2–11 (Mr. Esselstyn's testimony explaining that, when drawing illustrative districts, "I'm not looking at any one race of voters. . . . I'm always looking [at] a multitude of considerations").

141.   Mr. Esselstyn confirmed that race did not predominate when he drew his illustrative plans. Feb. 9, 2022, Afternoon Tr. 158:1–3. When asked by the Court whether race was the controlling issue when drawing his illustrative House

District 149, Mr. Esselstyn responded, "There's not one predominant consideration. . . . I'm trying to see if something can be satisfied while considering all the other traditional principles and the principles adopted by the General Assembly." Id. at 254:1–255:18.

142.   When asked by Defendants' counsel whether additional split counties in the illustrative maps were the result of an effort to add additional-majority Black districts, Mr. Esselstyn responded, "I don't know that I would guarantee that that was why. As I mentioned, it's one of the principles that I was trying to adhere to, as well as compactness. So I guess I could say that it's a consequence, but it's not necessarily that I'm trying to create additional majority Black districts necessarily in splitting more counties." Feb. 9, 2022, Afternoon Tr. 203:18–204:8.

143.   When asked by Defendants' counsel whether the composition of his illustrative House District 74 was "to achieve the goal of majority status in [that] district," Mr. Esselstyn responded, "No. . . . [T]here are always multiple goals," such as preserving the community of Irondale, ensuring that Fayetteville was kept intact in the illustrative map, and being "relatively consistent with what it is in the enacted plan" in terms of preexisting district boundaries. Feb. 9, 2022, Afternoon Tr. 246:16–247:5.

144.   In her expert report, Ms. Wright offered conclusory assertions that certain district boundaries in Mr. Esselstyn's illustrative maps were "drawn with a racial goal in mind" (DX41 ¶¶ 21–23), but provides no persuasive details or explanations to support these claims. Moreover, as discussed above, Mr. Esselstyn provided neutral justifications for the decisions he made when drawing his illustrative State Senate and House plans.

145.   Ms. Wright also suggested that "[i]t is [] unusual that District 116 follows the interstate except to take a single precinct across the interstate that likely has racial implications for District 117." DX41 ¶ 27. Mr. Esselstyn provided a neutral justification for this decision: "It's actually not a precinct. It is a portion of a precinct, and so I did—this is an instance where I did cho[o]se to divide a precinct and that was done actually in order to preserve a community of interest. So had I included the entire precinct, it would have actually split [McDonough]. It would have been a portion, a substantial portion . . . of [McDonough] in that eastern piece of that precinct. So by dividing the precinct, it was actually done to keep . . . the vast majority of McDonough in House District 117." Feb. 9, 2022, Afternoon Tr. 193:3–194:19.

146.   The Court finds that race did not predominate in the drawing of Mr. Esselstyn's illustrative legislative plans.

47

B.       **Second** <u>Gingles</u> **Precondition: Political Cohesion**

147.    Plaintiffs' racially polarized voting expert, Dr. Maxwell Palmer, demonstrated that Black voters in Georgia are politically cohesive.

148.    The Court has accepted Dr. Maxwell Palmer as qualified to testify as an expert regarding redistricting and data analysis. Feb. 10, 2022, Morning Tr. 47:18–19. The Court finds Dr. Palmer credible, his analysis methodologically sound, and his conclusions reliable. The Court credits Dr. Palmer's testimony and conclusions.

149.    Dr. Palmer conducted a racially polarized voting analysis of five different legislative focus areas. Doc. No. 56 ¶ 77; PX6 ¶ 9; Feb. 10, 2022, Morning Tr. 60:1–13.

150.    Dr. Palmer analyzed two focus areas for the State Senate plan:

• <u>Black Belt</u>: Senate Districts 22, 23, 24, 25, and 26. These districts include Baldwin, Burke, Butts, Columbia, Elbert, Emanuel, Glascock, Greene, Hancock, Hart, Jasper, Jefferson, Jenkins, Johnson, Jones, Lincoln, Mcduffie, Oglethorpe, Putnam, Richmond, Screven, Taliaferro, Twiggs, Warren, Washington, Wilkes, and Wilkinson Counties and parts of Bibb, Henry, and Houston Counties. PX6 ¶ 10.

- <u>Southern Atlanta</u>: Senate Districts 10, 16, 17, 25, 28, 34, 35, 39, and 44. These districts include Baldwin, Butts, Clayton, Coweta, Fayette, Heard, Jasper, Jones, Lamar, Morgan, Pike, Putnam, and Spalding Counties and parts of Bibb, Dekalb, Douglas, Fulton, Henry, Newton, and Walton Counties. PX6 ¶ 10.

151.    Dr. Palmer examined three focus areas for the House plan:

- <u>Black Belt</u>: House Districts 133, 142, 143, 145, 147, and 149. These districts include Bleckley, Crawford, Dodge, Twiggs, and Wilkinson Counties and parts of Baldwin, Bibb, Houston, Jones, Monroe, Peach, and Telfair Counties. PX6 ¶ 10.

- <u>Southern Atlanta</u>: House Districts 69, 74, 75, 78, 115, and 117. These districts include parts of Clayton, Fayette, Fulton, Henry, and Spalding Counties. PX6 ¶ 10.

- <u>Western Atlanta</u>: House Districts 61 and 64. These districts include parts of Douglas, Fulton, and Paulding Counties. PX6 ¶ 10.

152.    Dr. Palmer employed a statistical method called Ecological Inference ("EI") to derive estimates of the percentages of Black and white voters in the focus areas that voted for each candidate in 31 statewide elections between 2012 and 2021. PX6 ¶¶ 14–16; Feb. 10, 2022, Morning Tr. 59:12–25, 60:18–21.

153.   Dr. Palmer's EI analysis relied on precinct-level election results and voter turnout by race, as compiled by the State of Georgia. PX6 ¶ 12; Feb. 10, 2022, Morning Tr. 51:19–52:2, 59:12–20.

154.   Dr. Palmer first examined each racial group's support for each candidate to determine if members of the group voted cohesively in support of a single candidate in each election. PX6 ¶ 15. If a significant majority of the group supported a single candidate, he then identified that candidate as the group's candidate of choice. Id. Dr. Palmer next compared the preferences of white voters to the preferences of Black voters. Id. Evidence of racially polarized voting is found when Black voters and white voters support different candidates. Id.

155.   In every election examined, across the focus areas and in each State Senate and House district, Black voters had clearly identifiable candidates of choice. PX6 ¶ 17 & fig. 2.

156.   In the 2016–2020 elections, Black voters on average supported their preferred candidates with an estimated vote share of 95.2 percent. PX6 ¶ 17.

157.   Defendant's racially polarized voting expert, Dr. John Alford, does not dispute Dr. Palmer's conclusions as to the second Gingles precondition. See Feb. 11, 2022, Afternoon Tr. 154:15–17.

158.    Based on the expert reports and testimony provided in this case, the Court concludes that Black voters in the legislative focus areas are politically cohesive.

### C.    Third <u>Gingles</u> Precondition: Bloc Voting

159.    Dr. Palmer also demonstrated that white voters in the legislative focus areas vote as a bloc to defeat Black-preferred candidates.

160.    In each legislative district examined and in the focus areas as a whole, white voters had clearly identifiable candidates of choice for every election examined. Feb. 10, 2022, Morning Tr. 60:22–25; PX6 ¶ 17 & figs. 2–3, table 1.

161.    In the 2012–2021 elections, white voters were highly cohesive in voting in opposition to the Black candidate of choice in every election. On average, Dr. Palmer found that white voters supported Black-preferred candidates with a maximum of just 17.7 percent of the vote. PX6 ¶ 17. In other words, white voters on average supported their preferred candidates with an estimated vote share of 82.3 percent. <u>Id.</u>

162.    Overall, Dr. Palmer found "strong evidence of racially polarized voting across all five focus areas" as a whole and in each individual focus area he examined. Feb. 10, 2022, Morning Tr. 60:22–25; <u>see also</u> PX6 ¶¶ 17–18.

163.    As a result of this racially polarized voting, candidates preferred by Black voters have generally been unable to win elections in the focus areas outside of majority-Black districts. PX6 ¶ 20. Dr. Palmer concluded that "Black-preferred candidates win almost every election in the Black-majority districts, but lose almost every election in the non Black-majority districts." Id.

164.    Defendant's expert Dr. Alford does not dispute Dr. Palmer's conclusions as to the third Gingles precondition. Feb. 11, 2022, Afternoon Tr. 159:7–11.

165.    Dr. Alford testified that he "kn[e]w from [] past work that [Dr. Palmer is] competent at doing EI analysis," so he thus assumed that Dr. Palmer's analysis was correct regarding the existence of racially polarized voting for the geographies examined. Feb. 11, 2022, Afternoon Tr. 143:14–21. Although Dr. Alford raised speculative concerns about Dr. Palmer's results being more attributable to partisanship rather than race, see DX6, he admitted on cross-examination that he did not identify any errors that would affect Dr. Palmer's analysis or conclusions. Feb. 11, 2022, Afternoon Tr. 153:3–7.

166.    Using the returns from the 31 statewide elections, Dr. Palmer also analyzed whether Black voters in Mr. Esselstyn's additional majority-Black State Senate and House districts could elect their candidates of choice. He found that

"[i]n House Districts 64, 74, and 149, and Senate Districts 23, 25, and 28, the Black-preferred candidate won a larger share of the vote in all 31 statewide elections. In House District 117, the Black-preferred candidate won all 19 elections since 2018. In House District 145, the Black-preferred candidate won all 19 elections since 2018, and 27 of the 31 elections overall. Table 10 provides the full results." PX6 ¶ 22.

167.   Dr. Palmer also testified that the changes Mr. Esselstyn made to the preexisting majority-Black districts in the enacted map would <u>not</u> change the ability of Black-preferred candidates to win in these districts. Feb. 10, 2022, Morning Tr. 65:1–4.

168.   Based on the expert reports and testimony provided in this case, the Court concludes that white voters in the legislative focus areas vote as a bloc to usually defeat Black-preferred candidates, and that Black voters in Mr. Esselstyn's illustrative majority-Black State Senate and House districts would be able to elect their candidates of choice.

### D.   Totality of Circumstances

169.   The Court finds that each of the relevant Senate Factors—which inform Section 2's totality-of-circumstances inquiry—points decisively in Plaintiffs' favor.

### 1.      Senate Factor One: History of Voting-Related Discrimination

170.    Plaintiffs presented the expert report of Dr. Orville Vernon Burton to address Georgia's history of voting-related discrimination. <u>See</u> PX9. The Court has accepted Dr. Burton as qualified to testify as an expert on the history of race discrimination and voting. Feb. 10, 2022, Morning Tr. 7:6–11. The Court finds Dr. Burton credible, his analysis methodologically sound, and his conclusions reliable. The Court credits Dr. Burton's testimony and conclusions.

171.    The Court finds that Georgia has an extensive and well-documented history of discrimination against its Black citizens that has touched upon their right to register, vote, and otherwise participate in the political process. "Throughout the history of the state of Georgia, voting rights have followed a pattern where after periods of increased nonwhite voter registration and turnout, the state has passed legislation, and often used extralegal means, to disenfranchise minority voters." PX9 at 8. As Dr. Burton's expert report demonstrates, Georgia's history of discrimination spans from the Reconstruction Era to the present day.

### a.      Political Violence Against Black Georgians

172.    The Court finds that political violence suppressed the ability of Black Georgians to participate equally in the political process.

173.    Dr. Burton reported that between 1867 and 1872, "at least a quarter of the state's Black legislators were jailed, threatened, bribed, beaten or killed." PX9 at 12. This violence, often perpetrated by the Ku Klux Klan, enabled white Georgians to regain control of the levers of power in the state. Id. at 12–15. After seizing control of the state legislature through a campaign of violence and intimidation, white Democrats called a new constitutional convention chaired by the former Confederate secretary of state. That convention resulted in the Constitution of 1877, which effectively barred Black Georgians from voting through the implementation of a cumulative poll tax. Id. at 15.

174.    Violence, and the threat of it, "was constant for many Black Georgians after white Democrats controlled the state in the late 19th and first part of the 20th century." PX9 at 21. In addition to mob violence, Dr. Burton's report explained that Black Georgians endured a form of state-sanctioned violence through debt peonage and the convict lease system, which effectively amounted to "slavery by another name." Id. And violence against Black Georgians surged after the First World War, with many white Georgians holding "a deep antipathy" toward Black veterans. Id.

175.    Between 1875 and 1930, there were 462 lynchings in Georgia. PX9 at 24. Only Mississippi had more reported lynchings during that time. These

lynchings "served as a reminder for Black Georgians who challenged the status quo, and in practice lynchings did not need to be directly connected to the right to vote to act as a threat against all Black Georgians who dared to participate in the franchise." Id.

### b.    Pre-Voting Rights Act

176.   "While Georgia was not an anomaly, no state was more systematic and thorough in its efforts to deny or limit voting and officeholding by African-Americans after the Civil War." PX9 at 8 (quoting Laughlin McDonald, A Voting Rights Odyssey: Black Enfranchisement in Georgia 2–3 (2003)). Although Georgia's 1865 Constitution abolished slavery, it limited the franchise to white citizens and barred Blacks from holding elected office. Id. at 9; Feb. 10, 2022, Morning Tr. 8:23–9:9. To be sure, the federal government forced Georgia to extend the right to vote to Black males in 1867. See PX9 at 10. But Georgia responded with a series of facially neutral policies that had the intent and effect of "render[ing] black participation in politics improbable." Id. at 15.

