## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **ALPHA PHI ALPHA FRATERNITY INC., et al.,**<br>    Plaintiffs, | **CIVIL ACTION FILE**<br><br> **No. 1:21-CV-5337-SCJ** |
| **v.** | |
| **BRAD RAFFENSPERGER, in his official capacity as Secretary of State of Georgia,**<br>    Defendant. | |
| **COAKLEY PENDERGRASS, et al.,**<br>    Plaintiffs, | **CIVIL ACTION FILE**<br><br>**No. 1:21-CV-5339-SCJ** |
| **v.** | |
| **BRAD RAFFENSPERGER, et al.,**<br>    Defendants. | |
| **ANNIE LOIS GRANT, et al.,**<br>     Plaintiffs, | **CIVIL ACTION FILE**<br><br>**No. 1:22-CV-122-SCJ** |
| **v.** | |
| **BRAD RAFFENSPERGER, et al.,**<br>    Defendants. | <u>**ORDER FOLLOWING COORDINATED HEARING ON MOTIONS FOR PRELIMINARY INJUNCTION**</u> |

# **TABLE OF CONTENTS**

I.  BACKGROUND ................................................................................11

    A.  What Is Redistricting and Why Is It Necessary?................................12

    B.  Factual History ................................................................................14

    C.  The Purpose of the Voting Rights Act and the Conduct It
        Prohibits ........................................................................................16

    D.  Timeline ........................................................................................19

II.  LEGAL STANDARD ....................................................................21

    A.  Preliminary Injunction .................................................................21

        1.  Eleventh Circuit ....................................................................21

        2.  Recent Supreme Court Authority ..........................................23

    B.  The Voting Rights Act .................................................................27

        1.  The Gingles Preconditions ....................................................28

        2.  The Senate Factors ...............................................................29

    C.  Evidentiary Considerations ...........................................................32

    D.  Motions to Dismiss ......................................................................33

III.  FINDINGS OF FACT AND CONCLUSIONS OF LAW ...............34

    A.  Likelihood of Success on the Merits...............................................34

        1.  The First Gingles Precondition: Numerosity and
            Compactness ........................................................................35

            a)  Credibility Determinations ...........................................35

                (1) Mr. Cooper ...........................................................35

                (2) Mr. Esselstyn.........................................................38

(3) Mr. Morgan ................................................................42

(4) Ms. Wright ...............................................................46

b) First *Gingles* Precondition Legal Standard ...........................51

(1) Numerosity ..............................................................52

(2) Compactness .............................................................54

c) Pendergrass ...............................................................55

(1) Numerosity ..............................................................58

(a) Demographic developments in Georgia ..................59

(b) Georgia's 2021 congressional plan ...........................63

(c) The Pendergrass Plaintiffs' illustrative
congressional plan ..............................................66

(2) Geographic Compactness ....................................69

(a) Population equality ........................................71

(b) Compactness ...............................................71

(c) Contiguity ..................................................76

(d) Preservation of political subdivisions ......................76

(e) Preservation of communities of interest ..................79

(f) Core Retention ............................................85

(g) Racial considerations ....................................87

(3) Conclusions of Law ........................................92

d) Grant and Alpha Phi Alpha ....................................93

(1) The Grant Plaintiffs are substantially likely to
establish a Section 2 violation .........................101

3

(a) Senate Districts ...............................................................101

    i)    Numerosity ..............................................................101

    ii)  Geographic compactness ...................................107

        (a) Population equality ......................................108

        (b) Compactness .................................................110

        (c) Contiguity ......................................................115

        (d) Preservation of political subdivisions ....................................................115

        (e) Preservation of communities of interest ............................................................118

        (f) Incumbent protection ...................................123

        (g) Core retention ................................................123

        (h) Racial considerations ...................................125

(b) Esselstyn House Districts .........................................129

    i)    Numerosity ..............................................................129

    ii)  Geographic Compactness ...................................133

        (a) Population equality ......................................134

        (b) Compactness .................................................135

        (c) Contiguity ......................................................139

        (d) Preservation of political subdivisions ....................................................139

        (e) Preservation of communities of interest ............................................................143

(f) Incumbent protection ....................................145

(g) Core retention ...............................................148

(h) Racial considerations ...................................149

(2) The Alpha Phi Alpha Plaintiffs are substantially likely to establish a Section 2 violation ...................................................153

(a) Cooper's Illustrative House District 153 .................153

i) Numerosity ...........................................153

ii) Geographic compactness ...................................155

(a) Population equality .......................................156

(b) Compactness ................................................157

(c) Contiguity .....................................................159

(d) Preservation of political subdivisions ...................................159

(e) Preservation of communities of interest ...........................................164

(f) Incumbent protection ...................................165

(g) Core retention ...............................................168

(h) Racial considerations ...................................169

(3) Conclusions of Law .....................................171

2. The Second Gingles Precondition: Political Cohesion .............172

a) The parties' arguments .........................................172

(1) Defendants .....................................................172

(2) Plaintiffs .................................................................173

(3) Conclusions of law...........................................174

b) The existence of political cohesion........................................176

  (1) Pendergrass...........................................................176

    (a) Plaintiffs' Expert: Dr. Maxwell Palmer ...................176

      i)  Qualification............................................177

      ii)  Analysis..................................................178

    (b) Defendants' Expert: Dr. John Alford.......................180

      i)  Qualification............................................180

      ii)  Analysis..................................................182

    (c) Conclusions of Law...........................................185

  (2) Grant .......................................................................186

    (a) Dr. Palmer's analysis .................................................186

  (3) Alpha Phi Alpha ...................................................187

    (a) Plaintiffs' Expert:  Dr. Lisa Handley ......................188

      i)  Qualification............................................188

      ii)  Analysis..................................................190

        (a) Statewide general elections .........................191

        (b) State legislative elections ............................192

        (c) Primaries ..................................................193

    (b) Defendants' Expert:  Dr. Alford.............................195

    (c) Conclusions of Law...........................................197

3. The Third Gingles Precondition: Bloc Voting ............................ 197

    a) Pendergrass ..................................................... 198

    b) Grant ............................................................... 200

    c) Alpha Phi Alpha ............................................. 202

4. The Senate Factors ......................................................... 205

    a) Senate Factor One: Georgia has a history of official, voting-related discrimination. ................................. 205

    b) Senate Factor Two: Georgia voters are racially polarized. ........................................................ 209

    c) Senate Factor Three: Georgia's voting practices enhance the opportunity for discrimination. ................. 210

    d) Senate Factor Four: Georgia has no history of candidate slating for legislative elections. ..................... 211

    e) Senate Factor Five: Georgia's discrimination has produced significant socioeconomic disparities that impair Black Georgians' participation in the political process. ................................................. 211

    f) Senate Factor Six: Both overt and subtle racial appeals are prevalent in Georgia's political campaigns. ..................................................... 215

    g) Senate Factor Seven: Black candidates in Georgia are underrepresented in office and rarely succeed outside of majority-minority districts. ..................... 217

    h) Senate Factor Eight: Georgia is not responsive to its Black residents. ........................................... 218

    i) Senate Factor Nine: The justifications for the enacted redistricting maps are tenuous. ..................... 219

5.  Conclusions of Law........................................................................220

B.  Irreparable Injury........................................................................220

C.  Balancing of the Equities and Public Interest ...................................221

1.  Findings of Fact ...............................................................................222

2.  Conclusions of Law........................................................................230

IV. CONCLUSION ............................................................................237

# ORDER[1]

This matter appears before the Court on the pending Motions for Preliminary Injunction filed in the above-stated cases concerning the legality of the State of Georgia's newly adopted redistricting plans. APA Doc. No. [39],

---

[1] In the interest of judicial economy, the Court issues a single order that will be filed by the Clerk in each of the above-stated cases. The Court's issuance of this single order does not imply or reflect any intention of the court to consolidate these cases under Federal Rule of Civil Procedure 42 or otherwise.

For reference, the following citations are used for support for each of the findings below:

| Citation | Document Type |
|---|---|
| APA Doc. No. [ ] | Docket entry from Alpha Phi Alpha |
| Grant Doc. No. [ ] | Docket entry from Grant |
| Pendergrass Doc. [ ] | Docket entry from Pendergrass |
| Tr. | Transcript of the preliminary injunction hearing held February 7–14, 2022 in all three cases and filed at APA Doc. Nos. [106–117]; Grant Doc. Nos. [68–79]; Pendergrass Doc. Nos. [73–75, 77–85]. |
| DX | Defendants' Exhibits |
| APAX | Alpha Phi Alpha Plaintiffs' Exhibits |
| GPX | Grant/Pendergrass Plaintiffs' Exhibits |
| APA Stip. | Alpha Phi Alpha joint stipulated facts filed at APA Doc. No. [94] |
| Grant Stip. | Grant joint stipulated facts filed at Grant Doc. No. [56] |
| Pendergrass Stip. | Pendergrass joint stipulated facts filed at Pendergrass Doc. No. [63] |

<u>Grant</u> Doc. No. [19], <u>Pendergrass</u> Doc. No. [32]. In considering this important matter, the Court has had the benefit of thousands of pages of briefing and evidence, as well as the testimony of numerous fact and expert witnesses the Court observed over a six-day hearing on this matter. After careful review and consideration, the Court finds that while the plaintiffs have shown that they are likely to ultimately prove that certain aspects of the State's redistricting plans are unlawful, preliminary injunctive relief is not in the public's interest because changes to the redistricting maps at this point in the 2022 election schedule are likely to substantially disrupt the election process. As a result, the Court will not grant the requests for preliminary injunctive relief.

The Court's analysis proceeds as follows. First, the Court discusses redistricting, voting rights law, and the factual and procedural backgrounds of the above-stated actions. Second, the Court provides the relevant legal standard and discusses the voting rights legislation and case law that guides this Court's analysis. Finally, the Court provides its findings of fact and conclusions of law, which includes the Court's credibility determinations of expert witnesses as well as the Court's analysis under the pertinent law.

## I.  BACKGROUND

Long ago, the United States Supreme Court in <u>Yick Wo v. Hopkins</u>, 118 U.S. 356, 370 (1886). described the "political franchise of voting" as "a fundamental political right, [] preservative of all rights." Our sister court in the Northern District of Alabama therefore aptly expanded: "Voting is an inviolable right, occupying a sacred place in the lives of those who fought to secure the right and in our democracy, because it is 'preservative of all rights.'" <u>People First of Ala. v. Merrill</u>, 491 F. Supp. 3d 1076, 1091 (N.D. Ala. 2020) (quoting <u>Yick Wo</u>, 118 U.S. at 370), <u>appeal dismissed sub nom. People First of Ala. v. Sec'y of State for Ala.</u>, No. 20-13695-GG, 2020 WL 7038817 (11th Cir. Nov. 13, 2020), and <u>appeal dismissed</u>, No. 20-13695-GG, 2020 WL 7028611 (11th Cir. Nov. 16, 2020).

In the three cases before the Court, each set of Plaintiffs argues that their voting rights have been violated by the redistricting plans recently adopted by the State of Georgia in the wake of the 2020 Census. The Court thus approaches this case "with caution, bearing in mind that these circumstances involve 'one of the most fundamental rights of . . . citizens: the right to vote.'" <u>Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs</u>, 775 F.3d 1336, 1345 (11th Cir. 2015) (citations omitted).

### A.    What Is Redistricting and Why Is It Necessary?

The country's system of elections is based on the principle of "one person, one vote" espoused by the Supreme Court in Baker v. Carr, 369 U.S. 186 (1962). As a result, and because our federal system of government is representative when people are drawn into electoral districts, those districts must have equal populations. Karcher v. Daggett, 462 U.S. 725, 730 (1983) ("Article I, § 2 establishes a 'high standard of justice and common sense' for the apportionment of congressional districts: 'equal representation for equal numbers of people.'" (quoting Wesberry v. Sanders, 376 U.S. 1, 18 (1964))). Otherwise, the voting strength of people who live in districts with large populations will be diluted compared to those who live in districts with smaller populations. The Supreme Court has therefore held that in elections for members of the United States House of Representatives, "the command of Art. I, § 2 [of the Constitution], that Representatives be chosen 'by the People of the several States' means that as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's." Wesberry, 376 U.S. at 7–8 (footnotes omitted) (citations omitted). This principle has also been extended to state legislative bodies: "[A]s a basic constitutional standard, the Equal Protection Clause requires that the seats in both houses of a bicameral

state legislature must be apportioned on a population basis." <u>Reynolds v. Sims</u>, 377 U.S. 533, 568 (1964).

The number of people who must be in a particular electoral district depends on which legislative office the district is designed to cover. For instance, the U.S. Constitution prescribes that for the House of Representatives, "[t]he Number of Representatives shall not exceed one for every thirty Thousand, but each State shall have at Least one Representative." U.S. Const. art. I, § 2, cl. 3. When district populations are not equal, the districts are malapportioned. Because populations naturally shift and change over time, district boundaries must be adjusted periodically to correct any malapportionment. This "[r]ealignment of a legislative district's boundaries to reflect changes in population and ensure proportionate representation by elected officials" is known as reapportionment or redistricting. <u>Reapportionment</u>, <u>Black's Law Dictionary</u> (11th ed. 2019) (citing U.S. Const. art. I, § 2, cl. 3); <u>redistricting</u>, <u>Black's Law Dictionary</u> (11th ed. 2019). The U.S. Constitution requires that reapportionment for members of the U.S. House of Representatives occur every ten years, based on the Decennial Census. U.S. Const. art. I, § 2, cl. 3; <u>id.</u>, amend XIV, § 2. Likewise, the Georgia Constitution

requires that the Senate and House districts of the General Assembly be reapportioned after each Decennial Census. Ga. Const. art. III, § 2, ¶ II.

## B.    Factual History

All of this explains why it was necessary, after the results of the 2020 Census became available, for the Georgia General Assembly to pass laws reapportioning districts for the U.S. House of Representatives (SB 2EX), the Georgia Senate (SB 1EX), and the Georgia House (HB 1EX). Each of these provisions was signed into law by Governor Brian Kemp on December 30, 2021. Plaintiffs' claims all stem from that redistricting process, but they do not claim that the districts are malapportioned. Rather, their claims are based on the alleged improper dilution of their votes tied to race.

Within hours of Governor Kemp signing SB 2EX, SB 1EX, and HB 1EX into law, Plaintiffs in Alpha Phi Alpha v. Raffensperger, No. 1:21-cv-05337-SCJ (Alpha Phi Alpha) and Pendergrass v. Raffensperger, No. 1:21-cv-05339-SCJ (Pendergrass), filed suit. Ultimately, between December 30, 2021, and January 11, 2022, the three cases at issue here were filed against State of Georgia officials, alleging these redistricting plans (collectively, the "Enacted Plans") violated Section 2 of the Voting Rights Act of 1965.

The <u>Alpha Phi Alpha</u> Plaintiffs challenge certain State Senate and State House districts in the Enacted Plans. Specifically, they challenge Senate Districts 16, 17, and 23 in the Enacted State Senate Plan (SB 1EX), and House Districts 74, 114, 117, 118, 124, 133, 137, 140, 141, 149, 150, 153, 154, and 155, in the Enacted State House Plan (HB 1EX). <u>APA</u> Doc. No. [1], ¶¶ 64–66, 70–74. The Alpha Phi Alpha Plaintiffs contend that the Enacted State Senate and House Plans fail to include additional majority-minority districts (i.e., districts in which the majority of the voting-age population is Black) that would give Black voters the opportunity to elect their preferred candidates. Instead, they assert Black voters have been heavily "packed" into certain districts and split up into predominantly white districts (i.e., "cracked") in other areas. <u>See generally</u> <u>APA</u> Doc. No. [1].

The <u>Grant v. Raffensperger</u>, No. 1:22-cv-00122-SCJ (<u>Grant</u>) Plaintiffs, likewise challenge the Enacted State Senate and House Plans. Specifically, the <u>Grant</u> Plaintiffs challenge Senate Districts 10, 16, 17, 23, 24, 25, 28, 30, 34, 35 in the Enacted State Senate Plan, and House Districts 61, 64, 69, 74, 75, 78, 117, 133, 142, 143, 144, 145, 147, and 149 in the Enacted State House Plan. <u>Grant</u> Doc. No. [1], ¶¶ 41–44. They argue the General Assembly should have drawn three

additional majority-minority State Senate districts and five State House districts. See generally Grant Doc. No. [1].

Finally, the Pendergrass Plaintiffs, challenges certain congressional districts in the Congressional Enacted Plan. Specifically, the Pendergrass Plaintiffs challenge congressional Districts 3, 6, 11, 13, and 14. Pendergrass Doc. No. [1], ¶ 35. The Pendergrass Plaintiffs allege that SB 2EX should have included an additional majority-minority district in the western Atlanta metropolitan area.

Each set of Plaintiffs contends these failures to draw additional majority-minority districts violates Section 2 of the Voting Rights Act of 1965.

## C.     **The Purpose of the Voting Rights Act and the Conduct It Prohibits**

"The Fifteenth Amendment was ratified in 1870, in the wake of the Civil War. It provides that '[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude,' and it gives Congress the 'power to enforce this article by appropriate legislation.'" Shelby Cnty., Ala. v. Holder, 570 U.S. 529, 536 (2013). Even after the adoption of this amendment, however, many discriminatory systems—including violence—were used to deprive Blacks (among others) of their right to vote.

16

One particularly extreme use of such violence took place on Sunday, March 7, 1965 ("Bloody Sunday"). On that day, civil rights proponents began marching from Selma, Alabama to Montgomery, Alabama for, among other things, the right to vote. After crossing the Edmund Pettus Bridge, the marchers were attacked by state troopers and civilians, an event that was televised across America. The Bloody Sunday attack caused public outrage. See James D. Wascher, Recognizing the 50th Anniversary of the Voting Rights Act, Fed. Law., May 2015, at 41 (hereinafter, "Wascher") (citing Richard H. Pildes, *Introduction*, in The Future of the Voting Rights Act xi, (David L. Epstein, et al., eds., 2006)). Shortly thereafter, Congress passed the Voting Rights Act of 1965 ("VRA"). It was signed into law on August 6 of that year. Pub. L. No. 89-110, 79 Stat. 437 (1965) (codified as amended at 52 U.S.C. §§ 10301–10702). The VRA was adopted specifically "[t]o enforce the fifteenth amendment to the Constitution of the United States." Id. Many commentators have "rightly called [it] the most effective civil rights legislation ever adopted." Wascher at 38; see also Terrye Conroy, The Voting Rights Act of 1965: A Selected Annotated Bibliography, 98 Law Libr. J. 663, 663 (2006) (stating that the VRA "is widely considered one of the most important and successful civil rights laws ever enacted").

While the VRA has been amended several times, as originally adopted, Section 2 prohibited practices that denied or abridged the right to vote "on account of" race or color. Section 4 contained an automatic trigger for the review of new voting laws or practices adopted in certain locations that had a history of using discriminatory voting tests or devices (such as poll taxes or literacy requirements) (the "coverage formula"). The entire State of Georgia was among these "covered jurisdictions." Under Section 5, covered jurisdictions were required to submit new voting procedures or practices for prior approval ("preclearance") by the Department of Justice or a district court panel of three judges. See Wascher at 41. The VRA thus "employed extraordinary measures to address an extraordinary problem." Shelby Cnty., 570 U.S. at 534.

In 2013, the Supreme Court held that the coverage formula was no longer constitutional because it had not been reformulated since 1975. Shelby Cnty., 570 U.S. at 538, 556–57. As a result, the State of Georgia is no longer a covered jurisdiction. The current round of redistricting is the first to be done as a result of a Decennial Census after the Shelby County ruling. Thus, this is the first time in over fifty years in which Georgia has redistricted following the Decennial Census without having to seek preclearance. But Shelby County "in no way

affect[ed] the permanent, nationwide ban on racial discrimination in voting found in § 2." <u>Shelby Cnty.</u>, 570 U.S. at 557. And it is Section 2 on which the Plaintiffs in these three cases predicate their claims.

### D.   <u>Timeline</u>

Due to the serious time exigencies surrounding the fair and timely resolution of these cases, including the provisions of Georgia's election law that set various deadlines applicable to the upcoming 2022 elections, the Court moved expeditiously to hold a Rule 16 Status Conference on January 12, 2022. <u>APA</u> Doc. No. [8]; <u>Pendergrass</u> Doc. No. [15].

Following the Status Conference, the Court set the following schedule for briefing on motions to dismiss in all three matters: Motions to Dismiss were due by 5:00 PM EST on January 14, 2022; Responses were due by 5:00 PM on January 18; Replies were due by 5:00 PM on January 20. <u>APA</u> Doc. No. [37]; <u>Grant</u> Doc. No. [14]; <u>Pendergrass</u> Doc. No. [33].

The Court also set an expedited schedule for briefing on any motions for preliminary injunction in all three matters: Motions for preliminary injunction were due by 5:00 PM EST on January 13, 2022; Responses were due by 5:00 PM EST on January 18; Replies were due by 5:00 PM EST on January 20. <u>APA</u> Doc. No. [36]; <u>Grant</u> Doc. No. [15]; <u>Pendergrass</u> Doc. No. [35].

The Court then scheduled a six-day preliminary injunction hearing with deadlines for exchange of witnesses and exhibits, objections to witnesses and exhibits, and stipulated facts to streamline the hearing process. APA Doc. No. [55]; Grant Doc. No. [44]; Pendergrass Doc. No. [41]. The Court thereafter entered expedited rulings, denying Defendants' Motions to Dismiss on January 28, 2022. APA Doc. No. [65]; Grant Doc. No. [44]; Pendergrass Doc. No. [43].

The coordinated hearing on the preliminary injunctions in all three cases was held from February 7 through February 14, 2022. APA Doc. Nos. [106]–[117]; Grant Doc. Nos. [68]–[79]; Pendergrass Doc. Nos. [73]–[75], [77]–[85].[2]

Related to the coordinated hearing and in accordance with the Court's orders setting deadlines, the parties filed stipulations, requests for judicial notice, supplemental authority (and responses), and proposed findings and conclusions of law,[3] which the Court has reviewed in conjunction with the issuance of this Order.[4] APA Doc. Nos. [61], [73], [94], [95], [98], [101], [119],

---

[2] On February 8, 2022, the Court verbally granted the Motion for Leave to File Brief as Amici Curiae in Support of Plaintiffs filed by Fair Districts Ga and the Election Law Clinic at Harvard. APA Doc. No. [90]. The Amici Curiae brief has been fully considered by the Court in rendering its decision.

[3] In the interest of judicial economy, portions of the proposed findings of fact/conclusions of law have been adopted and incorporated into this Order.

[4] In addition, non-party, Fair Districts Ga and the Election Law Clinic at Harvard filed a Motion for Leave to File Brief as Amici Curiae in Support of Plaintiffs. APA Doc.

[120], [121], [123], [124]; Grant Doc. Nos. [39], [47], [56], [60], [61], [80], [81], [82];

Pendergrass Doc. Nos. [47], 54], [63], [66], [67], [69], [86], [87], [88].

The Court has also reviewed the entire record of each of the three cases at issue, inclusive of the exhibits and evidence admitted during the coordinated hearing. The pending preliminary injunction motions are now ripe for review.

## II.    LEGAL STANDARD

### A.    Preliminary Injunction

#### 1.    *Eleventh Circuit*

To obtain injunctive relief, Plaintiffs must demonstrate:

> (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest.

Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A., 320 F.3d 1205, 1210 (11th Cir. 2003); see also Parker v. State Bd. of Pardons and Paroles, 275 F.3d 1032, 1034–35 (11th Cir. 2001). Injunctive relief is an extraordinary and drastic remedy and should not be granted unless the movant clearly establishes the

---

No. [90]. On February 8, 2022, the Court verbally granted the Motion. The Amici Curiae brief has been fully considered by the Court in rendering its decision.

burden of persuasion as to each of these four factors. <u>Siegel v. LePore</u>, 234 F. 3d 1163, 1176 (11th Cir. 2000); <u>McDonald's Corp. v. Robertson</u>, 147 F.3d 1301, 1306 (11th Cir. 1998). Moreover, when a party seeks to affirmatively enjoin a state governmental agency, requiring it to perform a certain action, the "case must contend with the well-established rule that the Government has traditionally been granted the widest latitude in the dispatch of its own affairs." <u>Martin v. Metro. Atlanta Rapid Transit Auth.</u>, 225 F. Supp. 2d 1362, 1372 (N.D. Ga. 2002) (citing <u>Rizzo v. Goode</u>, 423 U.S. 362, 378–79 (1976)). This rule "bars federal courts from interfering with non-federal government operations in the absence of facts showing an immediate threat of substantial injury." <u>Id.</u> (quoting <u>Midgett v. Tri–Cnty. Metro. Dist. of Or.</u>, 74 F. Supp. 2d 1008, 1012 (D. Or. 1999); citing <u>Brown v. Bd. of Trs. of LaGrange Ind. Sch. Dist.</u>, 187 F.2d 20 (5th Cir. 1951)).[5] The decision to grant preliminary injunctive relief is within the broad discretion of the district court. <u>Majd–Pour v. Georgiana Cmty. Hosp., Inc.</u>, 724 F.2d 901, 902 (11th Cir. 1984).

---

[5] All decisions of the former Fifth Circuit entered prior to October 1, 1981, are binding precedent in the Eleventh Circuit. <u>Bonner v. City of Prichard, Ala.</u>, 661 F.2d 1206, 1209–10 (11th Cir. 1981).

## 2. *Recent Supreme Court Authority*

Added to this mix is the recent Supreme Court order in <u>Merrill v. Milligan</u>, 595 U.S. ---, 142 S. Ct. 879 (Feb. 7, 2022). <u>Milligan</u> involves challenges under the United States Constitution and the VRA to Alabama's recently redrawn congressional electoral maps. <u>See generally</u> <u>Milligan v. Merrill</u>, Case No. 2:21-cv-1530-AMM (N.D. Ala.) (three-judge court), <u>consolidated with</u> <u>Singleton v. Merrill</u>, Case No. 2:21-cv-1291-AMM (N.D. Ala.) (three-judge court). After an extensive evidentiary hearing, the three-judge court entered preliminary injunctions enjoining the Alabama Secretary of State from conducting congressional elections using those maps. <u>Id.</u> Doc. No. [107]. The Alabama defendants applied to the United States Supreme Court for a stay of the injunctive relief from those orders. <u>Milligan</u>, 142 S. Ct. at 879.[6] The Supreme Court granted the request and stayed, without opinion, the injunctions that were issued by the three-judge court. <u>See id.</u> Chief Justice Roberts, as well as Justices Kagan, Breyer, and Sotomayor, dissented. <u>Id.</u> at 882–89.

---

[6] Because the orders were issued by a three-judge court, all appellate review is by the United States Supreme Court. 52 U.S.C. § 10306(c) ("The district courts of the United States shall have jurisdiction of such actions which shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of Title 28 and any appeal shall lie to the Supreme Court.").

Justice Kavanaugh, joined by Justice Alito, wrote separately to concur with the stay of the injunctions. See id. at 879–82. Justice Kavanaugh's concurrence first emphasized that the stay was not a ruling on the merits but followed precedent—the Purcell principle[7]—which dictates that federal courts generally "should not enjoin state election laws in the period close to an election." Id. at 879. This is important because

> [l]ate judicial tinkering with election laws can lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters, among others. It is one thing for a State on its own to toy with its election laws close to a State's elections. But it is quite another thing for a federal court to swoop in and re-do a State's election laws in the period close to an election.

Id. at 881 (footnote omitted). Because "practical considerations sometimes require courts to allow elections to proceed despite pending legal challenges,"

---

[7]  The Purcell principle derives from Purcell v. Gonzales, 549 U.S. 1 (2006) (per curiam). There, the Supreme Court noted that "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase." Id. at 4–5. Accordingly, the Court vacated an appellate court order that enjoined enforcement of a voter-identification law about a month before an election. Id. at 3. Based on Purcell, both the Supreme Court and lower federal courts have applied the principle that "lower federal courts should ordinarily not alter the election rules on the eve of an election." Republican Nat'l Comm. v. Democratic Nat'l Comm., 140 S. Ct. 1205, 1207 (2020) (citations omitted).

id. at 882 (quoting <u>Riley v. Kennedy</u>, 553 U.S. 406, 426 (2008)), Justice Kavanaugh concluded that the <u>Purcell</u> principle should be applied to modify the traditional preliminary injunction standard when elections are close at hand:

> I would think that the <u>Purcell</u> principle thus might be overcome even with respect to an injunction issued close to an election if a plaintiff establishes at least the following: (i) the underlying merits are entirely clearcut in favor of the plaintiff; (ii) the plaintiff would suffer irreparable harm absent the injunction; (iii) the plaintiff has not unduly delayed bringing the complaint to court; and (iv) the changes in question are at least feasible before the election without significant cost, confusion, or hardship.

<u>Id.</u> at 881 (citations omitted).

Although Justice Kavanaugh's concurrence is not controlling, this Court would be remiss if it ignored its conclusions. First, even dicta from the Supreme Court carries strong persuasive value. The Eleventh Circuit has made this clear. In rejecting another appellate court's dismissal of Supreme Court dicta, the Eleventh Circuit emphasized the following:

> We disagree with the [] opinion's dismissal of the Supreme Court's specific pronouncements []. A lot. We will start with the most fundamental reason. We have always believed that when the Founders penned Article III's reference to the judicial power being vested "in one supreme Court and in such inferior

25

Courts" as Congress may establish, they used "supreme" and "inferior" as contrasting adjectives, with us being on the short end of the contrast. See U.S. Const. Art. III § 1. . . .

It is true that the Supreme Court's analysis . . . and its conclusion that the issue remains an open question in Supreme Court jurisprudence, is dicta. However, there is dicta and then there is dicta, and then there is Supreme Court dicta. . . .

We have previously recognized that "dicta from the Supreme Court is not something to be lightly cast aside."

Schwab v. Crosby, 451 F.3d 1308, 1325 (11th Cir. 2006) (quoting Peterson v. BMI Refractories, 124 F.3d 1386, 1392 n.4 (11th Cir. 1997)).

Second, although the Supreme Court did not issue an opinion in Milligan explaining its reasoning for staying the three-judge court's injunction orders, five justices agreed that the stay should issue. That is, a majority of the Supreme Court necessarily concluded that there was a "fair prospect" it would reverse the injunction on the merits, the Alabama defendants would suffer irreparable injury if the injunction were not lifted, the equities weighed in the defendants' favor, and the injunction was not in the public interest. 142 S. Ct. at 880 (Kavanaugh, J., concurring). Taken in this light, Justice Kavanaugh's opinion carries even more weight than typical Supreme Court dicta.

Accordingly, although this Court applies the traditional test employed by the Eleventh Circuit for determining whether a preliminary injunction should issue, it is cognizant of the proposed standard set forth by Justice Kavanaugh and that the State of Georgia has already begun the process of preparing for elections to take place under the Enacted Plans.

**B.** **The Voting Rights Act**

Subsection (a) of Section 2 of the VRA prohibits standards, practices, and procedures that deny or abridge the right to vote of any United States citizen based on race or color. 52 U.S.C. § 10301(a). Such a violation is established

> if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

Id. at § 10301(b). The Eleventh Circuit has emphasized that Section 2 is "a constitutional exercise of congressional enforcement power under the Fourteenth and Fifteenth Amendments." United States v. Marengo Cnty. Comm'n, 731 F.2d 1546, 1550 (11th Cir. 1984).

### 1.    *The Gingles Preconditions*

In <u>Thornburg v. Gingles</u>, 478 U.S. 30 (1986), the Supreme Court first interpreted Section 2 after Congress amended it in 1982. The statute, as amended, focuses on the results of the challenged standards, practices, and procedures; it is not concerned with whether those processes were adopted because of discriminatory intent. <u>Id.</u> at 35–36. "Under the results test, the inquiry is more direct: past discrimination can severely impair the present-day ability of minorities to participate on an equal footing in the political process. Past discrimination may cause [B]lacks to register or vote in lower numbers than whites. Past discrimination may also lead to present socioeconomic disadvantages, which in turn can reduce participation and influence in political affairs." <u>Marengo Cnty. Comm'n</u>, 731 F.2d at 1567 (footnote omitted) (citation omitted).

Under <u>Gingles</u>, plaintiffs must show that they have satisfied three prerequisites to make out a Section 2 vote dilution claim:

> First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district. If it is not, as would be the case in a substantially integrated district, the *multi-member form* of the district cannot be responsible for minority voters' inability to elect its candidates. Second, the

> minority group must be able to show that it is
> politically cohesive. If the minority group is not
> politically cohesive, it cannot be said that the selection
> of a multimember electoral structure thwarts
> distinctive minority group interests. Third, the
> minority must be able to demonstrate that the white
> majority votes sufficiently as a bloc to enable it—in
> the absence of special circumstances, such as the
> minority candidate running unopposed—usually to
> defeat the minority's preferred candidate.

478 U.S. at 50–51 (footnotes omitted) (citations omitted). Despite <u>Gingles</u>'s

focus on multi-member districts, in <u>Voinovich v. Quilter</u>, 507 U.S. 146, 153

(1993), the Supreme Court made clear that single-member districts can also

dilute minority voting strength and thereby violate Section 2. The <u>Gingles</u>

requirements "present mixed questions of law and fact." <u>Solomon v. Liberty</u>

<u>Cnty., Fla.</u>, 899 F.2d 1012, 1017 n.6 (11th Cir. 1990) (Kravitch, J., specially

concurring).

### 2. *The Senate Factors*

In addition to applying the <u>Gingles</u> factors, courts must also consider

several factors that may be relevant to Section 2 claims, which were identified

in the Senate Report accompanying the 1982 VRA amendment. <u>Gingles</u>, 478

U.S. at 44–45. The Court notes, "it will be only the very unusual case in which

the plaintiffs can establish the . . . <u>Gingles</u> [threshold] factors but still have

failed to establish a violation of § 2 under the totality of the circumstances."

Nipper v. Smith, 39 F.3d 1494, 1514 (11th Cir. 1994) (citing Jenkins v. Red Clay Consol. Sch. Bd. of Educ., 4 F.3d 1103, 1116 (3d Cir. 1993)); see also Clark v. Calhoun Cnty., 88 F.3d 1393, 1402 (5th Cir. 1996) (same). However, Gingles instructs Courts to evaluate the Senate Factors to determine, under the totality of the circumstances, if there was a Section 2 violation. See Gingles, 478 U.S. at 48, n.15. As later explained by the Eleventh Circuit, the Senate Report factors (the "Senate Factors") that will "typically establish" a violation of Section 2 are:

> 1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote or otherwise to participate in the democratic process;

> 2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

> 3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions,[8] or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

---

[8] Single-shot or bullet voting "enables a minority group to win some at-large seats if it concentrates its vote behind a limited number of candidates and if the vote of the majority is divided among a number of candidates." Gingles, 478 U.S. at 38 n.5 (internal quotation marks omitted) (citations omitted).

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment[,] and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

Solomon, 899 F.2d at 1015–16. Two additional circumstances may also be probative of a Section 2 violation:

8. whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group;

9. whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

Id. at 1016.

