**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| ANNIE LOIS GRANT; QUENTIN T. HOWELL; ELROY TOLBERT; THERON BROWN; TRIANA ARNOLD JAMES; EUNICE SYKES; ELBERT SOLOMON; DEXTER WIMBISH; GARRETT REYNOLDS; JACQUELINE FAYE ARBUTHNOT; JACQUELYN BUSH; and MARY NELL CONNER,<br><br>        Plaintiffs,<br><br>    v.<br><br>BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State; WILLIAM S. DUFFEY, JR., in his official capacity as chair of the State Election Board; MATTHEW MASHBURN, in his official capacity as a member of the State Election Board; SARA TINDALL GHAZAL, in her official capacity as a member of the State Election Board; EDWARD LINDSEY, in his official capacity as a member of the State Election Board; and JANICE W. JOHNSTON, in her official capacity as a member of the State Election Board,<br><br>        Defendants. | CIVIL ACTION FILE NO. 1:22-CV-00122-SCJ |

## SECOND AMENDED COMPLAINT

1.     Plaintiffs bring this action to challenge the Georgia Senate Redistricting Act of 2021 ("SB 1EX") and the Georgia House of Representatives Redistricting Act of 2021 ("HB 1EX") on the ground that they violate Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301.

2.     In undertaking the latest round of redistricting following the 2020 decennial census, the Georgia General Assembly diluted the growing electoral strength of the state's Black voters and other communities of color. Faced with Georgia's changing demographics, the General Assembly has ensured that the growth of the state's Black population will not translate to increased political influence in the Georgia State Senate and Georgia House of Representatives.

3.     The 2020 census data make clear that minority voters in Georgia are sufficiently numerous and geographically compact to form a majority of eligible voters—which is to say, a majority of the voting age population[1]—in multiple

---

[1] The phrases "majority of eligible voters" and "majority of the voting age population" have been used by courts interchangeably when discussing the threshold requirements of a vote-dilution claim under Section 2 of the Voting Rights Act. *Compare, e.g.*, *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1019 (8th Cir. 2006) ("[T]he first *Gingles* precondition . . . 'requires only a simple *majority of eligible voters* in a single-member district.'" (emphasis added) (quoting *Dickinson v. Ind. State Election Bd.*, 933 F.2d 497, 503 (7th Cir. 1991))), *with Bartlett v. Strickland*, 556 U.S. 1, 18 (2009) (plurality op.) ("[T]he majority-minority rule relies on an objective, numerical test: Do minorities make up *more than 50 percent of the voting-age population* in the relevant geographic area?" (emphasis added)). The phrase

legislative districts throughout the state, including two additional majority-Black State Senate districts in the southern Atlanta metropolitan area, one additional majority-Black State Senate district in the central Georgia Black Belt region, two additional majority-Black House districts in the southern Atlanta metropolitan area, one additional majority-Black House district in the western Atlanta metropolitan area, and two additional majority-Black House districts anchored in Bibb County. These additional majority-Black legislative districts can be drawn without reducing the total number of districts in the region and statewide in which Black and other minority voters are able to elect their candidates of choice.

4.     Rather than draw these State Senate and House districts as those in which Georgians of color would have the opportunity to elect their preferred candidates, the General Assembly instead chose to "pack" some Black voters into limited districts in these areas and "crack" other Black voters among rural-reaching, predominantly white districts.

5.     Section 2 of the Voting Rights Act prohibits this result and requires the General Assembly to draw additional legislative districts in which Black voters have opportunities to elect their candidates of choice.

---

"majority of eligible voters" when used in this Complaint shall also refer to the "majority of the voting age population."

6.     By failing to create such districts, the General Assembly's response to Georgia's changing demographics has had the effect of diluting minority voting strength throughout the state.

7.     Accordingly, Plaintiffs seek an order (i) declaring that SB 1EX and HB 1EX violate Section 2 of the Voting Rights Act; (ii) enjoining Defendants from conducting future elections under SB 1EX and HB 1EX; (iii) requiring adoption of valid plans for new State Senate and House districts in Georgia that comport with Section 2 of the Voting Rights Act; and (iv) providing any and such additional relief as is appropriate.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over this action pursuant to 42 U.S.C. §§ 1983 and 1988 and 28 U.S.C. §§ 1331, 1343(a)(3) and (4), and 1357.

9.     This Court has jurisdiction to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

10.     Venue is proper under 28 U.S.C. § 1391(b) because "a substantial part of the events or omissions giving rise to the claim occurred" in this district.

## PARTIES

11.     Plaintiff Annie Lois Grant is a Black citizen of the United States and the State of Georgia. Ms. Grant is a registered voter and intends to vote in future

legislative elections. She is a resident of Greene County and located in Senate District 24 and House District 124 under the enacted plans, where she is unable to elect candidates of her choice to the Georgia State Senate despite strong electoral support for those candidates from other Black voters in her community. Ms. Grant resides in a region where the Black community is sufficiently large and geographically compact to constitute a majority of eligible voters in a newly drawn State Senate district in which Black voters would have the opportunity to elect their preferred candidates. The enacted redistricting plan dilutes the voting power of Black voters like Ms. Grant and denies them an equal opportunity to elect candidates of their choice to the Georgia General Assembly.

