**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

ANNIE LOIS GRANT; QUENTIN T.
HOWELL; ELROY TOLBERT; TRIANA
ARNOLD JAMES; EUNICE SYKES;
ELBERT SOLOMON; DEXTER
WIMBISH; GARRETT REYNOLDS;
JACQUELINE FAYE ARBUTHNOT;
JACQUELYN BUSH; and MARY NELL
CONNER,

          Plaintiffs,

   v.

BRAD RAFFENSPERGER, in his official
capacity as the Georgia Secretary of State;
WILLIAM S. DUFFEY, JR., in his official
capacity as chair of the State Election
Board; MATTHEW MASHBURN, in his
official capacity as a member of the State
Election Board; SARA TINDALL
GHAZAL, in her official capacity as a
member of the State Election Board;
EDWARD LINDSEY, in his official
capacity as a member of the State Election
Board; and JANICE W. JOHNSTON, in
her official capacity as a member of the
State Election Board,

          Defendants.

CIVIL ACTION FILE
NO. 1:22-CV-00122-SCJ

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................1

ARGUMENT .......................................................................................2

    I.     The members of the State Election Board are proper defendants.........2

    II.    Plaintiffs have readily satisfied the first *Gingles* precondition. ...........4

        A.     Race did not predominate in Mr. Esselstyn's illustrative plans. 4

        B.     Mr. Esselstyn's illustrative plans adhere to traditional redistricting principles. ...........................................................10

        C.     Mr. Esselstyn's illustrative plans are permissible remedies.....16

    III.   Plaintiffs have proved legally significant racially polarized voting. ..17

        A.     Plaintiffs have satisfied their burden as to racially polarized voting..........................................................................................19

        B.     Defendants have failed to rebut Plaintiffs' proof of vote dilution. ....................................................................................22

        C.     Plaintiffs demonstrated that voting in Georgia is polarized on account of race. .......................................................................26

        D.     This Court's approach to racially polarized voting is consistent with Section 2, *Gingles*, and the U.S. Constitution. .................31

CONCLUSION ...................................................................................35

## INTRODUCTION

Defendants' summary judgment motion is little more than a replay of their greatest hits from earlier in this litigation. The first track Defendants reprise is the claim that Plaintiffs' illustrative legislative plans necessarily constitute impermissible racial gerrymanders—and thus Plaintiffs cannot satisfy the first *Gingles* precondition. The second is the belief that party, not race, explains Georgia's electoral polarization—and thus Plaintiffs cannot prove racially polarized voting. Even though the Court already rejected both in its preliminary injunction ruling, these familiar numbers now reappear on summary judgment.

The old tunes, however, are out of sync with both the applicable caselaw and the evidence in the record. Plaintiffs' illustrative legislative plans were drawn in compliance with traditional redistricting principles and unite voters with shared interests in the Atlanta metropolitan area and Black Belt. Defendants can point to nothing meaningful in the record—not even their own expert's testimony—to prove that race impermissibly predominated. As for racially polarized voting, not only do Defendants have the legal standard backwards, but they wholly disregard Plaintiffs' unrebutted evidence that race drives polarization in Georgia's electorate.

The record disproves Defendants' preferred refrains. Neither the law nor the facts are on their side, and their motion should be denied.

## ARGUMENT

### I.   The members of the State Election Board are proper defendants.

The members of the State Election Board ("SEB") are proper defendants in this action because they, along with the Secretary of State, have the legal responsibility to ensure the fair and lawful administration of Georgia's elections.

Among the SEB's statutorily enumerated responsibilities are "formulat[ing], adopt[ing], and promulgat[ing] such rules and regulations, consistent with law, as will be conducive to the fair, legal, and orderly conduct of primaries and elections." O.C.G.A. § 21-2-31(2). Given that Plaintiffs seek an order from this Court enjoining use of the enacted Georgia State Senate and Georgia House of Representatives maps in future elections administered in part by the SEB, *see* ECF No. 118 at 37–38, Plaintiffs' injury is fairly traceable to the SEB's conduct, and an injunction against the SEB's ability to conduct legislative elections under the enacted maps will redress that injury. This case is therefore distinguishable from *Jacobson v. Florida Secretary of State*, where the plaintiffs' ballot-order injury was not fairly traceable to the secretary of state because county officials maintained sole and independent responsibility for placing candidates on the ballot. *See* 974 F.3d 1236, 1253–54 (11th Cir. 2020). Nor does *Lewis v. Governor of Alabama*, 944 F.3d 1287 (11th Cir. 2019) (en banc), help Defendants' argument. There, the court determined that the Alabama

2

"Attorney General's litigating and opinion-giving authority" was insufficient to confer standing because he had no affirmative legal duty to actually do anything, and the speculative link between the plaintiffs' injury and the relief they sought against him vitiated Article III's traceability and redressability requirements. *Id.* at 1296–1306.

Here, by contrast, the SEB maintains broad powers and responsibilities in coordination with the Secretary of State—and an affirmative legal duty—to ensure the fair and orderly administration of elections. *See* O.C.G.A. §§ 21-2-31, 21-2-50. Accordingly, both the Secretary of State *and* the SEB are proper defendants.

That "Plaintiffs have not located any evidence that the named members of the SEB had any say in the design of the maps," ECF No. 190-1 ("Defs.' Mot.") at 17, is of little moment—Plaintiffs seek to enjoin *use* of the maps, making election administrators (as opposed to map-drawers) the appropriate defendants, *see, e.g.*, *Brown v. Jacobsen*, 590 F. Supp. 3d 1273, 1284–85 (D. Mont. 2022) (three-judge court); *La. State Conf. of NAACP v. Louisiana*, 490 F. Supp. 3d 982, 1030–31 (M.D. La. 2020). Nor does it matter that "Plaintiffs have produced no evidence in discovery that any of the individually named SEB members . . . implement the maps in any substantive way," Defs.' Mot. 18–19, since, "in the absence of clear evidence to the contrary, courts presume that [public officers] have properly discharged their official

3

duties," *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14–15 (1926). Given their statutory obligation to oversee Georgia's elections, the SEB's role in implementing the enacted legislative maps can be assumed.

## II. Plaintiffs have readily satisfied the first *Gingles* precondition.

Plaintiffs have satisfied the first *Gingles* precondition because the illustrative State Senate and House plans prepared by their mapping expert, Blake Esselstyn, comply with traditional redistricting principles and were not drawn based predominantly on race.[1]

### A. Race did not predominate in Mr. Esselstyn's illustrative plans.

Although Defendants claim that "[t]he evidence demonstrates that Plaintiffs have gone beyond" the limited consideration of race acceptable under Section 2, Defs.' Mot. 19, they provide no meaningful evidence that makes this demonstration.

