# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| ANNIE LOIS GRANT; QUENTIN T. HOWELL; ELROY TOLBERT; TRIANA ARNOLD JAMES; EUNICE SYKES; ELBERT SOLOMON; DEXTER WIMBISH; GARRETT REYNOLDS; JACQUELINE FAYE ARBUTHNOT; JACQUELYN BUSH; and MARY NELL CONNER,<br><br>       Plaintiffs,<br><br>  v.<br><br>BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State; WILLIAM S. DUFFEY, JR., in his official capacity as chair of the State Election Board; MATTHEW MASHBURN, in his official capacity as a member of the State Election Board; SARA TINDALL GHAZAL, in her official capacity as a member of the State Election Board; EDWARD LINDSEY, in his official capacity as a member of the State Election Board; and JANICE W. JOHNSTON, in her official capacity as a member of the State Election Board,<br><br>       Defendants. | CIVIL ACTION FILE NO. 1:22-CV-00122-SCJ |

## PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................1

ARGUMENT .......................................................................................3

I.   *Allen* confirms that Black Georgians in the Atlanta metropolitan area and the Black Belt can constitute a voting majority in reasonably configured legislative districts. ......................................................................................3

   A.   Mr. Esselstyn's illustrative districts are reasonably configured. ...................4

   B.   Race does not predominate in Mr. Esselstyn's illustrative maps. ................7

      1.   *Allen* concludes that mere awareness of racial considerations is insufficient to establish predominance. ...........................................7

      2.   *Davis* also forecloses a finding of racial predominance. ...........................9

II.   *Allen* confirms that Plaintiffs have indisputably satisfied the second and third *Gingles* preconditions. ...............................................................10

   A.   The record contains undisputed evidence of racially polarized voting.......11

   B.   Section 2 does not require Plaintiffs to prove that racially polarized voting results from racial motivations. ..........................................................14

   C.   *Allen* reiterates that Section 2's effects test is constitutional. .....................15

CONCLUSION .....................................................................................16

CERTIFICATE OF COMPLIANCE ....................................................18

CERTIFICATE OF SERVICE .............................................................19

i

## INTRODUCTION

The Supreme Court's decision in *Allen v. Milligan* confirms that Plaintiffs have satisfied the familiar requirements of *Thornburg v. Gingles* that "ha[ve] governed our Voting Rights Act jurisprudence since it was decided 37 years ago." *Allen v. Milligan*, No. 21-1086, ---U.S.----, ---S. Ct.----, 2023 WL 3872517, at *10 (June 8, 2023).

In satisfaction of the first *Gingles* precondition, Plaintiffs introduced reasonably configured illustrative plans, showing "it is *possible* that the State's map has a disparate effect on account of race." *Id.* at *13 (emphasis in original). As to the second and third *Gingles* preconditions, there is no material dispute that Black Georgians in the metropolitan Atlanta region and the Black Belt are "politically cohesive" and that "the white majority" in those areas "votes sufficiently as a bloc to enable it . . . to defeat the minority's preferred candidate." *Id*. at *9 (quoting *Thornburg v. Gingles*, 478 U.S. 30, 51 (1986)). Plaintiffs' unrebutted evidence thus satisfies these preconditions under the Section 2 standard that has existed for the past four decades and as reaffirmed and applied by the Court in *Allen*.[1]

---

[1] Plaintiffs focus their argument in this brief on *Allen*'s application of the *Gingles* preconditions. *See* Hr'g Tr. at 44–45 (May 18, 2023), Ex. 1 (noting that "[i]f the Court determines that the totality analysis requires fact finding or the weighing of evidence or a variety of inferences, it remains free to issue summary judgment on

1

Rather than rebutting Plaintiffs' evidence, Defendants attempted to transform this "intensely local appraisal" into a thicket of novel prerequisites and bars to relief—requiring race-blind map drawing and proof of causation. But *Allen* forecloses Defendants' attempts to prevail under a revised interpretation of Section 2 that never came to pass.

