# Exhibit 1

```
 1                   UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF GEORGIA
 2                          ATLANTA DIVISION


 3


 4   ALPHA PHI ALPHA FRATERNITY,    )
     INC., ET AL.,                  )
 5                   PLAINTIFFS,    )
                                    ) DOCKET NO. 1:21-CV-05337-SCJ
 6        -VS-                       )
                                    )
 7   BRAD RAFFENSPERGER,            )
                                    )
 8                   DEFENDANT.     )
     _____
 9   COAKLEY PENDERGRASS,           )
     ET AL.,                        )
10                   PLAINTIFFS,    )
                                    ) DOCKET NO. 1:21-CV-5339-SCJ
11        -VS-                       )
                                    )
12   BRAD RAFFENSPERGER, ET AL.,    )
                                    )
13                   DEFENDANTS.    )
     _____
14   ANNIE LOIS GRANT, ET AL.,      )
                                    )
15                   PLAINTIFFS,    )
                                    ) DOCKET NO. 1:22-CV-00122-SCJ
16        -VS-                       )
                                    )
17   BRAD RAFFENSPERGER, ET AL.,    )
                                    )
18                   DEFENDANTS.    )
     _____
19
              TRANSCRIPT OF SUMMARY JUDGEMENT PROCEEDINGS
20            BEFORE THE HONORABLE STEVE C. JONES
                  UNITED STATES DISTRICT JUDGE
21                  THURSDAY, MAY 18, 2023

22
              VIOLA S. ZBOROWSKI, CRR, CRC, CMR, FAPR
23     OFFICIAL COURT REPORTER FOR THE HONORABLE STEVE C. JONES
                  UNITED STATES DISTRICT COURT
24                      ATLANTA, GEORGIA
                        404-215-1479
25             VIOLA_ZBOROWSKI@GAND.USCOURTS.GOV
```

```
 1   APPEARANCES:

 2   ON BEHALF OF THE PLAINTIFFS:

 3    ABHA KHANNA, ESQ.
      SOPHIA LIN LAKIN, ESQ.
 4    ARI J. SAVITZKY, ESQ.
      JONATHAN HAWLEY, ESQ.
 5    MING CHEUNG, ESQ.
      RAHUL GARABADU, ESQ.
 6    KELSEY A. MILLER, ESQ.
      CASEY SMITH, ESQ.
 7    MAURA DOUGLAS, ESQ.
      CAITLIN F. MAY, ESQ.
 8    CORY ISAACSON, ESQ.
      JOSEPH D. ZABEL, ESQ.
 9    JUAN M. RUIZ TORO, ESQ.
      JOYCE GIST LEWIS, ESQ.
10    ADAN SPARKS, ESQ.

11
     ON BEHALF OF THE DEFENDANT:
12
      BRYAN P. TYSON, ESQ.
13    DIANA F. LA ROSS, ESQ.
      BRYAN JACOUTOT, ESQ.
14    DANIEL H. WEIGEL, ESQ.

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    (HELD IN OPEN COURT AT 10 A.M.)

 2             THE COURT:  I was starting to walk in here this morning

 3   to tell you-all that I just got off the press a ruling from the

 4   Supreme Court on Merrill.  But once I figured if I told you-all I

 5   was joking, that one CSO couldn't protect me.  So I decided not to

 6   do that.

 7             Good morning, everyone.

 8             Ms. Wright, you can call the case for the day.

 9             THE DEPUTY CLERK:  Yes, sir.  The Court calls the

10   following civil actions for court:  Alpha Phi Alpha Fraternity,

11   Inc., and others v. Brad Raffensperger, Civil Action No.

12   1:21-CV-05337; Coakley Pendergrass and others v. Brad

13   Raffensperger and others, Civil Action No. 1:21-CV-5339; and Annie

14   Lois Grant and others v. Brad Raffensperger and others, Civil

15   Action No.1:22-CV-00122.

16             THE COURT:  Okay.  If the plaintiffs' counsel will

17   introduce yourself and who all else is working for the plaintiffs'

18   case this morning.  I have a list, but I need it for the record.

19             MR. SAVITZKY:  Good morning, Your Honor.

20             THE COURT:  Good morning.

21             MR. SAVITZKY:  Ari Savitzky from the American Civil

22   Liberties Union on behalf of the Alpha Phi Alpha plaintiffs, Alpha

23   Phi Alpha AME Church, and Mr. Woods, Ms. Glenn, Mr. Browning,

24   Ms. Stewart (phonetic).  With me at counsel table are Sophia Lakin

25   and Kelsey Miller.
```

```
1              THE COURT:  Thank you.

2              MS. KHANNA:  Good morning, Your Honor.

3              THE COURT:  Good morning.

4              MS. KHANNA:  Abha Khanna for both the Pendergrass and

5    the Grant plaintiffs.  I will be arguing today on behalf of the

6    Pendergrass plaintiffs, and my colleague Jonathan Hawley will be

7    arguing on behalf of the Grant plaintiffs.

8              THE COURT:  Good morning.  Is there anyone else?

9              All right.  For the defense.

10             MR. TYSON:  Good morning, Your Honor.  Brian Tyson for

11   the defendants.  I'm joined today by Brian Jacoutot, Diane LaRoss,

12   and Dan Weigel from our firm.  We also have a law clerk with us, a

13   University of Georgia grad.  He's applying for law schools right

14   now.  And Diana LaRoss is joining us as well.

15             THE COURT:  Well, I hope you apply to UGA and you get

16   accepted -- and all of the other law schools you applied to as

17   well.

18             We're going to start off this morning with the Alpha Phi

19   Alpha Fraternity v. Brad Raffensperger, et al.  Defendants' motion

20   for summary judgment.  It's 20 minutes.  You can use all 20 or you

21   can save time for rebuttal.  Then we'll hear from plaintiffs, and

22   then we'll go from here.

23             Mr. Tyson.

24             MR. TYSON:  Your Honor, if I could, we have a paper copy

25   of the slides.
```

```
 1            THE COURT:  Thank you.  Mr. Tyson has done this with me
 2     so many times, he knows to bring the paper copy.  Thank you.
 3            MR. TYSON:  I've also had the technology fail on me more
 4     than once.  So it's always safe to have a backup.
 5            THE COURT:  That happens.
 6            MR. TYSON:  All right.  Well, thank you, Your Honor.
 7     Brian Tyson for the defendants.
 8            What I want to do today is just walk through our motion
 9     for summary motion, and I think it's important for us as we come
10     to this to recognize -- I know we were here on a preliminary
11     injunction a little bit over a year and three months ago.  We,
12     obviously, have an evidentiary standard today that looks for "is
13     there a dispute about a material fact."  Our submission is there
14     is not, and we want to talk to you about why that is this morning.
15            I'm going to cover the law on Section 2 and Gingles 1.
16     Mr. Jacoutot will finish up with Gingles 2 and 3, and then we'll,
17     hopefully, save a few minutes for rebuttal.
18            THE COURT:  All right.  Sounds good to me.
19            MR. TYSON:  We're going to begin -- you've seen this
20     slide before, legal standards on Section 2.  We talked about this
21     last time.  Is there a denial or abridgement of the right to vote
22     on account of race or color.  You look at all of these different
23     factors.  For this motion, since there is no plaintiff's motion,
24     we're only talking about Gingles 1, 2 and 3.  We're not talking
25     about totality for this one.  We'll get to those with the others.
```

1          I wanted to flag -- you've already flagged for us the

2   *Milligan* case that's out there.  I've called this one of our known

3   unknowns.  When we get this opinion, it might change the law in

4   Section 2.  It might not.  We don't know.

5          Arguing the law, focusing on *Gingles 1*, and so I think

6   there are some questions there.

7          Another known unknown we have is the *Rose v.*

8   *Raffensperger* case.  That's an appeal from the Public Service

9   Commission, an order issued by Judge Grimberg.  Again, the appeal

10  on that one focused on *Gingles 2 and 3*.  The Southern Circuit

11  expedited it.  They heard argument in December.  We thought they

12  would give an opinion by the end of March --

13         THE COURT:  Remember, just for the record, I will

14  indicate that Judge Grant said he kind of wanted to wait until the

15  Supreme Court rules.  When I didn't see anything by March, I kind

16  of figured they're waiting.

17         MR. TYSON:  Exactly.  So we're waiting on both of those.

18         What I wanted to talk through in terms of how -- what

19  we're looking at in Section 2 is -- as this Court recognizes,

20  preliminary injunction order, this is the first redistricting site

21  to include Shelby county.  And so when you look at historically

22  how redistricting cases have been brought against Georgia

23  redistricting Georgia claims.  '80s, '90s, 2000s, generally

24  speaking, you have Constitutional challenges and you have

25  challenges that are Section 5 and the preclearance provisions

 1  involved with that.  You have a couple Section 2 cases, none that

 2  have really gotten to a final judgment.  But historically when you

 3  look at a Section 2 case, a lot of them involve multi-member at

 4  large methods of election.  And so we have -- an example, common

 5  example a county like this, you have a county that had a city

 6  center with a black population in it, a surrounding white area.

 7  The county used an at-large method of election, and then the Black

 8  voters had their voices drowned out by the white voters around

 9  them.  And so the solution was to draw five districts that created

10  a district where the candidate of choice, the Black community,

11  could be elected.  And so we convert from an at-large system to a

12  district-based system.

13          But this case is a little bit different in what we're

14  looking at.  And the Court in *De Grandy* talked about that.  The

15  Court talked about in a multiple member district challenge, it's

16  different than when you challenge a series of single-member

17  districts for where dilution may be more difficult to grasp.

18          Because in that situation you're not saying, you know,

19  total submergence, you're saying, well, we've had some electoral

20  success, but we need more electoral success.  And how you measure

21  that is more challenging.  It's also challenging because as you

22  look on the map there, you can see that's a map of the Atlanta

23  area covered by the Black person into each precinct.  So the blue

24  and teal areas involve areas with less concentration to Black

25  voters.  White, green, and red show heavier concentrations of

1   Black voters.  And this is from Mr. Coopers' districts, that we'll

2   talk about, in which you can see, for example, in District 28

3   starting in a heavily Black area, South Clayton County, running

4   through Fayette down into a more rural white areas of Spalding

5   County.  And we'll see this kind of consistent pattern of striking

6   districts out of Atlanta in order to create additional majority

7   Black districts.

8            And so one of the challenging things for the Court is

9   trying to assess how much of that striking is required to create

10  additional majority Black districts beyond what's already created,

11  and we'll look through some of those pieces along the way.

12  Because unlike the kind of county-based things, we're not uniting

13  the Black community that's having its voice submerged.  A lot of

14  these maps were connecting disparate communities to create

15  additional districts, different types of communities.

16           So what I want to do this morning is move through one

17  other piece of the puzzle, which is in the legislative world,

18  you've got to navigate between complying with Section 2 of the

19  Voting Rights Act and also not racial gerrymandering.  So you have

20  to use race enough to consider the Voting Rights Act compliance

21  but not so much that you cross the line into a racial

22  gerrymandering.  And the top district there is the Shaw District

23  in North Carolina.  The bottom district is the Miller District

24  that ran from Atlanta down to Savannah.  In the '90s cycles are

25  prototypical racial gerrymanders.

1          But the difficulty is determining where -- where do we

2    find this balance along the way?

3          THE COURT:  You anticipated a question I was going to

4    ask you.  Where did you find the balance at?  You-all indicated

5    that you thought they were shading, but, you know, the Black

6    voters --

7          MR. TYSON:  Yes, Your Honor.

8          THE COURT:  Where do you stop?  Where do you stop and

9    where do you begin?

10          MR. TYSON:  And I think that's in evidence.  I think

11    from our perspective when you're relying on race to make the

12    decision about where the population goes, that's when you've

13    crossed the line.  So with that county example, when you're

14    uniting the community in the middle of the county, for example,

15    you don't need to use race.  You can draw five districts and see

16    there's clearly a district there.  When you're making -- using

17    racially shading and using racial features and then deciding what

18    population goes in and out based on that, that's where we think

19    you've crossed the line into racial predominance.

20          We'll talk a little bit about two that the -- unlike the

21    Legislature, the map drawers in all these cases didn't have to

22    look at the data.  So there was no explanation for politics for

23    the decisions they made; it had to be race.  So we knew that also

24    as a distinction.

25          But I think it gets us back to this main problem.  What

1   was the Legislature supposed to do about these particular plans?

2   And this is important because *Voinovich* tells us that federal

3   courts have to respect the state's districting decisions until

4   those choices contravene the federal requirements.

5          So does the federal requirement contravene drawing more

6   majority-Black districts on the various plans?  Which is what

7   these cases say.  Is it drawing more coalition districts and fewer

8   majority-Black districts?  Which is the argument in the Georgia

9   NAACP case, which I know we're not here about today.  Or is it

10  drawn less based on race, not using any racial splits of counties

11  and precincts like the Common Cause in Georgia NAACP cases say.

12         So I think this kind of begins zooming out to what the

13  question the Court has to consider is, how do you assess what

14  exactly is the violation here?  And we submit that what the

15  plaintiffs are giving you is not enough to show a violation of

16  Section 2.

17         So let me look a little bit more at one of the other

18  challenges with these plans, especially Mr. Cooper's plans is,

19  they want -- there's a continuing focus on looking at the

20  statewide numbers for these various plans, but I think you have to

21  go district by district.  I think their preliminary injunction

22  order definitely shows district by district.  But, for example,

23  Mr. Copper says, ah-huh, I split one less county on the house plan

24  than the enacted plan did, and I draw more majority-Black

25  districts.  So, therefore, my plan wins.  But when you look at

1  what Mr. Cooper did in areas in the state, he went to places there

2  and there's not much Black population and unsplit counties, for

3  example, Gordon County in the northwest corner of the state.  Mr.

4  Morgan talked about this.  So it makes the overall statistics look

5  better than they actually are along the way.

6        So I think it is very important that the Court not look

7  at kind of global statistics of really digging in district by

8  district.  What was the failure as to this district that needed to

9  happen.

10        So let's look at a few of these districts, and I think

11  it might be helpful to see what we're looking at here along the

12  way, and why there's not a disputed fact -- just, okay, we have a

13  bunch of maps from people, why is not a disputed fact that we need

14  to consider?  And I think if you just look at the districts you

15  can see what's here.

16        So, for example, starting with

17  District 69 in Mr. Copper's plan.  You can see it starts in the

18  South Fulton area.  The little cutout box there is another part of

19  Mr. Morgan's report that shows the racial makeup of the counties

20  included in that district.  So the portion of District 69 that

21  is -- in District 69 from Fulton is 94.15 percent Black.  The

22  portion of Fayette is only 34 percent.  So I've covered my own

23  things in the process there.  34 percent Black along the way.  So

24  that's the issue we have for that district, is striking from a

25  heavily minority area down to a heavily white area.

1          The same thing happens in District 77 with heavy
2     concentrations in Clayton County, down into a more rural
3     population in Fayette county.
4          Same in District 74.  We look at South Clayton over into
5     Henry and Spalding counties.  80 percent Black population in
6     Clayton down to 13 percent Black population in Spalding.  And this
7     is a pattern that continues throughout Mr. Cooper's plans.  So it
8     brings the question of what was the reason for drawing the
9     districts this way.  And the ultimate reason Mr. Copper gave was
10    not only a dispute about a material fact, he gave platitudes
11    about, well, it was their own Metro Atlanta statistical area.  I
12    looked at socioeconomic conditions.  He testified he did not look
13    at socioeconomic conditions beyond the county level.  He only had
14    the map of the county level.  So it couldn't have been that.  It
15    couldn't have been politics.  He didn't have that information.  So
16    our submission is that it has to be based on race to create these
17    districts.
18          Over in the eastern part of the state, we have another
19    example of this down in Laurens County here.  Mr. Copper begins
20    with a racial split of Laurens, goes through -- cuts Johnson
21    County over to Washington and Jefferson County, four different
22    counties along the way.  All that you can see, including more
23    heavy concentrations of Black voters, excluding lighter
24    concentrations of Black voters, and the same District 133.
25          Then we also have in South Georgia the connection

1  between Albany and Dougherty County, all the way down to Thomas

2  County.  We've talked about this one in the preliminary

3  injunction.  In Mr. Copper's deposition he said he followed this

4  highway but never checked to see if it matched the boundaries he

5  had looked at or located along the way.  And we submit, again, it

6  is not a disputed fact about the reasoning for this, it was the

7  connecting communities where intervening white population -- based

8  on race.

9          Mr. Copper's senate plans are similar.  We looked at

10  this a little earlier.  But we have the connection of heavy

11  concentrations of Black voters in Clayton County and South DeKalb,

12  even North Henry, North Clayton inbound with more rural

13  populations to create additional majority-Black districts.

14          And then this -- in the Eastern District and Senate

15  District 23, you see moving Senate District 22 out of its historic

16  home in Richmond County up to Warren and McDuffie Counties,

17  splitting those counties and then in taking in counties around

18  that free (sic) and Black population in this area of Richmond

19  County to create an additional majority Black district there.

20          So all in all, what Mr. Cooper has shown consistently in

21  his map drawing is a focus on race.  The other reasons he's

22  offered don't really create any dispute over a material fact

23  because he hasn't offered a basis that would be appropriate for

24  this.  That means he hasn't drawn a remedy this Court can order,

25  which is our Gingles 1 burden on the plaintiffs, and they haven't

1  carried that.

2          THE COURT:  Your argument that, therefore, summary

3  judgment should be granted based on compactness.  Or, one -- I

4  wrote a question down here.  Isn't that a weighing, wouldn't that

5  example create a disputed fact?  Not a disputed fact, but a

6  dispute?

7          MR. TYSON:  Yes, Your Honor.  I think the key is that it

8  doesn't create a dispute about an issue of material fact.  So if

9  Mr. Cooper had come forward with some basis of explaining

10 particular connections, I think at that point then we do have a

11 disputed fact.  But his -- all the reasons that he gave didn't

12 create a dispute of a material fact, because none of them actually

13 explained a boundary if you look at what he said.

14         So our submission would be, there's not a dispute of a

15 material fact.  I understand there may be disputes of fact about

16 what the drawing process was, those kinds of things, but not as to

17 any particular district.

18         THE COURT:  Because he does not offer an explanation

19 other than race?

20         MR. TYSON:  Yes, Your Honor.  And he does offer

21 explanations, I want to be clear, but we don't believe any of

22 those are material -- both inform the decision about the district

23 boundaries.  Only race informs those decisions.

24         So with that, Your Honor, I'll hand things over to Mr.

25 Jacoutot to talk about *Gingles 2 and 3*, and I'll save time for

1  rebuttal.

2         THE COURT:  Okay.

3         MR. TYSON:  Thank you.

4         MR. JACOUTOT:  Good morning, Your Honor.  Brian Jacoutot

5  for the state defendants.  Very good to see you again.

6         THE COURT:  Very good to see you again.

7         MR. JACOUTOT:  So I want to talk about the elephant in

8  the room, about *Gingles 2 and 3* first.  That is how your ruling

9  was at the preliminary injunction hearing.  You said at the

10 preliminary injunction hearing that, "The Court concludes as a

11 matter of law that, to satisfy the second Gingles precondition,

12 plaintiffs need not prove the causes of racial polarization, just

13 its existence."  And I don't think that we necessarily disagree on

14 that point, but we are saying that the plaintiffs haven't offered

15 anything apart from proof of partisan polarization, and that that

16 is not sufficient under the *Gingles 2 and 3* standard as adopted by

17 the majority justices of the Supreme Court.

18        THE COURT:  All right.  Here's the question the

19 plaintiffs can be prepared for.  Your argument is that most

20 African-Americans in Georgia vote Democrat, Democratic party,

21 Democratic candidate.  And that really you have to separate the

22 difference between partisans, bloc voting and racial bloc voting.

23 The burden is on the plaintiff.  How does the plaintiff do that?

24        MR. JACOUTOT:  Well, I'm glad you asked that, Your

25 Honor.  We can skip this slide here.

1          The Eleventh Circuit has great evidence on how to do

2    that.  And *Wright v. Sumter County* is a perfect example.  In that

3    case it was a non-partisan election.  So parties were out of the

4    equation.  And in that case, Black voters routinely voted for

5    Black candidates, extremely cohesively there, plenty of evidence

6    in that record -- in the record.  White voters routinely voted for

7    white candidates very cohesively.  And there was actually a

8    situation in that case where there was two white candidates

9    running for a particular office in Sumter County and the Black

10   voters cohesively voted for a write-in candidate that was Black.

11   So when the option presented itself with two white candidates,

12   Black voters cohesively decided that a write-in Black man was

13   preferable.  I mean, this is obvious -- this is obvious racial

14   polarization; right?  And the Eleventh Circuit has routinely said

15   that that is plenty of evidence.

16          But what we have here, the plaintiffs are offering, is

17   obvious evidence of partisan polarization and nothing more.

18   Whenever the race of a candidate changes and the evidence offered

19   by the plaintiffs' experts, the cohesiveness stays almost exactly

20   the same.  And that's what caused our expert, Dr. Alford, to say,

21   you know, there's remarkable stability in cohesion.  The race

22   defense was utterly ineffectual in terms of what -- what the

23   outcome was for the cohesive blocs.

