**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

ANNIE LOIS GRANT, *et al.*,

     *Plaintiffs*,

v.

BRAD RAFFENSPERGER, *et al.*,

     *Defendants*.

CIVIL ACTION

FILE NO. 1:22-CV-00122-SCJ

**SUPPLEMENTAL BRIEF REGARDING SUMMARY JUDGMENT
BRIEFING BASED ON <u>ALLEN v. MILLIGAN</u>**

## INTRODUCTION

As much as the parties and this Court anticipated the Supreme Court's ruling in Allen v. Milligan, Case No. 21-1086, 2023 WL 3872517 (U.S. June 8, 2023), the decision provided far less direction for the future of this case than expected because it did not alter or clarify the law of Section 2. Many of the arguments made by Alabama that were rejected by the majority are not raised by Defendants in this case. On other points, such as the impact of race on illustrative plans, only four Justices agreed on any particular approach. Alabama also did not advance the substantive arguments raised on several critical points contested in this case, including the issue of partisan polarization.

Ultimately, the ruling in Allen underscores a key issue in Voting Rights Act cases—the facts matter because the application of Gingles remains "peculiarly dependent on the upon the facts of each case." Roberts,[1] p. 11 (quoting Thornburg v. Gingles, 478 U.S. 30, 79 (1986)). This Court must still carefully apply the relevant law to the facts of this case to determine whether

_____

[1] For ease of reference, this brief references the PDF slip opinion released by the Supreme Court by the name of the Justice and page of that Justice's opinion. That opinion is available at
https://www.supremecourt.gov/opinions/22pdf/21-1086_1co6.pdf

1

the lack of electoral success Plaintiffs claim is occurring is because they are numerical minorities who lose elections in a majoritarian system or because they are facing vote dilution "on account of race or color." <u>Holder v. Hall</u>, 512 U.S. 874, 914 (1994) (Thomas, J., concurring). The undisputed material facts demonstrate that Plaintiffs have not put forward sufficient evidence demonstrating they are facing vote dilution on account of race or color as a result of Georgia's redistricting plans. Accordingly, this Court should grant judgment in favor of Defendants or, at the very least, deny Plaintiffs' motion for summary judgment.

## DIFFERENCES IN <u>ALLEN</u> AND DEFENDANTS' ARGUMENTS

To review the impact of <u>Allen</u>, it is first important to note the arguments Alabama advanced that the majority rejected, but which are not raised in this case. Defendants are not arguing for the map-comparison test sought by Alabama. Roberts, pp. 27-28. Nor are Defendants arguing for an intent standard in map design or that Section 2 does not apply to single-member redistricting. Roberts, pp. 29-34. Nor are Defendants seeking to overturn <u>Gingles</u>—but rather to apply it faithfully. Kavanaugh, pp. 1-2.

The complete lack of any discussion about partisanship driving voting patterns at the <u>Gingles</u> preconditions phase is also a huge difference in <u>Allen</u> and this case. The only reference in the opinions to primary elections is when

Justice Thomas explains that the plaintiffs offered evidence of racial voting patterns in the Republican primary—unlike this case. Thomas, pp. 26-27. Thus, Alabama apparently did not press any issues at the Supreme Court related to the impact of race and partisanship as Defendants do here.

Further, Alabama did not contest any of the factual findings of the district court, instead (apparently) opting to make legal arguments only on the appeal. Roberts, pp. 14-15.

The difference in the arguments by Alabama and Defendants limits the benefit of <u>Allen</u> in this case, because the major issues ruled on by the majority are not at issue in this case. And especially in light of the apparent confusion over Alabama's actual arguments (<u>see</u>, <u>e.g.</u>, Alito, p. 9), and the clear-error review standard (Roberts, pp. 14-15), the opinions do not break new ground in a way that materially assists this Court with resolving these cases.

## APPLYING <u>ALLEN</u>

Turning to the points where <u>Allen</u> offers at least some direction in this case, it is important for this Court to carefully review what the Supreme Court said and especially what portions are binding precedent.