177.   Georgia's 1877 Constitution, for example, did not explicitly disenfranchise Black citizens but made it practically impossible for Black Georgians to vote by implementing a "cumulative poll tax for elections, so that potential voters had to pay all previous unpaid poll taxes before casting a ballot."

PX9 at 15. Relatedly, Georgia prohibited Black voters from participating in the Democratic Primary. Id. at 16. Because Georgia was a one-party Democratic state, the "white primary" effectively eliminated Black participation in the state's politics. Id.

178.    In 1908, Georgia enacted the Felder-Williams Bill, which broadly disenfranchised many Georgians but contained numerous exceptions that allowed most whites to vote, including "owning forty acres of land or five hundred dollars' worth of property," "being able to write or to understand and explain any paragraph of the U.S. or Georgia Constitution," or being "persons of good character who understand the duties and obligations of citizenship." PX9 at 17. In conjunction with the Felder-Williams Bill, Georgia enacted a voter registration law allowing any citizen to "contest the right of registration of any person whose name appears upon the voters list." Id. at 18.

179.    These laws "were devastatingly effective at eliminating both Black elected officials from seats of power and Black voters from the franchise." PX9 at 19. At the time of the Felder-Williams Bill, there were 33,816 Black Georgians registered to vote. Two years later, only 7,847 Black voters were registered—a decrease of more than 75 percent. Id. From 1920 to 1930, the combined Black vote total in Georgia never exceeded 2,700. Id. And by 1940, "the total Black registration

in Georgia was still only approximately 20,000, around two or three percent of eligible Black voters." Id. By contrast, "fewer than six percent of white voters were disenfranchised by Georgia's new election laws." Id.

### c.   Post-Voting Rights Act

180.   Congress enacted the Voting Rights Act of 1965 to address these discriminatory practices. Among the Voting Rights Act's provisions was the preclearance requirement that prohibited certain jurisdictions with well-documented practices of discrimination—including Georgia—from making changes to their voting laws without approval from the federal government. PX9 at 33.

181.   The Voting Rights Act, however, "did not translate into instant success" for Black political participation. PX9 at 33. Among states subject to preclearance in their entirety, Georgia ranked second only to Alabama in the disparity in voter registration between its Black and white citizens by 1976. Id. at 34; Feb. 10, 2022, Morning Tr. 14:3–9. And these disparities were directly attributable to Georgia's continued efforts to enact policies designed to circumvent the Voting Rights Act's protections and suppress the rights of Black voters. PX9 at 34. From 1965 to 1981, the Department of Justice objected to more voting changes

from the state of Georgia than any other state in the country. <u>Id.</u> at 36; Feb. 10, 2022, Morning Tr. 15:7–15.

182.   The Court finds that Georgia's efforts to discriminate against Black voters persisted well past 1981. Notably, after the U.S. Supreme Court effectively ended the Voting Rights Act's preclearance requirement in <u>Shelby County v. Holder</u>, 570 U.S. 529 (2013), Georgia was the only former preclearance state that proceeded to adopt "all five of the most comment restrictions that impose roadblocks to the franchise for minority voters, including (1) voter ID laws, (2) proof of citizenship requirements, (3) voter purges, (4) cuts in early voting, and (5) widespread polling place closures." PX9 at 46.

183.   Dr. Burton discussed several of these restrictions in his report. <u>See</u> PX7 at 46–54. For example, "in a 2015 memo to local election officials, then-Secretary of State Kemp encouraged counties to reduce voting locations, noting that 'as a result of the Shelby vs. Holder Supreme Court decision, [counties are] no longer required to submit polling place changes to the Department of Justice for preclearance.'" <u>Id.</u> Later that year, Georgia began closing polling places in primarily black neighborhoods. <u>Id.</u> at 47. "By 2019, eighteen counties in Georgia closed more than half of their polling places, and several closed almost 90 percent." <u>Id.</u> (internal quotations omitted). These closures depressed turnout in affected

areas and led to substantially longer waiting times at the polls. According to one study in 2020, "about two-thirds of the polling places that had to stay open late for the June primary to accommodate waiting voters were in majority-Black neighborhoods, even though they made up only about one-third of the state's polling places." Id. at 48.

184.   Georgia also engaged in "systematic efforts to purge the voting rolls in ways that particularly disadvantaged minority voters and candidates" in the aftermath of Shelby County. PX9 at 48. In the period from 2012 to 2018, Georgia removed 1.4 million voters from the eligible voter rolls—and these purges disproportionately impacted Black voters. Id. at 48–49. While the State described these purges as "voter list maintenance," Dr. Burton testified that Georgia used similarly neutral terms to describe its voter registration law enacted in 1908 to keep Black Georgians off the voter rolls. Feb. 10, 2022, Morning Tr. 38:22–39:7.

185.   Georgia also enacted Senate Bill ("SB") 202 in the spring of 2021 following significant increases in Black voter turnout. SB 202 targets methods of voting that Black voters used extensively in the 2020 general election. Among other things, SB 202 (1) reduces the time available to request an absentee ballot, (2) increases identification requirements for absentee voting, (3) bans state and local governments from sending unsolicited absentee ballot applications, (4) limits

the use of absentee ballot drop boxes, (5) bans mobile polling places, and (6) prohibits anyone who is not a poll worker from giving food or drink to voters in line to vote. PX9 at 50.

186.    Dr. Burton found, and the Court agrees, that "[t]hese disenfranchising measures have racial roots." PX7 at 53. The growth of Georgia's nonwhite population over the past 20 years and the corresponding increase in minority voting power has "provide[d] a powerful incentive for [Georgia]officials at the state and local level to place hurdles in the path of minority citizens seeking to register and vote." Id.

### d.    Redistricting-Related Discrimination

187.    The Court also finds that Georgia used redistricting as a means to suppress Black political influence, and that these efforts have continued into the 21st century.

188.    Georgia's legislative and congressional districts were grievously malapportioned in the years preceding the enactment of the Voting Rights Act. See PX9 at 29; Feb. 10, 2022, Morning Tr. 11:21–12:18. In 1957, the Atlanta-based Congressional District Five was the second-most populous congressional district in the United States, with an estimated population of 782,800 — about twice the size of the average congressional district. PX9 at 29. By 1960, Fulton County was the

most underrepresented county in a state legislature of any county in the United States. Id. DeKalb County was the third-most underrepresented county. Id.

189.    Georgia's redistricting plans were subject to the Voting Rights Act's preclearance requirement. In the 40 years following its enactment, Georgia did not complete a redistricting cycle without objection from the Department of Justice. PX9 at 37–41. The Atlanta metropolitan area was often the focal point of Georgia's efforts to suppress Black political influence through redistricting. For example, the Department of Justice rejected Georgia's 1971 congressional plan, which cracked voters throughout Congressional Districts Four, Five, and Six to give the Atlanta-based Fifth District a substantial white majority. Id. at 37–38; see also Georgia v. United States, 411 U.S. 526, 541 (1973) (affirming that Georgia's 1972 reapportionment plan violated Section 5 of Voting Rights Act). It also rejected the congressional redistricting plan passed by Georgia following the 1980 Census, which contained white majorities in nine of the state's ten congressional districts, even though Georgia's population was nearly 30 percent Black. PX9 at 38; see also Busbee v. Smith, 549 F. Supp. 494, 517 (D.D.C. 1982) (three-judge panel) (denying preclearance based on evidence that Georgia's redistricting plan was product of purposeful discrimination in violation of Voting Rights Act), aff'd, 459 U.S. 1166 (1983); PX42 (1982 objection letter from Department of Justice asserting that "the

proposed [congressional] plan divides an apparently cohesive black community of Fulton and DeKalb Counties").

190.    In 2015, after Shelby County, the Georgia General Assembly engaged in mid-cycle redistricting. Doc. No. 56 ¶ 78. The Georgia General Assembly reduced the Black and Latino voting-age populations in House Districts 105 and 111, both of which had become increasingly diverse over the prior half-decade. See Feb. 11, 2022, Morning Tr. 12:22–25. Ms. Wright agreed that a court found that this redistricting effort "moved many black voters from districts where their votes would have made an impact into districts where they did not." Id. at 13:11–20.

## 2.    Senate Factor Two: Racially Polarized Voting

191.    As Dr. Palmer testified, racially polarized voting is "when majorities of voters of different racial or ethnic groups vote cohesively, that is, majorities of each group vote for the same candidates. And then polarization is when . . . voters of different groups are supporting different candidates." Feb. 10, 2022, Morning Tr. 48:22–49:4.

192.    As discussed at length above, see supra Part III.B–C, voting in Georgia is racially polarized because Black and white voters cohesively support opposing candidates. There is no factual dispute about the existence of racial polarization in

the legislative focus areas, the relevant State Senate and House districts, and Georgia more generally.

193.   As discussed in the Conclusions of Law below, the reasons <u>why</u> Black and white voters overwhelmingly support opposing candidates in Georgia is irrelevant to Section 2's effects-based inquiry. But even if those reasons were relevant, it is Defendants' burden to prove that political ideology is the <u>only</u> reason this racially polarized voting exists. This they have failed to do.

194.   The only evidence Defendants offered on this issue is Dr. Alford's observation that Black voters overwhelmingly prefer Democratic candidates and white voters overwhelmingly support Republican candidates. <u>See</u> Feb. 11, 2022, Afternoon Tr. 171:8–16 (Alford). But the fact that Black and white voters overwhelmingly support different political parties in Georgia tells us nothing about the cause of Georgia's racially polarized voting, and it certainly does not exclude the possibility that race and issues related to race contribute to that polarization.

195.   Other courts have discounted Dr. Alford's analyses. <u>See, e.g.</u>, <u>Lopez v. Abbott</u>, 339 F. Supp. 3d 589, 610 (S.D. Tex. 2018) ("At this juncture, the Court is only concerned with whether there is a pattern of white bloc voting that consistently defeats minority-preferred candidates. That analysis requires a

determination that the different groups prefer different candidates, as they do. It does not require a determination of why particular candidates are preferred by the two groups."); <u>Texas v. United States</u>, 887 F. Supp. 2d 133, 181 (D.D.C. 2012), <u>vacated on other grounds</u>, 570 U.S. 928 (2013) ("[T]he fact that a number of Anglo voters share the same political party as minority voters does not remove those minority voters from the protections of the VRA. The statute makes clear that this Court must focus on whether minorities are able to elect the candidate of their choice, no matter the political party that may benefit.").

196.   Moreover, the Court finds that racial attitudes and racialized politics do influence the historical and ongoing polarization among Black and white Georgians.

197.   As Dr. Burton testified, the partisan alignment of Black and white voters in Georgia is due in part to historical positions those two parties have taken on issues related to race, such as civil rights legislation. Feb. 10, 2022, Morning Tr. 20:13–21:10.

198.   That is still the case today: members of the Democratic and Republican Parties diverge deeply on issues inextricably linked to race both on a national level and in Georgia in particular. Feb. 10, 2022, Morning Tr. at 21:11–22:8.

### 3.      Senate Factor Three: Discriminatory Voting Procedures

199.    The Court further finds that Georgia—from the end of the Civil War to the present day—has enacted a wide variety of discriminatory voting procedures that have burdened Black Georgians' right to vote, including unusually large election districts and majority-vote requirements.

200.    Dr. Burton testified that Georgia deliberately malapportioned its legislative and congressional districts to dilute the votes of Black Georgians throughout the twentieth century. Feb. 10, 2022, Morning Tr. 12:7–18. In 1957, for example, Georgia's Congressional District 5—consisting of Fulton, DeKalb, and Rockdale Counties—was the second most populous congressional district in the United States. PX9 at 29. And by 1960, Fulton County was the most underrepresented county in its state legislature of any county in the United States; DeKalb County was in third place. Id.

201.    Georgia further manipulated the structure of its elections to suppress the political power of Black Georgians. After enactment of the Voting Rights Act, numerous Georgia counties with sizeable Black populations shifted from voting by district to at-large voting, ensuring that the white population could elect all the representatives in the district at issue. PX9 at 34. As Dr. Burton's report discussed in detail, Georgia also adopted a majority-vote requirement, "numbered-post

voting," and staggered voting in the 1960s and 70s to limit Black voting strength. Id. at 35.

202.    The Court further finds that these efforts have persisted well into the 21st century. Georgia shuttered polling places in predominantly Black communities beginning in 2015, perpetrated extensive purges from the State's voter registration rolls that disproportionately affected Black voters from 2012 to 2018, and enacted SB 202 in the spring of 2021, which restricted methods of voting used by Black Georgians to vote in record numbers during the 2020 election. PX9 at 46–50. SB 202 also authorized the State Election Board, and by extension the General Assembly, to replace county election board members. By June 2021, Georgia county commissions had replaced ten county election officials, most Democrats and half of them Black. Id. at 52.

### 4.    Senate Factor Four: Candidate Slating

203.    There is no slating process involved in Georgia's legislative elections.

### 5.    Senate Factor Five: Contemporary Socioeconomic Disparities

204.    The Court further finds that Black Georgians bear the effects of discrimination in areas like education, employment, and health, which hinder their ability to participate effectively in the political process.