In Gingles, the Supreme Court concluded that the Senate Factors "will often be pertinent to certain types of § 2 violations, particularly to vote dilution claims." 478 U.S. at 45 (footnote omitted). In conjunction, the Gingles

preconditions and Senate Factors require the consideration of race to some extent when evaluating electoral districts so that the voting rights of minorities are not denied or abridged. 52 U.S.C. § 10301(a); see also, e.g., Gingles, 478 U.S. 30; Voinovich, 507 U.S. 146; Solomon, 899 F.2d 1012; Marengo Cnty. Comm'n, 731 F.2d at 1561 ("Section 2 is not meant to create race-conscious voting but to attack the discriminatory results of such voting where it is present."). Satisfying the Gingles preconditions and the Senate Factors proves the injury of vote dilution. Such harms must, however, be evaluated on a district-by-district basis. Gill v. Whitford, 138 S. Ct. 1916, 1930 (2018).

Chief Justice Roberts recently noted that "it is fair to say that Gingles and its progeny have engendered considerable disagreement and uncertainty regarding the nature and contours of a vote dilution claim." Milligan, 142 S. Ct. at 882–83 (Roberts, C.J., dissenting) (citations omitted). Despite the disagreement and apparent uncertainty, this Court applies the relevant Supreme Court and Eleventh Circuit precedent as they currently exist.

### C. Evidentiary Considerations

At the preliminary injunction stage, "a district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is 'appropriate given the character and

objectives of the injunctive proceeding.'" <u>Levi Strauss & Co. v. Sunrise Int'l Trading Inc.</u>, 51 F.3d 982, 985 (11th Cir. 1995). A substantial amount of evidence was presented by the parties during the hearing, and much of it has been considered by the Court for purposes of this Order, even if such evidence may not ultimately be admissible at trial. When discussing the evidence, this Order addresses to the extent necessary any objections raised by the parties.[9]

### D.   <u>Motions to Dismiss</u>

The Court has already ruled on the motions to dismiss filed by Defendants in each of these three cases and denied their requests to certify the Court's rulings for interlocutory appeal. <u>APA</u> Doc. No. [65]; <u>Pendergrass</u> Doc. No. [50]; <u>Grant</u> Doc. No. [43]. No party has sought reconsideration of those Orders. <u>See generally</u> <u>APA</u> Docket; <u>Pendergrass</u> Docket; <u>Grant</u> Docket. Accordingly, the Court does not further address Defendants' argument that there is no private right of action under Section 2.[10]

---

[9]  The Court entered a separate order addressing evidentiary rulings.

[10]  The Court is aware of the recent decision in <u>Arkansas State Conference NAACP v. Arkansas Board of Apportionment</u>, Case No. 4:21-cv-01239-LPR, 2022 WL 496908, at *1 (E.D. Ark. Feb. 17, 2022) (<u>APA</u> Doc. No. [119]), in which the district court concluded there is no implied private right of action under Section 2. Given the extent and weight of the authority holding otherwise (<u>see</u> <u>APA</u> Doc. No. [65], 32–33), including from the Supreme Court, this Court finds no basis to alter the analysis in its Order denying Defendants' motions to dismiss.

## III.  FINDINGS OF FACT AND CONCLUSIONS OF LAW

Having reviewed the parties' briefs, evidence, and other filings, and having listened to and considered the testimony and arguments presented during the preliminary injunction hearing, the Court now provides the following findings of fact and conclusions of law. The Court first discusses Plaintiffs' likelihood of success on the merits, analyzing the Section 2 claims under the framework established by <u>Gingles</u> and its progeny. The Court then discusses whether Plaintiffs have shown that they will suffer irreparable injury absent the requested injunctions, whether Plaintiffs' threatened injury outweighs whatever the damage the proposed injunction may cause Defendants and if issued, whether the injunction is adverse to the public interest.

### A.  <u>Likelihood of Success on the Merits</u>

The Court's analysis begins with the first <u>Gingles</u> precondition and a credibility review of the expert witnesses who testified in relation to this prong.

**1.** ***The First <u>Gingles</u> Precondition: Numerosity and Compactness***

 **a)**   <u>**Credibility Determinations**</u>

   *(1) Mr. Cooper*

The <u>Alpha Phi Alpha</u> and <u>Pendergrass</u> Plaintiffs qualified Mr. William S. Cooper as an expert in redistricting and with reference to census data. Feb. 7, 2022, Morning Tr. 38:16–18; Feb. 7; 2022, Afternoon Tr. 112:16–19. Mr. Cooper earned a bachelor's degree in economics from Davidson College and has earned his living for the last thirty years by drawing maps, both for electoral purposes and for demographic analysis. APAX 1, ¶¶ 1–2. He has extensive experience testifying in federal courts about redistricting issues and has been qualified in forty-five voting rights cases in nineteen states. <u>Id.</u> ¶ 2.

 Over twenty-five of these cases led to changes in local election district plans. <u>Id.</u> And five of the cases resulted in changes to statewide legislative boundaries: <u>Rural West Tennessee African-American Affairs Council, Inc. v. McWherter</u>, 877 F. Supp. 1096 (W.D. Tenn. 1995); <u>Old Person v. Brown</u>, 182 F. Supp. 2d 1002 (D. Mont. 2002); <u>Bone Shirt v. Hazeltine</u>, 336 F. Supp. 2d 976 (D.S.D. 2004); <u>Alabama Legislative Black Caucus v. Alabama</u>, 231 F. Supp. 3d 1026 (M.D. Ala. 2017); and <u>Thomas v. Reeves</u>, 2:18-CV-441-CWR-FKB, 2021 WL 517038 (S.D. Miss. Feb. 11, 2021).

Mr. Cooper has served as an expert in two post-2010 local level Section 2 cases in Georgia (Ga. State Conf. of the NAACP v. Fayette Cnty. Bd. of Comm'rs, 118 F. Supp. 3d 1338 (N.D. Ga. 2015) and Ga. State Conf. of the NAACP v. Emanuel Cnty., 6:16-CV-00021, (S.D. Ga. 2016)) both of which resulted in settlements and implementation of the maps that Mr. Cooper created. Mr. Cooper has worked on behalf of both plaintiffs and defendants in redistricting cases. Caster v. Merrill, No. 2:21-cv-1536-AMM, 2022 WL 264819, at *35 (N.D. Ala. Jan. 24, 2022); APAX 1, 67–72.

The Court finds Mr. Cooper's testimony highly credible. Mr. Cooper has spent the majority of his career drawing maps for redistricting and demographic purposes, and he has accumulated extensive expertise (more so than any other expert in the first Gingles precondition in the case) in redistricting litigation, particularly in Georgia. Indeed, his command of districting issues in Georgia is sufficiently strong that he was able to draw a draft remedial plan for Pendergrass's counsel "in a couple of hours in late November." Feb. 7, 2022, Morning Tr. 69:6–9.

Throughout Mr. Cooper's reports and his live testimony, his opinions were clear and consistent, and he had no difficulty articulating his bases for them. See APAX 1, Feb. 7, 2022, Morning Tr. 39–104; Feb. 7, 2022, Afternoon Tr.

113–241. But he was not dogmatic: he took Mr. Tyson's and the Court's criticism of the compactness of his Illustrative State Senate District 18 seriously and stated, "I think the Plaintiffs – the Defendant are going to complain about [Senate District 18]. I think they sort of have a valid argument that you don't need to have a district that long, so . . . if I had that opportunity, will fix that problem." Feb. 7, 2022, Afternoon Tr. 149:14–23.

The Court particularly credits Mr. Cooper's testimony that he "tried to balance" all traditional redistricting principles. Feb. 7, 2022, Morning Tr. 50:24. Mr. Cooper also testified that he "was aware of [all the traditional redistricting principles] and [he] tried to achieve plans that were fair and balanced." Feb. 7, 2022, Afternoon Tr. 140:6–7. He was candid that he prioritized race only to the extent necessary to answer the essential question asked of him as an expert on the first Gingles precondition ("Is it possible to draw an additional, reasonably compact majority-Black district?"), and clearly explained that he did not prioritize it to any greater extent. See Feb. 7, 2022, Morning Tr. 51:4–5 ("I was aware of the racial demographics for most parts of the state, but certainly [race] did not predominate"); Feb. 7, 2022, Afternoon Tr. 135:17–19 ("I was aware of race as traditional redistrict principles suggest one should be. I mean, it's Voting Rights Act[]. It's Federal Law."). Mr. Cooper acknowledged that [the]

tradeoffs between traditional districting criteria are necessary, and he did not ignore any criteria. See Feb. 7, 2022, Afternoon Tr. 230:22–25 ("I have attempted to balance [traditional redistricting principles] together and I think overall, the Plan does comply with traditional redistricting principles, but I'm certainly willing to accept criticism and would make adjustments upon receiving that criticism.").

During Mr. Cooper's live testimony, the Court carefully observed his demeanor, particularly as he was cross-examined for the first time about his work on this case. He consistently defended his work with careful and deliberate explanations of the cases for his opinions. The Court observed no internal inconsistencies in his testimony, no appropriate question that he could not or would not answer, and no reason to question the veracity of his testimony. The Court finds that his methods and conclusions are highly reliable, and ultimately that his work as an expert on the first Gingles precondition is helpful to the Court.

### (2) Mr. Esselstyn

The Grant Plaintiffs qualified Mr. Blakeman B. Esselstyn as an expert in redistricting and census data. Feb. 8, 2022, Afternoon Tr. 111:18–112:1. Mr. Esselstyn earned his bachelor's in Geology & Geophysics and International

Studies from Yale University and a Master's in Computer and Information Technology from the University of Pennsylvania, School of Engineering. GPX 3, 26. Mr. Esselstyn testified that he has "more than 20 years in experience in looking at maps and demographics and recognizing patterns and things like that." Feb. 9, 2022, Afternoon Tr. 168:10–12. Since 2017, Mr. Esselstyn has taught two one-semester-graduate-level courses in Geographic Information Systems. GPX 3, at 27. Mr. Esselstyn has designed redistricting plans that were accepted by various local governments in North Carolina. Id. at 27–28. Mr. Esselstyn was a testifying expert witness in Jensen v. City of Asheville, Buncombe County, North Carolina, Superior Court (2009); Hall v. City of Asheville, Buncombe County, North Carolina, Superior Court (2009); and Arnold v. City of Ashville, Buncombe County, North Carolina, Superior Court (2005). On *voir dire*, Mr. Esselstyn acknowledged that he has never drawn a statewide map that was used in an election and that he has never drawn a map for any jurisdiction in Georgia. Feb. 8, 2022, Afternoon Tr. 112:13–18. The Court finds Mr. Esselstyn's testimony highly credible. Mr. Esselstyn has spent the majority of his professional life drawing maps for redistricting and demographic purposes.

Throughout Mr. Esselstyn's reports and his live testimony, his opinions were clear and consistent, and he had no difficulty articulating his bases for them. See GPX 3; Feb. 8, 2022, Afternoon Tr. 107–128; Feb. 9, 2022, Afternoon Tr. 148–276. Mr. Esselstyn acknowledged that his Illustrative State and House Plans had higher population deviations, more precinct splits, and more county splits than the Enacted State House and Senate Plans. Feb. 9, 2022, Afternoon Tr. 203:18–21, 205:8–14, 23–25. Mr. Esselstyn also stated that if he was asked to try to reduce these changes, he "could probably accommodate." Id. at 204:23–25.

The Court particularly credits Mr. Esselstyn's testimony that he tried "to sort of find the best balance that [he] can" for all the traditional redistricting principles. Feb. 9, 2022, Afternoon Tr. 157:14–25. Mr. Cooper also testified the traditional redistricting principles are "sort of the multi-layered puzzle" and it's a balancing act" because "there are often criteria that will be [in tension] with each other." Id. at 157:24–25. He was candid that he prioritized race only to the extent necessary to answer the essential question asked of him as an expert on the first Gingles precondition ("Is it possible to draw an additional, reasonably compact majority-Black district?"), and clearly explained that he did not prioritize it to any greater extent. See id. at 155:20–156:2 ("[M]y

understanding of Section 2 in the Gingles criteria is that the key metric is whether a district has a majority of Any Part Black population. . . . And that means . . . [y]ou have to look at the numbers that measure the percentage of the population is Black."). Mr. Esselstyn acknowledged that tradeoffs between traditional districting criteria are necessary, and he did not ignore any criteria. See id. at 157:14–21

> [O]ften the criteria will be [in tension] with each other. It may be that you are trying to just follow precinct lines and not split . . . precincts, but the precincts have funny shapes. So that means you either are going to end up with a less compact shape that doesn't split precincts or you could split a precinct and end up with a more compact shape.

During Mr. Esselstyn's live testimony, the Court carefully observed his demeanor, particularly as he was cross-examined for the first time about his work on this case. He consistently defended his work with careful and deliberate explanations of the cases for his opinions. The Court observed no internal inconsistencies in his testimony, no appropriate question that he could not or would not answer, and no reason to question the veracity of his testimony. The Court finds that his methods and conclusions are highly reliable, and ultimately that his work as an expert on the first Gingles precondition is helpful to the Court.

### (3) *Mr. Morgan*

The Defendants qualified Mr. John B. Morgan as an expert in redistricting and the analysis of demographic data. Feb. 11, 2022, Morning Tr. 121:8–10. Mr. Morgan has a bachelor's in History from the University of Chicago and has earned his living for the last thirty years by drawing maps, both for electoral purposes and for demographic analysis. DX 2, ¶ 2; Feb. 11, 2022, Morning Tr. 119:13–18. Prior to this case, Mr. Morgan has served as a testifying expert in five cases. Feb. 11, 2022, Afternoon Tr. 244:12–15. He has performed redistricting work for 20 states and performed demographics and election analysis in 40 states for both statewide and legislative candidates. DX 2, at 17–18.

Despite Mr. Morgan's extensive experience, the Court assigns very little weight to Mr. Morgan's testimony. Mr. Morgan's previous redistricting work includes drawing maps that were ultimately struck down as unconstitutional racial gerrymanders (Feb. 11, 2022, Afternoon Tr. 183:9–17, 183:24–184:6), as well as serving as an expert for the defense in a case in Georgia where the map was ultimately found to have violated the Voting Rights Act (Feb. 14, 2022, Morning Tr. 9:21–10:6).

In Georgia State Conference of NAACP v. Fayette County Board of Commissioners, Mr. Morgan testified as an expert for the defense opposite Mr. Cooper, who testified as an expert for the plaintiffs. 950 F. Supp. 2d 1294, 1310–11 (N.D. Ga. 2013). In granting the motion for summary judgment, that court found that the plaintiffs successfully asserted a vote dilution claim. Id. at 1326. At the preliminary injunction hearing for the cases sub judice, Mr. Morgan admitted that he worked on the 2011–2012 North Carolina State Senate Maps. Feb. 11, 2022, Afternoon Tr.182:22–183:13. Ultimately, twenty-eight districts in North Carolina's 2011 state House and Senate redistricting plans were struck down as racial gerrymanders. Id. at 183:14–19; see also Covington v. North Carolina, 316 F.R.D. 117 (M.D.N.C. 2016), aff'd North Carolina v. Covington, 137 S. Ct. 2211 (2017).

Additionally, two federal courts have determined that Mr. Morgan's testimony was not credible. Feb. 11, 2022, Afternoon Tr. 245:19–246:15, 246:17–19, 247:25–248:21. The Court gives great weight to the credibility determinations of its sister courts.

At the hearing for this matter, Mr. Morgan testified that he had helped draw the 2011 Virginia House of Delegates Maps. Feb. 11, 2022, Afternoon Tr. 183:20–25. In that case, "Mr. Morgan testified . . . that he played a substantial

role in constructing the 2011 plan, which role included his use of the Maptitude software to draw district lines." Bethune-Hill v. Virginia State Bd. of Elections, 326 F. Supp. 3d 128, 151 (E.D. Va. 2018). Ultimately, a three-judge court found that 11 of the House of Delegates districts were racial gerrymanders. Feb. 11, 2022, Afternoon Tr. 184:1–6; see also Bethune-Hill, 326 F. Supp. 3d at 181.

Mr. Morgan served as both a fact and expert witness in Bethune-Hill. That court ultimately found that Mr. Morgan's testimony was not credible. That court found that "Morgan's testimony was wholly lacking in credibility. Th[is] adverse credibility finding[] [is] not limited to particular assertions of [this] witness[], but instead wholly undermine[s] the content of . . . Morgan's testimony." Bethune-Hill, 326 F. Supp. 3d at 174; Feb. 11, 2022, Afternoon Tr. 246:17–19, 247:25–248:4. Specifically, "Morgan testified in considerable detail about his reasons for drawing dozens of lines covering all 11 challenged districts, including purportedly race-neutral explanations for several boundaries that appeared facially suspicious." Bethune-Hill, 326 F. Supp.3d at 151. "In our view, Morgan's contention, that the precision with which these splits divided white and black areas was mere happenstance, simply is not credible." Id. "[W]e conclude that Morgan did not present credible testimony, and we decline to consider it in our predominance analysis." Id. at 152.

Mr. Morgan also served as a testifying expert in <u>Page v. Virginia State Bd. of Elections</u>, No. 3:13cv678, 2015 WL 3604029 (E.D. Va. June 5, 2015). Feb. 11, 2022, Afternoon Tr. 245:2–5. When counsel for the <u>Pendergrass</u> and <u>Grant</u> Plaintiffs asked Mr. Morgan if he recalled that court's opinions about his testimony, he stated: "not specifically." <u>Id.</u> at 245:9–11. That court found "Mr. Morgan, contends that the majority-white populations excluded . . . were predominately Republican. . . . The evidence at trial, however, revealed that Mr. Morgan's analysis was based upon several pieces of mistaken data, a critical error. . . . Mr. Morgan's coding mistakes were significant to the outcome of his analysis." <u>Page</u>, 2015 WL 3604029, at *15 n.25; Feb. 11, 2022, Afternoon T. 245:19–3. Mr. Morgan explained that his error was caused because the attorneys asked him to produce an additional exhibit on the day of trial. Feb. 11, 2022, Afternoon Tr. 246:8–14.

During Mr. Morgan's live testimony, the Court carefully observed his demeanor, particularly as he was cross-examined for the first time about his work on this case. The Court found that Mr. Morgan declined to answer counsel's and the Court's questions about the definition for "packing." Feb. 11, 2022, Afternoon Tr. 192:24–196:25. The Court specifically asked Mr. Morgan for his definition of packing (<u>Id.</u> at 194:4), to which Mr. Morgan responded,

"Honestly, I have seen so many different places —" <u>Id.</u> at 194:4–6. The Court then stated, "I understand that. You said you have been doing this for four decades. You have more experience than just about everybody. What is your definition of it?" <u>Id.</u> at 194:7–9. Despite the Court and counsel's questioning, Mr. Morgan never gave a clear definition for the term "packing." <u>Id.</u> at 194:7–196:25. The Court also observed that Mr. Morgan consistently could not recall that his credibility was undermined in previous redistricting cases. As such, the Court finds that Mr. Morgan's testimony lacks credibility, and the Court assigns little weight to his testimony.

### (4) Ms. Wright

Over objection from the <u>Grant</u> and <u>Pendergrass</u> Plaintiffs, Defendants offered Ms. Regina Harbin Wright as an expert on redistricting in Georgia and the analysis of demographic data in Georgia.[11] Ms. Wright is an experienced map drawer and a busy public servant. Ms. Wright serves as the Executive Director of the Legislative and Congressional Reapportionment Officer (LCRO), a joint office of the Georgia General Assembly. DX 41, ¶ 2. Ms. Wright

---

[11] In 2012, Ms. Wright served as a technical advisor and consultant to this Court in the redrawing the Cobb County, Georgia electoral commission districts. <u>See</u> <u>Crumly v. Cobb Cnty. Bd. of Elections & Voter Registration</u>, 892 F. Supp. 2d 1333 (N.D. Ga. 2012); Feb. 11, 2022, Morning Tr. 9:2–4.

has worked for LRCO for just over twenty-one years and has been the director for almost ten years. Feb. 11, 2022, Morning Tr. 6:20–24. LRCO assists the General Assembly in drawing the Georgia State House and Senate Districts, the Public Service Commission, as well as the fourteen (14) United States Congressional Districts. Id. LRCO provides an array of maps and data reports to both legislators and the public at large. Id.

Ms. Wright has served as an expert or technical advisor for redistricting by federal courts in eight federal cases since the 2010 redistricting cycle. See DX 41, ¶ 6 (Ga. State Conf. of the NAACP v. Fayette Cnty. Bd. of Comm'rs, 996 F. Supp. 2d 1353, 1359 (N.D. Ga. 2014) (appointed as the court's "independent technical advisor"); Fayette Cnty. Bd. of Comm'rs, 118 F. Supp. 3d at 1340 (appointed to be the court's "expert or technical advisor"); Crumly v. Cobb Cnty. Bd. of Elections & Voter Registration, 892 F. Supp. 2d 1333, 1344 (N.D. Ga 2012) (appointed as the court's "technical advisor and consultant") Martin v. Augusta-Richmond Cnty., No. CV 112-058, 2012 WL 2339499, at *1 (S.D. Ga. June 19, 2012) (appointed by the court as "advisor and consultant"); Walker v. Cunningham, No. CV 112-058, 2012 WL 2339499, at *5 (S.D. Ga. June 19, 2012) (three-judge court) (appointed by the court "as its independent technical advisor"); Bird v. Sumter Cnty. Bd. of Educ., CA No. 1:12cv76-WLS (M.D. Ga.

2013) Doc. No. [70], 5 (appointed as the court's "independent technical advisor"); <u>Adamson v. Clayton Cnty. Elections & Reg. Bd.</u>, CA No. 1:12cv1665-CAP (N.D. Ga. 2012), Doc. No. [23], 2 (appointed as the court's "independent technical advisor."); <u>Ga. State Conf. of NAACP v. Kemp</u>, 312 F. Supp. 3d 1357, 1360–62 (N.D. Ga. 2018) (three-judge court) (testified at preliminary judgment hearing by deposition)).

Counsel for Defendants offered Ms. Wright as an expert on redistricting in Georgia and the analysis of demographic data in Georgia. Feb. 11, 2022, Morning Tr. 10:1–3. Counsel for the <u>Grant</u> and <u>Pendergrass</u> Plaintiffs objected to Ms. Wright's certification as an expert because

> Her credibility has been specifically questioned by the Court in connection with the 2015 redistricting where she moved many [B]lack voters from districts where their votes would have made an impact to districts where they would not. And [her] report[, in this case,] is little more than a running commentary untethered to data, much less any sort of scientific or technical analysis that would lend to credibility before this Court . . . . [A]lthough [Ms. Wright] has practical experience relating generally to redistricting, she doesn't apply that technical or specialized knowledge here in any way which might be helpful to this Court . . . . her testimony is not based on sufficient facts or data which are notably absent from the report . . . . [Ms. Wright] has not and cannot show that her analysis or conclusions to the product are reliable

48

> principles or methods at 702(C), and it too, is wholly
> absent from her report.

Feb. 11, 2022, Morning Tr. 20:10–17, 21:8–11, 18–20. The Court overruled counsel's objection and admitted Ms. Wright as an expert on redistricting in Georgia and the analysis of demographic data in Georgia. Id. at 24:1–5.

Although the Court finds that Ms. Wright is a credible expert witness with over twenty-one years of experience in redistricting and demographics in Georgia, the Court assigns little weight to her testimony regarding compactness and demographics; however, the Court assigns a greater amount of weight to Ms. Wright's testimony about communities of interest and political subdivisions in Georgia.

The Court finds that Ms. Wright did not provide any statistical metric by which to measure the compactness of any of the illustrative maps. Ms. Wright's report does not explain how she determined whether a particular district was more or less compact and thus was not permitted to explain her methodology at the hearing. DX 41; Feb. 11, 2022, Morning Tr. 47:18–48:6. Thus, the Court assigns very little weight to Ms. Wright's testimony regarding a district's compactness. The Court does recognize that Ms. Wright was given one day to

prepare and submit her expert report to the Court. See APA Doc. No. [85]; Pendergrass Doc. No. [58]; Grant Doc. No. [51].

Ms. Wright also testified about the demographics of the enacted Congressional, State House, and State Senate districts in comparison to the Illustrative Congressional, State House, and State Senate districts. Ms. Wright testified that the Secretary of State's Office used the Non-Hispanic Black metric as opposed to the Any Part Black metric that was used by Mr. Cooper and Mr. Esselstyn. Id. at 79:4–80:1. In particular, Ms. Wright testified when evaluating the percentage of Black registered voters, Ms. Wright's analysis is based on non-Hispanic Black metric and not Any Part Black metric. Id. at 79:18–21. Because the Court uses the Any Part Black metric to determine if the Black population is sufficiently numerous to create an additional majority-minority district—"it is proper to look at *all* individuals who identify themselves as [B]lack" in their census responses, even if they "self-identify as both [B]lack and a member of another minority group," because the case involved "an examination of only one minority group's effective exercise of the electoral franchise." Georgia v. Ashcroft, 539 U.S. 461, 473 n.1 (2003)—the Court assigns little weight to Ms. Wright's demographic analysis.

The Court assigns greater weight to Ms. Wright's testimony about communities of interest and political subdivisions in Georgia. Ms. Wright has twenty-one years of experience in drawing statewide Congressional, State House, and State Senate districts. DX 41, ¶ 2. Ms. Wright also assists in drawing maps for local County Commissions, Boards of Education, and City Councils throughout the state of Georgia. Id. Ms. Wright oversees a staff that draws maps in Georgia for statewide legislative districts, local redistricting plans, city creation boundaries, annexations and de-annexations, and precinct boundary changes. Id. ¶ 3. Finally, Ms. Wright has been appointed as an expert and technical advisor to the Court in seven federal redistricting cases between 2012 and 2015. Id. at 6. Accordingly, the Court finds that Ms. Wright has extensive knowledge about communities of interest and political subdivisions in Georgia. Thus, Ms. Wright's testimony regarding communities of interest and political subdivisions in Georgia is highly credible.

Having discussed the expert witnesses relevant to the analysis of the first Gingles precondition in these cases.

### b) **First *Gingles* Precondition Legal Standard**

To satisfy the first Gingles precondition, the plaintiffs must establish that Black voters as a group are "sufficiently large and geographically compact to

constitute a majority in some reasonably configured legislative district." Cooper, 137 S. Ct. at 1470 (internal quotation marks omitted). "When applied to a claim that single-member districts dilute minority votes, the first Gingles [pre]condition requires the possibility of creating more than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice." Johnson v. De Grandy, 512 U.S. 997, 1008 (1994). Although "[p]laintiffs typically attempt to satisfy [the first Gingles precondition] by drawing hypothetical majority-minority districts," Clark, 88 F.3d at 1406, such illustrative plans are "not cast in stone" and are offered only "to demonstrate that a majority-[B]lack district is feasible," Clark v. Calhoun Cnty., 21 F.3d 92, 95 (5th Cir. 1994); see also Bone Shirt v. Hazeltine, 461 F.3d 1011, 1019 (8th Cir. 2006) (same); Solomon, 899 F.2d at 1018 n.7 (Kravitch, J., specially concurring) ("So long as the potential exists that a minority group could elect its own representative in spite of racially polarized voting, that group has standing to raise a vote dilution challenge under the Voting Rights Act." (citing Gingles, 478 U.S. at 50 n.17)).

### (1) Numerosity

The plaintiffs must show that the Black population is sufficiently numerous to create an additional majority-minority district. "In majority-

minority districts, a minority group composes a numerical, working majority of the voting-age population. Under present doctrine, [Section] 2 can require the creation of these districts." Bartlett v. Strickland, 556 U.S. 1, 13 (2009) (plurality op.). "[A] party asserting [Section] 2 liability must show by a preponderance of the evidence that the minority population in the potential election district is greater than 50 percent." Id. at 19–20. When a voting rights "case involves an examination of only one minority group's effective exercise of the electoral franchise[,] . . . it is proper to look at *all* individuals who identify themselves as black" when determining a district's Black Voting Age Population ("BVAP"). Ashcroft, 539 U.S. at 474 n.1 (2003); see also Fayette Cnty., 118 F. Supp. 3d at 1343 n.8 ("[T]he Court is not willing to exclude Black voters who also identify with another race when there is no evidence that these voters do not form part of the politically cohesive group of Black voters in Fayette County.").

In determining whether a district is sufficiently numerous, Courts use the Any Part Black Voting Age Population ("AP BVAP") demographics, not single-race black demographics. The Supreme Court concluded that "it is proper to look at *all* individuals" even if they "self-identify as both [B]lack and a member of another minority group," because the case involved "an

53

examination of only one minority group's effective exercise of the electoral franchise." Ashcroft, 539 U.S. at 473 n.1 (2003). Because this Court must decide a case that involves claims about Georgia's Black population's effective exercise of the electoral franchise, this Court relies on the AP BVAP metric.

### (2) *Compactness*

The plaintiffs must show that Georgia's Black population can form additional reasonably compact Congressional, State Senate, and State House districts. Under the compactness requirement of the first Gingles precondition, Plaintiffs must show that it is "possible to design an electoral district[] consistent with traditional redistricting principles." Davis v. Chiles, 139 F.3d 1414, 1425 (11th Cir. 1998). Compliance with this criterion does not require that the illustrative plans be equally or more compact than the enacted plans; instead, this criterion requires only that the illustrative plans contain reasonably compact districts. An illustrative plan can be "far from perfect" in terms of compactness yet satisfy the first Gingles precondition. Wright v. Sumter Cnty. Bd. of Elections & Registration, 301 F. Supp. 3d 1297, 1326 (M.D. Ga. 2018), aff'd, 979 F.3d 1282 (11th Cir. 2020). "While no precise rule has emerged governing § 2 compactness," League of United Latin American Citizens (LULAC) v. Perry, 548 U.S. 399, 433 (2006), plaintiffs satisfy the first

Gingles precondition when their proposed majority-minority district is "consistent with traditional districting principles," Davis, 139 F.3d at 1425.

These traditional districting principles include "maintaining communities of interest and traditional boundaries," "geographical compactness, contiguity, and protection of incumbents. Thus, while Plaintiffs' evidence regarding the geographical compactness of their proposed district does not alone establish compactness under § 2, that evidence, combined with their evidence that the district complies with other traditional redistricting principles, is directly relevant to determining whether the district is compact under § 2." Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs, 950 F. Supp. 2d 1294, 1307 (N.D. Ga. 2013) (citations omitted), aff'd in part, rev'd in part on other grounds, 775 F.3d 1336 (11th Cir. 2015).

Plaintiffs' Illustrative Plans must comply with the one person one vote requirement under the Equal Protection Clause. Fayette Cnty., 996 F. Supp. 2d at 1368.

### c)     Pendergrass

The Court finds that the Pendergrass Plaintiffs have established that they are substantially likely to succeed on the merits of showing that it is possible to create an additional majority-minority congressional district in the western

Atlanta metropolitan area that complies with the relevant considerations under Gingles.

The Pendergrass Plaintiffs move for an order preliminarily enjoining Defendants from enforcing the boundaries of the congressional districts as drawn in the Georgia Congressional Redistricting Act of 2021, which they claim violates Section 2 by failing to include an additional congressional district in the western Atlanta metropolitan area in which Black voters would have the opportunity to elect their preferred candidates. Pendergrass Doc. No. [32], 2. In particular, the Pendergrass Plaintiffs contend that the new congressional map packs Black voters into the Thirteenth Congressional District—which has a BVAP over 66% and includes south Fulton, north Fayette, Douglas, and Cobb Counties—and cracks other Black voters among the more rural and predominately white Third, Eleventh, and Fourteenth Congressional Districts. Pendergrass Doc. No. [32-1], 4, 6–7. The Pendergrass Plaintiffs argue that increases in Georgia's Black population over the last decade, along with concurrent decreases in the state's white population, create an opportunity for an additional majority-minority congressional district that the State did not draw. See id. at 5, 9–10. Specifically, Plaintiffs contend that they can satisfy the first Gingles precondition by showing that an additional, compact majority-

minority district can be drawn in the western Atlanta metropolitan area. Id. at

9–10. Plaintiffs rely on the following illustrative plan by expert demographer

William S. Cooper to demonstrate how such a district could be drawn.



GPX 1, at 65–66. With Mr. Cooper's illustrative congressional plan, the

Pendergrass Plaintiffs contend that they have drawn an illustrative

Congressional District 6—which includes parts of Cobb, Douglas, Fulton, and

Fayette Counties—that is majority AP Black and thus would allow Black voters

to elect their preferred candidates. Pendergrass Doc. No. [32-1], 10; GPX 1,

¶¶ 47–48 & fig.8. Moreover, Plaintiffs argue that Mr. Cooper's illustrative congressional district is sufficiently compact and complies with other traditional redistricting principles such as population equality, contiguity, maintaining political boundaries and communities of interest, and avoiding pairing of incumbents. Pendergrass Doc. No. [32-1], 10.

Because the first Gingles precondition requires showings that the relevant minority population is "sufficiently large and geographically compact to constitute a majority in a single-member district," LULAC, 548 U.S. at 425 (quoting De Grandy, 512 U.S. at 1006–07), the Court now turns to discussion of whether the Pendergrass Plaintiffs have made those showings with their proposed congressional plan.

### (1) Numerosity

The first Gingles precondition requires a "numerosity" showing that "minorities make up more than 50 percent of the voting-age population in the relevant geographic area." Bartlett v, 556 U.S. at 18. The Court finds that the Pendergrass Plaintiffs have established that the AP BVAP in the western Atlanta metropolitan area is sufficiently numerous to constitute a majority of the voting-age population in a new congressional district in the western Atlanta metropolitan area. Below, the Court will discuss relevant demographic

developments in Georgia and then turn to how those developments inform review of the enacted and illustrative congressional maps.

**(a)** **Demographic developments in Georgia**

The U.S. Census Bureau releases population and demographic data to the states after each census for use in redistricting. Pendergrass Stip. ¶ 24. The Census Bureau provided initial redistricting data to Georgia on August 12, 2021. Id. ¶ 25. This data shows that from 2010 to 2020, Georgia's population grew by over 1 million people to 10.71 million, up 10.6% from 2010. Id. ¶ 26; GPX 1, ¶ 13. Based upon Georgia's population, it maintained its fourteen seats in the U.S. House of Representatives. Pendergrass Stip. ¶ 27.

Georgia's population growth since 2010 can be attributed to increases in the state's overall minority population. GPX 1, ¶ 14 & fig.1. For example, from 2010 to 2020, Georgia's Black population increased by almost half a million people, up nearly 16% in that time. Pendergrass Stip. ¶ 28; GPX 1, ¶ 15. During that decade, 47.26% of the state's population gain was attributable to Black population growth. Pendergrass Stip. ¶ 29; GPX 1, ¶ 14 & fig.1. Indeed, Georgia's Black population, as a share of the overall statewide population, increased from 31.53% in 2010 to 33.03% in 2020. GPX 1, ¶ 16 & fig.1. And as a

matter of total population, AP Black Georgians comprise the largest minority population in the state (at 33.03%). <u>Pendergrass</u> Stip. ¶ 32.

Georgia's white population, however, decreased by 51,764 persons, or approximately 1%, from 2010 to 2020. <u>Pendergrass</u> Stip. ¶ 30; GPX 1, ¶ 15 & fig.1. As a result, while non-Hispanic white Georgians remain a majority of the state's population, it is by a slim margin—50.06%. GPX 1, ¶ 17.