12.     Plaintiff Quentin T. Howell is a Black citizen of the United States and the State of Georgia. Mr. Howell is a registered voter and intends to vote in future legislative elections. He is a resident of Baldwin County and located in Senate District 25 and House District 133 under the enacted plans, where he is unable to elect candidates of his choice to the Georgia State Senate and Georgia House of Representatives despite strong electoral support for those candidates from other Black voters in his community. Mr. Howell resides in a region where the Black community is sufficiently large and geographically compact to constitute a majority of eligible voters in newly drawn State Senate and House districts in which Black

voters would have the opportunity to elect their preferred candidates. The enacted redistricting plan dilutes the voting power of Black voters like Mr. Howell and denies them an equal opportunity to elect candidates of their choice to the Georgia General Assembly.

13.     Plaintiff Elroy Tolbert is a Black citizen of the United States and the State of Georgia. Mr. Tolbert is a registered voter and intends to vote in future legislative elections. He is a resident of Bibb County and located in Senate District 18 and House District 144 under the enacted plans, where he is unable to elect candidates of his choice to the Georgia House of Representatives despite strong electoral support for those candidates from other Black voters in his community. Mr. Tolbert resides in a region where the Black community is sufficiently large and geographically compact to constitute a majority of eligible voters in a newly drawn House district in which Black voters would have the opportunity to elect their preferred candidates. The enacted redistricting plan dilutes the voting power of Black voters like Mr. Tolbert and denies them an equal opportunity to elect candidates of their choice to the Georgia General Assembly.

14.     Plaintiff Theron Brown is a Black citizen of the United States and the State of Georgia. Ms. Brown is a registered voter and intends to vote in future legislative elections. She is a resident of Houston County and located in Senate

District 26 and House District 145 under the enacted plans, where she is unable to elect candidates of her choice to the Georgia House of Representatives despite strong electoral support for those candidates from other Black voters in her community. Ms. Brown resides in a region where the Black community is sufficiently large and geographically compact to constitute a majority of eligible voters in a newly drawn House district in which Black voters would have the opportunity to elect their preferred candidates. The enacted redistricting plan dilutes the voting power of Black voters like Ms. Brown and denies them an equal opportunity to elect candidates of their choice to the Georgia General Assembly.

15.     Plaintiff Triana Arnold James is a Black citizen of the United States and the State of Georgia. Ms. James is a registered voter and intends to vote in future legislative elections. She is a resident of Douglas County and located in Senate District 30 and House District 64 under the enacted plans, where she is unable to elect candidates of her choice to the Georgia House of Representatives despite strong electoral support for those candidates from other Black voters in her community. Ms. James resides in a region where the Black community is sufficiently large and geographically compact to constitute a majority of eligible voters in a newly drawn House district in which Black voters would have the opportunity to elect their preferred candidates. The enacted redistricting plan dilutes the voting power of

Black voters like Ms. James and denies them an equal opportunity to elect candidates of their choice to the Georgia General Assembly.

16.     Plaintiff Eunice Sykes is a Black citizen of the United States and the State of Georgia. Ms. Sykes is a registered voter and intends to vote in future legislative elections. She is a resident of Henry County and located in Senate District 25 and House District 117 under the enacted plans, where she is unable to elect candidates of her choice to the Georgia State Senate and Georgia House of Representatives despite strong electoral support for those candidates from other Black voters in her community. Ms. Sykes resides in a region where the Black community is sufficiently large and geographically compact to constitute a majority of eligible voters in newly drawn State Senate and House districts in which Black voters would have the opportunity to elect their preferred candidates. The enacted redistricting plan dilutes the voting power of Black voters like Ms. Sykes and denies them an equal opportunity to elect candidates of their choice to the Georgia General Assembly.

17.     Plaintiff Elbert Solomon is a Black citizen of the United States and the State of Georgia. Mr. Solomon is a registered voter and intends to vote in future legislative elections. He is a resident of Spalding County and located in Senate District 16 and House District 117 under the enacted plans, where he is unable to

elect candidates of his choice to the Georgia State Senate and Georgia House of Representatives despite strong electoral support for those candidates from other Black voters in his community. Mr. Solomon resides in a region where the Black community is sufficiently large and geographically compact to constitute a majority of eligible voters in newly drawn State Senate and House districts in which Black voters would have the opportunity to elect their preferred candidates. The enacted redistricting plan dilutes the voting power of Black voters like Mr. Solomon and denies them an equal opportunity to elect candidates of their choice to the Georgia General Assembly.

18.     Plaintiff Dexter Wimbish is a Black citizen of the United States and the State of Georgia. Mr. Wimbish is a registered voter and intends to vote in future legislative elections. He is a resident of Spalding County and located in Senate District 16 and House District 74 under the enacted plans, where he is unable to elect candidates of his choice to the Georgia State Senate and Georgia House of Representatives despite strong electoral support for those candidates from other Black voters in his community. Mr. Wimbish resides in a region where the Black community is sufficiently large and geographically compact to constitute a majority of eligible voters in newly drawn State Senate and House districts in which Black voters would have the opportunity to elect their preferred candidates. The enacted

9

redistricting plan dilutes the voting power of Black voters like Mr. Wimbish and denies them an equal opportunity to elect candidates of their choice to the Georgia General Assembly.