Defendants' predominance argument hinges primarily on Mr. Esselstyn's alleged "use[ of] racial shading and other" unspecified "techniques" to draw new

---

[1] As an overarching issue, Defendants point to the differing views of the mapping experts in this case and the related *Alpha Phi Alpha* case, with the suggestion that the claims in one undermine the other. *See* Defs.' Mot. 3 n.1, 14–15. If anything, the fact that experienced map-drawers found *different* areas in which the Black population is sufficiently numerous and compact to constitute a majority in an additional legislative district only underscores the magnitude of the vote dilution throughout the state. And, in any event, whatever allegations have been lodged in *Alpha Phi Alpha* should have no bearing on summary judgment in *this* case.

majority-Black legislative districts, *id.*, but the excerpt from Mr. Esselstyn's deposition transcript that they cite hardly supports this contention. Far from admitting that he used racial shading as the predominant tool to draw his illustrative plans, Mr. Esselstyn conceded only that, *at some point*, his mapping software displayed the Black voting-age populations for the geographic areas in which he was working. Pls.' Statement of Additional Material Facts ("SAMF") ¶ 1; Ex. 7 ("Esselstyn Dep.") at 76:21–77:6.[2] Asked if he used the software's shading function when drawing his illustrative State Senate and House plans, Mr. Esselstyn responded that he was "not totally sure." SAMF ¶ 2; Esselstyn Dep. 77:7–19. And when queried about his use of these tools later in the deposition, Mr. Esselstyn confirmed that race *did not predominate* when he drew his illustrative plans:

> Q      My question is: Do you always have that [racial] shading
>          function on when you're map drawing?
>
> A      No.
>
> Q      Did you always have that shading function toggled on when you
>          were drawing your illustrative Senate and House maps in this
>          case?
>
> A      No. . . .
>
> Q      When you . . . had that shading function toggled and you could
>          see it, . . . did that information predominate in any given line

---

[2] All exhibits are attached to the Declaration of Jonathan P. Hawley, filed concurrently with this response.

> drawing decision you made when you were preparing you
> illustrative maps?
>
> A     No, it did not.

SAMF ¶ 3; Esselstyn Dep. 220:2–221:7.

Mr. Esselstyn's employment of demographic information is a far cry from the use of race in *Miller v. Johnson*, 515 U.S. 900 (1995), which Defendants invoke using a misleading parenthetical, *see* Defs.' Mot. 19. There, the federal government "was driven by its policy of maximizing majority-black districts" when preclearing Georgia's congressional plan, with one lawyer explaining that "what we did and what I did specifically was to take a map of the State of Georgia shaded for race, shaded by minority concentration, and overlay the districts that were drawn by the State of Georgia and see how well those lines adequately reflected black voting strength." *Miller*, 515 U.S. at 924–25 (cleaned up). Mr. Esselstyn, by contrast, was *not* asked to maximize the number of majority-Black districts in either illustrative plan. SAMF ¶ 4; Esselstyn Dep. 229:2–5. Instead, he was asked to "determine whether there are areas in the State of Georgia where the Black population is 'sufficiently large and geographically compact' to enable the creation of additional majority-Black legislative districts relative to the number of such districts provided in the enacted State Senate and State House of Representatives redistricting plans from 2021"—and concluded that there were. SAMF ¶¶ 5–6; Ex. 1 ("Esselstyn

6

Report") ¶¶ 9, 13. Mr. Esselstyn attested that neither race nor any other factor predominated in the drawing of his illustrative plans, SAMF ¶ 7; Esselstyn Report ¶ 25, and Defendants have adduced no compelling evidence to the contrary.

Defendants only fleetingly reference the expert report prepared by their mapping expert, John Morgan, which is not surprising given the report's limited probative value. For example, Defendants cite two paragraphs of Mr. Morgan's report to claim that Mr. Esselstyn's "county splits were often racial in nature," Defs.' Mot. 10, but these paragraphs note only that two of Mr. Esselstyn's illustrative districts include significant proportions of Black voters from the areas they encompass, *see* Ex. 5 ("Morgan Report") ¶ 33—hardly a revelatory observation given Section 2's "objective, numerical" requirement that "minorities make up more than 50 percent of the voting-age population in the relevant geographic area," *Bartlett v. Strickland*, 556 U.S. 1, 18 (2009) (plurality opinion).[3] Other contributions from Mr. Morgan—such as claiming that "Mr. Esselstyn lowered the Black percentages of the existing Macon districts to make Black population available to

---

[3] Defendants' assertion that Mr. Esselstyn "focused on areas with higher concentrations of Black voters [when] looking where additional districts could be drawn," Defs.' Mot. 10, is unrevealing for the same reason; the first *Gingles* precondition includes a *numerosity requirement*, and as such can be satisfied only in areas with sufficiently large concentrations of minority voters.

run into other counties and raise the Black percentages in Districts 145 and 149," Defs.' Mot. 13 (citing Morgan Report ¶ 58)—are merely descriptive and provide purely conclusory assumptions about Mr. Esselstyn's motivations. Mr. Morgan's entirely speculative analysis fails to provide sufficient grounds for summary judgment, especially given Mr. Esselstyn's repeated assertion that race did not predominate in his illustrative plans.

Defendants' own observations and conclusory assertions are no more compelling than Mr. Morgan's. For instance, Defendants claim that, "[t]o create Senate District 23, Mr. Esselstyn split counties based on race," Defs.' Mot. 10–11, but, like Mr. Morgan, Mr. Esselstyn acknowledged only that the portions of the counties inside the illustrative district have higher proportions of Black voting-age population than the portions outside the districts, *see* Esselstyn Dep. 141:24–142:3. This purely descriptive assessment does not speak to Mr. Esselstyn's motivations or intent—and, though Defendants omit this excerpt of his deposition transcript from their citation, Mr. Esselstyn explained his objection to this characterization of illustrative Senate District 23. *See id.* at 142:4–143:11. The same is true of Defendants' observations that illustrative House District 74 "connect[s] heavier concentrations of Black individuals in Clayton County with more heavily white portions of Fayette County," Defs.' Mot. 13, and that "all four districts that include

portions of Macon are all very close to 50% Black VAP," *id.* Defendants cannot simply describe mapping arrangements and then, without more, draw sweeping conclusions about Mr. Esselstyn's intent.