*Allen* "reiterat[es] that §2 turns on the presence of discriminatory effects, not discriminatory intent." *Allen*, 2023 WL 3872517, at *13; *see also id.* at *22 (Kavanaugh, J. concurring) ("[A]s this Court has long recognized—and as all Members of this Court today agree—the text of §2 establishes an effects test, not an intent test."). It makes clear that race consciousness does not equate to racial predominance. *Id.* at *15–16 (plurality opinion). And it reaffirms that proof of racially polarized voting satisfies the second and third *Gingles* preconditions without showing that the racial polarization is caused by racial motives rather than partisan ones. *Id.* at *11.

Defendants cannot prevail under the familiar *Gingles* framework because they hardly made any evidentiary showing at all. Their defense of the enacted maps

---

the undisputed fact[s] of the *Gingles* preconditions, and . . . reserve for trial the ultimate determination of liability. . . . *Gingles* is an objective, straightforward test.").

hinged entirely on their hope that the law was going to change. It didn't. *Allen* confirmed that this Court properly applied the *Gingles* framework at the preliminary injunction phase and that Defendants' arguments are entirely unfounded.

## ARGUMENT

I.  ***Allen* confirms that Black Georgians in the Atlanta metropolitan area and the Black Belt can constitute a voting majority in reasonably configured legislative districts.**

*Allen* makes clear that Plaintiffs have satisfied the first *Gingles* precondition with respect to six of their eight illustrative districts by showing that Black Georgians in the Atlanta metropolitan area and the Black Belt are "'sufficiently large and geographically compact to constitute a majority in a reasonably configured district.'" *Allen*, 2023 WL 3872517, at *9 (alteration adopted) (quoting *Wis. Legis. v. Wis. Elections Comm'n*, 142 S. Ct. 1245, 1248 (2022) (per curiam)).

Defendants have already conceded that Georgia's Black population is sufficiently numerous to create three additional majority-Black districts in the Senate plan and five additional majority-Black districts in the House plan. Statement of Undisputed Material Facts in Supp. of Pls.' Mot. for Partial SJ ("SUMF") ¶¶ 17, 30 (Mar. 20, 2023), ECF No. 189-2; Expert Rep. of Blakeman B. Esselstyn ("Esselstyn Rep.") ¶¶ 13, 17, 63 (Mar. 20, 2023), ECF No. 191-1; Dep. of John B. Morgan ("Morgan Dep.") at 73:17–75:4, 164:8–165:14, 197:15–19 (Mar. 17, 2023), ECF

No. 177. Instead of refuting Plaintiffs' evidence that Mr. Esselstyn complied with traditional redistricting criteria in creating these districts, Defendants instead quibbled that Mr. Esselstyn must have considered race as a predominant factor. Defs.' Br. in Supp. of Mot. for Partial SJ ("Defs.' SJ Br.") at 19–21 (Mar. 20, 2023), ECF No. 190-1. But *Allen* makes clear that Defendants' criticisms are unfounded. Mr. Esselstyn's illustrative districts are reasonably configured because they comply with traditional redistricting criteria. SUMF ¶¶ 42, 45–46; Esselstyn Rep. ¶¶ 25, 33. And contrary to Defendants' repeated refrain, race did not predominate in Mr. Esselstyn's illustrative plans, as mere awareness of race is insufficient to establish predominance. Plaintiffs have thus satisfied the first *Gingles* precondition with respect to six of the eight illustrative districts.

**A. Mr. Esselstyn's illustrative districts are reasonably configured.**

Mr. Esselstyn's illustrative districts are "reasonably configured" because they indisputably "comport[] with traditional districting criteria." *Allen*, 2023 WL 3872517, at *9. In *Allen*, the Court concluded that the experts' plans were reasonably configured because their districts were compact, had no obvious irregularities, had equal populations, were contiguous, and respected existing political subdivisions. *Id.* at *10. Here, Mr. Esselstyn's illustrative plans undoubtedly comport with the same criteria.