24          So that's the kind of evidence that we would be looking

25   for under the appropriate *Gingles 2 and 3* standard.

```
 1           THE COURT:  Well, in that case then, the only way they
 2    can show it, you would have to be a Black candidate in the
 3    election?  In other words --
 4           MR. JACOUTOT:  That's not the only way, but that's the
 5    most likely way.  That's the way courts usually get that
 6    information.
 7           THE COURT:  When I looked at this 15 months ago, Gingles
 8    pointed out, you're right, causation cannot be a requirement.
 9    It's irrelevant.  I admit since that time out of the Eleventh
10    Circuit there's been a number of cases where the Eleventh Circuit
11    says, no, you have to show the difference between partisan bloc
12    voting and racial bloc voting.
13           MR. JACOUTOT:  Absolutely.
14           THE COURT:  They had prior issued a ruling, a couple of
15    weeks ago, something along those lines.  And it probably to a
16    certain extent is just saying the same thing.  But does that not
17    just then basically then eliminate that?  In other words, most --
18    I wouldn't say most of the time.  A number of times you're going
19    to have a white Democrat candidate running.  I tried to go back
20    the other night to see how many times state-wide races you had a
21    Black candidate run against a Democrat or a Black candidate run
22    against as a Republican.  The last senate race, you know.  But
23    after that, in the general elections, I can only think about one
24    other time in the last ten years that you had a Black -- Mike
25    Thurmond was the one that came to mind.  Of course the governors'
```

```
 1  race, you know, Ms. Abrams.  But how many -- how many times do you
 2  really have that?  So if I say they voted for the Democrat, does
 3  that almost eliminate that particular factor, political
 4  cohesiveness on No. 2?
 5           MR. JACOUTOT:  I don't think it eliminates it,
 6  particularly when you consider Section 2 as it applies to the
 7  nation as a whole, which it does.  Georgia has some pretty unique
 8  demographics.  And so it is more rare here than elsewhere to have
 9  that occur.  But I don't think it eliminates it as a factor.  And
10  I think if we just say, well, let's throw up our hands and say
11  partisanship and race are inextricably intertwined that you run
12  afoul of the *League of Women Voters* out of the Eleventh Circuit
13  that just recently came down saying precisely that you cannot do
14  that.  So I hope that answers your question.
15           THE COURT:  It does.  But, again, this is a question I'm
16  going to ask the plaintiffs, but, you know, you've anticipated
17  what I was going to ask.  Go ahead.
18           MR. JACOUTOT:  Okay.  Would you like me to continue?
19           THE COURT:  Yes, continue.
20           MR. JACOUTOT:  Please interrupt me if you feel it's
21  needed.
22           And so just to kind of continue with this slide since
23  we're here.  All these cases here, *Georgia State Conference v.*
24  *Fayette County*, *United States v. Marengo*, cases that, you know,
25  are seminal on racialized polarized voting.
```

```
1          THE COURT:  Let me indicate one thing for the record.  I
2   didn't mean to not acknowledge Herschel Walker in the Republican
3   last senate race.  That was another situation.
4          MR. JACOUTOT:  Certainly.  And I think you'll see, you
5   know, that's -- it's a question of voter preference, right, and
6   that changes, but the law itself doesn't and it needs to be able
7   to address the changes of voter preference.  So we can't
8   guarantees that things are always going to be the way they were.
9          So these cases here all show racially polarized voting,
10  and the evidence that was presented to the Court there was just
11  like Wright v. Sumter County, and the evidence that we have here
12  is unlike that.  And that's part of the problem.
13         And the Southern Christian Leadership Conference case
14  out of the Eleventh Circuit sort of alluded to the fact that other
15  factors besides race can drive racial polarization and that that
16  should be considered, and it could obviate Gingles 2 and 3.
17         THE COURT:  What else other than a Black candidate
18  running can show racial bloc voting?
19         MR. JACOUTOT:  Well, another example could be vote
20  switching.  Say a white voter votes for a white Democrat in the
21  primary but a Black Democrat wins that primary, and then that
22  white voter -- the data shows that there is less white support in
23  the general for that Black Democrat and it increased voter support
24  for the white Republican, that would be another example of
25  evidence.
```

1          And so I understand that you have, I think, read our

2   briefs on *Thornburg v. Gingles*, so I'm not going to waste your

3   time on that.  But suffice it to say that the issue of Part III-C

4   was not decided by the majority of the Court, it was decided by

5   plurality.  And what does Part III-C talk about?  Evidence of

6   racially polarized voting.

7          THE COURT:  The plaintiffs disagree with you on how you

8   summarized Justice White's position.  In your brief, you put

9   Justice White in the position with the majority, not necessary

10  going with causation being irrelevant.  And in the plaintiff's

11  brief, they say, no, they don't summarize Justice White's position

12  correctly in Gingles.

13          MR. JACOUTOT:  Well, I think Justice White in his

14  concurring opinion says -- he starts off with Justice Brennan --

15  Justice Brennan states in Part III-C.  He doesn't join Part III-C.

16  And he says, I do not agree pretty unequivocally.

17          THE COURT:  Justice White.  Justice White not Brennan.

18  I've read Brennan again last night for the 100th time.  But

19  Justice White.  The plaintiff says in their brief -- I think I

20  remember it correctly.  I admit, I read a lot of papers in the

21  last few weeks.

22          MR. JACOUTOT:  We apologize for that.

23          THE COURT:  You-all have really hurt trees in Georgia.

24  But I think I remember plaintiff's argument correctly, they argued

25  the position you-all arguing with Justice White is not totally

1    correct.

2           MR. JACOUTOT:  I'm not sure -- I think Justice White is

3    pretty clear, he doesn't really agree with Part III-C.  We're

4    talking about Justice White; correct?

5           THE COURT:  Yes.

6           MR. JACOUTOT:  Yeah, I think he's pretty clear that he

7    doesn't agree with III-C, and that it results in exactly what we

8    have here, interest group politics:  Democrats v. Republicans.

9    And it is really important that in that opinion he says

10   specifically or expressly that it seems quite at odds with the

11   discussion in *Whitcomb*.  He offered *Whitcomb*.  In Section 2

12   purported to restore *Whitcomb* and *White* -- *White*, the case, not

13   the justice, obviously.  So it purported to restore *Whitcomb*.  And

14   he in his concurrent opinion said, "III-C doesn't comport with my

15   understanding of my own opinion."  So I think that's pretty

16   relevant here.

17           I think I'm out of time.

18           THE COURT:  You've used your time.  Sorry.

19           MR. JACOUTOT:  Thanks.

20           THE COURT:  Thank you.  I get the feeling that this will

21   not be the only time today that we'll be talking about this.

22           MR. SAVITZKY:  Good morning, Your Honor.  We can take

23   that off the screen.  I'm going to go decidedly low tech this

24   morning.

25           THE COURT:  I'll take it any way you present it.

1          MR. SAVITZKY:  May it please the Court, Ari Savitzky for

2     the American Civil Liberties Union on behalf of the Alpha Phi

3     plaintiffs.

4          It's been 15 months since we were before this Court on a

5     preliminary injunction hearing.  And at this point we have a

6     factual record with the scope and the complexity that one would

7     expect for trial on a Section 2 case involving multiple

8     legislative districts in the State of Georgia.

9          Summary judgment has to be denied unless there is no

10    dispute of material fact, viewing the facts in the light most

11    favorable to the plaintiffs, and if the defendant is entitled to

12    judgment as a matter of law.  And what we've just heard and we've

13    seen in defense papers are trial arguments, trial defenses, not

14    dispositive legal defenses based on undisputed facts.

15         So just to get into it on *Gingles 1*, defendant isn't

16    actually arguing that Mr. Cooper's illustrative plans are

17    inconsistent with traditional districting principles.  The

18    defendant basically agrees.  The overall numbers are what they

19    are, and on every -- more or less, every objective metric, overall

20    compactness, minimum compactness, splits Mr. Cooper's meeting the

21    appeal, the standard set by the enacted map, to say nothing of the

22    benchmark map that existed before it.

23         So their fundamental argument is instead Mr. Cooper's is

24    too focused on race.  But there's massive evidence in the record

25    that a fact finder could credit, including not just overall and in

```
 1  terms of Mr. Cooper's discussion of how he thought about
 2  compactness, the law about splits, thought about keeping towns
 3  together, thought of community interest, thought about
 4  transportation quarters and economic connections and census-based
 5  areas, not just that, but specific district-by-district testimony.
 6        THE COURT:  They're arguing, though, that there is not
 7  sufficient evidence coming from you-all regarding compactness that
 8  makes it material.
 9        MR. SAVITZKY:  So I understand.  And when I -- when I
10  heard Mr. Tyson say the word "material" there, I think that the
11  question is not one of materiality but one of credibility and what
12  a fact finder would credit.  If a fact finder credits -- and we
13  don't think credibility determinations, as the Court wells knows,
14  in summary judgment (sic).  A fact finder could credit
15  Mr. Cooper's testimony -- and just if you want to look at the
16  district-by-district evidence, a fact finder could consider
17  Mr. Cooper's testimony -- let's start with District 171 in
18  southwest Georgia that Mr. Cooper was reducing county splits in
19  Dougherty County.  Enacted maps split Dougherty County four times.
20  Mr. Cooper only splits it three.  And Mr. Cooper knew that there
21  was a historic Route 19, Dixie Highway, connecting Thomasville and
22  Albany and Mitchell County that Mr. Cooper was looking at
23  socioeconomic connections and historical connections, high levels
24  of poverty that join those towns together, who was looking at the
25  regional commission which include those counties, identifies them
```

1   in the same region.  He thought of all those factors.

2           There is specific evidence in the record on each of

3   these points.  And what it goes to is the fact, and not just there

4   but on every single one of these districts, district by district

5   evidence.  Look at pages 13 to 16 of our briefs.  It takes us

6   three pages to give you the pin sites for the specific testimony

7   from Mr. Cooper that the fact finder could credit that he thought

8   about factors other than race in configuring these specific

9   illustrative districts.

10          THE COURT:  Was race the dominant factor in making his

11  decision or was it just a factor?

12          MR. SAVITZKY:  It absolutely was just a factor.  That's

13  Mr. Cooper's testimony.  He was asked point blank in his

14  deposition, Did you prioritize race over other traditional

15  factors?  His response was, "Oh, absolutely not."  And the rest of

16  his testimony bears that out.

17          He discusses all of the different factors he considered.

18  And, of course, he did also consider race as one factor, which you

19  have to do to complete the *Gingles 1* assignment, to consider

20  whether or not you can draw additional Black majority districts

21  consistent with traditional districting principles.

22          THE COURT:  At what point, if any, in drawing the maps,

23  could taking race into consideration become unconstitutional?

24          MR. SAVITZKY:  So I think what this Court said is as

25  if -- as if traditional districting principles are subordinated to

1  race, significantly more than necessary to -- to remedy vote

2  dilution, then that would be problematic in terms of the

3  illustrative maps.  That's what the Court said.  The Court based

4  that on that standard, which I think in some way presages what may

5  well be, you know, what the Supreme Court says in Merrill.

6          THE COURT:  Could these maps pass strict scrutiny?

7          MR. SAVITZKY:  I absolutely think that they could,

8  because I think they remedy vote dilution.  But I don't think that

9  strict scrutiny applies here.  What the Eleventh Circuit has said

10  is that strict scrutiny, and what the Supreme Court said in *Bush*

11  *v. Vera* is strict scrutiny, applies to state action.

12          Now, I understand that the *Gingles 1* illustrative maps

13  need to be a workable remedy, but I don't think we're close to

14  that because you don't get to strict scrutiny until you get to

15  racial predominance in which all of the traditional districting

16  factors are subordinated to race.  And, again, we're here on

17  summary judgment.  A fact finder could look at this record, the

18  extensive testimony and evidence in his report from Mr. Cooper

19  that he considered other factors, balanced them all, and did not

20  subordinate race and say that that certainly you can't conclude as

21  a matter of law that race predominated.  And that is really all we

22  need to decide today.  The ultimate question is --

23          THE COURT:  Let's look at factors two and three.  You

24  read my opinion.  You probably know it.  As pointed out

25  previously, the Court ruled based on what I would say that

1  causation is irrelevant, more or less.  You heard me say, though,

2  since that 15-month decision, particularly coming out of the

3  Eleventh Circuit, there has been about three cases, maybe more,

4  where the judges are saying, well, district court judge you might

5  want to make sure it is not partisan bloc voting as compared to

6  racial bloc voting.  Okay?

7         Do I stick with what I said in my preliminary injunction

8  or do I stop and say, well -- this goes to the Eleventh Circuit

9  first.  I always tell myself that I may write a brilliant order,

10 but it's going in front of the Appellate Court one way or the

11 other.  Okay?  And this goes first to the Eleventh Circuit.  I

12 have a case that came out, the *League of Women Voters* case, it

13 came out about three weeks ago, chief judge of the circuit

14 wrote -- page 13 of that order -- make sure it's not partisan bloc

15 voting as compared to racial bloc voting.

16        So my question is do I stay with my ruling in my

17 preliminary injunction that says -- because, you know, this is

18 summary judgment, but if you can't get passed all three, you're

19 not going to go to trial.  Do I stay with my prior ruling?  If so

20 why?  How close should I look at what's being said to me.

21        In the case, the Rose case, Judge Branch and Judge

22 Grant -- and who is the third judge in that case?  Branch, Grant

23 -- you-all flunk the test.

24        MR. TYSON:  Anderson, maybe.

25        THE COURT:  Before I leave here, somebody is going to

1  tell me.

2       They also pointed out, well, there is a difference

3  between partisan bloc voting and racial bloc voting.

4       MR. SAVITZKY:  So, Your Honor, I do think that you can

5  deny the summary judgement motion here as a matter of law, the

6  case, or you can get into it more.  Because ultimately the

7  question of the cause of racially polarized voting, to the extent

8  it is relevant, is going to be a fact-intensive issue.  And we

9  have evidence in this record that race is the driver of the racial

10 polarized voting that everyone -- no one is disputing that it is

11 observed in Georgia elections that it's consistent and it is a

12 pattern over time.

13      THE COURT:  What would separate that from the partisan

14 voting?  In other words, there's no denying in the State of

15 Georgia, because the facts bear this out, that most of the time

16 the African-Americans are voting for the Democratic candidate, and

17 the whites are voting for the Republican candidate.  Now, the

18 question is, not wanting to see any more of a delay, but how do

19 you separate that?  Defense counsel has indicated based on the

20 case --

21      MR. SAVITZKY:  So -- and I -- just -- I will answer that

22 question.

23      THE COURT:  Go ahead.

24      MR. SAVITZKY:  Preliminarily just to say, I mean, I do

25 think *Gingles* -- not just the concurrence, but the majority of

1  *Gingles,* cite 478, 56(3)(B) of the opinion, this is the majority

2  of the opinion where the Court pretty clearly says what's required

3  for that Gingles 2/3 showing, and says the fact of polarization is

4  sufficient.  I think that's the law in *Nipper.*  And, you know, if

5  you look at, you know, what Judge Wisdom said in the *Marengo*

6  *County* case, racial polarization in voting, strong counter racial

7  polarized voting is the surest indication of race-conscious

8  politics.

9          THE COURT:  Yes, but in my ruling I, basically, said --

10  and I'm not saying I'm changing the ruling -- however, I,

11  basically, said causation was irrelevant.

12          MR. SAVITZKY:  And I think that at the *Gingles 2/3* stage

13  that's true.  And what *Marengo County* and *Nipper* indicate is not

14  that you can just show the fact of causation and -- and, sorry,

15  not just show the fact that polarization and causation is sort of

16  neither here or there, but rather the fact of polarization creates

17  an inference that racial bias is at work.  I mean, that's

18  literally a quote:  "Creates an inference that a racial bias is at

19  work," from the Eleventh Circuit in *Nipper.*  Right?

20          So then the defendant can come forward at the totality

21  of the circumstances stage and they can rebut that inference.

22  Right?  And this gets into the Court's question:  What is the

23  evidence that race is ultimately driving the polarization here.

24          Now, we don't think it's a *Gingles 2/3* issue.  I mean,

25  the Court was right about that.  You know, we don't think there is

 1  any reason to think that the Eleventh Circuit is going to get out

 2  ahead of the Supreme Court in *Gingles* in its majority and front

 3  load all of that analysis into *Gingles 2/3*.

 4          THE COURT:  Well, in *Brnovich* the Supreme Court said

 5  something, not exactly, but they did indicate that you need to

 6  look at the partisan bloc voting as compared to racial.

 7          MR. SAVITZKY:  So -- and I do think that the totality of

 8  the circumstances stage, that is a fact-intensive issue.  You

 9  know, opposing counsel's discussion of how you might go about

10  proving causes, just highlights how fact intensive it is.  And so

11  let me talk about what's in this record here.

12          We have, first of all, Dr. Handley, the racial

13  polarization expert did look at primary elections.  You saw some

14  of that evidence in the preliminary injunction hearing.  She did

15  observe racially-polarized voting patterns in a large number of

16  primary contests.  And, of course, defendant's racially-polarized

17  voting expert concedes partisan primaries control per party.  You

18  cannot explain the racially-polarized voting that is reserved in

19  party primaries through party.  So that's strong evidence that

20  raises -- it's not just that.  You have Emory University historian

21  Jason Ward who talks about the history of race and politics, and

22  how race is the best predictor of partisan preference in Georgia

23  since the Civil War.

24          And, in fact, the parties realign themselves over time

25  in response to -- voters realign themselves and their party

1   preferences over a time in response to the party's position on

2   issue of race and racial equality.

3          Not only do you have the historical evidence and the

4   evidence from partisan primaries, but you also have the expert

5   testimony of Dr. Jones who talks about contemporary politics, who

6   talks about racial appeals in politics.  If voters were just

7   responding to party and were not responsive to race, then there

8   would be no reason for candidates to continuously use racial

9   appeals in politics.  But instead you continue to see, into the

10  present day, racial appeals in politics.  They're designed to

11  polarize voters on the basis of race.  And, of course, we do

12  see -- and no one disputes -- a persistent, over election after

13  election after election, pattern of racially-polarized voting,

14  which itself, as the Eleventh Circuit says, creates an inference

15  that racial bias is at work.

16         And so -- but even if you want to sort of get into the

17  ultimate causes question, there is more than enough evidence here

18  for a fact finder to decide we've shown that race best explains

19  the observed and undisputed racial polarization in the electorate.

20         So you can deny summary motion on that basis as well, if

21  you'd like to go there.

22         THE COURT:  What is the argument, also -- I said I

23  wasn't going to bring it up, but since it's on my mind that

24  you-all have not really shown past racial discrimination, because

25  what you have put forth is so past -- in other words, as they

1   pointed out in the *League of Women Voters* case is that -- and in

2   the *Greater Birmingham* case is that the recent discrimination of

3   the nature that we're looking at, has not been shown in a lot of

4   the cases.  And the plaintiffs -- the defendants argue, also,

5   something that happened in 1965 it's not really relevant as far as

6   what's going on in 2023.

7           MR. SAVITZKY:  So, first, I would be remiss to not point

8   out that the *Greater Birmingham* case and *League of Women Voters*

9   cases are not redistricting cases, aren't *Gingles* cases, which is

10  an important distinction.

11          You know, Your Honor, the weightiness and the salience

12  of Georgia's history and the history of racial discrimination in

13  voting is precisely the type of totality of the circumstances

14  question going to the total context, going into the ultimate

15  issues that are best decided at trial after you hear witnesses and

16  hear their testimony and weigh and think about their arguments and

17  assess them.  I mean, these are -- I understand the argument, but,

18  again, what we're getting at are trial arguments and trial

19  defenses, not summary judgment arguments.

20          And we would, of course, argue that the history of

21  discrimination and the way that voters have responded to

22  discrimination, to messages about race and the parties' statements

23  about race by realigning themselves and reiterating over and over

24  and again racially polarized voting patterns, supports a finding

25  on that causation piece, if you want to consider the total of the

 1  circumstances, and supports the ultimate finding that we met our

 2  burden and shown vote dilution.

 3          If you have no further questions, Your Honor, I'll rest

 4  on that.

 5          THE COURT:  Thank you.

 6          MR. SAVITZKY:  Thank you.

 7          THE COURT:  If the defendants have any time left --

 8          MR. TYSON:  I don't think we have any time left.

 9          THE COURT:  All right.  Then we move to the next set of

10  arguments.

11          So no one needs a break?

12          Come on down.

13          Pendergrass plaintiffs argument/motion for summary

14  judgment.

15          MS. KHANNA:  Good morning, Your Honor.

16          THE COURT:  Good morning.

17          MS. KHANNA:  Abha Khanna on behalf of the Pendergrass

18  plaintiffs.

19          THE COURT:  Good to see you again.

20          MS. KHANNA:  The Court set out today a good amount of

21  time to consider a good number of motions, but ultimately there's

22  very little that the attorneys will argue today that Your Honor

23  hasn't heard already.

24          Now, as this Court wells knows, we've been here before.

25  And as we note in our briefs, the law as -- the existing law has

 1  not changed.  Now, I recognize what Your Honor has noted about in

 2  the intervening 15 months there have been discussions of the

 3  Eleventh Circuit, there have been statements in non-Section 2

 4  cases and non-redistricting cases that, perhaps, provide glimmers

 5  of the kind of laws that the defendants are hoping to achieve at

 6  the Eleventh Circuit, are hoping to have become -- made the law of

 7  the land, but those are not the law of the land today, and that is

 8  what we're arguing in this summary judgment motion.  The Court is,

 9  obviously, very familiar with that loss.  I'm going to dive

10  straight into the undisputed facts that warrant summary judgment

11  in favor of plaintiffs in this cases, in the Congressional

12  Pendergrass case.

13         I'm actually going to start with *Gingles 2 and 3*,

14  because I think that analysis is the most straightforward and has

15  been the subject of a lot of consideration already.

16         The second *Gingles*' precondition requires plaintiffs to

17  establish that the minority group in question is politically

18  cohesive.  This fact is not in dispute.  As made clear in the

19  response to plaintiffs' statement number 76, defendants do not

20  dispute that Black voters are extremely cohesive in the focus

21  area.