I.     **The first <u>Gingles</u> precondition.**

   A.     **The <u>Allen</u> opinions on the first <u>Gingles</u> precondition.**

First, the Justices disagreed with each other about the proper application of the first <u>Gingles</u> precondition, which was apparently the primary focus of Alabama's argument. Chief Justice Roberts' opinion commanded five votes for all sections except for III–B–1, which addressed a similar issue to that raised by Defendants in this case—the question of how to assess racial predominance in the illustrative plans. That portion received only four votes. Justice Thomas' dissent likewise received four votes for Parts II–A and II–B, which addressed racial predominance in the illustrative plans and questions related to proportionality. As discussed below, all of the various comments made by the pluralities on this point are relevant to the pending motions.

All the Justices who touched the topic agree that race cannot predominate in the creation of illustrative plans, even if "the line between racial predominance and racial consciousness can be difficult to discern." Roberts, p. 23; <u>compare</u> Thomas, pp. 10-11. But no method for determining where that line is drawn garnered a majority of votes on the Court.

Justice Thomas, joined by three others, would have determined that Section 2 plaintiffs "cannot satisfy their threshold burden of showing that a reasonably configured alternative plan with a proposal that could only be

viewed as a racial gerrymander if enacted by the State." Thomas, p. 21. The four Justices in that portion of the dissent criticize the Allen plaintiffs' map-drawers for prioritizing "race over neutral districting criteria" even when the map-drawers testified that they did not make this prioritization. Compare Thomas, p. 14 with Roberts p. 23.

In contrast, Chief Justice Roberts, also with three other votes, was willing to accept the testimony of Bill Cooper (one of plaintiffs' mapping experts), over the relative lack of evidence from Alabama of racial predominance. Roberts, p. 23-24. But the Chief Justice's opinion acknowledges that the eleven illustrative maps in that case were "districting maps that Alabama could enact." Roberts, p. 12. Justice Kavanaugh does not address the issue.

The majority noted that the only apparent counterarguments by Alabama to the illustrative plans was that they divided the Gulf Coast region, which was a community of interest in the southwest area of the state, and that the adopted plan performed better on core retention. Roberts, pp. 12-13. The majority then relied on the testimony about the community-of-interest nature of the Gulf Coast and the fact that a community of interest would be divided under either the state's plan or the illustrative plans. Roberts, p. 13. Notably absent from the portion of the Chief Justice's opinion that garnered five votes

is any analysis of the particular boundaries involved—only the general arguments made by Alabama.

But the approaches taken by both Chief Justice Roberts and Justice Thomas demonstrate that race predominated in the creation of the illustrative plans in this case. Unlike Alabama, Defendants here do not argue that every illustrative plan hits a racial target. Roberts, p. 25. Instead, Defendants focus particularly on boundaries and design of the illustrative plans, all of which would be considered racial gerrymanders if enacted by the State—and thus maps the State could not enact, unlike the maps in Allen. Roberts, p. 12.

### B.  The illustrative plans in this case.

When Mr. Esselstyn was creating his illustrative maps, he turned on features in the software to indicate where Black individuals were located, including using it to inform decisions about which populations were included and excluded from districts. [Doc. 192, ¶ 59]. He also focused on areas with higher concentrations of Black voters for looking where additional districts could be drawn. Id. at ¶ 60. Unlike the legislature, Mr. Esselstyn did not have any political data available to him. Id. at ¶ 61. His county splits were often racial in nature. Id. at ¶ 62. He also did not review any public comment until after drafting his preliminary injunction plans. Id. at ¶ 63. Mr. Esselstyn's

illustrative plans contained the maximum number of Black districts he drew for any legislative plan in Georgia. Id. at ¶ 64.

If the legislature had used racial shading, did not use political data, and drew without reviewing any public comments, it would be accused of racial gerrymandering—exactly as it has been in the three-judge panel cases. There is no indication in the Allen decision that Alabama advanced any arguments about the nature of the drawing process beyond its proposed race-neutral, alternative benchmark. Under the facts here, clearly Plaintiffs "cannot satisfy their threshold burden of showing that a reasonably configured alternative plan" by presenting a plan that would be a racial gerrymander if enacted by a state. Thomas, p. 21.

In order to create the additional majority-Black Senate districts on the illustrative plan, Mr. Esselstyn modified 22 of the 56 state Senate districts. [Doc. 192, ¶ 66].  To create Senate District 23, Mr. Esselstyn split counties based on race—in each case where a county is split, the higher-Black-percentage portion of the county is included in illustrative District 23, while the lower-Black-percentage portion of the county is outside of illustrative District 23. Id. at ¶ 67.