205.    Plaintiffs submitted the expert report of Dr. Loren Collingwood, who analyzed data from the American Community Survey ("ACS") along with voter-turnout data from the Georgia Secretary of State's office. PX12 at 2. The Court accepts Dr. Collingwood as qualified to testify as an expert on demographics and political science. The Court finds Dr. Collingwood credible, his analysis methodologically sound, and his conclusions reliable. The Court credits Dr. Collingwood's testimony and conclusions.

206.    The Court finds, based on Dr. Collingwood's report, that Black Georgians are disadvantaged socioeconomically relative to non-Hispanic white Georgians across multiple metrics. PX12 at 3.

207.    According to Census estimates, the unemployment rate among Black Georgians (8.7 percent) is nearly double that of white Georgians (4.4 percent). Doc. No. 56 ¶ 79.

208.    According to Census estimates, White households are twice as likely as Black households to report an annual income above $100,000. Doc. No. 56 ¶ 80.

209.    According to Census estimates, Black Georgians are more than twice as likely—and Black children in particular more than three times as likely—to live below the poverty line. Doc. No. 56 ¶ 81.

210.   According to Census estimates, Black Georgians are nearly three times more likely than white Georgians to receive SNAP benefits. Doc. No. 56 ¶ 82.

211.   According to Census estimates, Black adults are more likely than white adults to lack a high school diploma—13.3 percent as compared to 9.4 percent. Doc. No. 56 ¶ 83.

212.   According to Census estimates, 35 percent of white Georgians over the age of 25 have obtained a bachelor's degree or higher, compared to only 24 percent of Black Georgians over the age of 25. Doc. No. 56 ¶ 84.

213.   Black Georgians are more likely to report a disability than white Georgians (11.8 percent compared to 10.9 percent) and are more likely to lack health insurance (18.9 percent compared to 14.2 percent, among 19-64-year-olds). PX12 at 3.

214.   The Court further finds that Black Georgians participate in the political process at substantially lower rates than whites Georgians. Black Georgians vote at significantly lower rates than white Georgians, and this is true at statewide, county, and precinct levels—including in the Atlanta MSA and the Black Belt. PX12 at 3, 6–16. Dr. Collingwood also found racial disparities in other forms of voter participation: Black Georgians are less likely to attend political

meetings, display political signs like yard signs and bumper stickers, contact public officials, and donate money to political campaigns. Id. at 18.

215.    The Court finds that the socioeconomic disparities discussed above are a cause of lower political participation rates by Black Georgians. As Dr. Collingwood explained in his expert report, there is extensive literature in political science demonstrating a strong and consistent link between socioeconomic status and voter turnout. For example, studies have shown that wealth and education drive donation behavior, campaign volunteering, and voting. PX12 at 6. Other research has shown that neighborhoods with higher shares of home foreclosures during the 2008 financial crisis subsequently experienced drops in voter turnout. Id.

216.    The Court agrees with Dr. Collingwood's conclusion that "[t]his overwhelming academic literature shows that the socioeconomic disadvantages suffered by Black Georgians will affect their ability to participate in the political process." PX12 at 6.

### 6.    Senate Factor Six: Racial Appeals in Georgia Campaigns

217.    The Court further finds that Georgia's political campaigns have been characterized by both overt and subtle racial appeals.

218.   Georgia has a long and sordid history of such appeals in political campaigns that continues to this day. Dr. Burton's expert report discusses some of the earliest racial appeals in Georgia politics in response to the expansion of Black rights after the Civil War. See, e.g., PX9 at 11–12. Dr. Burton further testified that modern racial appeals in Georgia are rooted in the political realignment that followed from Democrats' support for civil rights legislation in the 1960s, after which white Georgians overwhelmingly switched to the Republican Party. Feb. 10, 2022, Morning Tr. 20:18–21:13.

219.   This realignment gave rise to the "Southern strategy," which refers to efforts by Republican politicians to use racialized politics and race-based appeals to attract racially conservative white voters. PX10 at 3. Dr. Burton explained in his supplemental expert report that "[t]he effectiveness of . . . the 'Southern strategy' had a profound impact on the development of the nearly all-white Republican Party in the South." Id. Associating the Democratic Party with the Black community allowed the Republican Party to become the majority party in what had traditionally been the solid Democratic South—and Republican politicians continue to employ this strategy today. Id.

220.   Dr. Burton further explained that Georgia is a "flash point of this modern strategy." PX10 at 6. The rise of the Republican Party in Georgia "was

grounded on fiscal conservatism, opposition to integration (particularly busing), and a growing demand among white suburbanites for 'law and order.'" Id. at 4. And notwithstanding substantial increases in its nonwhite population over the past two decades, Georgia remains a majority-white state—such that Republicans continue to benefit from a pattern of voting that is polarized along racial lines. Id. at 6.

221.    The Court also credits the expert report and testimony of Dr. Adrienne Jones. See AX5. Like Dr. Burton, Dr. Jones concluded that racial resentment and fear have often been incorporated into political campaign strategies in the State of Georgia. Id. at 25. Dr. Jones further concluded that modern political campaigns in Georgia heavily feature both explicit racial appeals and subtle racial appeals in the form of dog-whistle politics. Id.

222.    Dr. Jones provided numerous examples of dog-whistle politics in recent Georgia campaigns, demonstrating that racial appeals remain a feature of Georgia politics today. Many of these appeals attempted to galvanize white voters against gubernatorial candidate Stacey Abrams in 2018. For example, a robocall targeting Abrams referred to her as the "Negress Stacey Abrams" and a "poor man's Aunt Jemima." AX5 at 26–27; PX48. Later in that campaign, her opponent, now-Governor Kemp, circulated photos of members of the New Black Panther

Party marching in support of Ms. Abrams—even though she had never associated with that group. Id. at 27; PX49.

223.    Other examples abound. During the 2021 runoff election for the U.S. Senate, now-Senator Raphael Warnock was the target of both overt and subtle racial appeals. Senator Warnock's opponent, former Senator Kelly Loeffler, accused him of being "too extreme" because he had defended Barack Obama's former pastor, Jeremiah Wright, whom Senator Loeffler accused of being "divisive" and "hurtful" in "call[ing] on Americans to repent for their worship of Whiteness." AX5 at 27. Warnock's opponent also created two versions of a negative ad against him—one with Warnock's skin artificially darkened and one with his skin retaining its actual complexion—and spent 10 times as much money promoting the former version. Id.

224.    The Court finds that these examples, among others discussed in Dr. Jones's expert report, see AX5 at 28–29, and submitted as evidence by Plaintiffs, see PX43–PX54, show that racial appeals continue to play an important role in Georgia's political campaigns.

### 7.    Senate Factor Seven: Underrepresentation of Black Georgians in Elected Office

225.    The Court finds that Black Georgians have been historically underrepresented in elected office—a trend that continues to this day.

226.   At the time of the Voting Rights Act's passage, Black Georgians constituted 34 percent of the voting-age population, and yet the state had only three elected Black officials. PX9 at 32.

227.   By 1980, Black Georgians comprised only 3 percent of county officials in the state, the vast majority of whom were elected from majority-Black districts or counties. PX9 at 38–39. That particular trend has not changed: while more Black Georgians have been elected in recent years, those officials are almost always from near-majority- or outright-majority-Black districts. In the most recent General Assembly elections, for example, none of the House's Black members was elected from a district where white voters exceeded 55 percent of the voting-age population, and none of the State Senate's Black members was elected from a district where white voters exceeded 47 percent of the voting-age population. Id. at 53–54.

228.   Although Black Georgians comprise more than 33 percent of the state's population, the Georgia Legislative Black Caucus has only 14 members in the Georgia State Senate—25 percent of that chamber—and 41 members in the Georgia House of Representatives—less than 23 percent of that chamber. Doc. No. 56 ¶ 85.

229.   Black officials have been underrepresented across Georgia's statewide offices as well. Georgia has had 77 governors, none of whom has been Black. Doc. No. 56 ¶ 86; PX58.

230.   Senator Raphael Warnock is the first Black Georgian to serve Georgia in the U.S. Senate—after more than 230 years of white senators. Doc. No. 56 ¶ 87; PX60.

### 8.   Senate Factor Eight: Official Nonresponsiveness

231.   The Court further finds that there is a significant lack of responsiveness on the part of elected officials to the particularized needs of Black Georgians.

232.   Dr. Collingwood's expert report demonstrated significant socioeconomic disparities between Black and white Georgians, which contribute to the lower rates at which Blacks engage their elected representatives. PX12 at 18. And as explained in the expert report of Dr. Traci Burch, "public policies are important for creating and sustaining racial disparities," and the persistence of these disparities "demonstrate[s] the lack of responsiveness of public officials to the needs of Georgia's minority communities." AX6 at 28.

233.   Dr. Burch further found that, consistent with these ongoing disparities, Black Georgians are less satisfied than white Georgians with their

elected representatives. A survey conducted in 2020 by <u>The Atlanta Journal-Constitution</u> found that 74.9 percent of white Georgians were very or somewhat satisfied "with the way things are going in Georgia," compared to only 44.4 percent of Blacks Georgians. AX6 at 28. Dr. Burch's report further showed that Black Georgians consistently report lower satisfaction with the quality of local services they receive when compared to white Georgians. <u>Id.</u>

234.   The Court further finds that the dilution of Black voting power in the challenged legislative plans only exacerbates this nonresponsiveness. Mr. Carter explained that cracking Black voters into districts with a significant number of competing interests ensures that these voters will "not . . . have the amount of responsiveness that [they] would otherwise have." Feb. 10, 2022, Afternoon Tr. 132:11–15.

**9.   Senate Factor Nine: Absence of Justification for SB 1EX and HB 1EX**

235.   The Court further finds that Georgia's justifications for SB 1EX and HB 1EX are tenuous. Defendants failed to present evidence justifying their refusal to draw three additional majority-Black State Senate districts and five additional majority-Black House districts.

**IV.    Irreparable Harm**

236.    The Court finds that because the enacted legislative plans deny Plaintiffs and other Black Georgians an equal opportunity to participate in Georgia's political process, conducting the 2022 midterm elections under these plans would cause them irreparable harm.

237.    This Court has no power to provide any form of relief to Plaintiffs with respect to the 2022 elections once those elections have passed.

238.    There are no "do-overs" in elections. As such, the harm Plaintiffs identify in this case is, by definition, irreparable once an election is held under the enacted legislative plans.

239.    The testimony presented at the hearing underscores the extent to which an election held under unlawful maps would threaten voters' fundamental rights.

240.    Bishop Reginald Jackson is the Bishop of the Sixth District of the AME Church, which includes 520 churches and 90,000 members across the State of Georgia. Feb. 9, 2022, Afternoon Tr. 129:5–23, 133:9–11.

241.    Bishop Jackson testified that voter confidence would be diminished if the 2022 elections were conducted using unlawful district maps. According to Bishop Jackson, "if [the AME Church] thought something was inappropriate, first

of all it would disappoint [them,] . . . [and] if [they] thought that there was something inappropriate or out of line, [they] would expect that [to] be corrected." Feb. 10, 2022, Morning Tr. 136:10–18. According to Bishop Jackson, "[i]f there was some problem with the maps that need[ed] to be adjusted, [the church] would hope that those adjustments would be made so that [church members'] votes would not only matter but that [they] would count." Id.

242.   Richard Barron, the Fulton County Elections Director, testified that proceeding under maps that were perceived to be discriminatory against African Americans "could have an effect" on voter confidence "especially when [combined] with some of the effects of S.B. 202." Feb. 9, 2022 Morning Tr. 91:1–5. Barron agreed that voters of color are negatively impacted by voting under maps that dilute their voting power. Id.  at 101:1–3  (Q. Do you think that voters of color are also negatively impacted by voting under maps that dilute their voting power? A. Yes. They would be affected by that as well.").

## V.   Balance of Harms

243.   The Court further finds that the irreparable harm that Plaintiffs would suffer absent an injunction far outweighs any inconvenience an injunction will cause Defendants.

A.     **Harm to Defendants**

1.     **The 2022 Election Calendar**

244.    The candidate qualifying period for the May 2022 primary election begins on March 7, 2022, and ends on March 11, 2022. DX4.

245.    County registrars can begin mailing absentee ballots on April 5, 2022. DX4. Absentee ballots for overseas voters must be mailed by April 9, 2022. Feb. 8, 2022, Afternoon Tr. 88:4–8.

246.    The early voting period for the May 2022 primary election begins on May 2, 2022. DX4.

247.    The primary election is scheduled to be held on May 24, 2022. DX4. The primary election runoff is scheduled for June 21, 2022. Id.

248.    The General Election is scheduled to be held on November 8, 2022. Id.

2.     **The Voter Reallocation Process**

249.    Before the Secretary of State's office can create ballots for use in the primary election, county elections officials must allocate voters to their correct districts by updating street segments in Georgia's voter registration database. DX4 ¶¶ 6–7.

250.    Although Defendants' representative witness from the Secretary of State's office, Michael Barnes, testified that "[c]ounty registrars generally need

several weeks to complete the reallocation process for voters in their particular counties," DX4 ¶ 8, Mr. Barron testified that "it would take [his office] somewhere in the 2-to-3 week range" to reallocate voters to remedial districts. Feb. 9, 2022, Morning Tr. 84:7–10. The Court credits Mr. Barron's testimony on this subject.

251.    Although Mr. Barnes testified that the Secretary of State's office has instructed county elections officials to complete the voter reallocation process by February 18, 2022, he conceded on cross-examination that this deadline was not established by state law. See Feb. 8, 2022, Afternoon Tr. 85:16–24 (Mr. Barnes's testimony: "Q. That's not a deadline established by state law, is it? A. No, it is not.").