Georgia's Black population has increased in absolute and percentage terms since 1990, from about 27% in 1990 to 33% in 2020. <u>Pendergrass</u> Stip. ¶ 31. In that time, the Black population has more than doubled: from 1.75 million to 3.54 million, an increase that is the equivalent of the populations of more than two congressional districts. GPX 1, ¶ 22 & fig.3. Over the same period, the non-Hispanic white population also increased, but at a slower rate: from 4.54 million to 5.36 million, amounting to an increase of about 18% over the three-decade period. GPX 1, ¶ 22 & fig.3. And the percentage of Georgia's population identifying as non-Hispanic white has dropped from about 70% to just over 50%. <u>See</u> <u>Pendergrass</u> Stip. ¶ 31; GPX 1, ¶ 21 & fig.3.

As of the 2020 census, Georgia has a total voting-age population of 8,220,274, of whom 2,607,986 (31.73%) are AP Black. <u>Pendergrass</u> Stip. ¶ 33;

GPX 1, ¶ 18 & fig.2. The total estimated citizen voting-age population in Georgia in 2019 was 33.8% AP Black. <u>Pendergrass</u> Stip. ¶ 34; GPX 1, ¶ 20.

The Atlanta Metropolitan Statistical Area (the "Atlanta MSA") consists of the following twenty-nine counties: Barrow, Bartow, Butts, Carroll, Cherokee, Clayton, Cobb, Coweta, Dawson, DeKalb, Douglas, Fayette, Forsyth, Fulton, Gwinnett, Haralson, Heard, Henry, Jasper, Lamar, Meriwether, Morgan, Newton, Paulding, Pickens, Pike, Rockdale, Spalding, and Walton. <u>Pendergrass</u> Stip. ¶ 35; GPX 1, ¶ 12 n.3. The Atlanta MSA has driven Georgia's population growth in recent decades, due in part to a large increase in the region's Black population. <u>See</u> GPX 1, ¶ 24 & fig.4. Between 2010 and 2020, the overall population in the Atlanta MSA grew by 803,087 persons—greater than the population of a Georgia congressional district. <u>See</u> GPX 1, ¶ 29 & fig.5.[12] About half of that increase was attributable to the Atlanta MSA's Black population growing by 409,927 persons (or 23.07%). GPX 1, ¶ 29 & fig.5.[13] And looking at the period from 2000 to 2020, the Black population in the Atlanta

---

[12] According to the 2020 Census, the Atlanta MSA now has a total voting-age population of 4,654,322 persons. GPX 1, ¶ 30 & fig.6.

[13] According to the 2020 Census, the Atlanta MSA's voting-age population now includes 1,622,469 (34.86%) AP Black persons and 4,342,333 (52.1%) non-Hispanic white persons. GPX 1, ¶ 30 & fig.6.

MSA grew from 1,248,809 to 2,186,815 in 2020—or 938,006 persons. Pendergrass Stip. ¶ 36.[14]

This increase in the Atlanta MSA's Black population contrasts with the comparative decrease in the non-Hispanic white population in the same area. Under the 2000 Census, the population in the Atlanta MSA was 60.42% non-Hispanic white. GPX 1, ¶ 24 & fig.4. That share decreased to 50.78% in 2010 and then further to 43.71% in 2020. Id. In fact, between 2010 and 2020, the non-Hispanic white population in the Atlanta MSA decreased by 22,736 persons. Pendergrass Stip. ¶ 37; GPX 1, ¶ 24 & fig.4.

Demographic trends in another sub-group of counties provide further insight. The eleven core counties of the Atlanta Regional Commission ("ARC") service area are Cherokee, Clayton, Cobb, DeKalb, Douglas, Fayette, Forsyth, Fulton, Gwinnett, Henry, and Rockdale. Feb. 7, 2022, Morning Tr. 96:3–10. According to the 2020 Census, these ARC counties account for more than half (54.7%) of Georgia's Black population. GPX 1, ¶ 27. When considering the

---

[14] Charting the percentage share growth over the last two decades also illustrates the increases in the AP Black population in the Atlanta MSA: The AP Black population in the Atlanta MSA was 29.29% in 2000, which increased to 33.61% in 2010 and then further to 35.91% in 2020. Pendergrass Stip. ¶ 36.

entire Atlanta MSA (including the ARC counties), the Atlanta metropolitan area encompasses 61.81% of Georgia's Black population. Id.

And focusing more particularly on the area in which the illustrative District 6 is located, the 2020 Census shows that the combined Black population in Cobb, Fulton, Douglas, and Fayette Counties is 807,076 persons, which is more than necessary to constitute either an entire congressional district or a majority in two congressional districts. GPX 1, ¶ 40 & fig.7. More than half (53.27%) of the total population increase in these four counties since 2010 can be attributed to the increase in the counties' Black population. Id. ¶ 41.

**(b)** **Georgia's 2021 congressional plan**

Georgia's Enacted 2021 Congressional Plan contains two majority-minority districts using the AP BVAP metric—Districts 4 and 13. See Pendergrass Stip. ¶ 48. The Enacted Congressional Plan places Districts 3, 6, 11, 13, and 14 in the northwestern part of the state, including areas in the western portions of the Atlanta MSA.



GPX 1, at 55–56. The Enacted Congressional Plan reduces Congressional District 6's[15] AP BVAP from 14.6% under the prior congressional plan to 9.9%. Pendergrass Stip. ¶ 49; GPX 1, ¶ 38. Under the 2021 plan, Congressional District 13 has an AP BVAP of over 66%. Pendergrass Stip. ¶ 50. Under the Enacted Congressional Plan, Congressional Districts 3, 11, and 14 border Congressional District 13. Id. ¶ 51.

Mr. Cooper observed that "District 13 is packed with African-American voters. Under the 2021 plan it's almost 65 percent, a little bit over 65 percent black voting age." Feb. 7, 2022, Morning Tr. 45:4–6. Mr. Cooper concluded that "it would be very easy to unpack that population so that there are fewer African Americans living in the district but still a clear majority black voting age population district. And in so doing create an additional majority black district in western metro Atlanta that would include a little part of Fayette County and south Fulton County, . . . eastern Douglas County and central Southern Cobb County." Id. at 45:7–14. Mr. Cooper further observed that "the fragmentation of the black population . . . is most evident in Cobb County. Cobb County has

---

[15] The Court takes judicial notice that Congresswoman Lucy McBath, a Black woman, was elected to represent Congressional District 6 in 2018 and won reelection in 2020, even though the AP BVAP for the district was 14.6%.

been split four ways under the enacted plan . . . . As it now stands, the enacted plan takes population that is just a few minutes away from downtown Atlanta in western Cobb County and puts it in District 14, which goes all the way to the suburbs of Chattanooga." Id. at 46:19–47:4.

### (c) The Pendergrass Plaintiffs' illustrative congressional plan

Analyzing the demographic trends discussed above, as well as the enacted congressional map, Mr. Cooper concludes that "[t]he Black population in metropolitan Atlanta is sufficiently numerous and geographically compact to allow for the creation of an additional compact majority-Black congressional district anchored in Cobb and Fulton Counties (District 6 in the Illustrative Plan)." GPX 1, ¶¶ 10, 42, 59. Mr. Cooper opines that this "additional congressional district can be merged into the enacted 2021 Plan without making changes to six of the 14 districts: CD 1, CD 2, CD 5, CD 7, CD 8, and CD 12 are unaffected." Id. ¶ 11; see also id. ¶ 46 ("The result leaves intact six congressional districts in the enacted plan, modifying eight districts in the 2021 Plan to create an additional majority-Black district in and around Cobb and Fulton Counties."); Feb. 7, 2022, Morning Tr. 51:6–20 (Mr. Cooper's testimony about the unchanged districts).

Mr. Cooper drew an illustrative congressional plan that includes an additional majority-minority congressional district—illustrative Congressional District 6—in the western Atlanta metropolitan area. Pendergrass Stip. ¶ 52; GPX 1, ¶¶ 47–48 & fig.8. Mr. Cooper's Illustrative Congressional District 6 has an AP BVAP of 50.23% and a non-Hispanic Black citizen voting-age population ("BCVAP") of 50.69%. Pendergrass Stip. ¶ 53; GPX 1, ¶ 47.[16] Mr. Cooper's Illustrative Congressional Plan includes three total majority-minority districts using the any part BVAP metric and five total majority-minority districts using the non-Hispanic BCVAP metric. Pendergrass Stip. ¶ 55.[17]

Neither Mr. Morgan nor Ms. Wright disputes that Mr. Cooper's Illustrative Congressional District 6 is a majority-minority district under both the AP BVAP and non-Hispanic BCVAP metrics. See DX 3, ¶ 9 (Mr. Morgan's expert report noting that Mr. Cooper's Illustrative Congressional District 6 has a "50.2% any-part Black voting age population"); DX 41, ¶ 29 (Ms. Wright's expert report acknowledging that Mr. Cooper's Illustrative Congressional

---

[16] District 6 is below 50% on other racial metrics, including single-race BVAP and the percentage of registered voters who are Black. See DX 43. As stated above, however, this Court is relying on the AP Black metric.

[17] As a result of the adjustments in the illustrative map, District 13 went from having a 66.75% BVAP to having a 51.40% BVAP, and District 4 went from having a 54.42% BVAP to a 52.40% BVAP. See GPX 2, ¶ 5 & fig.1.

District 6 is "over the 50% threshold on any part Black").[18] Both Mr. Morgan and Ms. Wright admitted during the hearing that Mr. Cooper's illustrative Congressional District 6 has an AP BVAP of 50.23%. See Feb. 11, 2022, Morning Tr. 82:21–83:7 (Ms. Wright); Feb. 11, 2022, Afternoon Tr. 233:19–234:1 (Mr. Morgan). Although Ms. Wright claimed that Mr. Cooper's illustrative Congressional District 6 "is below 50% Black on voter registration" (DX 41, ¶ 29), she admitted during the hearing that more than 8% of registered voters are of unknown race and that this qualifying information was not included in her expert report.[19] See Feb. 11, 2022, Morning Tr. 71:10–78:12.

Notably, Mr. Cooper's illustrative plan does not reduce the number of preexisting majority-minority districts in the enacted congressional plan. See GPX 1, ¶ 51; GPX 2, ¶ 5 & fig.1. Mr. Cooper testified that creating an additional majority-minority congressional district in the western Atlanta metropolitan

---

[18] While Mr. Morgan notes that District 6 is "a *barely* majority Black district at 50.2%" AP BVAP (DX 3, ¶ 9 (emphasis added)), the question is whether the illustrative district is majority Black. Bartlett, 556 U.S. at 18. Because 50.2% is a majority, the Court finds that the numerosity requirement is met.

[19] Ms. Wright's report and testimony at trial referenced demographic statistics used by the Secretary of State's Office. See DX 41, ¶¶ 10–12, 21, 27–29; Feb. 11, 2022, Morning Tr. 71:10–78:12. Because this information was not attached to Ms. Wright's expert report, or submitted as an exhibit at trial, the Court requested that counsel for Defendants provide said statistics to the Court for review. Feb. 11, 2022, Morning Tr. 80:15–18. The Court reviewed the demographic statistics when preparing this Order.

area with the Black communities in Cobb, Douglas, Fulton, and Fayette Counties "was extremely easy to do" and "not a complicated plan drawing project." Feb. 7, 2022, Morning Tr. 53:6–8. Mr. Cooper emphasized this point throughout the hearing. E.g., id. at 69:6–9 (stating that "it was extraordinarily easy to draw this additional majority black district in the western part of metro Atlanta" and that "[i]t basically just draws it[self]"); id. at 75:11–12 (Mr. Cooper's testimony: "There are no complexities here like there might be in other states. This is just drop-dead obvious.").

Based on the expert reports and testimony provided in this case, the Court concludes that Mr. Cooper's illustrative congressional plan contains an additional majority-minority congressional district.

Based on the expert reports and testimony provided in this case, the Court concludes that Mr. Cooper's Illustrative Congressional Plan contains an additional majority-Black congressional district. Thus, the Court finds that the Pendergrass Plaintiffs have satisfied the numerosity component of the first Gingles precondition.

### (2) Geographic Compactness

To satisfy the first Gingles precondition, the Pendergrass Plaintiffs must also show that their proposed majority-Black congressional district is

sufficiently compact. This compactness requirement under Gingles requires a showing that it is "possible to design an electoral district[] consistent with traditional redistricting principles." Davis, 139 F.3d at 1425.

The redistricting guidelines adopted by the Georgia General Assembly provide that those drawing new districts should account for or consider population equality, compactness, contiguity, respect for political subdivision boundaries and communities of interest, and compliance with Section 2 of the Voting Rights Act. See GPX 40. Mr. Cooper testified that his Illustrative Map adheres to these and other neutral districting criteria. See Feb. 7, 2022, Morning Tr. 48:16–50:21 (Mr. Cooper's testimony describing traditional districting principles employed during his map-drawing process). Mr. Cooper explained that none of the traditional districting principles predominated when he drew his Illustrative Congressional Plan; instead, he "tried to balance them all" and "did not prioritize anything other than specifically meeting the one-person, one-vote zero population ideal district size." Id. 50:22–51:2.

For the reasons discussed below, the Court finds that the Pendergrass Plaintiffs' Illustrative Plan comports with traditional redistricting principles — including those enumerated in the General Assembly's redistricting guidelines.

Thus, the Court finds that the <u>Pendergrass</u> Plaintiffs satisfy the remainder of the first <u>Gingles</u> precondition analysis.

### (a)   Population equality

First, an illustrative plan must comply with the one-person, one-vote principle. <u>See</u> <u>Wright</u>, 301 F. Supp. 3d at 1325–26; <u>see also</u> <u>Reynolds</u>, 377 U.S. at 577 ("[T]he Equal Protection Clause requires that a State make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as practicable.").

Mr. Cooper's expert report demonstrates that his Illustrative Plan contains minimal population deviation. <u>See</u> GPX 1 at 67–68; Feb. 7, 2022, Morning Tr. 55:12–18 (Mr. Cooper's testifying that population equality is "reflected with perfection [in his illustrative map] because the districts are plus or minus one person"). Accordingly, the Court finds that Mr. Cooper's Illustrative Congressional Map complies with the one-person, one-vote principle.

### (b)   Compactness

Second, as discussed in greater detail above, an illustrative plan must contain "reasonably compact" districts. <u>See</u> <u>Bush v. Vera</u>, 517 U.S. 952, 979 (1996). Mr. Cooper testified that "there is no bright line rule" for compactness,

"nor should there be" given that "so many factors [] enter into the equation" —including, in Georgia, the fact that "municipal boundaries in many [c]ounties [] are not exactly compact." Feb. 7, 2022, Morning Tr. 60:14–24.

The parties' experts evaluated the Enacted Congressional Plan and Mr. Cooper's Illustrative Plan using the Reock and Polsby-Popper analyses, two commonly used measures of a district's compactness. See GPX 1, ¶ 54 & nn.11–12 & fig.10; DX 1, ¶ 17 & chart 2; see also Comm. for a Fair & Balanced Map v. Ill. State Bd. of Elections, 835 F. Supp. 2d 563, 570 (N.D. Ill. 2011) (referring to "the Polsby–Popper measure and the Reock indicator" as "two widely acceptable tests to determine compactness scores"). The Reock test is an area-based measure that compares each district to a circle, which is considered to be the most compact shape possible. GPX 1, ¶ 54 & n.11. For each district, the Reock test computes the ratio of the area of the district to the area of the minimum enclosing circle for the district. Id. The measure is always between 0 and 1, with 1 being the most compact. Id.; see also Feb. 7, 2022, Morning Tr. 59:21–60:4 (Mr. Cooper describing the Reock score as "just creating a number between zero and one to compare the area of a district with a circle drawn around the district, and so the higher you are towards one, the more compact the district would be under that measure"). The Polsby-Popper test,

on the other hand, computes the ratio of the district area to the area of a circle with the same perimeter. GPX 1, ¶ 54 n.12. The measure is always between 0 and 1, with 1 being the most compact. Id.; see also Feb. 7, 2022, Morning Tr. 60:5–13 (Mr. Cooper's testimony describing the Polsby-Popper measure). In discussing these methods of measuring compactness scores, Defendants' mapping expert Mr. Morgan stated that while he would not assert that a certain score would be a universally applicable threshold for compactness, the compactness scores generally "are usually useful in comparing one plan to another" and that "when you do a lot of comparisons, you can see some cases where things are considerably less compact than others." Feb. 11, 2022, Afternoon Tr. 226:2–11.

Mr. Cooper reported that the mean Reock score for his Illustrative Plan is 0.40, compared to a mean score of 0.43 for the Enacted Plan, and that the mean Polsby-Popper score for this Illustrative Plan is 0.23, compared to 0.25 for the Enacted Plan. GPX 1, ¶ 54 & fig.10; see also id. at 78–83. Mr. Morgan confirmed these figures in his report. See DX 3, ¶ 17; see also Feb. 11, 2022, Afternoon Tr. 243:3–9. The following table included in Mr. Morgan's report compares, on a district-by-district level for the eight congressional districts

changed in Mr. Cooper's Illustrative Plan, the compactness measures of Mr. Cooper's illustrative districts to those of the districts in the Enacted Map:

| Proposed Remedial Districts /Adopted Districts | Adopted Plan Reock | Cooper Remedial Plan Reock | Adopted Plan Polsby-Popper | Cooper Remedial Polsby-Popper |
|---|---|---|---|---|
| Congress 003 | **0.46** | 0.40 | **0.28** | 0.25 |
| Congress 004 | **0.31** | 0.29 | **0.25** | 0.21 |
| Congress 006 | **0.42** | 0.38 | **0.20** | 0.16 |
| Congress 009 | 0.38 | **0.40** | 0.25 | **0.32** |
| Congress 010 | **0.56** | 0.40 | **0.28** | 0.18 |
| Congress 011 | **0.48** | 0.40 | **0.21** | 0.16 |
| Congress 013 | 0.38 | **0.42** | 0.16 | **0.25** |
| Congress 014 | 0.43 | **0.48** | **0.37** | 0.34 |

DX 1, ¶ 17 & chart 2. Mr. Cooper testified that, "practically speaking, there is no difference" between compactness measures for the Illustrative and Enacted Congressional Plans. Feb. 7, 2022, Morning Tr. 61:4–15. Mr. Cooper also testified that the compactness measures for his Illustrative Congressional Plan are "[i]n the usual range. There is no problem with the compactness per se in either" the Enacted or Illustrative Congressional Plans. Id. at 61:16–20. Further, while Mr. Morgan stated that Mr. Cooper's Illustrative Congressional Plan is "less compact overall" than the Enacted Plan (DX 3, ¶ 17), he did not opine that Mr. Cooper's Illustrative Plan is not reasonably compact. Feb. 11, 2022,

Afternoon Tr. 243:19–244:1; see also id. at 228:3–16 (Mr. Morgan conceding that there is no minimum compactness threshold for districts under Georgia law).

Given the evidence discussed above, the Court finds that Mr. Cooper's Illustrative Congressional Map has comparable compactness scores to Georgia's enacted 2021 congressional plan. More specifically, after reviewing the compactness measures supplied by the expert reports in this case and listening to the expert testimony at the preliminary injunction hearing, the Court concludes that the districts in Mr. Cooper's Illustrative Plan are reasonably compact for purposes of the first Gingles precondition analysis. And beyond recognizing that the numerical compactness measures indicate that the affected districts in the Illustrative Plan are sufficiently compact, the Court finds that the districts in the Illustrative Plan pass the "eyeball test" in that they appear from a visual review to be compact. See Ala. State Conf. of NAACP v. Alabama, No. 2:16-CV-731-WKW, 2020 WL 583803, at *20 (M.D. Ala. Feb. 5, 2020) ("District 1 is contiguous and also passes the eyeball test for geographical compactness."); Comm. for a Fair & Balanced Map, 835 F. Supp. 2d at 571 (noting a district's Polsby-Popper and Reock scores but also stating that the district "passe[d] muster under the 'eyeball' test for compactness"). Accordingly, the Court finds that Mr. Cooper's Illustrative

Congressional Plan is consistent with the traditional districting principle of compactness.

### (c) Contiguity

Third, an illustrative plan's district must be contiguous. See Davis, 139 F.3d at 1425. The parties do not dispute that Mr. Cooper's Illustrative Congressional Map contains contiguous districts. See Feb. 7, 2022, Morning Tr. 62:4–14 (Mr. Cooper's testimony confirming that his illustrative districts are contiguous).

### (d) Preservation of political subdivisions

Fourth, an illustrative plan should consider the "preservation of significant political and geographic subdivisions." See Adamson, 876 F. Supp. 2d at 1353.

Mr. Cooper testified that he "attempted to avoid splitting counties where unnecessary and avoid splitting towns and municipalities." Feb. 7, 2022, Morning Tr. 55:19–56:22. However, he also noted that "to meet one-person, one-vote in the congressional plan, it is absolutely necessary to split some counties." Id. at 56:3–5. In those cases, Mr. Cooper "would try to split the county by precinct," though splitting precincts was also sometimes necessary to achieve population equality. Id. at 56:6–10. If splitting a precinct was

necessary, Mr. Cooper "would follow, if possible, a municipal boundary or an observable boundary like a road or waterway. And in some cases, [Mr. Cooper] generally follow[ed] observable boundaries, but also rel[ied] on a census bureau boundary that is established, known as a block group." Id. at 56:11–19.

As Mr. Morgan notes, Mr. Cooper's plan splits more political subdivisions than the Enacted Plan does. DX 3, ¶ 15. Overall, however, the Court finds that county, voting district ("VTD"),[20] and municipal splits are comparable between the Enacted Congressional Plan and Mr. Cooper's Illustrative Plan. Although thirteen counties are split in Mr. Cooper's Illustrative Plan (compared to twelve in the Enacted Plan), Mr. Cooper's Illustrative Plan includes fewer unique county-district combinations than the Enacted Plan—fourteen compared to nineteen—indicating fewer splits overall. See GPX 1, ¶ 55 & fig.11; id. at 84–91; Feb. 7, 2022, Morning Tr. 56:20–57:21 (Mr. Cooper's testimony distinguishing between number of counties that are split as opposed to number of splits total). Further, Mr. Cooper's Illustrative

---

[20] The term "voting district" is "a generic term adopted by the Bureau of the Census to include the wide variety of small polling areas, such as election districts, precincts, or wards, that State and local governments create for the purpose of administering elections." U.S. Census Bureau, https://www2.census.gov/geo/pdfs/reference /GARM/Ch14GARM.pdf (last visited February 27, 2022).

Congressional Plan splits fewer municipalities than the Enacted Plan: seventy-nine compared to ninety. See GPX 1, ¶ 55 & fig.11; id. at 92–97; Feb. 7, 2022, Morning Tr. 57:22–58:4 (Mr. Cooper's testimony describing municipality splits). Mr. Cooper's Illustrative Congressional Plan splits only five more VTDs than the Enacted Plan. See GPX 1, at 84–91; Feb. 7, 2022, Morning Tr. 58:5–59:3 (Mr. Cooper's testimony describing VTD splits). And as compared to the Enacted Congressional Plan, in which Cobb County is divided among four congressional districts, Mr. Cooper's Illustrative Plan divides Cobb County between only two congressional districts. Feb. 7, 2022, Morning Tr. 46:23–47:1, 53:9–22.

Based on the record, the Court finds that Mr. Cooper's Illustrative Congressional Plan sufficiently respects political subdivision boundaries for purposes of the first Gingles precondition. While Mr. Cooper's plan splits more political subdivisions than the Enacted Plan splits, the difference is small and not material. Further, the Court finds that Mr. Cooper provided convincing and permissible reasons for why he opted to split many of the political subdivisions he did split. E.g., Feb. 7, 2022, Morning Tr. 55:21–59:3, 83:2–20 (explaining that he had to split certain counties in order to comply with the one-person, one-

vote requirement). On balance, the Court finds that the Illustrative Plan adequately respects political subdivision boundaries.

### (e) Preservation of communities of interest

Fifth, an illustrative map should seek to keep communities of interest together in the same districts. See LULAC, 548 U.S. at 432–33. The Supreme Court has indicated that communities of interest may form by commonalities in "socio-economic status, education, employment, health, and other characteristics." See id. at 432 (citation omitted); see also Perez v. Abbott, No. SA-11-CV-360, 2017 WL 1406379, at *60 (W.D. Tex. Apr. 20, 2017) (recognizing communities of interest that shared "socioeconomic issues, poverty, lack of good jobs, and lack of access to health services and public hospitals"). "The recognition of nonracial communities of interest reflects the principle that a State may not assume from a group of voters' race that they think alike, share the same political interests, and will prefer the same candidates at the polls." LULAC, 548 U.S. at 432–33 (cleaned up). But the Supreme Court has also noted "evidence that in many cases, race correlates strongly with manifestations of community of interest (for example, shared broadcast and print media, public

transport infrastructure, and institutions such as schools and churches).” <u>Bush</u>, 517 U.S. at 964.[21]

With these principles in mind, the Court now turns to discuss whether the <u>Pendergrass</u> Plaintiffs’ Illustrative Map respects communities of interest. Because the relevant portions of the Enacted Map and the <u>Pendergrass</u> Plaintiffs’ Illustrative Map are in the western portion of the state, the Court focuses its discussion on those districts.

Referring to the Enacted Congressional District 14, Mr. Cooper testified, “I think you would be hard-pressed to find anything with relation to south Cobb County that would connect that part of District 14 to the remainder, particularly since District 14 extends way to the north. So it’s really— it’s really getting into an Appalachian Regional commission territory. It’s just not the same.” Feb. 7, 2022, Morning Tr. 47:5–15. When asked by the Court how he would describe southwest Cobb County, Mr. Cooper responded, “Suburban.” <u>Id.</u> at 47:16–18.

---

[21] While Georgia’s redistricting guidelines provide that communities of interest should be considered when districts are being drawn, the guidelines do not define what constitutes a community of interest. <u>See</u> GPX 40, at 2.

Jason Carter, a former member of the State Senate and candidate for Governor of Georgia during the 2014 election, agreed that the treatment of Cobb County in the enacted congressional map does not serve a clear community of interest, noting that it "looks like . . . you are taking bits and pieces of Cobb County and you are sticking them in these districts that are very, very different from Cobb County." Feb. 10, 2022, Afternoon Tr. 127:8–20. Mr. Carter explained that this "part of Cobb [County] is essentially Metro Atlanta. It's a suburban part . . . . And if you look at [Chattooga] County or some of these others, we are talking about rural, mountain counties in essence that are not part of the Metro Atlanta area at all and [confront] very different sets of issue[s], it would seem to me." Id. at 127:21–128:8. He further explained the difficulties that Cobb County residents would have in securing representation due to being included in more rural-reaching congressional districts: "[I]f you are in a part of that district that is, again, buried as an appendage, in a district that has a significant number of other interests, then you are not going to have the amount of responsiveness that you would otherwise have." Id. at 132:1–15.

Ms. Wright described southwest Cobb County as "municipalized" and "developed." Feb. 11, 2022, Morning Tr. 33:19–34:3. She also confirmed that this

area is "part of metro Atlanta." Id. at 34:4–5. By contrast, she described Polk and Bartow Counties in northwest Georgia—which are connected with southwest Cobb County in the Enacted Congressional Plan—as "more rural counties." Id. at 34:6–11.

Mr. Cooper explained that he looked at maps of Georgia's regional commissions and metropolitan statistical areas to guide his preservation of communities of interest. Feb. 7, 2022, Morning Tr. 62:15–63:17; see also Feb. 11, 2022, Morning Tr. 90:3–91:12 (Ms. Wright's testimony agreeing that a "community of interest is anything that unites people in an area and brings them together" and broadly defining communities of interest to include regions with shared commercial and economic interests). Mr. Cooper testified that he used these sources to derive communities with shared economic and transportation interests. Feb. 7, 2022, Morning Tr. 62:23–63:4. As depicted in his expert report, Mr. Cooper's illustrative Congressional District 6 is comprised of pieces of four counties—Cobb, Douglas, Fulton, and Fayette—that are among the 11 core ARC counties:



GPX 1, ¶ 47 & fig.8. As Mr. Cooper testified, "these [c]ounties are all part of core Atlanta," and the distances between them "are fairly small." Feb. 7, 2022, Morning Tr. 92:23–25; see also id. at 96:22–25 (Mr. Cooper's testimony characterizing 11 ARC counties as core Atlanta area). Mr. Cooper also testified that he was aware of the creation of at least four majority-Black Georgia State Senate districts in the western Atlanta metropolitan area under the newly enacted legislative maps. See GPX 2, ¶ 3; Feb. 7, 2022, Morning Tr. 103:4–14. He explained that "four Senate districts is one congressional, 14 times four is 56.

So that's why I was so confident at the outset that it was going to be likely that I could draw the additional majority black district in that part of the state." Feb. 7, 2022, Morning Tr. 103:15–22.

Commenting on Mr. Cooper's illustrative Congressional District 6, Mr. Carter testified, that it was "clearly" a "suburban district" in a "fast-growing" area of suburban Atlanta. Feb. 10, 2022, Afternoon Tr. 133:8–14. Mr. Carter noted that illustrative Congressional District 6 is an area within forty-five minutes of downtown Atlanta that confronts similar issues. See id. at 133:8–18. Mr. Carter described the interests that residents of the western Atlanta metropolitan area share, such as similar suburban school districts, transportation concerns ("the Atlanta traffic reports affect everybody's life in that part of West Cobb and it affects basically nobody's life in Gordon County"), and healthcare concerns. Id. at 128:9–129:11. Applying these shared concerns to Mr. Cooper's illustrative Congressional District 6, Mr. Carter testified that residents of these areas would have similar transportation, housing, and healthcare issues. Id. at 133:19–23. He further testified that Fulton, Cobb, and Douglas Counties are growing quickly "from a school district standpoint" and will "be in the kind of environments that are going to look familiar to each other." Id. at 133:23–134:2. Asked about shared infrastructure

concerns, Mr. Carter responded, "I think from an infrastructure standpoint, there is no doubt that the infrastructure needs here are really cohesive because you've got the traffic issues that are there . . . . And that also includes [] land use management . . . . [T]he Chattahoochee River runs through here and you are talking about drainage and land use and as these things are growing fast, the connectedness of this area is really real. So that infrastructure piece is another thing that links it together." Id. at 134:3–18.

Based on the record, the Court finds that Mr. Cooper's Illustrative Congressional Plan sufficiently respects communities of interest in the western Atlanta metropolitan area for purposes of the first <u>Gingles</u> precondition. Several witnesses testified that the areas constituting illustrative Congressional District 6 are developed and suburban in nature and generally face the same infrastructure, medical care, educational, and other critical needs. The Court finds that these needs, along with the relative geographic proximity given the compactness of the proposed district, combine to create a community of interest for <u>Gingles</u> purposes.

### (f) <u>Core Retention</u>

Next, the Court discusses the preservation of existing district cores, which is not an enumerated districting principle adopted by the Georgia

General Assembly. See GPX 40. Mr. Morgan opined that while the 2021 Enacted Congressional Plan "largely maintains existing district cores" from the prior congressional plan, Mr. Cooper's Illustrative Plan "makes drastic changes" to many of the districts from the prior plan. DX 3, ¶ 12 & chart 1. Mr. Cooper responds, however, that he could not avoid drawing illustrative districts with lower core retention scores than the districts in the Enacted Congressional Plan in light of his objective of satisfying the first Gingles precondition. See GPX 2, ¶ 4. As he explained in his expert report, "[c]ore retention is largely irrelevant when an election plan is challenged on the grounds that it violates Section 2[] of the VRA. The very nature of the challenge means that districts adjacent to the demonstrative majority-minority district must change, while adhering to traditional redistricting principles." Id.

During his testimony at the hearing, Mr. Morgan conceded that illustrative plans are necessarily different from enacted plans. Feb. 11, 2022, Afternoon Tr. 214:1–3. The Court also notes that Mr. Cooper's Illustrative Plan does not alter six of Georgia's fourteen congressional districts. See GPX 1, ¶¶ 11, 46; Feb. 7, 2022, Morning Tr. 51:6–20 (Mr. Cooper's testimony describing unchanged districts). As such, the Court finds that not only does Mr. Cooper's Illustrative Congressional Plan comply with the traditional districting

principles and the General Assembly's guidelines, his plan also does not alter existing district cores in a manner that counsels against finding that it satisfies the first <u>Gingles</u> precondition.

### (g) **Racial considerations**

Finally, the Court addresses whether Mr. Cooper subordinated traditional districting principles in favor of race-conscious considerations. A state cannot use race as the predominant factor motivating the decision to place a significant number of voters within or without a particular district, and the state is not allowed to subordinate other factors, such as compactness or respect for political subdivisions, to racial considerations. <u>Wright</u>, 301 F. Supp. 3d at 1325 (citations omitted). Thus, an illustrative plan should not subordinate traditional redistricting principles to racial considerations substantially more than is reasonably necessary to avoid liability under Section 2. <u>See</u> <u>Davis</u>, 139 F.3d at 1424.

Mr. Cooper was asked "to determine whether the African American population in Georgia is 'sufficiently large and geographically compact' to allow for the creation of an additional majority-Black congressional district in the Atlanta metropolitan area." GPX 1, ¶ 8 (footnotes omitted); <u>see also</u> Feb. 7, 2022, Morning Tr. 98:8–16. He testified that he was not asked to either "draw

as many majority black districts as possible" or "draw every conceivable way of drawing an additional majority black district." Id. at 98:17–24. And Mr. Cooper testified that if he had found that a majority-Black district could not have been drawn, he would have reported that to counsel, as he has "done [] in other cases." Id. at 98:25–99:24. Mr. Cooper testified that race "is something that one does consider as part of traditional redistricting principles" because "you have to be cognizant of race in order to develop a plan that respects communities of interest, as well as complying with the Voting Rights Act[,] because one of the key tenets of traditional redistricting principles is the importance of not diluting the minority vote." Id. at 48:4–15. Mr. Cooper emphasized that he accounted for other considerations when he drew his illustrative map, including the traditional districting principles described above. See id. at 48:16–51:5. Although he "was aware of the racial demographics for most parts of the state," race "certainly did not predominate." Id. at 51:3–5; see also id. at 50:22–51:2 (testifying that no factor was a predominant factor in drawing the Illustrative Plan); 99:25–100:9 (Mr. Cooper's testimony: "I looked at all of the factors that are part of the traditional redistricting principles and tried to balance them. So I tried to draw a compact district, a district that didn't split very many political subdivisions,

and we [have] already seen that the plan that I've drawn splits fewer municipalities than the adopted [] plan. And I looked at other factors, . . . the various traditional redistricting factors. The idea was to balance those factors and show that a district could be created if it could be created."); id. at 101:25–102:13 (similar).

Although Ms. Wright opined that she "cannot explain the decision to take District 6 into Fayette County" in Mr. Cooper's illustrative map (DX 41, ¶ 29), Mr. Cooper explained that "[t]o meet one-person one-vote requirements, one has to split Fayette County between District 13 and District 6 because if you put all of Fayette County in District 13, it would be overpopulated by . . . several thousand people." Feb. 7, 2022, Morning Tr. 64:22–65:8. Mr. Cooper noted that "the northern part of Fayette County" is "a racially diverse area. That is not overwhelmingly black. It's balanced to some part[s] of Cobb County where there is no racial majority." Id. at 82:6–18.