19.    Plaintiff Garrett Reynolds is a Black citizen of the United States and the State of Georgia. Mr. Reynolds is a registered voter and intends to vote in future legislative elections. He is a resident of Fayette County and located in Senate District 16 and House District 68 under the enacted plans, where he is unable to elect candidates of his choice to the Georgia State Senate despite strong electoral support for those candidates from other Black voters in his community. Mr. Reynolds resides in a region where the Black community is sufficiently large and geographically compact to constitute a majority of eligible voters in a newly drawn State Senate district in which Black voters would have the opportunity to elect their preferred candidates. The enacted redistricting plan dilutes the voting power of Black voters like Mr. Reynolds and denies them an equal opportunity to elect candidates of their choice to the Georgia General Assembly.

20.    Plaintiff Jacqueline Faye Arbuthnot is a Black citizen of the United States and the State of Georgia. Ms. Arbuthnot is a registered voter and intends to vote in future legislative elections. She is a resident of Paulding County and located in Senate District 31 and House District 64 under the enacted plans, where she is

unable to elect candidates of her choice to the Georgia House of Representatives despite strong electoral support for those candidates from other Black voters in her community. Ms. Arbuthnot resides in a region where the Black community is sufficiently large and geographically compact to constitute a majority of eligible voters in a newly drawn House district in which Black voters would have the opportunity to elect their preferred candidates. The enacted redistricting plan dilutes the voting power of Black voters like Ms. Arbuthnot and denies them an equal opportunity to elect candidates of their choice to the Georgia General Assembly.

21.    Plaintiff Jacquelyn Bush is a Black citizen of the United States and the State of Georgia. Ms. Bush is a registered voter and intends to vote in future legislative elections. She is a resident of Fayette County and located in Senate District 16 and House District 74 under the enacted plans, where she is unable to elect candidates of her choice to the Georgia House of Representatives despite strong electoral support for those candidates from other Black voters in her community. Ms. Bush resides in a region where the Black community is sufficiently large and geographically compact to constitute a majority of eligible voters in a newly drawn House district in which Black voters would have the opportunity to elect their preferred candidates. The enacted redistricting plan dilutes the voting power of

Black voters like Ms. Bush and denies them an equal opportunity to elect candidates of their choice to the Georgia General Assembly.

22.   Plaintiff Mary Nell Conner is a Black citizen of the United States and the State of Georgia. Ms. Conner is a registered voter and intends to vote in future legislative elections. She is a resident of Henry County and located in Senate District 25 and House District 117 under the enacted plans, where she is unable to elect candidates of her choice to the Georgia State Senate and Georgia House of Representatives despite strong electoral support for those candidates from other Black voters in her community. Ms. Conner resides in a region where the Black community is sufficiently large and geographically compact to constitute a majority of eligible voters in newly drawn State Senate and House districts in which Black voters would have the opportunity to elect their preferred candidates. The enacted redistricting plan dilutes the voting power of Black voters like Ms. Conner and denies them an equal opportunity to elect candidates of their choice to the Georgia General Assembly.

23.   Defendant Brad Raffensperger is the Georgia Secretary of State and is named in his official capacity. Secretary Raffensperger is Georgia's chief election official and is responsible for administering the state's elections and implementing election laws and regulations, including Georgia's legislative redistricting plans. *See*

O.C.G.A. § 21-2-50; Ga. Comp. R. & Regs. 590-1-1-.01–.02 (specifying, among other things, that Secretary of State's office must provide "maps of Congressional, State Senatorial and House Districts" when requested). Secretary Raffensperger is also an ex officio nonvoting member of the State Election Board, which is responsible for "formulat[ing], adopt[ing], and promulgat[ing] such rules and regulations, consistent with law, as will be conducive to the fair, legal, and orderly conduct of primaries and elections." O.C.G.A. §§ 21-2-30(d), -31(2).

24.     Defendant Judge William S. Duffey, Jr. is the Chair of the State Election Board and is named in his official capacity. In this role, he must "formulate, adopt, and promulgate such rules and regulations, consistent with law, as will be conducive to the fair, legal, and orderly conduct of primaries and elections." *Id.* § 21-2-31(2).

25.     Defendant Sara Tindall Ghazal is a member of the State Election Board and is named in her official capacity. In this role, she must "formulate, adopt, and promulgate such rules and regulations, consistent with law, as will be conducive to the fair, legal, and orderly conduct of primaries and elections." *Id.* § 21-2-31(2).

26.     Defendant Janice Johnston is a member of the State Election Board and is named in her official capacity. In this role, she must "formulate, adopt, and

promulgate such rules and regulations, consistent with law, as will be conducive to the fair, legal, and orderly conduct of primaries and elections." *Id.* § 21-2-31(2).

27.    Defendant Edward Lindsey is a member of the State Election Board and is named in his official capacity. In this role, he must "formulate, adopt, and promulgate such rules and regulations, consistent with law, as will be conducive to the fair, legal, and orderly conduct of primaries and elections." *Id.* § 21-2-31(2).

28.    Defendant Matthew Mashburn is a member of the State Election Board and is named in his official capacity. In this role, he must "formulate, adopt, and promulgate such rules and regulations, consistent with law, as will be conducive to the fair, legal, and orderly conduct of primaries and elections." *Id.* § 21-2-31(2).

## LEGAL BACKGROUND

29.    Section 2 of the Voting Rights Act prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). Thus, in addition to prohibiting practices that deny the exercise of the right to vote, Section 2 prohibits vote dilution.

30.    A violation of Section 2 is established if "it is shown that the political processes leading to nomination or election" in the jurisdiction "are not equally open to participation by members of a [minority group] in that its members have less

opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* § 10301(b).