At most, the evidence indicates that Mr. Esselstyn utilized racial information to *inform* his mapping decisions. SAMF ¶ 8; Esselstyn Dep. 77:20–25. But mere consciousness of race is neither comparable to racial predominance nor otherwise suspect. To the contrary, the U.S. Supreme Court has acknowledged that a "legislature always is *aware* of race when it draws district lines, just as it is aware of age, economic status, religious and political persuasion, and a variety of other demographic factors. That sort of race consciousness does not lead inevitably to impermissible race discrimination." *Shaw v. Reno*, 509 U.S. 630, 646 (1993).

At any rate, the Eleventh Circuit has expressly rejected "apply[ing] authorities such as *Miller* to [a] Section Two case . . . because the *Miller* and *Gingles*[] lines address very different contexts." *Davis v. Chiles*, 139 F.3d 1414, 1425 (11th Cir. 1998); *see also, e.g.*, *Robinson v. Ardoin*, 37 F.4th 208, 223 (5th Cir. 2022) (per curiam) ("[W]e have rejected the proposition that a plaintiff's attempt to satisfy the first *Gingles* precondition is invalid if the plaintiff acts with a racial purpose."). Section 2 "*require[s]* plaintiffs to show that it would be possible to design an electoral district, consistent with traditional districting principles, in which minority

voters could successfully elect a minority candidate." *Davis*, 139 F.3d at 1425. The gambit that Defendants have once again adopted—dismissing any illustrative plan as an impermissible gerrymander—is neither supported nor justifiable; "[t]o penalize [plaintiffs] for attempting to make the very showing that *Gingles*[ and its progeny] demand would be to make it impossible, as a matter of law, for any plaintiff to bring a successful Section Two action." *Id.* Defendants' position is not the law— nor should it be.

**B.    Mr. Esselstyn's illustrative plans adhere to traditional redistricting principles.**

Even if Defendants had mustered more compelling evidence of racial predominance, there is no indication that Mr. Esselstyn "subordinate[d] other factors, such as compactness or respect for political subdivisions, to racial considerations." ECF No. 91 ("PI Order") at 87. To the contrary, his illustrative plans comply with traditional redistricting principles such as "compactness, contiguity, and respect for political subdivisions," which "serve[s] to defeat a claim that a district has been gerrymandered on racial lines." *Shaw*, 509 U.S. at 647.[4]

---

[4] While core retention "was not an enumerated districting principle adopted by the General Assembly," PI Order 123–24, Plaintiffs first note that Mr. Esselstyn's illustrative plans modify just 22 of the 56 enacted State Senate districts and 25 of the 180 enacted House districts, SAMF ¶¶ 40–41; Esselstyn Report ¶¶ 26, 47.

**Population equality.** In Mr. Esselstyn's illustrative State Senate and House plans, most district populations are within plus-or-minus 1% of the ideal, and no district in either plan has a population deviation of more than 2%. SAMF ¶¶ 9–14; Esselstyn Report ¶¶ 34, 55, attachs. H & L. Defendants nevertheless maintain that the illustrative plans "do[] not comply with traditional redistricting principles" because they have higher total population deviations than the enacted plans. Defs.' Mot. 11–12, 14. But comparisons to the enacted plans, while at times illuminating, are not dispositive; just as Section 2 requires only illustrative majority-minority districts that are "*reasonably* compact and regular, taking into account traditional districting principles such as maintaining communities of interest and traditional boundaries," so it follows that illustrative plans as a whole need not "defeat rival[s] . . . in endless 'beauty contests.'" *Bush v. Vera*, 517 U.S. 952, 977 (1996) (plurality opinion). That Mr. Esselstyn's illustrative plans have (slightly) higher population deviations than the enacted plans says nothing about whether the illustrative plans comply with the traditional principle of population equality. And, ultimately, both plans fall well within the accepted bounds of constitutionality. *See Evenwel v. Abbott*, 578 U.S. 54, 60 (2016) ("Where the maximum population deviation between the largest and smallest district is less than 10%, the Court has held, a state or local legislative map presumptively complies with the one-person, one-vote rule.").

**Contiguity.** The districts in Mr. Esselstyn's illustrative plans satisfy the contiguity requirement in the same manner as the enacted plans. SAMF ¶¶ 15–16; Esselstyn Report ¶¶ 35, 56. Defendants do not dispute this point.

**Compactness.** The mean compactness measures for Mr. Esselstyn's illustrative plans are comparable—if not identical—to the mean measures for the enacted plans. SAMF ¶¶ 17–18; Esselstyn Report ¶¶ 36, 57, tbls.2 & 6; Morgan Dep. 90:6–17, 168:6–11. And, notably, the individual compactness scores for Mr. Esselstyn's additional majority-Black districts fall within the range of compactness scores of the enacted districts using the Reock, Schwartzberg, Polsby-Popper, and Area/Convex Hull measures; each of Mr. Esselstyn's additional majority-Black districts is more compact than the least-compact enacted districts. SAMF ¶¶ 19–24; Esselstyn Report ¶¶ 37, 58, figs.8 & 17, tbls.3 & 7, attachs. H & L. Defendants do not actually contest the compactness of Mr. Esselstyn's illustrative plans, instead faulting him for "not report[ing] the compactness scores of districts that he changed, instead only reporting the average score for all districts," Defs.' Mot. 12, 14—which is simply incorrect, as his report includes compactness scores for *all* districts in the enacted and illustrative legislative plans, *see* Esselstyn Report attachs. H & L.

**Political subdivisions.** Mr. Esselstyn's illustrative plans split only marginally more counties and voting districts than the enacted plans. SAMF ¶¶ 25–26; Esselstyn

Report ¶¶ 39, 59, tbls.4 & 8, attachs. H & L. Again, Defendants suggest that Mr. Esselstyn failed to satisfy this criterion because "[t]he illustrative Senate plan [] splits more counties and precincts than the enacted plan" and "[t]he illustrative House plan [] splits one more county and one more precinct than the enacted plan." Defs.' Mot. 12, 14. But, again, Defendants provide no authority to suggest that having *slightly* more subdivision splits than comparator plans renders the illustrative plans somehow noncompliant with this redistricting principle. *Cf. Vera*, 517 U.S. at 977. Notably, while Mr. Morgan compared the political subdivision splits of the illustrative plans and enacted plans, *see* Morgan Report ¶¶ 21, 35, charts 3 & 5, he did *not* opine that Mr. Esselstyn failed to sufficiently minimize subdivision splits in the illustrative plans.