4

**Compactness.** *Allen* concluded that one of the expert's plans was compact because its "districts [were] roughly as compact as the existing plan." *Id.* So too here. The mean compactness measures for Mr. Esselstyn's illustrative plans are comparable—if not identical—to the mean measures for the enacted plans. SUMF ¶¶ 53, 68; Esselstyn Rep. ¶¶ 36, 57, tbls.2 & 6; Morgan Dep. 90:6–17, 168:6–11. The individual compactness scores for Mr. Esselstyn's additional majority-Black districts fall within the range of compactness scores of the enacted districts using the Reock, Schwartzberg, Polsby-Popper and Area/Convex Hull measures; in other words, each of Mr. Esselstyn's additional majority-Black districts is more compact than the least-compact enacted districts. SUMF ¶¶ 54–56, 69–71; Esselstyn Rep. ¶¶ 37, 58, figs.8 & 17, tbls.3 & 7, attachs. H & L; *see also* Order Denying Mot. for Prelim. Inj. ("PI Order") at 110–15, 135–39 (Feb. 28, 2022), ECF No. 91. And Defendants' mapping expert, John Morgan, does not dispute that Mr. Esselstyn's illustrative plans are similarly compact as the enacted plans. *See* Expert Rep. of John Morgan ("Morgan Rep.") ¶¶ 22, 50 (Apr. 19, 2023), ECF No. 203-2.

**No obvious irregularities.** *Allen* explained that the experts' plans lacked "tentacles, appendages, bizarre shapes, or any other obvious irregularities that would make it difficult to find them sufficiently compact." *Allen*, 2023 WL 3872517, at *10

(internal quotation marks omitted). Here, Mr. Esselstyn's illustrative districts similarly lack any obvious irregularities, and Defendants have not argued otherwise.

**Equal population.** *Allen* observed that the experts' plans "contained equal populations." *Id.* In Mr. Esselstyn's illustrative State Senate and House plans, most district populations are within plus-or-minus 1% of the ideal, and no district in either plan has a population deviation of more than 2%. Pls.' Statement of Additional Material Facts ("SAMF") ¶¶ 9–14 (Apr. 19, 2023), ECF No. 205; Esselstyn Rep. ¶¶ 34, 55, attachs. H & L. Both plans fall well within the accepted bounds of constitutionality. *See Evenwel v. Abbott*, 578 U.S. 54, 60 (2016) ("Where the maximum population deviation between the largest and smallest district is less than 10%, the Court has held, a state or local legislative map presumptively complies with the one-person, one-vote rule.").

**Contiguity.** The districts in Mr. Esselstyn's illustrative plans satisfy the contiguity requirement in the same manner as the enacted plans. SUMF ¶¶ 50, 67; Esselstyn Rep. ¶¶ 35, 56; *see also* PI Order at 115, 139.

**Political Subdivisions.** *Allen* held that the experts' plans "respected existing political subdivisions, such as counties, cities, and towns." *Allen*, 2023 WL 3872517, at *10. Here, Mr. Esselstyn's illustrative plans split only marginally more counties

and voting districts than the enacted plans. SUMF ¶¶ 57, 72; Esselstyn Rep. ¶¶ 39, 59, tbls.4 & 8, attachs. H & L; *see also* PI Order at 115–18, 139–42.

* * *

Mr. Esselstyn's illustrative plans are thus reasonably configured because they comport with the same "traditional districting criteria" that the Court approved in *Allen*.

### B. Race does not predominate in Mr. Esselstyn's illustrative maps.

*Allen* requires rejection of Defendants' argument that race predominates in Mr. Esselstyn's illustrative plans. Moreover, because no majority of the *Allen* Court endorsed a new standard for assessing racial predominance, the Eleventh Circuit's decision in *Davis v. Chiles*, 139 F.3d 1414 (11th Cir. 1998), remains good law, and it too compels the conclusion that race does not predominate in Mr. Esselstyn's illustrative plans.