22         The third *Gingles*' precondition requires plaintiffs to

23  show that the white majority votes sufficiently as a bloc to

24  enable it usually to defeat the minority-preferred candidate.

25  This fact is also not in dispute.

1              In response to plaintiffs' statements 78 to 85,

2    defendants do not dispute that white voters in Georgia are highly

3    cohesive in opposition to Black-preferred candidates, and that

4    white-preferred candidates defeated Black-preferred candidates in

5    every election examined in each of the relevant districts except

6    for majority Black CD13.

7              The reason the defendants have not disputed these two

8    foundational and fundamental facts is because they are beyond

9    dispute.

10             The racial voting patterns observed in the focus area

11   here as depicted in Mr. -- in Dr. Palmer's graphic on the screen,

12   exemplify polarization along racial lines.  In fact, defendants'

13   own expert described this pattern of polarization between Black

14   and white voters as striking and remarkably stable across

15   elections.

16             So based on these undisputed facts, the second and third

17   *Gingles* preconditions are satisfied as a matter of law.

18             Now, defendants argue that *Gingles 2 and 3* don't

19   actually mean what they say, and instead require plaintiffs to

20   prove something else, specifically that race caused this

21   polarization.  That is absolutely not what *Gingles 2 and 3* says,

22   and that itself is an attempt to read tea leaves.  That just does

23   not have any support in the existing case law.

24             More than a year ago this Court concluded as a matter of

25   law that under the *Gingles*' preconditions, plaintiffs need not

1  prove the causes of racial polarization, just its existence.

2          In fact, defendants' are well aware, not only from this

3  case, but in the Rose case that the defendants also mention.  In

4  that same case the defendants made the same legal argument that

5  they make here before Judge Grimberg, and Judge Grimberg also

6  rejected it as a matter of binding law under Supreme Court

7  precedent and Eleventh Circuit precedent.

8          THE COURT:  When it went in front of the Eleventh

9  Circuit, though, was it not a question -- did it not -- at least

10 two of the judges questioned Judge Grimberg's decision and

11 preceded that way?

12         MS. KHANNA:  The Eleventh Circuit's most recent

13 reiteration?

14         THE COURT:  Yes.  They had oral argument, and I can't

15 remember the name.  You have to find it.  All I need is for the

16 Eleventh Circuit judge to check this.

17         They raised a question about whether Judge Grimberg was

18 correct on polarization of bloc voting.

19         MS. KHANNA:  I believe that the question is now

20 currently pending before the Eleventh Circuit based on defendant's

21 reformulation of the law of *Gingles 2 and 3*.  I think we can sit

22 here today and kind of debate what happened over oral argument,

23 who said what and what I can gleaned and what you can glean from

24 that, Your Honor.  But the fact is there's no law from the

25 Eleventh Circuit saying anything other than what this Court held

 1  in its PI order or anything other than what Judge Grimberg said in

 2  his order.  And then unless and until that law comes down, we have

 3  to operate under the law that exists.

 4          THE COURT:  But that law can change in a swift of an

 5  opinion.

 6          MS. KHANNA:  That law could do that.  You're right, Your

 7  Honor.  And I believe the plaintiffs and the parties in this case

 8  have shown their facility and their ability to turn on a dime as

 9  developments in the law happen.  And we know we are in an

10  environment where that could happen at any movement.

11          THE COURT:  Yes.

12          MS. KHANNA:  But does that mean that we kind of halt the

13  analysis or halt the progress of this case and let yet another

14  election go by in the hopes that maybe there will be some clarity

15  from another court?  It does not.  In fact, defendants have not

16  moved for a stay in this case pending either of them, either for

17  *Milligan* or *Rose*.  So unless and until there is some change, we

18  have to operate under the law as it exists.

19          And under the law as it exists, the facts are not in

20  dispute, and plaintiffs have established their burden under

21  *Gingles 2 and 3* warranting summary judgment on the existence of

22  racial bloc voting.

23          I'll turn now to *Gingles 1*.  The first Gingles

24  precondition requires plaintiffs to demonstrate that the Black

25  population in the focus area is sufficiently large and

1   geographically compact to constitute a majority in a single member

2   district.  So this precondition has two component parts:

3   Numerosity and compactness.

4           There is no dispute that plaintiffs have satisfied the

5   numerosity requirement.  In response to plaintiffs' statements 31

6   to 38, defendants do not dispute that in Mr. Cooper's illustrative

7   District 6, it has a Black voting age population of over 50

8   percent; and that it does so without reducing the number of

9   majority-Black districts -- existing majority-Black districts in

10  the enacted map.

11          Notably, Your Honor, there is no dispute among the

12  experts as to satisfaction of both Gingles -- both components of

13  the *Gingles 1* precondition.  In paragraph 86 of his report, our

14  expert, Mr. Cooper, states that the Black population in Metro

15  Atlanta is sufficiently numerous and geographically compact to

16  allow for the creation of an additional majority-Black

17  congressional district consistent with redistricting principles.

18          Mr. Morgan's very short report in Pendergrass provides

19  nothing to contradict any part of this statement.  And, in fact,

20  when asked in his deposition whether his report disputes Mr.

21  Cooper's conclusions in paragraph 86, he responded, quote, it

22  neither supports nor refutes it.

23          And in this sense, Mr. Morgan's Pendergrass report

24  stands out from his other reports in these consolidated cases.  In

25  both of the state legislative cases, Mr. Morgan's reports twice

 1   conclude that the illustrative maps he's analyzing there presented
 2   by plaintiffs, quote, focused on race, prioritizing race to the
 3   detriment of traditional redistricting factors.  There is no such
 4   statement in the Pendergrass report.  In those reports, you will
 5   see a lot of pictures and racial shading and a lot of things that
 6   the defendant put on the screen just now.  There is no such
 7   picture of the Pendergrass illustrative map and the district at
 8   issue there.  For a good reason.  There is no dispute as to the
 9   facts of that illustrative map when it comes to the experts
10   themselves.
11          In Pendergrass, the defendants have no expert evidence
12   to dispute plaintiffs' satisfaction of *Gingles 1*.  And they never
13   even in all of the Pendergrass briefing, defendants do not even
14   mention their expert Mr. Morgan once.
15          So let's go to the actual maps at issue.  Let's first
16   start with the enacted map.  Here is the enacted congressional
17   map.  And the focus area for our section two claim is here.  This
18   is the western Metro Atlanta area.
19          Plaintiffs contend under *Gingles 1* that the Black
20   population in this focus area is sufficiently numerous and
21   geographically compact to comprise a majority of the voting age
22   population in a new congressional district.  To demonstrate this,
23   plaintiffs offer illustrative District 6.  Importantly, defendants
24   do not dispute any of the objective metrics about the illustrative
25   maps' compliance with traditional districting criteria.  They do

1  not dispute that the illustrative map achieves equal population.

2  They do not dispute that the illustrative map is contiguous.  They

3  do not dispute that the illustrative map generally, and

4  illustrative District 6 specifically scored as high or better than

5  the enacted congressional districts on objective measures of

6  compactness.  They do not dispute that the illustrative maps put

7  the same number of counties as the enacted map, and includes fewer

8  unique county splits, fewer municipality splits, and fewer voting

9  district splits than the enacted map.  They do not even dispute

10 that the eyeball test tells us that illustrative District 6 is

11 compact.  None of these criteria are in dispute with respect to

12 this map.  And this is the map that is before this Court on

13 *Gingles 1* in the Pendergrass case.

14      So what do defendants say about plaintiffs' illustrative

15 map?  What do they say that their expert couldn't say?  What do

16 they say that the objective features of the map couldn't say?

17 Let's go to their brief to find out.  They make feeble arguments.

18      They say in their opposition brief -- first they cite

19 *LULAC* for the proposition that plaintiffs must demonstrate

20 connections between the disparate geographic communities they

21 unite that go beyond race.  But here, unlike the district at issue

22 in *LULAC*, there simply are no disparate geographic communities to

23 speak of within this illustrative district.

24      In *LULAC*, the Court examined the Section 2 compliance of

25 a district that it described as a long, narrow strip that winds

1  its way to combine Latino populations on the Mexican border with

2  Latino populations in Austin, in the center of the state 300 miles

3  away.  And *LULAC*, in that case the Court emphasized it is the

4  enormous geographical distance separating the Austin and Mexican

5  border communities coupled with the disparate needs of interest of

6  those populations and not either factor alone that renders

7  District 25 not compact for Section 2 purposes.

8         Now, defendants parrot and quote the *LULAC* language in

9  their brief, but they fail to actually connect it to the actual

10 illustrative district in question in this case.  Here just looking

11 at illustrative District 6, there are no disparate geographic

12 communities of any race included in this illustrative district.

13 The district is anchored in just four counties that comprise the

14 western edge of the 11-county Atlanta Metro area as objectively

15 defined by the Atlanta Regional Commission.  That is not in

16 dispute.  Defendants identify no far flung segments of a racial

17 group within this district, a district that otherwise complies

18 with all objective metrics of traditional criteria.

19         THE COURT:  They argue that you're putting rural and

20 urban areas together.

21         MS. KHANNA:  Your Honor, I believe all they note is that

22 Mr. Cooper noted that some portions of western Douglas County are

23 more rural than some of the more urban areas included in Cobb

24 County.  Now, there is prohibition on putting rural and urban

25 areas together.  And we, of course, are not bringing a claim

1  against bringing rural and urban areas together.

2           But specifically to their argument on this map again,

3  it's a cute little district, and I think we all have to agree --

4           THE COURT:  I'm not saying I disagree with you.  I'm

5  just saying that's what they are arguing.

6           MS. KHANNA:  And I'll address that.  And that argument,

7  in particular, is -- I think the Court can acknowledge that to the

8  extent any portion of Douglas County is rural, the defendants'

9  objection that we should have divided Douglas County and that

10 somehow would have been more consistent with traditional

11 districting principles, defies the very guidelines that guided the

12 Legislature where they said that counties and courts have

13 routinely found that county boundaries are objective metrics of

14 communities of interest.

15          So faulting plaintiffs for including the whole of

16 Douglas County, its, perhaps, somewhat rural and somewhat urban

17 populations included, it rings hollow here in this context, Your

18 Honor.

19          Defendants actually -- referring back to *LULAC* now.

20 Again, that was a 300-mile long district that conjoined two very

21 disparate populations of minority population.  And there's a

22 legend at the bottom of this map right here.  And you can see that

23 one inch is about six miles.  So if we take that little one

24 inch -- and I have a little handy tool there to do this -- and we

25 approximate how many of those little inches does this district

1  span?  I see one, two, three, four, five, six -- six-and-a-half

2  inches, 39 miles from top to bottom, approximately.  This is not

3  the *LULAC* district.  Defendants cite to *LULAC*, but they fail to

4  point to any evidence to indicate that this district, illustrative

5  District 6, is a *LULAC* district.  In other words, they identify no

6  genuine dispute of fact to the geographic compactness of the

7  minority population in this district.

8       The defendants' remaining objection on *Gingles 1*

9  reflects a straight up legal error.  Defendants look beyond

10 illustrative District 6.  And to pretend that Mr. Cooper connected

11 the same types of communities that he criticized the enacted plan

12 for connecting in other illustrative districts, in eastern

13 Georgia.  This argument fails on at least two levels:

14       First, the question under *Gingles 1* is whether the Black

15 population in western Metro Atlanta is large enough and compact

16 enough to comprise the majority in an additional district.

17       Defendants' complaint about districts other than

18 illustrative District 6 have no bearing on that question.  *LULAC*

19 itself makes this clear.  When evaluating the Section 2 violation

20 in District 23, it examined the compactness of the minority

21 population in District 23.  When evaluating the Section 2 defense,

22 Texas' Section 2 defense of District 25, it examined the

23 compactness of the minority population in District 25.  And when

24 the State of Texas tried to point to District 25 to defend against

25 Section 2 liability in District 23, the Court rejected their

1   attempt to look outside of the area that was the actual subject of

2   the Section 2 inquiry.

3        But more fundamentally, Your Honor, as Your Honor

4   already pointed out, defendants' argument on this score really

5   just misunderstands the legal relevance of plaintiffs illustrative

6   map.  Plaintiffs do not challenge the enacted map, because it

7   connects rural and urban populations.  That, of course, is not a

8   legal claim.  That does not violate any law.

9        Plaintiffs challenge the enacted map because it dilutes

10  the vote of a compact cohesive Black population in violation of

11  Section 2.  This Court does not have to decide whether the

12  illustrative map is better or worse than the enacted map.  This

13  Court does not have to choose the map it likes best as a legal

14  matter, as a practical matter, as a policy matter.  All it has to

15  do is determine whether plaintiffs' illustrative map identifies a

16  large compact minority population in the western Metro Atlanta

17  area that could comprise the majority of a new congressional

18  district.  That is the legal standard, and based on undisputed

19  facts, plaintiffs satisfy it.

20       Defendants have come forward with no evidence at all for

21  this Court to find in favor of the non-moving party.  All they

22  offer is their misunderstanding of the law.

23       Very briefly, Your Honor, there really is no dispute

24  that the *Gingles* preconditions, with all the pre-*Gingles*

25  preconditions that I've just discussed, are readily amenable to

```
 1  summary judgment determination.  The defendants say as much on
 2  page 32 in our on opposition brief to our motion where they state
 3  that the Gingles preconditions are, quote, proper basis on which
 4  this Court can rule on the legal impact of the undisputed material
 5  facts without weighing evidence.
 6          On page 25 of our reply brief, we identified several
 7  cases -- reports related to summary judgement for Section 2
 8  plaintiffs on one or more Gingles preconditions.  And, of course,
 9  just last year in Rose, Judge Grimberg granted summary judgement
10  to plaintiffs on each of their three Gingles preconditions,
11  holding that the secretary may present evidence at trial about the
12  inferences the Court should draw from these facts under the
13  totality of the circumstances.
14          And, of course, while plaintiffs have moved for summary
15  judgment on the entire case here, and why we believe that we have
16  established several of the senate factors as a matter of law, this
17  is not an all or nothing motion.  If the Court determines that the
18  totality analysis requires fact finding or the weighing of
19  evidence or a variety of inferences, it remains free to issue
20  summary judgment on the undisputed fact of the Gingles
21  preconditions, and reserve the trial -- reserve for trial the
22  ultimate determination of liability.  Because in the totality of
23  circumstances, all of the -- the hemming and the hawing, and what
24  about this and what about that, and all of the various stories
25  that defendants want to tell about the objective data, that's a
```

 1   place for the total of circumstances analysis.  There is no place

 2   for that under *Gingles*.  *Gingles* is an objective, straightforward

 3   test.

 4          THE COURT:  Do you really believe there's no argument

 5   under compactness factor at all?  In other words, there is no

 6   argument whatsoever?

 7          MS. KHANNA:  I believe there is no argument whatsoever.

 8   And the way I know that is not only by looking at this case, their

 9   briefs in this case and their evidence in this case, by looking at

10   it in the other cases.  They recognize or they tried, their expert

11   tries to -- to refute compactness as a factual matter -- the

12   Legislative cases.  They don't even try to do it here.  All they

13   say is "*LULAC*" and "disparate communities," but they don't

14   actually identify any disparate communities.  There are no

15   disputes about the objective traditional redistricting criteria,

16   including the Atlanta Regional Commissions' definition of the

17   community of interest.

18          And so I really believe that the Congressional case, you

19   know, doesn't fit their story line, Your Honor.  I understand the

20   story that they have crafted, that they crafted 15 months ago and

21   that they kind of deployed in each of these cases is the same,

22   word for word.  But, unfortunately, the facts just don't add up in

23   this case.  The maps just don't add up in this case.  There's a

24   reason they don't point to any portions of those maps.  There's no

25   reason their expert's report doesn't even show a picture of our

1  map, because there is no dispute about what that map actually does

2  on both numerosity and geographic compactness.

3       Your Honor, we are not asking this Court to do anything

4  that would make it queasy on summary judgment.  I know there's a

5  lot of opinions that are hanging out there in the balance.  We do

6  want to get this done right.  And while that may mean that we'll

7  be back here for trial in September, this Court has every reason

8  to narrow the issues actually in dispute and streamline the trial

9  to ensure the opportunity for effective and efficient relief for

10 plaintiffs on their claim in advance of the 2024 elections.

11      I don't know if I have any time left, but I will reserve

12 any time left for rebuttal.

13      THE COURT:  How much time does she have left?  Nothing.

14      MS. KHANNA:  I said it all, Your Honor.  Thank you.

15      THE COURT:  It was Judge Schlesinger.

16      MR. TYSON:  Judge Schlesinger.  Okay.  I think Judge

17 Henderson must have been in the Curling appeal.

18      THE COURT:  Three panelists have heard these arguments.

19      Mr. Tyson --

20      MR. TYSON:  Yes, sir.

21      THE COURT:  The argument is you now have a dispute here.

22      MR. TYSON:  Yes, Your Honor, and I'm going to explain

23 why I believe we do, not surprisingly.  And I want to begin with

24 the standard of review, because I think it's important again.  I

25 know this is a unique situation where we're saying we're entitled

```
 1  to summary judgment, the plaintiffs are saying they're entitled to
 2  summary judgment.  I think it's important to remember that the
 3  standard is different for -- for defendants getting summary
 4  judgment versus plaintiffs.  And so we have the summary judgment
 5  standard -- actually, Your Honor, if I could, I can hand up paper
 6  copies.
 7           THE COURT:  Thank you.
 8           MR. TYSON:  The Fayette County case, I think, is a very
 9  important one for this Court to consider as it thinks about
10  granting summary judgment for the plaintiffs.  That was a case
11  where Judge Batten granted summary judgment to the plaintiffs in a
12  case.  And A lot of what the Eleventh Circuit said, essentially,
13  was, well, we think that the defendants are going to lose at
14  trial, but you improperly weighed the evidence.  And so the
15  discussion there from Judge Wilson was, the district court at
16  trial -- at summary judgement may not weigh the evidence or find
17  facts.  You can't make credibility determinations on your own.
18           And in Burton v. Belle Glade I think it is even clearer
19  that even if we agree on basic facts but disagree about the
20  inferences that should be drawn from those facts, that's not where
21  summary judgment fits.  And I think this is where the distinction
22  between defendants' motion for summary judgement or we can say
23  plaintiffs haven't given you enough evidence to get past the
24  preconditions to get to trial.  It's different than plaintiff
25  saying we have carried our burden even assuming every inference in
```

1   favor of the non-moving party, which for this motion is the state.
2   So the standard review matters a lot.

3            To talk through a couple of points Ms. Khanna made, we
4   wanted -- I want to be clear that the *League of Women Voters* and
5   *Greater Birmingham*, *Brnovich*, yes, those were not restricting
6   cases.  We get that.  But they are interrupted in Section 2 and a
7   standard in Section 2.  So I understand there's a lot that's
8   different in redistricting.  I don't think the legal standard
9   there is different for those.

10           And I want to say freely, too, Mr. Morgan does treat
11  this plan differently.  We'll talk a little bit as we get into our
12  motion on this and why we believe that the Court has to look more
13  broadly on that.  I think for purposes of the *Gingles 1* -- and
14  I'll start the piece of this -- looking at what's happening -- oh,
15  I should address one point, Your Honor.

16           One issue of fact that we raised in our briefs and to
17  mention this as an aside, Mr. Cooper testified just a few years
18  ago that there should have been a new majority Black district in
19  eastern Georgia, not in Metro Atlanta.  And that was his expert
20  report here in the *White* case.  Just like in *Fair Fight* where the
21  burden wasn't on us to come forward with things, cross-examining
22  the witnesses about why they went through the methodology they
23  went through that leads to these kinds of disputes of fact.  Why
24  look at Atlanta this time versus eastern Georgia last time.  And
25  Mr. Cooper said, well, the census was different.  Okay, that's

1  fine.  But there was a clear change in direction for Mr. Cooper,

2  and then what he did in drawing is an important difference, and

3  Ms. Khanna showed you this map.  But you have to look one step

4  deeper, which is what is the racial makeup of the counties in --

5  what she referred to as the cute district on that front.

6         The racial makeup is -- the Fulton County portion at the

7  bottom there is 88 percent Black.  The Douglas County portion is

8  almost majority Black at 49 percent for the age population.  The

9  Cobb portion is not majority Black, it's only 37 percent.  And the

10 Fayette portion is only 21 percent.

11        So as the Court is considering this question of where is

12 the geographically compact minority community that is not being

13 properly represented, again, in a situation where we're not saying

14 no opportunity and we need to get opportunity, we're saying we

15 have some opportunity and we need more opportunity.  This is an

16 important factor in considering where is that population.

17        What the plaintiff's essentially wants you to do for

18 your *Gingles 1* analysis is -- is oversimplify the analysis for

19 purposes of their motion to the point of where they say, can we

20 draw a district?  If yes, we have succeeded on *Gingles 1*.