To create Senate District 25, Mr. Esselstyn could not recall why he decided to connect Clayton and Henry Counties in a single district. [Doc. 192,

¶ 68. In doing so, he significantly altered Senate District 10 to include areas with significant white populations and lengthening the district to measure 43 miles from north to south. Id. at ¶ 69. As a result, the only county in Senate District 10 (a majority-Black district) with a majority-Black voting age population is DeKalb County. Id. at ¶ 70.

To create Senate District 28, Mr. Esselstyn connected more-urban areas of Clayton County with more-rural areas in Coweta County. [Doc. 192, ¶ 71]. He was not trying to ensure that the district had areas in common with each other. Id. at ¶ 72. He also made changes to Senate District 35 that connected more-rural areas of Paulding County to Fulton County. Id. at ¶ 73.

Further, the illustrative Senate plan does not comply with traditional redistricting principles when compared to the enacted Senate plan. It has higher total population deviations than the enacted plan. [Doc. 192, ¶ 74]. The illustrative Senate plan also splits more counties and precincts than the enacted plan. Id. at ¶ 77. This is distinctly different from the Allen illustrative plans. Roberts, p. 12.

Likewise, in order to create the additional House districts, Mr. Esselstyn modified 25 of the 180 state House districts. [Doc. 192, ¶ 79].  Of the new districts created, illustrative House Districts 64, 117, 145, and 149 are all less

than 52% Black voting age population, with several barely above 50%.[2] Id. at ¶ 80. To create illustrative House District 64, Mr. Esselstyn connected parts of Paulding and Fulton counties but could not identify any basis for connecting those areas. Id. at ¶ 82. To create illustrative House District 74, Mr. Esselstyn connected heavier concentrations of Black individuals in Clayton County with more heavily white portions of Fayette County, while lowering the compactness of the surrounding districts. Id. at ¶ 83. To create illustrative House District 117, Mr. Esselstyn connected parts of districts from Clayton County to rural areas and was unable to identify any community that was being kept whole in District 117. Id. at ¶ 84. To create illustrative House Districts 145 and 149 in Macon, Mr. Esselstyn lowered the Black percentages of the existing Macon districts to make Black population available to run into other counties and raise the Black percentages in Districts 145 and 149. Id. at ¶ 85. As a result, all four districts that include portions of Macon are all very close to 50% Black VAP. Id. at ¶ 87. If the State had drawn districts in this

---

[2] In contrast, illustrative House Districts 77 and 86 are both greater than 75% Black voting age population, which Mr. Esselstyn called accidental but hesitated to characterize as packing. [Doc. 192, ¶ 80].

manner, it likely would be accused of racial gerrymandering to achieve a specific racial goal.

Further, the illustrative House plan does not comply with traditional redistricting principles when compared to the enacted House plan. It has higher total population deviations than the enacted plan. [Doc. 192, ¶ 88]. The illustrative House plan also splits one more county and one more precinct than the enacted plan. Id. at ¶ 91. Like the Senate plan, these differing metrics are not how the Allen illustrative plans were configured. Roberts, p. 12.

Mr. Esselstyn's illustrative plans in this case are thus categorically different than the plans in Allen. They split more counties, have higher deviations, and have features that are unexplainable on grounds other than race.

## C.   Applying Allen to the first Gingles precondition.

Defendants agree with how Justice Alito proposes to address the issue—that a plaintiff must "show at the outset that such a[n additional majority-minority] district can be created without making race the predominant factor in its creation." Alito, p. 5. And this is Plaintiffs' burden. Id. This is also consistent with Chief Justice Roberts' approach, that the illustrative plans had to be maps the state could enact. Roberts, p. 12.

Because the illustrative plans in this case could not be enacted by the State, the Plaintiffs have not put forth evidence sufficient to satisfy the first <u>Gingles</u> precondition. As a result, Plaintiffs have failed to carry their burden, and Defendants are entitled to judgment as a matter of law.