252.    After local officials reallocate voters, the Secretary of State's office begins creating ballot combinations. DX4 ¶ 8. A ballot combination lists the congressional, state legislative, and local districts that appear on a given ballot. Id. ¶ 9. The Secretary of State's office has previously created more than 2,000 ballot combinations using districts used in previous election cycles. Id.

253.    Typically, the Secretary of State's office creates ballot combinations seven to ten days after candidate qualifying ends. Feb. 9, 2022, Morning Tr. 115:1–5.

254.   After creating ballot combinations, the Secretary of State's office generates proofs of every ballot combination and sends those proofs to county elections officials for their review. Id. ¶ 13.

255.   State and county elections officials must then review the ballot combinations and make all necessary edits in time to mail absentee ballots to overseas and military voters. Id. ¶ 14.

256.   Mr. Barron testified that county elections officials can review and proofread ballot combinations in five to seven days. Feb. 9, 2022, Morning Tr. 82:9–16 ("Q. About how long does it usually take for your team to do that? A. Three to four days. And then we'll send them back to the State with corrections, and then we usually have two to three days afterward. Q. So about six or seven days total, you think? A. Yes. Q. Can you complete the process faster, if you had to? A. Probably. We probably could get it done in maybe five days.").

### 3.   Implementation of New Maps

257.   Mr. Barnes and Defendants' local election administration expert, Ms. Lynn Bailey, testified that when the implementation of a remedial plan has no effect on an existing district, state and local officials need not complete any additional work to implement the plan in that district. Feb. 8, 2022, Afternoon Tr. 85:11–15 (Mr. Barnes's testimony: "Q. And so long as those counties remain

untouched by the remedial plan, nothing about the remedial plan is going to change that; right, by definition? A. . . . I'm not familiar with all the intricacies of the court case, but I would assume that you are correct."); Feb. 9, 2022, Morning Tr. 62:18–23 (Ms. Bailey's testimony: "Q. In 90 of the 159 Georgia counties, there are no changes in the plaintiff's illustrative map. So if Judge Jones entered that as a remedial order, in most of the counties of the state, there would be no change, at least as a result of the remedial order, right? A. Correct.").

258.   This was confirmed by Ms. Nancy Boren, the Muscogee County Elections Director. See Feb. 9, 2022, Morning Tr. 116:15–21 ("Q. . . . So if you received remedial maps or new maps for this election cycle that—let's take the Congressional map, for example, that made no changes to Muscogee County, would it require you—and you received those new maps on March 3rd or 4th, could you still—would you still be prepared for qualifying on March 7? A. Yes."). The Court credits Ms. Boren's testimony on this subject.

259.   Moreover, when implementation of a remedial map changes only a subset of a county's VTDs, the map is easier for local officials to implement. Feb. 9, 2022, Morning Tr. 44:17–25 (Ms. Bailey's testimony: "Q. If the new redistricting map changes only some of the data . . . there is some work for the County Board to do, but less than what they had to do originally, isn't that correct? A. Sure. Q.

They could rely on what they've already done? A. To some extent hopefully, yes."); id. at 60:4–11 (Ms. Bailey's testimony: "Q. So, for example, Senate District 36 right here where this Courthouse sits, the illustrative map proposed by the plaintiff doesn't change anything about this district. So if Judge Jones enters a remedial order for the rest of the state, it's not going to affect the work right here in Senate District 36 at all, that work is continued, is that right? A. I think that's an accurate statement."); id. at 116:22–117:1 (Ms. Boren's testimony: "Q. And if you received legislative maps that made minimal changes and had few — a small number of split precincts, could you receive new maps on March 3rd or 4th and be prepared for qualifying on March 7? A. Yes.").

260.    Mr. Barron testified that Fulton County can conduct the May 24, 2022, election on time so long as Fulton County has a new ballot to proofread by April 1, 2022. Feb. 9, 2022, Morning Tr. 86:3–4 ("As long as we can have a ballot to proof by April 1, we should be alright.").

261.    The number of county splits in Mr. Esselstyn's illustrative State Senate and House plans are lower than the number of such splits in the legislative plans used in the most recent elections (which is to say, Georgia's 2014 State Senate and 2015 House plans). PX4 ¶ 11 & table 1; Feb. 9, 2022, Afternoon Tr. 178:1–5, 188:25–4.

262.    Out of 2,698 VTDs statewide, only 49 are split in Mr. Esselstyn's illustrative State Senate plan, and in only 18 of Georgia's 159 counties. Doc. No. 61-1 ¶ 3 & fig. 1; Feb. 9, 2022, Afternoon Tr. 163:17–20, 166:5–9. Some of these VTD splits are inherited from the enacted State Senate map because Mr. Esselstyn's illustrative map leaves a majority of districts untouched. Feb. 9, 2022, Afternoon Tr. 164:23–165:4.

263.    Similarly, out of 2,698 VTDs statewide, only 192 are split in Mr. Esselstyn's illustrative House plan, and in only 45 of Georgia's 159 counties. Doc. No. 61-1 ¶ 4 & fig. 2; Feb. 9, 2022, Afternoon Tr. 164:13–15, 166:10–11. Some of these VTD splits are inherited from the enacted House map because Mr. Esselstyn's illustrative map leaves a vast majority of districts untouched. Feb. 9, 2022, Afternoon Tr. 165:5–6.

264.    Across both illustrative maps, only 47 of Georgia's 159 counties have split VTDs. Feb. 9, 2022, Afternoon Tr. 166:15–21.

265.    In light of the limited impact that implementation of Mr. Esselstyn's illustrative State Senate and House plans would have on state and local elections officials, the Court finds that it is feasible for state and local elections officials to implement remedial State Senate and House plans in time to create and review

ballot combinations by April 1, 2022 and hold the primary election on May 24, 2022.

### 4.   Primary Delay

266.   Georgia officials have successfully administered several primary elections that were delayed. Feb. 8, 2022, Afternoon Tr. 86:5–22 (Mr. Barnes's testimony: "Q. . . . [Y]ou have seen primary election dates moved in Georgia? A. I have worked in the state long enough to see primary dates at different times, yes, sir. Q. In fact, you only would have to have worked in the elections administration for a couple of years to have seen those changes because the primary dates moved in 2020. A. Due to the pandemic it was moved, yes, sir. Q. Moved twice? A. Yes, sir, it was.").

267.   Ms. Boren testified that if the primary election were delayed to the current runoff date in June, Muscogee County would have no need to hire new poll workers or secure new polling places. Feb. 9, 2022, Morning Tr. 111:20–25 ("Q. And if the primary election was pushed to the current runoff date, would you need to hire new poll workers or secure new polling places? A. We have already secured polling places and early voting locations, as well as poll workers in anticipation of the runoff date.").

268.   Mr. Barron testified that moving the 2022 primary date to later in the summer would "give [Fulton County] more time to prepare for the election." Feb. 9, 2022, Morning Tr. 89:4–14.

269.   Ms. Bailey testified that it would be feasible to hold a primary runoff election in August. Feb. 9, 2022, Morning Tr. 47:10–15 ("Q. But you have no reason to believe that holding a primary runoff in August would not be feasible, that wouldn't work? A. I think that from the election official's perspective, that . . . we could make that work, of course.").

270.   Mr. Barron testified that delaying the primary would have little impact on Fulton County's ability to secure polling places. He testified that delaying the primary would make it "easier for [schools], if we vote when there is no school in session." Feb. 9, 2022, Morning Tr. 89:4–14. Mr. Barron further testified that "it's easy to move dates" for government buildings "[a]nd most of the churches that we use [] are available on Tuesdays." Id. at 89:4–14.

271.   Ms. Bailey agreed that churches and schools would likely be available for a later summer primary election. Feb. 9, 2022, Morning Tr. 58:1–6 ("Q. . . . And one of the reasons why you all were advocating for a primary in the summertime, because it was easier to get polling locations? A. Right, and I don't disagree with that at all."); id. at 68:5–8 (Q. And so for church locations, there's no reason to think

86

that a church would be less available on a given Tuesday if this Court were to reschedule the primary election? A: There is not, per se.").

272.   Bishop Jackson, whose AME Church offered the State of Georgia more than 500 potential polling places, testified that the churches would remain available for use even if the primary were delayed. Feb. 9, 2022, Afternoon Tr. 135:6–9 ("Q. And if the maps were changed or the election dates were changed, do you still think that some of the 500-odd AME churches would still be able to serve as polling locations? A. Oh, without a doubt.").

273.   Ms. Bailey testified that if the primary were delayed from May 24 to July 27, state and county elections officials would have the same 95-day period of time to prepare for the 2022 primary election that they would have if no remedial maps were ordered and the primary election was held on May 24. Feb. 9, 2022, Morning Tr. 45:19–46:6, 47:22–24.

274.   Ultimately, the state and county election officials who testified agreed that they have the ability to "get the job done no matter what." Feb. 8, 2022, Afternoon Tr. 74:16–25 (Mr. Barnes's testimony); see also Feb. 9, 2022, Morning Tr. 58:14–18 (Ms. Bailey's testimony: "Q. But regardless of what happens in this litigation, whatever the deadlines that ultimately get set, you still have confidence

that election officials will be able to do their job to the best of their ability; correct? A. I do. I do.").

275.   In light of the limited impact that implementation Mr. Esselstyn's illustrative State Senate and House plans would have on state and local election officials, the Court finds that it is feasible to implement remedial State Senate and House plans in time to hold the primary election on June 24, 2022, or July 27, 2022.

**B.   Harm to Voters and Candidates**

276.   The Court finds that the risk of hardship or confusion for Georgia voters and candidates would be low if new State Senate and House maps were implemented in advance of the 2022 midterm elections.

**1.   Voters**

277.   The Court finds that Georgia voters would be timely informed of any changes to the enacted maps or the election calendar.

278.   According to Bishop Jackson, Georgia's AME churches participate in Operation Voter Turnout, a program through which the churches collaborate to provide "voter registration, voter education, voter mobilization, and [voter] organization." Feb. 10, 2022, Morning Tr. 130:12–25. Each local church has an organizing committee with the name and address of all church voters. Id. at 131:1–13.

279.   Mr. Carter confirmed that the risk of voter confusion is low because of the scope of voter-education efforts in the state: "[T]here is so much voter communication going on from candidates, from other organizations. I mean the voter communication infrastructure with everything else is enormous, and I think there's no doubt that, you know—that the key is are the voters going to get educated about that. And the answer is definitely. . . . I will get 30 text personally telling me that [the] election date has changed." Feb. 10, 2022, Afternoon Tr. 149:25–150:20.

## 2.   Candidates

280.   Mr. Carter testified, based in part on his experience navigating rescheduled special elections during his first run for the State Senate, that the risk of harm to candidates as a result of new maps is low. See Feb. 10, 2022, Afternoon Tr. 147:13–151:16.

281.   Describing the hardships imposed on him due to changed election dates, Mr. Carter testified, "I was inconvenienced . . . . It's hard but [you] ultimately deal with it." Feb. 10, 2022, Afternoon Tr. 148:3–7.

282.   Mr. Carter noted that the candidate qualification deadline is "basically irrelevant to the candidate except for people who are trying to run unopposed." Feb. 10, 2022, Afternoon Tr. 148:11–20.

283.   Mr. Carter further explained that moving the primary date would have little practical effect on most campaigns, requiring only that campaigns educate voters about new dates and deadlines. See Feb. 10, 2022, Afternoon Tr. 149:25–150:20.

284.   When asked about the hardship imposed on a candidate who is required to run in a redrawn district, Mr. Carter testified, "It clearly matters what district you are running, right, no doubt. . . . As a candidate, I don't have any right to a district. It's not my district. It's the voter's district. And so, I want the voters to have the right district and then I'm going to run or not run but I think that, you know, all of the campaigns that are out there now have the contingency plan. They know that there's litigation and if the map changes, they'll make new choices but it seems to me that, again, it definitely matters to the candidate, but the candidate is not the center of that question[,] it's the voters, and the candidate doesn't have a right to the district." Feb. 10, 2022, Afternoon Tr. 148:24–149:18.

285.   Mr. Carter continued: "If you tell a candidate they have to run in the changed map, that candidate will adjust their campaign. They will do a variety of things. They will try to make sure that they can get elected in this new district. If you tell voters they are barely in a district that will not respect their interest or that they don't have the same voice, I don't how to remedy that after the fact. A

candidate can adjust. A candidate you can, you know, engage in this communication campaign, but voters don't get to adjust. If they are in an illegal district, they are [in] an illegal district. And that to me is big." Feb. 10, 2022, Afternoon Tr. 150:21–151:16.

## VI. Public Interest

286. Finally, the Court finds that an injunction would serve the public interest by vindicating Black Georgians' fundamental voting rights and ensuring that the State does not benefit from its intentional delay in enacting new districting maps.

287. The Court also finds that there is sufficient time for the General Assembly (or, if necessary, this Court) to draw State Senate and House maps that comply with Section 2 of the Voting Rights Act for use in the state's May 24, 2022, primary election.

288. On November 9, 2021, the Georgia State Senate passed SB 1EX, which revised that chamber's district boundaries. The House passed SB 1EX on November 15. Doc. No. 56 ¶ 53.

289. On November 10, 2021, the Georgia House of Representatives passed HB 1EX, which revised that chamber's district boundaries. The State Senate passed HB 1EX on November 12. Doc. No. 56 ¶ 54.