Similarly, Ms. Wright suggested that "District 13 reaches into Newton County in an unusual way that cannot be explained by normal redistricting principles" (DX 41, ¶ 29), but Mr. Cooper again explained that this was done "to balance populations out" because including all of Newton County in Congressional District 4 would have made that district overpopulated. Feb. 7,

2022, Morning Tr. 66:11–67:1. Ms. Wright also stated that "District 6 specifically grabs Black voters near Acworth and Kennesaw State University to connect them with other Black voters in South Cobb, Douglas, and Fulton Counties" (DX 41, ¶ 29), but Mr. Cooper explained that this decision was also made "to ensure that District 6 met population equality." Feb. 7, 2022, Morning Tr. 65:14–21. Mr. Cooper noted that the northern arm of his illustrative Congressional District 6 is not in "an area that is predominately black. It is a racially diverse area[.]" Id. at 65:21–66:2; see also id. at 84:4–7 (Mr. Cooper's testimony: "I was not trying to maximize the black voting age population of District 6 by going into . . . Kennesaw and Acworth."); id. at 85:18–86:4 (Mr. Cooper's testimony: "I had to go in some direction and pick up fairly heavily populated areas, and I knew Kennesaw and Acworth were racially diverse so from a community of interest standpoint it made sense to include that with central Cobb County, which is also racially diverse, and southern Cobb County, which is more predominantly black."); id. at 97:5–10 (Mr. Cooper's testimony: "That was an area with relative racial diversity. I thought it would fit into a majority black district. But I was not trying to identify majority black blocks to put into District 6 from that area.").

Indeed, when asked if "there [were] densely populated black areas in those [c]ounties that you didn't include in your illustrative map," Mr. Cooper confirmed that "there would be ways to enhance the black voting age population, not just in District 6 but elsewhere, by changing lines and perhaps splitting some additional [c]ounties." Feb. 7, 2022, Morning Tr. 66:3–10; see also id. at 97:11–19 (Mr. Cooper's testimony agreeing that he could have "done further changes to the plan that was adopted, perhaps, splitting an additional [c]ounty or something to find other areas to draw a majority black district"). In response to Ms. Wright's suggestion that "[t]he divisions of Cobb, Fayette, and Newton Counties do not make sense as part of normal redistricting principles" and were made "in service of some kind of specific goal" (DX 41, ¶ 29), Mr. Cooper confirmed that he did not have a single specific goal in mind when drawing his Illustrative Congressional Map, explaining that he was asked "to determine whether or not an additional majority black district could be created, but that was not the goal per se. I had to also follow traditional redistricting principles and then make an assessment as to whether that one additional black district could be determined. I determined that it could be, but that was not my goal per se." Feb. 7, 2022, Morning Tr. 68:5–20.

Given the record and the evidence discussed above, the Court finds that race did not predominate in the drawing of Mr. Cooper's Illustrative Congressional Plan. Specifically, the Court finds that Ms. Wright's criticisms of the Illustrative Plan are conclusory and lack analysis. For every unsupported conclusion she made that certain illustrative districts did not comply with traditional redistricting principles, Mr. Cooper offered detailed and readily understandable explanations for why he drew districts in the way he did and how his plan complies with traditional redistricting principles. Moreover, the Court finds that while Mr. Cooper was conscious of race when drawing the congressional districts, other redistricting principles were not subordinated.

### (3) Conclusions of Law

Thus, based on the evidence presented, the Court finds that the Pendergrass Plaintiffs' Illustrative Plan demonstrates that the Black population in the western Atlanta metropolitan area is sufficiently geographically compact to constitute a voting-age majority in an additional congressional district. Moreover, the Court finds that the Illustrative Plan is consistent with traditional redistricting principles. Accordingly, the Court finds that the Pendergrass Plaintiffs have shown a substantial likelihood to succeed on the merits of the first Gingles precondition.

### d)    Grant and Alpha Phi Alpha

The Court finds that the <u>Grant</u> and <u>Alpha Phi Alpha</u> Plaintiffs have sufficiently established that they are substantially likely to succeed on the merits in showing that it is possible to create two additional State Senate Districts and two State House Districts in the Atlanta Metropolitan area and one additional State House District in southwestern Georgia under relevant <u>Gingles</u> considerations.

In addition, as indicated above, Plaintiffs in both the <u>Grant</u> and <u>Alpha Phi Alpha</u> cases allege that the State maps passed in SB 2EX and HB 1EX violate Section 2 of the Voting Rights Act. Both the <u>Grant</u> and <u>Alpha Phi Alpha</u> Plaintiffs allege that the Georgia legislature should have drawn two additional Senate Districts in the southern metropolitan Atlanta area and one additional Senate District in the Eastern Black belt area. <u>Grant</u> Doc. No. [1], ¶¶ 41–42; <u>APA</u> Doc. No. [1], ¶¶ 64–66. While the Illustrative Maps (drawn by redistricting experts, Mr. Esselstyn and Mr. Cooper) presented by the <u>Grant</u> and <u>Alpha Phi Alpha</u> Plaintiffs are not exact replicas, they largely overlap.[22] <u>Compare</u> GPX 3,

---

[22]  The Court recognizes that "there is more than one way to draw a district so that it can reasonably be described as meaningfully adhering to traditional principles, even if not to the same extent or degree as some other hypothetical district." <u>Chen v. City of Houston</u>, 206 F.3d 502, 519 (5th Cir. 2000). And the remedial plan that the Court eventually implements if it finds Section 2 liability need not be one of the maps

¶ 26 & fig.6, <u>with</u> APAX 1, ¶ 79 & fig.17; <u>compare</u> GPX 3, ¶ 27 & fig.7, <u>with</u> APAX 1, ¶ 76 & fig.15; <u>compare</u> GPX 3, ¶ 41 & fig.12 <u>with</u> APAX 1, ¶ 112 & fig.28. The Court finds that both plans concern areas of Henry, Clayton, and Fayette Counties. Accordingly, because the Court found that Mr. Esselstyn's Illustrative Senate District 25 and 28 have a substantial likelihood of success on the merits as to the first <u>Gingles</u> precondition, the Court does not rule on the substantial likelihood of success of Mr. Cooper's Illustrative Senate Districts 17 and 28.

<u>Compare</u> GPX 3, ¶ 24 & fig.4

_____

proposed by Plaintiffs. <u>See</u> <u>Clark</u>, 21 F.3d at 95–96 & n.2 ("[P]laintiffs' proposed district is not cast in stone. It was simply presented to demonstrate that a majority-black district is feasible in [the jurisdiction] . . . . [T]he district court, of course, retains supervision over the final configuration of the districting plan.").

**Figure 4: Map of majority-Black districts in the illustrative State Senate plan.**



with, APAX 1, ¶ 71 & fig.14.

**Figure 14**



Additionally, both the <u>Grant</u> and <u>Alpha Phi Alpha</u> Plaintiffs allege that the Georgia legislature should have drawn five additional House Districts. The <u>Grant</u> Plaintiffs allege that two additional House Districts could be drawn in the southern Atlanta metropolitan area (<u>Grant</u> Doc. No. [1], ¶ 43), and the <u>Alpha Phi Alpha</u> Plaintiffs allege that three additional House Districts could be drawn in the southern Atlanta metropolitan area (<u>APA</u> Doc. No. [1], ¶¶ 70–72.). Mr. Cooper's Illustrative House Districts 74, 110, and 111 concern areas of

Henry, Fayette, and Clayton Counties. Mr. Esselstyn's Illustrative House Districts 74 and 117 also concern Henry, Fayette, Clayton, and Cowetta Counties. Accordingly, because the Court found that Mr. Esselstyn's Illustrative House District 74 and 117 have a substantial likelihood of success on the first <u>Gingles</u> precondition, the Court does not rule on the substantial likelihood of success of Mr. Cooper's Illustrative House Districts 73, 110, and 111.

**Figure 10: Map of majority-Black districts in the illustrative House plan.**



GPX 3, ¶ 39 & fig.10.

**Figure 28:** *Illustrative Plan District 73 and Vicinity*



APAX 1, ¶ 111 & fig.28.

The <u>Grant</u> Plaintiffs' redistricting expert drew one additional House District in the western metropolitan Atlanta area and two additional House Districts in central Georgia, that are anchored in Bibb County. <u>See</u> GPX 3, ¶ 39 & fig.10. The <u>Alpha Phi Alpha</u> Plaintiffs' redistricting expert drew one additional House District in the Eastern Black Belt and one additional House District in Southwestern Georgia.

**Figure 32**: *Illustrative Plan: District 144 and Vicinity*



Id. ¶ 116 & fig.32.

**Figure 34:** *Illustrative Plan: District 153 and vicinity*



Id. ¶ 118 & fig.34.

To recap the prior ruling, at this stage, the Court finds that the Grant and Alpha Phi Alpha Plaintiffs have established a substantial likelihood of succeeding on the merits of their claim that SB 2EX and HB 1EX violate Section 2 of the Voting Rights Act because the Black population is sufficiently large and compact to create two additional Black-majority Senate Districts in the southern Atlanta metropolitan area, two additional House Districts in the

southern Atlanta metropolitan area, one additional House District in southwestern Georgia.[23]

### (1) *The <u>Grant</u> Plaintiffs are substantially likely to establish a Section 2 violation*

This Court finds that the <u>Grant</u> Plaintiffs have shown that they have a substantial likelihood of satisfying the first <u>Gingles</u> precondition with respect to two additional State Senate Districts and two additional State House Districts in the Atlanta metropolitan area.

### (a) <u>Senate Districts</u>

### i) *Numerosity*

As indicated above, on December 30, 2021, Governor Kemp signed into law State Senate Maps. The Georgia State Senate map consists of 56 districts. GPX 3, ¶ 20; Feb. 9, 2022, Afternoon Tr. 169:13–14. The 2014 Georgia State Senate plan contained 13 majority-Black districts using the AP BVAP metric

---

[23] At this stage and without further discovery, the Court does not find that the <u>Grant</u> and <u>Alpha Phi Alpha</u> Plaintiffs have established that they have a substantial likelihood of succeeding on the merits of their claims that a third State Senate District should have been drawn in the Eastern Black Belt or that additional House Districts should have been drawn in the western Atlanta metropolitan area, central Georgia, or in the Eastern Black Belt. Because the burden of proving substantial likelihood of success for a preliminary injunction is a "high threshold," this in no way predetermines whether Plaintiffs can prove that Section 2 requires the creation of an additional Senate District in the Eastern Black Belt, or additional House Districts in central Georgia and in the Eastern Black Belt. See <u>Louisiana v. Envir. Soc., Inc. v. Coleman</u>, 524 F.2d 930, 931 (5th Cir. 1975).

when the 2020 Census data was applied. <u>Grant</u> Stip. ¶ 30. The Enacted State Senate Map contains 14 majority-Black districts using the AP BVAP metric. <u>Grant</u> Stip. ¶ 56; GPX 3, ¶ 21; Feb. 9, 2022, Afternoon Tr. 169:8–12. Ten of those districts are in the Atlanta metropolitan area and four are in the Black Belt. GPX 3, ¶ 21 & fig.3.

Redistricting expert, Mr. Esselstyn, drew two illustrative Senate Districts in the Atlanta metropolitan area, which are labeled Esselstyn Illustrative State Senate District 25 and Illustrative State Senate District 28. Just about half of Georgia's Black population lives in six counties in the Atlanta MSA. GPX 3, ¶ 17. Those six counties, listed in order of Black population, are Fulton, DeKalb, Gwinnett, Cobb, Clayton, and Henry. <u>Id.</u> Under the 2000 Census, the population in the 29-county Atlanta MSA was 29.29% AP Black, increasing to 33.61% in 2010, and increasing further to 35.91% in 2020. Since 2000, the Black population in the Atlanta MSA has grown from 1,248,809 to 2,186,815 in 2020. <u>Grant</u> Stip. ¶ 44.

Mr. Esselstyn's Illustrative State Senate District 25 is an additional majority-Black State Senate district in the southeastern Atlanta metropolitan area and is composed of portions of Clayton and Henry Counties. <u>Grant</u> Stip. ¶ 64; GPX 3, ¶ 26 & fig.6; Feb. 9, 2022, Afternoon Tr. 171:17–23, 228:10–13.

Mr. Esselstyn's Illustrative State Senate District 25 has an AP BVAP over 50%. Grant Stip. ¶ 65; GPX 3, ¶ 24 & tbl.1; Feb. 9, 2022, Afternoon Tr. 171:24–172:8.

Mr. Esselstyn's Illustrative State Senate District 28 is an additional majority-Black State Senate district in the southwestern Atlanta metropolitan area and is composed of portions of Clayton, Coweta, Fayette, and Fulton Counties. Grant Stip. ¶ 66; GPX 3, ¶ 27 & fig.7; Feb. 9, 2022, Afternoon Tr. 172:11–17. Mr. Esselstyn's Illustrative State Senate District 28 has an AP BVAP over 50%. Grant Stip. ¶ 67; GPX 3, ¶ 24 & tbl.1; Feb. 9, 2022, Afternoon Tr. 172:18–20.

**Table 1: Illustrative Senate plan majority-Black districts with BVAP percentages**

| District | BVAP% | District | BVAP% | District | BVAP% |
|---|---|---|---|---|---|
| 10 | 61.10% | 26 | 52.84% | 39 | 60.21% |
| 12 | 57.97% | 28 | 57.28% | 41 | 62.61% |
| 15 | 54.00% | 34 | 60.19% | 43 | 58.52% |
| 22 | 50.84% | 35 | 54.05% | 44 | 71.52% |
| 23 | 50.43% | 36 | 51.34% | 55 | 65.97% |
| 25 | 58.93% | 38 | 66.36% | | |

Grant Stip. ¶ 60; GPX 3, ¶ 24 & tbl.1; Feb. 9, 2022, Afternoon Tr. 169:20–22.

Mr. Morgan and Ms. Wright do not dispute that Mr. Esselstyn's Illustrative State Senate District 25 and Mr. Esselstyn's Illustrative State Senate District 28 both have AP BVAPs over 50%. See DX 2, ¶ 11 (Mr. Morgan's expert report confirming that Mr. Esselstyn's illustrative State Senate plan contains 17 majority-Black districts); Feb. 11, 2022, Afternoon Tr. 191:21–25 (Mr. Morgan's testimony agreeing that Mr. Esselstyn's illustrative State Senate plan includes three additional majority-Black districts); DX 41, ¶ 20 (Ms. Wright's expert report noting that "[t]he Esselstyn Senate plan also adds majority-Black districts above the adopted Senate plan when using the any-part Black voting age population Census metric"); Feb. 11, 2022, Morning Tr. 78:13–22, 80:23–81:24 (Ms. Wright's testimony acknowledging that AP BVAPs of Mr. Esselstyn's additional majority-Black State Senate districts exceed 50%).

Mr. Morgan's expert report included a chart demonstrating that Mr. Esselstyn's illustrative State Senate plan contains three fewer districts with AP BVAPs above 65% compared to the Enacted Plan.

**Chart 1. Number of Majority-Black Senate Districts.**

| | Majority-Black Senate Districts | | |
|---|---|---|---|
| % AP Black VAP | 2021 Adopted Plan | Proposed Democratic Plan | Esselstyn Remedial Plan |
| Over 75% | 0 | 1 | 0 |
| 70% to 75% | 3 | 2 | 1 |
| 65% to 70% | 3 | 3 | 2 |
| 60% to 65% | 3 | 1 | 4 |
| 55% to 60% | 3 | 3 | 4 |
| 52% to 55% | 1 | 3 | 3 |
| 50% to 52% | 1 | 2 | 3 |
| | | | |
| Total # Districts | 14 | 15 | 17 |

DX 2, ¶ 10 & chart 1.

As Mr. Esselstyn explained in his supplemental expert report, "[o]ne reason that the Enacted Plans have fewer majority-Black districts than the Illustrative Plans is that more Black voters were unnecessarily concentrated into certain Metro Atlanta districts in the Enacted Plans. By unpacking these districts, the Illustrative Plans contain fewer packed districts—and, consequently, additional majority-Black districts." GPX 4, ¶ 4.

Defendants argue that Senate District 25 is not sufficiently numerous to form an additional majority-Black district. Defendants point out that in

Mr. Esselstyn's Illustrative State Senate District 25, the district is 56.51% single-race Black voting age population and only 52.71% Black voter registration. DX 46. However, this argument fails. First, courts use the AP Black demographics, not single-race black demographics to determine whether the Black community is sufficiently numerous. Because this Court must decide a case that involves claims about Georgia's Black population's effective exercise of the electoral franchise, this Court relies on the AP Black metric.

Second, the Supreme Court held that "a party asserting [Section] 2 liability must show by a preponderance of the evidence that the minority population in the potential election district is greater than 50 percent." Bartlett, 556 U.S. at 19–20. As stated above, the single-race Black population exceeds 50% of the voting age population of Mr. Esselstyn's Illustrative State Senate District 25. Additionally, the percentage of Black registered voters exceeds 50%. Accordingly, the Mr. Esselstyn's Illustrative State Senate District 25 is sufficiently numerous for an additional majority-minority district.

Based on the expert reports and testimony provided in this case, the Court concludes that Mr. Esselstyn's Illustrative State Senate plan contains two additional majority-Black districts in the metropolitan Atlanta area.

### ii)   *Geographic compactness*

Mr. Esselstyn states that his Illustrative State Senate Plan "was drawn to comply with and balance" the principles enumerated in the 2021-2022 Senate Reapportionment Committee Guidelines. GPX 3, ¶ 29. The guidelines are as follows:

1. Each legislative district of the General Assembly should be drawn to achieve a total population that is substantially equal as practicable, considering the principles listed below.

2. All plans adopted by the committee will comply with Section 2 of the Voting Rights Act of 1965, as amended.

3. All plans adopted by the Committee will comply with the United States and Georgia Constitutions.

4. Districts shall be composed of contiguous geography. Districts that connect on a single point are not contiguous

5. No multi-member districts shall be drawn on any legislative redistricting plan.

6. The Committee should consider:

   a. The boundaries of counties and precincts;

   b. Compactness; and

   c. Communities of interest.

7. Efforts should be made to avoid unnecessary pairing of incumbents.

8. The identifying of these criteria is not intended to limit the consideration of other principles or factors that the Committee deems appropriate.

GPX 39, at 3.

Mr. Esselstyn explained in his supplemental expert report and during his testimony at the hearing, applying these traditional districting principles often required balancing. See GPX 4, ¶ 14. As he described the process,

> It's a balancing act. So . . . often the criteria will be [in tension] with each other. It may be that you are trying to just follow precinct lines and not split . . . precincts, but the precincts have funny shapes. So that means you either are going to end up with a less compact shape that doesn't split precincts or you could split a precinct and end up with a more compact shape. And some of the county shapes are highly irregular as well. So sometime[s] you can have a decision about splitting counties as well. So that's the example of where there's no one clear right answer and I'm trying to sort of find the best balance that I can.

Feb. 9, 2022, Afternoon Tr. 157:14–25.

(a) **Population equality**

Mr. Esselstyn's Illustrative State Senate Maps are not malapportioned and comply with the one-person, one-vote principle. See Wright, 301 F. Supp. 3d at 1325–26; see also Reynolds, 377 U.S. at 577 ("[T]he Equal Protection Clause requires that a State make an honest and good faith effort to construct

districts, in both houses of its legislature, as nearly of equal population as practicable.").

Mr. Esselstyn's expert report demonstrates that his Illustrative State Senate Plan contains minimal population deviation. In both the Enacted and Illustrative State Senate Plans, most district populations are within ±1% of the ideal, and a small minority are between ±1 and 2%. None has a deviation of more than 2%. For the Enacted Plan, the relative average deviation is 0.53%, and for the Illustrative Plan, the relative average deviation is 0.68%. GPX 3, ¶ 30; see also id. at 49–52, 54–55 (Mr. Esselstyn's expert report listing population statistics for enacted and illustrative State Senate maps); id. at 66 (similar); Feb. 9, 2022, Afternoon Tr. 158:4–22, 176:20–177:5, 188:4–12 (Mr. Esselstyn's testimony describing compliance with population equality). Mr. Esselstyn conceded that his illustrative Senate Plan had higher population deviations than the Enacted State Senate Map. Feb. 9, 2022, Afternoon Tr. 205:8-14. Mr. Esselstyn's population deviations are within the limits allowed by the Equal Protection Clause.

> [M]inor deviations from mathematical equality among state legislative districts are insufficient to make out a prima facie case . . . under the Fourteenth Amendments. . . . Our decisions have established, as a general matter, that an apportionment plan with a

> maximum population deviation under 10% falls
> within this category of minor deviations.

Brown v. Thomson, 462 U.S. 825, 842 (1983) (quoting Reynolds, 377 U.S. at 745) (quotation marks omitted). Thus, the Court finds that Mr. Esselstyn's Illustrative Senate Plan complies with population equality.

**(b)** **Compactness**

Mr. Esselstyn's Illustrative State Senate Plan has comparable compactness scores to the Enacted State Senate Map. Mr. Esselstyn reported the average compactness scores for both the Enacted Plans and his illustrative legislative plans using five measures—Reock,[24] Schwartzberg,[25] Polsby-

---

[24] The Court discussed Reock and Polsby-Popper in the Pendergrass section of this Order; however, considering the Order's length, the Court deems it proper to readdress these measures for the reader. The Reock test is an area-based measure that compares each district to a circle, which is considered to be the most compact shape possible. For each district, the Reock test computes the ratio of the area of the district to the area of the minimum enclosing circle for the district. The measure is always between 0 and 1, with 1 being the most compact. GPX 3, at 63.

[25] The Schwartzberg test is a perimeter-based measure that compares a simplified version of each district to a circle, which is considered to be the most compact shape possible. For each district, the Schwartzberg test computes the ratio of the perimeter of the simplified version of the district to the perimeter of a circle with the same area as the original district. This measure is usually greater than or equal to 1, with 1 being the most compact. GPX 3, at 63.

Popper,[26] Area/Convex Hull,[27] and Number of Cut Edges.[28] GPX 3, ¶¶ 31, 46 & tbls. 2, 5; see also Feb. 9, 2022, Afternoon Tr. 158:23–160:1 (Mr. Esselstyn's testimony describing common measures of compactness).

Mr. Esselstyn concluded that the average compactness measures for the Enacted State Senate Map and his Illustrative Plan "are almost identical, if not identical." GPX 3, ¶ 31 & tbl.2; see also id. at 66–79 (Mr. Esselstyn's expert report providing detailed compactness measures for enacted and illustrative State Senate maps); Feb. 9, 2022, Afternoon Tr. 160:2–10, 177:6–19, 188:13–17 (Mr. Esselstyn's testimony describing compliance with compactness principle); Feb. 11, 2022, Afternoon Tr. 223:23–224:3 (Mr. Morgan's testimony confirming

---

[26] The Polsby-Popper test computes the ratio of the district area to the area of a circle with the same perimeter: $4\pi Area/(Perimeter^2)$. The measure is always between 0 and 1, with 1 being the most compact. GPX 3, at 63.

[27] The Area/Convex Hull test computes the ratio the district area to the area of the convex hull of the district (minimum convex polygon which completely contains the district). The measure is always between 0 and 1, with 1 being the most compact. GPX 3, at 63.

[28] The Cut Edges test counts the number of edges removed ("cut") from the adjacency (dual) graph of the base layer to define the districting plan. The adjacency graph is defined by creating a node for each base layer area. An edge is added between two nodes if the two corresponding base layer areas are adjacent—which is to say, they share a common linear boundary. If such a boundary forms part of the district boundary, then its corresponding edge is cut by the plan. The measure is a single number for the plan. A smaller number implies a more compact plan. GPX 3, at 63–64; see also Feb. 9, 2022, Afternoon Tr. 236:2–16 (Mr. Esselstyn's testimony describing Cut Edges measurement).

that overall compactness scores of Mr. Esselstyn's illustrative State Senate map and enacted map are similar).

Mr. Esselstyn reported those measures as follows:

**Table 2: Compactness measures for enacted and illustrative State Senate plans.**

|  | Reock (average) | Schwartzberg (average) | Polsby-Popper (average) | Area/Convex Hull (average) | Number of Cut Edges |
|---|---|---|---|---|---|
| Enacted | 0.42 | 1.75 | 0.29 | 0.76 | 11,005 |
| Illustrative | 0.41 | 1.76 | 0.29 | 0.75 | 10,998 |

GPX 3, ¶ 31 & tbl.2.

In his expert report, Mr. Morgan, confirmed the accuracy of Mr. Esselstyn's compactness statistics without suggesting that Mr. Esselstyn's Illustrative Maps fail to comply with this districting principle. See DX 2, ¶¶ 23–24 & chart 5. Moreover, his report demonstrated that most of the additional majority-Black districts in Mr. Esselstyn's Illustrative Plans outperform their precursors in the Enacted Plans according to the Polsby-Popper compactness measure, with Senate District 25 performing better according to that measure and the Reock measure:

Chart 5. Compactness score summary

| New Black-Majority District | Adopted Plan Reock | Esselstyn Remedial Plan Reock | Adopted Plan Polsby-Popper | Esselstyn Remedial Plan Polsby-Popper |
|---|---|---|---|---|
| Senate 23 | **0.37** | 0.34 | 0.16 | **0.17** |
| Senate 25 | 0.39 | **0.57** | 0.24 | **0.34** |
| Senate 28 | **0.45** | 0.38 | **0.25** | 0.19 |
| House 64 | **0.37** | 0.22 | **0.36** | 0.22 |
| House 74 | **0.50** | 0.30 | **0.25** | 0.19 |
| House 117 | **0.41** | 0.40 | 0.28 | **0.33** |
| House 145 | **0.38** | 0.34 | 0.19 | **0.21** |
| House 149 | 0.32 | **0.42** | 0.22 | **0.23** |

Id.

Defendants maintained a line of questioning at the preliminary injunction hearing in an effort to show that the Reock and Schwartzberg scores of the 2021 adopted state Senate plan are more compact on average than Mr. Esselstyn's illustrative state Senate plan. Feb. 9, 2022, Afternoon Tr. 235:10–25. The evidence showed that several districts on the Esselstyn remedial Senate plan are far less compact than the 2021 adopted state Senate plan. DX 2, ¶ 24. However, the Enacted State Senate Map and Mr. Esselstyn's Illustrative Senate Map have identical Polsby-Popper scores (0.29) and Mr. Esselstyn's Illustrative Senate Map has seven fewer cut edges than the Enacted State Senate Map. Second, under the Reock, Schwartzberg and Area/Convex Hull tests the Illustrative Plan is one-one-hundredth of a point

less compact than the enacted State Plan. Accordingly, the Court does not find that Mr. Esselstyn's illustrative legislative maps are not sufficiently compact.

Looking at the challenged districts specifically, the Court finds Mr. Esselstyn's Illustrative State Senate District 25 is more compact than the Enacted State Plan. Mr. Esselstyn's Illustrative State Senate District 25 has a Reock score of 0.57 and Polsby-Popper score of 0.34 and the Enacted State Senate District 25 has a Reock score of 0.39 and a Polsby-Popper score of 0.24. See DX 2, ¶¶ 23–24 & chart 5. The Enacted State Senate District 28 is slightly more compact than Mr. Esselstyn's Illustrative State Senate District 28. Mr. Esselstyn's Illustrative State Senate District 28 has a Reock score of 0.38 and a Polsby-Popper score of 0.19 and the Enacted State Senate District 28 has a Reock score of 0.45 and a Polsby-Popper score of 0.19. Id. The Court finds that Mr. Esselstyn's Illustrative State Senate District 25 is sufficiently compact and more compact than Enacted State Senate District 25.

The Court also finds that Mr. Esselstyn's Illustrative State Senate District 28 is sufficiently compact. The Court does not find that the difference of six-hundredths of a point in the Polsby-Popper score and seven-hundredths of a point difference in the Reock scores makes Mr. Esselstyn's Illustrative State Senate District 28 not compact. Thus, the Court finds that Mr. Esselstyn's

Illustrative State Senate District 25 and Mr. Esselstyn's Illustrative State Senate District 28 are sufficiently compact and satisfy the first <u>Gingles</u> precondition.

### (c) <u>Contiguity</u>

Mr. Esselstyn's Illustrative Senate Districts are contiguous. There is no factual dispute on this issue. <u>See</u> Feb. 9, 2022, Afternoon Tr. 160:11–13 (Mr. Esselstyn's testimony confirming that his illustrative districts are contiguous).

### (d) <u>Preservation of political subdivisions</u>

Mr. Esselstyn's Illustrative Senate Plan preserves political subdivisions. Mr. Esselstyn testified that it was "not always possible" to preserve political subdivisions because, for example, "a typical precinct size is in the neighborhood typically around a few thousand people," and "[s]o often to get the best shape . . . , it's often practical to divide precincts." Feb. 9, 2022, Afternoon Tr. 160:20–161:1–8. Mr. Esselstyn concluded that "[w]hile the creation of three additional majority-Black State Senate districts involved the division of additional counties and VTDs, the differences are marginal." GPX 3, ¶¶ 32–33 & tbl.3; <u>see also</u> <u>id.</u> at 80–91 (Mr. Esselstyn's expert report providing political subdivision splits for enacted and illustrative State Senate maps); Feb. 9, 2022, Afternoon Tr. 161:9–11 (Mr. Esselstyn's testimony stating that "the

numbers of divided counties and precincts in the Illustrative Plans are similar, slightly higher than those for the Enacted Plans"); id. at 177:20–25, 188:18–24 (Mr. Esselstyn's testimony describing preservation of political subdivisions). He reported the splits in the enacted and illustrative State Senate maps as follows:

**Table 3: Political subdivision splits for enacted and illustrative State Senate Plans**

|  | Intact Counties | Split Counties | Split VTDs |
|---|---|---|---|
| Enacted | 130 | 29 | 47 |
| Illustrative | 125 | 34 | 49 |

GPX 3, ¶¶ 32–33 & tbl.3.

Out of 2,698 VTDs statewide, only 49 are split in Mr. Esselstyn's illustrative State Senate plan, and in only 18 of Georgia's 159 counties. Grant Doc. No. [61-1], ¶ 3 & fig.1; Feb. 9, 2022, Afternoon Tr. 163:17–20, 166:5–9. The 2021 Enacted State Senate Map divides fewer precincts than Mr. Esselstyn's Illustrative State Senate Maps. Feb. 9, 2022, Afternoon Tr. 205:23–25, 236:25–237:1. However, some of the VTD splits in Mr. Esselstyn's Illustrative State Senate Maps are inherited from the Enacted State Senate map because Mr. Esselstyn's illustrative map leaves a majority of districts untouched. Id. at 164:23–165:4. Mr. Esselstyn's second supplemental report included a

histogram depicting the VTD splits in his illustrative State Senate plan by county.



**Figure 1: VTD splits in illustrative State Senate plan by County**



<u>Grant</u> Doc. No. [61-1], ¶ 3 & fig.1. Thus, the Court finds that Mr. Esselstyn's Illustrative State Senate Map complies with the traditional redistricting principle of keeping political subdivisions together; even though, Mr. Esselstyn's Illustrative State Senate Maps has two more split VTDs than the Enacted State Senate Map.

Mr. Esselstyn's illustrative Senate plan splits thirty-four counties, which is five more than the 2021 adopted state Senate plan. <u>Grant</u> Stip. ¶¶ 58, 75; Feb. 9, 2022, Afternoon Tr. 203:18–21; DX 2, ¶ 21. However, the number of county splits in Mr. Esselstyn's Illustrative State Senate Map is lower than the

number of such splits in the legislative plans used in the most recent elections (which is to say, Georgia's 2014 State Senate plans).

**Table 1: Number of split counties in various plans.** [1]

|  | Illustrative | Adopted 2014/2015 |
|---|---|---|
| State Senate | 34 | 38 |
| House | 70 | 73 |

GPX 4, ¶ 11 & tbl.1; Feb. 9, 2022, Afternoon Tr. 178:1–5, 188:25–189:4. Defendants' expert Mr. Morgan's report confirmed Mr. Esselstyn's statistics for political subdivision splits without opining that Mr. Esselstyn's illustrative maps fail to comply with this districting principle. See DX 2, ¶¶ 20–22; see also Feb. 11, 2022, Afternoon Tr. 220:15–221:20 (Mr. Morgan's testimony confirming Mr. Esselstyn's reported figures and conceding that his expert report offers no opinion on issue of split geographies). Thus, the Court finds that Mr. Esselstyn's Illustrative State Senate Maps comply with the traditional redistricting principle of maintaining existing political subdivisions.

**(e)**     **Preservation of communities of interest**

The Court finds that Mr. Esselstyn's Illustrative State Senate Maps preserve communities of interest. Mr. Esselstyn testified regarding his definition of a community of interest:

> [C]ommunity of interest could be something as large
> as the Black Belt. As large as Metro Atlanta. Can span
> multiple counties. And . . . it could also be as small as
> a neighborhood. So it can be an area that is large or
> larger geographically but the basic idea is you are
> looking at areas that have a shared characteristics or
> where the people have a shared interest.

Feb. 9, 2022, Afternoon Tr. 167:1–11. Although sometimes such communities "can be delineated on [a] map"—such as municipalities, college campuses, or military bases—at other times "they don't have clearly defined boundaries." Id. at 167:18–168:9; see also Feb. 11, 2022, Morning Tr. 90:5–91:12 (Ms. Wright's testimony broadly defining communities of interest). Mr. Esselstyn testified that in drawing his illustrative maps, he sought to preserve communities of interest where possible. Feb. 9, 2022, Afternoon Tr. 168:13–16. This does not necessarily mean that each illustrative district is homogenous; as Mr. Esselstyn explained, "I don't believe that the communities of interest principle[] requires every two communities in a given district to have commonalities. I don't think that's what the principle stands for. . . . [M]y focus on communities of interest is trying to keep them intact, when possible." Feb. 9, 2022, Afternoon Tr. 221:1–222:11. Accordingly, the absence of "some shared characteristic" does not necessarily indicate "a failure to meet the communities of interest criteria or any other [] traditional redistricting principle." Id. at 222:12–17.

With respect to Mr. Esselstyn's Illustrative State Senate District 25, Defendants' expert Ms. Wright conceded that "District 25 is at least more compact," but concluded that Mr. Esselstyn's Illustrative State Senate District 25 has the effect of dividing communities of interest in Mr. Esselstyn's Senate District 10. DX 41, ¶ 23; Feb. 11, 2022, Morning Tr. 48:20–49:4. Mr. Esselstyn's Illustrative Senate District 10 stretches from Stonecrest in DeKalb County to Butts County. Id. The Court finds that even if Mr. Esselstyn's Illustrative Senate District 10 divides communities of interest, that does not necessarily mean that Mr. Esselstyn's Illustrative State Senate District 25 does not respect traditional redistricting principles. See Wright, 301 F. Supp. 3d at 1326 (finding that plaintiffs successfully proved violation of Section 2 of the VRA, even though the "illustrative plan [was] [] far from perfect"). Given that Mr. Esselstyn's Illustrative Senate District 10 does not represent a challenged district, and Ms. Wright testified that Mr. Esselstyn's Senate District 25 is "at least more compact," (Feb. 11, 2022, Morning Tr. 48:20–49:4), the Court finds that Mr. Esselstyn's Senate District 25 respects communities of interest.