31.     Such a violation might be achieved by "cracking" or "packing" minority voters. To illustrate, the dilution of Black voting strength "may be caused by the dispersal of blacks into districts in which they constitute an ineffective minority of voters"—cracking—"or from the concentration of blacks into districts where they constitute an excessive majority"—packing. *Thornburg v. Gingles*, 478 U.S. 30, 46 n.11 (1986).

32.     In *Thornburg v. Gingles*, the U.S. Supreme Court identified three necessary preconditions for a claim of vote dilution under Section 2: (i) the minority group must be "sufficiently large and geographically compact to constitute a majority in a single-member district"; (ii) the minority group must be "politically cohesive"; and (iii) the majority must vote "sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Id.* at 50–51.

33.     Once all three preconditions are established, Section 2 directs courts to consider whether, "based on the totality of circumstances," members of a racial minority "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).

34.     The Senate Report on the 1982 amendments to the Voting Rights Act identified several non-exclusive factors that courts should consider when determining if, under the totality of circumstances in a jurisdiction, the operation of the challenged electoral device results in a violation of Section 2. *See Wright v. Sumter Cnty. Bd. of Elections & Registration*, 979 F.3d 1282, 1288–89 (11th Cir. 2020). These "Senate Factors" include:

a.      the history of official voting-related discrimination in the state or political subdivision;

b.      the extent to which voting in the elections of the state or political subdivision is racially polarized;

c.      the extent to which the state or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority-vote requirements, or prohibitions against bullet-voting;

d.      the exclusion of members of the minority group from candidate-slating processes;

e.      the extent to which minority group members bear the effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process;

f.    the use of overt or subtle racial appeals in political campaigns; and

g.    the extent to which members of the minority group have been elected to public office in the jurisdiction.

35.    The Senate Report itself and the cases interpreting it have made clear that "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1566 n.33 (11th Cir. 1984) (quoting S. Rep. No. 97-417, at 29 (1982)); *see also id.* at 1566 ("The statute explicitly calls for a 'totality-of-the circumstances' approach and the Senate Report indicates that no particular factor is an indispensable element of a dilution claim.").

## FACTUAL BACKGROUND

### The 2020 Census

36.    Between 2010 and 2020, Georgia's population increased by more than 1 million people.

37.    The population growth during this period is entirely attributable to the increase in Georgia's minority population. The 2020 census results indicate that Georgia's Black population grew by over 15 percent and now comprises 33 percent of Georgia's total population. Meanwhile, Georgia's white population *decreased* by

4 percent over the past decade. In total, Georgia's minority population now comprises just under 50 percent of the state's total population.

**The 2021 Legislative Redistricting Plan**

38.    In enacting Georgia's new State Senate and House maps, the Republican-controlled General Assembly diluted the political power of the state's minority voters.

39.    On November 9, 2021, the Georgia State Senate passed SB 1EX, which revised that chamber's district boundaries. The House passed SB 1EX on November 15.

40.    On November 10, 2021, the Georgia House of Representatives passed HB 1EX, which revised that chamber's district boundaries; the State Senate passed HB 1EX on November 12.

41.    On December 30, 2021, Governor Kemp signed SB 1EX and HB 1EX into law.

42.    Democratic and minority legislators were largely excluded from the redistricting process and repeatedly decried the lack of transparency. Moreover, lawmakers and activists from across the political spectrum questioned the speed with which the General Assembly undertook its redistricting efforts, observing that the haste resulted in unnecessary divisions of communities and municipalities.

43.     The Republican majority's refusal to draw districts that reflected the past decade's growth in the state's minority communities was noted by lawmakers. Commenting on the new State Senate map, Senator Michelle Au observed, "It's our responsibility to ensure the people in this room are a good reflection of the people in this state. This map before us does not represent the Georgia of today. It does not see Georgia for who we have become." Senator Elena Parent remarked, "This map is designed to shore up the shrinking political power of the majority. As proposed, it fails to fairly reflect Georgians['] diversity."

44.     Minority lawmakers in the House also objected to their chamber's new map, noting that it packed minority voters and diluted their voting strength.

45.     Rather than create additional State Senate and House districts in which Georgia's growing minority populations would have the opportunity to elect candidates of their choice, the General Assembly did just the opposite: it packed and cracked Georgia's minority voters to dilute their influence.

46.     SB 1EX packs some Black voters into the southern Atlanta metropolitan area and cracks others into rural-reaching, predominantly white State Senate districts. Specifically, Black voters in the southwestern Atlanta metropolitan area are packed into Senate Districts 34 and 35 and cracked into Senate Districts 16, 28, and 30. In the southeastern Atlanta metropolitan area, Black voters are packed

into Senate Districts 10 and 44 and cracked into Senate Districts 17 and 25. Two additional majority-Black State Senate districts could be drawn in the southern Atlanta metropolitan area without reducing the total number of minority-opportunity districts in the enacted map.

47.    SB 1EX also cracks Black voters in the Black Belt among Senate Districts 23, 24, and 25. An additional majority-Black State Senate district could be drawn in this area without reducing the total number of minority-opportunity districts in the enacted map.

48.    HB 1EX packs some Black voters into the southern and western Atlanta metropolitan area and cracks others into rural-reaching, predominantly white districts. Specifically, Black voters in the western Atlanta metropolitan area are packed into House District 61 and cracked into House District 64. In the southern Atlanta metropolitan area, Black voters are packed into House Districts 69, 75, and 78 and cracked into House Districts 74 and 117. Two additional majority-Black House districts could be drawn in the southern Atlanta metropolitan area, and one additional majority-Black House district in the western Atlanta metropolitan area, without reducing the total number of minority-opportunity districts in the enacted map.