**Incumbent pairings.** Mr. Esselstyn's illustrative State Senate plan does not pair any incumbent senators in the same district, while his illustrative House plan pairs a total of eight incumbents—the same number of pairings as in the enacted plan, as previously reported by Mr. Morgan. SAMF ¶¶ 27–28; Esselstyn Report ¶¶ 42, 61 & nn.17–18. Defendants do not dispute this point.

**Communities of interest.** Mr. Esselstyn's illustrative plans preserve various communities with shared interests. SAMF ¶¶ 29–38; Esselstyn Report ¶¶ 29 n.7, 31 n.8, 41, 51 & nn.12–13, 52 & nn.14–16, 60. For example, his illustrative House

13

District 149 generally follows the orientation of the Georgia Fall Line geological feature, which brings with it shared economic, historic, and ecological similarities; Macon and Milledgeville, parts of which are in illustrative House District 149, are both characterized as "Fall Line Cities" and were identified in public comment before the General Assembly's Joint Reapportionment Committee as two cities that should be kept in the same district. SAMF ¶¶ 36–37; Esselstyn Report ¶ 52 & nn.14–16. Illustrative House District 149 also includes the entirety of Twiggs and Wilkinson counties—which were described by Gina Wright, the Executive Director of the General Assembly's Legislative and Congressional Reapportionment Office, as "constitut[ing] a single community of interest." SAMF ¶ 35; Esselstyn Report ¶ 51 & n.12 (alteration in original) (quoting ECF No. 55 at 9).

While Defendants grouse about a variety of community pairings in certain districts, they hardly contend—let alone establish—that the illustrative plans fail to respect communities of interest. For example, Defendants fault Mr. Esselstyn for "not recall[ing] why he decided to connect Clayton and Henry Counties in" illustrative Senate District 25, Defs.' Mot. 11, but the first *Gingles* precondition does not include a memory requirement, and Defendants do not otherwise suggest that this configuration of Senate District 25 is improper or otherwise suspect. (Nor would such a critique seemingly be forthcoming, given that illustrative Senate District 25

is a relatively small district contained wholly in the southeastern Atlanta suburbs. SAMF ¶ 39; Esselstyn Report ¶ 30, fig.6.). The same is true of Defendants' objections to the communities included in various other illustrative districts: namely, Senate District 28 ("Mr. Esselstyn connected more-urban areas of Clayton County with more-rural areas in Coweta County"), Defs.' Mot. 11; House District 64 ("Mr. Esselstyn connected parts of Paulding and Fulton counties"), *id.* at 13; and House District 117 ("Mr. Esselstyn connected parts of districts from Clayton County to rural areas"), *id.* In none of these instances did Defendants actually contend that Mr. Esselstyn's illustrative districts are improperly configured, and the record is devoid of any evidence or opinions to this effect.

Defendants also object to the configurations of illustrative Senate Districts 10 and 35, Defs.' Mot. 11, but these are *not* among Mr. Esselstyn's eight new majority-Black districts. Defendants' focus on these districts is misplaced. The Section 2 compactness inquiry relates to the "compactness of the minority population" whose voting strength is improperly diluted. *LULAC v. Perry*, 548 U.S. 399, 433 (2006) (plurality opinion). Because the compactness of the minority group is used to assess "the opportunity that § 2 requires [and] that the first *Gingles* condition contemplates," *id.*, there is neither a requirement nor a reason for Plaintiffs to

15

demonstrate the shared interests of communities *outside* of their illustrative majority-Black districts.

In short, this is not a case where illustrative districts combine "disparate communities of interest" with "differences in socio-economic status, education, employment, health, and other characteristics" across an "enormous geographical distance." *Id.* at 435 (cleaned up). Certainly, at least, Defendants have not demonstrated that Mr. Esselstyn's districts are insufficiently compact.

### C.   Mr. Esselstyn's illustrative plans are permissible remedies.

While "[a] district court must determine as part of the *Gingles* threshold inquiry whether it can fashion a permissible remedy in the particular context of the challenged system," *Nipper v. Smith*, 39 F.3d 1494, 1530–31 (11th Cir. 1994) (en banc) (opinion of Tjoflat, C.J.), Defendants have identified no meaningful deficiencies with Mr. Esselstyn's illustrative plans that would render them impermissible remedies.

As discussed above, Defendants have not demonstrated that the illustrative plans were drawn with impermissible racial predominance or that the plans (or, for that matter, the eight proposed majority-Black districts) fail to comply with traditional redistricting principles. Any isolated critiques of Mr. Esselstyn's illustrative legislative plans are, ultimately, neither dispositive nor even revealing.

The U.S. Supreme Court has explained that the "impossibly stringent" standard of perfect districting is "unattainable" and not required under the Voting Rights Act. *Vera*, 517 U.S. at 977. After all, "[i]llustrative maps are just that—illustrative. The Legislature need not enact any of them." *Robinson*, 37 F.4th at 223. To the extent Defendants might prefer different remedial maps, they can take that up with the Georgia General Assembly after a liability ruling, since "states retain broad discretion in drawing districts to comply with the mandate of § 2." *Shaw v. Hunt*, 517 U.S. 899, 917 n.9 (1996). The State of Georgia (or, if needed, this Court) would be free to adopt alternative legislative maps so long as they remedy the unlawful dilution of Black voting strength in the Atlanta metropolitan area and Black Belt.[5]

### III.   Plaintiffs have proved legally significant racially polarized voting.

Just as the Court concluded following the preliminary injunction proceedings, *see* PI Order 209–10, Plaintiffs have satisfied the applicable test for racially polarized voting.

---

[5] Moreover, even if the racial-gerrymandering doctrine could be mechanically applied to the first *Gingles* precondition—it cannot, *see supra* at 9–10—and even if race predominated over other factors in the illustrative plans—it did not, *see supra* at 4–16—Mr. Esselstyn's illustrative majority-Black State Senate and House districts would be permissible because they would survive strict scrutiny, *see Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 950 F. Supp. 2d 1294, 1305 (N.D. Ga. 2013), *aff'd in part, rev'd in part on other grounds*, 775 F.3d 1336 (11th Cir. 2015).

At the outset, Defendants contend that the causes of racially polarized voting are properly considered as part of the first two *Gingles* preconditions, as opposed to the second Senate Factor. Although they acknowledge that "courts disagree on" this point, they casually conclude that "this minor disagreement does not matter much." Defs.' Mot. 29. This is simply disingenuous: The distinction matters a great deal, since while "there is no requirement that any particular number of [Senate F]actors be proved, or that a majority of them point one way or the other," the *Gingles* preconditions are "*necessary*" to prove unlawful vote dilution under Section 2. *Thornburg v. Gingles*, 478 U.S. 30, 45, 50 (1986) (emphasis added) (quoting S. Rep. No. 97-417, pt. 1, at 29 (1982)).