#### 1. *Allen* concludes that mere awareness of racial considerations is insufficient to establish predominance.

*Allen*'s conclusion that "in the context of districting . . . aware[ness] of racial considerations . . . is permissible," *Allen*, 2023 WL 3872517, at *15 (plurality opinion) (internal quotation marks omitted), forecloses Defendants' argument that race predominates in Mr. Esselstyn's illustrative plans merely because he "*at some point*" displayed the Black voting-age populations for the geographic areas in which

7

he was working. SAMF ¶ 1; Dep. of Blakeman Esselstyn ("Esselstyn Dep.") at 76:21–77:6 (Mar. 17, 2023), ECF No. 179. *Allen* recognized that "[t]he question whether additional majority-*minority* districts" can be drawn "involves a 'quintessentially race-conscious calculus.'" *Allen*, 2023 WL 3872517, at *15 (plurality opinion) (quoting *Johnson v. De Grandy*, 512 U.S. 997, 1020 (1994)) (emphasis in original)). Consequently, "[t]he contention that mapmakers must be entirely 'blind' to race has no footing in our § 2 case law." *Id*. at *16 (plurality opinion). The Supreme Court has "long drawn" a line "between consciousness and predominance." *Id.* (plurality opinion). Race predominates when "'race-neutral considerations come into play only after the race-based decision had been made." *Id.* at *15 (plurality opinion) (alteration adopted) (quoting *Bethune-Hill* v. *Va. State Bd. of Elections*, 580 U. S. 178, 189 (2017)).

Here, as in *Allen*, race did not predominate because Mr. Esselstyn gave "equal weighting" to "several other factors" including "compactness, contiguity, and population equality." *Id.* (plurality opinion); *see also* PI Order at 125–28, 149–152. Mr. Esselstyn attested that neither race nor any other single factor predominated in the drawing of his illustrative plans, SAMF ¶ 7; Esselstyn Rep. ¶ 25. At most, the undisputed evidence indicates that Mr. Esselstyn utilized racial information to

*inform* his mapping decision, which is perfectly acceptable under *Allen.* SAMF ¶ 8; Esselstyn Dep. at 77:20–25.

### 2. *Davis* also forecloses a finding of racial predominance.

Because no majority of the *Allen* Court announced a new standard for finding racial predominance, *Davis* remains binding in this Circuit, and *Davis* likewise compels the conclusion that mere awareness of race is insufficient to establish predominance.

*Davis* rejected the argument that race predominates in a remedial plan merely because "race was a factor" in the mapmaker's "process of designing the proposed" remedy. *Davis*, 139 F.3d at 1426. Instead, it recognized that Section 2 "*require[s]* plaintiffs to show that it would be possible to design an electoral district, consistent with traditional districting principles, in which minority voters could successfully elect a minority candidate." *Id.* at 1425. Thus, "[t]o penalize [plaintiffs] for attempting to make the very showing that *Gingles* [and its progeny] demand would be to make it impossible, as a matter of law, for any plaintiff to bring a successful Section Two action." *Id. Davis* held that race does not predominate when a mapmaker "adhere[s] . . . to traditional redistricting criteria," testifies that "race was not the predominant factor motivating his design process," and explains that he never sought to "maximize the number of majority-minority" districts. *Id.* at 1426.

Here, Mr. Esselstyn adhered to traditional redistricting criteria, *see supra* at 4–7. He attested that neither race nor any other single factor predominated in the drawing of his illustrative plans. SAMF ¶ 7; Esselstyn Rep. ¶ 25. And he did *not* attempt to maximize the number of majority-Black districts in his illustrative plans. SAMF ¶ 4; Esselstyn Dep. at 229:2–5. *Allen* and *Davis* thus require the Court to find that race does not predominate in Mr. Esselstyn's illustrative plan.