21 Whereas, the Eleventh Circuit standard is you have to find a

22 remedy the Court can enter.  And this is where we get into a

23 little bit of a chicken and egg problem in Section 2, because how

24 do you know you need to draw the district?  There was a Section 2

25 violation.  How do you prove the Section 2 violation?  You've got

```
 1   to draw a district.  And that's an awful place to be.  But I think
 2   in looking at this, it has to be more than just I can draw a
 3   district.  It has to be I can create a remedy, I can explain why
 4   I'm uniting these communities, I have a reason behind why I'm
 5   doing what I'm doing.  And when we get into our motion, we'll talk
 6   a little bit more about the other districts around the state.
 7   Because I think you can't look at again one district in isolation,
 8   because redistricting is a very interconnected process.  Creating
 9   this one district drives decisions about other districts around
10   the state that will make a big difference in how that goes.
11            THE COURT:  According to her, in *LULAC* they say, no,
12   it's not relevant what effect it has on another district.
13            MR. TYSON:  The discussion in *LULAC* was, you can't use
14   one district to just -- because we created a new majority Latino
15   district over here, therefore, it's okay that we got rid of this
16   district over here.  And that's more of a Section 5 argument, the
17   total number of districts, is it retrogressive.
18            What we're advocating on this point is, you can't look
19   at District 6 in isolation because the decisions made about
20   creating District 6 have an effect on the other districts around
21   the state.
22            THE COURT:  You said in your brief, how many districts
23   are affected.  Let's say if we looked at this new District 6, how
24   many other districts are affected?  What other changes does it
25   have on the other 13?
```

1          MR. TYSON:  And my recollection, Your Honor, is that

2    Mr. Cooper changed I believe eight of the other districts to draw

3    this one.  And a couple of distinctions that happened there --

4    let's look at some of them.  District 3, Mr. Cooper in his report

5    heavily criticizes the state for connecting parts of south Cobb

6    with the suburbs of Chattanooga.  But he's done the same thing

7    here in this -- connecting part of south Cobb or west Cobb all the

8    way down through Carroll County, through LaGrange, all the way

9    down to downtown Columbus.  I mean, he's added farming communities

10   that are parts here.  He couldn't explain his decision-making

11   about why those different portions of the districts were connected

12   beyond, well, I portioned equality, and I think he thought that

13   Cobb County was closer to Columbus than it was to Chattanooga.

14          On other side of the state, his District 10, also.

15   Really, he couldn't explain the explanation for that beyond

16   population equality.  It starts in majority-Black Hancock County.

17   There's a lot of discussion about the Black belt in our

18   preliminary injunction hearing.  And Clarke County was part of

19   that.  It includes Clarke all the way up to Rabun and Towns

20   Counties.

21          Over in District 14, Mr. Cooper cut across where the

22   General Assembly drew a line in a mountain range.  He has cut

23   right past that between Murray and Fannin and Gilmer Counties in

24   creating that district.  So this is where I think you have to look

25   and weigh out at *Gingles 1* the question of is this a remedy the

1  Court can order, because these are all things that were affected
2  by District 6.  And I know the response has always been this is
3  just illustrative, you don't have to use this map, you can use a
4  different map.  The reality is if you draw District 6 the way it's
5  drawn, it has impacts all across the rest of the state.  So we get
6  back to the question was the General Assembly required by
7  Section 2 to draw District 6 as it's configured here or at least
8  draw a majority Black district in western Atlanta, or is it
9  required to do something else?

10          The other piece I want to touch on in terms of where --
11  would it be required to find for the plaintiffs, and I think
12  Ms. Khanna has in a lot of ways kind of backed off some of the
13  totality factors here, but the Court literally is required to
14  conduct a searching analysis and weigh out the weight to give to
15  the various totality factors.  And we just don't see how that can
16  happen at summary judgment.

17          As we talked about, you can't infer the racial issue
18  from a partisanship, and we'll talk about *Gingles 2 and 3* in a
19  minute.  We've talked about the history of discrimination and what
20  is the impact of that.  I'm relying on the things that this Court
21  and other courts have ruled are not discriminatory, are not
22  actionable.  How does that weigh into the official history of
23  discrimination in Georgia?  That's something the Court has to
24  weigh.  How does, for example -- they cite again in *Fair Fight* to
25  this alleged memo from then Secretary Kemp about closing polling

1  places.  How does that play into this particular factor?  How does

2  that affect -- and then, again, is it informing the environment

3  that goes to the question of is there, based on the totality of

4  circumstances, a denying or abridgement on account of race.

5          You have to use the various voting practices that are

6  involved.  *Brnovich* makes clear, I think, you have to look broader

7  than just those practices.  You have to look at the entire

8  environmental.  How do you factor in early voting?  How do you

9  factor in other opportunities to vote, like, automatic voting

10  registration?  Those are things that require weighing.

11         The effects of discrimination on the ability to

12  participate in the political process.  We recognize the Eleventh

13  Circuit has said you have disparate socioeconomic conditions that

14  kind of gets you across this particular factor, but then how much

15  weight does that carry especially when Georgia is electing

16  candidates of choice in the Black community on a statewide basis.

17  Senator Warnock, Senator Ossoff, President Biden are all examples

18  of that.  So how does that factor weigh?  Again, we're well beyond

19  what summary judgment requires here.

20         Racial appeals is the same thing, figuring out what the

21  weight to give that.  What is the impact of using voter fraud as a

22  racial appeal in voting?  The extent of election minority members

23  to public office.  We have three members of Congress from Georgia

24  who are Black-preferred candidates and Black individuals who are

25  elected from non-majority districts.  That's Congressman Bishop,

 1  Congresswoman Williams, Congresswoman McBath.  How does that

 2  weight into the consideration of the Court here?  We understand

 3  the statewide elections happen -- Mr. Thurman and others.  But how

 4  do we weigh out those pieces?  Again, that's not a factor or

 5  decision for summary judgement.

 6          The plaintiffs don't offer you anything on

 7  responsiveness of the elected official just because we don't have

 8  a particularized need of the Black community that's distinct.  Not

 9  just, again, a Democratic political priority, which is what the

10  large discussion was, but a distinct issue for the Black community

11  that is not being represented right now.  Judge Grimberg talked

12  about that in *Rose*.

13          And the justification, the tenuousness of the

14  justification ignores the evidence of partisanship from the

15  Legislator.  And it kind of gets us back to our same point of

16  *League of Women Voters* and *Brnovich*, how do we weigh out race and

17  partisanship?  And without more, that's something, number one, you

18  can't weigh at summary judgment on the senate factor.  But in

19  terms of how do you interpret the evidence the plaintiffs have

20  brought forward, have they brought you sufficient evidence to get

21  across the finish line even if all inferences are drawn in our

22  favor on their motion.  We'll obviously argue for our motion that

23  there's not enough to even get you past Gingles 2 *and 3* on those

24  other points.

25          So with that, Your Honor, I will yield to Mr. Jacoutot

 1    to talk a little bit more about partisan and racial polarization.

 2              THE COURT:  Thank you.

 3              MR. TYSON:  Thank you.

 4              MR. JACOUTOT:  Thank you, Your Honor.

 5              I want to begin with something that Ms. Khanna said in

 6    her argument.  She characterized our argument with respect to

 7    *Gingles 2 and 3* as a reformulation of the factors -- or a

 8    reformulation of the law, excuse me.  And I don't think -- I don't

 9    think that's what we're doing here at all.  I don't think we're

10    changing the law at all.  In fact, all of these Eleventh Circuit

11    cases that you see here, would come out precisely as they did

12    under the standard that we are advocating for -- with respect to

13    *Gingles 2 and 3* except, perhaps, *Southern Christian Leadership*

14    *Conference*, which is a case where racial polarization was not

15    found -- or excuse me, a Section 2 violation was not found, and

16    that one might turn out differently.

17              But the cases where racial polarization was found and a

18    Section 2 violation was found, those all come out, I think,

19    exactly the same under our standard.

20              In fact, it's worth pointing out that *Gingles* itself

21    comes out exactly the same under our standard.  That's why there

22    were concurring opinions.

23              I want to highlight sort of the lack of evidence, the

24    absolute lack of evidence that we have on point for granting

25    plaintiffs' summary judgment using the *Wright v. Sumter* case that

1  we talked about earlier as a model.  The *Wright v. Sumter* case

2  had, again, nonpartisan elections, and they had some elections

3  with Black and white candidates, some elections with only white

4  candidates.  But if you look here, you'll see the Black support is

5  very cohesive for the Black candidate who is identified with

6  asterisk next to their name.  This is not all of the election

7  contests, this a portion.  I don't want to go through them all,

8  but this is indicative of the overall analysis that the Eleventh

9  Circuit included in its opinion in this case.

10        And you'll see Black support very cohesive of Black

11  candidates.  White support sometimes split amongst white

12  candidates, but very cohesive for white candidates.  And if you

13  compare that with what Dr. Palmer has given us in this report,

14  you'll see a kind of stark difference.  The asterisk here -- this

15  is, again, a portion of Dr. Palmer's report, not the whole

16  thing -- but the asterisk here represents Black candidates, and

17  the first column is Black voter cohesion with respect to the

18  election.  And you'll notice a very strong pattern of Black

19  cohesion for any candidate regardless of their race.  Right?

20  They're constantly saying the only thing that is different amongst

21  these candidates or, excuse me, the only thing that matters to the

22  Black voter is the party of the candidate.  And the same is true

23  for the white voters.  White voters routinely vote against the

24  Black candidate regardless of whether -- Black-preferred candidate

25  regardless of whether that candidate is white or Black.  This is

1   very different than what we see in *Wright v. Sumter County*.

2          I highlighted the race at the bottom there, the two

3   white candidates, and you'll notice all of that cohesion between

4   the races absolutely evaporates in that -- in that race because

5   they had two white candidates.  The -- there's hardly -- possible

6   to determine a candidate of choice for either race in that -- in

7   that contest.

8          And then, of course, there was the write-in campaign,

9   another contest -- this is also taken from the *Wright v. Sumter*

10  *County* opinion -- was a write-in campaign because there were two

11  white candidates who split the white support.  And then the Black

12  voters in that area actually wrote in very impressively a

13  candidate for office in that election as well.  You see that

14  candidate has a write-in -- received 96.5 percent of Black support

15  and actually got 27.3 percent of overall support.  So a very

16  strong write-in campaign.  And that shows the racial cohesion,

17  racial element that we think is required for racial polarization.

18         But I think the plaintiffs have asked you that we just

19  sort of infer from the data that they provided in Dr. Palmer's

20  analysis from the partisan evidence.  And as we spoke about the

21  *League of Women Voters,* the recent case said, essentially, that

22  that should not be done.  And the District Court's opinion that

23  that case was appealed from, the District Court said something

24  very familiar, you probably heard this here today, that racial

25  partisanship are inextricably intertwined.

1          And then the court, the District Court found that --

2    this Court finds that white voters are likely to vote for the

3    Republican party, while Black voters -- Floridians are likely to

4    vote for the tax map party.  I think you called it science fiction

5    in certain terms, with the ability to separate those two.

6          And addressing that remark about science fiction, the

7    Eleventh Circuit said the Supreme Court has warned against

8    conflating discrimination on the basis of party affiliation with

9    discrimination on the basis of race citing *Brnovich.*  Partisan

10   motives are not the same as racial motives.

11         And so the evidence that you have before you asks you to

12   make that inference.  And we would submit that it is certainly not

13   appropriate for granting summary judgment in favor of the

14   plaintiffs, and I think we will show that it's worth granting

15   summary judgement in favor of the defendants on that issue.

16         THE COURT:  So you strongly disagree with Ms. Khanna

17   when says the law is set?  I shouldn't try to anticipate what the

18   Eleventh Circuit might do.  I should go with what the law says

19   right now.  So you disagree that the law is not set?

20         MR. JACOUTOT:  Yes, I agree that the law -- *Gingles 2*

21   *and 3* are not at issue.  We are saying, you just -- it's the

22   manner in which those factors are applied where there is a

23   discrepancy.  *Gingles 2 and 3* are not at issue.  The law is set,

24   and something more needs to be given -- remember, it is the

25   plaintiffs' burden at this juncture to give you something more

1  than partisan differences for you to make a judgment as to *Gingles*

2  *2 or 3*.  If you don't, you're necessarily inferring race where

3  they've only shown party, and as we seen in the *League of Women*

4  *Voters*, that is not a permissible thing for the Court to do.

5          I would also state --

6          THE COURT:  Maybe I misunderstood.  I thought Ms. Khanna

7  was saying, Judge, you need to stick with what you said in your

8  preliminary injunction order, that causation is irrelevant.  I

9  raised the *League of Women Voters* thing twice, but you're saying,

10  no, that's not the case, Judge.  The *League of Women Voters* has

11  said partisan bloc voting and racial bloc voting are different --

12  or the same, excuse me, in a sense, and that you need to show how

13  they're different at all.  Maybe I misunderstood Ms. Khanna's

14  argument.  I thought she was saying, Judge, the law is set, and

15  you're saying it is not.

16          MR. JACOUTOT:  Well, I think the term "causation" is

17  also a little confusing because there is a statistical term for

18  causation, which is as our experts have shown, is very different

19  from what we might consider is a legal term for causation.  We're

20  certainly not asking for a statistical cause of causation analysis

21  here.  Merely what we're saying is there has to be -- in order for

22  you to say that there is racially-polarized voting, there has to

23  be some evidence in the data that they present -- given that it is

24  their burden, there has to be some evidence beyond what they've

25  presented.  And it can look a lot like what *Wright v. Sumter*

1   *County said.*  But when I show you Dr. Palmer's analysis and you

2   watch the remarkable cohesion regardless of any sort of racial

3   factor, that's the whole ball game.  They are missing something

4   incredibly important for you to rule in their favor on *Gingles 2*

5   *and 3.*  And I want to be clear that we are not asking for some

6   sort of intent analysis.  We're not asking to get into the

7   motivation of the voter.

8            THE COURT:  I understand that.  You're not asking that.

9            MR. JACOUTOT:  Okay.  That's outside of our opinion and

10  our argument.  But there should be objective measurable factors

11  that you can pull from, and the plaintiffs have not shown us any

12  thus far.

13           So if you don't have any other questions, that's all I

14  have.

15           THE COURT:  Thank you, sir.

16           Before we start with the defendants' argument, let's

17  take a break.  It is 11:25.  I have 11:22.  I have to go to a

18  lunch meeting at 12:30.  So I would like to at least get through

19  the defendant's argument.  So let's come back at 11:35.  Okay?

20           THE DEPUTY CLERK:  This Court will be in recess until

21  11:35.

22           (Recess from 11:22 a.m. to 11:35 a.m.)

23           THE COURT:  Mr. Tyson, are you ready?

24           MR. TYSON:  I'm ready, Your Honor.

25           I spoke with Mr. Hawley and Ms. Khanna on the break, and

 1  we're going to see where we can get to before 12:30.  There's a
 2  lot of argument --
 3          THE COURT:  I have to stop at 12 and have you-all come
 4  back, unless you-all think you can do it in 20 minutes.
 5          MR. TYSON:  I don't think we can do that, Your Honor.
 6          THE COURT:  Here is the plan.  I have to be at the place
 7  at 12:30 and it will take 20 minutes for me to get there.  So
 8  we'll stop at 12 and start back at 2.
 9          MR. TYSON:  That works.  Thank you, Your Honor.
10          THE COURT:  This is a new 20 minutes.
11          MR. TYSON:  Thank you, Your Honor.
12          Brian Tyson for the defendants' again.  So when I talk
13  about our motion in Pendergrass, there are a couple of different
14  pieces -- a lot of what we already covered.
15          First, my state election board clients would always want
16  me to emphasize they understand why they're defendants in a lot of
17  the cases that they're defendants in, this one they don't.
18          THE COURT:  Why?
19          MR. TYSON:  And we would submit, they have no role in
20  the implementation of the plan and there is nothing in what the
21  plaintiffs have offered to show that they have a role in that, and
22  there is no reason to keep them in the case.  We can continue with
23  a separate hearing.  So I don't think I need to say more on that.
24          For *Gingles 1*, we've talked through already just the
25  differences of the districts.  And our submission would be that

1  since the plaintiffs have to come forward with a plan the Court

2  can order as a remedy, they've given the significant questions of

3  Mr. Cooper's inability to explain the other districts beyond

4  District 6 and how he fit District 6 back into the statewide plan,

5  that that's the failure of proof here.  So it is a little bit

6  different than the argument for the legislative districts, which

7  we'll talk about those in Grant, where we've said the racial

8  predominance element here is the lack of an explanation of how

9  this district fits back into the overall plan.

10       Mr. Cooper didn't have any explanation beyond population

11  equality or I think this place is closer than that place when

12  asked about several of the districts.  We've talked about District

13  3, District 10, and we believe that that is a requirement of the

14  proof.  It has to fit back into the plan, because it has to be

15  something that the Court can order.

16       So from our perspective, either it's a scenario where

17  the plaintiffs have failed to come forward with evidence on that

18  point, which means summary judgment for the defendants or --

19       THE COURT:  And the plaintiffs have argued that

20  Mr. Cooper's compactness scores are similar or identical to the

21  enacted plan.

22       MR. TYSON:  That's correct.  I don't think anybody

23  disputes the scores in those.

24       THE COURT:  But your argument is that he does not still

25  provide us with enough information about how he came about putting

1 | together this particular Congressional district?

2 | MR. TYSON:  Yes, Your Honor.  Because of the

3 | interconnected nature of districting, I think that's where we get

4 | back to.  It's like a water balloon, you squeeze at one point,

5 | it's going to pop out somewhere else.  That's the way population

6 | works.

7 | Mr. Cooper and the plaintiffs are saying you must draw

8 | District 6 or something very much like it on this plan.  Well,

9 | that leads to all of the other pieces on this plan.  It pushes

10 | District 13 from Fayette to Clayton, all the way out to Jasper

11 | County -- that pink district there at the bottom.  Mr. Cooper

12 | couldn't explain the very rural nature of Butts and Jasper

13 | connecting back with Clayton and Fayette.  It is those kind of

14 | things where the decision made at one point on the map affect the

15 | remainder of the map.  So, again, it's a little bit different

16 | argument overall, but I think at the end of the day, either this

17 | plan is not a sufficient evidentiary offering of a remedy, or in

18 | this case, we would receive summary judgment, or there are

19 | significant questions about the way Mr. Cooper drew this plan

20 | which goes to the weight the Court is supposed to give it as to

21 | whether it is a proper remedy, which means the plaintiffs don't

22 | get summary judgment and we're at trial.  So I think it's either

23 | one of those pieces of the puzzle.

24 | So with that I want to talk briefly also about

25 | proportionality that we raise in our briefs.  And I think the key

```
 1  point from LULAC here is, does the absence of this district
 2  constitute impermissible vote dilution.  That's the thing that
 3  proportionality is trying to get at.  And as De Grandy said, we
 4  know from the statute there is no right to proportionality.
 5            THE COURT:  True.
 6            MR. TYSON:  And we know that.  And then the question
 7  becomes how do we assess proportionality otherwise.  And right now
 8  in Georgia we have five districts, majority or not, that are
 9  electing the candidates of choice to the Black community and their
10  electing Black individuals to those offices.  That's more than a
11  third of the population.  So the question --
12            THE COURT:  I have a problem with that, though, Mr.
13  Tyson.  You are right.  You don't have a right to say we have 35
14  percent African-American population in Georgia, so 35 percent of
15  the Congressional district should be African-American.  We agree
16  with that.
17            MR. TYSON:  Right.
18            THE COURT:  You take it the other way, though, you're
19  saying, well, we only have five districts, we have 32 percent of
20  the population of Georgia is African-American.  Five out of 14 is
21  about 35 percent.  So it's not being diluted.
22            MR. TYSON:  And I think it gets to your evidentiary
23  question.  Is the election system that's happening here in Georgia
24  diluting the right to vote on account of race or color.  And if
25  the system is electing Senator Warnock statewide, if it's electing
```

1   35 percent of the members of Congress from Georgia as candidates

2   of choice of the Black community, where is the denial of equal

3   openness in the system under Section 2?  I think that's what

4   proportionality at the end of the day gets to.  And does it

5   require then in the light of that adding an additional district

6   where Black voters are entitled to elect the candidate or have an

7   opportunity to elect the candidate of choice.  Because then we get

8   6 districts out of 14 in that scenario.  So does Section 2 compel

9   that outcome when the political system looks like it looks for

10  Georgia overall.  And I think that's the key for proportionality.

11          THE COURT:  What about the individuals, though, in that

12  district, proposed District 6?  What if I'm saying to them, taking

13  your arguments that, look, 35 percent of the Congressional

14  districts in the State of Georgia are represented by

15  African-Americans and, therefore, there is no vote dilution.  But

16  if you're in that district and you're saying but I don't -- I'm

17  not represented by an African-American.  I don't know if it's

18  compactness here --

19          MR. TYSON:  Certainly, Your Honor.  And I think the

20  key -- it gets us back to the obligation to kind of push, pull,

21  haul, trade in the political process.  That's ultimately where we

22  get to.  Because the same could be said of a white Republican

23  voter in District 7 or District 5 in Atlanta.  I may look and say,

24  well, I cannot ever elect the candidate of my choice either.

25          So the question is not so much can a particular

 1  political outcome happen, I think that's where we start straying

 2  you to is this a Constitutional -- are we interpreting Section 2

 3  in a way that raises questions about its constitutionality if it's

 4  compelling a political outcome.

 5         The question is, is the system equally open?  Is there a

 6  right to vote that's being abridged in some way on account of race

 7  or color, and we can do something about that.  So I think that's

 8  where -- I understand the frustration everybody has had -- various

 9  points lived in districts that you didn't like the member that was

10  elected from that.  But the question is does it violate Section 2,

11  and we submit that it does not.

12         With that, Mr. Jacoutot has a few more points on prongs

13  two and three.

14         THE COURT:  Okay.  Thank you.

15         MR. TYSON:  Thank you.

16         MR. JACOUTOT:  I'm going to say good afternoon, Your

17  Honor.

18         THE COURT:  Almost.

19         MR. JACOUTOT:  So I have a few more things to discuss

20  about *Gingles 2 and 3*.  I want to bring up the senate report,

21  because it does I think inform Justice White's concurrence in

22  *Gingles*.