## II.    The third <u>Gingles</u> precondition.

The majority opinion does not provide much direct guidance for lower courts on a plaintiff's evidentiary burden in satisfying the third <u>Gingles</u> precondition, because that precondition was not squarely at issue in <u>Allen</u>. Unlike Defendants here, Alabama conceded that the third precondition was satisfied, so there was no reason for the District Court or the Supreme Court to address any other arguments. But to the extent the majority says anything about the third <u>Gingles</u> precondition (racial polarization), it supports Defendants here.

### A.    Chief Justice Roberts' majority opinion reinforces the Defendants' interpretation of the evidence required to establish the third <u>Gingles</u> precondition.

Chief Justice Roberts recounts the history of the events leading to the 1982 amendments to Section 2 of the Voting Rights Act. And he focuses on <u>City of Mobile v. Bolden</u>, the case that catalyzed changes to the Act proposed and adopted by Congress just two years later. 446 U.S. 55 (1980). The majority noted the sharp disagreement surrounding the <u>Bolden</u> decision in Congress,

11

with one side of the debate clamoring for a rework of the statutory language to allow for an "effects" test, and others expressing concern that such a test would create a right to proportional representation among the races in elected bodies, thereby entrenching "more, not less, racial and ethnic polarization." Roberts, p. 4. (quoting <u>Wall Street J.</u>, Jan. 19, 1982, p. 28). This initial recognition of racial polarization is appropriate, because returning to the <u>Bolden</u> case as Chief Justice Roberts did demonstrates how policymakers viewed the term "racial polarization" at the time the amendments were passed. Thus, to understand the analysis in <u>Allen</u>, we have to review <u>Bolden</u>.

> **1.    *The <u>Bolden</u> case--from trial court to Supreme Court and through the 1982 amendments it inspired--offers support for Defendants' view on racial polarization.***

Though not using the magic words of "racial polarization," the <u>Bolden</u> trial court provides a comprehensive definition of racial polarization, offering a view of what a plaintiff is required to show in order to demonstrate it:

> In the 1960's and 1970's there has been general [racial] polarization in the white and black voting. The polarization has occurred with **white voting for white** and **black for black** if a white is opposed to a black, or if the race is between two white candidates and one candidate is identified with a favorable vote in the black wards, or identified with sponsoring particularized black needs. When this occurs, **a white backlash** occurs which usually results in the defeat of the black candidate or the white candidate identified with the blacks.

Bolden v. Mobile, 423 F. Supp. 384, 388 (S.D. Ala. 1976) (emphasis added). Thus, in the period before the 1982 amendments, the race of the candidate and corresponding voter behavior was paramount to a polarized-voting analysis. If a Black candidate is running against a white candidate, racial polarization occurs "with white voting for white and black for black if a white is opposed to a black...." Id. We can also see that when the only option to voters is a choice between white candidates, race still underlies the racial polarization inquiry. That is because the trial court first concluded it must determine which white candidate is associated with "the black wards" or "identified with sponsoring particularized black needs." If such candidate is readily identifiable, the court then must determine whether "a white backlash" occurred resulting in the usual defeat of the Black-preferred white candidate. Id. The use of the term "backlash" here is important because it suggests a change or alteration in voting patterns by a white majority that occurs on account of race. In other words, it is because the candidate is Black, or it is because a white candidate is identified with Black interests, that gives rise to the inference of racial polarization in differential racial bloc voting patterns. It is not merely differential racial voting patterns standing alone.

On appeal, the Fifth Circuit agreed with the factual finding that the plaintiffs presented sufficient evidence to show racial polarization. "No black

had achieved election to the city commission due, in part, to racially polarized voting of an acute nature." <u>Bolden v. Mobile</u>, 571 F.2d 238, 243 (5th Cir. 1978). The Supreme Court also accepted the trial court definition: "[T]he District Court based its conclusion of unconstitutionality primarily on the fact that no Negro had ever been elected to the City Commission, apparently because of the pervasiveness of racially polarized voting in Mobile." <u>Bolden</u>, 446 U.S. at 71.

Of course, the presence of racially polarized voting did not alter the outcome in <u>Bolden</u> because the Court determined that intent was necessary to a Section 2 case, and it was against this backdrop that Congress enacted the 1982 amendments to override the Court's decision in <u>Bolden</u>, as Chief Justice Roberts explained. But neither the text of amended Section 2 nor the Senate Report discussing the amendment process purport to alter or recast what was understood to be racially polarized voting at the time. Accordingly, the <u>Bolden</u> trial court's definition of racial polarization remains undisturbed. And this definition is in line with how the Supreme Court viewed it almost ten years earlier in <u>Whitcomb v. Chavis</u>, which the 1982 amendments sought to restore after <u>Bolden</u>. 403 U.S. 124 (1971).