290.    Governor Brian Kemp then waited 38 days to sign SB 1EX and HB 1EX into law, on December 30, 2021. Doc. No. 56 ¶ 55.

291.    The Atlanta Journal-Constitution reported, "While there was never a doubt that Kemp would sign the redistricting bills, he waited over a month since they passed the General Assembly. The delay stalled legal action until the new maps were written into state law." PX37.

292.    Plaintiffs in this case did not delay in filing suit. Indeed, they filed this suit less than two weeks after SB 1EX and HB 1EX were signed into law. Doc. No. 1.

293.    Georgia's candidate qualification period begins on March 7, 2022. DX4. The state's primary is scheduled for May 24, 2022. Id.

294.    Due to the temporal gap between the candidate qualification deadline and the primary election, this Court can extend the filing deadline without creating any need to alter the primary election date.

295.    Recent practices in other states indicate that there is sufficient time for Georgia to enact a new plan in time for the 2022 primary election.

296.    North Carolina law provides that when a court invalidates a redistricting plan, it can give the legislative as few as 14 days to craft a new plan. See N.C. Gen. Stat. § 120-2.4(a). Despite not being bound by that rule, federal

courts have followed the practice. After invalidating a congressional plan on February 5, 2016, the U.S. District Court for the Middle District of North Carolina gave the legislature until February 19 to enact a new plan. Harris v. McCrory, 159 F. Supp. 3d 600, 627 (M.D.N.C. 2016) (three-judge court). Similarly, after invalidating a congressional plan on January 9, 2018, the same court gave the legislature until January 24 to enact a new plan. See Common Cause v. Rucho, 279 F. Supp. 3d 587, 691 (M.D.N.C.) (three-judge court), rev'd on other grounds, 138 S. Ct. 823 (2018).

297.   Other federal courts have ordered similarly abbreviated timelines. See, e.g., Larios v. Cox, 300 F. Supp. 3d 1320, 1357 (N.D. Ga. 2004) (three-judge court) (ordering General Assembly to enact new legislative plans within two-and-a-half weeks).

298.   After state courts invalidated North Carolina's congressional and state legislative plans in 2019, the legislature drew a new congressional plan in less than three weeks and new state legislative plans (involving nearly 80 districts) in even less time. See Harper v. Lewis, No. 19-CVS-012667 (N.C. Super. Ct. Oct. 28, 2019); Common Cause v. Lewis, No. 18-CVS-014001, 2019 WL 4569584 (N.C. Super. Ct. Sept. 3, 2019).

299.   Just last month, after invalidating Ohio's state legislative plans, the Ohio Supreme Court ordered that new plans be drawn in just 10 days. League of Women Voters of Ohio v. Ohio Redistricting Comm'n, 2022 WL 110261, at *28 (Ohio Jan. 12, 2022).

300.   The Court further finds that it retains the power to move the candidate qualification period or even the primary election itself as necessary to afford relief. See, e.g., Sixty-Seventh Minn. State Senate v. Beens, 406 U.S. 187, 201 n.11 (1972) ("[T]he District Court has the power appropriately to extend [election-related] time limitations imposed by state law."); United States v. New York, No. 1:10-cv-1214 (GLS/RFT), 2012 WL 254263, at *2 (N.D.N.Y. Jan. 27, 2012) (moving primary date to ensure UOCAVA compliance); Quilter v. Voinovich, 794 F. Supp. 760, 762 (N.D. Ohio 1992) (three-judge court) (noting that court ordered rescheduling of primary election to permit drawing of remedial legislative plans); Busbee v. Smith, 549 F. Supp. 494, 519 (D.D.C. 1982) (adopting special election calendar).[2]

---

[2]  Larios v. Cox, 305 F. Supp. 2d 1335 (N.D. Ga. 2004) (per curiam) (three-judge order), is particularly instructive. There, the three-judge court observed that it "has broad equitable power to delay certain aspects of the electoral process if necessary" to ensure the implementation of remedial legislative plans in a malapportionment case. Id. at 1342. It then explained that "there is no reason why the court could not extend [the candidate qualification] period if this proves to be necessary to ensure constitutional elections,"

301.    Just this cycle, Kentucky moved its candidate filing date by 18 days because of redistricting delays; this action did not impact the state's normally scheduled primary date. <u>See</u> Ky. H.B. 172 (2022). In a pending North Carolina case, the state's Supreme Court delayed the filing deadline but not the primary. <u>See</u> <u>Harper v. Hall</u>, No. 413PA21, 2022 WL 343025, at *1 (N.C. Feb. 4, 2022).

302.    This Court's exercise of its inherent power to adjust the election calendar would allow the State to "easily . . . make the change" to Georgia's congressional and legislative maps "without undue collateral effects." <u>Merrill v.</u> <u>Milligan</u>, Nos. 21A375, 21A376, slip op. at 4 n.1 (Kavanaugh, J., concurring).

303.    The feasibility of a revised calendar is underscored by the fact that, until 2014, Georgia's primary election fell in July of election years—and, in years following the release of census data, even later. <u>See</u> H.B. 310, 152d Gen. Assemb., 2d Sess. (Ga. 2014).

304.    Moreover, Mr. Esselstyn testified that, among other things, limiting the extent to which a remedial plan affects existing districts and counties and splits

---

noting in particular that, at that time, "the Georgia General Assembly contemplated precisely that scenario for elections immediately following the redistricting process, establishing a qualifying period for the election year subsequent to redistricting that is substantially later than any dates" that the court contemplated. <u>Id.</u> at 1343.

precincts helps ensure expeditious implementation. Feb. 8, 2022, Afternoon Tr. 119:3–6.

305.   Across both of Mr. Esselstyn's illustrative State Senate and House maps, only 47 of Georgia's 159 counties have split VTDs. Feb. 9, 2022, Afternoon Tr. 166:15–21.

306.   The Court thus finds that delaying the candidate qualification deadline or the 2022 primary dates would allow the State additional time to feasibly implement remedial State Senate and House plans for the 2022 elections.

**PROPOSED CONCLUSIONS OF LAW**

307.   Plaintiffs have satisfied each of the four elements of a preliminary injunction by showing that: (1) they are substantially likely to succeed on the merits; (2) there is a substantial threat that Plaintiffs and other Black Georgians will face irreparable harm in the absence of an injunction; (3) irreparable harm to Plaintiffs far outweighs any harm an injunction would cause to Defendants; and (4) a preliminary injunction will serve the public interest. See Friedenberg v. Sch. Bd., 911 F.3d 1084, 1090 (11th Cir. 2018).

**I.   Plaintiffs are substantially likely to succeed on the merits of their Section 2 claims.**

308.   Plaintiffs have satisfied all elements of their straightforward Section 2 claims.

96

309.    Section 2 of the Voting Rights Act ("VRA") renders unlawful any state "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a).

310.    "Dilution of racial minority group voting strength" in violation of Section 2 "may be caused by the dispersal of blacks into districts in which they constitute an ineffective minority of voters or from the concentration of blacks into districts where they constitute an excessive majority." Thornburg v. Gingles, 478 U.S. 30, 46 n.11 (1986).

311.    Dilution of a minority community's voting strength violates Section 2 if, under the totality of the circumstances, the "political processes leading to nomination or election in the State . . . are not equally open to participation by members of [a racial minority group] . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).

312.    "The essence of a Section 2 claim . . . is that certain electoral characteristics interact with social and historical conditions to create an inequality in the minority and majority voters' ability to elect their preferred

representatives." <u>City of Carrollton Branch of NAACP v. Stallings</u>, 829 F.2d 1547, 1554–55 (11th Cir. 1987).

313.   "[P]roof that a contested electoral practice or mechanism was adopted or maintained with the intent to discriminate against minority voters[] is not required under Section 2 of the Voting Rights Act." <u>Carrollton Branch</u>, 829 F.2d at 1553.

314.   Rather, the question posed by a Section 2 claim is "whether as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice." <u>Gingles</u>, 478 U.S. at 44 (internal quotation marks and citation omitted); <u>see also</u> <u>Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs</u>, 775 F.3d 1336, 1342 (11th Cir. 2015) ("A discriminatory <u>result</u> is all that is required; discriminatory intent is not necessary.").

315.   While "federal courts are bound to respect the States' apportionment choices," they must intervene when "those choices contravene federal requirements," such as Section 2's prohibition of vote dilution. <u>Voinovich v. Quilter</u>, 507 U.S. 146, 156 (1993).

316.   A Section 2 plaintiff challenging a districting plan as dilutive must satisfy three criteria, first set forth by the Supreme Court in <u>Gingles</u>.

317.   The three Gingles preconditions are: (1) the minority group must be "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) the minority group must be "politically cohesive"; and (3) the white majority must "vote[] sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." 478 U.S. at 50.

318.   "The 'geographically compact majority' and 'minority political cohesion' showings are needed to establish that the minority has the potential to elect a representative of its own choice in some single-member district. And the 'minority political cohesion' and 'majority bloc voting' showings are needed to establish that the challenged districting thwarts a distinctive minority vote by submerging it in a larger white voting population." Growe v. Emison, 507 U.S. 25, 40 (1993).

**A.   Plaintiffs have satisfied the first Gingles precondition because additional, compact majority-Black State Senate and House districts can be drawn in the Atlanta metropolitan area and Black Belt.**

319.   To satisfy the first Gingles precondition, Plaintiffs must show that the Black population in Georgia is "sufficiently large and geographically compact to constitute a majority in a single-member district." LULAC, 548 U.S. at 425 (quoting Johnson v. De Grandy, 512 U.S. 997, 1006–07 (1994)); see also Wright v. Sumter Cnty. Bd. of Elections & Registration, 979 F.3d 1282, 1303 (11th Cir. 2020).

320.    Although "[p]laintiffs typically attempt to satisfy [the first <u>Gingles</u> precondition] by drawing hypothetical majority-minority districts," <u>Clark v. Calhoun Cnty.</u>, 88 F.3d 1393, 1406 (5th Cir. 1996), such illustrative plans are "not cast in stone" and are offered only "to demonstrate that a majority-[B]lack district is feasible." <u>Clark v. Calhoun Cnty.</u>, 21 F.3d 92, 95 (5th Cir. 1994); <u>see also</u> <u>Bone Shirt v. Hazeltine</u>, 461 F.3d 1011, 1019 (8th Cir. 2006) (same); <u>Solomon v. Liberty Cnty.</u>, 899 F.2d 1012, 1018 n.7 (11th Cir. 1990) (en banc) (Kravitch, J., specially concurring) ("So long as the <u>potential</u> exists that a minority group could elect its own representative in spite of racially polarized voting, that group has standing to raise a vote dilution challenge under the Voting Rights Act." (emphasis added) (citing <u>Gingles</u>, 478 U.S. at 50 n.17)).

321.    "When applied to a claim that single-member districts dilute minority votes, the first <u>Gingles</u> condition requires the possibility of creating more than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice." <u>De Grandy</u>, 512 U.S. at 1008.

322.    The Court concludes that Plaintiffs have shown that Georgia's Black population is sufficiently numerous and geographically compact to support the creation of three additional majority-Black State Senate districts and five additional majority-Black House districts.

1.      **The Black populations in the Atlanta metropolitan area and Black Belt are sufficiently numerous to form additional majority-Black State Senate and House districts.**

323.    Plaintiffs have shown that Georgia's Black population is sufficiently large to constitute majorities in three additional State Senate districts and five additional House districts.

324.    Under the first <u>Gingles</u> precondition, the Court must answer an objective numerical question: "Do minorities make up more than 50 percent of the voting-age population in the relevant geographic area?" <u>Bartlett v. Strickland</u>, 556 U.S. 1, 18 (2009) (plurality op.).

325.    The burden of proof is "a preponderance of the evidence that the minority population in the potential election district is greater than 50 percent." <u>Bartlett</u>, 556 U.S. at 19–20.

326.    When a voting rights "case involves an examination of only one minority group's effective exercise of the electoral franchise[,] . . . it is proper to look at <u>all</u> individuals who identify themselves as black" when determining a district's BVAP. <u>Georgia v. Ashcroft</u>, 539 U.S. 461, 474 n.1 (2003); <u>see also</u> <u>Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs</u>, 118 F. Supp. 3d 1338, 1343 n.8 (N.D. Ga. 2015) ("[T]he Court is not willing to exclude Black voters who also

identify with another race when there is no evidence that these voters do not form part of the politically cohesive group of Black voters in Fayette County.").

327.   Mr. Esselstyn drew illustrative plans that contain three additional majority-Black State Senate districts (two in the southern Atlanta metropolitan area and one in the Black Belt) and five additional majority-Black House districts (one in the western Atlanta metropolitan area, two in the southern Atlanta metropolitan area, and two in the Black Belt anchored in Bibb County). These additional districts were drawn while balancing traditional redistricting criteria.

328.   Neither Defendants nor their experts dispute that Plaintiffs have satisfied the numerosity requirement. Indeed, both Mr. Morgan and Ms. Wright conceded that this requirement has been met in both their expert reports and at the hearing. See DX2 ¶ 11 (Mr. Morgan's expert report confirming that Mr. Esselstyn's illustrative State Senate plain contains 17 majority-Black districts); Feb. 11, 2022, Afternoon Tr. 191:21–25 (Mr. Morgan's testimony agreeing that Mr. Esselstyn's illustrative State Senate plan includes three additional majority-Black districts); DX41 ¶ 20 (Ms. Wright's expert report noting that "[t]he Esselstyn Senate plan also adds majority-Black districts above the adopted Senate plan when using the any-part Black voting age population Census metric"); Feb. 11, 2022, Morning Tr. 78:13–22, 80:23–81:24 (Ms. Wright's testimony acknowledging that

AP BVAPs of Mr. Esselstyn's additional majority-Black State Senate districts exceed 50 percent).