Jason Carter, a former member of the State Senate and candidate for Governor of Georgia during the 2014 election, testified that Mr. Esselstyn's Illustrative State Senate District 25

> includes virtually all of Henry County in a single district . . . [which] helps in some context for sure . . . . [I]f there were really differing aspects in Henry County that needed to be divided, up that would be one thing but . . . Henry County is a fast-growing, multi-racial community that . . . would seem like [] the kind of place that can be kept together . . . if you can make it coherent, it would seem that that would be great.

Feb. 10, 2022, Afternoon Tr. 138:9–139:6. Thus, the Court finds that Mr. Esselstyn's Illustrative State Senate District 25 respects communities of interest.

With respect to Mr. Esselstyn's Illustrative Senate District 28, Defendants argued it connects pieces of the following counties to create a district that is majority-Black: Clayton, Coweta, Fayette, and Fulton. See Feb. 9, 2022, Afternoon Tr. 229:4–7. To create this district, Mr. Esselstyn has to double the traditional number of Senate districts in Clayton County from two to four and cut into Coweta County to reach a sizeable Black population in Newnan. DX 41, ¶ 22; Feb. 9, 2022, Afternoon Tr. 229:23–230:16. Unlike the Democratic Senate plan and 2021 adopted state Senate plan that kept Coweta County whole, Mr. Esselstyn's Senate District 28 splits Coweta County three ways. DX 13; DX 10; Feb. 9, 2022, Afternoon Tr. 231:8–17. Mr. Esselstyn's Illustrative Senate District 28 from his report is reproduced below.



**Figure 7: Map of western Metro Atlanta area of illustrative plan with majority-Black State Senate districts indicated.**

GPX 3, ¶ 27 & fig.7.

Mr. Carter described the communities of interest contained in Mr. Esselstyn's Illustrative Senate District 28 as follows: "[T]hat is . . . to me, a cohesive community and . . . Newnan certainly has more in common with that part of South Fulton than it does with . . . Franklin, Georgia, because of the issues that it confronts from an infrastructure standpoint and [] other issues[.]" Feb. 10, 2022, Afternoon Tr. 139:18–140:19. Despite the additional county splits, Mr. Esselstyn's Illustrative Senate District 28 "goes right around the Airport,

285. 85 corridors that are . . . those suburban south side areas." <u>Id.</u> at 140:10–12. Thus, Mr. Esselstyn's Illustrative Senate District 28 respects communities of interest.

### (f) Incumbent protection

Defendants point out that Mr. Esselstyn's Illustrative State Senate Map pairs incumbents Marty Harbin (R) and Valencia Seay (D) into one district; while, the Enacted State Senate Map pairs no incumbents who are running for reelection. DX 1, ¶ 15. During the hearing, Mr. Esselstyn testified that "I was not able to find a publicly-available authoritative source . . . for incumbent address data . . . [s]o, as a result I did not have that data and so I did not take it into account." Feb. 9, 2022, Afternoon Tr. 223:16–18. Despite not having this information, Mr. Esselstyn's Illustrative State Senate Maps only create one incumbent pairing. The Court finds that Mr. Esselstyn's Illustrative State Senate Map complies with the traditional redistricting principle of protecting incumbents.

### (g) Core retention

The Court finds that Mr. Esselstyn's Illustrative State Senate Map retains the core of the Enacted State Senate Map. As an initial note, preservation of existing district cores was not an enumerated districting principle adopted by

the General Assembly. <u>See</u> GPX 39; 40. However, in terms of implementing a remedial map, the Court takes core retention into consideration.

Mr. Esselstyn's Illustrative State Senate Plan changes 22 of the 56 2021 Enacted State Senate districts in the process of creating three additional majority-Black districts. DX 2, ¶ 19. Mr. Esselstyn explained in his supplemental expert report, "One of the guiding principles in the creation of my Illustrative Plans was to keep changes to a minimum while adhering to other neutral criteria . . . . [W]hile the illustrative plans are—intentionally—a departure from the enacted plans, most of the plans' districts remain intact." GPX 4, ¶ 9; <u>see</u> Feb. 9, 2022, Afternoon Tr. 267:20–268:4 (Mr. Esselstyn's testimony: "One of the other considerations for me was not trying to make more changes that I have to.").

The Court finds that Mr. Esselstyn's Illustrative State Senate Maps do not change over 60% of the Enacted State Senate Map. The Court notes that "[m]odifying one district necessarily requires changes to districts adjacent to the original modification, and harmonizing those changes with traditional redistricting criteria (such as population equality and intactness of counties) often inescapably results in cascading changes to other surrounding districts."

GPX 4, ¶ 9. Accordingly, the Court finds that Mr. Esselstyn's Illustrative State Senate Map respects the principle of core retention.

## (h)    <u>Racial considerations</u>

Defendants argued that Mr. Esselstyn's Illustrative Senate Maps must fail because they were predominately drawn for racial considerations. The Court is not persuaded by this argument. Both the Supreme Court's and Eleventh Circuit's "precedents require [Section 2] plaintiffs to show that it would be possible to design an electoral district, consistent with traditional districting principles, in which minority voters could successfully elect a minority candidate." <u>Davis</u>, 139 F.3d at 1425. "[I]ntentional creation of a majority-minority district necessarily requires consideration of race." <u>Fayette Cnty.</u>, 118 F. Supp. 3d at 1345. Therefore, "[t]o penalize [plaintiffs] . . . for attempting to make the very showing that <u>Gingles</u> [and its progeny] demand would be to make it impossible, as a matter of law, for any plaintiff to bring a successful Section [2] action." <u>Davis</u>, 139 F.3d at 1425. Consideration of race accordingly does not mean that an illustrative plan must be subjected to strict scrutiny or any other heightened bar beyond the question of whether traditional districting principles were employed. Consistent with this understanding, the Eleventh Circuit, and every other circuit to address this

issue, has rejected attempts to graft the constitutional standard that applies to racial gerrymandering by the State onto the first <u>Gingles</u> precondition vote dilution analysis. <u>See</u> <u>Davis</u>, 139 F.3d at 1417–18; <u>see also, e.g.,</u> <u>Bone Shirt</u>, 461 F.3d at 1019; <u>Clark</u>, 88 F.3d at 1406–07; <u>Sanchez v. Colorado</u>, 97 F.3d 1303, 1327 (10th Cir. 1996); <u>Cane v. Worcester Cnty.</u>, 35 F.3d 921, 926 n.6 (4th Cir. 1994); <u>Bridgeport Coal. for Fair Representation v. City of Bridgeport</u>, 26 F.3d 271, 278 (2d Cir. 1995), <u>vacated on other grounds sub nom.</u> <u>City of Bridgeport v. Bridgeport Coal. for Fair Representation</u>, 512 U.S. 1283 (1994).

Mr. Esselstyn explained that he was asked "to determine whether there are areas in the State of Georgia where the Black population is 'sufficiently large and geographically compact' to enable the creation of additional majority-Black legislative districts relative to the number of such districts provided in the enacted State Senate and State House of Representatives redistricting plans from 2021." GPX 3, ¶ 8 (footnote omitted); <u>see also</u> Feb. 9, 2022, Afternoon Tr. 150:11–19, 202:15–29 (Mr. Esselstyn's testimony confirming what he was asked to do in this case). Mr. Esselstyn testified that he was not asked to maximize the number of majority-Black districts in the State Senate or House map. Feb. 9, 2022, Afternoon Tr. 150:23–25. Mr. Esselstyn also testified that it

was necessary for him to consider race as part of his analysis because, under Section 2,

> the key metric is whether a district has a majority of the Any Part Black population. So that means it has to be over 50 percent. And that means looking at a column of numbers in order to determine, to assess whether a district has that characteristic. You have to look at the numbers that measure the percentage of the population is Black.

Id. at 155:15–156:2. When asked by the Court whether race was the controlling issue when drawing his illustrative House District 149, Mr. Esselstyn responded, "There's not one predominant consideration . . . . I'm trying to see if something can be satisfied while considering all the other traditional principles and the principles adopted by the General Assembly." Feb. 9, 2022, Afternoon Tr. 254:1–255:18. Mr. Esselstyn emphasized that he took other considerations into account as well when drawing his Illustrative Plans, including population equality, compliance with the federal and state constitutions, contiguity, and other traditional districting principles. Id. at 156:10–157:9; see also id. at 275:2–11 (Mr. Esselstyn's testimony explaining that, when drawing illustrative districts, "I'm not looking at any one race of voters . . . . I'm always looking [at] a multitude of considerations").

Defendants' expert, Ms. Wright, opined that Mr. Esselstyn's Illustrative Senate District 25 and 28 were drawn predominately with racial considerations, "District 25 . . . strategically connects pieces of south Clayton with Henry apparently in service of a racial goal" (DX 41, ¶ 23) and "District 28 . . . splits Clayton County into four districts in a manner that make [sic] no geographical sense apart from a racial goal." Id. ¶ 22. Without more, the Court is unable to uphold Ms. Wright's assessment. Mr. Esselstyn testified that he used various metrics including but not limited to population size, communities of interest, and political subdivisions, in addition to race when he drew his Illustrative State Senate Maps. Accordingly, the Court does not find that race predominated the drawing of Mr. Esselstyn's Illustrative State Senate Districts 25 and 28.

The Court finds that Mr. Esselstyn's Illustrative State Senate Districts 25 and 28 contain Black population that are sufficiently numerous and compact, as to create two additional districts that comply with traditional redistricting principles. Accordingly, the Court finds that the Grant Plaintiffs have a substantial likelihood of success in proving that Mr. Esselstyn's Illustrative State Senate Districts 25 and 28 satisfy the first Gingles precondition.

**(b)** <u>**Esselstyn House Districts**</u>

*i) Numerosity*

As stated above, on December 30, 2021, Governor Kemp signed the Enacted State House Map into law. The Georgia House of Representatives map consists of 180 districts. GPX 3, ¶ 35; Feb. 9, 2022, Afternoon Tr. 178:10–12. The 2015 Georgia House of Representatives plan contained 47 majority-Black districts using the AP BVAP metric when the 2020 Census data was applied. <u>Grant</u> Stip. ¶ 31. The enacted House plan contains 49 majority-Black districts using the AP BVAP metric. <u>Grant</u> Stip. ¶ 57; GPX 3, ¶ 36; Feb. 9, 2022, Afternoon Tr. 178:17–19. Thirty-four of those districts are in the Atlanta metropolitan area, 13 are in the Black Belt, and two small districts are within Chatham County (anchored in Savannah) and Lowndes County (anchored in Valdosta) in the southeastern part of the state. GPX 3, ¶ 36 & fig.9.

Mr. Esselstyn also drew two additional majority-Black House Districts in the metropolitan Atlanta area: Illustrative State House District 74 and Illustrative State House District 117. As stated above, the AP Black population in the Atlanta MSA increased from 29.29% in 2000 to 33.61% in 2010 and to 35.91% in 2020. <u>Grant</u> Stip. ¶ 44. And half of Georgia's Black population live in Fulton, DeKalb, Gwinnett, Cobb, Clayton, and Henry counties. GPX 3, ¶ 17.

Mr. Esselstyn drew two additional majority-Black House districts in the southern Atlanta metropolitan area (Mr. Esselstyn's Illustrative State House District 74 and Mr. Esselstyn's Illustrative State House District 117) are composed of portions of Clayton, Fayette, and Henry Counties. Grant Stip. ¶ 70; GPX 3, ¶ 41 & fig.12; Feb. 9, 2022, Afternoon Tr. 185:12–18. Mr. Esselstyn's illustrative House Districts 74 and 117 have AP BVAPs over 50%. Grant Stip. ¶ 71; GPX 3, ¶ 39 & tbl.4; Feb. 9, 2022, Afternoon Tr. 185:23–186:5.

**Table 4: Illustrative House plan majority-Black districts with BVAP percentages**

| District | BVAP% | District | BVAP% | District | BVAP% | District | BVAP% |
|---|---|---|---|---|---|---|---|
| 38 | 54.23% | 69 | 62.73% | 91 | 60.01% | 137 | 52.13% |
| 39 | 55.29% | 74 | 53.94% | 92 | 68.79% | 140 | 57.63% |
| 55 | 55.38% | 75 | 66.89% | 93 | 65.36% | 141 | 57.46% |
| 58 | 63.04% | 76 | 67.23% | 94 | 69.04% | 142 | 50.14% |
| 59 | 70.09% | 77 | 76.13% | 95 | 67.15% | 143 | 50.64% |
| 60 | 63.88% | 78 | 51.03% | 113 | 59.53% | 145 | 50.38% |
| 61 | 64.87% | 79 | 71.59% | 115 | 53.77% | 149 | 50.02% |
| 62 | 72.26% | 84 | 73.66% | 116 | 51.95% | 150 | 53.56% |
| 63 | 69.33% | 85 | 62.71% | 117 | 51.56% | 153 | 67.95% |
| 64 | 50.24% | 86 | 75.05% | 126 | 54.47% | 154 | 54.82% |
| 65 | 55.32% | 87 | 73.08% | 128 | 50.40% | 165 | 50.33% |
| 66 | 50.64% | 88 | 63.35% | 129 | 54.87% | 177 | 53.88% |
| 67 | 58.92% | 89 | 62.54% | 130 | 59.91% | | |
| 68 | 55.75% | 90 | 58.49% | 132 | 52.34% | | |

Grant Stip. ¶ 61; GPX 3, ¶ 39 & tbl.4.

Mr. Morgan and Ms. Wright do not dispute that Mr. Esselstyn's Illustrative State House District 74 and Mr. Esselstyn's Illustrative State House

District 117 have AP BVAPs over 50%. <u>See</u> DX 2, ¶ 13 (confirming that Mr. Esselstyn's illustrative House plain contains 54 majority-Black districts); DX 41, ¶ 24 (Ms. Wright's expert report noting that "[t]he Esselstyn House plan adds majority-Black districts above the adopted House plan when using the any-part Black voting age population Census metric"); Feb. 11, 2022, Morning Tr. 81:25–82:16 (Ms. Wright's testimony acknowledging that AP BVAPs of Mr. Esselstyn's additional majority-Black House districts exceed 50%).

Mr. Morgan's expert report includes a chart demonstrating that Mr. Esselstyn's illustrative House plan contains three fewer districts with AP BVAPs above 65% compared to the Enacted Plan.

**Chart 2. Number of Majority-Black House Districts**

| | Majority-Black House Districts | | |
|---|---|---|---|
| **% AP Black VAP** | **2021 Adopted Plan** | **Proposed Democratic Plan** | **Esselstyn Remedial Plan** |
| Over 75% | 2 | 6 | 2 |
| 70% to 75% | 9 | 7 | 5 |
| 65% to 70% | 7 | 7 | 8 |
| 60% to 65% | 8 | 3 | 8 |
| 55% to 60% | 11 | 9 | 10 |
| 52% to 55% | 10 | 10 | 10 |
| 50% to 52% | 2 | 3 | 11 |
| | | | |
| Total # Districts | 49 | 45 | 54 |

DX 2, ¶ 12 & chart 2. As Mr. Esselstyn explained in his supplemental expert report, "[o]ne reason that the enacted plans have fewer majority-Black districts than the illustrative plans is that more Black voters were unnecessarily concentrated into certain Metro Atlanta districts in the enacted plans. By unpacking these districts, the illustrative plans contain fewer packed districts—and, consequently, additional majority-Black districts." GPX 4, ¶ 4.

Although Ms. Wright asserts that Mr. Esselstyn's illustrative House Districts 64, 74, and 117 are "below 50% Black on voter registration" (DX 41, ¶¶ 27–28), she admitted during the hearing that more than 8% of registered

voters are of unknown race and that this qualifying information was not included in her expert report. Feb. 11, 2022, Morning Tr. 71:10–78:12.[29]

Based on the expert reports and testimony provided in this case, the Court concludes that Mr. Esselstyn's illustrative House plan contains two additional majority-Black districts.

### ii)    *Geographic Compactness*

Mr. Esselstyn states that his illustrative State House Map "was drawn to comply with and balance" the principles enumerated in the 2021-2022 House Reapportionment Committee Guidelines, discussed <u>supra</u>. GPX 3, ¶ 44; 40, 3.

As stated above, Mr. Esselstyn explained in his supplemental expert report and during his testimony at the hearing, applying these traditional districting principles often required balancing. <u>See</u> GPX 4, ¶ 14. As he described the process,

> It's a balancing act. So . . . often the criteria will be [in tension] with each other. It may be that you are trying to just follow precinct lines and not split . . . precincts, but the precincts have funny shapes. So that means you either are going to end up with a less compact shape that doesn't split precincts or you could split a precinct and end up with a more compact shape. And some of the county shapes are highly irregular as well. So sometime[s] you can have a decision about

---

[29] <u>See</u> <u>supra</u> n.19.

> splitting counties as well. So that's the example of where there's no one clear right answer and I'm trying to sort of find the best balance that I can.

Feb. 9, 2022, Afternoon Tr. 157:14–25.

Mr. Esselstyn's Illustrative House Districts 74 and 117 are consistent with traditional redistricting principles of compactness.

### (a)      Population equality

Mr. Esselstyn's Illustrative State House Map is not malapportioned and complies with the one-person, one-vote principle. See Wright, 301 F. Supp. 3d at 1325–26; see also Reynolds, 377 U.S. at 577 ("[T]he Equal Protection Clause requires that a State make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as practicable."). Mr. Esselstyn's expert report demonstrates that his Illustrative State House Map contains minimal population deviation.

In both the Enacted and Illustrative House plans, most district populations are within ±1% of the ideal, and a small minority are between ±1 and 2%. None has a deviation of more than 2%. For the Enacted Plan, the relative average deviation is 0.61%, and for the Illustrative Plan, the relative average deviation is 0.64%. GPX 3, ¶ 45; see also id. at 97–106, 108–13 (Mr. Esselstyn's expert report listing population statistics for enacted and

illustrative House maps); id. at 121 (similar); Feb. 9, 2022, Afternoon Tr. 158:4–22, 176:20–177:5, 188:4–12 (Mr. Esselstyn's testimony describing compliance with population equality).

Mr. Esselstyn conceded that his illustrative House plan has higher deviations than the 2021 adopted House plan. Feb. 9, 2022, Afternoon Tr. 205:8-14. Mr. Esselstyn's population deviations are within the limits allowed by the Equal Protection Clause. See Brown, 462 U.S. at 842 (quoting Reynolds, 377 U.S. at 745). Thus, the Court finds that Mr. Esselstyn's Illustrative Senate Plan complies with population equality.

### (b) Compactness

Mr. Esselstyn's Illustrative State House Plan has comparable compactness scores to HB 1EX. Using the same compactness measures as for the Illustrative Senate plans, Mr. Esselstyn concluded that the average compactness measures for the enacted House plan and his illustrative plan "are almost identical, if not identical." GPX 3, ¶ 46 & tbl.5; see also id. at 121–52 (Mr. Esselstyn's expert report providing detailed compactness measures for enacted and illustrative House maps); Feb. 9, 2022, Afternoon Tr. 160:2–10 (Mr. Esselstyn's testimony describing compliance with compactness principle); Feb. 11, 2022, Afternoon Tr. 224:4–7 (Mr. Morgan's testimony confirming that

overall compactness scores of Mr. Esselstyn's illustrative House map and enacted map are similar). Mr. Esselstyn reported those measures as follows:

**Table 5: Compactness measures for enacted and illustrative House plans.**

| | Reock (average) | Schwartzberg (average) | Polsby-Popper (average) | Area/Convex Hull (average) | Number of Cut Edges |
|---|---|---|---|---|---|
| Enacted | 0.39 | 1.80 | 0.28 | 0.72 | 22,020 |
| Illustrative | 0.39 | 1.82 | 0.28 | 0.72 | 22,475 |

GPX 3, ¶ 46 & tbl.5.

Looking at average compactness scores, Mr. Esselstyn's Illustrative House plan has identical Reock, Polsby-Popper and Area/Convex Hull scores as the State's enacted plan, and it is two-hundredths of a point less compact under the Schwartzberg method. GPX 3, ¶ 46 & tbl.5. In his expert report, Mr. Morgan confirmed the accuracy of Mr. Esselstyn's compactness statistics without suggesting that Mr. Esselstyn's illustrative maps are not sufficiently compact. See DX 2, ¶¶ 23–24 & chart 5.

Chart 5. Compactness score summary

| New Black-Majority District | Adopted Plan Reock | Esselstyn Remedial Plan Reock | Adopted Plan Polsby-Popper | Esselstyn Remedial Plan Polsby-Popper |
|---|---|---|---|---|
| Senate 23 | **0.37** | 0.34 | 0.16 | **0.17** |
| Senate 25 | 0.39 | **0.57** | 0.24 | **0.34** |
| Senate 28 | **0.45** | 0.38 | **0.25** | 0.19 |
| House 64 | **0.37** | 0.22 | **0.36** | 0.22 |
| House 74 | **0.50** | 0.30 | **0.25** | 0.19 |
| House 117 | **0.41** | 0.40 | 0.28 | **0.33** |
| House 145 | **0.38** | 0.34 | 0.19 | **0.21** |
| House 149 | 0.32 | **0.42** | 0.22 | **0.23** |

Looking at the Schwartzberg and Cut Edges scores, the 2021 adopted state House plan is more compact on average than Mr. Esselstyn's illustrative state House plan. See Feb. 9, 2022, Afternoon Tr. 264:24–265:7. Of the twenty-six districts changed on Mr. Esselstyn's illustrative state House plan, sixteen are less compact on the Reock measurement and fifteen are less compact on the Polsby-Popper measurement. DX 2, ¶ 24. This evidence, however, does not persuade the Court that Mr. Esselstyn's Illustrative House Map is not sufficiently compact. First, the Enacted State House Map and Mr. Esselstyn's Illustrative House Map have identical compactness scores in three out of the five compactness measures. See GPX 3, ¶ 46 & tbl.5. Second, the Enacted State House Map is only two-hundredths of a point more compact than Mr. Esselstyn's Illustrative Map and has only 455 fewer cut edges. Id. The Court

does not find that these minor deviations render Mr. Esselstyn's Illustrative House Map non-compact. Accordingly, the Court does not find that Mr. Esselstyn's Illustrative House Map is not sufficiently compact.

Looking at the challenged districts specifically, the Court finds Mr. Esselstyn's Illustrative State House District 74 is less compact than the Enacted State House District 74. Whereas Mr. Esselstyn's Illustrative State House District 74 has a Reock score of 0.30 and Polsby-Popper score of 0.19, the Enacted State House District 74 has a Reock score of 0.50 and a Polsby-Popper score of 0.25. See DX 2, chart 5. Also, although Enacted State House District 117 is slightly more compact than Mr. Esselstyn's Illustrative State House District 117 under the Reock measure, it is less compact under the Polsby-Popper measure. Id. Specifically, Mr. Esselstyn's Illustrative State House District 117 has a Reock score of 0.40 and a Polsby-Popper score of 0.33 and the Enacted State Senate District 28 has a Reock score of 0.41 and a Polsby-Popper score of 0.28. Id.

After reviewing the data above, the Court finds that Mr. Esselstyn's Illustrative State House Districts 74 and 117 are sufficiently compact. The Court does not find that the difference of one-hundredths of a point in the Reock score makes Mr. Esselstyn's Illustrative State House District 117 not compact,

especially given that the Mr. Esselstyn's Illustrative State House District 117 Polsby-Popper score is five-hundredths of a point higher than the Enacted State House District 117. The Court also finds that Mr. Esselstyn's Illustrative State House District 74 is sufficiently compact. Although Mr. Esselstyn's Illustrative State House District 74 has a Reock score that is a twentieth of a point less compact than the Enacted State House District 74 and six-hundredths of a point less compact under Polsby-Popper, Mr. Morgan acknowledged that there is no minimum compactness threshold for districts under Georgia law. See Feb. 11, 2022, Afternoon Tr. 228:3–16. Thus, the Court finds that Mr. Esselstyn's Illustrative State House Districts 74 and 117 are sufficiently compact and satisfy the first <u>Gingles</u> precondition.

### (c)     <u>Contiguity</u>

Mr. Esselstyn's Illustrative House Districts 74 and 117 are contiguous. There is no factual dispute on this issue. <u>See</u> Feb. 9, 2022, Afternoon Tr. 160:11–13 (Mr. Esselstyn's testimony confirming that his illustrative districts are contiguous).

### (d)     <u>Preservation of political subdivisions</u>

Mr. Esselstyn's Illustrative House Plan preserves political subdivisions. Mr. Esselstyn testified that it was "not always possible" to preserve political

subdivisions because, for example, "the ideal population for a House district is around 60,000 people, and there are going to be counties that have way more than 60,000 people. So you are going to have to divide that county up into multiple districts." Feb. 9, 2022, Afternoon Tr. 160:14–25. Similarly, "a typical precinct size is in the neighborhood typically around a few thousand people," and "[s]o often to get the best shape . . . it's often practical to divide precincts." Id. at 161:1–8. Mr. Esselstyn concluded that "[w]hile the creation of five additional majority-Black House districts involved the division of one additional county and a handful of VTDs, the differences are marginal." GPX 3, ¶¶ 47–48 & tbl.6; see also id. at 153–85 (Mr. Esselstyn's expert report providing political subdivision splits for enacted and illustrative House maps); Feb. 9, 2022, Afternoon Tr. 161:9–11 (Mr. Esselstyn's testimony stating that "the numbers of divided counties and precincts in the illustrative plans are similar, slightly higher than those for the enacted plans"). He reported the splits in the enacted and illustrative House maps as follows:

**Table 6: Political subdivision splits for enacted and illustrative House plans.**

|              | Intact Counties | Split Counties | Split VTDs |
| ------------ | --------------- | -------------- | ---------- |
| Enacted      | 90              | 69             | 185        |
| Illustrative | 89              | 70             | 192        |

GPX 3, ¶¶ 47–48 & tbl.6.

Out of 2,698 VTDs statewide, only 192 are split in Mr. Esselstyn's illustrative House plan, and in only 45 of Georgia's 159 counties. <u>Grant</u> Doc. No. [61-1], ¶ 4 & fig.2; Feb. 9, 2022, Afternoon Tr. 164:13–17, 166:4–11. Some of these VTD splits are inherited from the enacted House map because Mr. Esselstyn's illustrative map leaves a vast majority of districts untouched. Feb. 9, 2022, Afternoon Tr. 164:22–165:6. Mr. Esselstyn's second supplemental report included a histogram depicting the VTD splits in his illustrative House plan by county:

**Figure 2: VTD splits in illustrative State House plan by County**



<u>Grant</u> Doc. No. [61-1], ¶ 4 & fig.2.

After reviewing this data, the Court finds that although Mr. Esselstyn's Illustrative State House Maps has seven more split VTDs than the Enacted State

Senate Map, it still complies with the traditional redistricting principle of keeping political subdivisions together. Thus, the Court finds fact that Mr. Esselstyn's Illustrative State House Maps satisfy this factor.

Mr. Esselstyn's illustrative House plan splits 70 counties, which is one more than the 2021 enacted state House plan. Grant Stip. ¶¶ 59, 76; Feb. 9, 2022, Afternoon Tr. 267:4–7; DX 2, ¶ 22. However, the number of county splits in Mr. Esselstyn's illustrative State Senate and House plans are lower than the number of such splits in the legislative plans used in the most recent elections (namely, Georgia's 2014 State Senate and 2015 House plans). GPX 4, ¶ 11 & tbl.1; Feb. 9, 2022, Afternoon Tr. 178:1–5, 188:25–189:4.

Mr. Morgan confirmed Mr. Esselstyn's statistics for political subdivision splits without opining that Mr. Esselstyn's illustrative maps fail to comply with this districting principle. See DX 2, ¶¶ 20–22; see also Feb. 11, 2022, Afternoon Tr. 220:15–221:20 (Mr. Morgan's testimony confirming Mr. Esselstyn's reported figures and conceding that his expert report offers no opinion on issue of split geographies). After reviewing the data above, the Court finds that Mr. Esselstyn's Illustrative State House Maps comply with the traditional redistricting principle of maintaining existing political subdivisions.

**(e)** **Preservation of**
**communities of interest**

The Court finds that Mr. Esselstyn's Illustrative State House Maps preserve communities of interest. Mr. Esselstyn testified regarding his definition of a community of interest: "[C]ommunity of interest could be something as large as the Black Belt. As large as Metro Atlanta. Can span multiple counties. And . . . it could also be as small as a neighborhood. So it can be an area that is large or larger geographically but the basic idea is you are looking at areas that have a shared characteristic[] or where the people have a shared interest." Feb. 9, 2022, Afternoon Tr. 167:1–11. Although sometimes such communities "can be delineated on a map"—such as municipalities, college campuses, or military bases—at other times "they don't have clearly defined boundaries." Id. at 167:18–168:9; see also Feb. 11, 2022, Morning Tr. 90:3–91:12 (Ms. Wright's testimony broadly defining communities of interest). Mr. Esselstyn testified that in drawing his illustrative maps, he sought to preserve communities of interest where possible. Feb. 9, 2022, Afternoon Tr. 168:13–16. This does not necessarily mean that each illustrative district is homogenous; as Mr. Esselstyn explained, "I don't believe that the communities of interest principle[] requires every two communities in a given district to have commonalities. I don't think that's what the principle stands for. . . . [M]y focus

on communities of interest is trying to keep them intact, when possible." Id. at 221:1–222:11. Accordingly, the absence of "some shared characteristic" does not necessarily indicate "a failure to meet the communities of interest criteria or any other [] traditional redistricting principle." Id. at 222:12–17.

Defendants' expert Ms. Wright did not testify or provide any expert opinion about whether Mr. Esselstyn's Illustrative House Districts 74 and 117 respected communities of interest.[30] When asked by Defendants' counsel whether the composition of his illustrative House District 74 was "to achieve the goal of majority status in [that] district," Mr. Esselstyn responded, "No. . . . [T]here are always multiple goals," such as preserving the community of Irondale, ensuring that Fayetteville was kept intact in the illustrative map, and being "relatively consistent with what it is in the enacted plan" in terms of preexisting district boundaries. Feb. 9, 2022, Afternoon Tr. 246:16–247:5. Ms. Wright, in rebuttal testified that Irondale was not an incorporated city in

---

[30] Ms. Wright's expert report states that "Districts 74 and 117 suffer from the same problems I outlined above regarding Cooper House District 73 and 110" (DX 41, ¶ 27); however, the Court is unable to determine exactly what problems Mr. Esselstyn's House Districts 74 and 117 suffer from. While Mr. Esselstyn's Illustrative House Districts 74 and 117 overlaps with Mr. Cooper's Illustrative House Districts 73 and 110, the districts are not identical and have boundaries that affect different communities. Thus, the Court will not apply Ms. Wright's opinions about Mr. Cooper's Illustrative House District 73 and 110 to Mr. Esselstyn's Illustrative House Districts 74 and 117.

Georgia. Feb. 11, 2022, Morning Tr. 51:18–52:2. Even though Irondale is not an incorporated municipality, it does not mean that it is not a community of interest. Accordingly, the Court finds that Mr. Esselstyn's Illustrative House Districts 74 and 117 adhere to the traditional redistricting principle of maintaining communities of interest.

### (f) Incumbent protection

Mr. Morgan states in his report that Mr. Esselstyn's illustrative state House plan pairs eight sets of incumbents (16 total) who are running for reelection, whereas the Enacted State House map pairs only four sets of incumbents (eight total) who are running for reelection. DX 2, ¶¶ 17–18 & chart 4.

## Chart 4. House incumbent pairings

| Incumbent Pairings | Adopted House Plan | Esselstyn House Plan |
|---|---|---|
| Pairing #1 | Rebecca Mitchell -D<br>Shelly Hutchison -D | Mike Glanton -D<br>Demetrius Douglas -D |
| Pairing #2 | Gerald Green -R<br>Winifred Dukes -D | Rebecca Mitchell -D<br>Shelly Hutchison -D |
| Pairing #3 | James Burchett -R<br>Dominic LaRiccia -R | El-Mahdi Holly -D<br>Regina Lewis-Ward -D |
| Pairing #4 | Danny Mathis – R<br>Robert Pruitt - R | Miriam Paris -D<br>Dale Washburn -R |
| Pairing #5 | | Robert Dickey -R<br>Shaw Blackmon -R |
| Pairing #6 | | Noel Williams – R<br>Robert Pruitt - R |
| Pairing #7 | | Gerald Green -R<br>Winifred Dukes -D |
| Pairing #8 | | James Burchett -R<br>Dominic LaRiccia -R |
| | | |
| Total incumbents Paired | **8** | **16** |

DX 2, ¶ 18 & chart 4.

During the hearing, Mr. Esselstyn testified that "I was not able to find a publicly-available authoritative source . . . for incumbent address data . . . [s]o, as a result, I did not have that data and so I did not take it into account." Feb. 9, 2022, Afternoon Tr. 223:16–22. Indeed, the Court finds it notable that Mr. Esselstyn's Illustrative State House Map creates only eight incumbent pairings even though Mr. Esselstyn had no address information regarding

incumbents. Further, three of the incumbent pairings are unchanged from the Enacted State House Map (Rebecca Mitchell and Shelly Hutchinson; Gerald Green and Winifred Dukes; James Burchett and Dominic LaRiccia). DX 2, ¶ 18 & chart 4. Additionally, while Robert Pruitt is paired against Danny Mathis in the enacted plan, Robert Pruitt is paired against Noel Williams in Mr. Esselstyn's Illustrative House Maps—in both pairings, both incumbents are Republicans. Id.

With respect to Mr. Esselstyn's Illustrative House Districts 74 and 117, six-incumbents are paired against one another, two more than the Enacted House Plan. Two of the incumbent pairings (Miriam Paris and Dale Washburn; and Shaw Blackmon and Robert Dickey) are not impacted by Mr. Esselstyn's Illustrative House Districts 74 and 117. Rep. Paris currently represents House District 142 in Bibb County and Rep. Washburn represents House District 141 in Bibb and Monroe Counties. Rep. Blackmon represents House District 146 in Houston County and Rep. Dickey represents House District 140 in Houston, Bibb, Monroe and Peach Counties. Georgia General Assembly House of Representatives, https://www.legis.ga.gov/members/ house (last visited Feb.

28, 2022).[31] Thus, Mr. Esselstyn's Illustrative House Districts 74 and 117 creates six incumbent pairings, two more than the Enacted State House Map. The Court finds that Mr. Esselstyn's Illustrative State House Map complies with the traditional redistricting principle of protecting incumbents.

### (g) Core retention

The Court finds that Mr. Esselstyn's Illustrative State House Map retains the core of the Enacted State House Map. As an initial note, preservation of existing district cores was not an enumerated districting principle adopted by the General Assembly. See GPX 40. However, if the Court were to implement a remedial map, the Court would consider core retention. Thus, the Court has considered this issue and finds as follows:

Mr. Esselstyn's illustrative state House plan changes 26 of the 180 2021 adopted House districts in the process of creating five additional majority-minority districts. DX 2, ¶ 19. Mr. Esselstyn explained in his supplemental expert report that "[o]ne of the guiding principles in the creation of my illustrative plans was to keep changes to a minimum while adhering to other neutral criteria . . . . While the illustrative plans are—intentionally—a

---

[31] The Court takes judicial notice of the names of the members of the House of Representative for the Georgia General Assembly and the districts that those members serve. Fed. R. Evid. 201(b).

departure from the enacted plans, most of the plans' districts remain intact." GPX 4, ¶ 9; see also Feb. 9, 2022, Afternoon Tr. 267:20–268:4 (Mr. Esselstyn's testimony: "One of the other considerations for me was not trying to make more changes [than] I have to.").