49.     HB 1EX further packs Black voters into two House districts anchored in Bibb County—House Districts 142 and 143—even though two additional majority-Black House districts could be drawn in this area by uncracking House Districts 133, 144, 145, 147, and 149, without reducing the total number of minority-opportunity districts in the enacted map.

50.     This combination of cracking and packing dilutes the political power of Black voters in the Atlanta metropolitan area and central Georgia. The General Assembly could have instead created additional, compact State Senate and House districts in which Black voters, including Plaintiffs, comprise a majority of eligible voters and have the opportunity to elect their preferred candidates, as required by Section 2 of the Voting Rights Act. Significantly, this could have been done without reducing the number of other districts in which Black voters have the opportunity to elect candidates of their choice.

51.     Unless enjoined, SB 1EX and HB 1EX will deny Black voters throughout the state the opportunity to elect candidates of their choice.

52.     The relevant factors and considerations readily require the creation of majority-Black districts under Section 2.

**Racial Polarization**

53.    This Court has recognized that "voting in Georgia is highly racially polarized." *Ga. State Conf. of NAACP v. Georgia*, 312 F. Supp. 3d 1357, 1360 (N.D. Ga. 2018) (three-judge panel).

54.    "Districts with large black populations are likely to vote Democratic." *Id.* Indeed, during competitive statewide elections over the past decade—from the 2012 presidential election through the 2021 U.S. Senate runoff elections—an average of 97 percent of Black Georgians supported the Democratic candidate.

55.    White voters, by striking contrast, overwhelmingly vote Republican. An average of only 13 percent of white Georgians supported the Democratic candidate in competitive statewide elections over the past decade.

56.    Georgia's white majority usually votes as a bloc to defeat minority voters' candidates of choice, including in the areas where Plaintiffs live and the Black population could be united to create a new majority-Black district.

**History of Discrimination**

57.    Georgia's past discrimination against its Black citizens, including its numerous attempts to deny Black voters an equal opportunity to participate in the political process, is extensive and well documented. This prejudice is not confined to history books; the legacy of discrimination manifests itself today in state and local

elections marked by racial appeals and undertones. And the consequences of the state's historic discrimination persist to this day, as Black Georgians continue to experience socioeconomic hardship and marginalization.

58.     This history dates back to the post-Civil War era, when Black Georgians first gained the right to vote and voted in their first election in April 1868. Soon after this historic election, a *quarter* of the state's Black legislators were either jailed, threatened, beaten, or killed. In 1871, the General Assembly passed a resolution that expelled 25 Black representatives and three senators but permitted the four mixed-race members who did not "look" Black to keep their seats. The General Assembly's resolution was based on the theory that Black Georgians' right of suffrage did not give them the right to hold office, and that they were thus "ineligible" to serve under Georgia's post-Civil War state constitution.

59.     After being denied the right to hold office, Black Georgians who attempted to vote also encountered intense and frequently violent opposition. The Ku Klux Klan and other white mobs engaged in a campaign of political terrorism aimed at deterring Black political participation. Their reigns of terror in Georgia included, for instance, attacking a Black political rally in Mitchell County in 1868, killing and wounding many of the participants; warning the Black residents of Wrightsville that "blood would flow" if they exercised their right to vote in an

upcoming election; and attacking and beating a Black man in his own home to prevent him from voting in an upcoming congressional election.

60.     In the General Assembly, fierce resistance to Black voting rights led to more discriminatory legislation. In 1871, Georgia became the first state to enact a poll tax. At the state's 1877 constitutional convention, the General Assembly made the poll tax permanent and cumulative, requiring citizens to pay all back taxes before being permitted to vote. The poll tax reduced turnout among Black voters in Georgia by half and has been described as the single most effective disenfranchisement law ever enacted. The poll tax was not abolished until 1945—after it had been in effect for almost 75 years.

61.     After the repeal of the poll tax in 1945, voter registration among Black Georgians significantly increased. However, as a result of the state's purposeful voter suppression tactics, not a *single* Black lawmaker served in the General Assembly between 1908 and 1962.

62.     Georgia's history of voter discrimination is far from ancient history. As recently as 1962, 17 municipalities and 48 counties in Georgia required segregated polling places. When the U.S. Department of Justice filed suit to end this practice, a local Macon leader declared that the federal government was ruining "every vestige of the local government."

63.     Other means of disenfranchising Georgia's Black citizens followed. The state adopted virtually every one of the "traditional" methods to obstruct the exercise of the franchise by Black voters, including literacy and understanding tests, strict residency requirements, onerous registration procedures, voter challenges and purges, the deliberate slowing down of voting by election officials so that Black voters would be left waiting in line when the polls closed, and the adoption of "white primaries."

64.     Attempts to minimize Black political influence in Georgia have also tainted redistricting efforts. During the 1981 congressional redistricting process, in opposing a bill that would maintain a majority-Black district, Joe Mack Wilson—a Democratic state representative and chair of the House Reapportionment Committee—openly used racial epithets to describe the district; following a meeting with officials of the U.S. Department of Justice, he complained that "the Justice Department is trying to make us draw [n*****] districts and I don't want to draw [n*****] districts." Speaker of the House Tom Murphy objected to creating a district where a Black representative would certainly be elected and refused to appoint any Black lawmakers to the conference committee, fearing that they would support a plan to allow Black voters to elect a candidate of their choice. Several senators also

expressed concern about being perceived as supporting a majority-Black congressional district.