While the second and third *Gingles* preconditions provide the *quantitative* basis to assess "whether voting is racially polarized and, if so, whether the white majority is usually able to defeat the minority bloc's candidates," *Brooks v. Miller*, 158 F.3d 1230, 1240 (11th Cir. 1998), the *qualitative* underpinnings of that polarization are properly understood as part of the totality-of-circumstances analysis, *see, e.g.*, *Rose v. Raffensperger*, No. 1:20-cv-02921-SDG, 2022 WL 3135915, at *12 (N.D. Ga. Aug. 5, 2022), *appeal docketed*, No. 22-12593 (11th Cir. Aug. 8, 2022). As the Eleventh Circuit has explained, satisfaction of the *Gingles* preconditions creates an inference of racial bias, since "[t]he surest indication of race-conscious

politics is a pattern of racially polarized voting." *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1567 (11th Cir. 1984); *see also Nipper*, 39 F.3d at 1525–26; *Sanchez v. Colorado*, 97 F.3d 1303, 1310 (10th Cir. 1996) (*Gingles* preconditions "create[] the inference the challenged practice is discriminatory"). *After* a Section 2 plaintiff has established the requisite minority cohesion and bloc voting under *Gingles*, "[t]he weight that should be placed on the extent of such polarization—and any link to partisanship—must necessarily be part of the totality-of-the-circumstances analysis under the second Senate Factor." PI Order 174–75; *see also, e.g.*, *Lewis v. Alamance County*, 99 F.3d 600, 615 n.12 (4th Cir. 1996) ("We think the best reading of the several opinions in *Gingles* . . . is one that treats causation as irrelevant in the inquiry into the three *Gingles* preconditions but relevant in the totality of circumstances inquiry." (citations omitted)). But this is not an inquiry required as part of the threshold *Gingles* preconditions.[6]

> **A.    Plaintiffs have satisfied their burden as to racially polarized voting.**

Under circuit precedent, Plaintiffs have proved the existence of legally significant racially polarized voting.

---

[6] Considering racially polarized voting as part of the totality-of-circumstances inquiry also makes logical sense: If that analysis were already subsumed in the *Gingles* preconditions, then the second Senate Factor would be superfluous.

As discussed at length in Plaintiffs' summary judgment brief, *see* ECF No. 189-1 ("Pls.' Mot.") at 13–16, 22–25, Dr. Maxwell Palmer demonstrated that, in the areas where they have proposed new majority-Black legislative districts, Black voters overwhelmingly support their candidates of choice and white voters consistently and cohesively vote in opposition to Black-preferred candidates, SAMF ¶¶ 42–49; Ex. 2 ("Palmer Report") ¶¶ 16, 18–19 & nn.14–15, figs.2 & 3, tbls.1, 2, 3, 4, 5, 6, & 7; Ex. 3 ¶ 6, fig.1, tbl.1; Ex. 6 ("Alford Report") at 3; Ex. 10 ("Alford Dep.") at 37:13–15, 38:20–39:8, 44:8–16, 45:10–12. Far from disputing this polarization, Defendants' quantitative expert, Dr. John Alford, *confirmed* it, both in his expert report, *see* Alford Report 3 ("As evident in Dr. Palmer's [reports], the pattern of polarization is quite striking."), and in his deposition, *see* Alford Dep. 44:8–16, 45:10–12 ("This is clearly polarized voting, and the stability of it across time and across office and across geography is really pretty remarkable."). Voting in these parts of Georgia is undeniably polarized along racial lines, thus creating an "inference that racial bias is at work." *Nipper*, 39 F.3d at 1525. This showing satisfies Plaintiffs' burden.

Defendants assert that "Plaintiffs must . . . *prove*" that "*race*, not *party*, is the cause of" polarization, Defs.' Mot. 32, but the Eleventh Circuit has never held that Section 2 requires an affirmative showing that voters are motivated by race when

evaluating the existence of racially polarized voting as part of the totality of circumstances. In fact, it has indicated the *opposite*, reversing a district court's insistence that a Section 2 plaintiff "indicate that race was an overriding or primary consideration in the election of a candidate." *City of Carrollton Branch of NAACP v. Stallings*, 829 F.2d 1547, 1556 (11th Cir. 1987). In so doing, the court reiterated the *Gingles* plurality position on this issue: "[R]acially polarized voting, as it relates to claims of vote dilution, refers only to the existence of a correlation between the race of voters and the selection of certain candidates." *Id.* at 1557 (quoting *Gingles*, 478 U.S. at 74). Thus, "Plaintiffs need not prove causation or intent in order to prove a prima facie case of racial bloc voting." *Id.* at 1557–58 (quoting *Gingles*, 478 U.S. at 74); *see also, e.g.*, *Rose*, 2022 WL 3135915, at *12 ("The Secretary cannot point to a single case establishing that, even if [the *Gingles* preconditions and Senate Factors] are satisfied, a plaintiff must still prove that race independent of partisanship explains the discriminatory effect. That is not the law, and this Court will not impose such a requirement.").

To the extent that courts consider potential causes of polarization, moreover, it is *Defendants'* burden to *dis*prove racial motivation among the electorate. It is possible, as the Eleventh Circuit has noted, that "[o]ther circumstances may indicate that both the degree and nature of the bloc voting weigh against an ultimate finding

of minority exclusion from the political process," since "what appears to be bloc voting on account of race may, instead, be the result of political or personal affiliation of different racial groups with different candidates." *Solomon v. Liberty Cnty. Comm'rs*, 221 F.3d 1218, 1225 (11th Cir. 2000) (en banc). But significantly, the "inference [of] racial bias" created by the *Gingles* preconditions "will endure *unless and until* the defendant adduces credible evidence tending to prove that detected voting patterns can most logically be explained by factors unconnected to the intersection of race with the electoral system." *Uno v. City of Holyoke*, 72 F.3d 973, 983 (1st Cir. 1995). Defendants thus have the burden precisely backwards: The onus is on *them* to "rebut proof of vote dilution by showing that losses by minority-preferred candidates are attributable to non-racial causes." *Nipper*, 39 F.3d at 1526.