## II. *Allen* confirms that Plaintiffs have indisputably satisfied the second and third *Gingles* preconditions.

Plaintiffs have satisfied the second and third *Gingles* preconditions because Black Georgians in the Atlanta metropolitan area and the Black Belt are "politically cohesive" and "the white majority votes sufficiently as a bloc to enable it . . . to defeat the minority's preferred candidate." *See Allen*, 2023 WL 3872517, at *9 (quoting *Gingles*, 478 U.S. at 51). The second precondition, "concerning the political cohesiveness of the minority group, shows that a representative of its choice would in fact be elected." *Id.* "The third precondition, focused on racially polarized voting, 'establishes that the challenged districting thwarts a distinctive minority vote' at least plausibly on account of race." *Id.* (quoting *Growe v. Emison*, 507 U. S. 25, 40 (1993)). Satisfying these preconditions creates the inference that polarization is on account of race. *See Nipper v. Smith*, 39 F.3d 1494, 1525–26 (11th Cir. 1994) (en banc).

Defendants did not dispute the material facts that support Plaintiffs' satisfaction of the second and third *Gingles* preconditions. Defendants instead argued that they were entitled to summary judgment because Plaintiffs failed to prove that the racial polarization was caused by racial motives rather than partisan ones. *See, e.g.*, Defs.' Reply Br. at 11 (May 3, 2023), ECF No. 215 ("This is not a factual dispute because everyone agrees on the facts. It is only the conclusion drawn from those facts that is at issue."). Defendants even argued that Section 2's well-settled effects test is unconstitutional. Br. in Supp. of Defs.' MSJ ("Defs.' Mot.") at 30–32 (Mar. 20, 2023), ECF No. 190-1. But *Allen* rejected Defendants' "attempt[ ] to remake . . . §2 jurisprudence anew." *Allen*, 2023 WL 3872517, at *11. Instead, it confirmed that the second and third *Gingles* preconditions are straightforward, objective inquiries that do not include a causation requirement. *Id.* Plaintiffs' undisputed evidence of racially polarized voting easily satisfies the second and third *Gingles* preconditions.

**A. The record contains undisputed evidence of racially polarized voting.**

Plaintiffs' undisputed evidence of racially polarized voting is just as strong as the evidence submitted in *Allen*. There, "Black voters supported their candidates of choice with 92.3% of the vote" while "white voters supported Black-preferred candidates with 15.4% of the vote." *Id.* (internal quotation marks omitted) (citation

11

omitted). Even the state's expert in that case conceded that "the candidates preferred by white voters in the areas that he looked at regularly defeat the candidates preferred by Black voters." *Id.* (internal quotation marks omitted).

Here, Dr. Palmer found that Black voters in the focus areas are extremely cohesive, with a clear candidate of choice in all 40 elections he examined—a conclusion with which Defendants' expert, Dr. John Alford, readily agreed. SUMF ¶ 87; Expert Rep. of Dr. Maxwell Palmer ("Palmer Rep.") ¶ 18, fig.2, tbls. 1, 2, 3, 4, 5 & 6 (Mar. 20, 2023), ECF No. 191-2; Suppl. Expert Rep. of Dr. Maxwell Palmer ("Suppl. Palmer Rep.") ¶ 6, fig.1, tbl.1 (Mar. 20, 2023), ECF No. 191-3; Expert Rep. of Dr. John R. Alford ("Alford Rep.") at 3 (Mar. 20, 2023), ECF No. 191-7; Dep. of Dr. John Alford ("Alford Dep.") at 37:13–15 (Mar. 17, 2023), ECF No. 178. Across the focus area, Black voters supported their candidates of choice with an average of 98.5% of the vote, a finding reflected in each constituent State Senate and House district. SUMF ¶¶ 88–90; Palmer Rep. ¶¶ 16, 18–19 & nn.14–15, fig.3, tbls.1 & 7. Plaintiffs therefore satisfy the second *Gingles* precondition. *See* 478 U.S. at 56 ("A showing that a significant number of minority group members usually vote for the same candidates is one way of proving [] political cohesiveness[.]"); *see also* PI Order at 186–87 (concluding that "Plaintiffs have met their burden to establish the second *Gingles* precondition").