23         The senate report made pretty clear that the amendment

24  restores the legal standards based on the controlling Supreme

25  Court precedents according to *Mobile v. Bolden*.  And Justice

1   O'Connor said that amended Section 2 was intended to codify the

2   results test employed in *Whitcomb* and *White.*  And both *Whitcomb*

3   and *White* were written by Justice White.  So I think those helped

4   inform his concurring opinion.

5           And just briefly looking at the text in the -- which I

6   know you have seen, but it's important to note that the touchstone

7   is whether the political processes are equally open in that -- or

8   not equally open in that the members of the class of citizens

9   protected by Subsection A have less opportunity than other members

10  of the electorate to, one, participate in the political process;

11  and, two, to elect representatives of their choice.

12          Justice Brennan's -- excuse me.  Justice Brennan's view

13  on the *Gingles* factors 2 and 3 really only looks at number 2 and

14  it doesn't consider number 1, and we would submit that both of

15  those needs to be considered under *Gingles 2 and 3*.  And looking

16  to what Justice White's opinion was in *White,* he said it is the

17  plaintiff's burden to produce evidence and to support findings.

18  And then he goes on to use language almost identical to that which

19  is used in the statute.  In fact, the statute was taken from that

20  language.

21          And in this portion he cites himself in *Whitcomb*.  And

22  in *Whitcomb*, it's very clear that Justice White was worried about

23  Section 2 being morphed into a partisan equality, a law that

24  protects political parties or interest groups instead of what it's

25  supposed to do, which is to protect the electorate against

 1  invidious discrimination by a majority.  He said that the voting

 2  power of the plaintiffs in *Whitcomb* may have been cancelled out in

 3  that they lost and as the district court held.  But that seemed to

 4  him like a mere euphemism for political defeat at the polls.  So

 5  partisanship was very much on his mind in that case.

 6          And a reverse in district court, Justice White held that

 7  the district's court standard was, again, expressed in a more

 8  general proposition that any group with distinctive interests must

 9  be represented in the Legislative halls if it's numerous enough to

10  command at least -- that's a typo -- command at least one seat and

11  represent a majority living in an area sufficiently compact to

12  constitute a single-member district.

13          Now if that sounds like *Gingles 1, 2 and 3* as Justice

14  Brennan interprets it, it is because it's very close to that.  And

15  he was worried about that eventuality.

16          And returning to his opinion in *White* -- or, excuse me,

17  in *Gingles*, he says:  I do not agree with how Justin Brennan

18  states part III-C.  He says, this is interest group politics.  And

19  he says, it seems quite at odds with the discussion in Whitcomb.

20  It also could be read that it seems quite at odds as my opinion in

21  *Whitcomb*.  So he wrote that.

22          In closing, racial polarization under *Gingles 2 and 3* as

23  the majority of concurring justices saw it, requires more than

24  mere differential voting patterns and it requires it at the

25  *Gingles* precondition stage.  If it doesn't, as Mr. Tyson alluded

```
 1   to earlier, it potentially raises serious Constitutional questions
 2   as to the ongoing viability of Section 2.  And we have our
 3   Hornbook law here, McCulloch v. Maryland.  But that -- that is,
 4   essentially, what leads to congruence in proportionality
 5   requirements so that Section 2 be adopted with the injury to be
 6   prevented or remedied in mind.  So Section 2, it becomes just a
 7   device to protect political parties and interest groups.  It is
 8   beyond that Section 2 of the Fifteenth Amendment enforcement
 9   authority granted to Congress, and its Constitutional viability
10   becomes very much in question.  The way to stop that is
11   interpreting Gingles 2 and 3 appropriately so that something
12   beyond mere partisanship shows a violation.
13            So in conclusion, I think the defendants' interpretation
14   is faithful to the majority of justices' view on the necessary
15   evidence to establish racially-polarized voting.  I think it is
16   faithful to the text of Section 2 of the Voting Rights Act as
17   amended by Congress.  I think it's faithful to the pre-Bolton
18   Supreme Court precedent under Whitcomb and White that Congress
19   expressly sought to restore.  And I think it's faithful to the
20   scope of Congressional authority outlined by the Constitution.
21            So if you don't have any other questions -- I'm happy to
22   answer any that you might have.  But with that, I can sit down.
23            THE COURT:  Thank you.
24            We'll have the response after lunch, unless you think
25   you can do it in ten minutes.  But I don't want to rush you.  I
```

1  want you to take all the time that you will need.

2          MS. KHANNA:  I will take the lunch, Your Honor.

3          THE COURT:  We'll start back at 2.

4          (Recess from 11:50 a.m. to 2 p.m.)

5          THE COURT:  I'm ready to resume.

6          MS. KHANNA:  Your Honor, good afternoon.

7          I want to respond to a few points raised by defendants

8  and their arguments in support of their motion for summary

9  judgment.  There is going to be some overlap.  I'm going to try

10 not to repeat myself for the court, because I think there are ways

11 to kind of pinpoint --

12         THE COURT:  Don't worry about it.  You just say what you

13 have to say.

14         MS. KHANNA:  It's notable, Your Honor, when it first

15 comes to *Gingles* 1 that counsel's -- Mr. Tyson's first slide

16 jumped first to a picture of illustrative Congressional District

17 3.  Defendants are making a point of looking everywhere but the

18 actual illustrative district to try to find some dispute of facts,

19 let alone some dispute of material fact.  And I believe Mr. Tyson

20 said something, like, you cannot look at the illustrative district

21 in isolation.  But *LULAC* on 548 U.S. at 429 specifically said when

22 it's considering Section 2 liability in District 23, considering

23 the district in isolation, the three *Gingles* preconditions are

24 satisfied.  It then goes on to reject the state's attempt to look

25 somewhere other than the actual Section 2 district at issue.

1        So this is, in fact, the law.  The law that, frankly,

2   defendants rely upon when they repeatedly site *LULAC*.   *LULAC*

3   specifically says it is the minority population in this district.

4   And that is the subject of the examination, and it is notable that

5   that is not the subject of dispute here.

6        Defendants' counsel also talked about the need for the

7   illustrative plan as a whole to be a viable remedy.  That was the

8   basis, I think, that their argument for looking at districts other

9   than the illustrative district.  But the cases on which they

10  relied, *Nipper -- cases like Nipper* where the issue there is

11  whether the remedy that plaintiffs are seeking, which is complete

12  overhaul to the way an election system is run -- in that case the

13  election of judges -- whether that is a feasible remedy.

14       There's no -- so, for instance, in this case, if

15  plaintiffs were asking for a 15th or 16th Congressional district,

16  that would be a remedy that we would really have to prove up that

17  could possibly even be conceivable by this Court.  That's not the

18  case here.  We're talking about single-member district maps just

19  like the one that is enacted.  Those maps, as we know from the

20  recent Fifth Circuit decision in *Robinson v. Ardoin*, they do not

21  have to be perfect.  They do not have to be the map.  They're just

22  that, they're illustrative.  I believe that counsel said that the

23  Court has to be able to -- it has to be something that the Court

24  can order.  And they've identified no reason why the Court

25  couldn't order a 14-District map like the ones in place of

1  illustrative district.

2           Mr. Tyson's only real complaint with the other

3  districts, even if we were to look at them, even if they were part

4  of the agreement, is what he referred to as the inability of

5  Mr. Cooper to explain his reasoning behind them other than

6  population equality and county boundaries -- which was his reason

7  for explaining.

8           Now, it's important to note they're not arguing, for

9  instance, that the creation of our illustrative district

10  necessitates some kind of racial gerrymander in an adjacent

11  district.  They're not even arguing the creation of our

12  illustrative districts create some serious non-compactness problem

13  in an adjacent district.  They're really just taking issue with

14  the fact that they don't like his explanation for why you did this

15  and that in north Georgia, in south Georgia, in east Georgia, none

16  of which are at issue in this case.  That is not a legal basis.

17  That's not a factual basis for denying summary judgment here.

18           Before I move onto *Gingles* 2 and 3, I just want to

19  briefly touch on proportionality.  I know that's not part of the

20  *Gingles* 1 analysis.  And, frankly, as we've already discussed,

21  this is part of a senate factors analysis that the Court can

22  clearly defer to a fact-finding stage.  They are not part of the

23  salvaging the *Gingles* preconditions.  But I do want to clear up

24  what I think is a serious misconception.

25           Defendants have effectively invented a new standard for

```
 1  proportionality, one that is inconsistent with the binding
 2  precedent.  De Grandy and its progeny are clear, the proper method
 3  for proportionality inquiry is the number of majority/minority
 4  districts.  Not the number of districts where the
 5  minority-preferred candidates prevail.  At most, only four of
 6  Georgia's 14 districts are majority Black.  It's 29 percent, while
 7  the state's Black population is, roughly, 33 percent.
 8          Now, proportionate -- as we've already discussed,
 9  proportionality is never an absolute bar in any event.  But here
10  it does not even weigh against the finding of vote dilution.
11          Now defendants focus on what they call five majority/
12  minority districts or minority opportunity districts.  Notably,
13  they're not majority Black districts.  They're including districts
14  where different minority groups are joining together in coalition
15  and forming a majority for voting age population.
16          Now, if that is the metric that they would like to use,
17  then the appropriate apples to apples comparator is the minority
18  population of the State of Georgia.  That is not 33 percent.
19  That's the Black population.  The minority population of the State
20  of Georgia is just under 50 percent.  It's 49 percent.  So by that
21  logic that the minority opportunity districts that they say would
22  require -- would be proportionately, would be half of 14
23  districts.  Five is nowhere close.
24          And on this point, Your Honor, I want to note that
25  defendants vigorously object to any remedy noted that place
```

1  minority voters at some kind of parity with their share of the

2  site-wide population.  But it's interesting to note that they have

3  no such qualms about white over representation in the enacted map.

4  Right now white voters are a majority in nine of the states 14

5  Congressional districts -- 64 percent even though they comprise a

6  razor-thin majority of the state's population.  Even if a fifth

7  majority black district were added pursuant to our claim, 57

8  percent of the districts would still remain majority white.  If

9  there is a proportionality problem, it is not because Black voters

10  are trying to get more than their fair share.

11          I want to move onto the *Gingles* 2/3 analysis that

12  Mr. Jacoutot addressed.

13          I believe Mr. Jacoutot said something along the lines of

14  *Gingles* 2 and 3 are not at issue.  If the inference is that you

15  draw from those factors, that cannot be done on summary judgment.

16  I think that is a very telling statement, because what cases like

17  *Nipper* have told us is that the mere existence and establishment

18  of *Gingles* 2 and 3 necessarily create an inference of the racial

19  bias and the account on account of race that the defendants are

20  talking about.

21          As a matter of law, the establishment of *Gingles* 2 and 3

22  creates the inference.  That's not something that the Court has to

23  weigh or consider, that is as a matter of law.  And when it comes

24  to the other factors, the other inferences that can be made to

25  maybe outweigh or counter that, that is part of the totality

1  analysis.  That's what *Nipper* says.  It is not part of *Gingles* 2

2  and 3.

3      Mr. Jacoutot also said several times that it is

4  plaintiff's burden to show the cause behind *Gingles* 2 and 3.  He

5  specifically said there has to be some evidence beyond the *Gingles*

6  factors to establish the *Gingles* factors.  There is not a single

7  case that says that, Your Honor.

8      THE COURT:  Would it be fair to say, hypothetically, if

9  I maintain my ruling in the preliminary injunction hearing in this

10  case and say the law is what I said it was there, then I should

11  grant summary motion for two and three?

12      MS. KHANNA:  Absolutely.  And the law is what Your Honor

13  said it was.  When it comes to the *Gingles* preconditions, there is

14  no reasonable dispute about that, because there is no -- Mr.

15  Jacoutot could not point to a single case that says it is

16  plaintiffs' burden to establish some evidence beyond the *Gingles*

17  factors when proving the *Gingles* factors.

18      THE COURT:  I think what Mr. Jacoutot was doing, and I

19  may have led him this way, the cases that have come out since the

20  preliminary injunction hearing are not Section 2 cases.

21      MS. KHANNA:  Right.

22      THE COURT:  They were 14th and 15th amendment

23  Constitution cases.  But you are a very good lawyer.  You

24  sometimes try to read what the appellate courts may be

25  telegraphing to you.  That is kind of what I was doing last week.

1    Are they telegraphing me something here?  But you're right.  They

2    weren't Section 2 cases.  They were 14th and 15th amendment cases.

3    But I can't say that Mr. Jacoutot was completely off base because

4    you've got it at some level.  Maybe they're saying for these 14th

5    and 15th amendment cases it might apply.  But I understand what

6    you're saying, Judge, that's not the law.

7               MS. KHANNA:  Well, Your Honor, let's look at that case.

8    Let's look at the *League of Women Voters* case that was discussed.

9    But I understand the concerns raised there.  That was a Section 2

10   intentional discrimination case.  It's not a redistricting case,

11   not a *Gingles* case, it's an intent-based claim.

12              The paragraphs that Your Honor mentioned and that Mr.

13   Jacoutot mentioned about the distinguishing between racial animus

14   or racial discrimination and partisan discrimination, have

15   absolutely nothing to do with any discussion with the *Gingles*

16   preconditions, have absolutely nothing to do with any discussion

17   of racial-polarized voting.  Instead, in context of an intentional

18   discrimination claim, the Court said we should be mindful of the

19   fact that we're looking at racial discrimination and not solely

20   partisan discrimination.

21              There is one important sentence that was left out of

22   defendants' analysis of that paragraph in the *League of Women*

23   *Voters* case.  In that same paragraph that Mr. Jacoutot cited, the

24   Court says in the --

25              THE COURT:  What is it?

 1          MS. KHANNA:  The site is -- it is Star 6 of the *League*
 2  *of Women Voters*' opinion on Westlaw page 7, if that is at all
 3  helpful.
 4          And, again, this is in the intentional discrimination
 5  context.  To be sure, as the organizations point out,
 6  intentionally targeting a particular racist's access to the
 7  franchise because its members vote for a particular party is
 8  impermissible.
 9          The Court there acknowledges, as it must, that you
10  cannot disenfranchise -- and that's a vote denial case -- you
11  cannot disenfranchise a racial minority because of the way they
12  vote.  And that kind of -- you can call that political, but that
13  is race-based discrimination.
14          So even the very passages that Mr. Jacoutot chose to
15  rely on in that case, which again is an intent-based claim, don't
16  suggest that plaintiffs have any burden to completely separate and
17  disentangle race from party as if they are two entirely separate
18  and different things.
19          The actual case law at issue here when it comes to the
20  *Gingles* preconditions two and three, say that it is, in fact,
21  defendants' burden.
22          THE COURT:  Well, Mr. Jacoutot may have overlooked one
23  section of that *League of Women Voters* case, though.  On page 15,
24  I don't know if it's the same one you have, the Supreme Court has
25  warned against conflating discrimination on the basis of party

 1  affiliation with discrimination on the basis of race.  The

 2  partisan voters are not the same as racial voters.  Be sure an

 3  organization -- as an organization pointed out, intentionally

 4  targeting a particular race with respect to the franchise because

 5  if its members vote a particular partisan is impermissible.  And

 6  that's kind of where this Court is at, but I see your point.  I

 7  see his argument is just what I'm saying.

 8       MS. KHANNA:  No, I completely understand, Your Honor.

 9  Actually, read the last sentence of that paragraph.

10       But we must be careful not to infer that racial

11  targeting is, in fact, occurring based solely on evidence of

12  partisanship.  We do not have evidence solely of partisanship.

13       And, in fact, the Eleventh Circuit standard tells us

14  that if the defendants want to argue that it is solely

15  partisanship or it is not or something other than race, it is

16  their burden to put that evidence forward.  They do not even

17  grapple with that legal standard, Your Honor, and for good reason,

18  because they have put no evidence here.  The only evidence they

19  have on *Gingles* 2 and 3 is Dr. Alford's report and his testimony

20  here.  What we know about Dr. Alford, and these are undisputed

21  facts, is he testified that the objective facts listed in

22  Dr. Palmer's report, the objective facts about racial-polarized

23  voting are consistent with both race and party as a cause.

24       He has testified that race likely plays a role -- he

25  agreed that race likely plays a role in shaping the voters'

```
 1  partisan preferences.  And he testified that he conducted no
 2  analysis of his own to determine what factor other than race would
 3  be driving these polarized-voting results.  He opined that maybe
 4  it's partisanship that is doing some of the work here.  He
 5  inferred from the undisputed data, but he did not actually do
 6  anything to further the ball on defendant's burden to establish --
 7  to counter the inference of racial bias at play that is created by
 8  the satisfaction of Gingles 1 -- 2 and 3.
 9           THE COURT:  Here is what caught my attention when I was
10  reading this these last few weeks.  The argument is that you don't
11  want to seem like you're favoring one political party over
12  another.  In doing this, if one race is voting particularly
13  Democrat and you say, well, that's just the way it is.  That's,
14  basically, what I was saying.  So far that's the way it is.  But
15  they argue, well, you can't favor one political party over
16  another, and if you have one race that is voting particularly for
17  one party, could it not be argued that if you go and start making
18  changes you really have to make the changes based on the political
19  party?
20           MS. KHANNA:  No, Your Honor.  I think the premise of the
21  question, where you started, Your Honor, was that's just the way
22  it is.  That Black voters are voting for Democrats and white
23  voters are voting for Republicans.  That's not just the way it is.
24  There's not some generic component to party affiliation that
25  requires or that predisposes Black voters to vote for Democrats.
```

```
 1  And while it is not plaintiffs' burden to disprove factors other
 2  than race, even if in that context plaintiffs did provide plenty
 3  of evidence in the report of Dr. Burton that says it's not just
 4  the way it is when it comes to partisan affiliation of different
 5  issues.  In fact, Dr. Burton testifies, unrebutted testimony, race
 6  is the driving factor in determining partisan preferences in
 7  Georgia precisely because of the racial policies embraced by the
 8  political parties, both historically and in the present day.  It
 9  is not an accident of -- of politics that we're seeing this racial
10  polarization among the two political parties.  It is because of
11  the racialized policies those parties have.  That is the evidence
12  that plaintiffs has put forward to do as Your Honor has suggested,
13  like, is there a way to explain the causes here.  We have provided
14  that evidence.  Defendants have not rebutted that evidence.
15  Defendants have not even addressed that evidence.
16          I believe we raised Dr. Burton's testimony in each of
17  our briefs.  I don't believe that defendants have once actually
18  engaged in that testimony.  In fact, their expert Dr. Alford, who
19  is their only expert on racially-polarized voting and purports to
20  opine on the partisan basis of polarized voting, did not even read
21  Dr. Burton's report.  Did not even engage with plaintiffs'
22  evidence.  Forget doing his own analysis there.
23          THE COURT:  So would it be better for this Court to say
24  causation is irrelevant?
25          MS. KHANNA:  It would be -- I think under the standard
```

1  in *Nipper*, the causation question is, A, deferred to the totality

2  of circumstances; and, B, the burden of defendants once plaintiffs

3  have established *Gingles* 2 and 3.  That is the accurate statement

4  under the law.

5         I want to address the issue that -- we talked a lot

6  about Justice White's concurrence in *Gingles*.  And I think, again,

7  I just think looking at the actual cases, looking at *LULAC*,

8  looking at *Gingles*, looking at the *League of Women Voters*, I think

9  we will learn a lot more than just kind of pulling out the quotes

10 that each side likes the most.

11        Justice White's concurrence in *Gingles* -- I thought it

12 was three paragraphs.  Essentially two paragraphs long.  We can

13 read it together.  I won't tire the Court with that right now.

14        But Mr. Jacoutot pointed out, though, highlighted the

15 key sentences.  One is:  "I do not agree;" and two is:  "This is

16 interest group politics rather than a role hedging against racial

17 discrimination."  What he did not quote was the sentence precisely

18 before that.

19        Before that Justice White says that the reason that he

20 believes the race of A candidate might be relevant, because I take

21 it that otherwise there would be a violation in a single-member

22 district that is 60 percent Black but enough of the Blacks vote

23 with the whites to elect a Black candidate who is not the choice

24 of the majority of Black voters.  This is interest group politics

25 rather than a rule hedging against racial discrimination.

1          What Justice White was hypothesizing in that case -- it

2   was not the actual case -- but he was, basically, making the

3   assumption, well, if Black voters are only faced with the choice

4   of white candidates, they're not really going to be cohesively in

5   support of any one of those candidates.  They're going to break

6   either way or maybe slightly in one way.  That is the hypothetical

7   on which Justice White's concurrence was based in which he said:

8   "You can't say the race of the candidate is never relevant."

9          In *Nipper*, the court follows up on this in the Eleventh

10  Circuit.  In *Nipper*, Tjoflat says when it comes to the White v.

11  White elections, such elections may reveal little about the issue

12  to be determined.  Particularly where voting is extremely

13  polarized by race in an election in which Black candidates

14  participate, white on white elections in which a small majority or

15  a plurality of Black voters prefer the winning candidate seem

16  comparatively less important.

17         The very important qualifier there is for white on white

18  elections is the assumption that in those elections, that Black

19  voters will be kind of divided among their options.  That is not

20  the case here.  Those assumptions have not proven true, and

21  they're certainly not proving true here where the undisputed facts

22  show that there's not just cohesion, there is extreme cohesion.

23  There is 98 percent Black cohesion for Black-preferred candidates

24  regardless of their race.  So are not -- this case does not fall

25  within the ambit of the concerns expressed by Justice White in his

 1  concurrence.

 2          The last thing I'll say, Your Honor, and I promise this

 3  is the last anything.

 4          THE COURT:  I have one question before you finish.

 5  Finish your argument.  It is something a little different.

 6          MS. KHANNA:  I want to go back to the political -- to

 7  the idea about partisan politics instead of race.