> [T]he failure of the [minority residents] to have legislative seats in proportion to its population emerges more as a function of losing elections than of built-in bias against poor [minorities]. The voting power of [minority] residents may have been "cancelled out" as the

District Court held, but this seems a mere euphemism for political defeat at the polls.

Id. at 153.

Of course, Justice Brennan attempted in Gingles to change the definition of racially polarized voting into one concerned purely with the mathematical results of voting patterns, but his view was specifically rejected by five Justices on this point. See, e.g., Gingles, 478 U.S. at 83 (White, J., concurring) ("I doubt that this is what Congress had in mind in amending § 2 as it did, and it seems quite at odds with the discussion in Whitcomb . . ."); see also, id. at 101 (O'Connor, J., concurring the judgment) ("I agree with Justice White that Justice Brennan's conclusion that the race of the candidate is always irrelevant in identifying racially polarized voting conflicts with Whitcomb"). Instead, Justice White (who dissented in Bolden and authored the majority opinion of the Court in Whitcomb) specifically would have held that racially polarized voting requires a showing of racial causation. Id.

### 2. *The Roberts majority opinion reaffirms the vitality of the Whitcomb and Bolden definitions of racial polarization in its brief discussion of the third Gingles precondition.*

After discussing Bolden and the subsequent amendments, the majority opinion in Allen noted that "[t]he third [Gingles] precondition, focused on racially polarized voting, 'establish[es] that the challenged districting thwarts

a distinctive minority vote' *at least plausibly on account of race*." Roberts,

p. 11 (emphasis added) (citing to <u>Growe v. Emison</u>, 507 U.S. 25, 40 (1993)). It

is significant that the Chief Justice recognizes the racial causation element not

just in the context of the broader Section 2 inquiry, but also <u>within</u> the discrete

inquiry into whether the plaintiffs have proven the third <u>Gingles</u> precondition.

The existence of this causal element harkens back to the <u>Bolden</u> trial court's

definition of racial polarization that requires a "white backlash," <u>i.e.</u>, a majority

voting bloc motivated in some identifiable way "on account of race."

      **3.**    *The majority opinion could not affect or change its third <u>Gingles</u> precondition jurisprudence because the issue was not before the Court in any meaningful way.*

     But the next mention in the majority opinion of the third <u>Gingles</u>

precondition explains why the Supreme Court did not offer any additional

clarity on it—because there was "no reason to disturb the District Court's

careful factual findings, which are subject to clear error review **and have gone**

**unchallenged by Alabama in any event.**" Roberts, p. 14 (emphasis added).

And this lack of dispute removed from the majority decision any discussion of

the issue raised by Defendants here. [3]

_____

[3] Although it should not matter, even in the district court, Alabama hardly pressed a partisan polarization argument, as it conceded that voting <u>was</u> racially polarized. The Alabama defendants' expert "testified that he and [the

So, unlike here, there was no consideration of what kind of statistical evidence is necessary at the third <u>Gingles</u> precondition to demonstrate <u>racial</u> polarization in the electorate as distinct from <u>partisan</u> polarization. Put differently, there was no discussion of whether the data supported the position that Black voters were losing at the polls due to bloc voting "at least plausibly on account of race," (Roberts, p. 11) or whether those losses simply reflected "a mere euphemism for political defeat at the polls." <u>Whitcomb</u>, 403 U.S. at 153.[4]

Next, the Supreme Court credited the District Court with "faithfully appl[ying]" its precedents. Roberts, p. 15. And this is unsurprising because, unlike Defendants here, Alabama's litigation strategy was apparently that

---

plaintiffs' expert] 'both found evidence of racially polarized voting in Alabama." <u>Singleton v. Merrill</u>, 582 F. Supp. 3d 924, 991 (N.D. Ala. 2022). And "[t]he only evidence Defendants offer to support their assertion that party, not race, may be the real issue is the recent election of a Black Republican, Kenneth Paschal, to the Alabama House from a majority-white district." <u>Merrill</u>, 582 F. Supp. 3d at 1019. By contrast, Defendants here have pressed the point that partisan polarization best explains the data at every opportunity and articulated the insufficiency of the statistical analysis provided by Plaintiffs, which only shows bloc voting on account of party in Georgia elections.