329.   For these reasons, the Court concludes that Plaintiffs have shown that Georgia's Black population is large enough to constitute majorities in three additional State Senate districts and five additional House districts.

> **2.   The Black populations in the Atlanta metropolitan area and the Black Belt are sufficiently compact to form additional majority-Black State Senate and House districts.**

330.   The Court further concludes that Plaintiffs are likely to show that Georgia's Black population can form additional majority-Black State Senate and House districts that are reasonably compact.

331.   Under the compactness requirement of the first Gingles precondition, Plaintiffs must show that it is "possible to design an electoral district[] consistent with traditional redistricting principles." Davis v. Chiles, 139 F.3d 1414, 1425 (11th Cir. 1998).

332.   It is important to emphasize that compliance with this criterion does not require that the illustrative plans be equally or more compact than the enacted plans; instead, this criterion requires only that the illustrative plans contain reasonably compact districts. An illustrative plan can be "far from perfect" in terms of compactness yet satisfy the first Gingles precondition. Wright v. Sumter

Cnty. Bd. of Elections & Registration, 301 F. Supp. 3d 1297, 1326 (M.D. Ga. 2018), aff'd, 979 F.3d 1282 (11th Cir. 2020).

333.   "The first Gingles precondition does not require some aesthetic ideal of compactness, but simply that the black population be sufficiently compact to constitute a majority in a single-member district." Houston v. Lafayette Cnty, 56 F.3d 606, 611 (5th Cir. 1995) (quoting Clark, 21 F.3d at 95).

334.   "While no precise rule has emerged governing § 2 compactness," LULAC, 548 U.S. at 433, plaintiffs satisfy the first Gingles precondition when their proposed majority-minority district is "consistent with traditional districting principles." Davis, 139 F.3d at 1425.

335.   These traditional districting principles include "maintaining communities of interest and traditional boundaries," "geographical compactness, contiguity, and protection of incumbents. Thus, while Plaintiffs' evidence regarding the geographical compactness of their proposed district does not alone establish compactness under § 2, that evidence, combined with their evidence that the district complies with other traditional redistricting principles, is directly relevant to determining whether the district is compact under § 2." Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs, 950 F. Supp. 2d 1294, 1307 (N.D. Ga.

2013) (citations omitted), <u>aff'd in part, rev'd in part on other grounds</u>, 775 F.3d 1336 (11th Cir. 2015).

336.   "[T]here is more than one way to draw a district so that it can reasonably be described as meaningfully adhering to traditional principles, even if not to the same extent or degree as some other hypothetical district." <u>Chen v. City of Houston</u>, 206 F.3d 502, 519 (5th Cir. 2000).

337.   The remedial plan that the Court eventually implements if it finds Section 2 liability need not be one of the maps proposed by Plaintiffs. <u>See</u> <u>Clark</u>, 21 F.3d at 95–96 & n.2 ("[P]laintiffs' proposed district is not cast in stone. It [is] simply presented to demonstrate that a majority-black district is feasible in [the jurisdiction]. . . . The district court, of course, retains supervision over the final configuration of the districting plan.").

338.   The Court concludes that Mr. Esselstyn's illustrative State Senate and House maps satisfy the criteria of population equality and contiguity. There is no factual dispute on these issues.

339.   The Court further concludes that Mr. Esselstyn's illustrative State Senate and House maps satisfy the criterion of compactness. Defendants' experts do not dispute this conclusion; they instead report the same statistics as Mr. Esselstyn without questioning whether this principle is satisfied. Indeed, their

testimony confirms that Mr. Esselstyn's illustrative legislative plans have compactness scores comparable to—and, in many cases, better than—the enacted plans.

340.   The Court further concludes that Mr. Esselstyn's illustrative State Senate and House maps preserve political subdivision boundaries. Although his plans split marginally more VTDs and counties than the enacted maps, they perform better on this principle than the 2014 State Senate and 2015 House maps.

341.   The Court further concludes that Mr. Esselstyn's illustrative State Senate and House maps preserve communities of interest. Mr. Esselstyn testified that his additional districts preserve areas with shared regional, historic, geological, and historical interests. Although Ms. Wright faulted his districts for including some disparate communities within their boundaries, there is no requirement that every district must be internally homogenous, and Mr. Esselstyn demonstrated that he sought to preserve communities of interest where possible in his illustrative maps.

342.   Although not an enumerated principle adopted by the General Assembly, the Court concludes that Mr. Esselstyn's illustrative State Senate and House maps satisfy the criterion of core retention. Although some alteration of

enacted maps is inevitable in a Section 2 case, Mr. Esselstyn's maps leave the vast majority of enacted districts unaffected.

343.    Finally, the Court concludes that race did not predominate in the drawing of Mr. Esselstyn's illustrative State Senate and House maps. Defendants provided no evidence that race predominated in the drawing of any of Mr. Esselstyn's illustrative districts, and he provided race-neutral reasons for the individual line-drawing decisions that Ms. Wright called into question. Defendants offered no evidence to rebut Mr. Esselstyn's account.

344.    Moreover, it is hardly remarkable that Mr. Esselstyn testified that the creation of an additional majority-Black district required some consideration of race. Both the U.S. Supreme Court's and Eleventh Circuit's "precedents require [Section 2] plaintiffs to show that it would be possible to design an electoral district, consistent with traditional districting principles, in which minority voters could successfully elect a minority candidate." Davis, 139 F.3d at 1425. Because Section 2 requires the intentional creation of a majority-Black district, it "necessarily requires considerations of race." Fayette Cnty., 118 F. Supp. 3d at 1345. Therefore, "[t]o penalize [plaintiffs] . . . for attempting to make the very showing that Gingles, Nipper [v. Smith, 39 F.3d 1494 (11th Cir. 1994)], and [Southern Christian Leadership Conference v. Sessions, 56 F.3d 1281 (11th Cir.

1995),] demand would be to make it impossible, as a matter of law, for any plaintiff to bring a successful Section Two action." <u>Davis</u>, 139 F.3d at 1425.

345.   As a result, and contrary to Defendants' unsupported assertions, courts adjudicating Section 2 claims should "not determine as part of the first Gingles inquiry whether Plaintiffs' Illustrative Plan subordinates traditional redistricting principles to race." <u>Fayette Cnty.</u>, 950 F. Supp. 2d at 1306; see also <u>Fayette Cnty.</u>, 118 F. Supp. 3d at 1344–45 (reaffirming this principle on remand).

346.   Defendants' focus on racial predominance is a misplaced application of racial gerrymandering case law, an independent area of law wholly distinct from the claims that Plaintiffs raise here. The Eleventh Circuit has previously rejected attempts to conflate these doctrines — by, for example, relying on <u>Miller v. Johnson</u>, 515 U.S. 900 (1995), as Defendants do here — finding the argument "unpersuasive" because these doctrines "address very different contexts." <u>Davis</u>, 139 F.3d at 1425.

347.   Even if racial predominance were a relevant consideration in a Section 2 case (it is not), and even if race did predominate in Plaintiffs' illustrative plans (it did not), Plaintiffs are still likely to succeed on the merits of their claim because their illustrative plans are motivated by an effort to comply with the Voting Rights Act and is sufficiently tailored to achieving that end. See <u>Miller</u>, 515 U.S. at 916

(explaining in racial gerrymandering cases that it is "plaintiff's burden . . . to show
. . . that race was the predominant factor motivating the legislature's decision to
place a significant number of voters within or without a particular district[s]," after
which state must "satisfy strict scrutiny" by demonstrating that plan "is narrowly
tailored to achieve a compelling interest").

348.   The U.S. Supreme Court has "assume[d], without deciding, that . . .
complying with the Voting Rights Act was compelling." Bethune-Hill v. Va. State
Bd. of Elections, 137 S. Ct. 788, 801 (2017). Indeed, the redistricting guidelines
adopted by the General Assembly confirm that compliance with the Voting Rights
Act is a compelling state interest. See PX39–PX40.

349.   In this context, narrow tailoring does not "require an exact connection
between the means and ends of redistricting," but rather just "'good reasons' to
draft a district in which race predominated over traditional districting criteria."
Ala. Legis. Black Caucus v. Alabama, 231 F. Supp. 3d 1026, 1064 (M.D. Ala. 2017)
(quoting Ala. Legis. Black Caucus v. Alabama, 575 U.S. 254, 278 (2015)).

350.   In other words, even if racial predominance were relevant here,
Plaintiffs' compliance with Section 2 of the Voting Rights Act constitutes "good
reason" to create race-based districts, and the remedy would be narrowly tailored
even if it were not the only manner in which to draw additional majority-Black

State Senate and House districts. Accordingly, even if strict scrutiny applied here (which it does not), Plaintiffs' illustrative plans satisfy it.

351.    In light of this precedent, Defendants' insistence that faithful application of Supreme Court caselaw produces an "unconstitutional" result would require the Court to find that Section 2 of the Voting Rights Act is itself unconstitutional. But this Court may not ignore precedent; nearly four decades ago, the Eleventh Circuit held that Section 2 "is a constitutional exercise of the congressional enforcement power under the Fourteenth and Fifteenth Amendments." United States v. Marengo Cnty. Comm'n, 731 F.2d 1546, 1550 (11th Cir. 1984). This Court holds the same. See In re Hubbard, 803 F.3d 1298, 1309 (11th Cir. 2015) (explaining "the fundamental rule that courts of this circuit are bound by the precedent of this circuit").

352.    Applying controlling Section 2 caselaw, the Court concludes that Plaintiffs have demonstrated that the Black populations in the Atlanta metropolitan area and Black Belt are sufficiently large and geographically compact to support three additional majority-Black State Senate districts and five additional majority-Black House districts.

**B.     Plaintiffs have satisfied the second <u>Gingles</u> precondition because Black Georgians are politically cohesive.**

353.    The second <u>Gingles</u> precondition requires that "the minority group must be able to show that it is politically cohesive." 478 U.S. at 51.

354.    Plaintiffs can establish minority cohesiveness by showing that "a significant number of minority group members usually vote for the same candidates." <u>Solomon</u>, 899 F.2d at 1019 (Kravitch, J., specially concurring); <u>see also</u> <u>Gingles</u>, 478 U.S. at 56 ("A showing that a significant number of minority group members usually vote for the same candidates is one way of proving the political cohesiveness necessary to a vote dilution claim, and, consequently, establishes minority bloc voting within the context of § 2." (internal citations omitted)).

355.    Courts rely on statistical analyses to estimate the proportion of each racial group that voted for each candidate. <u>See, e.g.</u>, <u>Gingles</u>, 478 U.S. at 52–54; <u>Nipper</u>, 39 F.3d at 1505 n.20.

356.    Courts have recognized EI as an appropriate analysis for determining whether a plaintiff has satisfied the second and third <u>Gingles</u> preconditions. <u>See,</u> <u>e.g.</u>, <u>Rose v. Raffensperger</u>, No. 1:20-CV-02921-SDG, 2022 WL 205674, at *11 (N.D. Ga. Jan. 24, 2022); <u>Patino v. City of Pasadena</u>, 230 F. Supp. 3d 667, 691 (S.D. Tex. 2017); <u>Benavidez v. City of Irving</u>, 638 F. Supp. 2d 709, 723–24 (N.D. Tex. 2009);

<u>Bone Shirt v. Hazeltine</u>, 336 F. Supp. 2d 976, 1003 (D.S.D. 2004), <u>aff'd</u> 461 F.3d 1011 (8th Cir. 2006).

357.    The second <u>Gingles</u> precondition is satisfied here because Black voters in Georgia are politically cohesive. <u>See</u> 478 U.S. at 49. "Bloc voting by blacks tends to prove that the black community is politically cohesive, that is, it shows that blacks prefer certain candidates whom they could elect in a single-member, black majority district." <u>Id.</u> at 68. Dr. Palmer's analysis clearly demonstrate high levels of cohesiveness among Black Georgians in supporting their preferred candidates, both across the legislative focus areas and in the individual districts that comprise them. Defendants' expert Dr. Alford does not contest this conclusion.

358.    This conclusion is also consistent with previous findings of political cohesion among Black Georgians. <u>See, e.g.</u>, <u>Wright</u>, 301 F. Supp. 3d at 1313 (noting that, in ten elections for Sumter County Board of Education with Black candidates, "the overwhelming majority of African Americans voted for the same candidate"); <u>Lowery v. Deal</u>, 850 F. Supp. 2d 1326, 1329 (N.D. Ga. 2012) ("Black voters in Fulton and DeKalb counties have demonstrated a cohesive political identity by consistently supporting black candidates."). Defendants have offered no evidence suggesting that this is no longer the case.

C.   **Plaintiffs have satisfied the third <u>Gingles</u> precondition because white Georgians engage in bloc voting to defeat Black-preferred candidates.**

359.   The third <u>Gingles</u> precondition requires that "the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." 478 U.S. at 51.

360.   As to the third <u>Gingles</u> precondition, "a white bloc vote that normally will defeat the combined strength of minority support plus white 'crossover' votes rises to the level of legally significant white bloc voting." 478 U.S. at 56.