The Court finds that in Mr. Esselstyn's Illustrative House Map, "86% of the districts are unchanged from the enacted House plan." GPX 4, ¶ 9. The Court notes that "[m]odifying one district necessarily requires changes to districts adjacent to the original modification, and harmonizing those changes with traditional redistricting criteria (such as population equality and intactness of counties) often inescapably results in cascading changes to other surrounding districts." Id. Accordingly, the Court finds that Mr. Esselstyn's Illustrative State House Map respects the principle of core retention.

### (h)  Racial considerations

Defendants argue that Mr. Esselstyn's Illustrative House Maps still must fail because they were drawn predominately for racial considerations. The Court is not persuaded by this argument. Both the U.S. Supreme Court's and Eleventh Circuit's "precedents require [Section 2] plaintiffs to show that it would be possible to design an electoral district, consistent with traditional districting principles, in which minority voters could successfully elect a

minority candidate." <u>Davis</u>, 139 F.3d at 1425. "[I]ntentional creation of a majority-minority district necessarily requires consideration of race." <u>Fayette Cnty.</u>, 118 F. Supp. 3d at 1345. Therefore, "[t]o penalize [plaintiffs] . . . for attempting to make the very showing that <u>Gingles</u>, <u>Nipper</u>, 39 F.3d 1494, and [<u>Southern Christian Leadership Conference v. Sessions</u>, 56 F.3d 1281 (11th Cir. 1995),] demand would be to make it impossible, as a matter of law, for any plaintiff to bring a successful Section Two action." <u>Davis</u>, 139 F.3d at 1425.

Mr. Esselstyn explained that he was asked "to determine whether there are areas in the State of Georgia where the Black population is 'sufficiently large and geographically compact' to enable the creation of additional majority-Black legislative districts relative to the number of such districts provided in the enacted State Senate and State House of Representatives redistricting plans from 2021." GPX 3, ¶ 8 (footnote omitted); <u>see also</u> Feb. 9, 2022, Afternoon Tr. 150:11–19 (Mr. Esselstyn's testimony confirming what he was asked to do in this case). Mr. Esselstyn testified that he was not asked to maximize the number of majority-Black districts in the State Senate or House map. Feb. 9, 2022, Afternoon Tr. 150:23–25. Mr. Esselstyn also testified that it was necessary for him to consider race as part of his analysis because, under Section 2, "the key metric is whether a district has a majority of the Any Part Black population. So

that means it has to be over 50 percent. And that means looking at a column of numbers in order to determine, to assess whether a district has that characteristic. You have to look at the numbers that measure the percentage of the population is Black." Id. at 155:15–156:2.

When asked by the Court whether race was the "controlling question" when drawing his illustrative House District 149, Mr. Esselstyn responded that he did not have "one predominant consideration. . . . [he was] trying to see if something can be satisfied while considering all the other traditional principles and the principles adopted by the General Assembly." Feb. 9, 2022, Afternoon Tr. 254:1–255:18. Mr. Esselstyn emphasized that he took other considerations into account as well when drawing his illustrative plans, including population equality, compliance with the federal and state constitutions, contiguity, and other traditional districting principles. Id. at 156:10–157:9; see also id. at 275:2–11 (Mr. Esselstyn's testimony explaining that, when drawing illustrative districts, "I'm not looking at any one race of voters. . . . I'm always looking [at] a multitude of considerations").

Defendants' expert Ms. Wright opined that Mr. Esselstyn's Illustrative House District 117 was drawn predominately with racial considerations: "It is also unusual that District 116 follows the interstate except to take a single

precinct across the interstate that likely has racial implications for District 117." DX 41, ¶ 27. The Court does not agree with Ms. Wright's assessment. As stated above, Mr. Esselstyn testified that he used various metrics including but not limited to population size, communities of interest, and political subdivisions, in addition to race, when he drew his Illustrative State House Maps. Accordingly, the Court does not find that race predominated the drawing of Mr. Esselstyn's Illustrative State House Districts 74 and 117.

The Court finds that Mr. Esselstyn's Illustrative State House Districts 74 and 117 contain Black populations that are sufficiently numerous and compact to create two districts that comply with traditional redistricting principles. Accordingly, the Court finds that the <u>Grant</u> Plaintiffs have a substantial likelihood of success in proving that Mr. Esselstyn's Illustrative State House Districts 74 and 117 satisfy the first <u>Gingles</u> precondition.

**(2)** *The <u>Alpha Phi Alpha</u> Plaintiffs are substantially likely to establish a Section 2 violation.*[32]

**(a)** <u>Cooper's Illustrative House District 153</u>

This Court finds that the <u>Alpha Phi Alpha</u> Plaintiffs have shown that they have a substantial likelihood of satisfying the first <u>Gingles</u> precondition with respect to an additional majority-minority district in southwest Georgia.

### *i)    Numerosity*

Mr. Cooper drew one illustrative House District in southeastern Georgia. Mr. Cooper's Illustrative House District 153 is in the area South of Albany, including Dougherty, Mitchell, and Thomas Counties. APAX 1, ¶ 118 & fig.34. Mr. Cooper's Illustrative State House District 153 includes all of Mitchell County, and parts of Dougherty and Thomas Counties. <u>Id.</u>

---

[32] In closing arguments, the court asked counsel for <u>Alpha Phi Alpha</u> whether the <u>Alpha Phi Alpha</u> Plaintiffs would be "upset if [the Court] just totally disregarded Mr. Cooper['s] maps on the Senate?" Feb. 14, 2022, Morning Tr. 81:25–82:1. In response, counsel stated "[n]ot at all, your Honor. They draw districts in exactly— pretty much the same areas of the State and at the end of the day, remedy the same violation based on the exact same population growth, based on the exact same concentration of Black voting strengths in different parts of the Black Belt." <u>Id.</u> 82:2– 7. Accordingly, the Court formally incorporates its findings for the <u>Grant</u> Plaintiffs into its findings for the <u>Alpha Phi Alpha</u> Plaintiffs.

**Figure 34:** *Illustrative Plan: District 153 and vicinity*



APAX 1, ¶ 117 & fig.34.

In 1990, Non-Hispanic whites constituted about half of the overall population in the Senate District 12 region. See APAX 1, ¶ 55 & fig.9. By 2020, Non-Hispanic whites comprised only about one-third of the population. See id. Over the same period, the Black population grew in absolute terms from 102,728 to 115,621, representing just under half the population in 1990, but 60.6% of the population by 2020. See id. From 2000 to 2020, the proportion of

the AP Black population in the southwest Georgia counties comprising Senate District 12 grew, representing just over half the population in 2000 at 55.33%, but 60.6% of the population by 2020. APA Stip. ¶ 109. In the area where Enacted Senate District 12 was drawn with a majority-Black population, only two of the three House districts in the Enacted House Plan are majority Black. See id. ¶ 110. This fact, combined with the increase in the proportion of the Black population in that area over the last decade, indicates that an additional Black-majority House district can very likely be drawn in the area of Southwest Georgia covered by Enacted Senate District 12. Feb. 7, 2022, Afternoon Tr. 123:6–19, 124:8–16; see also APAX 1, ¶ 117 & fig.34; id. ¶ 118 & fig.35. Mr. Cooper's Illustrative House District 153 has an AP BVAP of 57.96%. APAX 1, at 293. Neither of Defendants' experts disputes that Mr. Cooper's Illustrative House District 153 has an AP BVAP greater than 50%. Accordingly, the Court finds that the Black population in Mr. Cooper's Illustrative State House District 153 is sufficiently numerous to constitute an additional Black-majority house district.

### ii) *Geographic compactness*

Mr. Cooper reported that his plans "comply with traditional redistricting principles, including population equality, compactness, contiguity, respect for

communities of interest, and the non-dilution of minority voting strength." APAX 1, ¶ 8. Mr. Cooper testified that he attempted to balance all these principles and that no one principle predominated over the others. See Feb. 7, 2022, Afternoon Tr. 140:2–7 ("I tried to balance [all the traditional redistricting principles]. I was aware of them all and I tried to achieve plans that were fair and balanced.").

### (a)  Population equality

Mr. Cooper's Illustrative House District 153 is not malapportioned, and it complies with the one-person, one-vote principle. "[T]he Equal Protection Clause requires that a State make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as practicable." Reynolds, 377 U.S. at 577. Mr. Cooper's report states that the population deviation for his Illustrative House District 153 is 1.35% (APAX 1, at 293) and the enacted House District 153 has a population deviation of 0.36% (id. at 282). Mr. Cooper also testified that his Illustrative House Map overall had a deviation of ± 1.5%. Feb. 7, 2022, Afternoon Tr. 169:1–2. Mr. Cooper's population deviations are within the limits allowed by the Equal Protection Clause.

> [M]inor deviations from mathematical equality among state legislative districts are insufficient to make out a prima facie case . . . under the Fourteenth Amendment . . . . Our decisions have established, as a general matter, that an apportionment plan with a maximum population deviation under 10% falls within this category of minor deviations.

Brown v. Thomson, 462 U.S. 835, 842 (1983) (quotations and citations omitted). Thus, the Court finds that Mr. Cooper's Illustrative House District 153 complies with population equality.

### (b) Compactness

Mr. Cooper's Illustrative House District 153 has a comparable compactness score to the Enacted State House Map. Mr. Cooper reported that his Illustrative House Map has an average Reock score of 0.39 and an average Polsby-Popper score of 0.27. APAX 1, ¶¶ 122–123 & fig.36. In comparison, the Enacted State House Map has an average Reock score of 0.39 and an average Polsby-Popper score of 0.28. Id. In other words, Mr. Cooper's Illustrative House Map has an identical Reock score as the enacted House Map and is one one-hundredth of a point less compact under Polsby-Popper. Id.

**Figure 36**

**Compactness Scores – Illustrative House Plan vs 2014 Benchmark and 2021 House Plans**

| | Reock | | | Polsby-Popper | |
|---|---|---|---|---|---|
| | Mean | Low | | Mean | Low |
| **Illustrative House Plan** | .39 | .16 | | .27 | .11 |
| **2014 Benchmark House Plan** | .39 | .13 | | .27 | .09 |
| **2021 House Plan** | .39 | .12 | | .28 | .10 |

Id.

Defendants' expert Mr. Morgan reports that Mr. Cooper's Illustrative House District 153 has a Reock score of 0.28 and a Polsby-Popper score of 0.19. DX 1, ¶ 24 & chart 5. In comparison, the Enacted State House District 153 has a Reock score of 0.30 and a Polsby-Popper score of 0.30. Id.

**Chart 5. Compactness score summary**

| New Majority-Black District | Adopted Plan Reock | Cooper Plan Reock | Adopted Plan Polsby-Popper | Cooper Plan Polsby-Popper |
|---|---|---|---|---|
| Senate 6 | 0.41 | **0.43** | **0.24** | 0.23 |
| Senate 9 | 0.24 | **0.33** | 0.21 | 0.21 |
| Senate 17 | 0.35 | **0.37** | 0.17 | **0.18** |
| Senate 23 | **0.37** | 0.35 | 0.16 | 0.16 |
| Senate 28 | 0.45 | **0.49** | **0.25** | 0.22 |
| House 73 | 0.28 | **0.44** | 0.20 | 0.20 |
| House 110 | 0.36 | **0.44** | **0.33** | 0.24 |
| House 111 | **0.33** | 0.30 | **0.29** | 0.23 |
| House 144 | **0.51** | 0.31 | **0.32** | 0.16 |
| House 153 | **0.30** | 0.28 | **0.30** | 0.19 |

Id.

The Court finds that Mr. Cooper's Illustrative House District 153 is sufficiently compact. Mr. Cooper's Illustrative House District 153 has a Reock score only two-hundredths of a point less compact than the Enacted State House District 153. Additionally, the Court does not find that the difference in nine-hundredths of a point difference in the Polsby-Popper scores makes Mr. Cooper's Illustrative House District 153 not compact. Thus, the Court finds that Mr. Cooper's Illustrative House District 153 is sufficiently compact to satisfy the first Gingles precondition.

### (c) Contiguity

Mr. Cooper's Illustrative House District 153 is contiguous. There is no factual dispute on this issue. See Feb. 7, 2022, Afternoon Tr. 133:8–13 (Mr. Cooper testimony confirming that he used Maptitude when drawing to alert him to whether his districts were contiguous).

### (d) Preservation of political subdivisions

Mr. Cooper's Illustrative State House District 153 preserves political subdivisions. Mr. Cooper reported that "[t]he illustrative plans are drawn to follow, to the extent possible, county and VTD boundaries. Where counties are split to comply with one-person one-vote requirements or to avoid pairing

incumbents, [he] ha[s] generally used whole 2020 Census VTDs as sub-county components." APAX 1, ¶ 9 (footnote omitted). Mr. Cooper also stated that "[w]here VTDs are split, [he] ha[s] followed census block boundaries that are aligned with roads, natural features, census block groups, or municipal boundaries." Id.

Mr. Cooper's Illustrative House Plan as a whole, splits four more counties than the Enacted State House Map and splits 83 more VTDs than the Enacted House Plan. APAX 1, ¶ 124 & fig.37. The Court notes that Mr. Cooper based his Illustrative House Plan on the 2015 Benchmark House Plan, not the Enacted State House Map, because Mr. Cooper began drawing his maps before the Georgia Assembly passed the Enacted State House Map. See Feb. 7, 2022, Afternoon Tr. 239:25–240:5.

**Figure 37**

**County and VTD Splits – Illustrative Plan vs 2006 and 2015 Plans**

| | County Splits (Populated) | Unique County-District Combinations | 2020 VTD Splits (Populated) |
|---|---|---|---|
| **Illustrative House Plan** | 74 | 206 | 262 |
| **2015 Benchmark House Plan** | 73 | 215 | 232 |
| **2021 House Plan** | 70 | 211 | 179 |

APAX 1, ¶ 124 & fig.37.

With respect to Mr. Cooper's Illustrative House District 153, Mr. Cooper testifies that his Illustrative House District 153 includes "part of Dougherty County, Albany, [] all of Mitchell and part of Thomas into Thomasville, following the main route there from Albany to Thomasville." Feb. 7, 2022, Afternoon Tr. 159:10–14. Defendants noted that Mr. Cooper's Illustrative State House District 153 has the effect that no district is wholly within Dougherty County on the illustrative plan. See id. at 217:2–10. Upon review, however, the Court notes that Dougherty County is split four ways in the Enacted State Plan and only three ways Mr. Cooper's Illustrative State House Plan. Compare APAX 1, at ¶ 117 & fig.34,

**Figure 34:** *Illustrative Plan: District 153 and vicinity*



with id. at ¶ 118 & fig.35.

**Figure 35:** *2021 Plan: District 151, 153, 171 and Vicinity*



In Mr. Cooper's Illustrative State House Plan, Dougherty County is split among Illustrative Districts 151, 153, and 154. Id. at 60 fig.34. In the Enacted State House Map, on the other hand, Dougherty County is split between Districts 153, 154, 155 and 171. Id. at 61 fig.35. Although District 153 is wholly within Dougherty County in the Enacted State House Map, Mr. Cooper's Illustrative State House Map splits Dougherty County three not four times. Accordingly, the Court does not find that Mr. Cooper's Illustrative House

District 153 does not respect political boundaries simply because there is not one district that is wholly within Dougherty County. The Court finds that Mr. Cooper adhered to respecting political subdivisions when he drew his Illustrative House District 153.

(e) **Preservation of communities of interest**

The Court finds that Mr. Cooper's Illustrative House District 153 preserves communities of interest. Mr. Cooper testified that "there is a clear transportation route along the Highway 19." Feb. 7, 2022, Afternoon Tr. 160:19–23. Additionally, Mr. Cooper stated that "the Southwest Georgia Regional Commission includes Thomas, and extends all the way out to the Albany area. So it's in the same Regional Commission and it's connected by a major highway that's featured in the Georgia tourist volume I think that you can get at rest stops." Id. at 161:3–8. Thus, Mr. Cooper opined, "[t]here are clear connections between Albany and Thomasville." Id. at 161:8–9. Defendants' expert Ms. Wright, however, testified that Albany and Thomasville are "communities that would not typically be combined together . . . . Albany is very – is a very unique, defined identity in that region, as is Thomasville further south, but they don't share a common interest." Feb. 11, 2022, Morning Tr. 44:22–45:2. The Court is not convinced by this assessment. After all, Ms. Wright also testified

that a community of interest is "kind of in the eye of the beholder." Id. at 91:11–12. The Court finds that there is a major roadway that connects the two towns, and the regional commission lists Albany and Thomasville as part of the same region. Feb. 7, 2022, Afternoon Tr. 160:19–23; 161:3–8. Accordingly, the Court finds that Mr. Cooper's Illustrative State House District 153 contains communities of common interest.

### (f) Incumbent protection

Mr. Cooper's Illustrative State House District 153 does not pair any incumbents. Mr. Morgan criticized Mr. Cooper's Illustrative State House Plan because it paired 26 total incumbents as opposed to the Enacted State House Map, which paired eight incumbents. DX 1, ¶ 18. Mr. Cooper responded explaining that he used a publicly available database when he drew his Illustrative State House Plan, which had different information than the "incumbent databases used by the Georgia General Assembly during the redistricting process" that Mr. Morgan used. APAX 2, ¶¶ 3–4. Mr. Cooper testified that after he received the information that Mr. Morgan had access to, he was able to sharply reduce the number of incumbent pairings in three or four hours. Feb. 7, 2022, Afternoon Tr. 138:14–140:1. Mr. Cooper was ultimately

able to reduce the number of incumbent pairings significantly. <u>See</u> APAX 2, ¶¶ 3–14.

Of the incumbent pairings that Mr. Morgan identified, only incumbents Winifred Dukes and Gerald Greene currently represent a district that is impacted by Mr. Cooper's Illustrative House District 153.

## Chart 4. House incumbent pairings

| Incumbent Pairings | Adopted House Plan | Cooper House Plan |
|---|---|---|
| Pairing #1 | Rebecca Mitchell -D<br>Shelly Hutchison -D | Matthew Gambill -R<br>Mitchell Scoggins -R |
| Pairing #2 | Gerald Green -R<br>Winifred Dukes -D | Trey Kelley -R<br>Tyler Smith -R |
| Pairing #3 | James Burchett -R<br>Dominic LaRiccia -R | Matt Dubnik -R<br>Emory Dunahoo -R |
| Pairing #4 | Danny Mathis – R<br>Robert Pruitt - R | Angelika Kausche -D<br>Sam Park -D |
| Pairing #5 | | Regina Lewis-Ward -D<br>Angela Moore -D |
| Pairing #6 | | Billy Mitchell -D<br>Doreen Carter -D |
| Pairing #7 | | Mike Cheokas -R<br>Debbie Butler -D |
| Pairing #8 | | Rick Williams -R<br>Dave Belton -R |
| Pairing #9 | | Noel Williams -R<br>Shaw Blackmon -R |
| Pairing #10 | | Robert Pruitt -R<br>Matt Hatchett -R |
| Pairing #11 | | Gerald Greene -R<br>Winifred Dukes -D |
| Pairing #12 | | Ron Stephens -R<br>Carl Guillard -D |
| Pairing #13 | | Darlene Taylor -R<br>John LaHood -R |
| | | |
| Total incumbents Paired | 8 | 26 |

DX 1, ¶ 17 & chart 4.; See Georgia General Assembly House of Representatives, https://www.legis.ga.gov/members/ house (last visited Feb. 28, 2022). Rep. Dukes represents House District 154, which includes part of Albany. Id. This

167

pairing, however, exists in both the Enacted State House Plan and Mr. Cooper's Illustrative State House Plan. DX 1, ¶ 17 & chart 4. The Court thus finds that Mr. Cooper's Illustrative State House District 153 protects incumbents because no incumbents are paired in this district.

### (g)    Core retention

Defendants argue that Mr. Cooper's Illustrative House Plan does not retain the core of the Enacted State House Map. As an initial note, preservation of existing district cores was not an enumerated districting principle adopted by the General Assembly. See GPX 40. However, if the Court were to implement a remedial map, the Court would consider core retention. Thus, the Court has considered this issue and finds as follows:

The Court finds that Mr. Cooper's Illustrative State House Maps and the enacted House Maps overlap by 61.4%. Although, Mr. Morgan found that only enacted House District 003 was unchanged in Mr. Cooper's Illustrative House Plan (DX 1, ¶ 19), Mr. Cooper found that there is a total 61.4% overlap between Mr. Cooper's Illustrative State House Plan and the Enacted State House Map (APAX 2, ¶ 16). Mr. Morgan testified that he only opined on whether the districts between Mr. Cooper's Illustrative State House Plan and the Enacted State House Map were exactly the same. Feb. 14, 2022, Morning Tr. 13:23–14:1.

However, Mr. Morgan did not contest that Mr. Cooper's Illustrative State House Plan and the Enacted State House Map overlapped by 61.4%. Id. at 14:13–20. Accordingly, the Court finds that Mr. Cooper's Illustrative House Plan maintains more than half of the Enacted State House Map.

(h)    **Racial considerations**

Defendants also argue that Mr. Cooper's Illustrative State House Maps still must fail because they were drawn predominately for racial considerations. The Court is not persuaded by this argument. Both the U.S. Supreme Court's and Eleventh Circuit's "precedents require [Section 2] plaintiffs to show that it would be possible to design an electoral district, consistent with traditional districting principles, in which minority voters could successfully elect a minority candidate." Davis, 139 F.3d at 1425. "[I]ntentional creation of a majority-minority district necessarily requires consideration of race." Fayette Cnty., 118 F. Supp. 3d at 1345. Therefore, "[t]o penalize [plaintiffs] . . . for attempting to make the very showing that Gingles [and its progeny] demand would be to make it impossible, as a matter of law, for any plaintiff to bring a successful Section Two action." Davis, 139 F.3d at 1425.

Mr. Cooper explained that he was "aware of race as traditional redistricting principles suggest one should be." Feb. 7, 2022, Afternoon Tr.

135:17–18. Mr. Cooper explained that considering race was required to comply with the Voting Rights Act, which is federal law. Id. at 135:17–21. Mr. Cooper testified that he did not aim to draw any minimum number of Black-majority districts in his analysis. Id. at 135:22–136:3. When asked by the State whether his goal "really was to create an additional majority Black district in the creation of [his] House and Senate Plans," he answered that his goal "was to determine whether or not additional majority Black districts could be created. So there was no goal per se." Id. at 164:16–21. Mr. Cooper repeatedly testified that he balanced all redistricting principles and stated that no one principle predominated. E.g., id. at 140:3–7, 230:17–25.

Ms. Wright testified that Mr. Cooper's Illustrative House District 153 contained "communities that would not typically be combined together. So [she is] not sure what the reason would be unless there was another particular goal in mind to draw that." Feb. 11, 2022, Morning Tr. 44:22–25. The Court does not agree with Ms. Wright's assessment. Mr. Cooper testified that his Illustrative House District 153 is connected by "a clear transportation route along Highway 19" (Feb. 7, 2022, Afternoon Tr. 160:22–23) and is in within the same regional commission (id. at 161:3–8). Mr. Cooper also testified that he took into account a district's population size, political subdivisions and

incumbent pairings, in addition to race. Accordingly, the Court does not find that race predominated the drawing of Mr. Cooper's Illustrative State House District 153.

The Court finds that Mr. Cooper's Illustrative House District 153 contains Black population that is sufficiently numerous and compact, as to create an additional district that complies with traditional redistricting principles. Accordingly, the Court finds that the Alpha Phi Alpha Plaintiffs have a substantial likelihood of success in proving that Mr. Cooper's Illustrative House District 153 satisfies the first Gingles precondition.

### (3) Conclusions of Law

Thus, based upon the evidence presented, the Court finds that the Grant and Alpha Phi Alpha Plaintiffs have sufficiently established that they are substantially likely to succeed on the merits of satisfying the first Gingles precondition because it is possible to create two additional State Senate Districts (Mr. Esselstyn's Illustrative Senate Districts 25 and 28) and two State House Districts in the Atlanta Metropolitan area (Mr. Esselstyn's Illustrative House Districts 74 and 117) and one additional State House District in southwestern Georgia (Mr. Cooper's Illustrative House District 153).

### 2.    *The Second <u>Gingles</u> Precondition: Political Cohesion*

The second <u>Gingles</u> element is that "the minority group . . . show that it is politically cohesive." 478 U.S. at 50. This involves an assessment of the extent to which elections in the jurisdiction are affected by racial polarization:

> [T]he question whether a given district experiences legally significant racially polarized voting requires discrete inquiries into minority and white voting practices. A showing that a significant number of minority group members usually vote for the same candidates is one way of proving the political cohesiveness necessary to a vote dilution claim, and, consequently, establishes minority bloc voting within the context of § 2.

<u>Id.</u> at 56 (citations omitted).

All the parties agree that there is an extremely large degree of racial polarization in Georgia elections. However, they starkly disagree about the causes of that polarization and whether those causes are relevant to the second <u>Gingles</u> precondition.

### a)    <u>The parties' arguments</u>

#### (1)    *Defendants*

Defendants contend, in short, that the polarization is caused by partisan factors rather than "the race of the candidate" Black voters vote for. <u>APA</u> Doc. No. [120], ¶ 285. Because white voters cohesively support Republican

candidates and Black voters cohesively support Democratic candidates without regard to whether the candidate is Black or white, Defendants attribute the polarization to partisanship. Id. ¶¶ 286–287. In doing so, Defendants assert that the extreme level of polarization is really partisan rather than racial. Id. Because the vote dilution must be "on account of race or color" to violate Section 2, Defendants argue that the Court must determine whether some other factor is the cause. See id. ¶ 430. As a result, Defendants argue that Plaintiffs cannot show that "electoral losses are 'on account of race or color' and not partisan voting patterns." Id. 430 (citing 52 U.S.C. § 10301(a); Solomon, 221 F. 3d at 1225 (en banc); LULAC, 999 F. 2d at 854 (en banc)).

### (2) Plaintiffs

In contrast, all three sets of Plaintiffs contend that the reasons *why* Black Georgia voters and white Georgia voters overwhelmingly support opposing candidates is irrelevant to Section 2's effects-based inquiry. The evidence compellingly demonstrates acute polarization by race and, Plaintiffs assert, what causes Georgia voters to vote that way is not relevant to the second Gingles Precondition or the second Senate Factor. They argue they are not required "to prove [that] racism determines the voting choices of the white electorate in order to succeed in a voting rights case." Pendergrass Doc. No.

[87], ¶ 351 (citing <u>Askew v. City of Rome</u>, 127 F.3d 1355, 1382 (11th Cir. 1997);

<u>Fayette Cnty.</u>, 950 F. Supp. 2d at 1321 n.29); <u>see also</u> <u>APA</u> Doc. No. 121, ¶ 665

(similar); <u>Grant</u> Doc. No. [82], ¶ 381 (same).

### (3) Conclusions of law

The Court concludes as a matter of law that, to satisfy the second <u>Gingles</u>

precondition, Plaintiffs need not prove the causes of racial polarization, just its

existence. The plurality opinion in <u>Gingles</u> concluded that, "[f]or purposes of

§ 2, the legal concept of racially polarized voting incorporates neither causation

nor intent. *It means simply that the race of voters correlates with the selection of a*

*certain candidate or candidates*; that is, it refers to the situation where different

races (or minority language groups) vote in blocs for different candidates."

<u>Gingles</u>, 478 U.S. at 62 (emphasis added). Thus, four Supreme Court justices

concluded that the existence of political polarization does not negate Plaintiffs'

ability to establish the second <u>Gingles</u> precondition by showing the extent of

racial-bloc voting. <u>Id.</u>; <u>see also</u> <u>Chisom v. Roemer</u>, 501 U.S. 380, 404 (1991)

(emphasizing that "Congress made clear that a violation of § 2 could be

established by proof of discriminatory results alone").

The weight that should be placed on the extent of such polarization—

and any link to partisanship—must necessarily be part of the totality-of-the-

circumstances analysis under the second Senate Factor. <u>Gingles</u>, 478 U.S. at 37 (identifying extent of racial polarization in elections under second Senate Factor); <u>Solomon</u>, 899 F.2d at 1015 (Kravitch, J., specially concurring) (same). However, such evidence must again be considered in light of the admonition in <u>Gingles</u>'s plurality opinion that

> [i]t is the *difference* between the choices made by blacks and whites—not the reasons for that difference—that results in blacks having less opportunity than whites to elect their preferred representatives. Consequently, we conclude that under the "results test" of § 2, only the correlation between race of voter and selection of certain candidates, not the causes of the correlation, matters.
>
> . . . .
>
> [W]e would hold that the legal concept of racially polarized voting, as it relates to claims of vote dilution, refers only to the existence of a correlation between the race of voters and the selection of certain candidates. Plaintiffs need not prove causation or intent in order to prove a prima facie case of racial bloc voting and defendants may not rebut that case with evidence of causation or intent.

478 U.S. at 63, 74 (emphasis in original).

As discussed above, applying the standard advocated by Defendants would undermine the congressional intent behind the 1982 amendments to the VRA—namely, to focus on the *results* of the challenged practices. <u>Id.</u> at 35–36;

see also <u>Marengo Cnty. Comm'n</u>, 731 F.2d at 1567. Congress wanted to avoid "unnecessarily divisive [litigation] involv[ing] charges of racism on the part of individual officials or entire communities." S. Rep. No. 97-417, pt. 1, at 36 (1982); <u>see also</u> <u>Solomon</u>, 899 F.2d at 1016 n.3 (Kravitch, J., specially concurring) (explaining that this theory "would involve litigating the issue of whether or not the community as a whole was motivated by racism, a divisive inquiry that Congress sought to avoid by instituting the results test"). As the Eleventh Circuit long ago made clear, "[t]he surest indication of race-conscious politics is a pattern of racially polarized voting." <u>Marengo Cnty. Comm'n</u>, 731 F.2d at 1567.

Here, each set of Plaintiffs has more than satisfied its burden to show political cohesion among Black voters in the relevant regions and districts.

      **b)**     **The existence of political cohesion**

          *(1)*     *Pendergrass*

              **(a)**     **Plaintiffs' Expert: Dr. Maxwell Palmer**[33]

The <u>Pendergrass</u> Plaintiffs proffered Dr. Maxwell Palmer as their racially polarized voting expert. Feb. 10, 2022, Morning Tr. 44:17–20, 47:8–19.

---

[33] To the extent Dr. Palmer provided evidence related to other issues or Plaintiffs, the following discussion is necessarily applicable to those matters as well.

*i)* *Qualification*

Dr. Palmer received his undergraduate degree in mathematics, and government and legal study from Bowdoin College in Maine; he holds a Ph.D. in political science from Harvard University. Feb. 10, 2022, Morning Tr. 45:14–18. He is currently a tenured associate professor of political science at Boston University. Id. at 45:21–25. He teaches classes on American politics and political methodology, including data science and formal theory. Id. at 46:1–5. Among his principle areas of research are voting rights. Id. at 46:6–8.

Dr. Palmer has previously served as an expert witness in numerous redistricting cases, conducting racially polarization analyses in each; he has never been rejected as such an expert. Feb. 10, 2022, Morning Tr. 46:9–24; GPX 5, ¶ 3 & 22–31. He has also served as an expert for the Virginia Independent Redistricting Commission. Feb. 10, 2022, Morning Tr. 47:3–7; GPX 5, at 29.

Defendants did not object to Dr. Palmer being qualified as an expert in redistricting and data analysis, and the Court so qualified him. Feb. 10, 2022, Morning Tr. 47:15–19. The Court found Dr. Palmer's testimony to be credible and his analyses to be methodologically sound. The Court notes that Dr. Palmer's findings are consistent with the Alpha Phi Alpha Plaintiffs' expert

Dr. Handley. <u>See</u> <u>infra</u> (III.A.2.(b)(3)(a)(ii)). It credits that testimony and the reliability of Dr. Palmer's conclusions.

During Dr. Palmer's live testimony, the Court carefully observed his demeanor, particularly as he was cross-examined for the first time about his work on this case. He consistently defended his work with careful and deliberate explanations of the cases for his opinions. When Defense counsel questioned his methodology, and particularly the reason behind not using primary data, Dr. Palmer provided measured and thoughtful responses. The Court observed no internal inconsistencies in his testimony, no appropriate question that he could not or would not answer, and no reason to question the veracity of his testimony. The Court finds that his methods and conclusions are highly reliable, and ultimately that his work as an expert on the second and third <u>Gingles</u> preconditions is helpful to the Court.

### ii)    *Analysis*

Dr. Palmer was tasked with offering an expert opinion on the extent to which voting is racially polarized in each of the Congressional Districts 3, 11, 13, and 14 of the Enacted Maps, as well as the region covered by those districts. <u>Pendergrass</u> Stip. ¶ 56; GPX 5, ¶ 9; Feb. 10, 2022, Morning Tr. 52:5–16. Dr. Palmer found strong evidence of such voting in every area he examined.

Feb. 10, 2022, Morning Tr. 48:3–6. In other words, Dr. Palmer found that Black and white voters consistently support different candidates. GPX 5, ¶ 6.

To assess polarization, Dr. Palmer employed a statistical method called Ecological Inference ("EI") to derive estimates of the percentages of Black and white voters in elections conducted in the relevant Congressional Districts in 31 statewide elections held between 2012 and 2021. GPX 5, ¶¶ 10, 12; Feb. 10, 2022, Morning Tr. 49:19–50:1, 51:16–19. He described EI as a "statistical procedure . . . that estimates group-level preferences based on aggregate data." GPX 5, ¶ 12. His EI analysis relied on precinct-level election results and voter turnout by race, as compiled by the State of Georgia. GPX 5, ¶ 10; Feb. 10, 2022, Morning Tr. 51:20–52:3.

First, Dr. Palmer examined each racial group's support for each candidate to determine if members of the group voted cohesively in support of a single candidate in each election. GPX 5, ¶ 13. If a significant majority of the group supported a single candidate, he then identified that candidate as the group's candidate of choice. Id. Dr. Palmer next compared the preferences of white voters to the preferences of Black voters. Id. In every election he examined, across the relevant region and in each Congressional District from the Enacted Maps, Dr. Palmer found that Black voters had clearly identifiable

candidates of choice. GPX 5, ¶¶ 15, 17–18, & figs. 2–4, 6; Feb. 10, 2022, Morning

Tr. 52:17–54:19. For elections from 2012 through 2021, Black voters on average

supported their preferred candidates with an estimated vote share of 98.5%.

GPX 5, ¶¶ 6, 14–15 & figs. 2–3, tbl.1.

**(b)** **Defendants' Expert: Dr. John Alford**[34]

Defendants proffered Dr. John Alford as their expert on the issue of racial

polarization. Feb. 11, 2022, Afternoon Tr. 140:17–22. Plaintiffs did not object to

Dr. Alford being so qualified, and the Court so qualified him. Id. at 140:23–

141:4.

*i)* *Qualification*

Dr. Alford is a tenured professor of Political Science at Rice University.

DX 42, Ex. 1, at 1; Feb. 11, 2022, Afternoon Tr. 140:1–4. He holds a Master's in

Public Administration from the University of Houston and a Ph.D. in Political

Science from the University of Iowa. DX 42, Ex. 1, at 1; Feb. 11, 2022, Afternoon

Tr. 139:18–25. He has taught graduate and undergraduate level courses on

various subjects, including redistricting, elections, and political representation.