65.     Indeed, federal courts have invalidated Georgia's redistricting plans for voting rights violations numerous times. In *Georgia v. United States*, the U.S. Supreme Court affirmed a three-judge panel's decision that Georgia's 1972 reapportionment plan violated Section 5 of the Voting Rights Act, at least in part because it diluted the Black vote in an Atlanta-based congressional district in order to ensure the election of a white candidate. *See* 411 U.S. 526, 541 (1973); *see also Busbee v. Smith*, 549 F. Supp. 494, 517 (D.D.C. 1982) (three-judge panel) (denying preclearance based on evidence that Georgia's redistricting plan was product of purposeful discrimination in violation of Voting Rights Act), *aff'd*, 459 U.S. 1166 (1983); *Larios v. Cox*, 300 F. Supp. 2d 1320 (N.D. Ga. 2004) (per curiam) (three-judge panel) (invalidating legislative plans that reduced number of majority-minority districts).

66.     Due to its lengthy history of discrimination against racial minorities, Georgia became a "covered jurisdiction" under Section 5 of the Voting Rights Act upon its enactment in 1965, prohibiting any changes to Georgia's election practices or procedures (including the enactment of new redistricting plans) until either the

U.S. Department of Justice or a federal court determined that the change did not result in backsliding, or "retrogression," of minority voting rights.

67.     Accordingly, between 1965 and 2013—at which time the U.S. Supreme Court effectively barred enforcement of the Section 5 preclearance requirement in *Shelby County v. Holder*, 570 U.S. 529 (2013)—Georgia received more than 170 preclearance objection letters from the U.S. Department of Justice.

68.     Georgia's history of racial discrimination in voting, here only briefly recounted, has been thoroughly documented by historians and scholars. Indeed, "[t]he history of the state['s] segregation practice and laws at all levels has been rehashed so many times that the Court can all but take judicial notice thereof." *Brooks v. State Bd. of Elections*, 848 F. Supp. 1548, 1560 (S.D. Ga. 1994); *see also, e.g.*, *Fair Fight Action, Inc. v. Raffensperger*, No. 1:18-CV-5391-SCJ, slip op. at 41 (N.D. Ga. Nov. 15, 2021), ECF No. 636 (taking judicial notice of fact that "prior to the 1990s, Georgia had a long sad history of racist policies in a number of areas including voting").

69.     Ultimately, as this Court has noted, "Georgia has a history chocked full of racial discrimination at all levels. This discrimination was ratified into state constitutions, enacted into state statutes, and promulgated in state policy. Racism and race discrimination were apparent and conspicuous realities, the norm rather

than the exception." *Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 950 F. Supp. 2d 1294, 1314 (N.D. Ga. 2013) (quoting *Brooks*, 848 F. Supp. at 1560), *aff'd in part, rev'd in part on other grounds*, 775 F.3d 1336 (11th Cir. 2015).

### Use of Racial Appeals in Political Campaigns

70.    In addition to Georgia's history of discrimination against minorities in voting, political campaigns in the state have often relied on both overt and subtle racial appeals—both historically *and* during recent elections.

71.    In 2016, Tom Worthan, former Republican Chair of the Douglas County Board of Commissioners, was caught on video making racist comments aimed at discrediting his Black opponent, Romona Jackson-Jones, and a Black candidate for sheriff, Tim Pounds. During the recorded conversation with a Douglas County voter, Worthan asked, "Do you know of another government that's more black that's successful? They bankrupt you." Worthan also stated, in reference to Pounds, "I'd be afraid he'd put his black brothers in positions that maybe they're not qualified to be in."

72.    In the 2017 special election for Georgia's Sixth Congressional District—a majority-white district that had over the previous three decades been represented by white Republicans Newt Gingrich, Johnny Isakson, and Tom Price— the husband of the eventual Republican victor, Karen Handel, shared an image over

social media that urged voters to "[f]ree the black slaves from the Democratic plantation." The image also stated, "Criticizing black kids for obeying the law, studying in school, and being ambitious as 'acting white' is a trick the Democrats play on Black people to keep them poor, ignorant and dependent." The image was then shared widely by local and national media outlets.

73.    During that same election, Jere Wood—the Republican Mayor of Roswell, Georgia's eighth-largest city—insinuated that voters in the Sixth Congressional District would not vote for Democratic candidate Jon Ossoff because he has an "ethnic-sounding" name. When describing voters in that district, Wood said, "If you just say 'Ossoff,' some folks are gonna think, 'Is he Muslim? Is he Lebanese? Is he Indian?' It's an ethnic-sounding name, even though he may be a white guy, from Scotland or wherever."[2]

74.    On a separate occasion, State Senator Fran Millar alluded to the fact that the Sixth Congressional District was gerrymandered in such a way that it would not support candidate Ossoff—specifically, because he was formerly an aide to a

---

[2] In actuality, now-U.S. Senator Ossoff's paternal forebears were Ashkenazi Jewish immigrants who fled pogroms during the early 20th century. *See* Etan Nechin, *Jon Ossoff Tells Haaretz How His Jewish Upbringing Taught Him to Fight for Justice*, Haaretz (Dec. 20, 2020), https://www.haaretz.com/us-news/.premium-jon-ossoff-tells-haaretz-how-his-jewish-upbringing-taught-him-to-fight-for-justice-1.9386302.