## B.   Defendants have failed to rebut Plaintiffs' proof of vote dilution.

There is no question that Defendants have failed to disprove the inference that racial bias causes polarized voting in Georgia. Defendants repeatedly *suggest* that partisanship and not race is responsible for the polarization that Drs. Palmer and Alford identified, but they have not provided a shred of probative evidence to *prove* this is the case.

The testimony of their only expert on this issue underscores their failure to meet their burden. Dr. Alford concluded in his report that "the voting pattern is

clearly one of partisan polarized voting, with both highly cohesive Black vote for the Democrat and highly cohesive white vote for the Republican candidate." Alford Report 9. But he undertook *no* research or analysis to support his assertion that partisanship and not race explains the polarization. Instead, Dr. Alford simply looked at Dr. Palmer's data and drew different inferences—and the data cannot support his expansive, unwarranted conclusions.

Most significantly, although Dr. Alford emphasized that the data show "cohesive Black voter support for *Democratic* candidates, and white voter support for *Republican* candidates," *id.*, these same empirical results would be seen if Black Georgians voted Democratic (and white Georgians voted Republican) *because of race*—in other words, if race were indeed the root cause of the polarization. Dr. Alford conceded as much, noting that the data "doesn't demonstrate that" partisan behavior is not "actually being driven by racial considerations." SAMF ¶ 50; Alford Dep. 109:15–111:1. The partisan breakdown of the data cannot support the causal weight Dr. Alford places on it; the objective numbers alone say nothing about what "*motivated* [the] voting patterns" Dr. Palmer reported, and Dr. Alford did not undertake that inquiry. *Nipper*, 39 F.3d at 1515 (emphasis added). Moreover, "*Gingles* . . . requires Plaintiffs to show that voting is both racially polarized *and* politically cohesive. This necessarily means that the correlation between race and

23

partisan voting must be high, or else there would be no discernable evidence of cohesive bloc voting." *Rose*, 2022 WL 3135915, at \*7. Far from undermining Plaintiffs' showing, the presence of a stark partisan divide supports it.

Dr. Alford also concluded that race has no effect on polarization because the data do not show "cohesive Black voter support for *Black* candidates and white voter support for *white* candidates." Alford Report 9. But he also admitted that the race of candidates is not the *only* role race might play in a voter's decision, SAMF ¶ 51; Alford Dep. 99:14–100:7, and therefore he cannot foreclose the possibility of racial motivation based solely on this single racial cue. Indeed, Dr. Alford conceded that race likely plays a role in shaping voters' party preferences. SAMF ¶ 51; Alford Dep. 99:14–100:7, 134:19–135:18 ("[T]here's certainly room for race to be involved in decision-making in a wide variety of ways."). He did *not*, however, explore the role of race in shaping political behavior, either generally or in this case. SAMF ¶ 52; Alford Dep. 12:15–18, 115:12–116:10, 132:8–133:15.

In short, Dr. Alford's conclusion that party and not race explains the stark voting polarization reported by Dr. Palmer is based on nothing more than speculation. Under the most generous standard available to them, it is Defendants' burden to "introduc[e] *evidence* of objective, non-racial factors" that caused the polarization that Plaintiffs demonstrated. *Nipper*, 39 F.3d at 1513 (emphasis added).

Dr. Alford's report falls well short of this burden; having reviewed Dr. Palmer's data, he merely drew competing (and unsupported) inferences but *did not prove* that factors other than race motivated the decisions of Georgia voters. Indeed, he admitted that he could *not* have made such a showing by only considering the results of Dr. Palmer's ecological inference analysis. SAMF ¶ 53; Alford Dep. 82:17–84:14, 90:4–91:9 ("EI is never going to answer a causation question. . . . Establishing causation is a very difficult scientific issue[.]").[7]

In short, while "Plaintiffs have proven both political cohesion and racial polarization," Defendants have "not offered any evidence of an alternate explanation for why minority-preferred candidates are less successful, such as 'organizational disarray, lack of funds, want of campaign experience, the unattractiveness of particular candidates, or the universal popularity of an opponent.'" *Rose*, 2022 WL 3135915, at *14 (quoting *Uno*, 72 F.3d at 983 n.4). Having failed to rebut the inference of racial bias established by Plaintiffs' evidence, Defendants are not

---

[7] The shortcomings in Dr. Alford's report reflect those of the Secretary of State's racially polarized voting expert in *Rose*, whose analysis was "of limited utility" because he "did not consider the impact of race on party affiliation, which was a crucial omission. Indeed," like Dr. Alford, "[he] conceded that his model did not account for factors that may determine partisanship, including race or racial identity." 2022 WL 3135915, at *7.

entitled to summary judgment on this issue. To the contrary, summary judgment in

*Plaintiffs'* favor is warranted.

### C.   Plaintiffs demonstrated that voting in Georgia is polarized on account of race.

Defendants contend that "Plaintiffs' claim fails under Section 2 because they

'have not even attempted to establish proof of racial bloc voting by demonstrating

that race, not . . . partisan affiliation, is the predominant determinant of political

preference.'" Defs.' Mot. 32 (alteration in original) (quoting *LULAC, Council No.*

*4434 v. Clements*, 999 F.2d 831, 855 (5th Cir. 1993) (en banc)). Setting aside that

Plaintiffs need not make this showing in the first instance, *see supra* at 20–22,

Defendants are simply incorrect: Plaintiffs *did* prove that race drives political

preferences in Georgia.

Plaintiffs' Senate Factors expert, Dr. Orville Vernon Burton, explored the

relationship between race and partisanship in Georgia politics. SAMF ¶ 54; Ex. 4

("Burton Report") at 57–62.[8] As he explained,

> [s]ince Reconstruction, conservative whites in Georgia and other
> southern states have more or less successfully and continuously held
> onto power. While the second half of the twentieth century was
> generally marked by a slow transition from conservative white

---

[8] Notably, Dr. Alford did not review Dr. Burton's conclusions on this issue, SAMF ¶ 55; Alford Dep. 16:3–14, and certainly provided no grounds to refute them.

> Democrats to conservative white Republicans holding political power,
> the reality of conservative white political dominance did not change.

SAMF ¶ 56; Burton Report 57. Notably, the Democratic Party's embrace of civil rights legislation in the mid-20th century—and the Republican Party's opposition to it—was the catalyst for this political transformation, as Black voters left the Republican Party (the "Party of Lincoln") for the Democratic Party. SAMF ¶ 57; Burton Report 57–58. In turn, the Democratic Party's embrace of civil rights sparked the "Great White Switch," in which white voters abandoned the Democratic Party for the Republican Party. SAMF ¶ 58; Burton Report 58.