Dr. Palmer also found high levels of white bloc voting in opposition to the candidates whom Black voters cohesively supported—another finding Dr. Alford did not dispute. SUMF ¶ 91; Palmer Rep. ¶ 18, fig.2, tbl.1; Suppl. Palmer Rep. ¶ 6, fig.1, tbl.1; Alford Report 3; Alford Dep. 38:20–39:8. On average, only 8.3% of white voters supported Black-preferred candidates, and in no election did white support exceed 17.7%. SUMF ¶ 92; Palmer Rep. ¶ 18. SUMF ¶ 91; Palmer Rep. ¶ 18, fig.2, tbl.1; Suppl. Palmer Rep. ¶ 6, fig.1, tbl.1; Alford Report 3; Alford Dep. 38:20–39:8. These findings were confirmed by the endogenous results from the 2022 midterms, in which Black-preferred legislative candidates were defeated in every majority-white district and elected in every majority-Black district in the focus areas. SUMF ¶ 97; Suppl. Palmer Rep. ¶ 5, tbl.2.

In short, Black voters' candidates of choice are consistently defeated in the focus areas by white bloc voting, except where Black voters make up a majority of eligible voters—thus satisfying the third *Gingles* precondition. *See* 478 U.S. at 68 ("Bloc voting by a white majority tends to prove that blacks will generally be unable to elect representatives of their choice."); *see also* PI Order at 200–01 (concluding that "Plaintiffs have satisfied their burden under the third *Gingles* precondition").

13

**B. Section 2 does not require Plaintiffs to prove that racially polarized voting results from racial motivations.**

Rather than disputing Plaintiffs' evidence of racially polarized voting, Defendants "attempt[ed] to remake . . . §2 jurisprudence anew," *Allen*, 2023 WL 3872517, at *11, by contending that the second and third *Gingles* preconditions require Plaintiffs to prove that racially polarized voting is caused by racially discriminatory motives. *See, e.g.*, Defs.' Reply Br. at 13 ("Plaintiffs claim Defendants improperly require them to prove [that] race, not party, is the cause of polarization. But this is precisely their burden of proof." (internal quotation marks omitted)). But *Allen* squarely rejected this argument. It confirmed that Supreme Court "precedents and the legislative compromise struck in the 1982 amendments clearly rejected treating discriminatory intent as a requirement for liability under §2." *Allen*, 2023 WL 3872517, at *19.

*Allen* also "reiterat[ed] that §2 turns on the presence of discriminatory effects, not discriminatory intent." *Id.* at *13; *see also id.* ("'Congress . . . used the words 'on account of race or color' in the Act to mean 'with respect to' race or color, and not to connote any required purpose of racial discrimination.'" *Id.* (quoting *Gingles*, 478 U. S., at 71, n. 34 (plurality opinion))). Thus, *Allen* makes clear that Defendants were wrong when they argued that "establishing racial polarization requires something more than just different races voting for different parties." Defs.' Reply

14

Br. at 9. These principles foreclose Defendants' repeated protestations that Plaintiffs cannot satisfy the second and third *Gingles* preconditions without showing that racially polarized voting in the focus area is motivated by race rather than partisanship or any other factor.