 8          The defendants have done everything they can to make

 9  this a case about partisanship rather than of race.  And to

10  affirmatively -- and they have even affirmatively stated that the

11  Legislature had a partisan reason to redraw the Atlanta Metro area

12  the way they did.

13          Now, as plaintiffs unrebutted evidence has demonstrated,

14  this distinction between partisan and race that they draw is

15  actually not substantiated by the evidence -- theirs, and ours,

16  obviously, refute it.  But even setting that aside, the defendants

17  cannot escape the requirements of Section 2 simply by trying to

18  make this a case about politics.  We know that once again because

19  the Supreme Court told us so *LULAC*.

20          In *LULAC* the State of Texas had a partisan explanation

21  for what it did in District 23.  It explained that it did not draw

22  a minority opportunity district where Section 2 required one in

23  the interest of protecting a Republican incumbent.  The Court

24  flatly rejected this justification explaining, quote, this policy

25  whatever its validity in the realm of politics, cannot justify the

```
 1  effect on Latino voters.  And here, Your Honor, Georgia's apparent
 2  policy preference for ensuring greater Republican success cannot
 3  justify the effect on Black voters, which is a violation of
 4  Section 2.
 5          I'm happy to answer your question.
 6          THE COURT:  One of the questions raised regarding the
 7  Board of Election, board individuals, why should they remain in
 8  this case?
 9          MS. KHANNA:  Your Honor, I think we've explained -- in
10  our papers we addressed the fact that as a legal matter, as a
11  statutory matter, the board has a legal responsibility to oversee
12  fair elections.  That responsibility is shared with the secretary
13  under statute.  Unlike in the Jacobson case that the defendants
14  rely upon, that's where the Court found that the secretary that
15  was sued there had no responsibility for overseeing the
16  implementation of the law.  That is just not the case here as a
17  matter of law.
18          THE COURT:  But the board is going to supervise the
19  election regardless whoever I say or the General Assembly says --
20  it's an elected situation.  But we have a Sixth District that's
21  also selected.  If we don't add one -- in other words, what effect
22  do they have other than the fact that they supervised the
23  election?  The Secretary of State supervises the election.  But
24  I'm trying to figure out what effect does this case have on them
25  or they have on this case?
```

1          MS. KHANNA:  Well, that's a fair question, Your Honor.

2     I think ultimately the reason why these kinds of cases sue

3     executive officials is because the injunction that plaintiffs are

4     seeking is against the implementation of the map.  And regardless

5     of who drew the map, it is the secretary in conjunction with the

6     state board who overseas the implementation of the map.  To enjoin

7     them is to enjoin the map.

8          THE COURT:  Yes, but they're not in this case and the

9     Secretary of State Raffensperger is still in this case.  What

10    effect does that have on your case?

11         MS. KHANNA:  Your Honor, if this Court decides that as a

12    legal matter that they're a nonprobative defendant here, doesn't

13    have any effect on the ability for us to continue to litigate our

14    case.  Certainly, we are cognizant of the *Jacobson* case, and the

15    Eleventh Circuit's decision that somebody must or must not be in

16    the defendant's seat --

17         THE COURT:  I've been doing Fair Fight for five years.

18    I know the *Jacobson* case quite well.  I can assure you, that if I

19    take the State Election Board out of this case, Mr. Raffensperger

20    is still going to meet all of the objective requirements.

21         MS. KHANNA:  Then on that argument, Your Honor, we will

22    rest on our papers.  And I see your point that it will not have a

23    practical effect of bringing this case to a halt or dismissing it.

24         THE COURT:  Thank you.

25         MS. KHANNA:  Thank you, Your Honor.

1          THE COURT:  You have some time left.  So do you --

2          THE DEPUTY CLERK:  Yes, you do.  Ten minutes.

3          MR. TYSON:  Thank you, Your Honor.  I will endeavor not

4    to use all of the ten minutes.

5          THE COURT:  You could if you need to.

6          MR. TYSON:  Just a couple of little points in response

7    to Ms. Khanna's arguments.

8          Just so that we are abundantly clear, the secretary

9    builds the ballots, as the evidence shows in this case, and I

10   think an injunction against the secretary about the ballots is

11   enough to get you to where you need to go remedy-wise.  The State

12   Election Board's evidence shows they had no role in that process.

13   So that settles that issue.

14         On *Gingles* 1, I think Ms. Khanna's argument there kind

15   of points out the difficulty we're facing of fitting this case

16   into the general multi-member at large world that Section 2

17   emerged from.

18         We've got -- we have to find a remedy the Court can

19   order.  And the reason for all those Eleventh Circuit cases about

20   the types of remedies in judicial cases and the other cases was,

21   we had to look at what can a court actually do here.  And because

22   it is a part of that element of proof -- that's what the

23   plaintiffs have to show -- here's something you can order, Judge,

24   that fits into the larger issues.  And we would submit -- and

25   again I don't have a case that says this -- but something that

1 could fit with the policy roles the Legislature shows but for

2 whatever the failing is.  Like, where did the Legislature go

3 astray from the requirements of federal law related to the

4 creation of this district?  And if the only way to create the

5 district is to create a number of other districts around it that

6 can't be explained, that don't meet up with other factors that the

7 Legislature was considering, I think that is a significant issue

8 as to whether it is an appropriate remedy.  And so we looked at

9 all those districts, and we don't need to go back through that

10 again.

11          In terms of the proportionality arguments, again, I

12 think the challenge there is proportionality goes primarily to

13 this question is there equal openness in the political process.

14 And so when you look at the process, we're not relying on

15 districts that are majority non-white as a basis for

16 proportionality.  What we're saying is you have districts across

17 the State of Georgia that are electing candidates preferred by the

18 Black community.  You have the State of Georgia as a state

19 electing candidates that are preferred by the Black community.

20 That goes to the question of the equal openness of the process

21 overall, and that's, I think, the important point on that.

22          Again, what did Section 2 require the state to do in

23 terms of providing those opportunities beyond what's it's arguing.

24 That's the issue for that piece.

25          Ms. Khanna talked -- Mr. Jacoutot will talk about

1   *Gingles* 2 and 3 here in a minute.  But I think an important

2   evidentiary piece at this point is she talked, again, about the

3   inferences that come from that.  And, again, I think that

4   inference only arises once you've met the burden, once you've come

5   forward with the evidence.  And the submission we're looking at

6   here is, we have no evidence that voter behavior changes in the

7   slightest based on the race of the candidates.  The concerns of

8   Justice White's and the concerns from Judge Tjoflat, in the

9   situation where partisanship are -- partisanship, where you have

10  the right type of scenario, where voter behavior changes when

11  there are two white candidates, for example, that would tend to

12  indicate that you do have racially-polarized voting there, not

13  partisanship.  Because you see voter behavior changing when the

14  race of the candidate changes.

15          That's not the evidence we have here.  The evidence we

16  have here with no preliminaries, just only general elections is

17  that voter behavior doesn't change based on the race of the

18  candidates.  And I think that's the key point, that the plaintiffs

19  need to come forward with something more than just voting is

20  polarized in a general electrician.  Maybe they could have looked

21  at primaries or looked at other issues, but they haven't done that

22  in this case.

23          So with that, Your Honor, I will turn it over to Mr.

24  Jacoutot and finish up our piece of evidence.

25          THE COURT:  Thank you, Mr. Tyson.

1          Mr. Jacoutot.

2          MR. JACOUTOT:  I don't have any additional slides for

3   you today.  I just wanted to respond to Ms. Khanna's argument

4   there saying that we sort of conceded that *Gingles* 2 and 3 were

5   established.  I don't think that we did.

6          In order to establish *Gingles* 2 and 3 and get that

7   inference in your favor that was spoken of in *Marengo County*,

8   there still has to be some underlying evidence of something behind

9   partisan motivations.  We're saying they haven't established two

10  and three under the appropriate standard.  So they don't get that

11  *Marengo County* inference.

12         THE COURT:  Well, let me ask you this first.  If the

13  Court may reject your argument regarding two and three, racial

14  bloc voters compared to partisan bloc voters, do you concede then

15  that they should receive summary judgment on two and three?

16         MR. JACOUTOT:  I don't know if they could get summary

17  judgment on it.  I think that we still would be able to show

18  partisan motivation at trial, maybe with the evidence that we have

19  that Dr. Alford provided, for instance, the Herschel Walker race,

20  things like that, adding that in.

21         THE COURT:  I don't know if I follow you on that.  In

22  other words --

23         MR. JACOUTOT:  Well, I think that is something that

24  would have to be weighed.  You could weigh Dr. Alford's evidence

25  of that primary against the evidence that the plaintiffs have

 1  provided.  But at the end of the day if --

 2          THE COURT:  If I reject your arguments regarding racial

 3  bloc voting and partisan bloc voting and maintain the prior ruling

 4  that I made, I don't know what we are left to argue.

 5          MR. JACOUTOT:  Yes.  I'm sorry, I misunderstood you.  If

 6  you reject that argument, then I think at two and three you would

 7  be able to grant summary judgment on that.  But that doesn't mean

 8  that racial polarization is established.  At that point, racial

 9  polarization kicks to the totality of the circumstances analysis,

10  and that would be our opportunity at trial to show, yes, they've

11  shown what we call partisan polarization and here's why.

12          THE COURT:  Under your Constitutional argument, would

13  Section 2 be unconstitutional if the Court -- I mean, were to

14  consider the partisan issue at the totality of the circumstances

15  phase instead of the *Gingles* precondition phase?

16          MR. JACOUTOT:  I think it would be a little redundant to

17  consider -- effectively, *Gingles* 2 and 3 is considering the racial

18  polarization question.  And then we say, historically, we'll allow

19  another inquiry into racial polarization at totality of the

20  circumstances.  I don't think that's necessary.  But the racial

21  polarization senate factor is just that, it's a senate factor from

22  the report.  It is not part of the case law, except to the extent

23  that racial polarization appears in *Gingles* 2 and 3.

24          So to answer your question, I think that that would be

25  probably an unconstitutional view of Section 2 in this instance

1  where the only evidence that's been presented is clearly along

2  partisan lines.

3          If there's conflicting evidence that -- if there was a

4  traditional *Marengo County* or *Wright v. Sumter* case, I think you

5  can avoid two and three and then we can go to -- ask another

6  totality of circumstances, if there was evidence in the record

7  like that.  But since we don't have that, I think it would be

8  improper to, essentially, say let's take this question up later.

9  I think it should be taken up now.

10          THE COURT:  All right.

11          MR. JACOUTOT:  And I think that's all I have, Your

12  Honor.  So you if you don't have any other questions...

13          THE COURT:  Thank you, sir.  Okay.

14          I think we now move to Grant's argument for motion for

15  summary judgment argument.

16          MR. HAWLEY:  Good afternoon, Your Honor.  May it please

17  the Court, Jonathan Hawley on behalf of the Grant plaintiffs.

18          Now, I'm going to start with some good news.  As the

19  Court is aware, the Grant plaintiffs' evidence and arguments

20  overlap considerably with Pendergrass plaintiffs.  So I'm not

21  going to repeat the things that Ms. Khanna has already said.

22          Instead, I want the focus to begin on the first *Gingles*

23  preconditions.  And so that's where most of the distinctions

24  between Grant and Pendergrass can be found.

25          I want to begin with *LULAC v. Perry*.  We talked a lot

1   about this case over the last few hours, and I thought it would be
2   helpful to actually take a look at it.
3            Now, defendants rely heavily on the *LULAC* case, and they
4   argue that our cases here are analogous to that one.  But that
5   just isn't so.  As we can -- so this is the map that was at issue
6   *in LULAC*.  And the Section 2 discussion in that case, which it was
7   actually drawn by a majority of the U.S. Supreme Court.  It is a
8   polarity opinion overall, but the Section 2 was enjoined by a
9   majority of the court.  And the district at issue there was
10  Congressional District 25.  And it's circled there.  It's a little
11  hard to see, but it's that gray district there.  It snakes for 300
12  miles from Austin and central Texas down to the Rio Grande valley.
13           As we've discussed, the Supreme Court concluded that
14  District 25 was not compact.  Not only because of its size and
15  it's meandering shape, but because it grew the Austin Latino
16  population in an urban and suburban area with Latino communities
17  along the Mexico boarder who were separated not only by hundreds
18  of miles, but vastly different lived experiences, needs,
19  socioeconomic interests and so forth.  That is what noncompactness
20  looks like.
21           Now, I want to start by looking at it, because when
22  we're talking about compactness, the eyeball test is a good place
23  to start.  That's just what the Fifth Circuit noted last year in
24  the *Robinson v. Ardoin* case.  It's a helpful place to get your
25  grounding.

1          And so now that we're primed, I would like to look at

2     the six districts that Mr. Esselstyn drew in this case in which we

3     are now seeking summary judgment.

4          Illustrative Senate Districts 25 and 28, as you can see,

5     are geographically confined to the southern Atlanta metropolitan

6     area.  Illustrative Districts 64 and 117 are also small districts

7     in the Atlanta metro area.  And illustrative House Districts 145

8     and 149 are small districts anchored in Macon-Bibb County.

9          All six of these districts satisfy the *Gingles*

10    numerosity requirement.  They have 50 percent Black voting age

11    population.  There is no dispute on that point.

12         And all six of these districts are compact as well.  And

13    we know this not just because of the eyeball test, but as a

14    quantitative matter as well.

15         Mr. Esselstyn supplied these charts in his report that

16    show the compactness scores for his illustrative districts as

17    compared to the range of the compactness scores of the enacted

18    districts.  And the illustrative districts fall well within range

19    of normal districts under the enacted plan both for the State

20    Senate and for the House.  Mr. Esselstyn's illustrative districts

21    are not outliers.  They're not vast sprawling districts with

22    appendages and tendrils that reach out and grab isolated pockets

23    of Black votes.  They do not include disparate communities.

24    Instead, they're either firmly anchored in the Atlanta area or the

25    Macon area.  The districts are visually compact, they're

1  geographically compact, and they're quantitatively compact and,

2  therefore, for the purposes of *Gingles 1*, they are sufficiently

3  compact.

4          Now, here is the crucial thing.  Defendants do not

5  meaningfully dispute the compactness of these six districts.

6  Certainly, Mr. Morgan didn't.

7          Now, I want to note, the Grant plaintiffs are not moving

8  for summary judgment on illustrative Senate District 23 or

9  illustrative House District 74.  And that's because Mr. Morgan at

10  least attempted to contest the compactness of those districts.

11  And so we acknowledge there is a dispute of fact as to whether

12  those two districts are compact.  But that's where his analysis

13  stopped.  Mr. Morgan did not even mention Senate Districts 25 and

14  28 in his report.  And for illustrative House Districts 64, 117,

15  145, 149, he only reports the same compactness scores that

16  Mr. Esselstyn already provided.  There is no analysis of

17  compactness of these districts of any kind, meaningful or

18  otherwise.  And there is certainly nothing in his report that can

19  develop a genuine dispute as to whether these six districts are

20  compact.

21          Now, defendants themselves as a legal matter tried to

22  contest compactness by pointing out some of the districts

23  contained communities that are different one from another.  But

24  there is no uniformity requirement under Section 2.  And the *LULAC*

25  majority actually spoke to this point.  They acknowledge that,

```
 1   quote, "Members of a racial group in different areas, for example,
 2   rural and urban communities, could share similar interests and,
 3   therefore, form a compact district if the areas are in reasonably
 4   close proximity."  That's at 548 U.S. Reporter at 435.  Reasonably
 5   close proximity.  That describes to a tee these six illustrative
 6   districts.
 7           And defendants have not actually argued that
 8   Mr. Esselstyn's districts do unite disparate communities based
 9   only on race.  They don't argue that because they can't.  There is
10   no genuine dispute that these six districts are compact.
11           THE COURT:  They do argue that he does not explain his
12   decisions or connect to them.
13           MR. HAWLEY:  The records shows that Mr. Esselstyn at
14   times could not recall specific line drawings decisions he made
15   more than a year ago, right, because his maps did not change
16   considerably between the PI phase and his report that was
17   submitted last December.  These decisions were made a long time
18   ago.
19           But, again, just as there is no uniformity or
20   homogeneity requirement under Section 2, there is not a memory
21   requirement either.  He might have some difficulty explaining, but
22   these are small geographically compact districts in metropolitan
23   areas.  And the fact --
24           THE COURT:  Go ahead, go ahead, go ahead.
25           MR. HAWLEY:  The very fact of their size and their
```

1  nature -- and, again, there is no evidence in the record that

2  there are disparate communities that the *LULAC* court or any court

3  would consider would defeat compactness in these cases.

4         He might not be able to explain every detail in this

5  district, but that doesn't mean that the districts are not

6  compact.  And defendants never actually take that leap and say so.

7  That's because they do not contain disparate communities.

8         And Mr. Esselstyn's -- whether it be a memory issue or

9  whatever difficulty he might have identifying specific things, I

10 think it is notable that the largest district that we're seeking

11 summary judgement on is House District 149, which is just

12 physically the largest of these House districts.

13        And he explained there that Macon, Milledgeville, and

14 Baldwin County are connected by shared interests.  He gleaned that

15 from public comments that were submitted during the redistricting

16 process, by what Ms. Wright testified when she testified before

17 the Court last year, and because of geographic and economic

18 similarities that come from them being fall line cities.

19        So even on the largest district there where compactness

20 might be, perhaps, you know, arguably the most questionable, he

21 does provide specific reasons why those districts were composed as

22 they are.

23        The other districts, again, they are small districts

24 firmly ensconced in these metropolitan areas.

25        Now, setting aside compactness, defendants' last resort

1   is to once again to bang the drum of racial predominance.  It is

2   an argument we heard throughout the last year.  But all the

3   records in this case shows is, one, that Mr. Esselstyn focused on

4   areas with higher concentration of Black voters when he drew his

5   illustrative maps; and two, that that demographic information

6   informed some of his line drawing decisions.  That's it.

7          Equating this mere consideration and awareness of race

8   with elicit racial predominance, is not only disingenuous, it's

9   foreclosed by Eleventh Circuit precedent.

10         *Gingles* 1 has a numerosity requirement.  Plaintiffs must

11  prove that majority Black districts can be drawn as a quantifiable

12  matter.  The Voting Rights Act does not require that Mr. Esselstyn

13  clicks around in his "Math A Tube" software at random in the hopes

14  that he would eventually land on a district that has a Black

15  voting age population over 50 percent.

16         Section 2 is proof with evidence, not blind luck.  That

17  is exactly what the Eleventh Circuit was getting at in the

18  *Davis v. Chiles* opinion.  Defendants attempted application of

19  *Miller* and these other racial gerrymandering cases to *Gingles* 1,

20  would make it impossible for any plaintiff to satisfy Section 2

21  and prove the first *Gingles* precondition.

22         Davis is still good law, as much as defendants might

23  wish it weren't.  And in this circuit, their racially

24  gerrymandering argument fails at the outset.  And even if

25  defendants could advance this argument, there is no genuine

 1  disputed fact here that race was not the predominant factor, and

 2  there certainly is no dispute that Mr. Esselstyn complied with

 3  traditional redistricting principles when he drew his illustrative

 4  maps.

 5          Now to illustrate, I want to, once again, return to the

 6  eyeball test.  We'll take a quick tour through some past

 7  districts.  I will play the part of ghost of gerrymanders past.

 8  We'll start here in Georgia, *Miller v. Johnson* from the 1990s.

 9          On the left is the proposed district that the

10  Legislature worked with, and they eventually drew the Eleventh

11  District that appears on the right.  And I'll let the *Miller* court

12  do the talking for me.

13          Quote, "The populations of the 11th are centered around

14  four discrete widely-spaced urban centers that have absolutely

15  nothing to do with each other, and stretch the districts hundreds

16  of miles across rural counties and narrow swamp corridors."

17          Next.  Also in the 1990s.  Both of these Congressional

18  District 4s in Louisiana were struck down at racial

19  gerrymandering.  One can see one skirted the outlines of

20  Louisiana, and the other one cut through what I believe they said

21  in the opinion, like an ink stain spreading out across the

22  state -- struck down as racial gerrymanders.

23          *Shaw v. Reno*, another seminal gerrymandering case.

24  Courts invalidated Congressional District 1, which is that

25  rust-colored district in the eastern part of the state, and if you

1   can see it, Congressional District 12 which is that

2   fuchsia-colored district that snakes through central North

3   Carolina, struck down as racial gerrymanders.  20 years later day,

4   déjà vu all over again.  *Cooper v. Harris*, again, Congressional

5   District One and Congressional District 12 struck down as racial

6   gerrymanders.

7           This is what racial gerrymandering looks like.  These

8   are districts were traditional redistrict principles were

9   subordinated to racial considerations.

10          And now you look at Mr. Esselstyn's map.  Those are his

11  illustrative districts.  That did not happen here.  Mr. Morgan

12  stated that race predominated to the detriment of traditional

13  redistricting principles, but that's all he says.  He makes a

14  conclusionary statement about content.  He doesn't back it up with

15  any analysis, any opinions certainly, any support.

16          To defeat summary judgment under Eleventh Circuit case

17  law, you need something more than speculation.  But speculation is

18  all that Mr. Morgan has provided with respect to the six districts

19  that we're moving for summary judgement on.

20          Now, defendants also suggest that Mr. Esselstyn's maps

21  don't comply with traditional districting principles.  But the

22  only basis for that assertion, is that the illustrative map that

23  don't (sic) outperform the enacted map on certain criteria.