[4] Plaintiffs may suggest that the causal elements of racially polarized voting identified in <u>Whitcomb</u>, <u>White</u>, <u>Bolden</u>, and the majority of justices in <u>Gingles</u> means that they can satisfy their evidentiary burden as to the third <u>Gingles</u> precondition by an <u>inference</u> of racial causation. But, at least in the Eleventh Circuit, Section 2 plaintiffs "must be careful not to infer that <u>racial</u> targeting is, in fact, occurring based solely on evidence of partisanship." <u>League of Women Voters of Fla. Inc. v. Fla. Sec'y of State</u>, 66 F. 4th 905, 924 (11th Cir. 2023)

"<u>Gingles</u> must be overruled." Roberts, p. 25 (four justices); <u>see also</u>, Kavanaugh, p. 1 ("[T]he upshot of Alabama's argument is that the Court should overrule <u>Gingles</u>."). But as Defendants have repeatedly noted in briefing and at oral argument: <u>Gingles</u> remains the standard for Section 2 cases, and Defendants' legal analysis is perfectly in line with existing precedent. The key is that courts must give effect to <u>all</u> the aspects of the <u>Gingles</u> opinion (including the concurring opinions) and take into account still relevant (and controlling) pre-amendment Supreme Court precedent.

**B.   The third <u>Gingles</u> precondition operates as a temporal limitation on the reach of Section 2, thus assuaging concerns raised by Justice Kavanaugh in his concurring opinion.**

Justice Kavanaugh references an argument not made by Alabama—a "temporal argument" that calls into question the constitutionality of Section 2, which creates an additional reason for the Court to adopt Defendants' argument on the third <u>Gingles</u> precondition. Kavanaugh, p. 4. Defendants' approach to this precondition operates as a naturally occurring temporal limitation on the reach of Section 2. Since the passage of the 1982 amendments, voting patterns have doubtless become far more partisan. But, crucially, as Plaintiffs' evidence demonstrates, they have also become less focused on the

race of the candidate so that the race of the candidate is irrelevant in current Georgia elections.[5]

Unlike during the time of <u>Gingles</u>, white voters consistently support Black and Black-preferred candidates who are nominated in their party's primary. Lately, this has been true of both major political parties in Georgia. Adopting Defendants' interpretation of the third <u>Gingles</u> precondition anchors the Act in—as its text dictates—correcting the problem of invidious racial discrimination that results in a jurisdiction that is not equally open to minority voters. Over time, the trend may be that the disadvantages associated with invidious discrimination in elections are addressed to such a degree that Section 2 no longer need be invoked to ensure "equal openness" to the election process. Thus, there is no concern about the timing of continuing race-based districting into the future because a proper interpretation of the third <u>Gingles</u> precondition addresses that exact concern in a way that preserves not just the Supreme Court's decades of jurisprudence interpreting the Act, but the Act itself.

---

[5] Plaintiffs' own expert reports make this abundantly clear.

19

**C.**     **Failing to adopt the Defendants' interpretation of the third <u>Gingles</u> precondition puts Section 2 on a problematic constitutional path.**

While a majority of the Supreme Court approved the ongoing constitutionality of Section 2, a minority of four justices called it into question. More importantly, Justice Kavanaugh's concurring opinion—the <u>fifth</u> vote— makes abundantly clear that the constitutionality of the law is not at all settled into the future. And like the broader inquiry into the third <u>Gingles</u> precondition itself, the question of whether it is appropriate to declare Section 2 unconstitutional because of a temporal limitation was not squarely before the Court. Kavanaugh, p. 4. Only Defendants' interpretation of the third <u>Gingles</u> precondition, consistent with voting patterns in Georgia, helps ensure Section 2 endures unless and until it is determined, in the wisdom of Congress, that it has outlived its usefulness.