361.   No specific threshold percentage is required to demonstrate bloc voting, as "[t]he amount of white bloc voting that can generally 'minimize or cancel' black voters' ability to elect representatives of their choice . . . will vary from district to district." <u>Gingles</u>, 478 U.S. at 56.

362.   The concludes that Dr. Palmer's analysis demonstrates high levels of white bloc voting in legislative focus areas and the individual districts that comprise them. The Court also finds that candidates preferred by Black voters are almost always defeated by white bloc voting except in those areas where they form majorities. Defendants' expert Dr. Alford does not contest this conclusion.

363.   This conclusion is again consistent with the findings of previous courts. <u>See, e.g.</u>, <u>Whitest v. Crisp Cnty. Bd. of Educ.</u>, No. 1:17-CV-109 (LAG), 2021

WL 4483802, at *3 (M.D. Ga. Aug. 20, 2021) ("African Americans in Crisp County are politically cohesive in elections for members of the Board of Education, but the white majority votes sufficiently as a bloc to enable it to defeat the candidates preferred by Black voters in elections for members of the Board of Education."), appeal docketed sub nom. Postell v. Crisp Cnty. Sch. Dist., No. 21-13268 (11th Cir. Sept. 21, 2021); Wright, 301 F. Supp. 3d at 1317 (finding that "[t]he third Gingles factor is satisfied" after concluding that "there can be no doubt black and white voters consistently prefer different candidates" and that "white voters are usually able to the defeat the candidate preferred by African Americans"). Defendants have offered no evidence suggesting that this is no longer the case.

364.    The Court also concludes that Dr. Palmer's analysis demonstrates that Black voters would be able to elect their candidates of choice in Mr. Esselstyn's illustrative State Senate and House districts. Again, Dr. Alford does not contest this conclusion.

**D.    The totality of circumstances demonstrates that SB 1EX and HB 1EX deny Black Georgians equal opportunity to elect their preferred candidates to the General Assembly.**

365.    Court concludes that the totality of circumstances confirms what Plaintiffs' satisfaction of the Gingles preconditions indicates: SB 1EX and HB 1EX

deny Black voters in Georgia an equal opportunity to elect their legislative candidates of choice.

366.   Because each of the relevant considerations discussed below weighs in favor of a finding of vote dilution, Plaintiffs have demonstrated that the enacted State Senate and House plans violate Section 2 of the Voting Rights Act.

367.   Once a Plaintiff satisfies the three Gingles preconditions, the court considers whether the "totality of the circumstances results in an unequal opportunity for minority voters to participate in the political process and to elect representatives of their choosing as compared to other members of the electorate." Fayette Cnty., 775 F.3d at 1342.

368.   "[I]t will be only the very unusual case in which the plaintiffs can establish the existence of the three Gingles factors but still have failed to establish a violation of § 2 under the totality of the circumstances." Fayette Cnty., 775 F.3d at 1342 (quoting Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ., 4 F.3d 1103, 1135 (3d Cir. 1993)).

369.   In cases where Plaintiffs have satisfied the Gingles preconditions but the court determines the totality of the circumstances does not show vote dilution, "the district court must explain with particularity why it has concluded, under the particular facts of that case, than an electoral system that routinely results in white

voters voting as a bloc to defeat the candidate of choice of a politically cohesive minority group is not violative of § 2 of the Voting Rights Act." <u>Jenkins</u>, 4 F.3d at 1135.

370.    The determination of whether vote dilution exists under the totality of the circumstances requires "a searching practical evaluation of the past and present reality," which is an analysis "peculiarly dependent upon the facts of each case and requires an intensely local appraisal of the design and impact of the contested" district map. <u>Gingles</u>, 478 U.S. at 79 (internal quotation marks and citations omitted).

371.    To determine whether vote dilution is occurring, "a court must assess the impact of the contested structure or practice on minority electoral opportunities on the basis of objective factors. The Senate Report [from the 1982 Amendments to the Voting Rights Act] specifies factors which typically may be relevant to a § 2 claim[.]" <u>Gingles</u>, 478 U.S. at 44.

372.    The "Senate Factors" include: (1) "the history of voting-related discrimination in the State or political subdivision"; (2) "the extent to which voting in the elections of the State or political subdivision is racially polarized"; (3) "the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the

minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting"; (4) "the exclusion of members of the minority group from the candidate slating processes"; (5) "the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process"; (6) "the use of overt or subtle racial appeals in political campaigns"; and (7) "the extent to which members of the minority group have been elected to public office in the jurisdiction." Gingles, 478 U.S. at 44–45.

373.   "The [Senate] Report notes also that evidence demonstrating that elected officials are unresponsive to the particularized needs of the members of the minority group and that the policy underlying the State's . . . use of the contested practice or structure is tenuous may have probative value." Gingles, 478 U.S. at 45.

374.   The Senate Report's "list of typical factors is neither comprehensive nor exclusive." Gingles, 478 U.S. at 45. "Ultimately, Gingles 'calls for a flexible, fact-intensive inquiry into whether an electoral mechanism results in the dilution of minority votes.'" Rose, 2022 WL 205674, at *3 (quoting Brooks v. Miller, 158 F.3d 1230, 1239 (11th Cir. 1998)).

375.   "[T]here is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." United States v. Marengo Cnty. Comm'n, 731 F.2d 1546, 1566 n.33 (11th Cir. 1984) (quoting S. Rep. No. 97-417, at 29 (1982)).

### 1.   Senate Factor One: Georgia has an ongoing history of official, voting-related discrimination.

376.   It cannot be disputed that Black Georgians have experienced franchise-related discrimination. "African-Americans have in the past been subject to legal and cultural segregation in Georgia[.]" Cofield v. City of LaGrange, 969 F. Supp. 749, 767 (N.D. Ga. 1997). "Black residents did not enjoy the right to vote until Reconstruction. Moreover, early in this century, Georgia passed a constitutional amendment establishing a literacy test, poll tax, property ownership requirement, and a good-character test for voting. This act was accurately called the 'Disfranchisement Act.' Such devices that limited black participation in elections continued into the 1950s." Id.

377.   This Court has recently taken judicial notice of the fact that "prior to the 1990s, Georgia had a long sad history of racist policies in a number of areas including voting." Fair Fight Action, Inc. v. Raffensperger, No. 1:18-CV-5391-SCJ, slip op. at 41 (N.D. Ga. Nov. 15, 2021). As it previously described, "Georgia has a history chocked full of racial discrimination at all levels. This discrimination was

118

ratified into state constitutions, enacted into state statutes, and promulgated in state policy. Racism and race discrimination were apparent and conspicuous realities, the norm rather than the exception." <u>Fayette Cnty.</u>, 950 F. Supp. 2d at 1314.

378.    The history described above and recounted by Dr. Burton demonstrates that voting-related discrimination is not a vestige of the past and persists to this day. The first Senate Factor thus weighs heavily in Plaintiffs' favor.

### 2.    Senate Factor Two: Georgia voters are racially polarized.

379.    It is also indisputable that Black and white Georgians consistently support opposing candidates. Dr. Palmer provided clear evidence that this is the case, which Dr. Alford did not contest.

380.    "The second Senate Factor focuses on 'the extent to which voting in the elections of the State or political subdivision is racially polarized.'" <u>Wright</u>, 979 F.3d at 1305 (quoting <u>LULAC</u>, 548 U.S. at 426). "This 'factor will ordinarily be the keystone of a dilution case.'" <u>Id.</u> (quoting <u>Marengo Cnty. Comm'n</u>, 731 F.2d at 1566).

381.    Defendants are wrong to suggest that this factor asks the Court to look into the subjective minds of voters and ask why they are voting in a racially polarized manner. Eleventh Circuit case law makes clear that Plaintiffs are not

required to prove that Georgia's racially polarized voting results from any particular racial attitudes. Plaintiffs are not required "to prove racism determines the voting choices of the white electorate in order to succeed in a voting rights case." Askew v. City of Rome, 127 F.3d 1355, 1382 (11th Cir. 1997); see also Fayette Cnty., 950 F. Supp. 2d at 1321 n.29 (explaining that plaintiffs "are not required to prove[] racial animus" within electorate).

382.   Because "racially polarized voting, as it relates to claims of vote dilution, refers only to the existence of a correlation between the race of voters and the selection of certain candidates," Plaintiffs "need not prove causation or intent in order to prove a prima facie case of racial bloc voting and defendants may not rebut that case with evidence of causation or intent." Carrollton Branch, 829 F.2d at 1557–78 (quoting Gingles, 478 U.S. at 74). "It is the difference between the choices made by blacks and whites—not the reasons for that difference—that results in blacks having less opportunity than whites to elect their preferred representatives. Consequently, . . . under the 'results test' of § 2, only the correlation between race of voter and selection of certain candidates, not the causes of the correlation, matters." Gingles, 478 U.S. at 63. In other words, "[a]ll that matters under § 2 and under a functional theory of vote dilution is voter behavior, not its explanations." Id. at 73; see also Marengo Cnty. Comm'n, 731 F.2d at 1557

("[R]acially polarized voting, as it relates to claims of vote dilution, refers only to the existence of a correlation between the race of voters and the selection of certain candidates." (quoting <u>Gingles</u>, 478 U.S. at 74)).

383.    The dicta in the Eleventh Circuit's <u>Solomon</u> opinion did not alter binding precedent on this issue. That opinion's analysis focused on just two of the Senate Factors: the level of minority candidate success and the tenuous justifications of the challenged electoral scheme. <u>See</u> <u>Solomon</u>, 221 F.3d at 1228-34. In fact, the district court decision that the <u>Solomon</u> court affirmed had concluded that racially polarized voting is not dependent upon the subjective thoughts of voters. <u>See</u> <u>Solomon v. Liberty Cnty.</u>, 957 F. Supp. 1522, 1543 (N.D. Fla. 1997) (concluding that "the presence or absence of racial bias within the voting community is not dispositive of whether liability has been established under Section 2").

384.    Putting case law aside, requiring courts to inquire into the reasons why Georgians vote in a racially polarized manner would directly contradict Congress's explicit purpose in turning Section 2 into an entirely effects-based prohibition. That purpose was to avoid "unnecessarily divisive [litigation] involv[ing] charges of racism on the part of individual officials or entire communities." S. Rep. No. 97-417, pt. 1, at 36 (1982); <u>see also</u> <u>Solomon</u>, 899 F.2d at

1016 n.3 (Kravitch, J., specially concurring) (explaining that this theory "would involve litigating the issue of whether or not the community as a whole was motivated by racism, a divisive inquiry that Congress sought to avoid by instituting the results test"). It would also erect an evidentiary burden that "would be all but impossible" for Section 2 plaintiffs to satisfy. Gingles, 478 U.S. at 73 (describing "inordinately difficult burden" this theory would place on plaintiffs (quotations omitted)); Fayette Cnty., 950 F. Supp. 2d at 1321 n.29 (characterizing defendants' theory as "unpersuasive," as it would make it "nearly impossible for § 2 plaintiffs because defendants could always point to some innocent explanation for the losing candidates' loss"). "To accept this theory would frustrate the goals Congress sought to achieve by repudiating the intent test of Mobile v. Bolden, 446 U.S. 55 (1980), and would prevent minority voters who have clearly been denied an opportunity to elect representatives of their choice from establishing a critical element of a vote dilution claim." Gingles, 478 U.S. at 71.

385.   Even if the reasons why Black and white voters overwhelmingly support opposing candidates in Georgia were relevant to the totality-of-circumstances analysis, it would be Defendants' "obligation to introduce evidence" and "affirmatively prove, under the totality of the circumstances, that racial bias does not play a major role in the political community." Nipper, 39 F.3d

at 1524–26 nn.60, 64. After all, "[t]he surest indication of race-conscious politics is a pattern of racially polarized voting." <u>Marengo Cnty. Comm'n</u>, 731 F.2d at 1567. Section 2 plaintiffs are therefore under "no obligation" to "search . . . out" such evidence "and disprove [non-racial explanations] preemptively." <u>Nipper</u>, 39 F.3d at 1525 n.64.

386.   Here, Defendants have failed to prove "that racial bias does not play a major role in the political community." Nipper, 39 F.3d at 1524 n. 60. In support of their assertion that policy ideology and not race explains Georgia's racially polarized voting, Defendants and their expert offer the simple fact that Black voters prefer Democrats and white voters prefer Republicans. But as Plaintiffs have shown, that fact tells us nothing about whether race and issues inextricably linked to race impact the partisan preferences of Black and white voters. Indeed, Plaintiffs offered substantial evidence that race and issues inextricably linked to race do play a part in those preference today.

387.   In sum, the second Senate Factor pays no attention to the subjective motivations behind the racially polarized voting that occurs in Georgia. But even if it did, there has been no showing that partisan ideology, and not race, is causing that polarization.

388.   The second Senate Factor thus weighs heavily in Plaintiffs' favor.

### 3. Senate Factor Three: Georgia's voting practices enhance the opportunity for discrimination.

389. Senate Factor Three "considers 'the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting.'" Wright, 979 F.3d at 1295 (quoting Gingles, 478 U.S. at 44–45).

390. As discussed above and throughout Dr. Burton's expert report, Georgia's history is marked by electoral schemes that have enhanced the opportunity for discrimination against Black voters—some of which persist to this day. This factor thus weighs in Plaintiffs' favor.

### 4. Senate Factor Four: Georgia has no history of candidate slating for legislative elections.

391. It is undisputed that Georgia uses no slating process for its legislative elections. As a result, this factor is irrelevant to this case.