DX 42, 2. Dr. Alford has authored numerous scholarly articles and presented

---

[34] Since Dr. Alford was Defendants' expert in each of the three cases on multiple issues, the following discussion applies to those matters as well.

papers at various conferences and consortia. DX 42, Ex. 1, at 1–8. He has previously been qualified as an expert witness on racial polarization in cases involving Section 2 claims. Id. at 140:13–18. However, Dr. Alford has never published a paper on racially polarized voting or any peer-reviewed articles using EI; and, he has never written about Section 2 of the Voting Rights Act in an academic publication. See Feb. 11, 2022, Afternoon Tr. 160:8–16.

While the Court found Dr. Alford to be credible, his conclusions were not reached through methodologically sound means and were therefore speculative and unreliable. Other courts have come to similar conclusions. See Lopez v. Abbott, 339 F. Supp. 3d 589, 610 (S.D. Tex. 2018) (crediting Dr. Handley's testimony over Dr. Alford's because "Dr. Alford's testimony . . . focused on issues other than the ethnicity of the voters and their preferred candidates—which are the issues relevant to bloc voting"); Texas v. U.S., 887 F. Supp. 2d 133, 146–47 (D.D.C. 2012) (critiquing Dr. Alford's approach because he used an analysis that "lies outside accepted academic norms among redistricting experts," and instead relying heavily on Dr. Handley's testimony), vacated on other grounds, 570 U.S. 928 (2013).

*ii)* *Analysis*

Dr. Alford was tasked with responding to Dr. Palmer's expert report and providing expert opinions about the nature of the polarized voting in Georgia. DX 42; Feb. 11, 2022, Afternoon Tr. 140:5–12. Dr. Alford assumed that Dr. Palmer's EI analysis of existence of racially polarized voting was sound because he knows from his own past work that Dr. Palmer is competent at performing such analyses. Feb. 11, 2022, Afternoon Tr. 143:14–21. However, he raised concerns that Dr. Palmer's results were more attributable to partisanship than race. See DX 42, at 6.

The Court cannot credit this testimony. Dr. Alford admitted on cross-examination that he did not identify any errors that would affect Dr. Palmer's analysis or conclusions. Feb. 11, 2022, Afternoon Tr. 153:3–7. The basis for his testimony was only Dr. Alford's conclusion that Black voters overwhelmingly prefer Democratic candidates and white voters overwhelmingly support Republican candidates. Feb. 11, 2022, Afternoon Tr. 171:8–16; DX 42, at 5. But Dr. Alford did not perform his own analyses of voter behavior, and he testified that it is not possible to separate partisan polarization from racial polarization based on Dr. Palmer's analysis. DX 42; Feb. 11, 2022, Afternoon Tr. 143:4–10. In fact, there is no evidentiary support in the record for Dr. Alford's treatment of

race and partisanship as separate and distinct factors affecting voter behavior. Nor is there any evidence—aside from Dr. Alford's speculation—that partisanship is the cause of the racial polarization identified by Dr. Palmer. DX 42, at 3–4. Dr. Alford himself acknowledged that polarization can reflect both race *and* partisanship, and that "it's possible for political affiliation to be motivated by race." Feb. 11, 2022, Afternoon Tr. 171:8–16. All this undermines Dr. Alford's insistence that partisanship rather than race is the cause of the polarization. In any event, and as discussed above, the cause of the polarization is not relevant to the second <u>Gingles</u> precondition.

Other courts have discounted Dr. Alford's testimony for similar reasons. <u>See, e.g.</u>, <u>NAACP, Spring Valley Branch v. E. Ramapo Cent. Sch. Dist.</u>, 462 F. Supp. 3d 368, 381 (S.D.N.Y. 2020) ("[Dr. Alford's] testimony, while sincere, did not reflect current established scholarship and methods of analysis of racially polarized voting and voting estimates."), <u>aff'd sub nom.</u> <u>Clerveaux v. E. Ramapo Cent. Sch. Dist.</u>, 984 F.3d 213 (2d Cir. 2021); <u>Flores v. Town of Islip</u>, 382 F. Supp. 3d 197, 233 (E.D.N.Y. 2019) ("Dr. Alford maintains that at least 80% of the white majority in Islip must vote against the Hispanic-preferred candidate for the white bloc vote to be sufficient. . . . This theory has no foundation in the applicable caselaw."); <u>Lopez v. Abbott</u>, 339 F. Supp. 3d 589, 610 (S.D. Tex. 2018)

("At this juncture, the Court is only concerned with whether there is a pattern of white bloc voting that consistently defeats minority-preferred candidates. That analysis requires a determination that the different groups prefer different candidates, as they do. It does not require a determination of why particular candidates are preferred by the two groups."); Patino v. City of Pasadena, 230 F. Supp. 3d 667, 709–13 (S.D. Tex. 2017) (finding in favor of the plaintiffs as to Gingles' second and third prongs, contrary to Dr. Alford's testimony on behalf of the defendant jurisdiction), stay denied pending appeal, 667 F. App'x 950 (5th Cir. 2017) (per curiam); Montes v. City of Yakima, 40 F. Supp. 3d 1377, 1401–07 (E.D. Wash. 2014) (finding the same and stating that Dr. Alford's testimony did "not defeat a finding of Latino voter cohesion"); Benavidez v. Irving Indep. Sch. Dist., No. 3:13–CV–0087–D, 2014 WL 4055366, at *11–13 (N.D. Tex. Aug. 15, 2014) (same); Fabela v. City of Farmers Branch, No. 3:10–CV–1425–D, 2012 WL 3135545, at *8–13 (N.D. Tex. Aug. 2, 2012) (same); Texas v. United States, 887 F. Supp. 2d 133, 181 (D.D.C. 2012) ("[T]he fact that a number of Anglo voters share the same political party as minority voters does not remove those minority voters from the protections of the VRA. The statute makes clear that this Court must focus on whether minorities are able to elect the candidate of their choice, no matter the political party that may benefit."),

vacated on other grounds, 570 U.S. 928 (2013); Benavidez v. City of Irving, 638 F. Supp. 2d 709, 722–25, 731–32 (N.D. Tex. 2009) (finding in favor of the plaintiffs as to Gingles' second and third prongs, contrary to Dr. Alford's testimony on behalf of the defendant jurisdiction); see also Feb. 11, 2022, Afternoon Tr. 172:17–20 (agreeing that other courts have rejected his testimony before "[i]n the sense of deciding to go in a different direction than what I thought the facts of the case suggested").

### (c)    Conclusions of Law

The Court concludes that the Pendergrass Plaintiffs have satisfied their burden to establish that Black voters in Georgia (at least for those regions examined) are politically cohesive. Gingles, 478 U.S. at 49. "Bloc voting by blacks tends to prove that the black community is politically cohesive, that is, it shows that blacks prefer certain candidates whom they could elect in a single-member, black majority district." Id. at 68. Dr. Palmer's analysis clearly demonstrate high levels of such cohesiveness, both across the congressional focus area and in the individual districts that comprise it. Neither Dr. Alford's testimony nor his expert report undermines this conclusion.

This finding is also consistent with previous findings of political cohesion among Black Georgians. See, e.g., Wright, 301 F. Supp. 3d at 1313

(noting that, in ten elections for Sumter County Board of Education with Black candidates, "the overwhelming majority of African Americans voted for the same candidate"); Wright, 979 F.3d at 1306 (noting "the high levels of racially polarized voting" in Sumter County).

### (2) *Grant*

The Grant Plaintiffs also proffered Dr. Palmer as their racially polarized voting expert. Feb. 10, 2022, Morning Tr. 44:17–20, 47:8–11. Defendants again proffered Dr. Alford. Except with regard to the specific areas and districts analyzed by Dr. Palmer for the Grant case, (which are discussed further below), the discussion concerning the existence of political cohesion in Pendergrass applies equally here. The Court likewise finds that the Grant Plaintiffs have met their burden to establish the second Gingles precondition.

### (a) **Dr. Palmer's analysis**

In Grant, Dr. Palmer was tasked with offering an expert opinion on the extent to which voting is racially polarized in five different "focus areas" based on the Georgia General Assembly House and Senate Enacted Maps. Grant Stip. ¶ 77; Feb. 10, 2022, Morning Tr. 60:1–13; GPX 6, ¶ 9. The focus areas cover those regions where Plaintiffs' illustrative majority-minority districts are located. GPX 6, ¶ 9. For the Georgia House, Dr. Palmer examined regions he described

as the Black Belt (covering Enacted Map House Districts 133, 142, 143, 145, 147, and 149), Southern Atlanta (Enacted Map House Districts 69, 74, 75, 78, 115, and 117), and Western Atlanta (Enacted Map House Districts 61 and 64). GPX 6, ¶ 10. For the Georgia Senate, Dr. Palmer looked at the Black Belt (Enacted Map Senate Districts 22, 23, 24, 25, and 26) and Southern Atlanta (Enacted Map Senate Districts 10, 16, 17, 25, 28, 34, 35, 39, and 44). GPX 6, ¶ 11.

The analysis Dr. Palmer performed was the same type of EI as that in Pendergrass (GPX 6, ¶¶ 14–16; Feb. 10, 2022, Morning Tr. 59:12–25, 60:18–21), and the results were similar: Black voters in the relevant regions supported their preferred candidate with at least 95.2% of the vote. GPX 6, ¶ 17 & fig.2, tbl.1. Each of the House districts Dr. Palmer examined also exhibited a high degree of polarization. Id. ¶ 18 & fig.3. For the Senate districts, 12 of the 14 showed racial polarization. Id.[35]

### (3) *Alpha Phi Alpha*

The Alpha Plaintiffs proffered Dr. Lisa Handley as an expert in racial polarization analysis and the analysis of minority vote dilution and

---

[35] For the two districts where Dr. Palmer concluded there was not consistent evidence of racially polarized voting, he noted the following: "Voting is generally not polarized in Senate District 39. In Senate District 44, White voters do not have a clear candidate of choice in 18 of the 31 elections, and majorities of White voters opposed the Black-preferred candidate in 13 elections." GPX 6, ¶ 18 & fig.3.

redistricting. Feb. 10, 2022, Morning Tr. 76:13, 81:8–10. Defendants proffered Dr. Alford. Accordingly, except with regard to the specific areas and districts analyzed by Dr. Handley for the Alpha Phi Alpha case, the discussion concerning the existence of political cohesion in Pendergrass applies here, too.

### (a) Plaintiffs' Expert: Dr. Lisa Handley

#### i) Qualification

Dr. Handley holds a Ph.D. in Political Science from The George Washington University. Feb. 10, 2022, Morning Tr. 78:22–79:4; APAX 3, at 47. She has over thirty years of experience in the areas of redistricting and voting rights, and has provided election assistance to numerous countries including to various post-conflict countries through the United Nations. Feb. 10, 2022, Morning Tr. 79:5–18; APAX 3, at 47. She has taught political science courses at both the graduate and undergraduate level at several universities. APAX 3, at 47. She has authored numerous scholarly works concerning redistricting and minority vote dilution, including her dissertation. Feb. 10, 2022, Morning Tr. 79:22–80:4; APAX 3, at 50–52.

Dr. Handley has served as an expert in "scores" of redistricting and voting rights cases, including on behalf of jurisdictions defending against Section 2 cases. Feb. 10, 2022, Morning Tr. 80:5–12, 102:23–103:6; APAX 3, at 46.

In those cases, she generally analyzes voting patterns by race and ethnicity. Feb. 10, 2022, Morning Tr. 80:13–19. As an expert, she has also numerous times performed analyses of racial-bloc voting and evaluations of whether proposed districts provide minorities with the opportunity to elect candidates of their choice. Feb. 10, 2022, Morning Tr. 80:20–81:7. She has routinely been qualified as an expert in cases where she used the same methodology she employed here. Feb. 10, 2022, Morning Tr. 84:25–85:4; APA Doc. No. [118-2], ¶ 4.

Defendants did not object to Dr. Handley being qualified as an expert in the analysis of racial polarization and minority vote dilution and redistricting, and the Court so qualified her. Feb. 10, 2022, Morning Tr. 81:14–17. The Court found Dr. Handley's testimony to be credible and her analyses to be sound. At the live hearing, the Court carefully observed Dr. Handley's demeanor, particularly as she was cross-examined for the first time about his work on this case. She consistently defended his work with careful and deliberate explanations of the cases for his opinions. When Defense counsel questioned her about her methodology particularly the reason behind not using confidence intervals, Dr. Palmer provided measured and thoughtful responses. The Court observed no internal inconsistencies in her testimony, no appropriate question that he could not or would not answer, and no reason to question the veracity

of her testimony. Thus, the Court credits that testimony and the reliability of Dr. Handley's conclusions.

### ii) *Analysis*

Dr. Handley was tasked with conducting an analysis of voting patterns by race in several regions of Georgia to determine whether there is racially polarized voting there. APAX 3, at 2. She concluded that an election was racially polarized where, according to her EI analysis, "the outcome would be different if the election were held only among black voters compared to only among white voters." Feb. 10, 2022, Morning Tr. 83:13–14. In all six regions that Dr. Handley examined, Black voters were cohesive in supporting their preferred candidates. APAX 3, at 23.

Dr. Handley analyzed voting patterns by race in the six regions that are the focus of the Alpha Phi Alpha case, specifically: the Eastern Atlanta Metro Region, the Southern Atlanta Metro Region, East Central Georgia with Augusta, the Southeastern Atlanta Metro Region, Central Georgia, and Southwest Georgia. APAX 3, at 2; Feb. 10, 2022, Morning Tr. 83:7–8. Dr. Handley's analysis employed three commonly used statistical methods that have been widely accepted by courts in voting rights cases: homogeneous precinct analysis, ecological regression, and "King's EI." Feb. 10, 2022, Morning

Tr. 83:21–23, 84:3–24, 85:12–25; APAX 3, at 3–5; <u>APA</u> Doc. No. [118-2], ¶ 4. Dr. Handley has employed King's EI in numerous cases, and courts have routinely accepted her use of that methodology to assess racially polarized voting. <u>APA</u> Doc. No. [118-2], ¶ 4; Feb. 10, 2022, Morning Tr. 84:20–85:4. She uses homogeneous precinct analysis and ecological regression to check the estimates produced by EI. Feb. 10, 2022, Morning Tr. 84:2–19. She has used all three techniques in previous cases. <u>Id.</u> at 83:19–85:4.

Although Dr. Alford claimed that Dr. Handley should have used a version of EI called "RxC," Dr. Handley credibly explained why her use of King's EI here was appropriate. Dr. Handley testified that she uses EI RxC analysis in only two situations: (1) when "estimating the voting patterns of more than two racial/ethnic groups"; or (2) when she lacks data showing "turnout by race," and she "instead must rely on voting age population by race to estimate voting patterns." <u>APA</u> Doc. No. [118-2], ¶¶ 1–2. Because neither was present here, she concluded that King's EI was an appropriate methodology. <u>Id.</u>

(a) **Statewide general elections**

Dr. Handley estimated of the percentage of Black and white voters in the six regions in statewide general elections for U.S. Senate, Governor,

Commissioner of Insurance, and School Superintendent. Feb. 10, 2022, Morning Tr. 86:1–7; APAX 3, at 5–6; APA Doc. No. [118-1]. All but two of those elections involved Black and white candidates—i.e., they were biracial elections. APAX 3, at 6, 8–11; Feb. 10, 2022, Morning Tr. 91:8–17. According to Dr. Handley, biracial elections are the most probative for measuring racial polarization. Feb. 10, 2022, Morning Tr. 86:16–20. Courts generally have agreed. See Feb. 11, 2022, Afternoon Tr. 170:25–171:7. Dr. Handley also analyzed the 2020 U.S. Senate general election and 2021 U.S. Senate runoff election with Jon Ossoff, in part because Black candidates ran in the primary. Feb. 10, 2022, Morning Tr. 86:23–87:3.

The racial polarization was stark in every statewide general election that Dr. Handley analyzed, with the vast majority of Black voters supporting one candidate and the vast majority of white voters supporting the other candidate. Feb. 10, 2022, Morning Tr. 90:18–20, 91:6–25, 101:20–23; APA Doc. No. [118-1]. The Black-voter preferred candidates in these races typically received more than 98% of Black voters' support. APA Doc. No. [118-1].

**(b)** **State legislative elections**

Dr. Handley also looked at 26 State legislative elections in the relevant regions. Feb. 10, 2022, Morning Tr. 86:1–7, 91:12–17; APAX 4, at 5, 7–10. She

found starkly racially polarized voting here, too. Feb. 10, 2022, Morning Tr. 91:8–25; APAX 4, at 5, 7–10. She analyzed recent biracial elections in General Assembly districts wholly contained within or overlapping with the additional majority-Black districts drawn by Plaintiffs' expert demographer. Feb. 10, 2022, Morning Tr. 91:8–17; APAX 3, at 8–11. There were eight such State senate contests, and 18 such State house contests. APAX 3, at 8–11. All these elections were racially polarized, with Black candidates receiving a minuscule share of the white vote and the overwhelming support of Black voters. Feb. 10, 2022, Morning Tr. 91:8–25; APAX 4, at 5, 7–10. Indeed, in all but one of the 26 contests, over 95% of Black voters supported the same candidate. APAX 4, at 5, 7–10.

### (c)  Primaries

In addition to analyzing statewide elections, Dr. Handley applied her EI analysis to statewide Democratic primaries for Governor, Lieutenant Governor, Commissioner of Insurance, School Superintendent, and Commissioner of Labor. APAX 3, at 5–6; APA Doc. No. [118-1]; Feb. 10, 2022, Morning Tr. 86:3–4. Although Dr. Handley acknowledged that polarized voting is "somewhat less stark in the primaries" and in a few instances the support of Black and white voters for the same candidate is close (Feb. 10, 2022, Morning Tr. 101:3–23), the majority of primaries she analyzed across all six

regions still demonstrated evidence of racially polarized voting (Feb. 10, 2022, Morning Tr. 100:13–16; APAX 4, at 2–3). The only regular exceptions were the two recent Democratic primaries in which Black voters supported white candidates (Jon Ossoff in the 2020 primary for U.S. Senate and Jim Barksdale in his bid for the Democratic nomination for U.S. Senate in 2016). APAX 3, at 8, 23.

Specifically, Dr. Handley found that in all six regions, at least 62.5% of the eight primaries she analyzed showed evidence of racial polarization. APAX 4, at 2–3. For example, in the 2018 Democratic primary for Lieutenant Governor, the white candidate received an average of more than 83% of the white vote in these areas, and the Black candidate received an average of nearly 60% of the Black vote. See APA Doc. No. [118-1], 3–13. Similarly, in the 2018 Democratic primary for the Commissioner of Insurance, the white candidate received on average more than 60% of the white vote, and the Black candidate received on average more than 78% of the Black vote. See APA Doc. No. [118-1], 3–13.

This evidence of racial polarization in primary elections is particularly compelling here because it undermines Defendants' contention that the polarization is the result of partisan factors. By definition, partisan affiliation

cannot explain polarized election outcomes in primary contests, where Democrats are necessarily running against other Democrats.

### (b)  Defendants' Expert: Dr. Alford

As an expert witness, Dr. Alford has used all three statistical methods employed by Dr. Handley here. Feb. 11, 2022, Afternoon Tr. 168:21–24. He agrees that King's EI is "the gold standard for experts in this field doing a racially-polarized voting analysis." Id. at 163:20–23. Dr. Alford did, however, voice some concern that the type of ecological inference analysis Dr. Handley employed was not really "King's EI" but instead an "iterative version of it" that lacks "an appropriate test of statistical significance." Id. at 165:13–15. Dr. Handley later clarified that she did use King's EI to produce her results, and she ran the analysis more than once (i.e., "iteratively"). APA Doc. No. [118-2], ¶ 1. Dr. Handley has used, and courts have accepted and relied on, this exact method of EI in numerous prior minority vote dilution cases. Feb. 10, 2022, Morning Tr. 84:25–85:4; APA Doc. No. [118-2], ¶ 4.

Dr. Alford did agree with Dr. Handley's assessment that statewide general elections involving Black and white candidates are the most probative for measuring racial polarization. Feb. 11, 2022, Afternoon Tr. 170:25–171:7. And he did not dispute Dr. Handley's conclusions there is a high degree of

racial polarization in the election contests she analyzed, testifying that in general elections in Georgia, Black voters are "very cohesive." Id. at 154:15–17; DX 42, at 6. He concluded the same of white voters. Feb. 11, 2022, Afternoon Tr. 154:18–19; DX 42, at 6. Dr. Alford also found Dr. Handley's conclusions and those of Dr. Palmer were "entirely compatible with each other," and that both showed polarized voting. Feb. 11, 2022, Afternoon Tr. 142:9–13, 145:21. Dr. Alford said that "[i]t would be hard to get a difference more stark" than the voting patterns of Black and white voters reflected in the analyses of Drs. Handley and Palmer. Id. at 154:20–22.

Moreover, Dr. Alford did not testify to anything contradicting Dr. Handley's assessment that there was evidence of racially polarized voting in Democratic primaries in the six regions she evaluated. In fact, in a previous case in which he was an expert witness, "Dr. Alford testified that an analysis of primary elections is preferable to general elections because primary elections are nonpartisan and cannot be influenced by the partisanship factor." Perez v. Pasadena Indep. Sch. Dist., 958 F. Supp. 1196, 1225 (S.D. Tex. 1997), aff'd, 165 F.3d 368 (5th Cir. 1999); accord Feb. 11, 2022, Afternoon Tr. 171:17–172:16 (Dr. Alford testifying that partisanship cannot explain racial polarization in

nonpartisan elections such as primaries). This undermines Dr. Alford's speculation that partisanship explains the polarization better than race.

### (c)   Conclusions of Law

As with Dr. Alford's critiques of Dr. Palmer's analyses, the Court finds the criticisms of Dr. Handley's work unpersuasive. For the same reasons as stated with regard to the <u>Pendergrass</u> Plaintiffs, the <u>Alpha Phi Alpha</u> Plaintiffs have satisfied their burden to establish that, for the regions and elections Dr. Handley examined, Black voters in Georgia are politically cohesive. <u>Gingles</u>, 478 U.S. at 49.

### 3.   *The Third Gingles Precondition: Bloc Voting*

The third <u>Gingles</u> precondition requires that the minority group be able to demonstrate that "the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate." <u>Gingles</u>, 478 U.S. at 51 (citations omitted). In <u>Gingles</u>, the Supreme Court treated the terms "racial bloc" and "racial polarization" as interchangeable. <u>Id.</u> at 53 n.21. Thus, the third precondition involves the same evaluation as to the voting preferences of the majority group as that the second precondition does for the minority group: "[I]n general, a white bloc vote that normally will defeat

the combined strength of minority support plus white 'crossover' votes rises to the level of legally significant white bloc voting." Id. at 56 (citations omitted).

### a)    Pendergrass

In addition to his work concerning political cohesion, Dr. Palmer also testified about racial-bloc voting. He employed the same methods described above, and the Court incorporates that discussion here by reference.[36] Dr. Palmer's analysis shows that white voters in the regions he examined vote sufficiently as a bloc to defeat Black voters' candidates of choice except in majority-Black districts. Feb. 10, 2022, Morning Tr. 48:9–13; GPX 5, ¶ 7.

Overall, Dr. Palmer found "strong evidence of racially polarized voting" as a whole and in each individual congressional district he examined. Feb. 10, 2022, Morning Tr. 48:3–8; GPX 5, ¶¶ 6, 18. White voters had clearly identifiable candidates of choice in each election. GPX 5, ¶¶ 16–17 & figs. 2–4. From 2012 to 2021, white voters were highly cohesive in opposing the Black candidate of choice in every election. On average, Dr. Palmer found that white voters supported Black-preferred candidates with an average of just 11.5% of the vote.

---

[36] See supra Sections III(A)(2)(b)(1)(a), (2)(a).

See id. ¶ 16. White voters, however, on average supported their preferred candidates with an estimated vote-share of 88.5%. See id.

As a result of this racially polarized voting in the regions Dr. Palmer examined, candidates preferred by Black voters have generally been unable to win elections outside of majority-Black districts. Feb. 10, 2022, Morning Tr. 48:9–13. Excluding the existing majority-Black Congressional District 13, Black-preferred candidates were defeated by white-bloc voting in all 31 elections Dr. Palmer examined. GPX 5, ¶ 21. Dr. Alford did not dispute Dr. Palmer's conclusions about racial-bloc voting. Feb. 11, 2022, Afternoon Tr. 159:7–11.

Dr. Palmer also assessed the anticipated performance of Plaintiffs' Illustrative Congressional District 6. Feb. 10, 2022, Morning Tr. 47:21–48:2. Dr. Palmer concluded that this proposed district would permit the Black voters there to elect candidates of their choice with an average of 66.7% of the vote. Id. at 48:5–8, 58:13–59:1; GPX 5, ¶¶ 8, 22–23. Dr. Alford did not contest this conclusion. Dr. Palmer's analysis of the illustrative district also weighs in favor of the feasibility of the Pendergrass Plaintiffs' proposed remedy.

For these reasons and those explained above,[37] the Court credits Dr. Palmer's analysis and testimony, and concludes that the <u>Pendergrass</u> Plaintiffs have satisfied their burden under the third <u>Gingles</u> precondition.

**b)** <u>**Grant**</u>

Dr. Palmer testified similarly concerning the regions he examined in <u>Grant</u>. In the areas as a whole and in each legislative district, Dr. Palmer concluded that white voters had clearly identifiable candidates of choice for every election he analyzed. Feb. 10, 2022, Morning Tr. 60:22–25; GPX 6, ¶ 17 & figs. 2–3, tbl.1. In elections from 2012 to 2021, white voters were highly cohesive in voting in opposition to the Black voters' candidate of choice. On average, Dr. Palmer found that white voters supported Black-preferred candidates with a maximum of just 17.7% of the vote. GPX 6, ¶ 17. That is, white voters on average supported their preferred candidates with an estimated vote share of 82.3%. <u>Id.</u>

Dr. Palmer also concluded that, as a result of this racially polarized voting, candidates preferred by Black voters in the regions he examined have generally been unable to win elections outside of majority-Black districts. GPX

---

[37] <u>See</u> <u>supra</u> Sections III(A)(2)(b)(1)(a), (2)(a).

6, ¶ 20. He testified that "Black-preferred candidates win almost every election in the Black-majority districts, but lose almost every election in the non Black-majority districts." Id.

Using returns from 31 statewide elections, Dr. Palmer analyzed the illustrative State House and Senate districts drawn by Esselstyn. GPX 6, ¶ 22 & fig.5, tbl.10. He found that in "Senate Districts 23, 25, and 28, the Black-preferred candidate won a larger share of the vote in all 31 statewide elections. In House District 117, the Black-preferred candidate won all 19 elections since 2018." Id. ¶ 22. He also confirmed that that changes Esselstyn made to the majority-Black districts in the Enacted Maps would not change the ability of candidates preferred by Black voters to win there. Feb. 10, 2022, Morning Tr. 65:1–4.

For these reasons and those explained above,[38] the Court credits Dr. Palmer's analysis and testimony, and concludes that the Grant Plaintiffs have satisfied their burden under the third Gingles precondition.

---

[38] See supra Sections III(A)(2)(b)(1)(a), (2)(a).

### c) **Alpha Phi Alpha**

The <u>Alpha Phi Alpha</u> Plaintiffs' expert, Dr. Handley, also provided evidence about racial-bloc voting. She performed the same type of analysis for racial-bloc voting as she did for political cohesion, looking at voting patterns by race in the six identified regions. APAX 3, at 2. For every general election she analyzed, Dr. Handley found that white voters voted as a bloc against the preferred candidates of Black voters. <u>Id.</u> at 8; APAX 4, at 5, 7–10; <u>APA</u> Doc. No. [118-1]; Feb. 10, 2022, Morning Tr. 90:18–20, 91:22–25, 101:20–23. She concluded that, as a result of the stark racial polarization, candidates preferred by Black voters were consistently unable to win elections and will likely continue to be unable to win elections outside of majority-Black districts. Feb. 10, 2022, Morning Tr. 95:24–96:3; APAX 3, at 8–9.

Specifically, Dr. Handley found that the candidate of choice for Black voters on average secured the support of less than 5% of white voters in State Senate races and less than 9.5% of white voters in State House races. APAX 3, at 8; APAX 4, at 5, 7–10. As a result, blocs of white voters in the regions Dr. Handley examined were able to consistently defeat the candidates preferred by Black voters in state legislative general elections, except where the districts were majority Black. Feb. 10, 2022, Morning Tr. 95:21–96:3; <u>APA</u> Doc.

No. [118-1]. Based on this "starkly" racially polarized voting, Dr. Handley concluded that the ability of Black voters to elect candidates of their choice to the Georgia General Assembly is substantially impeded unless majority-minority districts are drawn to provide Black voters with such opportunities. Feb. 10, 2022, Morning Tr. 82:16–83:4, 95:9–96:3, 99:12–18; APAX 3, at 12.

Dr. Handley also evaluated whether Black voters had the opportunity to elect candidates of their choice under the illustrative districts drawn by Cooper compared with the Enacted Maps. Feb. 10, 2022, Morning Tr. 81:21–25; APAX 3, at 7–8. She used recompiled election results with official data from 2016, 2018, and 2020 statewide election contests and 2020 Census data, to determine whether Black voters have an opportunity to elect their candidates of choice. Feb. 10, 2022, Morning Tr. 92:18–93:3, 93:7–9; APAX 3, at 2–4. Recompiled elections analysis has been accepted by courts and used by special masters specifically for the purpose of evaluating whether a proposed majority-minority district will provide Black voters with the opportunity to elect their candidates of choice. Feb. 10, 2022, Morning Tr. 92:1–93:17.

To do so, Dr. Handley calculated a "General Election" effectiveness score ("GE Score"), which averaged the vote-share of candidates of choice for Black voters in five prior statewide elections in each of the districts in the illustrative

maps and the Enacted Maps for the regions of focus. Feb. 10, 2022, Morning Tr. 92:18–93:3, 93:7–9; APAX 3, at 12. The GE Scores show that, on average, the candidates preferred by Black voters receive less than 50% of the vote outside of districts that are majority-Black and were thus likely to be defeated. Feb. 10, 2022, Morning Tr. 97:4–99:11; APAX 3, at 12–23. Based on her analysis, Dr. Handley concluded that the illustrative maps provide "at least one additional black opportunity district compared to the enacted plan" in the regions she analyzed. Feb. 10, 2022, Morning Tr. 83:2–4; APAX 3, at 12–20. This means that, for each of the proposed majority-Black districts, candidates of choice for Black voters would have received more than 50% of the total vote, providing Black voters with an opportunity they would not otherwise have had to elect those candidates. APAX 3, at 22–23.

For example, in and around Illustrative House District 153, white voters consistently joined together to defeat Black voters' candidates of choice. Feb. 10, 2022, Morning Tr. 95:21–96:3; APA Doc. No. [118-1]. As House District 173 was constituted before the Enacted Maps were adopted, its area overlapped with illustrative House District 153. In elections in District 173 in 2016 and 2020, candidates preferred by Black voters garnered more than 96% of Black votes but were defeated because of white racial-bloc voting, with white voters'

candidates of choice securing more than 90% of the white vote. APAX 4, at 8, 10.

Accordingly, and for the reasons explained above,[39] the Court credits Dr. Handley's analysis and testimony and concludes that the <u>Alpha Phi Alpha</u> Plaintiffs have satisfied their burden under the third <u>Gingles</u> precondition.

### 4. *The Senate Factors*

As indicated above, to determine whether vote dilution is occurring, "a court must assess the impact of the contested structure or practice on minority electoral opportunities on the basis of objective factors. The Senate Report [from the 1982 Amendments to the VRA] specifies factors which typically may be relevant to a § 2 claim[.]" <u>Gingles</u>, 478 U.S. at 44. The Court now reviews the relevant Senate factors.

### a) <u>Senate Factor One: Georgia has a history of official, voting-related discrimination.</u>

It cannot be disputed that Black Georgians have experienced franchise-related discrimination. "African-Americans have in the past been subject to legal and cultural segregation in Georgia[.]" <u>Cofield v. City of LaGrange</u>, 969 F. Supp. 749, 767 (N.D. Ga. 1997). "Black residents did not enjoy the right to

---

[39] <u>See</u> <u>supra</u> Section III(A)(2)(b)(3)(a).

vote until Reconstruction." Id. "Moreover, early in this century, Georgia passed a constitutional amendment establishing a literacy test, poll tax, property ownership requirement, and a good-character test for voting." Id. "This act was accurately called the 'Disfranchisement Act.' Such devices that limited black participation in elections continued into the 1950s." Id.

This Court recently took judicial notice of the fact that "prior to the 1990s, Georgia had a long sad history of racist policies in a number of areas including voting." Fair Fight Action, Inc. v. Raffensperger, No. 1:18-CV-5391-SCJ, slip op. at 41 (N.D. Ga. Nov. 15, 2021) (hereinafter, "Fair Fight") (order denying defendants' motion for summary judgment). As this Court has described, "Georgia has a history chocked full of racial discrimination at all levels. This discrimination was ratified into state constitutions, enacted into state statutes, and promulgated in state policy. Racism and race discrimination were apparent and conspicuous realities, the norm rather than the exception." Fayette Cnty., 950 F. Supp. 2d at 1314; see also Wright, 301 F. Supp. 3d at 1310 ("Georgia's history of discrimination has been rehashed so many times that the Court can all but take judicial notice thereof." (citation and internal quotation marks omitted)).

The Pendergrass and Grant Plaintiffs detailed this sad history through the report and testimony of their expert witness, Dr. Orville Vernon Burton. See GPX 7; Feb. 10, 2022, Morning Tr. 4:11–43:22. Dr. Burton is a professor of history at Clemson University who earned his undergraduate degree from Furman University and Ph.D. in American History from Princeton University. GPX 7, at 4. He was retained "to analyze the history of voting-related discrimination in Georgia and to contextualize and put in historical perspective such discrimination." Id. at 2. His report describes the many decades of efforts to minimize the influence of minority—and specifically Black—voters. See id. at 2–3; 7–54. This historical review spans from the Reconstruction era to the present day. Id. at 9–54. Most of his analysis relates to discrimination that occurred prior to the 1980s. See id. at 9–38. Dr. Burton expounded on his report when he testified remotely by videoconference at the hearing, where he was qualified as an expert on the history of race discrimination and voting. Feb. 10, 2022, Morning Tr. 7:6–11. The Court has reviewed Dr. Burton's report and closely observed his testimony. The Court finds Dr. Burton to be highly credible. His historical analysis was thorough and methodologically sound. Further, the Court finds Dr. Burton's conclusions to be reliable.

Dr. Burton opined on the extensive history of discrimination against Black voters in Georgia and concluded that throughout the State's history, "voting rights have followed a pattern where after periods of increased nonwhite voter registration and turnout, the state has passed legislation, and often used extralegal means, to disenfranchise minority voters." GPX 7, at 8. This discrimination included years of physical violence and intimidation (id. at 12–15, 22), as well as official barriers such as poll taxes and legislation that had the effect of disenfranchising most Black voters (e.g., id. at 15–20). The Court need not belabor this issue—as stated above, this history is well-documented in the relevant caselaw. The Court finds that Plaintiffs have shown that Black Georgians have historically experienced franchise-related discrimination.