Black member of Congress. State Senator Millar said, "I'll be very blunt. These lines were not drawn to get Hank Johnson's protégé to be my representative. And you didn't hear that. They were not drawn for that purpose, OK? They were not drawn for that purpose."

75.    Earlier in 2017, Tommy Hunter, a member of the board of commissioners in Gwinnett County—the second-most populous county in the state—called the late Black Congressman John Lewis a "racist pig" and suggested that his reelection to the U.S. House of Representatives was "illegitimate" because he represented a majority-minority district.

76.    Racist robocalls targeted the Democratic candidate for governor in 2018, referring to Stacey Abrams as "Negress Stacey Abrams" and "a poor man's Aunt Jemima." The Republican candidate, now-Governor Kemp, posted a statement on Twitter on the eve of the election alleging that the Black Panther Party supported Ms. Abrams's candidacy.

77.    Governor Kemp also ran a controversial television advertisement during the primary campaign asserting that he owned "a big truck, just in case [he] need[s] to round up criminal illegals and take 'em home [him]self."

78.    The 2020 campaigns for Georgia's two U.S. Senate seats were also rife with racial appeals. In one race, Republican incumbent Kelly Loeffler ran a paid

advertisement on Facebook that artificially darkened the skin of her Democratic opponent, now-Senator Raphael Warnock. In the other race, Republican incumbent David Perdue ran an advertisement against Democratic nominee Ossoff that employed a classic anti-Semitic trope by artificially enlarging now-Senator Ossoff's nose.

79.     Senator Perdue later mispronounced and mocked the pronunciation of then-Senator Kamala Harris's first name during a campaign rally, even though the two had been colleagues in the Senate since 2017.

80.     Racial appeals were apparent during local elections in Fulton County even within the last few months. City council candidates in Johns Creek and Sandy Springs pointed to Atlanta crime and protests that turned violent to try to sway voters, publicly urging residents to vote for them or risk seeing their cities become home to chaos and lawlessness. *The Atlanta Journal-Constitution* quoted Emory University political scientist Dr. Andra Gillespie, who explained that although the term "law and order" is racially neutral, the issue becomes infused with present-day cultural meaning and thoughts about crime and violence and thus carries racial undertones.

81.   These are just a few—and, indeed, only among the more recent—examples of the types of racially charged political campaigns that have tainted elections in Georgia throughout the state's history.

## Ongoing Effects of Georgia's History of Discrimination

82.   State-sponsored segregation under Georgia's Jim Crow laws permeated all aspects of daily life and relegated Black citizens to second-class status. State lawmakers segregated everything from public schools to hospitals and graveyards. Black Georgians were also precluded from sitting on juries, which effectively denied Black litigants equal justice under the law. Moreover, Black Georgians were excluded from the most desirable manufacturing jobs, which limited their employment opportunities to primarily unskilled, low-paying labor. And in times of economic hardship, Black employees were the first to lose their jobs.

83.   Decades of Jim Crow and other forms of state-sponsored discrimination—followed by continued segregation of public facilities well into the latter half of the 20th century, in defiance of federal law—resulted in persistent socioeconomic disparities between Black and white Georgians. These disparities hinder the ability of voters in each of these groups to participate effectively in the political process.

84.   Black Georgians, for instance, have higher poverty rates than white Georgians. According to the U.S. Census Bureau's 2019 American Community Survey ("ACS") 1-Year Estimate, 18.8 percent of Black Georgians have lived below the poverty line in the past 12 months, compared to 9 percent of white Georgians.

85.   Relatedly, Black Georgians have lower per capita incomes than white Georgians. The 2019 ACS 1-Year Estimate shows that white Georgians had an average per capita income of $40,348 over the past 12 months, compared to $23,748 for Black Georgians.

86.   Black Georgians also have lower homeownership rates than white Georgians. The 2019 ACS 1-Year Estimate shows that 52.6 percent of Black Georgians live in renter-occupied housing, compared to 24.9 percent of white Georgians. And Black Georgians also spend a higher percentage of their income on rent than white Georgians. The 2019 ACS 1-Year Estimate shows that in Georgia, the percent of income spent on rent is a staggering 54.9 percent for Black Georgians, compared to 40.6 percent for white Georgians.

87.   Black Georgians also have lower levels of educational attainment than their white counterparts and are less likely to earn degrees. According to the 2019 ACS 1-Year Estimate, only 25 percent of Black Georgians have obtained a bachelor's degree or higher, compared to 37 percent of white Georgians.

88.     These disparities impose hurdles to voter participation, including working multiple jobs, working during polling place hours, lack of access to childcare, lack of access to transportation, and higher rates of illness and disability. All of these hurdles make it more difficult for poor and low-income voters to participate effectively in the political process.

## CAUSES OF ACTION

### COUNT I:
### SB 1EX Violates Section 2 of the Voting Rights Act

89.     Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint as though fully set forth herein.

90.     Section 2 of the Voting Rights Act prohibits the enforcement of any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or" membership in a language minority group. 52 U.S.C. § 10301(a).

91.     The Georgia State Senate district boundaries, as currently drawn, crack and pack minority populations with the effect of diluting their voting strength, in violation of Section 2 of the Voting Rights Act.