Electoral politics in the postwar American South illustrated this phenomenon. During the 1948 presidential election, South Carolina Governor Strom Thurmond mounted a third-party challenge to Democratic President Harry Truman in protest of Truman's support for civil rights, including his integration of the armed forces. SAMF ¶ 59; Burton Report 58. Thurmond ran on the ticket of the so-called Dixiecrat Party, which claimed the battle flag of the Confederacy as its symbol, and ended Democratic dominance of the Deep South by winning South Carolina, Alabama, Mississippi, and Louisiana. SAMF ¶ 59; Burton Report 58. Sixteen years later, in 1964, Republican presidential nominee Barry Goldwater—who told a group of Southern Republicans that it was better for the Republican Party to forgo the "Negro vote" and instead court white Southerners who opposed equal rights—became the

27

first Republican candidate to win Georgia's electoral votes. SAMF ¶¶ 60–61; Burton Report 58–59. Four years after that, third-party candidate George Wallace won Georgia's electoral votes after running on a platform of vociferous opposition to civil rights legislation. SAMF ¶ 62; Burton Report 58.

The effectiveness of what was called the "Southern strategy" during Richard Nixon's presidency had a profound impact on the development of the nearly all-white modern Republican Party in the South, including in Georgia. SAMF ¶ 63; Burton Report 59. Matthew D. Lassiter, an historian of the Atlanta suburbs, observed that "the law-and-order platform at the center of Nixon's suburban strategy tapped into Middle American resentment toward antiwar demonstrators and black militants but consciously employed a color-blind discourse that deflected charges of racial demagoguery." SAMF ¶ 64; Burton Report 60 (quoting Matthew D. Lassiter, *The Silent Majority: Suburban Politics in the Sunbelt South* 234 (2006)). As Dr. Burton concluded, "[w]hite southerners abandoned the Democratic Party for the Republican Party because the Republican Party identified itself with racial conservatism. Consistent with this strategy, Republicans today continue to use racialized politics and race-based appeals to attract racially conservative white voters." SAMF ¶ 65; Burton Report 59.

28

The significant impact of race on Georgia's partisan divide can be further seen in the opposing positions taken by officeholders of the two major political parties on issues inextricably linked to race. For example, the Democratic and Republican members of Georgia's congressional delegation consistently oppose one another on issues related to civil rights, according to a report prepared by the NAACP. SAMF ¶ 66; Burton Report 74–75. These opposing attitudes extend to voters as well: In a poll of 3,291 likely Georgia voters conducted just before the 2020 election, among voters who believed that racism was the most important issue facing the country, 78% voted for Joe Biden and 20% voted for Donald Trump; among voters who believed that racism was "not too or not at all serious," 9% voted for Biden and 90% voted for Trump; and among voters who believed that racism is a serious problem in policing, 65% voted for Biden and 33% voted for Trump. SAMF ¶ 67; Burton Report 76. The Pew Research Center found a similar divergence on racial issues between Democratic and Republican voters nationwide. SAMF ¶ 68; Burton Report 75–76.[9]

---

[9] Dr. Burton further noted that, while "Republicans nominated a Black candidate— Herschel Walker, a former University of Georgia football legend—to challenge Senator Raphael Warnock in the 2022 general election for U.S. Senate"—a fact Defendants previously cited as "tend[ing] to indicate a lack of racism in Georgia politics," ECF No. 25 at 20—"Walker's nomination only underscores the extent to which race and partisanship remain intertwined. Republican leaders in Georgia

Dr. Burton concluded that racial bloc voting "is so strong, and race and partisanship so deeply intertwined, that statisticians refer to it as multicollinearity, meaning one cannot, as a scientific matter, separate partisanship from race in Georgia elections." SAMF ¶ 70; Burton Report 61; *see also Rose*, 2022 WL 3135915, at *13 ("[T]he Court is heavily persuaded by . . . testimony that it is impossible to separate race from politics in current-day Georgia, even if that were required under the [Voting Rights Act]. . . . [R]ace likely drives political party affiliation, not the other way around."). Tellingly, Defendants completely ignore this evidence in their summary judgment motion; Dr. Burton's name appears not once in their brief.[10] Instead, their brief uses the phrase "race-neutral partisan politics," Defs.' Mot. 22—a contradiction in terms, since Dr. Burton's historical analysis (and, indeed, *any* realistic appraisal of Georgia's political history) belies the notion that partisan politics is somehow devoid of racial motivation.

---

admittedly supported Walker because they wanted to 'peel[] off a handful of Black voters' and 'reassure white swing voters that the party was not racist,'" SAMF ¶ 69; Burton Report 61 (quoting Cleve R. Wootson Jr., *Herschel Walker's Struggles Show GOP's Deeper Challenge in Georgia*, Wash. Post, https://www.washingtonpost.com/politics/2022/09/22/herschel-walker-georgia-black-voters (Sept. 22, 2022)).

[10] Indeed, Defendants baldly assert that "Plaintiffs' experts studiously avoided any analysis of the cause of the polarization they found," Defs.' Mot. 5, notwithstanding Dr. Burton's analysis of this very issue—calling into question whether Defendants have actually engaged with the evidence before the Court.

\*      \*      \*

Once again, Defendants' rush to advance a predetermined legal argument has run up against the evidence in the record. Although Plaintiffs need not demonstrate in the first instance that race and not partisanship is the case of polarized voting— their satisfaction of the *Gingles* preconditions presupposes as much—Dr. Burton's unrebutted testimony proves that this is indeed the case.

### D.   This Court's approach to racially polarized voting is consistent with Section 2, *Gingles*, and the U.S. Constitution.

Given that they have mischaracterized the proper standard for racially polarized voting and ignored Plaintiffs' unrebutted evidence that race does indeed motivate the electoral polarization that Drs. Palmer and Alford observed, Defendants' discussion of other circuits' caselaw and the constitutionality of Section 2 amounts to little more than an academic digression. *See* Defs.' Mot. 22–32. Plaintiffs nevertheless respond to emphasize that the standard for racially polarized voting adopted by this Court (and, for that matter, the Eleventh Circuit) is consistent with precedent and the U.S. Constitution.