### C. *Allen* reiterates that Section 2's effects test is constitutional.

*Allen* also rejected Defendants' arguments that Section 2 is unconstitutional. *See* Defs.' Mot. at 30–32. For nearly sixty years, the Supreme Court has held and reaffirmed that "[t]he VRA's 'ban on electoral changes that are discriminatory in effect . . . is an appropriate method of promoting the purposes of the Fifteenth Amendment.'" *Allen*, 2023 WL 3872517, at *21 (quoting *City of Rome v. United States*, 446 U.S. 156, 177 (1980)); *accord South Carolina v. Katzenbach*, 383 U.S. 308–309, 329–337 (1966). *Allen* also recognized that proper application of the *Gingles* framework alleviates the equal protection concern that Defendants raised because federal courts have "authorized race-based redistricting as a remedy for state districting maps that violate § 2" for four decades. *Allen*, 2023 WL 3872517, at *21. No constitutional considerations arise unless race predominates in a remedial map, and for the reasons discussed in *Allen*, those concerns are not present here. *See id.* at *23 (Kavanaugh, J., concurring) ("Alabama asserts that §2, as construed by *Gingles* to require race-based redistricting in certain circumstances, exceeds Congress's

remedial or preventive authority under the Fourteenth and Fifteenth Amendments. As the Court explains, the constitutional argument presented by Alabama is not persuasive in light of the Court's precedents."). Accordingly, Defendants' constitutionality arguments fail.

## CONCLUSION

Plaintiffs have satisfied the *Gingles* preconditions as to six of Mr. Esselstyn's eight illustrative state legislative districts. Defendants' arguments on summary judgment relied on their subjective expectation that the U.S. Supreme Court might upend settled Section 2 precedent. The Court refused to do so. The Court's decision in *Allen* reaffirmed that the familiar requirements of *Thornburg v. Gingles* remain good law, and applying *Allen* to the undisputed material facts in this case shows that Plaintiffs are entitled to summary judgment on the *Gingles* preconditions as to six of the eight illustrative districts. Plaintiffs respectfully request that the Court enter partial summary judgment in their favor on, at the very least, the three *Gingles* preconditions, and allow the rest of Plaintiffs' claims to proceed to trial.

Dated: June 22, 2023

Respectfully submitted,

By: **Adam M. Sparks**

Joyce Gist Lewis

Georgia Bar No. 296261

Adam M. Sparks

Georgia Bar No. 341578

**KREVOLIN & HORST, LLC**

One Atlantic Center

1201 West Peachtree Street, NW,
Suite 3250

Atlanta, Georgia 30309

Telephone: (404) 888-9700

Facsimile: (404) 888-9577

Email: JLewis@khlawfirm.com

Email: Sparks@khlawfirm.com

Abha Khanna*

Jonathan P. Hawley*

Makeba A.K. Rutahindurwa*

**ELIAS LAW GROUP LLP**

1700 Seventh Avenue,
Suite 2100

Seattle, Washington 98101

Phone: (206) 656-0177

Facsimile: (206) 656-0180

Email: AKhanna@elias.law

Email: JHawley@elias.law

Email: MRutahindurwa@elias.law

Michael B. Jones

Georgia Bar No. 721264

**ELIAS LAW GROUP LLP**

250 Massachusetts Avenue NW,
Suite 400

Washington, D.C. 20001

Phone: (202) 968-4490

Facsimile: (202) 968-4498

Email: MJones@elias.law

*Counsel for Plaintiffs*

*Admitted pro hac vice

17

**<u>CERTIFICATE OF COMPLIANCE</u>**

I hereby certify that the foregoing Plaintiffs' Supplemental Brief in Support of Their Motion for Partial Summary Judgment has been prepared in accordance with the font type and margin requirements of LR 5.1, NDGa, using font type of Times New Roman and a point size of 14.

Dated: June 22, 2023                      **<u>Adam M. Sparks</u>**
                                          *Counsel for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that I have on this date caused to be electronically filed a copy of the foregoing Plaintiffs' Supplemental Brief in Support of Their Motion for Partial Summary Judgment with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to counsel of record.

Dated: June 22, 2023

**Adam M. Sparks**
*Counsel for Plaintiffs*