24          As this Court knows, there is no requirement that the

25  illustrative map has to be the best enacted map across every

1  principle.  Illustrative maps don't have to be perfect.  And,

2  again, defendants never actually assert that these maps don't

3  comply with traditional districting principles.  They just make

4  the comparison with the enacted map.  But that doesn't say

5  anything about whether these maps do comply with traditional

6  redistricting principles.  There is no evidence that they don't.

7  There is no dispute that these maps comply with traditional

8  criteria.

9       That ends *Gingles* 1.  And so I'll briefly talk about

10 *Gingles* 2 and 3 because there has been a lot of discussion about

11 that, and I feel that, you know, just a brief clarification of

12 where the law stands at this moment in this Court might again be

13 helpful.  And we have a map.

14      This is the reporting that Dr. Palmer did here in the

15 Grant case showing clear and undeniable racial polarization across

16 the focus areas where we proposed new districts.  And I have the

17 slide with Dr. Alford's report.  It is the same thing he said

18 about Pendergrass -- quite striking and it's remarkably stable.

19 But let's go back for a second.

20      Mr. Jacoutot just a moment ago suggested that *Gingles* 2

21 and 3, that they require more than just proving *Gingles* 2 and 3

22 but there has to be some evidence of causation or some evidence

23 that race is what was causing these things.  But there's no case

24 that says that.

25      We've have what *Gingles* says.  *Gingles* 2 is the minority

 1  group cohesive?  We can look at this chart.  The answer to that is

 2  as what Dr. Alford said, is absolutely yes.

 3          *Gingles* 3.  Does the white majority voters bloc you to

 4  defeat Black preferred candidates?  Yes, they do.  Those are the

 5  dots at the bottom.  These are quantitative facts that are not in

 6  dispute.  That is all *Gingles* 2 and 3 requires.  And from that we

 7  have the inference that racial bias is at work, an inference that

 8  has gone unrebutted in this case.

 9          THE COURT:  So I should grant you summary judgment on

10  two and three for Grant?

11          MR. HAWLEY:  Yes.  Yes, I would say so.  Because we've

12  satisfied -- we've demonstrated unrebutted -- in fact, not only is

13  it unrebutted, Dr. Alford agreed there is political cohesion among

14  the Black communities in these areas, and the white voters vote as

15  a bloc to defeat Black-preferred candidates.  That is all that is

16  required under *Gingles* 2 and 3, and it is also sufficient to

17  create the inference of racial bias that defendants claim we have

18  to prove independently.  Again, there is no case that says that.

19  We have *Gingles* 2 and 3, we have the *Nipper* "gloss" that shifts

20  the burden to them to prove that it's something other than race.

21  The burden that Ms. Khanna has pointed, they have utterly failed

22  to grapple with.  And they have not even addressed Dr. Burton's

23  evidence that race is the driver of partisanship in Georgia

24  elections.

25          There is some brief discussion about the race of the

1   candidates might be relevant here.  But again setting aside that

2   that is a totality of circumstances issue, if you read the case

3   law talking about the race of the candidates, like *Nipper*, it is

4   because as Ms. Khanna said, it was the court's belief that, for

5   example, white on white elections might not be probative of

6   racially-polarized voting if Black voters essentially split

7   equally between the two.  But the *Nipper* court acknowledged that

8   if there is a case where Black voters overwhelmingly support even

9   a white candidate and white voters don't, that's an indication of

10  racially-polarized voting.  Again, I direct you to look at this

11  chart.  That is exactly what happens in contemporary Georgia.  And

12  so these concerns about the race of the candidates the defendants

13  have raised simply do not apply here.

14          I will finish -- I have a few minutes left.  I will save

15  what time I have.  But just before I go, Mr. Tyson was talking

16  about sort of the requirement that plaintiffs or the mapmaker

17  justified a composition of every district other than the

18  illustrative district.  That is true both in the Congressional

19  Pendergrass case, but that has also come up in this case.  We have

20  a lot of other Legislative districts other than the six

21  illustrative districts that Mr. Esselstyn is moving -- that we are

22  moving for summary judgment on.

23          Now, I don't have a case that says if we need to prove

24  the compactness and prove the -- you know, defend the compositions

25  of every other district.  They don't have a case that says that.

1  But we have *LULAC*.  And, again, *LULAC* says you look at the

2  district where the vote dilution has occurred.  That is where we

3  focus the compactness inquiry.  *LULAC* is good law.  It's the

4  majority of the court.  That is the case that provides the

5  standard when we're assessing compactness of districts.

6          Defendants as a policy preference, they might prefer a

7  higher standard that would require essentially the drawing of a

8  perfect map or the drawing of a map that somehow satisfies

9  everybody or satisfies them.

10          If that is their policy preference, this is not the

11  right forum to air it.  What we have here is binding law from the

12  U.S. Supreme Court, from the Eleventh Circuit, and it rejects

13  they're position.  They're attempting to raise the burden on

14  plaintiffs.

15          Plaintiffs have satisfied at least, and especially as to

16  the *Gingles* preconditions, the requirements of the Eleventh

17  Circuit and the requirements, again, that this Court correctly

18  laid out in the preliminary injunction order.  That analysis, that

19  legal analysis was all correct, and the law hasn't changed since

20  then.  Under those standards, we have satisfied the *Gingles*

21  preconditions in both Pendergrass and in Grant.

22          THE COURT:  In the preliminary injunction order, though,

23  I think I did consider what effect the new sixth district will

24  have on the fifth district in Fulton County.  I think it went

25  from, like, 57 percent to 52 percent, something like that.

 1          MR. HAWLEY:  Yes.

 2          THE COURT:  And your argument is that is irrelevant.

 3          MR. HAWLEY:  There is a point there.  And I think this

 4  actually -- there is a -- if I can have a small exception to that.

 5  What *De Grandy* and other cases looking at *Gingles* have proposed,

 6  is the creation of additional districts, essentially, where

 7  minority voters would have the opportunity to elect their

 8  preferred candidates.

 9          So we do believe that it is important to know that the

10  creation of these additional illustrative districts, will not take

11  away opportunities for Black voters and minority voters in other

12  parts of the state.  And that's why Dr. Palmer looked into this.

13  He looked at this issue, and he concluded that in the preexisting

14  majority Black districts, Black voters would still have the

15  opportunity to elect their preferred candidate.

16          So when we're moving for summary judgment on six of

17  these illustrative districts, these are sixth additional districts

18  where Black voters have the opportunity to elect their preferred

19  candidates without taking away those opportunities where they

20  currently exist in the enacted maps.

21          Thank you.

22          THE COURT:  Thank you.  I know you are all very excited

23  about this, but the court reporter can't keep up with you-all.

24  Slow down.  Because I've got to read it, and if she doesn't give

25  it to me right, then I won't get it right.

1          MR. TYSON:  Thank you, You Honor.  I've already been

2    admonished once before we started today actually.  So I will do my

3    best on that front.

4          Your Honor, what I will do here again not to repeat all

5    of the different pieces here, I'll just respond to a few of

6    Mr. Hawley's arguments.  I'll look at the maps in our motion.  It

7    fits a little better there on the *Gingles* 1 issue.

8          THE COURT:  All right.

9          MR. TYSON:  Mr. Hawley mentioned the policy preference

10   issue, we're trying to raise the burden on the plaintiffs.  And I

11   think, going back to *Brnovich* tells us, you don't get to

12   substitute what the Legislature did until there is a violation of

13   federal law.  And figuring out exactly what that is important.

14         And determining -- the plaintiffs for their motion have

15   to show that with all the inferences in favor of the state and why

16   the state did what they did and if they still prevail on all these

17   points -- and, again, we can't draw those inferences.

18         Mr. Hawley didn't discuss the totality of the

19   circumstances.  I think that we all agree that if there is not

20   summary judgment for the defendants at this point, we're going to

21   trial on those issues.

22         So, again, just kind of pulling back to a few of the

23   larger points.

24         Mr. Hawley talked about the districts being small in

25   size.  And we know Georgia has a lot of counties.  We also have a

1    lot of state representatives and a lot of state senators, which

2    means that by nature our -- the geography of our districts is

3    going to be relatively small.  So I think, again, going back over

4    and over to the 200/300 mile distance in *LULAC*, that was there.

5    But also the shape of that district was striking down from one

6    area into another.  And that's a consistent feature we see on the

7    districts that are on Mr. Esselstyn's plans that he altered to

8    create these additional districts.

9         The other piece we have on the compactness score chart

10   Mr. Hawley showed, those charts Mr. Esselstyn testified didn't

11   include all of his districts.  He only included the districts that

12   were new.  So he didn't look at districts around the districts he

13   drew that were irregular in shape.  And we'll get to those in our

14   motion on that part.

15        THE COURT:  This eye test argument they're making, one

16   thing I need to look at is a past eye test.  Is that a map that

17   can be distributed?

18        MR. TYSON:  I think it is, Your Honor, because I think

19   by nature of the eye test means what is in the eye of the

20   beholder.  So I think there is an element there in terms of that.

21        I think the bigger challenge is it's very easy to find a

22   set of metrics that will justify a particular outcome.  And this

23   is kind of a statistical game at some level on the maps.

24        The eye test, I think for the shape of the districts,

25   while it's relevant to the racial gerrymander piece and I think

1   can be paired with, for example, a mapmaker's decision to only

2   look at race in terms of what goes in and out of district, which

3   that's what Mr. Esselstyn has testified that he used race to

4   decide what went in and what went out.  That combined with the eye

5   ball test, I think can get you to a racial predominance issue.

6   But I think that race has standing on one of them, eye ball test

7   is kind of an idle holder by nature.

8           In terms of whether Mr. Morgan disputes the various

9   pieces, I think, again, it's the plaintiffs' burden at this point

10  in their motion.  Whether Mr. Morgan offers testimony there or

11  not, he's provided data and information that we can argue and we

12  can test Mr. Esselstyn on the stand with.  So, again, I don't

13  think that standing alone the fact that Mr. Morgan didn't specify,

14  I believe this district is also problematic, gets the plaintiffs

15  to summary judgement on these points because it involves weighing.

16          The other piece, Your Honor, in terms of the *Davis v.*

17  *Chiles* case, I think we've addressed this in our briefing.  In

18  that decision the issue the Eleventh Circuit discussed was the

19  relationship of racial predominance and the drawing of districts.

20  But in that case they also found there was no racial predominance

21  in the drawing of the districts.  They looked at it and said this

22  is a very normal looking district, the mapmaker didn't make

23  decisions based on race.  So they really didn't have to reach the

24  question of how far is too far in a remedial plan.

25          And, again, I think it pushes us back onto this world

1  of, again, we're not asking the Court to go from no opportunity to

2  some opportunity; we're asking to go from some opportunity to more

3  opportunity.  And so ultimately, at least on the evidence before

4  the Court, the plaintiffs are not entitled to summary judgment on

5  any of the factors here -- with the one exception/caveat from Mr.

6  Jacoutot earlier.  I think you are correct that if you reject our

7  argument on *Gingles* 2 and 3, then summary judgment to the

8  plaintiffs would be appropriate.  But we still would have an

9  opportunity at totality to raise the issues for polarization.

10           THE COURT:  All right.  There won't be any game at will.

11           MR. TYSON:  And it didn't end the game with *Rose* either,

12  Your Honor, I think for Judge Grimberg, how he handled that.

13  So...  But that's all we have to offer in response on *Grant*.

14           THE COURT:  Thank you, Mr. Tyson.

15           MR. TYSON:  Thank you.

16           THE DEPUTY CLERK:  I think you have about four minutes.

17           MR. HAWLEY:  I will only take two minutes.

18           THE COURT:  Take all four, if you need to.

19           MR. HAWLEY:  I have a sneaky suspicion that the

20  admonition about slowing down might have been directed in my way.

21  So maybe I'll take three minutes just in the interest of the Court

22  court reporter.

23           Just three brief responses to Mr. Tyson just now.

24           He pointed out that those charts that Mr. Esselstyn

25  produced with the compactness scores, doesn't include all of

1  districts he changed.  I know that Mr. Esselstyn prizes the

2  presentability of information.  And I think putting all of the

3  districts in would have been a polychromatic nightmare.  And so he

4  focused on, again, what *LULAC* tells us to focus on.  What is the

5  compactness of the illustrative districts.

6          But his report, the appendices, do include the full

7  information about each -- the compactness score of all 56 Senate

8  Districts and 180 House districts, both in the enacted plan and

9  the illustrative plan.  So that evidence is there.

10          And also the average scores between the enacted plans

11  and the illustrative plans are essentially the same.

12          THE COURT:  Mr. Hawley, let's take another hypothetical.

13          MR. HAWLEY:  Sure.

14          THE COURT:  Let's stay with this idea with you on two

15  and three.  But I still have some questions about, one,

16  compactness.  That's not a material disputed fact there.  Tell me

17  why I'm wrong.  Let's say I think that, one, there are disputed

18  material facts there.  Tell me why I'm wrong.

19          MR. HAWLEY:  So I would say that -- and actually there

20  is some language in *Fayette County* -- in *Fayette County*, the

21  Eleventh Circuit decision, that is essentially our -- we can

22  consult a rule book for how to resolve these issue on summary

23  judgment.  And Judge Wilson emphasized, you have to be careful and

24  really be thoughtful about it.

25          But there is a quote there that I like.  At summary

1   judgment the Court is both limited to deciding whether there is

2   sufficient evidence upon which a fact finder could find for the

3   non-moving party.  Again, for the state.  So we can take a step

4   back.  You can set aside plaintiffs' evidence.  What evidence has

5   defendants presented that can lead to a finding in their favor?

6   They have no meaningful evidence on the issue of compactness for

7   the six districts.  They have legal arguments about whether or not

8   we need to look at the other districts to form conclusions.  We

9   know that we don't because of *LULAC*.

10          They make the legal argument that the district has to

11   best be an enacted map on these metrics in order to be deemed

12   compliant with traditional redistricting principles.  We know

13   that's not the case as *Bush v. Vera* said, the plurality of the

14   opinion there.  We don't need the -- the illustrative map doesn't

15   need to best the map, an endless beauty contest.  That's not the

16   inquiry we're looking for.

17          They have legal arguments on their side, but they don't

18   actually have any evidence to demonstrate that these districts are

19   not compact.  We have not only the eye ball test, which, granted,

20   is an inherently sort of a qualitative exercise.  We have

21   quantitative evidence of compactness as well, and we have

22   Mr. Esselstyn's testimony and his deposition, and in his report

23   about other shared interests that these various districts have.

24          THE COURT:  What you asking me at this stage is to make

25   a decision based on a difficult trial standard rather than a

1  summary judgment standard?

2          MR. HAWLEY:  No.  We believe that using that summary

3  judgment standard, which is asking if there are any genuine

4  disputes of material fact.  And here we believe that there are not

5  as to first *Gingles* precondition.  That's the summary judgment

6  standard, and we believe that is satisfied here because of the

7  complete absence of meaningful evidence on the other side.

8          The Court is not supposed to weigh evidence at summary

9  judgement, but weighing presupposes that there is something on the

10 other side.  If there is nothing on the other side, no weighing is

11 necessary.  And we're not asking for the Court to draw any

12 improper influences -- inferences, especially not on the first

13 *Gingles* precondition, because we have evidence of compactness, we

14 have evidence that the maps comply with traditional districting

15 principles, and there is not a shred of compelling evidence for

16 these six districts on the other side.  Not enough to rule and

17 defend in the state's favor on the other side, and certainly

18 nothing to develop a genuine dispute of material fact.

19         THE COURT:  They say you're finished.

20         MR. HAWLEY:  Thank you.

21         THE COURT:  Anybody need a break?  Let's keep going

22 then.

23         MR. TYSON:  I'm going to hand up, with your permission,

24 a few more sets of maps.

25         THE COURT:  This is a new motion.

1          MR. TYSON:  All right.  Last round of districting plans

2     here, Your Honor.

3          So not to recap where we've been all the way along.  I'm

4     just going to focus in on *Gingles* 1 and the issue particularly

5     with Mr. Esselstyn's plan.  And unlike the plans in Alpha Phi

6     Alpha, Mr. Esselstyn's plans have higher population deviations

7     than the enacted plans.  They have more split counties than the

8     enacted plans.  So when we talk about what is the evidence on

9     *Gingles* 1, I think recognizing there's a distinction there is

10    important because the Court has to look at what's going on with

11    that.

12         So looking -- just to go kind of district by district, I

13    know the plaintiffs are not moving particularly on Senate 23.  We,

14    obviously, are moving on all claims.  So I want to go ahead and

15    cover these pieces.

16         This is a similar heat map of what we looked at

17    previously.  And you can see, again, if you look at around the

18    perimeter of the districts starting in Baldwin County, you see

19    racial splits there.  Greene County taking in more heavily Black

20    population, Wilkes County taking in more heavy Black population,

21    excluding the white population.  Same in McDuffie as we curve all

22    the way around on the plan.  And this data is borne out by the

23    information of what Mr. Esselstyn included and excluded in

24    District 23.  In every situation where there is a split county,

25    the Black percentage of what's included in the district is much

1  higher in many cases than what is included outside of the

2  district.  The one exception is Richmond County there where there

3  is a District 22 and 23 are both majority Black.  And we would

4  submit, just like the evidence in the Constitutional cases of

5  racial splits of counties being evidence of racial predominance,

6  here Mr. Esselstyn had no political data, did not look at any

7  political data, and so the only explanation is a racial focus in

8  his map drawing.

9          District 28 the plaintiffs showed the shape here

10  earlier, but if you look at the underlying demographics, you can

11  see, again, a pattern of including heavily Black populations in

12  Fulton, Clayton, and Fayette, and then putting about 40 percent of

13  the district into Coweta County, which is only 25 percent Black

14  and going down to Newnan there in the southern part of the

15  district down at this part here.

16          So, again, combining communities to reach racial goals,

17  the shape is present there, the shape is nice and compact.  And I

18  think looking at compactness scores alone doesn't really tell you

19  a lot because you have to look at the underlying population and

20  see what is the explanation for this district.  And Mr. Esselstyn

21  wasn't able to offer that.

22          In terms of him having a memory test, I think it's the

23  plaintiffs' burden to show why was this district drawn the way it

24  was drawn?  If it was -- if it was -- if there was no other

25  evidence beyond a racial goal, then the plaintiffs' haven't

1    carried their burden, we submit, under *Gingles* 1.

2            District 25 on the Senate map I think is a special case

3    because it is a nice compact district in the middle of Henry

4    County there.  But, again, to understand how Mr. Esselstyn drew

5    District 25, you have to look at what happens around it.  So on

6    one side you have the District 34 there, again, taking heavily

7    Black populations in Clayton, combining that with populations,

8    basically, from the airport down to Peachtree City to create a

9    district, striking that district down along the way to create a

10   majority Black district on one side and free up Henry County

11   population.

12           On the other side we have a district that runs from

13   South DeKalb, where the population in the district is 94.9 percent

14   Black, all the way down to Butts County, Georgia, coming through a

15   more white area of Henry County along the way.  Again, these are

16   the kinds of decisions that are necessary to free up what

17   Mr. Esselstyn does in District 25, and why, we would submit, that

18   it's very easy to look at a district in isolation.  It's much more

19   difficult to consider is this District 25 a district that must

20   have been drawn, especially when you have to modify all these

21   districts around it, that the Legislature failed to draw a

22   district it should have here.

23           Those are the Senate Districts, Your Honor.

24           On the house districts you see a similar pattern in the

25   Macon districts.  Each of the districts that's majority Black is

1  just barely so; 50.14, 50.64, 50.38, 51.5.  And we would submit
2  when you're at that tight of a tolerance, you have to be aware of
3  your racial decisions because you're drawing right at the edge of
4  what's considered a majority district.  And you see on the heat
5  map here, the division of the Black population in Macon into four
6  separate districts, the running of District 145 and into the more
7  heavily Black population in Warner Robins around the Air Force
8  base, and then up into Baldwin County to capture Black voters in
9  the Milledgeville area.  So we would submit, again, this shows
10 evidence of racial predominance.

11        Mr. Esselstyn's testimony here about public testimony
12 and about other issues that he considered, I believe all came
13 after he drew the map.  And so it couldn't have informed -- he's
14 looking for justifications after he had drawn these districts.

15        For House District 64, the shape, again, is relevant.
16 We start in the heavily Black area of Fulton County that's 96
17 percent Black, and drive out to Paulding County.  This is, again,
18 is about 40 percent of the district here, which is 32 percent
19 Black, much lower percentage.  And the striking is necessary to
20 crate this district.  And, again, we're back to kind of where we
21 started on the geographic compactness of the minority community,
22 and what we're trying to represent in the district is this
23 District 64 compelled and required by Section 2 to run out across
24 these three counties and connect them.  And, again, Mr. Esselstyn
25 couldn't identify a reason for doing that.

1          In South Metro you also see this similar pattern on

2    House.  Districts that begin up here in Clayton County strike

3    their way down to Brooks and South Fayette County, starting in the

4    southern part of Clayton, running through Hampton down into rural

5    areas of Spalding County.  And, again, these are areas where one

6    county is going to be heavily majority Black and the other

7    counties are going to be much lower to create these additional

8    majority-Black districts.

9          And in the Henry County area, we see the same pattern.

10   District 91 starts in South DeKalb, runs all the way down into a

11   more heavily white area of Henry, staying with the striking of

12   District 116 to then allow the population for District 117, which

13   Mr. Esselstyn says is a new majority-Black district.

14         So, Your Honor, just in terms of looking at the *Gingles*

15   1 maps, we, again, see a mapmaker making decisions primarily based

16   on race, not able to explain the reasons for those districts, and

17   uniting populations with this kind of striked approach or

18   race-conscious splitting of counties to do that, which we would

19   submit is not permissible as a remedy under *Gingles* 1.