**III.   The totality of the circumstances.**

Section 2 is aimed at equal openness in the political processes of a state. 52 U.S.C. § 10301. Thus, a "district is not equally open, in other words, when minority voters face—unlike their majority peers—bloc voting along racial lines, arising against the backdrop of <u>substantial racial discrimination</u> within the State, that renders a minority vote unequal to a vote by a nonminority voter." Roberts, p. 17 (emphasis added). That is the question this Court must

answer under Section 2. If minority voters face voting against the backdrop of substantial political polarization within a state, their votes are not unequal— because numerical minorities lose elections. Hall, 512 U.S. at 901 (Thomas, J., concurring).

That is why, unlike what Alabama argued, the totality of the circumstances is not based on a single circumstance, but must be carefully weighed by this Court to look for racial discrimination in the Georgia election system. Roberts, p. 18. And this requires an "intensely local appraisal" and a "searching practical evaluation." Roberts, p. 11 (quoting Gingles, 478 U.S. at 79).

Beyond those points, Allen does not offer any direction to this Court on how to apply the totality of the circumstances. Accordingly, Defendants rely on their earlier briefing in opposition to Plaintiffs' motion for summary judgment about why that determination is inappropriate at this stage of the case.

## THE UNANSWERED QUESTIONS

Despite hopes of further clarifying Section 2 law, the Allen majority ultimately left a number of unanswered questions that must be addressed here. The majority made clear that Section 2 required Alabama to divide a single community of interest to create an additional majority-Black district,

primarily because a community would be divided either way and it did not affect the overall plan metrics. Roberts, pp. 12-13.

While that seems straightforward, much more is at issue in this case, and Plaintiffs' approach here would extend the reach of federal law far deeper into districting decisions by legislatures. For example:

- Does Section 2 require the division of more <u>counties</u> to create additional majority-Black districts? If so, how many and why?

- Does Section 2 require the state to increase its <u>population deviations</u> to create additional majority-Black districts? If so, how much and why?

- Does Section 2 require the state to draw additional majority-Black districts even if those districts result in other districts that are unexplainable based on traditional districting principles in other parts of the state? If so, why, and are there any protections for traditional principles in non-majority-Black districts?

- How many additional districts does Section 2 require? If the legislature is able to draw seven additional majority-Black legislative districts, does Section 2 require it to keep adding districts up to proportionality so long as there are no "tentacles

and appendages" (see Roberts, p. 12)? Or is that racial gerrymandering?

- How can this Court determine the nature of the polarized voting without more evidence?

Defendants submit that these questions are where Plaintiffs' lack of evidence is most glaring. If Plaintiffs had submitted illustrative plans with the same population deviation and the same number of split counties, been able to explain the overall design of the other districts, or provided evidence of racial voting behavior in primaries, then this case would be more like <u>Allen</u>. But they have not done so and have not proposed any limiting principle beyond the districts they challenge—which is not enough for the State to have clarity on the law of Section 2 moving forward.

## CONCLUSION

The Voting Rights Act need not remain forever ambiguous, but <u>Allen</u> does not offer this Court much assistance with the salient questions before it, especially given the different arguments made by Alabama and Defendants. The facts of this case demonstrate that Plaintiffs have failed to carry their burden regarding material facts necessary to the <u>Gingles</u> preconditions and that judgment should be entered for Defendants. But if this Court determines

that there are material facts at issue, it cannot enter summary judgment against Defendants, but rather should proceed to trial of this case.

Respectfully submitted this 22nd day of June, 2023.

Christopher M. Carr
Attorney General
Georgia Bar No. 112505
Bryan K. Webb
Deputy Attorney General
Georgia Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
Georgia Bar No. 760280
Elizabeth Vaughan
Assistant Attorney General
Georgia Bar No. 762715
**State Law Department**
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*/s/ Bryan P. Tyson*
Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@taylorenglish.com
Frank B. Strickland
Georgia Bar No. 687600
fstrickland@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Diane Festin LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com
Donald P. Boyle, Jr.

24

Georgia Bar No. 073519
dboyle@taylorenglish.com
Daniel H. Weigel
Georgia Bar No. 956419
dweigel@taylorenglish.com
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, GA 30339
Telephone: 678-336-7249

*Counsel for Defendants*

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing Supplemental Brief has been prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).

*/s/Bryan P. Tyson*
Bryan P. Tyson