### 5. Senate Factor Five: Georgia's discrimination has produced severe socioeconomic disparities that impair Black Georgians' participation in the political process.

392. The Eleventh Circuit has "recognized in binding precedent that 'disproportionate educational, employment, income level, and living conditions arising from past discrimination tend to depress minority political participation.'"

Wright, 979 F.3d at 1294 (quoting Marengo Cnty. Comm'n, 731 F.2d 1546, 1568).

"Where these conditions are shown, and where the level of black participation is

depressed, plaintiffs need not prove any further causal nexus between their

disparate socio-economic status and the depressed level of political participation."

Id. (quoting Marengo Cnty., 731 F.2d at 1568–69); see also United States v. Dallas

Cnty. Comm'n, 739 F.2d 1529, 1537 (11th Cir. 1984) ("Once lower socio-economic

status of blacks has been shown, there is no need to show the causal link of this

lower status on political participation.").

393.    This Court recently credited evidence that "twice as many Black

Georgians as white Georgians live below the poverty line; the unemployment rate

for Black Georgians is double that of white Georgians; Black Georgians are less

likely to attain a high school or college degree; and Black Georgians die of cancer,

heart disease and diabetes at a higher rate than white Georgians." Fair Fight, slip

op. at 44 (internal citations omitted). In addition, Plaintiffs have offered

unrebutted evidence that Black Georgians suffer socioeconomic hardships

stemming from centuries-long racial discrimination, and that those hardships

impede their ability to participate in the political process. Defendants no do not

dispute this evidence, nor do they otherwise contest Dr. Collingwood's analysis

or conclusions.

394.   Because Defendants do not rebut Plaintiffs' evidence on this factor, it weighs heavily in favor of a finding of vote dilution.

### 6.   Senate Factor Six: Both overt and subtle racial appeals are prevalent in Georgia's political campaigns.

395.   This factor "asks whether political campaigns in the area are characterized by subtle or overt racial appeals." Wright, 979 F.3d at 1296 (quoting Gingles, 478 U.S. at 45).

396.   This Court recently credited evidence of racial appeals in recent Georgia elections. See Fair Fight, slip op. at 45–46. In addition, Plaintiffs have submitted substantial evidence—corroborated by Dr. Jones—that overt and subtle racial appeals remain common in Georgia politics.

397.   This factor thus weighs in Plaintiffs' favor.

### 7.   Senate Factor Seven: Black candidates in Georgia are underrepresented in office and rarely succeed outside of majority-minority districts.

398.   This factor "focuses on 'the extent to which members of the minority group have been elected to public office in the jurisdiction.'" Wright, 979 F.3d at 1295 (quoting LULAC, 548 U.S. at 426). "If members of the minority group have not been elected to public office, it is of course evidence of vote dilution." Marengo Cnty. Comm'n, 731 F.2d at 1571.

399.   Plaintiffs' evidence demonstrates that Black Georgians are underrepresented in statewide elected offices and rarely succeed in local elections outside of majority-Black districts.

400.   This factor thus weighs in Plaintiffs' favor.

### 8.   Senate Factor Eight: Georgia is not responsive to its Black residents.

401.   "The authors of the Senate Report apparently contemplated that unresponsiveness would be relevant only if the plaintiff chose to make it so, and that although a showing of unresponsiveness might have some probative value a showing of responsiveness would have very little." Marengo Cnty. Comm'n, 731 F.2d at 1572.

402.   Here, Plaintiffs have submitted evidence that elected officials are unresponsive to the needs of Black Georgians—including and especially the socioeconomic disparities identified in Dr. Collingwood's report.

403.   This factor thus weighs in Plaintiffs' favor.

### 9.   Senate Factor Nine: The justifications for SB 1EX and HB 1EX are tenuous.

404.   Defendants have offered no justification for the General Assembly's failure to draw an additional majority-Black legislative districts in the Atlanta metropolitan area and Black Belt. And Mr. Esselstyn's illustrative maps

demonstrate that it is possible to create such plans while respecting traditional redistricting principles—just as the Voting Rights Act requires.

405.    This factor thus weighs in Plaintiffs' favor.

\*        \*        \*

406.    Because Plaintiffs have satisfied the three <u>Gingles</u> preconditions, and because each of the considerations relevant to the totality-of-circumstances inquiry in this case indicates that SB 1EX and HB 1EX deny Black Georgians an equal opportunity to elect their candidates of choice to the General Assembly, Plaintiffs have shown a substantial likelihood of proving that the enacted legislative maps violate Section 2 of the Voting Rights Act.

**E.    Defendants' additional legal arguments lack merit.**

407.    The Court further reiterates that the additional legal arguments raised in Defendants' motion to dismiss and opposition to Plaintiffs' motion for preliminary injunction (Doc. Nos. 23, 25) lack merit and do not require dismissal of Plaintiffs' claims.

**1.    Section 2 confers a private right of action.**

408.    As the Court previously concluded, Section 2 confers a private right of action. <u>See</u> Doc. No. 43 at 30–33.

### 2.     This case is properly before a single-judge district court.

409.    As the Court previously concluded, this case is properly before a single-judge district court. See Doc. No. 43 at 7–30.

## II.   Plaintiffs and other Black Georgians will suffer irreparable harm absent a preliminary injunction.

410.    "Courts routinely deem restrictions on fundamental voting rights irreparable injur[ies]." League of Women Voters of N.C. v. North Carolina, 769 F.3d 224, 247 (4th Cir. 2014); see also, e.g., Obama for Am. v. Husted, 697 F.3d 423, 436 (6th Cir. 2012) (similar); Williams v. Salerno, 792 F.2d 323, 326 (2d Cir. 1986) (similar). That is certainly case for Section 2 violations. See, e.g., Dillard v. Crenshaw County, 640 F. Supp. 1347, 1363 (M.D. Ala. 1986) (concluding that Section 2 vote-dilution violation was "clearly" irreparable harm). "Casting a vote has no monetary value. It is nothing other than the opportunity to participate in the collective decisionmaking of a democratic society and to add one's own perspective to that of his or her fellow citizens." Jones v. Governor of Fla., 950 F.3d 795, 828–29 (11th Cir. 2020). Accordingly, "[t]he denial of the opportunity to cast a vote that a person may otherwise be entitled to cast—even once—is an irreparable harm." Id.

411.    The Section 2 violations found here will irreparably damage Plaintiffs' right to participate in the political process. Accordingly, the Court finds

that, absent preliminary injunctive relief, Plaintiffs will suffer irreparable harm if they are forced to vote under Georgia's unlawful State Senate and House plans.

## III.   The balance of equities and the public interest favor injunctive relief.

412.   The Court concludes, based on the findings of fact above, that implementation of remedial legislative maps would be feasible in advance of the 2022 midterm elections. Any "inconvenience" or administrative cost the State and candidates might bear in remedying Georgia's unlawful legislative plans thus "does not rise to the level of a significant sovereign intrusion" to tilt the equities against vindicating Plaintiffs' voting rights. Covington v. North Carolina, 270 F. Supp. 3d 881, 895 (M.D.N.C. 2017) (three-judge court).

413.   To the extent the State needs more time to implement a remedial plan, the Court may "extend the time limitations imposed by state law" related to its election deadlines. Beens, 406 U.S. at 201 n.11.

414.   Federal courts that have recently invalidated congressional districting plans during the first months of an election year have given the corresponding state legislature two weeks to enact new plans. Harris, 159 F. Supp. 3d at 627; Common Cause, 279 F. Supp. 3d at 691. State courts have required maps to be drawn in even less time. See, e.g., League of Women Voters of Ohio, 2022 WL 110261, at *28 (ordering new state legislative plans to be drawn within 10 days).

415.    Vindicating voting rights is indisputably in the public interest. <u>See,</u> <u>e.g.</u>, <u>Charles H. Wesley Educ. Found., Inc. v. Cox</u>, 408 F.3d 1349, 1355 (11th Cir. 2005). "Ultimately," the Court's "conclusion that the plaintiffs have a substantial likelihood of success on the merits disposes of this question in short order. The public, of course, has every interest in ensuring that their peers who are eligible to vote are able to do so in every election." <u>Jones</u>, 950 F.3d at 831; <u>see also</u> <u>Husted</u>, 697 F.3d at 437 ("The public interest . . . favors permitting as many qualified voters to vote as possible.").

**IV.    Any remedial plan must contain three additional State Senate districts and five additional House districts in which Black voters have demonstrable opportunities to elect their candidates of choice.**

416.    Having concluded that SB 1EX and HB 1EX are substantially likely to violate Section 2 and that a preliminary injunction is appropriate under the circumstances, the Court turns to the question of what a proper remedial plan must contain.

417.    Where, as here, Plaintiffs have established Section 2 violations based on the State's failure to create additional districts in which Black voters have opportunities to elect their preferred candidates, new State Senate and House plans containing additional districts in which Black voters have demonstrable opportunities to elect their preferred candidates would remedy their injuries.

## PROPOSED ORDER GRANTING INJUNCTIVE RELIEF

418.   Because all four of the preliminary injunction factors support relief, the Court GRANTS Plaintiffs' motion for a preliminary injunction.

419.   The Court ENJOINS Defendants, as well as their agents and successors in office, from using SB 1EX and HB 1EX in any election, including the 2022 primary and general elections.

420.   Having found it substantially likely that SB 1EX and HB 1EX violate Section 2 of the Voting Rights Act and that an injunction is warranted, the Court now addresses the appropriate remedy.

421.   The Court is conscious of the powerful concerns for comity involved in interfering with the State's legislative responsibilities. As the Supreme Court has repeatedly recognized, "redistricting and reapportioning legislative bodies is a legislative task with the federal courts should make every effort not to pre-empt." Wise v. Lipscomb, 437 U.S. 535, 539 (1978). As such, it is "appropriate, whenever practicable, to afford a reasonable opportunity for the legislature to meet" the requirements of Voting Rights Act "by adopting a substitute measure rather than for the federal court to devise . . . its own plan." Id. at 540.

422.   The Court also recognizes that Plaintiffs and other Black voters in Georgia whose voting rights have been injured by the violations of Section 2 of the

132

Voting Rights Act have suffered significant harm. Those citizens are entitled to vote as soon as possible for their representatives under lawful apportionment plans. Therefore, the Court will require that new State Senate and House plans be drawn forthwith to remedy the Section 2 violations.

423.   In accordance with well-established precedent, the Court allows the General Assembly 14 days from this Order to adopt remedial legislative plans.

424.   This Court retains jurisdiction to determine whether any remedial legislative plans adopted by the General Assembly remedy the Section 2 violations by incorporating additional districts in which Black voters have demonstrable opportunities to elect their candidates of choice.

425.   In the event that Georgia is unable or unwilling to enact remedial plans within 14 days that satisfy the requirements set forth above, this Court will proceed to draw or adopt remedial plans for use during the 2022 primary and general elections.

426.   Because time is of the essence, the Court in the meantime invites the parties' proposals on (a) special masters to assist the Court in evaluating and/or adopting any remedial plans as needed, and (b) whether and how to amend Georgia's election calendar to accommodate remedial plans. The parties should submit their proposals within three business days of this order.

Dated: February 18, 2022

By: **Adam M. Sparks**
Joyce Gist Lewis
Georgia Bar No. 296261
Adam M. Sparks
Georgia Bar No. 341578
**KREVOLIN & HORST, LLC**
One Atlantic Center
1201 West Peachtree Street, NW,
Suite 3250
Atlanta, Georgia 30309
Telephone: (404) 888-9700
Facsimile: (404) 888-9577
Email: JLewis@khlawfirm.com
Email: Sparks@khlawfirm.com

Kevin J. Hamilton*
**PERKINS COIE LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101
Phone: (206) 359-8000
Facsimile: (206) 359-9000
Email: KHamilton@perkinscoie.com

Respectfully submitted,

Abha Khanna*
Jonathan P. Hawley*
**ELIAS LAW GROUP LLP**
1700 Seventh Avenue, Suite 2100
Seattle, Washington 98101
Phone: (206) 656-0177
Facsimile: (206) 656-0180
Email: AKhanna@elias.law
Email: JHawley@elias.law

Daniel C. Osher*
Christina A. Ford*
Graham W. White*
Michael B. Jones
Georgia Bar No. 721264
**ELIAS LAW GROUP LLP**
10 G Street NE, Suite 600
Washington, D.C. 20002
Phone: (202) 968-4490
Facsimile: (202) 968-4498
Email: DOsher@elias.law
Email: CFord@elias.law
Email: GWhite@elias.law
Email: MJones@elias.law

*Counsel for Plaintiffs*

*Admitted *pro hac vice*

134

**<u>CERTIFICATE OF COMPLIANCE</u>**

I hereby certify that the foregoing <u>Plaintiffs' Proposed Findings of Fact and Conclusion of Law</u> has been prepared in accordance with the font type and margin requirements of LR 5.1, NDGa, using a font type of Book Antiqua and a point size of 13 for all text except for footnotes, which appear in a point size of 12.

Dated: February 18, 2022            **<u>Adam M. Sparks</u>**
                                    *Counsel for Plaintiffs*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I have on this date caused to be electronically filed a copy of the foregoing <u>Plaintiffs' Proposed Findings of Fact and Conclusion of Law</u> with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to counsel of record.

Dated: February 18, 2022            **<u>Adam M. Sparks</u>**
                                    *Counsel for Plaintiffs*