During the hearing, Defendants seemingly attempted to cast aside this history as long past and therefore less relevant. See, e.g., Feb. 10, 2022, Morning Tr. 25:16–26:13 (emphasizing how much of Dr. Burton's report concerns pre-1980 matters). Of course, whether some of the history Dr. Burton discussed is decades or centuries old does not diminish the importance of those events and trends under this Senate Factor, which specifically requires the Court to consider the *history* of official discrimination in Georgia. And it is not a novel concept that a history of discrimination can have present-day ramifications. See

Marengo Cnty. Comm'n, 731 F.2d at 1567; Wright, 301 F. Supp. at 1319 (quoting Marengo Cnty. Comm'n).

Accordingly, the Court finds that Plaintiffs have demonstrated the history of voting-related discrimination in Georgia. The first Senate Factor thus weighs decisively in Plaintiffs' favor.

### b) Senate Factor Two: Georgia voters are racially polarized.

"The second Senate Factor focuses on 'the extent to which voting in the elections of the State or political subdivision is racially polarized.'" Wright, 979 F.3d at 1305 (quoting LULAC, 548 U.S. at 426). "This 'factor will ordinarily be the keystone of a dilution case.'" Id. (quoting Marengo Cnty. Comm'n, 731 F.2d at 1566).

Plaintiffs' experts, Dr. Palmer and Dr. Handley, provided clear evidence through their reports and hearing testimony that Black and white Georgians consistently support different candidates. Defendants' expert, Dr. Alford, did not contest this point—in fact, he agreed with it. See Feb. 11, 2022, Afternoon Tr. 153:15–154:22. Moreover, Dr. Alford's observations about the relationship between race and partisanship—namely, that Black voters overwhelmingly support Democratic candidates and that white voters overwhelmingly support Republican candidates (see Feb. 11, 2022, Afternoon Tr. 171:8–16)—are

irrelevant because the fact remains that voters are racially polarized, as Plaintiffs have shown. In short, the Court's analysis on the second and third <u>Gingles</u> preconditions controls here.[40] The second Senate Factor thus weighs in Plaintiffs' favor.

### c) **Senate Factor Three: Georgia's voting practices enhance the opportunity for discrimination.**

Senate Factor Three "considers 'the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting.'" <u>Wright</u>, 979 F.3d at 1295 (quoting <u>Gingles</u>, 478 U.S. at 44–45).

For this Senate Factor, the Court returns to Dr. Burton's expert report and testimony. Dr. Burton opined that throughout much of the twentieth century, Georgia deliberately malapportioned its legislative and congressional districts to dilute the votes of Black Georgians, citing as examples past congressional districts in and near Atlanta that were severely malapportioned. <u>See</u> GPX 7, at 29–30; Feb. 10, 2022, Morning Tr. 12:7–18. Dr. Burton also opined that Georgia's history is marked by electoral schemes that have enhanced the opportunity for

---

[40] <u>See</u> <u>supra</u> Sections III.A.2. and III.A.3.

discrimination against Black voters, such as shifts from voting by district to at-large voting and staggered voting. See GPX 7, at 34–36. Dr. Burton also opined that similar efforts have persisted to today. See id. at 44–53. Because Plaintiffs have shown there has been a history of voting practices or procedures in Georgia that have enhanced the opportunity for discrimination against Black voters, the Court finds that this factor weighs in Plaintiffs' favor.

### d) Senate Factor Four: Georgia has no history of candidate slating for legislative elections.

It is undisputed that Georgia uses no slating process for its legislative or congressional elections. As a result, this factor is irrelevant to these cases.

### e) Senate Factor Five: Georgia's discrimination has produced significant socioeconomic disparities that impair Black Georgians' participation in the political process.

The Eleventh Circuit has "recognized in binding precedent that 'disproportionate educational, employment, income level, and living conditions arising from past discrimination tend to depress minority political participation.'" Wright, 979 F.3d at 1294 (quoting Marengo Cnty. Comm'n, 731 F.2d at 1568). "Where these conditions are shown, and where the level of black participation is depressed, plaintiffs need not prove any further causal nexus between their disparate socio-economic status and the depressed level of

political participation." Id. (quoting Marengo Cnty., 731 F.2d at 1568–69);

United States v. Dallas Cnty. Comm'n, 739 F.2d 1529, 1537 (11th Cir. 1984)

("Once lower socio-economic status of [B]lacks has been shown, there is no

need to show the causal link of this lower status on political participation.")).

Here, Plaintiffs have offered unrebutted evidence that Black Georgians

suffer socioeconomic hardships stemming from centuries-long racial

discrimination, and that those hardships impede their ability to fully

participate in the political process. To that end, the Court accepts the analysis

and conclusions of Plaintiffs' expert, Dr. Loren Collingwood. Dr. Collingwood,

a professor of political science at the University of New Mexico, has published

extensively on matters of election administration and racially polarized voting.

See GPX 11, at 2. Dr. Collingwood analyzed data from the American

Community Survey ("ACS"), as well as voter-turnout data from the Georgia

Secretary of State's office. Id. at 3. From this data, he concluded that Black

Georgians are disadvantaged socioeconomically relative to non-Hispanic white

Georgians by several measures. Id. at 3–6.

For example, the unemployment rate among Black Georgians (8.7%) is

nearly double that of white Georgians (4.4%). Id. at 4; Pendergrass Stip. ¶ 58.

White households in Georgia are twice as likely as Black households to

(1) report an annual income above $100,000 and (2) not to live below the poverty line. GPX 11, at 4; <u>Pendergrass</u> Stip. ¶¶ 59–60. Black Georgians are less likely than white Georgians to have received a high school diploma or a bachelor's degree or higher. GPX 11, at 4; <u>Pendergrass</u> Stip. ¶¶ 62–63. And statistics indicate that Black Georgians also experience disparities in medical care. <u>See, e.g.</u>, GPX 11, at 4 (stating that Black Georgians are more likely than white Georgians to lack health insurance).[41]

These disparities have extended to the political arena. Historically and today, the number of Black legislators serving in the Georgia General Assembly has trailed the number of white legislators, and Georgia has never had a Black governor. <u>See</u> <u>Pendergrass</u> Stip. ¶¶ 64–65. Generally, Black Georgians have voted at significantly lower rates than white Georgians, and there is evidence that Black Georgians have been less engaged in political activities such as attending political meetings and donating to political campaigns. <u>See</u> GPX 11, at 6–23.

---

[41] This Court recently credited similar evidence that "twice as many Black Georgians as white Georgians live below the poverty line; the unemployment rate for Black Georgians is double that of white Georgians; Black Georgians are less likely to attain a high school or college degree; and Black Georgians die of cancer, heart disease and diabetes at a higher rate than white Georgians." <u>Fair Fight</u>, slip op. at 44 (citations omitted).

After careful review of Dr. Collingwood's report, the Court accepts Dr. Collingwood as qualified to opine as an expert on demographics and political science. The Court finds Dr. Collingwood to be credible, his analysis methodologically sound, and his conclusions reliable. The Court credits Dr. Collingwood's opinions and conclusions, which support a finding that Black Georgians bear the effects of discrimination in such areas as education, employment, and health, which hinder their ability to participate effectively in the political process. Specifically, the Court is persuaded by Dr. Collingwood's opinion that many of the socioeconomic disparities discussed above have been a cause of lower political participation among Black Georgians. See id. at 6.

To be sure, Senator Raphael Warnock was recently elected as the first Black Georgian to serve Georgia in the U.S. Senate. Pendergrass Stip. ¶ 66. And while Defendants have highlighted the record-breaking turnout of Black voters in the 2020 election as an indication that Blacks are no longer hindered from participating in the political process (see Feb. 10, 2022, Afternoon Tr. 198:18–24), the Court finds that it is still important to consider the pre-2020 level of Black political participation for purposes of this Senate Factor. Put another way, the Court finds that one recent example of increased Black voter turnout does

not erase the evidence that Black individuals have for years participated less in the political process in Georgia.

Accordingly, the Court finds that Plaintiffs' evidence on this factor weighs in favor of a finding of vote dilution.

> **f)    Senate Factor Six: Both overt and subtle racial appeals are prevalent in Georgia's political campaigns.**

This factor "asks whether political campaigns in the area are characterized by subtle or overt racial appeals." <u>Wright</u>, 979 F.3d at 1296 (quoting <u>Gingles</u>, 478 U.S. at 45).

This Court recently credited evidence of racial appeals in recent Georgia elections. <u>Fair Fight</u>, slip op. at 44–46. In addition, Plaintiffs have submitted substantial evidence that overt and subtle racial appeals remain common in Georgia politics. To start, Dr. Burton's report provides a historical backdrop for this issue, discussing early, post-Civil War racial appeals in Georgia politics. GPX 7, at 9–20. And at the hearing, Dr. Burton related this history to the modern era, testifying that contemporary racial appeals in Georgia stem from the political realignment that followed Democrats' support for civil rights legislation in the 1960s and that saw white Georgians overwhelmingly switch to the Republican Party. Feb. 10, 2022, Morning Tr. 20:13–22:8. Dr. Burton

explained that during this transition, Republican politicians courted conservative constituents with race-based appeals, including what Dr. Burton deemed to be implicitly racist language and terms such as the "Welfare queen" and "strapping young buck." Id.; GPX 8, at 3–6. Dr. Burton further opined that such coded racial appeals have continued to this day, with conservative political discourse constantly focused on matters such as poverty, "criminal corruption," and immigration. Feb. 10, 2022, Morning Tr. 21:25–22:8, 30:20–32:13.

For this Senate Factor, Plaintiffs also relied on the report and testimony of Dr. Adrienne Jones, a political science professor at Morehouse College in Atlanta, who has expertise in the history of racial discrimination in voting. See APAX 5, at 3. The Court has reviewed Dr. Jones's report and listened to her testify during the hearing. The Court finds her to be credible, and the Court accepts her as qualified to opine as an expert on political science. Feb. 10, 2022, Afternoon Tr. 172:3–10. In her report and in her testimony, Dr. Jones opined that explicit and subtle racial appeals have been used in political campaign strategies in Georgia. E.g., APAX 5, at 25–29; see also Feb. 10, 2022, Afternoon Tr. 176:2–183:4 (discussing what Dr. Jones determines to be racial appeals in recent campaigns, which has included the darkening of Black candidates' skin

color in advertisements to create what Dr. Jones opines to be a "dark menacing" image). Dr. Jones concludes that these and similar instances of race-based messaging in recent Georgia campaigns and election cycles show that racial appeals continue to play an important role in Georgia political campaigns. APAX 5, at 25–29.

After careful review and consideration, the Court finds that Plaintiffs have presented sufficient evidence for this factor to weigh in their favor. The Court is unable to uphold Defendants' suggestion that appeals to racism by "unsuccessful candidates" do not weigh toward this Senate Factor or the totality of the circumstances. As this Court has previously explained, "this factor does not require that racially polarized statements be made by successful candidates. The factor simply asks whether campaigns include racial appeals." Fair Fight, slip op. at 45–46 (citing Gingles, 478 U.S. at 37).

### g) Senate Factor Seven: Black candidates in Georgia are underrepresented in office and rarely succeed outside of majority-minority districts.

This factor "focuses on 'the extent to which members of the minority group have been elected to public office in the jurisdiction.'" Wright, 979 F.3d at 1295 (quoting LULAC, 548 U.S. at 426). "If members of the minority group have not been elected to public office, it is of course evidence of vote dilution."

Marengo Cnty. Comm'n, 731 F.2d at 1571. As discussed above under Senate Factor Five, Plaintiffs' evidence demonstrates that Black Georgians have been and continue to be underrepresented in statewide elected offices and rarely succeed in local elections outside of majority-minority districts. Further, the Court notes that Dr. Burton discussed how Black Georgians historically have been underrepresented politically—comparatively few Black individuals have held statewide positions, and Black candidates tend to have struggled even at the county level unless they were in majority-minority districts. See GPX 7, at 32–38, 53–54. Based on the evidence presented, the Court finds that this factor thus weighs in Plaintiffs' favor.

### h)    Senate Factor Eight: Georgia is not responsive to its Black residents.

"The authors of the Senate Report apparently contemplated that unresponsiveness would be relevant only if the plaintiff chose to make it so, and that although a showing of unresponsiveness might have some probative value a showing of responsiveness would have very little." Marengo Cnty. Comm'n, 731 F.2d at 1572 (footnote omitted). As discussed above, Dr. Collingwood's expert report shows significant socioeconomic disparities between Black and white Georgians, which Dr. Collingwood opines contribute to the lower rates at which Black Georgians engage in the political process and

elect their preferred candidates. See GPX 11, at 16–19. Moreover, political science professor Dr. Traci Burch was offered as an expert in political behavior, barriers to voting, and political participation. See APAX 6, at 3. She explained that disparities, such as the ones Dr. Collingwood identified, are often caused by public policies and demonstrate a lack of responsiveness by public officials to the needs of Black Georgians, which in turn leaves those Black Georgians dissatisfied with their elected representatives and the quality of the local services they receive. See id. at 28. While the Court does not find that this evidence causes this factor to weigh heavily in Plaintiffs' favor, it still weighs in their favor.

### i) Senate Factor Nine: The justifications for the enacted redistricting maps are tenuous.

Defendants have offered no justification for the General Assembly's failure to draw additional majority-Black legislative districts in the areas at issue in the pending cases. And Mr. Esselstyn's and Mr. Cooper's illustrative maps demonstrate that it is possible to create such maps while respecting traditional redistricting principles—just as the Voting Rights Act requires.

This factor thus weighs in Plaintiffs' favor.

## 5. *Conclusions of Law*

As is clear from this discussion, the Court finds that Plaintiffs have satisfied each of the <u>Gingles</u> preconditions for at least some of the Illustrative Districts at issue. Further, all the applicable Senate Factors weigh in Plaintiffs' favor. The Court therefore concludes that the <u>Pendergrass</u> Plaintiffs have satisfied their burden to show a substantial likelihood of success as to Illustrative Congressional District 6. The <u>Grant</u> Plaintiffs have shown a substantial likelihood of success as to Illustrative State Senate Districts 25 and 28, and Illustrative State House Districts 74 and 177. The <u>Alpha Phi Alpha</u> Plaintiffs have shown a likelihood of success as to Illustrative State House District 153. This does not mean that the other proposed districts cannot ultimately succeed, only that Plaintiffs have not met their burden as to those districts at this preliminary injunction stage.

## B. <u>Irreparable Injury</u>

The Eleventh Circuit has explained that an injury is irreparable "if it cannot be undone through monetary remedies." <u>Cunningham v. Adams</u>, 808 F.2d 815, 821 (11th Cir. 1987) (citation omitted). It has also been held that "[a]bridgement or dilution of a right so fundamental as the right to vote constitutes irreparable injury." <u>Cardona v. Oakland Unified Sch. Dist.</u>, 785

F. Supp. 837, 840 (N.D. Cal. 1992); <u>see also</u> <u>League of Women Voters of N.C. v.</u> <u>North Carolina</u>, 769 F.3d 224, 247 (4th Cir. 2014) ("Courts routinely deem restrictions on fundamental voting rights irreparable injury.") (citations omitted).

In view of this Court's finding, <u>supra</u>, that there is a substantial likelihood the Enacted Plans violate Section 2 of the Voting Rights Act,[42] this Court further finds that Plaintiffs have met their burden of persuasion of establishing that the resulting threatened injury of having to vote under those plans cannot be undone through any form of monetary or post-election relief as to the 2022 election cycle only. <u>See</u> <u>League of Women Voters</u>, 769 F.3d at 247 ("[O]nce the election occurs, there can be no do-over and no redress.").

### C. <u>Balancing of the Equities and Public Interest</u>

"The last two requirements for a preliminary injunction involve a balancing of the equities between the parties and the public." <u>Florida v. Dep't</u> <u>of Health & Hum. Servs.</u>, 19 F.4th 1271, 1293 (11th Cir. 2021). "Where the government is the party opposing the preliminary injunction, its interest and harm—the third and fourth elements—merge with the public interest." <u>Id.</u>

---

[42] <u>See generally</u> <u>supra</u> Section III.A.

(citation omitted). All Defendants in each of the cases at issue were named in their official capacities as governmental actors and oppose the preliminary injunction. Therefore, the Court will address the third and fourth preliminary injunction factors together in a merged format in accordance with applicable authority. See Swain v. Junior, 961 F.3d 1276, 1293 (11th Cir. 2020) (indicating that the balance of the equities and public interest factors "'merge' when, as here, 'the Government is the opposing party'") (quoting Nken v. Holder, 556 U.S. 418, 435 (2009)).

Thus, the Court proceeds with its findings of fact and conclusions of law as to the issue of whether the threatened injuries to Plaintiffs outweigh the harm that the preliminary injunction would cause Defendants and the public.

### 1. *Findings of Fact*

At the preliminary injunction hearing, this Court heard extensive evidence about Georgia's election timelines and machinery, as well as evidence on the potential effects of issuing a preliminary injunction related to the upcoming 2022 election cycle. The Court heard from multiple witnesses in this regard. The Court found the expert witness testimony of Lynn Bailey, the former director of the Richmond County Board of Elections, who has decades of experience as a county election official, particularly credible.

More specifically, the evidence at the hearing showed that the election timeline is tight in a normal year, but it is even more challenging this year because of the delayed release of the 2020 Census data and an earlier-than-usual general primary, currently scheduled for May 24, 2022. DX 38, ¶ 8; Feb. 9, 2022, Morning Tr. 8:21–9:2. The General Election is scheduled to be held on November 8, 2022. DX 4, Ex. 1, at 1.

In addition, the election calendar generally works backwards from the date for an election. DX 38, ¶ 12. The earliest day a candidate could circulate a nominating petition for the 2022 General Election was January 13, 2022. See O.C.G.A. § 21-2-170(e). The deadline for calling special elections to be held in conjunction with the May 2022 primary and the deadline for setting polling places outside the boundaries of a precinct was February 23, 2022. DX 38, ¶¶ 13–14; Feb. 9, 2022, Morning Tr. 118:6–12. Qualifying for the May 2022 primary is set to begin on March 7, 2022. DX 4, ¶ 6; see also O.C.G.A. § 21-2-153(c)(1)(A). County registrars can begin mailing absentee ballots on April 5, 2022. DX 4, ¶14. Absentee ballots for overseas voters must be mailed by April 9, 2022. Feb. 8, 2022, Afternoon Tr. 88:4–8; see also O.C.G.A. § 21-2-384(a)(2). The early voting period for the May 2022 primary election begins on May 2, 2022. DX 4, Ex. 1, at 2. The primary election is scheduled to be held on May 24,

2022. Id. at 1.[43] The primary election runoff is scheduled for June 21, 2022. Id. The General Election is scheduled to be held on November 8, 2022. Id.

Before the Georgia Secretary of State's office can create ballots for use in the primary election, county elections officials must allocate voters to their correct districts by updating street segments in Georgia's voter registration database—the 2022 process has already begun as of the date of this Order. DX 4, ¶¶ 6–7; Feb. 9, 2022, Morning Tr. 41:24–42:10. More specifically, county election officials have to update each individual street segment manually to update district numbers for voters on that street segment. Feb. 9, 2022, Morning Tr. 17:5–18:9, 32:1–25. During this process, county election officials engage in a manual review of maps to identify where each street segment is located on the new district plans. Id. at 20:14–21:9, 81:7–20; DX 38, ¶ 9. Once a county has entered the data-entry/redistricting module, the county registrar is prevented from engaging in normal activity in the voter registration system, such as adding new voters. Feb. 9, 2022, Morning Tr. 20:4–11; DX 7, at 31.

---

[43] A number of Georgia election officials requested a change in the primary election schedule in the summer of 2021; however, the General Assembly did not make that change during the special session, as had been requested. Feb. 9, 2022, Morning Tr. 54:1–23. Without the schedule change, election officials proceeded to plan for the election by contacting polling places and taking other steps based on the established election calendar. Id. at 57:6–25.

Defendants' representative witness from the Secretary of State's office, Michael Barnes, stated in his declaration that "[c]ounty registrars generally need several weeks to complete the reallocation process for voters in their particular counties." DX 4, ¶ 16.[44] There was also evidence that it took Fulton County four weeks to update its street segments. Feb. 9, 2022, Morning Tr. 83:12–19.[45]

After counties complete updating their street segments, the next step is to request precinct cards from the voter-registration system to notify voters about their new districts. DX 7, at 49. Also, after county registrars complete the process of updating all the street segments in a county with new district numbers, the Center for Election Systems of the Office of the Secretary of State begins the manual process of creating ballot combinations for use in the

---

[44] The Secretary of State set a February 18, 2022, non-statutory deadline for all county registrars to complete their updates to the voter-registration database with new district information. DX 4, ¶ 15; DX 38, ¶ 12; Feb. 8, 2022, Afternoon Tr. 73:20–74:1.

[45] Plaintiffs' demographer/map expert, Mr. Esselstyn also provided testimony about the feasibility of implementing his maps/plans. However, that testimony was based on his belief that Georgia's voter-registration system allowed the mass assignment of all voters in a single precinct to a particular district. Feb. 8, 2022, Afternoon Tr. 123:15–124:16. Mr. Esselstyn was mistaken on that point, as several county election officials attested, and thus his testimony on the feasibility of relief does not assist the Court.

election. DX 4, ¶¶ 8–9, 11; DX 38, ¶ 12; Feb. 8, 2022, Afternoon Tr. 68:3–23.[46]

Ballot combinations account for every possible combination of political districts in the State and include all races from United States Congress down to county commission and school board. Feb. 8, 2022, Afternoon Tr. 67:11–68:2; Feb. 9, 2022, Morning Tr. 105:4–24. There is at least one ballot combination per precinct, so the total is more than 2,000 ballot combinations or styles in the state of Georgia. Feb. 8, 2022, Afternoon Tr. 67:24–68:2; DX 4, ¶ 9. According to Elections Director Michael Barnes, the Center for Election Systems has already started building election projects for use in the 2022 primary election for counties that already know their districts. Feb. 8, 2022, Afternoon Tr. 70:4–7.

Once qualifying occurs, the Center for Election Systems adds candidate names to the relevant contests and begins preparing proofing packages to send to counties. DX 4, ¶ 12; Feb. 8, 2022, Afternoon Tr. 70:8–71:2. County election officials then proof those drafts, identify errors, and return the drafts to the Center for Election Systems to make corrections to the databases. Feb. 8, 2022, Afternoon Tr. 71:3–6; DX 38, ¶¶ 15, 16. The Center for Election Systems then

---

[46] State officials cannot build ballot combinations until after county registrars have entered all updated information into the voter-registration database. Feb. 9, 2022, Morning Tr. 92:16–19.

makes those corrections, generates a revised proofing package, and creates print files for absentee ballots and final project files for programming the voting machines. Feb. 8, 2022, Afternoon Tr. 71:7–23. This entire process occurs for all 159 counties between the close of qualifying on March 11 and the deadline for sending ballots for overseas voters on April 9. Id. at 71:24–72:4, 86:23–88:8.

The upcoming primary is the first time the State of Georgia has built ballot combinations for the Dominion ballot-marking voting system after redistricting. Id. at 72:8–20. In addition, extra election projects have to be built this year because of the addition of ranked-choice voting for overseas and military voters. Id. If all the ballot combinations are not ready by qualifying, then no ballot proofing can occur because the Center for Elections Systems cannot generate a proofing package without both the ballot combinations and candidate information. Id. at 72:21–73:19.

There was also evidence presented at the hearing about various remedial/injunctive relief options, such as changing the qualifying date without changing the election date, and changing both the qualifying and election dates. The evidence revealed that if the qualifying dates for the primary elections are moved without moving the May 24, 2022, election date, the work of the Center for Election Systems and counties becomes incredibly

compressed, risking the accuracy of the election. Id. 74:13–75:16. In essence, delaying qualifying without delaying the primary would limit the time election officials have to engage in the quality-assurance checks necessary to ensure the election is accurate. Feb. 9, 2022, Morning Tr. 8:13–9:15. In addition, without candidate names after qualifying, no ballot proofs can be completed, meaning that the Center for Election Systems cannot send proofing packages and counties cannot begin proofing ballots. Feb. 8, 2022, Afternoon Tr. 75:17–76:7. There was also testimony that reduced time for proofing ballots can lead to errors in information that could result in less voter confidence in the election system. Id. at 102:8–103:15.

The evidence also showed that delaying qualifying without delaying the primary while also imposing new district lines would require election officials to simultaneously input new district information while conducting other tasks related to elections, reducing the opportunity to check for errors. DX 38, ¶ 21.

The evidence from Ms. Bailey concerning changing the election date was clear: there could be "massive upheaval." DX 38, ¶ 19. She testified that there could be problems with the polling places as some counties have already secured their polling locations for the May 2022 primary. Feb. 9, 2022, Morning Tr. 94:15–19, 111:20–25, 119:3–5. In addition, election officials have already

scheduled poll workers and poll-worker training around the existing election calendar for the May primary. Id. at 121:7–10. And voters are already being notified of their districts and polling locations for the May primary election. Id. at 10:13–11:11.

The testimony also showed that facilities used as polling locations have other events on their calendars this year. Id. at 9:16–24, 27:15–23; DX 38, ¶¶ 19–20. For example, churches have often scheduled Vacation Bible School around the planned election dates and may not be available as polling locations if the date of the election were to change. Feb. 9, 2022, Morning Tr. 68:5–19, 119:3–18. In addition, finding new polling facilities is challenging not only because of scheduling but also because of the electrical power needs of Georgia's voting machines. Id. at 73:17–74:5, 75:15–20.[47]

Furthermore, when the 2020 primary elections were delayed during the pandemic, county officials in Fulton County lost access to polling locations. Id. at 95:10–24. The resulting loss of access meant voters were combined in voting

---

[47] The Court recognizes that Plaintiffs' witness, Bishop Reginald Johnson, offered 520 African Methodist Episcopal churches as polling places. Feb. 9, 2022, Afternoon Tr. 131:24–132:21. However, it was not clearly established that all 520 of these churches would meet the power requirements for the Dominion voting machines and other polling location requirements.

locations. Id. at 95:1–96:17. Voters in Fulton County (a number of whom were of color) waited in line for hours during the June 9, 2020, primary at locations where polling places had to be combined. Id. at 96:18–97:22. There was also testimony that voter confidence can be adversely affected by long lines and that moving polling locations causes confusion for voters. Id. at 98:9–23; Feb. 9, 2022, Afternoon Tr. 144:21–23.[48]

Additionally, there was testimony of the "whiplash" effect that could occur if the primary election date were changed by this Court and then that order were stayed by an appellate court. On this, the testimony from Ms. Bailey was clear that there would be chaos and confusion for local election officials and voters. Feb. 9, 2022, Morning Tr. 12:22–13:3; DX 38, ¶ 19.

### 2. Conclusions of Law

This Court must weigh the threatened injury to Plaintiffs (discussed above) and the public interests of the State of Georgia.

---

[48] Another potential concern with awarding remedial relief in these cases is the fact that the recent change in Georgia law from nine-week runoffs to four-week runoffs is currently being challenged in three of the consolidated cases challenging provisions of SB 202, which regulates various election processes and activities. New Georgia Project v. Raffensperger, Sixth District AME v. Raffensperger, and Concerned Black Clergy v. Raffensperger, Consolidated Case No. 1:21-mi-55555-JPB (N.D. Ga.).

The State of Georgia has significant interests "in conducting an efficient election [and] maintaining order," because "'[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy.'" New Ga. Project v. Raffensperger, 976 F.3d 1278, 1284 (11th Cir. 2020) (quoting Purcell, 549 U.S. at 4).

The Court finds that the public interest of the State of Georgia would be significantly undermined by altering the election calendar and unwinding the electoral process at this point.

More specifically, the evidence at the preliminary injunction hearing showed that elections are complex and election calendars are finely calibrated processes, and significant upheaval and voter confusion can result if changes are made late in the process. With candidate qualifying for the State of Georgia set to begin in six days, any change now would be considered late in the process. Applying the Purcell principle, the United States Supreme Court "has also repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." Republican Nat'l Comm. v. Democratic Nat'l Comm., 140 S. Ct. 1205, 1207 (2020) (citing, inter alia, Purcell, 549 U.S. at 1).

And while "it would be the unusual case in which a court would be justified in not taking appropriate action to [e]nsure that no further elections are conducted under the invalid plan," the United States Supreme Court has recognized that "under certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief in a legislative apportionment case, even though the existing apportionment scheme was found invalid." <u>Reynolds</u>, 377 U.S. at 585. Here, in considering the "proximity of a forthcoming election and the mechanics and complexities of state election laws, and . . . general equitable principles," the Court is of the opinion that it would not be proper to enjoin the 2022 election cycle for which the election machinery is already in progress. <u>Id.</u>

More specifically, the evidence at the preliminary injunction hearing showed that moving the date for qualifying without moving the date of the primary election risks the accuracy of the primary because of the required timelines for building ballot combinations, proofing draft ballots, and preparing ballots for printing by the deadline for overseas and military voters. Likewise, moving the primary election date would upend months of planning by local election officials. Multiple county election officials testified that they

already selected polling places for all election dates in 2022 and changing those dates could entail having to locate new polling places on short notice. Fulton County's experience in June 2020 showed that consolidating polling places at the last minute can lead to long lines for voters (including voters of color). And several witnesses testified to the voter confusion that would occur if last-minute changes were required. There is also the potential for "whiplash" if orders of this Court and subsequent rulings of appellate courts resulted in different conclusions. Such events could create even more voter confusion and loss of confidence in the election system. See Purcell, 549 U.S. at 4–5 ("Court orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls."). In essence, the sum of the testimony of the election officials presented at the preliminary injunction hearing was that changes in the 2022 election calendar at this point would result in significant cost, confusion, and hardship.

Further, under applicable law, this Court would be required to first give the Georgia General Assembly the opportunity to draw new district plans based on this Court's findings. Cf. Wise v. Lipscomb, 437 U.S. 535, 540 (1978) ("When a federal court declares an existing apportionment scheme unconstitutional, it is therefore, appropriate, whenever practicable, to afford a

reasonable opportunity for the legislature to meet constitutional requirements by adopting a substitute measure rather than for the federal court to devise and order into effect its own plan.").[49] Even if this election process were to continue through a court-drawn redistricting plan, at least one former special master recommends "[a]llowing one month for the drawing of a plan and an additional month for hearings and potential modifications to it [in order to] build in enough of a cushion so that all concerned can proceed in a nonfrenzied fashion." Nathaniel Persily, <u>When Judges Carve Democracies: A Primer on Court-Drawn Redistricting Plans</u>, 73 Geo. Wash. L. Rev. 1131, 1148 (2005). This is because "[a] quick plan . . . is not necessarily a good plan." <u>Id</u>. at 1147.[50]

Ultimately, voters are not well served "by a chaotic, last–minute reordering of [] districts. It is best for candidates and voters to know significantly in advance of the [qualifying] period who may run where." <u>Favors</u>

---

[49] While constitutionality of the apportionment scheme is not at issue in these three cases, the Supreme Court's ruling in <u>Wise</u> is still analogous.

[50] The Court notes that the evidence at the preliminary injunction hearing showed that the General Assembly's process of drawing redistricting maps for 2021 took "a couple of months" even though the legislation for the maps was introduced, considered, and passed in a matter of days. Feb. 11, 2022, Morning Tr. 59:3–17; 114:9–15.

v. Cuomo, 881 F. Supp. 2d 356, 371 (E.D.N.Y. 2012) (three-judge court) (citing Diaz v. Silver, 932 F. Supp. 462, 466–68 (E.D.N.Y. 1996) (three-judge court)).

While not precedential, as indicated above, the Court is also aware of the Supreme Court's ruling on Alabama's motion to stay the three-judge court's injunction in Merrill v. Milligan. APA Doc. No. [97]; Grant Doc. No. [59]; Pendergrass Doc. No. [65].[51] Given the similarity of the claims in these three cases on the one hand and the Alabama cases on the other hand (i.e., they are Section 2 cases seeking at least one additional majority-minority district), and the timeline (i.e., both sets of cases involve a May 24 primary election), it would be unwise, irresponsible, and against common sense for this Court not to take note of Milligan, which essentially allowed Alabama's May 24, 2022, primary election to go forward despite a three-judge court's preliminary injunction ruling that the plaintiffs had a likelihood of success on the merits of their Section 2 claims. See Upham v. Seamon, 456 U.S. 37, 44 (1982) (noting that the Supreme Court has "authorized District Courts to order or to permit elections

---

[51] The Court also recognizes that the stay issued by the Supreme Court did not change the law in this Circuit. Cf. Schwab v. Sec'y, Dep't of Corr., 507 F.3d 1297, 1298 (11th Cir. 2007) ("The district court's action in granting the stay is contrary to the unequivocal law of this circuit that . . . grants of certiorari do not themselves change the law . . . .").

to be held pursuant to apportionment plans that do not in all respects measure up to the legal requirements, even constitutional requirements").

Numerous other lower courts have also permitted elections to proceed when the state's election machinery was already in progress, even after a finding that the districts were unlawful. See Wright v. Sumter Cnty. Bd. of Elections & Registration, No. 1:14-CV-42 (WLS), 2018 WL 7365178, at *3 (Mar. 30, 2018), objections overruled, 2018 WL 7365179 (Apr. 11, 2018), and modified, 2018 WL 7366461 (M.D. Ga. June 21, 2018); see also Covington, 316 F.R.D. 117.

While this Court proceeded with these three important cases as quickly as practicable in light of the complicated issues involved, the "greatest public interest must attach to adjudicating these claims fairly—and correctly." Favors, 881 F. Supp. 2d at 371. Given the massively complex factual issues combined with the timeline of candidate qualifying set to begin in days, it would not serve the public interest or the candidates, poll workers, and voters to enjoin use of the Enacted Plans and begin the process of putting new plans in their place for the 2022 election cycle.

After review of the evidence and briefing submitted by the parties, this Court concludes that due to the mechanics of State election requirements, there is insufficient time to effectuate remedial relief for purposes of the 2022 election

cycle. The Court is unable to disregard the <u>Purcell</u> principle given the progress of Georgia's election machinery toward the 2022 election. The merged balancing of the harms and public interest factors weigh against injunctive relief at this time.

## IV. CONCLUSION

For the foregoing reasons, the Court **DENIES** the pending Motions for Preliminary Injunctions in each of the above-stated cases. Doc. Nos. [26], [39], 1:21-cv-5337; Doc. No. [32], 1:21-cv-5339; Doc. No. [19], 1:22-cv-122.[52] Having determined that a preliminary injunction should not issue, the Court cautions that this is an interim, non-final ruling that should not be viewed as an indication of how the Court will ultimately rule on the merits at trial.

Under the specific circumstances of this case, the Court finds that proceeding with the Enacted Maps for the 2022 election cycle is the right decision. But it is a difficult decision. And it is a decision the Court did not make lightly.

---

[52] While the option of halting all proceedings to await a future ruling by the United States Supreme Court was briefly mentioned at the preliminary injunction hearing, in the absence of a formal motion and full briefing, the Court declines to halt these proceedings. To this regard, each of the above-stated cases shall proceed on the same discovery tracks previously set for the three-judge court redistricting cases pending in the Northern District of Georgia. The Court will issue formal scheduling orders at a later date.

**IT IS SO ORDERED** this 28th day of February, 2022.

_____

**HONORABLE STEVE C. JONES**
**UNITED STATES DISTRICT JUDGE**