92.     Black Georgians in the southern Atlanta metropolitan area and the central Georgia Black Belt region are sufficiently numerous and geographically compact to constitute a majority of eligible voters in three additional State Senate

districts, without reducing the number of minority-opportunity districts already included in the enacted map.

93. Under Section 2 of the Voting Rights Act, the General Assembly was required to create three additional State Senate districts in which Black voters in these areas would have the opportunity to elect their candidates of choice.

94. Black voters in Georgia, particularly in and around these areas, are politically cohesive. Elections in these areas reveal a clear pattern of racially polarized voting that allows blocs of white voters usually to defeat Black voters' preferred candidates.

95. The totality of the circumstances establishes that the current State Senate map has the effect of denying Black voters an equal opportunity to participate in the political process and elect candidates of their choice, in violation of Section 2 of the Voting Rights Act.

96. By engaging in the acts and omissions alleged herein, Defendants have acted and continue to act to deny Plaintiffs' rights guaranteed by Section 2 of the Voting Rights Act. Defendants will continue to violate those rights absent relief granted by this Court.

## COUNT II:
## HB 1EX Violates Section 2 of the Voting Rights Act

97.     Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint as though fully set forth herein.

98.     The Georgia House of Representative district boundaries, as currently drawn, crack and pack minority populations with the effect of diluting their voting strength, in violation of Section 2 of the Voting Rights Act.

99.     Black Georgians in the southern and western Atlanta metropolitan area and central Georgia are sufficiently numerous and geographically compact to constitute a majority of eligible voters in five additional House districts, without reducing the number of minority-opportunity districts already included in the enacted map.

100.    Under Section 2 of the Voting Rights Act, the General Assembly was required to create five additional House districts in which Black voters in these areas would have the opportunity to elect their candidates of choice.

101.    Black voters in Georgia, particularly in and around these areas, are politically cohesive. Elections in these areas reveal a clear pattern of racially polarized voting that allows blocs of white voters usually to defeat Black voters' preferred candidates.

102.   The totality of the circumstances establishes that the current House map has the effect of denying Black voters an equal opportunity to participate in the political process and elect candidates of their choice, in violation of Section 2 of the Voting Rights Act.

103.   By engaging in the acts and omissions alleged herein, Defendants have acted and continue to act to deny Plaintiffs' rights guaranteed by Section 2 of the Voting Rights Act. Defendants will continue to violate those rights absent relief granted by this Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

A.   Declare that SB 1EX and HB 1EX violate Section 2 of the Voting Rights Act;

B.   Enjoin Defendants, as well as their agents and successors in office, from enforcing or giving any effect to the boundaries of the Georgia State Senate districts as drawn in SB 1EX and the boundaries of the Georgia House of Representatives districts as drawn in HB 1EX, including an injunction barring Defendants from conducting any further legislative elections under the current maps;

C.     Hold hearings, consider briefing and evidence, and otherwise take actions necessary to order the adoption of a valid legislative redistricting plan that includes three additional Georgia State Senate districts and five additional Georgia House of Representatives districts in which Black voters would have opportunities to elect their preferred candidates, as required by Section 2 of the Voting Rights Act, without reducing the number of minority-opportunity districts currently in SB 1EX and HB 1EX;

D.     Grant such other or further relief the Court deems appropriate, including but not limited to an award of Plaintiffs' attorneys' fees and reasonable costs.

Dated: October 28, 2022

By: **Adam M. Sparks**
Joyce Gist Lewis
Georgia Bar No. 296261
Adam M. Sparks
Georgia Bar No. 341578
**KREVOLIN & HORST, LLC**
One Atlantic Center
1201 West Peachtree Street, NW,
Suite 3250
Atlanta, Georgia 30309
Telephone: (404) 888-9700
Facsimile: (404) 888-9577
Email: JLewis@khlawfirm.com
Email: Sparks@khlawfirm.com

Kevin J. Hamilton*
**PERKINS COIE LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101
Phone: (206) 359-8000
Facsimile: (206) 359-9000
Email: KHamilton@perkinscoie.com

Respectfully submitted,

Abha Khanna*
Jonathan P. Hawley*
Makeba Rutahindurwa*
**ELIAS LAW GROUP LLP**
1700 Seventh Avenue, Suite 2100
Seattle, Washington 98101
Phone: (206) 656-0177
Facsimile: (206) 656-0180
Email: AKhanna@elias.law
Email: JHawley@elias.law
Email: MRutahindurwa@elias.law

Daniel C. Osher*
Christina A. Ford*
Graham W. White*
Michael B. Jones
Georgia Bar No. 721264
**ELIAS LAW GROUP LLP**
10 G Street NE, Suite 600
Washington, D.C. 20002
Phone: (202) 968-4490
Facsimile: (202) 968-4498
Email: DOsher@elias.law
Email: CFord@elias.law
Email: GWhite@elias.law
Email: MJones@elias.law

*Counsel for Plaintiffs*

*Admitted pro hac vice*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing **<u>SECOND AMENDED COMPLAINT</u>** has

been prepared in accordance with the font type and margin requirements of LR 5.1,

NDGa, using font type of Times New Roman and a point size of 14.

Dated: October 28, 2022                    **<u>Adam M. Sparks</u>**

                                       *Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have on this date caused to be electronically filed a copy of the foregoing **<u>SECOND AMENDED COMPLAINT</u>** with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to counsel of record.

Dated: October 28, 2022                    **<u>Adam M. Sparks</u>**

*Counsel for Plaintiffs*