First, Defendants fault this Court for adopting the *Gingles* plurality's standard for polarized voting, suggesting that "a closer review of the opinions shows that a majority of the justices . . . declined to endorse this approach to majority-bloc voting." Defs.' Mot. 22–23. This is simply untrue. The *Gingles majority* "adopt[ed

31

a] definition of 'racial bloc' or 'racially polarized' voting" that was premised on "*correlation*"; specifically, that "'racial polarization' exists where there is a consistent relationship between the race of the voter and the way in which the voter votes." 478 U.S. at 53 n.21 (cleaned up) (emphasis added). Not only is that the standard this Court adopted, *see* PI Order 174–76, but it is *precisely* what Dr. Palmer proved (and Dr. Alford confirmed).

A close reading of Justice White's *Gingles* concurrence demonstrates that the separate position he articulated is consistent with that definition of racially polarized voting. While Justice White disagreed with the *Gingles* plurality's position that causation is *never* relevant to the racially polarized voting analysis, he did not suggest that causation is *always* relevant. To the contrary, Justice White acknowledged that, "on the facts of [that] case," there was "*no need*" to analyze causation. *Gingles*, 478 U.S. at 83 (White, J., concurring) (emphasis added). Nor, under Justice White's reasoning, is there a need to analyze causation in *this* case, as his reservations implicated hypotheticals that simply do not apply here.

Specifically, Justice White noted that where significant numbers of Black voters support white candidates of choice, an inference that electoral decisions might be motivated by issues other than race—such as the "interest-group politics" that Defendants reference, Defs.' Mot. 24—might indeed be drawn, *see Gingles*, 478

U.S. at 83 (White, J., concurring). But that hypothetical is completely divorced from contemporary political realities in Georgia.

As Dr. Palmer reported and Dr. Alford agreed, there is virtually *no* Black crossover voting for white-preferred candidates where Plaintiffs have proposed additional majority-Black legislative districts. Across these areas, Black voters supported their candidates of choice with an average of *98.5%* of the vote in the 40 elections Dr. Palmer examined. SAMF ¶ 45; Palmer Report ¶ 18. Under such circumstances—where voting is dramatically polarized along racial lines and there is no indication that non-racial interest-group politics is confounding the results— there is "a sufficient inference that racial bias is at work." *Nipper*, 39 F.3d at 1525. This Court was therefore correct in concluding that "Plaintiffs need not prove the causes of racial polarization," PI Order 174, especially given Defendants' failure to produce evidence identifying non-racial causes for the polarization.

Second, Defendants discourse on the constitutionality of a Section 2 standard that would impose liability in cases where partisanship impacts polarization. Given Plaintiffs' evidence that race *does* motivate both partisanship and the polarization reported by Dr. Palmer, these concerns are misplaced. Defendants' argument is also foreclosed by Eleventh Circuit precedent, *see Marengo Cnty. Comm'n*, 731 F.2d at 1550 ("[A]mended section 2 is a constitutional exercise of congressional

enforcement power under the Fourteenth and Fifteenth Amendments."), and for good reason. The *Gingles* preconditions and Senate Factors constitute "objective indicia that ordinarily would show whether the voting community as a whole is driven by racial bias as well as whether the contested electoral scheme allows that bias to dilute the minority group's voting strength," *Nipper*, 39 F.3d at 1534—thus establishing the requisite link between the challenged vote dilution and the racial discrimination that the Fifteenth Amendment was designed to redress.

In any event, Defendants cannot isolate just one factor from the "totality" and pronounce it a poison pill to the entire Section 2 inquiry. *See Johnson v. De Grandy*, 512 U.S. 997, 1011 (1994) ("[T]he ultimate conclusions about equality or inequality of opportunity were intended by Congress to be judgments resting on comprehensive, not limited, canvassing of relevant facts."). Indeed, as the *Gingles* Court explained, "[t]he essence of a § 2 claim is that a certain electoral law, practice, or structure *interacts* with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." 478 U.S. at 47 (emphasis added). The results test is designed to operate at the intersection of race, politics, and history, and the interaction of these forces is a *feature* of the Section 2 inquiry, not a disqualification. There is thus no need to cleanly disentangle race from political and other considerations, as

Defendants suggest—which would be a virtually impossible task at any rate, as their expert conceded. SAMF ¶ 53; Alford Dep. 82:17–84:14, 90:4–91:9.

As then-Chief Judge Tjoflat evocatively expounded in *Nipper*, "[l]ike a Seurat painting, a portrait of the challenged scheme emerges against the background of the voting community. Only by looking at all of the dots on the canvas is a district court able to determine whether vote dilution has occurred." 39 F.3d at 1527. Here, putting those dots together—including racially polarized voting—leads to the conclusion that Black Georgians have been denied equal access to the electoral process on account of race. *See generally* Pls.' Mot.

## CONCLUSION

The chords Defendants strike in their motion sound no better now than they did last February. Plaintiffs' illustrative legislative plans are not racial gerrymanders and satisfy the first *Gingles* precondition. Plaintiffs have surpassed their burden of proving that voting in this area of Georgia is polarized on racial lines by demonstrating that the polarization is indeed on account of race. And the SEB members are proper defendants in this action.

For these reasons, summary judgment in Defendants' favor is unwarranted, and their motion should be denied.

Dated: April 19, 2023

By /s/ Adam M. Sparks
Joyce Gist Lewis
Georgia Bar No. 296261
Adam M. Sparks
Georgia Bar No. 341578
**KREVOLIN & HORST, LLC**
One Atlantic Center
1201 West Peachtree Street, NW,
Suite 3250
Atlanta, Georgia 30309
Telephone: (404) 888-9700
Facsimile: (404) 888-9577
Email: JLewis@khlawfirm.com
Email: Sparks@khlawfirm.com

Respectfully submitted,

Abha Khanna*
Jonathan P. Hawley*
Makeba A.K. Rutahindurwa*
**ELIAS LAW GROUP LLP**
1700 Seventh Avenue,
Suite 2100
Seattle, Washington 98101
Phone: (206) 656-0177
Facsimile: (206) 656-0180
Email: AKhanna@elias.law
Email: JHawley@elias.law
Email: MRutahindurwa@elias.law

Michael B. Jones
Georgia Bar No. 721264
**ELIAS LAW GROUP LLP**
250 Massachusetts Avenue NW,
Suite 400
Washington, D.C. 20001
Phone: (202) 968-4490
Facsimile: (202) 968-4498
Email: MJones@elias.law

*Counsel for Plaintiffs*

*Admitted pro hac vice*

36

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing Plaintiffs' Response in Opposition to Defendants' Motion for Summary Judgment has been prepared in accordance with the font type and margin requirements of LR 5.1, NDGa, using font type of Times New Roman and a point size of 14.

Dated: April 19, 2023

/s/ Adam M. Sparks
*Counsel for Plaintiffs*