20         And with that, Your Honor, I'll hand it over to

21   Mr. Jacoutot.  I think he has a couple of last points on *Gingles* 2

22   and 3.

23         THE COURT:  Thank you.

24         MR. TYSON:  Thank you.

25         MR. JACOUTOT:  Thank you, Your Honor.  I did just want

1  to clear up a few remaining things.  I don't think we need to

2  rehash everything we talked about this afternoon and earlier this

3  morning.

4          I just want to point out that it is not our standard

5  that requires more than proving *Gingles* 2 and 3.  It's the

6  question -- excuse me.  It's not that our standard requires more

7  than proving *Gingles* 2 and 3, it is the question of how to prove

8  or the evidence required to prove two and three was exactly what

9  is in dispute in Part III-C of the *Gingles* opinion.  And the

10  dispute is --

11          THE COURT:  Say that again.  Say that again.

12          MR. JACOUTOT:  Sure.

13          It's that the question of how to prove or the evidence

14  required to prove *Gingles* 2 and 3, that was exactly what was in

15  dispute in Part III-C of the Gingles' opinion.  The dispute was

16  whether, as Brennan thought, Justice Brennan thought that the mere

17  mechanical evidence of cohesion and bloc voting was sufficient to

18  show racial polarization and demonstrate *Gingles* 2 and 3 or was it

19  something more.  And I believe we've shown today that Justices

20  White and O'Connor felt that there was something more than that is

21  necessary in the usual case.  Five justices were worried about

22  that being sufficient.

23          And I do just want to point out that regarding the

24  historical expert reports -- using the historical expert reports

25  to demonstrate *Gingles* 2 and 3 would be somewhat out of character.

1    It's inherently a statistical inquiry.  And we've shown cases here

2    where the statistics pan out and do show racial polarization right

3    in Sumter County being an example.  But the statistics that we

4    have here are simply not enough, and I'm not going to rehash why

5    we feel that.

6              Unless Your Honor has any further questions...

7              THE COURT:  Thank you, sir.

8              MR. HAWLEY:  Thank you, Your Honor.  A few brief points,

9    and, again, we won't try to avoid rehashing things done, if

10   possible.

11             Mr. Tyson showed a bunch of heat maps showing the

12   demographic information in these maps.  From that alone, he

13   concludes that these decisions were drawn, these maps -- these

14   districts were drawn, quote, "primarily based on race."  But that

15   is not what those maps show.  Those maps show only the

16   unremarkable fact that Mr. Esselstyn, consistent with *Bartlett v.*

17   *Strickland*, drew illustrative districts that had Black voting age

18   populations above 50 percent.  That is far from being a

19   controversial point.  That is what the requirement is under

20   Section --

21             THE COURT:  But the problem is that he does not give any

22   other reason or cannot show any other reason for drawing it other

23   than alining the Black population.

24             MR. HAWLEY:  Certainly -- and there are times, I will

25   say, he does give those reasons.  To say he gives no reason, I

1 think, kind of ignores both deposition testimony and his report.

2 And we discuss this in our brief.  But, for example, a number of

3 times he identified counties as being within the Atlanta

4 Metropolitan area.  As Ms. Khanna described earlier, that is sort

5 of an objective way of defining a community of interest.  He also

6 looked at other landmarks and things.  He incorporated public

7 comments.  So it isn't -- again, it is a district by district

8 inquiry.  But to say that he had no reasons other than race is

9 simply untrue.  And when he was flat out asked if race

10 predominated in any of these decisions, he said no.

11        THE COURT:  Look, if he splitting counties, splitting

12 precincts to get to that 50 percent, could it be inferred that you

13 are just trying to get to race and you're just saying you're doing

14 it?  And that's part of his argument is that you're splitting

15 counties, you're splitting precincts to get to that -- some of it

16 was something like 55.5, 51.2, could I infer, well, he's trying to

17 get to that 50 percent mark to do it?

18        MR. HAWLEY:  I would say, first of all, if that is an

19 inference, then by -- again, by the defendants' own statement,

20 that is not an appropriate undertaking for summary judgment.

21        But even setting that aside, I don't think that is a

22 fair inference, because as with any map drawing decisions about

23 balancing criteria, Mr. Esselstyn was consistent about that in his

24 report and in his deposition.  He has to hit 50 percent because

25 the U.S. Supreme Court set that benchmark.  How to do that

```
 1  involves at times weighing and balancing the other criteria,
 2  keeping a county whole versus splitting a county.  Making some
 3  population deviation within the kind of the acceptable five
 4  percent balanced versus not.  Those are individualized decisions
 5  that he -- as he testified, he made those decisions in balance
 6  with each other.  The very fact that you hit close to 50 percent
 7  on some of the Macon-Bibb counties --
 8              THE COURT:  Three of them.
 9              MR. HAWLEY:  Three of them.  That alone proves that --
10  all that proves is that he has, again, satisfied that the U.S.
11  Supreme Court's standard.  But whether race predominates -- but I
12  will say this.  Again, if the Court has any doubts about what --
13  how his specific methodology went, if the Court would like to
14  assess Mr. Esselstyn's credibility, ask him some of these
15  questions, then going to trial is the appropriate course.  And we
16  acknowledge that all -- we want this Court to get this right, and
17  we want to get this right, and if that means discussing *Gingles* 1
18  further or even distinguishing between the different districts,
19  because again it is an individualized district alternative and,
20  you know, some districts -- not all districts are created equally.
21              THE COURT:  You hit on a key part.  At this point in
22  time, I can't weigh credibility of what he says or what he did,
23  but I can at trial.
24              MR. HAWLEY:  That's absolutely true.  If the Court feels
25  that -- again, especially using kind of *Fayette County* as sort of
```

1   a helpful guide as to when summary judgment is appropriate in a

2   Section 2 case and when it is not, if credibility determinations

3   are required here -- we'd always say they are not, again, because

4   of the absence of evidence on the other side.  But that being

5   said, if further interrogation in Mr. Esselstyn's thought process

6   and his decisions, if that is required, then that is an issue that

7   we can have at trial.  But it's certainly not an issue that should

8   be resolved against plaintiffs on summary judge and end this case

9   when the only evidence they have is, again, descriptive evidence

10  of how these districts look without any evidence about the intent

11  of Mr. Esselstyn or any other circumstantial evidence of illicit

12  racial predominance.

13          There's no bright line in racial gerrymandering cases.

14  It is a complicated inquiry.  You have to look at many different

15  issues.  Simply pointing to a heat map and seeing, you know, where

16  Black voters live and how the districts are drawn, that certainly

17  falls well short of any kind of conclusion that Section 2 isn't

18  satisfied here because these maps are not compact or not an

19  appropriate remedy or however they would characterize it.  Those

20  are issue that would need to be determined by the finder of fact.

21          THE COURT:  Well, I'm still trying to think of what

22  Mr. Esselstyn said that takes it outside of Mr. Tyson's argument.

23  Mr. Tyson's argument, Judge, there is no other way you can come to

24  the conclusion that he drew these districts based on race.  He

25  doesn't argue that he tried to put people together at the same

1  military bases or -- I'm trying to think.  What is there for me to

2  say, no, Mr. Tyson, this is a disputed fact?

3          MR. HAWLEY:  Sure.  I will tell you one thing is what we

4  don't have the benefit of right now is fact witness testimony.  If

5  you remember, at the PI stage from Senator Carter who talked about

6  how these districts -- how they perform on the ground?  Who are

7  people that live in these districts, and how do they -- what do

8  they have to do with each other?  That is evidence that we can

9  hear in trial that we don't have in the record right now.

10         THE COURT:  Well, Senator Carter talked about -- what

11 did he call them?  Well, being a lawyer is a big honor.  But he

12 talked about going up toward -- he was talking about the ones in

13 South Georgia or the Augusta area.

14         MR. HAWLEY:  Sure.  Not to show our hand truly, but in

15 our pretrial disclosures we identify a number of fact witnesses

16 from -- throughout Georgia who can speak to these other districts

17 much in the way that Mr. Carter referred to the districts in the

18 Atlanta Metropolitan area, and those are ways of establishing the

19 communities of interest that exist in these districts, the

20 compactness.  We don't have that in the record right now.  What we

21 do have is Mr. Esselstyn's testimony, and we have the objective

22 metrics of compactness.

23         THE COURT:  But that's Mr. Tyson's argument, though, you

24 don't have anything in the record to point to other than as Mr.

25 Tyson is saying, it was put together based on race.  You don't

 1   have anything to point to, that says, well, he tried to tie

 2   communities that military bases together.  He tried to tie

 3   together communities that were all rural, whatever.  That's his

 4   argument.

 5         MR. HAWLEY:  Right.  But, again, I would encourage the

 6   Court, again, to look at what Mr. Esselstyn has actually said

 7   about these different districts, because I think there is more

 8   there than, perhaps, what the defendants are giving him credit

 9   for.  To reach the inference that race predominated when we don't

10   have any other evidence that it did, that is an inference that is

11   not appropriate for summary judgment based only on the descriptive

12   criteria of how these districts are drawn.  It is a leap to then

13   infer intent to Mr. Esselstyn, and to discount the other criteria

14   that might justify the creation of these maps.

15         Even setting aside what we discussed in our brief

16   whether or not -- whether, kind of, the racially predominance

17   inquiry is appropriate in this -- the first *Gingles* precondition.

18   Anyway, Courts have suggested that it's not precisely for this

19   reason.  Because in the Fifth Circuit, *Robinson v. Ardoin*,

20   recognized the tension between requiring -- Section 2 requires

21   some consideration of race, but too much consideration of race is

22   racial gerrymandering.  There is a tension.  But it's a line that

23   the state is expected to thread as part of its redirecting

24   obligations, but it is not something that I think -- underscores

25   that you can't jump to the inference of racial predominance in a

```
 1  case like this, because some consideration of race is expected.
 2  And the evidence right now, that's all we have.  Mr. Esselstyn
 3  admitted as much, that he did have racial demographic information,
 4  and that at times that -- that it informed his decisions.  He
 5  never said it predominated.  In fact, he said the opposite.  So I
 6  think with that evidence in the record to infer that he -- that,
 7  in fact, race did predominate, that's an inference that this Court
 8  simply cannot not reach on summary judgment.
 9          Last thing on Gingles.  I feel we dissected Gingles, you
10  know, basically, talking about comas and semicolons at this point,
11  but one last note on Gingles.
12          The Gingles majority, which is to say the four justices,
13  including Justice Brennan and Justice White, joined together in
14  adopting the district court's definition of racially-polarized
15  voting, which was a correlation between the race of voters and how
16  they vote.  That is something that all five justices agreed to.
17  That is, in essence, Gingles 2 and Gingles 3; is their cohesion on
18  one side, and is there cohesion on the other side that defeats
19  minority-preferred candidates.  That was the majority of the
20  Gingles court as we discussed in our briefs.  And that definition
21  is very important, because that is what has driven every case
22  subsequently that has treated Gingles 2 and 3 as objective factors
23  without concerns about causation.  That is how this Court
24  approached it at the PI hearing.  That is good law, and that comes
25  from the Gingles' majority.
```

```
 1              Again, where Justice White -- we don't even need Justice
 2    O'Connor to reach our conclusion here.  We have Justice White,
 3    because he agreed with that definition.  He parted ways with Part
 4    III-C, the Gingles plurality opinion, only to the extent that
 5    Justice Brennan suggested that causation and these other
 6    qualitative issues were never relevant to the inquiry.  Justice
 7    White said I don't agree with that.  He admitted it's not relevant
 8    here.  Because under the facts of Gingles, there was -- like we
 9    have in this case -- striking polarization between Black voters
10    and white voters.  He said, I don't need to talk -- essentially, I
11    don't need to worry about causation here under the facts of this
12    case.  But I'm concerned to say that it's never relevant precisely
13    because there could be occasions where Black voters are not
14    foreclosed from participating in the political process, because
15    white candidates of choice, court Black voters engaged in partisan
16    politics, interest group politics, and are able to achieve winning
17    majorities with white and Black voters.  Because in that case, the
18    Black candidate of choice might not win, but Black voters are part
19    of a coalition that elects the white-preferred candidate.  In that
20    case there might not be a Section 2 violation, which is why deeper
21    inquiries into causation might be required.
22              But that wasn't the case in Gingles, and that is
23    certainly not the case here where we do not have Black crossover
24    voting for white-preferred candidates.  It is infinitesimally
25    small in these elections in Georgia in the areas where we're
```

1   moving for summary judgment.

2           So using that, Justice White's concurrence simply does

3   not apply here.  And his suggestion that causation is sometimes

4   relevant, is consistent with what this court said at the PI stage.

5   As part of the totality of the circumstances, perhaps, we will

6   look at issues of causation.  But, again, the Eleventh Circuit has

7   been clear, once you have second and third *Gingles* preconditions,

8   that creates an inference that then defendants have to rebut.  We

9   have that inference here because we've satisfied *Gingles* 2 and 3

10  as the objective metrics that the *Gingles* majority said that they

11  are.

12          THE COURT:  Thank you, sir.

13          MR. HAWLEY:  Thank you.

14          THE COURT:  Mr. Tyson, this defendant alluded to the

15  credibility of the expert, something I should weigh and weigh at

16  the trial.  In other words, he does say I considered race but it

17  wasn't a predominant issue.

18          MR. TYSON:  Yes, Your Honor.  So I think, number one, if

19  you're weighing credibility of experts, yes, that is a trial

20  question.  And if from your perspective Mr. Esselstyn's blanket

21  statement I didn't consider race is enough to get across that

22  line, then I think that becomes a trial issue.

23          We would submit that the relative lack of evidence on

24  all of the other explanations doesn't overcome a statement of "I

25  didn't consider race."  And if "I didn't consider race" is enough

1  to get you across that line, then you just can include that in an

2  expert report and you're always getting to trial.

3       I think the key point is, is it a material fact at this

4  point?  Is it disputed by a material fact about how Mr. Esselstyn

5  drew those districts?  I want to make sure I'm being precise.

6  Mr. Esselstyn did provide some reasons.

7            THE COURT:  Yes.

8            MR. TYSON:  But like Mr. Cooper, they were very much on

9  the platitude kind of idea -- I think the closest he could provide

10 was the Georgia fall line between Macon and Milledgeville.  He

11 mentioned Fort Gordon around the Augusta area, but that was about

12 the extent of where we were.  Most of it was all along the lines

13 of it's all in Metro Atlanta, which to me is not enough to create

14 a genuine issue of material fact.

15           So, again, I think the key point is looking at the data,

16 looking at the lack of explanation, and then Mr. Hawley talked

17 about, well, we had Senator Carter at the PI, we had these other

18 witnesses.  The plaintiffs could have come in their response with

19 declarations from those witnesses of, yes, those districts

20 Mr. Esselstyn drew unites my community in some way.  They haven't

21 done that.  They've relied on Mr. Esselstyn's testimony here.

22           So that's our view why there it's not a disputed fact.

23 But I think you are correct, to the extent it requires a weighing

24 of evidence in some way or a credibility assessment about

25 Mr. Esselstyn's testimony, then that would be a triable issue.

```
 1  That's why we also tried to rely on Mr. Esselstyn not looking at

 2  Mr. Morgan in terms of any disputes on those points.

 3          I think the last point, Your Honor, just -- Mr. Hawley

 4  mentioned infinitesimally small levels of support for

 5  Black-preferred candidates as we kind of look at the *Gingles* 2 and

 6  3 issues.  That is exactly our point.  If you look at the other

 7  cases that found racially-polarized voting under *Gingles* 2 and 3,

 8  you don't find situation where the only consistent explanation is

 9  partisanship.  You find voter behavior changing as the race of the

10  candidate changes, as the dynamic of the race change.  And as all

11  of the charts show, there is absolutely no change in voter

12  behavior on either front when they're presented with different

13  kinds of candidates along the way.

14          So we submit that we're entitled to summary judgment on

15  those points, but to the extent we're not, we'll be ready to go to

16  trial if that is what Your Honor says.

17          THE COURT:  Thank you, Mr. Tyson.

18          MR. TYSON:  Thank you, Your Honor.

19          THE COURT:  I think that's it.

20          All right.  Let me tell you my plan.  I'm not going to

21  rule, which you-all figured out, until I hear from the Supreme

22  Court.  They've got to tell me -- correct the record.  They don't

23  have to do anything.  But in the past, they have made rulings by

24  June 30 at the latest.

25          I don't plan on ruling on these motions for summary
```

1  judgment until after June 30.  So let me kind of give you-all a

2  calendar of what may happen.  If they rule, let's say, on June 30,

3  I will be asking supplemental briefs to be due by July 7.  You

4  don't have to file a supplemental brief, but something in my mind

5  tells me that they're going to say something that you-all probably

6  want to file supplemental briefs on.  Okay?

7          July 7.  You have until July 7.  Does anybody think you

8  need more time?  I'm asking you-all to file at the same time, July

9  7 send me supplemental briefs.

10          At this point in time, I don't plan on doing another

11  oral argument.  But if somebody -- you need to tell me.  I think

12  I'm going to be -- you-all have been quite thorough in your briefs

13  that you sent me, and I really appreciate it.  And today you've

14  been quite thorough.

15          I've thrown question at you-all that I have been

16  pondering.  I was kind of anticipating and do things -- it's just

17  the way I do things.  I'm sorry.  But I don't think I will need

18  another oral argument after I get your briefs on July 7 -- unless

19  somebody says, I really want to be heard.  Tell me now.

20          Then what happens next is then I'm going to try my best

21  to get you a summary judgment order, okay -- put those knives down

22  -- by July 21.  The reason, if that's the case, we will then have

23  a pretrial conference if there is something left to try on August

24  the 15th.  Pretrial orders be due on August the 22nd.  The

25  deadline to Daubert motion will be August the 22nd.  The deadline

1  to file a motion in limine will be August the 22nd.  Deadline to

2  file objection to any video depositions will be August the 22nd.

3          Now, you-all may be saying, Judge, that's a lot to get

4  done, because I have a trial date set if it going to trial is

5  September the 5th, the day after Labor Day.

6          I'm trying to balance two things:  Plaintiffs on one

7  hand is saying to me, Judge, we really need these done so it can

8  affect the 2024 election.  And the defendants are saying, Judge,

9  we need to be able to present our case and build our record.

10 That's, basically, what I'm hearing.

11         I have been doing this long enough to know that you-all

12 probably know how I'll rule in that trial, but let me add one

13 other thing.  September the 25th, proposed findings of facts and

14 conclusion of law will be due from you-all.

15         I'm anticipating trial is going to take, roughly, two

16 weeks.  So once I get those findings of facts and conclusion of

17 law from you-all, I'm guessing two to three weeks, maybe less,

18 maybe more.  I should get an order back to you in October.

19         Now, this is saying we're going to have a trial on the

20 issues.  But right now I can't tell you how many issues you're

21 going to have in there.  So this is giving you a broad overview.

22 Okay?  It might be narrower or it might be wider.  It's going to

23 depend on -- I heard a lot today that's going to help me fashion

24 what I think the issues are, but the Supreme Court is really going

25 to make the final decision for me, obviously.

 1          After that, once I rule and, you know, obviously one or

 2   both sides are going to appeal the case, it is out of my hands.

 3   It's up to the people in the Eleventh Circuit.

 4          What I'm saying to you plaintiffs, it's going to be a

 5   whole lot of fast moving on a whole lot of different ends for it

 6   to affect the 2024 election.  And that's all I can say about that.

 7   But I have no control after it leaves me.

 8          Questions?  Do you want me to go over the schedule

 9   again?  We'll prepare an order.  If we haven't already sent them

10   an order on their schedule.

11          Yes, sir?

12          MR. HAWLEY:  Thank you, Your Honor.  If we hear from the

13   Supreme Court before June 30, should we assume a similar schedule

14   will follow with supplemental briefings due a week later?

15          THE COURT:  Great question.  Let's say they tell me

16   something on June 16 or June 15, you'll get a new schedule.

17   You'll get a whole new schedule from me.  It may be saying

18   supplemental briefs due -- if I got a ruling on June 15, I may say

19   supplemental briefs due on June 25, something like that.  I'm

20   trying to give you-all enough time to prepare for trial.  But your

21   question is a great question.

22          You know, I think most of you-all were either district

23   or circuit clerks -- I think you-all have been Supreme Court

24   clerks.  In the past, they usually would just tell you the last

25   week.  That's what we kind of went through and looked at and

1    talked to people.  So I don't know.  If they tell me something

2    tomorrow...

3              I was reading the other day that South Carolina has a

4    redistricting case that the Supreme Court said -- I kind of

5    laughed, when they said we need you to put it on the October trial

6    -- not trial, oral argument, and we get a ruling to you-all by

7    January the 1st.  I said okay.  I'm not going -- I'm going to send

8    you a brief outline of what the schedule is like in an order.

9    Good question, though.  It may changed, but I don't anticipate it.

10   Anything else?

11             Did I miss anything, ladies?

12             Thank you-all, have a great day and a great rest of the

13   week.

14             (The hearing concluded at 3:34 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1              C E R T I F I C A T E

2

3  UNITED STATES DISTRICT COURT

4  NORTHERN DISTRICT OF GEORGIA

5

6     I do hereby certify that the foregoing pages are a true and

7  correct transcript of the proceedings taken down by me in the case

8  aforesaid.

9     This the 18th day of May, 2023.

10

11

12

13

14                    /s/Viola S. Zborowski _____
                       VIOLA S. ZBOROWSKI,
15                     RDR, FAPR, CMR, CRR, RPR, CRC
                       OFFICIAL COURT REPORTER TO
16                     THE HONORABLE STEVE C. JONES

17

18

19

20

21

22

23

24

25