# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

ANNIE LOIS GRANT, et al.,

    Plaintiffs,

v.

BRAD RAFFENSPERGER, et al.,

    Defendants.

CIVIL ACTION FILE

No. 1:22-CV-122-SCJ

## ORDER

This matter appears before the Court on the Parties' Cross-Motions for Summary Judgment. (Doc. Nos. [189]; [190]). [1]

Full briefing on these Motions—responses in opposition (Doc. Nos. [203]; [205]) and replies in support (Doc. Nos. [215]; [217])—has been completed. The Parties have also submitted supplemental briefing (Doc. Nos. [227]; [228]) following the Supreme Court's recent voting rights decision in Allen v. Milligan, 599 U.S.---, 143 S. Ct. 1487 (2023).

---

[1] All citations are to the electronic docket unless otherwise noted, and all page numbers are those imprinted by the Court's docketing software.

The Parties' Motions for Summary Judgment are now ripe for review. The inquiry into a vote dilution claim must involve a "comprehensive, not limited canvassing of relevant facts." Johnson v. De Grandy, 512 U.S. 997, 1011 (1994). The Court has thoroughly analyzed the Parties' Statements of Material Facts, the Record, and the Parties' arguments and ultimately determines that each Motion must be **DENIED**. Material questions of fact remain as to all aspects of Plaintiffs' claims, and the Court cannot rule for one Party without making factual determinations, weighing evidence, and assessing the credibility of the experts. Unlike on a motion for a preliminary injunction, these determinations are impermissible on motions for summary judgment.

\*    \*    \*    \*    \*

"[T]he political franchise of voting . . . is regarded as a fundamental political right, because [it is] preservative of all rights." Yick Wo v. Hopkins, 118 U.S. 356, 370 (1886). The Supreme Court's "paramount concern has remained an individual and personal right—the right to an equal vote." Gaffney v. Cummings, 412 U.S. 775, 781 (1973) (Brennan, J., concurring). And the "[p]assage of the Voting Rights Act of 1965 was an important step in the struggle to end discriminatory treatment of minorities who seek to exercise one of the

2

most fundamental rights of [American] citizens: the right to vote." Bartlett v. Strickland, 556 U.S. 1, 10 (2009).

In the intervening fifty-eight years since the passage of the Voting Rights Act and thirty-seven years since its most substantive amendment, the Voting Rights Act has been used to ensure that minority voters have an equal opportunity to participate in elections and elect candidates of their choice. Specifically, Section 2 was enacted to prohibit, in all 50 States, any "standard, practice, or procedure . . . imposed or applied . . . to deny or abridge the right of any citizen of the United States to vote on account of race or color." Shelby Cnty. v. Holder, 570 U.S. 529, 536 (2013). "Section 2 is permanent [and] applies nationwide . . . ." Id. at 537.

During the Supreme Court's October 2022 Term, it heard argument on Section 2 challenges to Alabama's congressional map. Allen, 143 S. Ct. 1487.  On June 8, 2023, in a 5-4 decision, Chief Justice Roberts delivered the opinion of the Court and affirmed the three-judge court's order granting plaintiffs a preliminary injunction. Id. at 1504. The majority[2] conducted a clear error review of the lower

---

[2]  The Court notes that Part III-B-1 of the Allen opinion was rendered by a plurality of the Court. "When a fragmented Court decides a case and no single rationale explaining

3

court's factual findings and applied them to the virtually untouched and longstanding test from <u>Thornburg v. Gingles</u>, 478 U.S. 30 (1986).

Unequivocally, the <u>Allen</u> majority asserted:

> <u>Gingles</u> has governed our Voting Rights Act jurisprudence since it was decided 37 years ago. Congress has never disturbed our understanding of § 2 as <u>Gingles</u> construed it. And we have applied <u>Gingles</u> in one § 2 case after another, to different kinds of electoral systems and to different jurisdictions in States all over the country.

---

the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" <u>Marks v. United States</u>, 430 U.S. 188, 193 (1977). <u>But see</u> <u>Horton v. Zant</u>, 941 F.2d 1449, 1464 n.32 (11th Cir. 1991) ("Plurality opinions are only persuasive authority; they are not binding on [the Eleventh Circuit]."). Part III-B-1 of <u>Allen</u> is not the Court's holding; rather it is the Court's reasoning for rejecting a part of Alabama's proposed test.

Justice Kavanaugh did not join Part III-B-1 and wrote a concurrence that likewise rejected Alabama's attempt to create a new test for Section 2. He reasoned that under the doctrine of statutory *stare decisis*, "'the Court has ordinarily left the updating or correction of erroneous statutory precedents to the legislative process.'" <u>Allen</u>, 143 S. Ct. at 1517 (Kavanaugh, J., concurring) (quoting <u>Ramos v. Louisiana</u>, 590 U. S. ----, 140 S. Ct. 1390, 1413 (2020)). He rejected that the <u>Gingles</u> test requires the number of majority-minority districts be proportional to the minority population because under that formulation, "States would be forced to group together geographically dispersed minority voters into unusually shaped districts," which is not the test. <u>Id.</u> at 1518. Justice Kavanaugh also declined to address the constitutional question of whether Section 2 should continue to extend into the future because it was not raised before the Court. <u>Id.</u> at 1519.

4

143 S. Ct. at 1504. Thus, following <u>Allen</u>, the standards governing Plaintiffs' Section 2 challenges are the same as those this Court applied in its preliminary injunction order.[3]

## I.    BACKGROUND

On January 11, 2022, Plaintiffs Annie Lois Grant, Quentin T. Howell, Elroy Tolbert, Theron Brown, Triana Arnold James, Eunice Sykes, Elbert Solomon, and Dexter Wimbish filed Voting Rights Act ("VRA") Section 2 claims against Secretary of State Brad Raffensperger and the 2022 members of the State Election Board ("SEB" or "Board"). Doc. No. [1].[4] Plaintiffs amended their Complaint on March 29, 2022 and again on October 28, 2022. Doc. Nos. [96]; [118]. The Second Amended Complaint is the operative complaint and includes additional Plaintiffs (Garrett Reynolds, Jacqueline Faye Arbuthnot, Jacquelyn Bush, and Mary Nell Conner)[5] and updates Defendants to include the current SEB members and remove former members. Doc. No. [118].

---

[3] The Court conducts a more thorough discussion of <u>Allen</u> in its Summary Judgment Order in <u>Alpha Phi Alpha Fraternity, Inc. v. Brad Raffensperger</u>, No. 1:21-cv-5337-SCJ (N.D. Ga. July 17, 2023) ("<u>Alpha Phi Alpha</u>").

[4] On March 10, 2023, Plaintiff Brown was dismissed from the case by order of the court following the Parties' stipulation and consent motion. Doc. Nos. [160]; [162].

[5]   All named Plaintiffs are registered voters and reside in the State of Georgia.

Plaintiffs bring this action to challenge the Georgia Senate Redistricting Act of 2021 ("SB 1EX" or "Enacted Senate Plan") and the Georgia House of Representatives Redistricting Act of 2021 ("HB 1EX" or "Enacted House Plan") (collectively the "Enacted Plans") on the ground that they violate Section 2 of the VRA, 52 U.S.C. § 10301. Doc. No. [118].

In their Second Amended Complaint, Plaintiffs argue that based on the 2020 Census data, minority voters in Georgia are sufficiently numerous and geographically compact to form a majority of eligible voters for eight legislative districts throughout the State as follows: (1) two additional majority-Black State Senate districts in the southern Atlanta metropolitan area; (2) one additional majority-Black State Senate district in the central Georgia Black Belt region; (3) two additional majority-Black House districts in the southern Atlanta metropolitan area; (4) one additional majority-Black House district in the western Atlanta metropolitan area; and (5) two additional majority-Black House districts

---

Doc. No. [192], ¶¶ 16 (Grant), 22 (Howell), 28 (Tolbert), 31 (James), 35 (Sykes), 37 (Solomon), 41 (Wimbish), 44 (Reynolds), 50 (Bush), 54 (Conner); see also Doc. Nos. [166] (Arbuthnot Dep.); [218] (voter declarations).

anchored in Bibb County (collectively "the Proposed Districts"). Doc. No. [118], 2–3.

Immediately following the filing of their Complaint, Plaintiffs filed a motion for a preliminary injunction. Doc. No. [19]. In February of 2022, the Court presided over a preliminary injunction hearing—coordinated with two related redistricting cases.[6] After carefully weighing the evidence and determining the credibility of the witnesses, the Court found that Plaintiffs had a substantial likelihood of success on the merits as to their "Illustrative State Senate Districts 25 and 28, and Illustrative State House Districts 74 and 1[1]7."[7] Doc. No. [91], 220. The Court ultimately denied Plaintiffs' motion, because, in light of the upcoming primaries, the balance of harms and public interest weighed in favor of denying the preliminary injunction. Id. at 221–38; see also Alpha Phi Alpha Fraternity Inc. v. Raffensperger, 587 F. Supp. 3d 1222, 1327 (N.D. Ga. 2022).

The case proceeded to discovery and on March 20, 2023, Plaintiffs and Defendants filed Cross-Motions for Summary Judgment. Doc. Nos. [189]; [190].

---

[6] The two related redistricting cases are: Alpha Phi Alpha and Coakley Pendergrass, et al. v. Brad Raffensperger, et al., No. 1:21-cv-5339 (N.D. Ga. Feb. 7, 2022) ("Pendergrass").

[7] Page 220 of the Court's Preliminary Injunction Order contained a typographical error as to the second digit in District 117.

A hearing was held on May 18, 2023. See Doc. No. [224] ("Hearing Tr."). The Parties also filed supplemental briefs on June 22, 2023. Doc. Nos. [227]; [228].

The undisputed material facts for purposes of summary judgment are as follows. [8]

Both the Georgia Constitution and the Fourteenth Amendment require that the Senate and House of Representatives districts of the Georgia General Assembly be reapportioned after each Decennial Census. Ga. Const. art. III, § 2, ¶ II; Reynold v. Sims, 377 U.S. 533, 568 (1964).

According to the 2020 Census, approximately 33% of Georgia's population (essentially one-third) identified as "Black or African American alone or in combination." Doc. No. [189-2], ¶ 2. [9] The Census data showed that the increase

---

[8] The Court derives the facts from the Parties' submissions (Doc. Nos. [189-2]; [192]; [203-1]; [204]; [205-1]; [205-2]) and the Record. Pursuant to Local Rule 56.1(B), when a fact is undisputed, the Court includes the fact. For the disputed facts, the Court reviews the Record to determine if a dispute exists and, if so, whether the dispute is material. If the dispute is not material, the Court cites the fact and the opposing party's response. Where the dispute is material and the opposing party's response reflects the Record more accurately, the Court modifies the proposed fact and cites the Record. The Court also rules on objections to proposed facts and excludes immaterial facts, those stated as an issue or legal conclusion, those not supported by a citation to evidence, or those that the Record citation fails to support. Finally, where appropriate, the Court includes facts drawn from its review of the Record.

[9] The Court uses the any-part Black population or any-part Black voting age population

in the percentage of Black voters in Georgia from 2010 to 2020 was slightly more than two percentage points. Doc. No. [192], ¶ 1. More specifically, in 2020, the APBVAP made up 31.7% of the voting age population, an increase from 29.7% in 2010. Doc. No. [189-2], ¶ 7.

The 2020 Census data also showed that the non-Hispanic white population constitutes a majority of the State's population at 50.06%.[10] However, the non-Hispanic single-race white proportion of the voting-age population decreased from 59.0% in 2010 to 52.8% in 2020. Id. ¶ 8.

_____

("APBVAP") for purposes of determining numerosity. "[I]t is proper to look at *all* individuals who identify themselves as [B]lack" in their census responses, even if they "self-identify as both [B]lack and a member of another minority group," because the inquiry involved "an examination of only one minority group's effective exercise of the electoral franchise." Georgia v. Ashcroft, 539 U.S. 461, 473 n.1 (2003), superseded by statute in other part, Ala. Legis. Black Caucus v. Alabama, 575 U.S. 254, 276–77 (2015).

[10]  The Court notes that Mr. Esselstyn's Report states that the non-Hispanic white population is 50.1%. Doc. No. [189-2], ¶ 5. However, the Court takes judicial notice of the 2020 Census data, which states that the non-Hispanic white population is 50.06%. Census Bureau, Table S2901 https://data.census.gov/cedsci/table?q=S2901&g =0400000US13&tid=ACSST1Y2021.S2901. See United States v. Phillips, 287 F.3d 1053, 1055 n.1 (11th Cir. 2002) (citing Hollis v. Davis, 941 F.2d 1471, 1474 (11th Cir. 1991) and Moore v. Comfed Savings Bank, 908 F.2d 834, 841 n.4 (11th Cir. 1990)) (taking judicial notice of the United States Census Bureau's 1990 census figures).

Pursuant to 2020 U.S. States Census, Georgia's total population was 10,711,908 and the non-Hispanic white population was 5,362,156, which was approximately 50.06% of the total population. U.S. Census Bureau, Table S2901 (Jul. 13, 2023, 9:00 AM), https://data.census.gov/cedsci/table?q=S2901&g=0400000US13&tid=ACSST1Y2021 .S2901.

The State of Georgia engaged in the redistricting process following the 2020 Census, in which joint House and Senate redistricting committees adopted guidelines to govern the map-drawing process. Doc. No. [192], ¶ 5. The Parties dispute the remaining facts surrounding the map drawing and plan enactment process. See Doc. No. [205-1], ¶¶ 2–11. SB 1EX and HB 1EX were passed by the Georgia General Assembly and on December 30, 2021, Governor Brian Kemp signed SB 1EX and HB 1EX into law. Doc. No. [189-2], ¶ 13. The Enacted Senate Plan is comprised of 56 districts, each with a population near 191,284 (one-fifty-sixth of Georgia's total population). Id. ¶ 14. The Enacted House Plan is comprised of 180 districts, each with a population near 59,511 (one-one-hundred-eightieth of Georgia's total population). Id. ¶ 27. The Enacted Plans were used in the 2022 elections. Doc. No. [192], ¶ 14.

Of the 56 enacted State Senate districts, 14 are majority-Black in terms of the APBVAP.[11] Doc. No. [189-2], ¶¶ 15, 220.

---

[11]  Map-drawers distinguish "majority-minority" districts from "majority-Black" districts. Majority-minority districts have a majority of non-white and Latino voters, while majority-Black districts are districts where Black voters as a single racial category constitute a majority of a district." Doc. No. [192], ¶ 58. The Court clarifies that as a legal term of art, majority-minority districts and opportunity districts can refer to districts where a single-minority group makes up the majority of a particular district. See Allen,

Plaintiffs' mapping expert, Blakeman B. Esselstyn, has prepared an expert report and provided deposition testimony in which he concludes that Georgia's any-part Black population is sufficiently numerous to create three additional majority-Black districts in the State Senate Plan. Doc. No. [189-2], ¶ 17. [12] Mr. Esselstyn has also prepared an illustrative State Senate plan (the "Illustrative Senate Plan") with three additional majority-Black districts—Illustrative Senate Districts 23, 25, and 28—for a total of 17 majority-Black State Senate districts. Id. ¶¶ 18, 221.

Plaintiffs also submitted evidence from their racially polarized voting expert, Dr. Maxwell Palmer, who analyzed the performance of Black-preferred candidates in the Illustrative Senate Plan. Doc. No. Id. ¶ 24. Defendants' expert on this topic is Dr. John Alford. Doc. No. [178].

---

148 S. Ct. at 1506–14 (using the term majority-minority districts to describe districts where the Black population, alone, exceeded 50% of the proposed district); Abbott v. Perez, 585 U.S. ----, 138 S. Ct. 2305, 2315 (2018) ("[i]n a series of cases tracing back to Gingles, we have interpreted this standard to mean that, under certain circumstance, States must draw 'opportunity' districts in which minority groups form 'effective majorit[ies].'") (cleaned up). Thus, the Court will use the term "majority-minority districts" to encompass majority-Black districts.

[12] Defendants' expert, Mr. John Morgan, does not dispute this conclusion, however, it appears that Defendants dispute that the evidence Plaintiffs rely upon (in support of summary judgment) shows that Mr. Morgan agreed that these additional districts could be drawn in accordance with traditional redistricting principles. Doc. No. [204], ¶ 41.

11

Of the 180 enacted House districts, 49 are majority-Black in terms of the APBVAP. Doc. No. [189-2], ¶¶ 28, 222.

Mr. Esselstyn concluded that Georgia's any-part Black population is sufficiently numerous to create five additional majority-Black districts in the House Plan. Id. ¶¶ 30, 223.[13] Mr. Esselstyn has also prepared an Illustrative State House Plan (the "Illustrative House Plan") with five additional majority-Black districts—Illustrative House Districts 64, 74, 117, 145, and 149—for a total of 54 majority-Black House districts. Id. ¶ 31.[14]

Additional expert testimony found in the Record is from Plaintiffs' expert, Dr. Maxwell Palmer, who analyzed the performance of Black-preferred candidates in the Illustrative Plans. Id. ¶ 36; see also Doc. No. [20-2], ¶¶ 5–8. There is also evidence in the Record from Plaintiffs' experts, Dr. Orville Vernon Burton, who explored the relationship between race and partisanship in Georgia

---

[13] Similar to his assessment of the Enacted Senate Plan, Defendants' expert, Mr. Morgan, does not dispute this conclusion as to the Enacted House Plan, however, it appears that Defendants dispute that the evidence Plaintiffs rely upon (in support of summary judgment) shows that Mr. Morgan agreed that all of the additional districts could be drawn in accordance with traditional redistricting principles. Doc. No. [204], ¶ 41.

[14] The Illustrative Senate Plan and Illustrative House Plan are collectively referred to as the "Illustrative Plans."

politics, and Dr. Loren Collingwood, who examined socioeconomic and political disparities between Black and white Georgia voters. Doc. Nos. [204], ¶ 172; [205-2], ¶ 54; see also Doc. Nos. [191-4]; [191-5].[15]

As stated above, the Parties have filed Cross-Summary Judgment Motions, which are now ripe for the Court's consideration.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A factual dispute is genuine if the evidence allows a reasonable jury to find for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if it is "a legal element of the claim under the applicable substantive law which might affect the outcome of the case." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (citations omitted).

The moving party bears the initial burden of showing the court, by reference to materials in the record, that there is no genuine dispute as to any

---

[15]  Additional facts may be discussed as necessary in the Analysis section of this Order.

material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co.,

357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317,

323 (1986)). The moving party meets its burden merely by "'showing'—that is,

pointing out to the district court—that there is an absence of evidence to support

[an essential element of] the non-moving party's case." Celotex Corp., 477 U.S.

at 325. In determining whether the moving party has met this burden, the district

court must view the evidence and all factual inferences in the light most favorable

to the non-moving party. Johnson v. Clifton, 74 F.3d 1087, 1090 (11th Cir. 1996).

Once the moving party has adequately supported its motion, the non-movant

then has the burden of showing that summary judgment is improper by showing

specific facts of a genuine dispute. Matsushita Elec. Indus. Co. v. Zenith Radio

Corp., 475 U.S. 574, 587 (1986). The court should resolve all reasonable doubts in

the nonmovant's favor. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir.

1993). In addition, the court must "avoid weighing conflicting evidence or

making credibility determinations." Stewart v. Booker T. Washington Ins.,

232 F.3d 844, 848 (11th Cir. 2000)(citations omitted). When the record could not

lead a rational trier of fact to find for the non-moving party, there is no genuine

dispute for trial. Fitzpatrick, 2 F.3d at 1115 (citations omitted).

14

The filing of cross motions for summary judgment "does not give rise to any presumption that no genuine issues of material fact exist." 3D Med. Imaging Sys., LLC v. Visage Imaging, Inc., 228 F. Supp. 3d 1331, 1336 (N.D. Ga. 2017). Rather, cross motions for summary judgement "must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." Id. (citing Shaw Constructors v. ICF Kaiser Eng'rs, Inc., 395 F.3d 533, 538–39 (5th Cir. 2004)).[16]

## III.   ANALYSIS

Having reviewed the Parties' briefing, the Court denies both Defendants' and Plaintiffs' Motions for Summary Judgment. "Voting rights cases are inherently fact intensive[.]" Nipper v. Smith, 39 F.3d 1494, 1498 (11th Cir. 1994). This is especially the case for:

> [S]ection 2 vote dilution claims alleging that . . . minority voters are denied an equal opportunity to participate in the political process and to elect representatives of their choice. In such cases, courts must conduct a "searching practical evaluation of the 'past and present reality'" of the electoral system's operation.

---

[16]  In light of the Parties' factual disputes, this case does not present one of the "limited circumstances wherein the district court may treat cross-motions for summary judgment as a trial and resolve the case on the merits." Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs, 775 F.3d 1336, 1345–46 (11th Cir. 2015).

Nipper, 39 F.3d at 1498 (quoting Gingles, 478 U.S. at 45). "Because a claim of voting dilution must be evaluated with a functional, rather than a formalistic, view of the political process, the Supreme Court has emphasized the importance of 'an intensely local appraisal of the design and impact' of the electoral structure, practice, or procedure at issue." Id. (quoting Gingles, 478 U.S. at 79); see also Rogers v. Lodge, 458 U.S. 613, 621 (1982)).

The Court proceeds by first addressing Defendants' Motion because Defendants move for summary judgment on the Gingles preconditions (and Defendants' success on any of their arguments would be dispositive). The Court then turns to Plaintiffs' Motion for Summary Judgment.

### A.    Defendants' Motion for Summary Judgment

Defendants move for summary judgment on Plaintiffs' claim. Doc. No. [190-1]. Defendants first argue that Plaintiffs do not have standing to assert their claim against the SEB because the alleged injury is neither traceable nor redressable by the SEB. Id. at 17–19. Defendants then move for summary judgment on the merits of Plaintiffs' Section 2 claim arguing that Plaintiffs failed to adduce facts that support the three Gingles preconditions. Id. at 19–34. The Court finds that neither argument is availing.

16

### 1.    *Plaintiffs' Standing Against SEB Defendants*

Defendants first argue that Plaintiffs failed to adequately assert Article III standing against the SEB. Id. at 17–19. "Standing 'is the threshold question in every federal case, determining the power of the court to entertain the suit.'" CAMP Legal Def. Fund, Inc. v. City of Atlanta, 451 F.3d 1257, 1269 (11th Cir. 2006) (quoting Warth v. Seldin, 422 U.S. 490, 499 (1975)). Article III of the United States Constitution limits the courts to hearing actual "Cases" and "Controversies." U.S. Const. art. III § 2; see also Lujan v. Defs. of Wildlife, 504 U.S. 555, 559–60 (1992). Overall, the standing requirement arising out of Article III seeks to uphold separation-of-powers principles and "to prevent the judicial process from being used to usurp the powers of the political branches." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 408 (2013) (citations omitted).

"Standing is typically determined by analyzing the plaintiff's situation as of the time the complaint is filed, and subsequent events do not alter standing." Fair Fight Action, Inc. v. Raffensperger, No. 1:18-CV-5391-SCJ, 2021 WL 9553855, at *3 (N.D. Ga. Feb. 16, 2021) (citing Focus on the Fam. v. Pinellas Suncoast Transit Auth., 344 F.3d 1263, 1275 (11th Cir. 2003) (collecting authorities); Charles H. Wesley Educ. Found., Inc. v. Cox, 408 F.3d 1349, 1352 n.3 (11th Cir. 2005); Johnson

17

v. Bd. of Regents of Univ. of Ga., 263 11 F.3d 1234, 1267 (11th Cir. 2001)). While

standing is generally determined when the plaintiff's complaint is filed, "it must

persist throughout a lawsuit." Ga. Ass'n of Latino Elected Offs., Inc. v. Gwinnett

Cnty. Bd. of Registration & Elections, 36 F.4th 1100, 1113 (11th Cir. 2022).

> To establish standing, a plaintiff must show three things:
>
> > First, the plaintiff must have suffered an injury in
> > fact—an invasion of a legally protected interest which is
> > (a) concrete and particularized, and (b) actual or
> > imminent, not conjectural or hypothetical. Second, there
> > must be a causal connection between the injury and the
> > conduct complained of—the injury has to be fairly
> > traceable to the challenged action of the defendant, and
> > not the result of the independent action of some third
> > party not before the court. Third, it must be likely, as
> > opposed to merely speculative, that the injury will be
> > redressed by a favorable decision.

Lujan, 504 U.S. at 560–61 (internal quotations, citations, and alterations omitted).

"The party invoking federal jurisdiction bears the burden of establishing

standing—and, at the summary judgment stage, such a party can no longer rest

on . . . mere allegations, but must set forth by affidavit or other evidence specific

facts." Clapper, 568 U.S. at 411–12 (internal quotations and citations omitted);

see also Church of Scientology Flag Serv. Org., Inc. v. City of Clearwater, 777 F.2d

598, 607 n.24 (11th Cir. 1985) (noting that standing "is a legal determination based on the facts established by the record").

Defendants argue that Plaintiffs' injuries are not fairly traceable to the State Election Board and its members, nor redressable by the SEB. Doc. No. [190-1], 17–19. Defendants do not meaningfully contest that Plaintiffs have alleged an injury-in-fact,[17] that their injuries are fairly traceable to Secretary of State Raffensperger, or that Plaintiffs' injuries are redressable by Secretary Raffensperger.[18] Accordingly, the Court will now determine whether Plaintiffs

---

[17] "To demonstrate an injury-in-fact for purposes of a vote dilution claim, Plaintiffs must show that they (1) reside and are registered voters in districts where alleged dilution occurred, and (2) are members of a protected class whose voting strength was diluted." Rose v. Raffensperger, 511 F. Supp. 3d 1340, 1352 (N.D. Ga. 2021) (citing Broward Citizens for Fair Dists. v. Broward Cnty., No. 12-60317-CIV, 2012 WL 1110053, at *3 (S.D. Fla. Apr. 3, 2012) (collecting cases)); cf. United States v. Hays, 515 U.S. 737, 744–45 (1995) ("Where a plaintiff resides in a racially gerrymandered district . . . the plaintiff has been denied equal treatment because of the legislature's reliance on racial criteria, and therefore has standing to challenge the legislature's action."). Because the named Plaintiffs reside in the Senate and House districts at issue, Plaintiffs have asserted sufficient injury-in-fact. See Doc. No. [192], ¶¶ 16 (Grant), 22 (Howell), 28 (Tolbert), 31 (James), 35 (Sykes), 37 (Solomon), 41 (Wimbish), 44 (Reynolds), 50 (Bush), 54 (Conner); see also Doc. Nos. [166] (Arbuthnot Dep.); [218] (voter declarations); Section (III)(B)(1) infra (resolving whether Plaintiffs have sufficiently stated a district-specific injury).

[18] Reapportionment litigation is redressable against the Secretary of State. "[T]he Georgia Secretary of State is a necessary party [in challenges to electoral maps] because []he is designated by state law as being responsible for administering state-wide elections, and accordingly we cannot require that state-wide elections in Georgia be

have adequately asserted (a) the traceability and (b) the redressability of their injuries to the SEB.

### a)   <u>Traceability</u>

"To establish causation [for standing,] a plaintiff need only demonstrate, as a matter of *fact*, a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant." <u>Cox</u>, 408 F.3d at 1352 (emphasis in original) (internal quotations omitted). An injury is traceable to an election official responsible for the election administration process or for a rule that allegedly caused the plaintiff's injury. <u>Compare</u> <u>Ga. Ass'n of Latino Elected Offs., Inc.</u>, 36 F.4th at 1116 (finding the traceability requirement met when a plaintiff made allegations that a state election official failed to provide bilingual voting materials and information, which caused the organizational plaintiff's diversion of resources), <u>with</u> <u>Jacobson</u>, 974 F.3d at 1253 (finding no traceability to an election official who was not responsible for the allegedly injurious policy). Establishing traceability is sufficient to establish causation, but only for purposes of standing. <u>See</u> <u>Ga. Ass'n of Latino Elected Offs., Inc.</u>, 36 F.4th at 1116.

---

conducted using constitutional apportionment system in h[is] absence." <u>Larios v. Perdue</u>, 306 F. Supp. 2d 1190, 1999 (N.D. Ga. 2003).

Defendants argue that Plaintiffs' alleged injuries are not traceable to the SEB and its members because there is "no evidence . . . that any of the individually named SEB members designed or implement[ed] the maps in any substantive way . . . ." Doc. No. [190-1], 18 n.19. The Court agrees with Defendants that there is no factual evidence in the Record that the SEB takes any direct action in the administrative implementation of Georgia's Enacted Plans. Doc. No. [215], 4 (arguing there is "no authority that the SEB builds ballots or that the SEB plays any role in the counties' implementation of the challenged legislative maps."). Administrative implementation of the maps, however, was not Plaintiffs' requested relief.

Plaintiffs seek to:

> [e]njoin Defendants, as well as their agents and successors in office, from enforcing or giving any effect to the boundaries of the Georgia State Senate districts as drawn in SB 1EX and the boundaries of the Georgia House of Representatives districts as drawn in HB 1EX, including an injunction barring Defendants from conducting any further legislative elections under the current maps.

Doc. No. [118], 37. Plaintiffs argue that "the SEB maintains broad powers and responsibilities . . . to ensure the fair and orderly administration of elections."

21

Doc. No. [205], 5. At this stage of the case, this requested relief is broad enough to be traceable to the SEB.

Under Georgia law, the SEB has a statutory duty to "formulate, adopt, and promulgate such rules and regulations, consistent with law, as will be conducive to the fair, legal, and orderly conduct of primary elections." O.C.G.A. § 21-2-31(2). Georgia law also tasks the SEB with "investigat[ing], or authoriz[ing] the Secretary of State to investigate, when necessary or advisable[,] the administration of primary and election laws and frauds and irregularities in primaries and elections and report violations of the primary and election laws either to the Attorney General or the appropriate district attorney . . . ." Id. at § 21-2-31(5). Furthermore, the SEB is "vested with the power to issue orders, after the completion of appropriate proceedings, directing compliance with [election code] or prohibiting the actual or threatened commission of any conduct constituting a violation . . . . " O.C.G.A. § 21-2-33.1. The Enacted Plans provide that "[t]he provisions of this Act shall be effective for the primary and general elections of 2022 for the purpose of electing members of the Senate who are to take office in 2023. Successors to those members shall likewise be elected under

22

the provisions of this Act." <u>See</u> SB 1EX § 2(f).[19] Thus, SB 1EX and HB 1EX are election laws.

Additionally, Georgia law tasks the SEB with oversight authority over the counties. <u>See</u> O.C.G.A. § 21-2-31(1) ("It shall be the duty of the [SEB] . . . [t]o promulgate rules and regulations so as to obtain uniformity in the practices and proceedings of superintendents, registrars, deputy registrars, poll officers, and other officials, as well as the legality and purity in all primaries and elections."); <u>id.</u> § 21-2-31(2) ("[t]o formulate, adopt, and promulgate such rules and regulations, consistent with law, as will be conducive to the fair, legal, and orderly conduct of primaries and elections; and, upon the adoption of each rule and regulation."); <u>id.</u> § 21-2-31(5) ("[t]o investigate, or authorize the Secretary of State to investigate, when necessary or advisable the administration of primary and election laws and frauds and irregularities in primaries and elections and to report violations of the primary and election laws either to the Attorney General or the appropriate district attorney who shall be responsible for further

_____

[19] The text of HB 1EX states as follows: "[t]he provisions of this Act shall be effective for the primary and general elections of 2022 for the purpose of electing members of the House of Representatives who are to take office in 2023. Successors to those members shall likewise be elected under the provisions of this Act." <u>See</u> HB 1EX § 2(f).

investigation and prosecution.”). The Court finds that these statutes give the SEB broad statutory authority to oversee the bodies that implement election law. Georgia law assigns to the county board of registrars the “duty of determining and placing the elector in the proper . . . state Senate district [and] state House district.” O.C.G.A. § 21-2-226(b). Thus, a lawsuit seeking to enjoin placing electors in specific House and Senate districts is fairly traceable to the SEB because the SEB has oversight powers over the entities that make such determinations.[20]

Defendants argue that Jacobson forecloses traceability of Plaintiffs’ alleged injuries to the SEB because the SEB has only “a generalized duty that was insufficient in Jacobson.” Doc. No. [190-1], 18. In Jacobson, the Eleventh Circuit held that the ballot order was not traceable to the Florida Secretary of State, even though she was tasked with the general duty to oversee elections, because the legislature expressly delegated sole authority over ballot creation to an independent body. 974 F. 3d at 1242, 1253–54.

---

[20] The Court also finds that a mixed question of law and fact may be exist on this issue. For example, in Fair Fight v. Raffensperger, No. 1:18-cv-5391, 2022 WL 4725887, at * 39 (N.D. Ga. Sept. 30, 2022), this Court cited to both the above-listed statutes and the testimony of Georgia’s former director of elections as proof that the SEB has oversight authority over the counties. To the extent that this determination is a mixed question of law and fact, it is inappropriate to decide it at summary judgment.

Unlike in <u>Jacobson</u>, the SEB does not have just a generalized duty to oversee elections. The SEB has the authority to investigate "irregularities in primaries and elections." O.C.G.A. § 21-2-31(5). It can hold hearings if it finds such irregularities. <u>Id.</u> at § 21-2-33.1(a). The SEB also has the power to issue orders and penalties to ensure compliance with election laws, rules, and regulations. <u>Id.</u> In essence, the SEB is tasked with ensuring that both general and primary elections are run in accordance with state laws. Additionally, there is no statutory limitation to the SEB's oversight in districting matters. <u>See generally</u> O.C.G.A. §§ 21-2-31, 21-2-32.

Similarly, Defendants citation to <u>Lewis v. Governor of Ala.</u>, 944 F.3d 1287 (11th Cir. 2019) is inapposite. Doc. No. [190-1], 17–18. In <u>Lewis</u>, the plaintiffs created an extra-textual duty for the Alabama Attorney General and then sought to bring a challenge for violation of said duty. <u>Id.</u> at 1297–98. The Eleventh Circuit rejected this theory because the Attorney General "ha[d] no legal duty to inform anyone of anything under these circumstances." <u>Id.</u> at 1298. In the case *sub judice*, again, the statutes defining the SEB's power affirmatively create oversight duties over the implementation of election laws. The SEB exercises broad oversight authority over elections laws, which seemingly include SB 1EX, HB 1EX, and

25

O.C.G.A. § 21-2-226(b). These laws, moreover, have the force and effect of implementing the Enacted Plans about which Plaintiffs complain. Accordingly, the Court is not persuaded by Defendants' reliance on <u>Lewis</u> and concludes for purposes of summary judgment that Plaintiffs' injuries are fairly traceable to the SEB and its members.

Plaintiffs challenge the implementation and use of the allegedly unlawful Enacted Plans, over which the SEB has statutory oversight authority. The Court finds that the alleged injury is thereby fairly traceable to the SEB Defendants for purposes of standing.

### b) <u>Redressability</u>

An injury is redressable when "a decision in a plaintiff's favor would significantly increase the likelihood that she would obtain relief." <u>Lewis</u>, 944 F.3d at 1301 (cleaned up). That is true so long as the Court's judgment may remedy the plaintiff's injury, "whether directly or indirectly." <u>Id.</u> (quotation marks omitted); <u>see also</u> <u>Ga. Ass'n of Latino Elected Offs.</u>, 36 F.4th at 1116 (stating it must be "likely," not merely "speculative," that the alleged injury will be redressed by a favorable decision). Thus, if a state election official lacks the authority to redress the alleged injury, the Court cannot enter a judgment to

26

remedy the plaintiff's injury, and the plaintiff lacks standing. See, e.g., Jacobson, 974 F.3d at 1269 (finding the plaintiffs lacked standing because the defendant election official did not control the complained-of ballot-listing injury, which meant she could not redress the alleged injury).

The Court finds in the case *sub judice* that Plaintiffs' alleged injury is redressable by the SEB. First, the Court must determine "whether a decision in [Plaintiffs'] favor would 'significant[ly] increase . . . the likelihood' that [they] 'would obtain relief that directly redresses the injury' that [they] claim[] to have suffered." Lewis, 944 F.3d at 1301 (quoting Harrell v. Fla. Bar, 608 F.3d 1241, 1260 n.7 (11th Cir. 2010)). "Second, 'it must be *the effect of the court's judgment on the defendant*'—not an absent third party—'that redresses the plaintiff's injury, whether directly or indirectly.'" Id. (citing Dig. Recognition Network, Inc. v. Hutchinson, 803 F.3d 952, 958 (8th Cir. 2015)).

The Enacted Plans are election laws that affect both general elections and primaries. Plaintiffs ask the Court to enjoin Defendants from enforcing or giving any effect to the boundaries in the Enacted Plans. Doc. No. [118], 37. The SEB has the authority to ensure compliance with the implementation of the Enacted Plans by passing rules or regulations regarding its implementation, conducting

hearings and investigations on failures to implement, and issuing sanctions to ensure compliance with the law. <u>See</u> Section III(A)(1)(a) <u>supra</u>. Because the Court can enjoin the SEB from taking any of these actions with respect to the current Enacted Plans, the Court finds that the injuries are redressable by the SEB.

*   *   *   *   *

The Court finds that Plaintiffs adequately asserted Article III standing with respect to the SEB. Plaintiffs have alleged an injury based upon allegedly unlawful Enacted Plans, the injury is fairly traceable to the SEB under various Georgia statutes, and the Court can award a remedy that is redressable by the SEB. The Court acknowledges that Plaintiffs have not pointed to any factual evidence of the SEB's direct actions in implementing or passing the Enacted Plans at issue. However, under the broad language of the aforementioned Georgia statutes and making all inferences in the light most favorable to the non-moving

party,[21] the SEB is not "entitled to judgment as a matter of law."[22] Fed. R. Civ. P. 56(a).

### 2. _Gingles_ Preconditions

Turning to Defendants' merits arguments, the Court concludes that Defendants have not shown they are entitled to summary judgment, as a matter of law, on the undisputed facts as it relates to the three Gingles preconditions.

Section 2 of the VRA provides:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).

---

[21] In reviewing a motion for summary judgment, the Court considers the evidence in the light most favorable to the non-movant. Centurion Air Cargo, Inc. v. United Parcel Serv. Co., 420 F.3d 1146, 1149 (11th Cir. 2005). Thus, in stating the facts, we afford Plaintiffs, the non-movants, all credibility choices and the benefit of all reasonable inferences the facts in the Record yield. Latimer v. Roaring Toyz, Inc., 601 F.3d 1224, 1237 (11th Cir. 2010).

[22] Assuming _arguendo_ that Plaintiffs lack standing to challenge the SEB, this Action would proceed against the Secretary of State. Because the Secretary of State is responsible for administering the elections, the Court can "enjoin the holding of elections pursuant to the [Enacted Plans] (assuming, of course, that the [Enacted P]lan[s] [] in fact [violate Section 2]) and subsequently require elections to be conducted pursuant to a [legal] apportionment system . . . ." Larios, 306 F. Supp. 2d at 1199; see also n.16 supra.

> (b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

52 U.S.C. § 10301(a)–(b).

In order to prevail on a Section 2 claim, Plaintiffs must satisfy three "preconditions." Gingles, 478 U.S. at 50. First, the "minority group must be sufficiently large and [geographically] compact to constitute a majority in a reasonably configured district . . . ." Wisc. Legis. v. Wisc. Elections Comm'n, 595 U.S.---, 142 S. Ct. 1245, 1248 (2022) (per curiam) (citing Gingles, 478 U.S. at 50–51). "A district will be reasonably configured, our cases explain, if it comports with traditional districting criteria, such as being contiguous and reasonably compact." Allen, 143 S. Ct. at 1503 (citing Ala. Legis. Black Caucus

v. Alabama, 575 U.S. 254, 272 (2015)).[23] "Second, the minority group must be able to show that it is politically cohesive." Gingles, 478 U.S. at 51. And third, "the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it . . . to defeat the minority's preferred candidate." Id.

Finally, a plaintiff who demonstrates the three preconditions must also show, under the "totality of circumstances," that the political process is not "equally open" to minority voters. Id., at 45–46; see also id., at 36–38 (identifying several factors relevant to the totality of circumstances inquiry).

### a)   First *Gingles* Precondition

Under the first Gingles precondition, the "minority group must be sufficiently large and [geographically] compact to constitute a reasonably configured district." Wisc. Legis., 142 S. Ct. at 1248. "A district will be reasonably configured . . . if it comports with traditional districting criteria, such as being

---

[23] In supplemental briefing, Defendants "agree with how Justice Alito proposes to address [racial predominance]." Doc. No. [228], 11. That is Defendants argue that a "plaintiff must 'show at the outset that such a[n additional majority-minority] district can be created without making race the predominant factor in its creation.'" Id. at 11 (alteration in original) (quoting Allen, 143 S. Ct. at 1551 (Alito, J., dissenting)). To the extent that Defendants argue that Plaintiffs must show, as part of the first Gingles precondition that race did not predominate the drawing of the Illustrative Plans, the Court agrees. The Court, however, declines to adopt the test as defined in Justice Alito's dissent in *toto*.

contiguous and reasonably compact." <u>Allen</u>, 143 S. Ct. at 1503 (citing <u>Ala. Legis.</u> <u>Black Caucus</u>, 575 U.S. at 272). To determine whether Plaintiffs have met the numerosity and compactness requirements, the Court must evaluate the specific challenged district and not the state as a whole. <u>Cf.</u> <u>Ala. Legis. Black Caucus</u>, 575 U.S. at 268 ("[T]he [d]istrict [c]ourt's analysis of racial gerrymandering [under the Equal Protection Clause] of the State 'as a whole' was legally erroneous.").[24]

Defendants make a number of arguments pertaining to the first <u>Gingles</u> precondition. The Court addresses these arguments as follows: (1) whether Mr. Esselstyn allowed race to predominate his drawing of the Illustrative Plans, (2) if the Proposed Districts are sufficiently compact, and (3) if the Illustrative Plans could operate as a remedial plan.

### *(1)   Racial predominance*

First, the Court rejects Defendants' argument that Mr. Esselstyn's use of racial shading alone is fatal to Plaintiffs' claim. Defendants argue that because the Legislature could not have used racial shading when it drew the Enacted

---

[24] Although <u>Alabama Legislative Black Caucus</u> concerned constitutional redistricting challenges, the Supreme Court applied its analysis to a Section 2 challenge in <u>Allen</u>, 143 S. Ct. at 1503, 1519.

32

Plans, Plaintiffs' expert likewise is precluded from using racial shading when drawing the Illustrative Plans. Doc. No. [190-1], 19–21; <u>see also</u> Doc. No. [228], 8 ("If the legislature had used racial shading, did not use political data, and drew without reviewing any public comments, it would be accused of racial gerrymandering."). [25]

Precedent establishes that the Court is to evaluate whether race impermissibly *predominated* the drawing of the Illustrative Plans, or whether the Illustrative Plans are simply race conscious. "The contention that mapmakers must be entirely 'blind' to race has no footing in our § 2 case law. The line that we have long drawn is between consciousness and predominance." <u>Allen</u>, 143 S. Ct. at 1512 (plurality opinion). Defendants' argument, however, conflicts

_____

[25] Whether Defendants are accused of racial gerrymandering or if the Enacted Plans are, in fact, gerrymandered, constitute two different inquiries. The Supreme Court acknowledged that a State's awareness of race when it draws its districts is not *per se* racial gerrymandering. "[W]e have assumed that compliance with the VRA may justify the consideration of race in a way that would not otherwise be allowed . . . complying with the VRA is a compelling state interest, and that a State's consideration of race in making a district decision is narrowly tailored and thus satisfies strict scrutiny." <u>Abbott</u>, 135 S. Ct. at 2315. "[T]he legislature always is *aware* of race when it draws district lines . . . . That sort of race consciousness does not lead inevitably to impermissible race discrimination." <u>Shaw v. Reno</u>, 509 U.S. 630, 646 (1993) (emphasis in original). Thus, because the State is not prohibited from reviewing race when it draws its legislative maps, neither is Plaintiffs' expert in drawing illustrative maps to satisfy the first <u>Gingles</u> precondition.

33

with this existing precedent. See also Davis v. Chiles, 139 F.3d 1414, 1425–26 (11th Cir. 1998) (finding clear error with the district court's finding of racial predominance based on an expert's testimony that he was asked to draw additional majority-minority districts in an area with a high concentration of Black citizens).

The Court finds that material disputes of fact exist over whether race predominated the drawing of the Illustrative Plans. Mr. Esselstyn testified that he may have used his map-drawing software's racial shading feature when drafting his Illustrative Plans. See Doc. No. [179] ("Esselstyn Dep. Tr."), Tr. 85:1–5 ("Q: Did you turn on racial shading or features to determine where [B]lack voters were located as part of your initial process of deciding where to begin? A: I don't recall. Maybe."); id. at 220:7–10 ("And you mentioned that you have used that [racial] shading, including in the development of your illustrative plans, correct? A: Correct.").

When questioned about whether race predominated Mr. Esselstyn's decision making when drawing his Illustrative Plans, he testified that it did not:

> Q: When you—when you had that shading function toggled and you could see it, did you use the information that that shading provided—did that information predominate in any given line drawing decision you

34

made when you were preparing you[r] illustrative maps?

A:      No, it did not . . . .

Q:      Were you—did any one factor predominate in the drawing of either you[r] State Senate or House illustrative maps?

A:      No.

Q:      Did race predominate in the drawing of your illustrative State Senate and House maps?

A:      No.

Q:      Were you ever instructed to maximize the number of majority [B]lack districts in either the State Senate or House map?

A:      I was not . . . .

Q:      So when you're using the phrase traditional redistricting principles there, you're referring to the principles outlined in the Georgia General Assembly's guidelines involving redistricting?

A:      Yes, mostly. The one that they did not identify that I did consider was minimizing changes to the adopted map. I could have drawn a plan that was not based on the adopted map, but I opted to use one that was using what might be called a principle of continuity or core preservation trying to keep elements of the previous plan, the -- the predecessor plan, if you will, to keep modifications, too -- well, I was going to say to a minimum, but of course, with all the other

35

> considerations it's -- it's one of the things that's being
> considered.

Id. 221:1–7; 228:20–229:5; 85:21–86:12.

In summary, Mr. Esselstyn testified that he was aware of race, and it was one factor in his line-drawing process, but race did not predominate over traditional redistricting principles when he drew his Illustrative Plans. He testified that when drawing the Illustrative Plans, he took into account a variety of factors, including those used by the Georgia Legislature. Mr. Esselstyn's awareness of race, in conjunction with his evaluation of traditional redistricting principles is consistent with Eleventh Circuit precedent. The Eleventh Circuit held:

> [P]recedent[] *require[s]* plaintiffs to show that it would
> be possible to design an electoral district, consistent
> with traditional districting principles, in which
> minority voters could successfully elect a minority
> candidate. To penalize [plaintiff], as the district court
> has done, for attempting to make the very
> showing . . . would be to make it impossible, as a
> matter of law, for any plaintiff to bring a successful
> Section Two action.

Davis, 139 F.3d at 1425 (emphasis in original).

Moreover, Mr. Esselstyn's racial awareness is distinguishable from Miller v. Johnson, 515 U.S. 900, 919 (1995). In Miller, there was evidence that under the

36

former preclearance regime, the Department of Justice ("DOJ") rejected Georgia's congressional plan because there were not enough majority-minority districts. Id. at 906-07. A DOJ line attorney testified that during the preclearance process, he took "[a] map of the State of Georgia shaded for race, shaded by minority concentration, and overla[id] the districts that were drawn by the State of Georgia and [saw] how well those lines adequately reflected [B]lack voting strength.'" Id. at 925 (citing Johnson v. Miller, 864 F. Supp. 1354, 1362 n.4 (S.D. Ga. 1994)). Georgia's representatives testified that they redrew the offending district to comply with the DOJ's preclearance determination. Miller, 515 U.S. at 918–19. The Supreme Court found a Fourteenth Amendment violation and expressly rejected the DOJ's "maximization policy" that was used to draw the districts in Miller. Id. at 926–27. Having the benefit of a fully developed trial record, factual findings, and credibility determinations, the Supreme Court found that race predominated the drawing of the district in Miller.

At this stage of the instant case, however, Record evidence indicates that Mr. Esselstyn may have been aware of racial demographics when drafting the Illustrative Plans, but he also testified that he considered traditional redistricting principles and did not let race predominate. Doc. No. [206-1] ("Esselstyn Rep.")

37

¶¶ 26, 63; Esselstyn Dep. Tr. 221:1–7; 228:20–229:5. Because the awareness of racial demographics is not *per se* impermissible, any determination that race predominated the drawing of the Proposed Districts turns on Mr. Esselstyn's credibility. On summary judgment, such credibility determinations are inappropriate, and thereby the Court denies Defendants' Motion.

### (2)   Compactness factors

Second, Defendants have not shown they are entitled to summary judgment on the compactness inquiry because there is Record evidence that the minority populations in the Proposed Districts are compact. "Under § 2 . . . the compactness inquiry considers 'the compactness of the minority population, not . . . the compactness of the contested district.'" League of United Latin Am. Citizens v. Perry, 548 U.S. 399, 408 (2006) ("LULAC") (quoting Bush v. Vera, 517 U.S. 952, 997 (1996). A district that "reaches out to grab small and apparently isolated minority communities" is not reasonably compact. Id. (citing Vera, 517 U.S. at 979).

Defendants argue that "Plaintiffs have presented no evidence of the geographic compactness of the Black community in the proposed new districts aside from the fact that they can be drawn." Doc. No. [190-1], 20. The Court

disagrees. There is Record evidence about the compactness of the APBVAP in the Proposed Districts that is sufficient to defeat Defendants' Motion for Summary Judgment. The relevant factors for compactness under the first <u>Gingles</u> precondition include population equality, contiguity, empirical compactness scores, the eyeball test for irregularities and contiguity, respect for political subdivisions, and uniting communities of interest. <u>See</u> <u>Reynolds</u>, 377 U.S. at 598 (population equality); <u>LULAC</u>, 548 U.S. at 433 (communities of interest); <u>Vera</u>, 517 U.S. at 959–60 (contiguity, eyeball test); <u>Cooper v. Harris</u>, 581 U.S. 285, 291, 312 (2017) (political subdivisions, partisan advantage, empirical compactness measures).

### (a)   objective compactness factors

The Court finds that there is Record evidence about the objective compactness factors. It is undisputed that all of the districts in the Illustrative Plans are contiguous. Doc. No. [189-2] ¶¶ 50; 67. Additionally, Mr. Esselstyn's Report states that under the General Assembly's guidelines, the permissible population equality threshold for legislative districts is ± 5%. Esselstyn Rep., ¶ 34. It is undisputed that no district in the Illustrative Plans has a population deviation of more than 2%. Doc. No. [189-2], ¶¶ 48, 65. The average population

deviation of the Illustrative Senate Plan is 0.67% as opposed to the Enacted Senate Plan, which is 0.53%. Doc. No. [189-2], ¶ 49. The average population deviation of the Enacted House Plan is 0.61% and is 0.64% for the Illustrative House Plan. Id. ¶ 66.

Finally, Mr. Esselstyn's Report details the comparative compactness scores[26] between the relevant districts in the Enacted Plans and the Proposed Districts.[27] Therefore, the Court finds that there is evidence in the Record about

───────────────────────

[26]  Mr. Esselstyn utilized the Reock test and Polsby-Popper test to assess the numerical compactness of his districts. "The Reock test is an area-based measure that compares each district to a circle, which is considered to be the most compact shape possible. For each district, the Reock test computes the ratio of the area of the district to the area of the minimum enclosing circle for the district. The measure is always between 0 and 1, with 1 being the most compact." Alpha Phi Alpha, 587 F. Supp. 3d at 1275 n.24. "The Polsby-Popper test computes the ratio of the district area to the area of a circle with the same perimeter: $4\pi\text{Area}/(\text{Perimeter}^2)$. The measure is always between 0 and 1, with 1 being the most compact." Id. at n.26.

[27]  As of December 3, 2022, Enacted SD-23 has a Reock score of 0.37 and Polsby-Popper score of 0.16; Illustrative SD-23 has a Reock score of 0.34 and a Polsby-Popper score of 0.17; Enacted SD-25 has a Reock score of 0.39 and Polsby-Popper score of 0.24; Illustrative SD-25 has a Reock score of 0.57 and a Polsby-Popper score of 0.34. Enacted SD-28 has a Reock score of 0.45 and Polsby-Popper score of 0.25; Illustrative SD-28 has a Reock score of 0.38 and a Polsby-Popper score of 0.19. Doc. No. [191-1], 81–82; 88–89.

  As of December 3, 2022, Enacted HD-64 has a Reock score of 0.37 and Polsby-Popper score of 0.36; Illustrative HD-64 has a Reock score of 0.22 and a Polsby-Popper score of 0.22; Enacted HD-74 has a Reock score of 0.50 and Polsby-Popper score of 0.25; Illustrative HD-74 has a Reock score of 0.30 and a Polsby-Popper score of 019; Enacted HD-117 has a Reock score of 0.41 and Polsby-Popper score of 0.28; Illustrative HD-117 has a Reock score of 0.40 and a Polsby-Popper score of 0.33; Enacted HD-145 has a Reock

the compactness of the Proposed Districts. A determination on whether the Proposed Districts are, in fact, compact cannot be decided as a matter of law; it is a question of fact that the Court cannot resolve on summary judgment.

Despite this evidence, Defendants advance arguments challenging the numerosity and relative compactness of the Proposed Districts in comparison to the Enacted Plans. Doc. No. [190-1], 20–21. Defendants argued that "[l]ike the Senate plan, these differing metrics are not how the Allen illustrative plans were configured . . . . [The Illustrative Plans] are thus categorically different than the plans in Allen." Doc. No. [228], 11. The Court acknowledges that the Illustrative Plans differ from those in Allen. However, the precedent makes clear that questions about redistricting under Section 2 are "'intensely local appraisal[s] of the design and impact' of the contested electoral mechanisms." Gingles, 478 U.S. at 79 (quoting Rogers, 458 U.S. at 621–22). The three-judge court in Allen concluded that the proposed district satisfied the first Gingles precondition after it evaluated facts and made credibility determinations. Allen, 143 S. Ct. at 1504.

_____

score of 0.38 and Polsby-Popper score of 0.19; Illustrative HD-145 has a Reock score of 0.34 and a Polsby-Popper score of 0.21; Enacted HD-149 has a Reock score of 0.32 and Polsby-Popper score of 0.22; Illustrative HD-149 has a Reock score of 0.46 and a Polsby-Popper score of 0.28. Doc. No. [191-1], 140, 141, 144, 146; 156, 157, 160, 162.

At this stage, the Court cannot make a factual finding that the Proposed Districts are not compact by using the objective compactness measures.

### (b)   eyeball test

The eyeball test is commonly utilized to determine if a district is compact or not. See Allen, 143 S. Ct. at 1528 n.10 (quoting Singleton v. Merrill, 582 F. Supp. 3d 924, 1011 (N.D. Ala. 2022)) (crediting the district court's findings that the illustrative maps were compact because they did not contain "tentacles, appendages, bizarre shapes or any other obvious irregularities."). The use of any "eyeball test" to assess irregularities, however, is necessarily a matter for the factfinder. See Ala. State Conf. of NAACP v. Alabama, 612 F Supp. 3d 1232, 1266 (M.D. Ala. 2020); Comm. For a Fair and Balanced Map v. Ill. State Bd. of Elections, 835 F. Supp. 2d 563, 570 (N.D. Ill. 2011). Thus, questions of fact remain that cannot be resolved on summary judgment.

### (c)   communities of interest or combinations of disparate communities

Defendants also argue that "Plaintiffs' experts . . . could not identify communities beyond race when preparing the maps that united disparate communities of Black voters." Doc. No. [190-1], 4. Specifically, Defendants argue

42

that Mr. Esselstyn was unable to identify specific counties in the Black Belt and did not strictly adhere to those county lines when drafting his Illustrative Plans. Doc. No. [204], ¶¶ 10–12, 26, 28, 35. Again, this dispute as to whether the Illustrative Plans unite communities of interest or simply combine disparate communities must be resolved by a factfinder and cannot be decided on a motion for summary judgment.

The case law is not clear about what constitutes a community of interest. In LULAC, the Supreme Court noted, "[w]hile no precise rule has emerged governing § 2 compactness, the inquiry should take into account traditional redistricting principles such as maintaining communities of interest and traditional boundaries." LULAC, 548 U.S. at 433 (cleaned up) (quoting Abrams v. Johnson, 521 U.S. 74, 92 (1992)). The Court went on to reason that "in some cases members of a racial group in different areas—for example, rural and urban communities—could share similar interests and therefore form a compact district if the areas are in reasonably close proximity." Id. at 435 (citing Abrams, 521 U.S. at 111–12 (Breyer, J., dissenting)). However, race being the only uniting factor between Latino communities that are 300-miles apart, without more, was not a

sufficient compactness finding under Section 2. <u>Id.</u> "The mathematical possibility of a racial bloc does not make a district compact." <u>Id.</u>[28]

Although a definitive test has not emerged, it is abundantly clear that the determinations about communities of interest are questions of fact. Most recently, in <u>Allen</u>, the Court credited the district court's factual finding that Alabama's Black Belt could be a community of interest. <u>Allen</u>, 143 S. Ct. at 1505 (citing <u>Singleton</u>, 582 F. Supp. 3d at 1015) ("The District Court understandably found [State witness's testimony about a community of interest] insufficient to sustain Alabama's 'overdrawn argument that there can be no legitimate reason to split' the Gulf Coast region."). Similarly, the Court in <u>LULAC</u> emphasized that the district court needed and failed to make a factual finding about the compactness of the challenged district. 548 U.S. at 433–35. Without the benefit of trial evidence or the ability to weigh the Record evidence, the Court clearly cannot heed the Supreme Court's guidance in making these necessary factual determinations.

---

[28] Factors that have been considered by Courts in the past include: socio-economic status, education, employment and health. <u>LULAC</u>, 548 U.S. at 432 (quoting the district court's decision). Other considerations may include shared media sources, public transportation infrastructure, schools, and places of worship. <u>Vera</u>, 514 U.S. at 964.

### *(3)      Proposed Remedy*

Finally, Defendants argue that they are entitled to summary judgment because the Illustrative Plans cannot be ordered as a remedy. Doc. Nos. [190-1], 20; [215], 8. Defendants state: "[i]n short, if a plaintiff cannot show that the plan used to demonstrate the first prong can be a proper remedy, the plaintiff has not shown compliance with the first prong of <u>Gingles</u>." Doc. No. [190-1], 20. Plaintiffs respond by arguing that that their map need not win a "beauty contest," but they need only to show that their proposed districts are reasonably compact. Doc. No. [205], 13. Although not abundantly clear, it seems that Defendants argue that the Illustrative Plans cannot be used as a remedy because (1) they do not comply with traditional redistricting principles and (2) the non-challenged districts do not comply with <u>Gingles</u>' compactness requirements. Doc. No. [215], 7–9.

For these arguments in particular, Defendants rely on the Eleventh Circuit's <u>Nipper</u> decision. In <u>Nipper</u>, the Eleventh Circuit held that "the first threshold factor of <u>Gingles</u> [] require[s] that there must be a remedy within the confines of the state's judicial model that does not undermine the administration of justice." 39 F.3d at 1531 (plurality opinion). The Eleventh Circuit later clarified that "[t]his requirement simply serves 'to establish

45

that the minority has the potential to elect a representative of its own choice from some single-member district.'" Burton v. City of Belle Glade, 178 F.3d 1175, 1199 (11th Cir. 1999) (quoting Nipper, 39 F.3d at 1530). Additionally, "if a minority cannot establish that an alternate election scheme exists that would provide better access to the political process, then the challenged voting practice is not responsible for the claimed injury." Id; see also Brooks v. Miller, 158 F.3d 1230, 1239 (11th Cir. 1998) (holding that "[i]f the plaintiffs in a § 2 case cannot show the existence of an adequate alternative electoral system under which the minority group's rights will be protected, then the case ends on the first prerequisite.").

Under Nipper, the question of remedy relies on whether the alternate scheme is a "workable remedy within the confines of the state's system of government." 39 F.3d at 1533. For example, in Wright v. Sumter Cnty. Bd. of Elections and Registration, 979 F.3d 1282, 1304 (11th Cir. 2020), the Eleventh Circuit found that the first Gingles precondition had been met because the special master's maps showed that at least three majority-[B]lack districts could have been drawn in that area, meaning "that a meaningful remedy was available."

46

As to the first argument, the Court cannot determine, as a matter of law, that the Black community is not sufficiently compact in the challenged districts. See Section III(A)(2)(a)(2) supra.

As to the second argument, contrary to Defendants' assertions, as a matter of law, Plaintiffs do not have to prove that all districts in the Illustrative Plans are compact. "To be sure, § 2 does not forbid the creation of a noncompact majority-minority district." LULAC, 548 U.S. at 430 (citing Vera, 517 U.S. at 999 (Kennedy, J., concurring)). "Simply put, the State's creation of an opportunity district for those without a § 2 right offers no excuse for its failure to provide an opportunity district for those with a § 2 right." Id.; see also id. at 430–31 ("[S]ince there is no § 2 right to a district that is not reasonably compact, the creation of a noncompact district does not compensate for the dismantling of a compact opportunity district.") (citing Abrams, 521 U.S. at 91–92)). The Court understands LULAC and Vera to mean that in order for there to be a Section 2 remedy, a plaintiff must show that it is possible to create a compact majority-minority district. However, if an affected majority-minority district is not remedial under Section 2, this compactness inquiry is not required.

The Eleventh Circuit's case law seems to suggest that so long as the legislature could implement the Illustrative Plans, within the confines of state law, without undermining the administration of justice, then it has provided an available remedy. Burton, 178 F3d at 1199; Wright, 979 F.3d at 1304. Because it is permissible for the Legislature to draw non-compact districts when those districts are not Section 2 remedial districts, Defendants remedy argument on that basis fails as a matter of law. Thus, the Court rejects Defendants' argument that the Illustrative Plans cannot be ordered as a remedy because districts other than the Proposed Districts do not comply with Gingles. LULAC, 548 U.S. at 430; Bush, 517 U.S. at 999.[29]

_____

[29] Assuming *arguendo* that Nipper requires Plaintiffs to produce evidence that all districts in the Illustrative Plans are reasonably compact and comply with traditional redistricting principles, the Court finds that material disputes of fact persist. For example, Plaintiffs disputed the contention that "Mr. Esselstyn also made changes to Senate District 35 that connected more-rural areas of Paulding County to Fulton County." Doc. No. [205-1], ¶ 73. In his deposition, Mr. Esselstyn testified that Illustrative Senate District 35 placed Douglas County in one district and confirmed that the district connected parts of south Paulding County with portions of Fulton County. Esselstyn Dep. Tr. 155:12–156:13. When asked if he was aware of any connection between Paulding County and Fulton County, Mr. Esselstyn testified about a "sense they would be considered generally part of metro Atlanta." Id. at 156:1–4. The Court finds that Mr. Esselstyn's explanation creates a genuine fact dispute of whether Illustrative SD-35 violates traditional redistricting principles. A determination over whether these considerations show that race did or did not predominate the drawing of Mr. Esselstyn's Illustrative Plans are questions of credibility, which are inappropriate at

\*    \*    \*    \*    \*

In sum, the Court concludes that there are material disputes of fact as to whether race predominated when Mr. Esselstyn drew the Illustrative Plans and whether he respected traditional redistricting principles. The Court cannot decide these disputes as to the first <u>Gingles</u> precondition on summary judgment.

### b)    <u>Second and Third *Gingles* Preconditions</u>

Likewise, the Court denies Defendants' Motion for Summary Judgment as to second and third <u>Gingles</u> preconditions. The second <u>Gingles</u> precondition requires Plaintiffs show that "the minority group . . . is politically cohesive" and the third precondition requires Plaintiffs show that "the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances . . . usually to defeat the minority's preferred candidate." <u>Gingles</u>, 478 U.S. at 51.

### (1)    *Required showing for the second and third* <u>*Gingles*</u> *preconditions*

As the Court ruled in its Preliminary Injunction Order, the second and third <u>Gingles</u> preconditions require only that Plaintiffs show that minority-voter

_____

the summary judgment phase of the case.

political cohesion and racial bloc voting exists, not the reason for its existence. Alpha Phi Alpha, 587 F. Supp. 3d at 1303 ("The Court concludes as a matter of law that, to satisfy the second Gingles precondition, Plaintiffs need not prove the causes of racial polarization, just its existence."); id. at 1312 ("[T]he third precondition involves the same evaluation as to the voting preferences of the majority groups as the second precondition does for the minority group.").

Defendants advance four purely legal arguments. First, Defendants argue that Plaintiffs must prove that race, not partisanship, explains racial bloc voting and minority-voter political cohesion under the second and third Gingles preconditions. Doc. No. [190-1], 21–32. Second, Defendants argue that a failure to show that race and partisanship caused racial bloc voting is not congruent and proportional to the Fifteenth Amendment (i.e., the constitutional authority supporting Section 2 of the VRA). Id. at 32–34. Third, Defendants argue that Plaintiffs must show the racial group's voting patterns in relation to the race of the *candidate*. Hearing Tr. 87:25–88:7. Finally, Defendants argue that the holdings in Mobile v. Bolden, 446 U.S. 55 (1980) and Whitcomb v. Chavis, 403 U.S. 124 (1971) require the Court to evaluate the causes of the racial polarization at the preconditions phase. Doc. No. [228], 11–19.

### (a)    Cause of race-based voting

As for the first argument — that "th[e] Court should require proof of racial bloc voting as part of the third Gingles factor" (Doc. No. [190-1], 29–30) — Defendants argue that the Court should be able to decide this at the Gingles preconditions phase, rather than at the totality of the circumstances (i.e., Senate Factors) phase, because "the analysis is ultimately the same." Id. As was the case in the Preliminary Injunction Order, the Court disagrees. Precedent establishes that evaluating the reasons behind racial bloc voting and minority political cohesion is inappropriate at the Gingles preconditions phase.

The Gingles plurality concluded, "the reasons [B]lack and white voters vote differently have no relevance to the central inquiry of § 2. By contrast, the correlation between race of voter and the selection of certain candidates is crucial to that inquiry." Gingles, 478 U.S. at 63. Only three other Justices joined this portion of Justice Brennan's opinion. However, four other Justices likewise found that the reasons for minority political cohesion and racial bloc voting are not relevant in establishing the Gingles preconditions. Justice O'Connor wrote:

> [i]nsofar as statistical evidence of divergent racial voting
> patterns is admitted solely to establish that the minority
> group is politically cohesive and to assess its prospects
> for electoral success, I agree that defendants cannot rebut

51

> this showing by offering evidence that the divergent racial voting patterns may be explained in part by causes other than race, such as an underlying divergence in the interests of minority and white voters.

Gingles, 478 U.S. at 100 (O'Connor, J., concurring). Justice White is the only Justice to suggest that the Court should consider the race of the candidates in addition the race of the voter at the precondition phase. Id. at 83 (White, J., concurring).

Although only a plurality of the Justices signed onto Justice Brennan's analysis regarding proof of racial bloc voting and minority voter cohesion, all but one Justice agreed that the reasons that Black voters and white voters vote differently is irrelevant to meeting the second and third Gingles preconditions. Thus, the second and third Gingles preconditions can be established by the mere existence of minority group political cohesion and majority voter racial bloc voting. See Chisom v. Roemer, 501 U.S. 380, 404 (1991) ("Congress made clear that a violation of § 2 could be established by proof of discriminatory results alone.").

Most recently, the Supreme Court confirmed that the Section 2 analysis is an effects test. "[F]or the last four decades, this Court and the lower federal courts have repeatedly applied the effects test of § 2 as interpreted in Gingles and, under

52

certain circumstances, have authorized race-based redistricting as a remedy for state districting maps that violate § 2." <u>Allen</u>, 143 S. Ct. at 1516–17. Although Justice Brennan's language regarding the "effects test" in <u>Gingles</u>, is a part of the plurality, the Supreme Court, in <u>Allen</u>, made clear that Section 2, requires Plaintiffs to prove only the effects of racially polarized voting and minority voter political cohesion at the <u>Gingles</u> preconditions phase, not its causes. <u>Id.</u>

Eleventh Circuit precedent also supports the conclusion that Plaintiffs are not required to prove that race caused racial bloc voting or minority voter cohesion to satisfy the second and third <u>Gingles</u> preconditions. Judge Tjoflat's plurality opinion in <u>Nipper</u> explained:

> Proof of the second and third <u>Gingles</u> factors—demonstrating racially polarized bloc voting that enables the white majority usually to defeat the minority's preferred candidate—is circumstantial evidence of racial bias operating through the electoral system to deny minority voters equal access to the political process.

39 F.3d at 1524 (plurality opinion). <u>Nipper</u> did not require the plaintiffs to prove that race was the cause of the second and third <u>Gingles</u> preconditions or disprove that another reason could account for the polarization. Rather, Judge Tjoflat went on to opine that "[t]he defendant may rebut the plaintiff's evidence by

53

demonstrating the absence of racial bias in the voting community; for example,

by showing that the community's voting patterns can be best explained by other,

non-racial circumstances." Id.

Following Nipper, the Eleventh Circuit clarified the appropriate test for

finding a Section 2 violation. First, the plaintiff:

> must, at a minimum, establish the three now-familiar
> Gingles factors . . . . Proof of these three factors does not
> end the inquiry, however . . . . This is because it is
> entirely possible that bloc voting (as defined by Gingles)
> could exist, but that such bloc voting would not result in
> a diminution of minority opportunity to participate in
> the political process and elect representatives of the
> minority group's choice . . . . To aid courts in
> investigating a plaintiff's Section 2 claims, the Gingles
> court identified other factors that may, in the "totality of
> the circumstances," support a claim of racial vote
> dilution.

Solomon v. Liberty Cnty. Comm'rs, 221 F.3d 1218, 1225 (11th Cir. 2000). Thus, it

is firmly established in both Supreme Court and Eleventh Circuit precedent that

Plaintiffs do not have to prove the causes of polarized voting at the preconditions

phase of a Section 2 claims.[30]

---

[30] Defendants also argue that the Eleventh Circuit in Greater Birmingham Ministries v. Sec'y of State of Ala., 992 F.3d 1299, 1329-30 (11th Cir. 2021) created a causation requirement as a part of the second and third Gingles preconditions.

In summary, eight Supreme Court Justices agreed that the second and third Gingles preconditions do not require Plaintiffs to prove that race is the cause of the minority group's political cohesion or racial bloc voting. In Allen, the Supreme Court confirmed that Section 2 is an effects test. 143 S. Ct. at 1516–17. Following Gingles, the Eleventh Circuit in both Nipper and again in Solomon confirmed that the question of potential reasons for vote dilution is relevant to the totality of the circumstances phase of the case, not in regard to the Gingles preconditions.[31]

_____

Doc. No. [190-1], 25. The quoted portion of Greater Birmingham discusses causation, however, the language is found in the totality of the circumstances analysis and discussion of the ultimate burden of proof, not in the preconditions portion. 992 F.3d at 1332 (holding plaintiffs "ma[d]e no mention of the three 'necessary preconditions' and . . . they 'ma[d]e no attempt to articulate the existence of . . . minority cohesion or bloc voting, and majority bloc voting.'") Accordingly, the Court finds that Greater Birmingham is not instructive as to Plaintiffs' burden for establishing the Gingles preconditions.

[31] The Court further rejects Defendants' efforts to distinguish the aforementioned binding authority with citations to non-binding cases. Defendant first cites Vecinos De Barrio Uno v. City of Holyoke, 72 F.3d 973, 983 (1st Cir. 1995). Doc. No. [190-1], 28. In Uno, however, the First Circuit, likewise, did not require plaintiffs to disprove partisanship as a part of the Gingles preconditions. It held that "the second and third preconditions are designed to assay whether racial cleavages in voting patterns exist and, if so, whether those cleavages are deep enough to defeat minority-preferred candidates time and again." Id. Once these preconditions are proven, they "give rise to an inference that racial bias is operating through the medium of the targeted electoral structure to impair minority political opportunities." Id.

Defendants also cite to a non-binding Fifth Circuit case. Doc. No. [190-1], 28–29

To be clear, Defendants' partisanship argument may be relevant to whether the political process is equally open to minority voters, but it is not dispositive. At no point do Plaintiffs have the *burden* of proving the causes behind a lack of equal opportunity to participate in the political process. Allen, 143 S. Ct. at 1507 ("[W]e have reiterated that § 2 turns on the presence of discriminatory effects, not discriminatory intent."); see also id. ("[T]he Gingles test helps determine whether th[e] possibility . . . that the State's map has a disparate effect on account of race . . . is reality by looking to the polarized voting

---

(citing League of United Latin American Citizens v. Clements, 999 F.2d 831, 855 (5th Cir. 1993)). In Clements, the Fifth Circuit took an opposite approach, finding it "difficult to see how the record in this case could possibly support a finding of liability" when "Plaintiffs [had] not even attempted to establish proof of racial bloc voting by demonstrating that race, not . . . partisan affiliation, is the predominant determinant of political preference." Clements, 999 F.2d at 855 (quotations omitted). For its part, the Fourth Circuit has rejected the Fifth Circuit's approach. United States v. Charleston Cnty., 365 F.3d 341, 347–48 (4th Cir. 2004) ("[T]he approach most faithful to the Supreme Court's case law 'is one that treats causation as irrelevant in the inquiry into the three Gingles preconditions, but relevant in the totality of circumstances inquiry.'") (quoting Lewis v. Alamance Cnty., 99 F.3d 600, 615–16 n.12 (4th Cir. 1996)) .

Given the Court's interpretation of the Supreme Court's statements on the matter and the Eleventh Circuit's binding precedent, the Court agrees with the First and Fourth Circuits. Thus, the Court reserves the question of whether partisanship or race is the driving force behind the differences in racial voting patterns for the totality of the circumstances inquiry, rather than at the Gingles preconditions.

preference and frequency of racially discriminatory actions taken by the State, past and present.").

**(b)** **congruence and proportionality: Fifteenth Amendment**

Second, Defendants argue that "[i]f Section 2 were interpreted in a way that [P]laintiffs can establish racial bloc voting merely by showing the minority and majority vote differently, it would not fit within th[e] constitutional bounds . . . of the Fifteenth Amendment." Doc. No. [190-1], 31. Section 2 of the VRA provides:

> [n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . .

52 U.S.C. § 10301(a).

"[U]nder the analysis set forth by the statutory text and embraced by the Supreme Court in Chisom and [the Eleventh Circuit] in Johnson, [courts] must consider whether the challenged law results in a denial or abridgment of the right to vote on account of race or color." Greater Birmingham, 992 F.3d at 1329 (citing Chisom, 501 U.S. at 403–04; Johnson v. Governor of Fla., 405 F.3d 1214,

1227 (11th Cir. 2005)). The Court's "analysis turns on whether, based on the totality of the circumstances, the challenged law violates Section 2(a) because it deprives minority voters of an equal opportunity to participate in the electoral process *and* to elect representatives of their choice." Id.

For this inquiry, the Court must "ask whether the totality of facts . . . showed that the new scheme would deny minority voters equal political opportunity." De Grandy, 512 U.S. at 1013–14. And according to the Eleventh Circuit, "[t]o be actionable, a deprivation of the minority group's right to equal participation in the political process must be on account of a classification, decision, or practice that depends on race or color, not on account of some other racially neutral cause." Solomon, 221 F.3d at 1225 (quoting Nipper, 39 F.3d at 1515 (plurality opinion)).

Thus, the Court finds that the question of whether the racial bloc voting is on account of race or on account of race-neutral reasons—i.e., partisanship—is relevant at the totality of the circumstances phase of the inquiry. The current formulation of the Gingles test is congruent with and proportional to the

Fifteenth Amendment.[32] Consistent with the Fifteenth Amendment, the Court must determine, at the totality of the circumstances phase, whether the past and present realities result in a lack of an equal opportunity for minorities to participate in the electoral process on account of race. And to be successful in their Section 2 case, Plaintiffs bear the ultimate burden of proving that it satisfied the three Gingles preconditions *and* that, under the totality of circumstances, the Enacted Plans have the effect of abridging minority voters' right to vote on account of a race.

### (c)   race of the candidate

Third, at the hearing on the Motion for Summary Judgment and in their supplemental briefing, Defendants advanced the argument that, as part of the second and third Gingles preconditions, Plaintiffs must show that the race of the candidate changed voters' behavior. Doc. No. [226], 19–20; Hearing Tr. 87:26–88:7 ("I think that the inference [of] . . . Gingles 2 and 3 . . . only arises once you've met the burden, once you've come forward with the evidence. And the submission

---

[32] "The right of the citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. Const. amend. XV.

we're looking at here is, we have no evidence that voter behavior changes in the slightest based on the race of the candidates.").

The Court finds that an inquiry into voter preferences as it relates to the race of the candidate is not necessary to prove the second and third <u>Gingles</u> preconditions. The Supreme Court in <u>De Grandy</u> expressly disclaimed Defendants' proposed test:

> The assumption that majority-minority districts elect only minority representatives, or that majority-white districts elect only white representatives, is false as an empirical matter. And on a more fundamental level, the assumption reflects the demeaning notion that members of the defined racial groups ascribe to certain minority views that must be different from those of other citizens.

<u>De Grandy</u>, 512 U.S. at 1027 (cleaned up). And, again in <u>LULAC</u>, the Supreme Court affirmed a finding that Texas's Congressional District 23 violated Section 2, even though Texas intentionally created a district that would elect a Latino representative:

> To begin the <u>Gingles</u> analysis, it is evident that the second and third <u>Gingles</u> preconditions—cohesion among the minority group and bloc voting among the majority population—are present in District 23. The District Court found "racially polarized voting" in south and west Texas, and indeed "throughout the State." The polarization in District 23 was especially severe: 92% of Latinos voted against Bonilla in 2002, while 88% of

non-Latinos voted for him. Furthermore, the projected results in new District 23 show that the Anglo citizen voting-age majority will often, if not always, prevent Latinos from electing the candidate of their choice in the district. For all these reasons, appellants demonstrated sufficient minority cohesion and majority bloc voting to meet the second and third <u>Gingles</u> requirements.

<u>LULAC</u>, 548 U.S. at 427 (plurality opinion) (citations omitted).[33] In <u>LULAC</u>, the plurality found that it was "evident" the plaintiffs successfully proved the second and third <u>Gingles</u> preconditions because 92% of Latinx voters voted against Bonilla, even though Congressman Bonilla is Latino. <u>Id.</u> If those plaintiffs were required to prove that white voters did not vote for Latinx candidates and that Latinx voters voted for Latinx candidates, then the second and third <u>Gingles</u> preconditions would not have been "evidently" met. In fact, the plaintiffs in <u>LULAC</u> would not have been able to prove the second and third <u>Gingles</u> preconditions in that geographic area.

In a similar vein, although the Eleventh Circuit has concluded that it is not clear error to give greater weight to elections involving Black candidates, it has

---

[33] The Court notes that only two Justices—Justice Kennedy and Justice Breyer—joined this portion of the <u>LULAC</u> opinion. However, none of the concurrences or dissents discuss the second or third <u>Gingles</u> preconditions. <u>See generally</u>, <u>id.</u>

cautioned, "[w]e do not mean to imply that district courts *should* give elections involving [B]lack candidates more weight; rather, we merely note that in light of existing case law district courts may do so without committing clear error." Johnson v. Hamrick, 196 F.3d 1216, 1221–22 (11th Cir. 1999) (emphasis in original). In fact, the Eleventh Circuit went on to clarify "[w]e point out, however, that this Court 'will not automatically assume that the [B]lack community can only be satisfied by [B]lack candidates.'" Id. at 1222 n.6 (quoting Askew v. City of Rome, 127 F.3d 1355, 1378 (11th Cir. 1997)).

Accordingly, the Court rejects Defendants' arguments that the second and third Gingles preconditions require Plaintiffs to produce evidence that voter preferences changed based upon the race of the candidate. As the Supreme Court noted, that assumption is false as an empirical matter. And, as the Eleventh Circuit noted, courts cannot automatically assume that the Black community, as a whole, will be satisfied with any Black candidate. Thus, the Court finds that the requirement urged by Defendants is incorrect as a matter of law.

**(d)**   **precedential arguments following** *Allen*

Finally, Defendants argue that the *Allen* majority's treatment of <u>Bolden</u> requires that the Court determine the causes of racial polarization. Doc. No. [228], 12–19. Defendants begin their argument by stating "[t]he majority opinion does not provide much direct guidance for lower courts on plaintiff's evidentiary burden in satisfying the third <u>Gingles</u> precondition, because that precondition was not squarely at issue in <u>Allen</u>." <u>Id.</u> at 12. Defendants go on to point out that "the Supreme Court did not offer any additional clarity on [the third <u>Gingles</u> precondition] because there was 'no reason to disturb the [d]istrict [c]ourt's careful factual findings, which are subject to clear error review *and have gone unchallenged by Alabama in any event*." <u>Id.</u> at 16 (citing <u>Allen</u>, 143 S. Ct. 1506). Despite these caveats, Defendants also argue that the majority opinion reaffirmed these causation tests from <u>Bolden</u>. <u>Id.</u>

The majority opinion, in its historical background section discusses the 115 years of history between the passage of the Fifteenth Amendment and the 1982 amendments to the VRA. <u>Allen</u>, 143 S. Ct. at 1498–1501. The majority's treatment of <u>Bolden</u> can be described only as a summation of the holding, the resulting backlash, the Congressional debates, and the ultimate passage of the

1982 Amendments. Id. At no other point in the majority opinion, does Chief Justice Roberts discuss the viability of any precedent that came out of Bolden. [34] In fact, the Gingles plurality expressly rejected the test that Defendants are proposing:

> Finally, we reject the suggestion that racially polarized voting refers only to white bloc voting which is caused by white voters' *racial hostility* toward black candidates. To accept this theory would frustrate the goals Congress sought to achieve by repudiating the intent test of Mobile v. Bolden . . . and would prevent minority voters who have clearly been denied an opportunity to elect representatives of their choice from establishing a critical element of a vote dilution claim.

Gingles, 478 U.S. at 70–71 (citation omitted).

The Court finds reading the majority opinion's citation to Bolden as a reversion to the pre-Gingles frameworks to be a bridge too far. [35] The Court

---

[34] Bolden was overruled when Congress passed the 1982 amendments to the VRA. See Gingles, 478 U.S. at 35 ("The amendment was largely a response to this Court's plurality opinion in [Bolden] . . . Congress substantially revised § 2 to make clear that a violation could be proved by showing discriminatory effect alone and to establish as the relevant legal standard the 'results test' . . . .").

[35] Defendants argue that Allen restores the precedent from Whitcomb. Doc. No. [228], 16–17. On an initial note, neither the Allen majority, nor any of the concurrences or dissents, cite to or mention Whitcomb. Second, the sentence cited by Defendants, "[t]he third precondition, focused on racially polarized voting, 'establish[es] that the challenged districting thwarts a distinctive minority vote at least plausibly on account

understands that Defendants disagree with the Court's reading of the effects test outlined by the plurality in <u>Gingles</u>; however, as the case law stands today and as noted in detail above, the Court concludes that Plaintiffs do not have to prove that race is the cause of majority-bloc voting at the preconditions phase. As the Defendants' noted, the <u>Allen</u> Court did not disturb the case law regarding the third <u>Gingles</u> precondition. Rather, at the preconditions phase, Plaintiffs need only prove its existence, and then at the totality of the circumstances phase the Court may evaluate its causes.

* * * * *

---

of race'" does not create a causation requirement. Doc. No. [228], 16 (emphasis omitted) (citing <u>Allen</u>, 143 S. Ct. at 1507). The majority opinion defines:

> 'on account of race or color' to mean 'with respect to' race or color, and does not connote any required purpose of racial discrimination . . . . A district is not equally open, in other words, when minority voters face—unlike their majority peers—bloc voting along racial lines, arising against the backdrop of substantial racial discrimination within the State, that renders a minority vote unequal to a vote by a nonminority voter.

<u>Allen</u>, 143 S. Ct. at 1507. The Court understands this to mean that at the preconditions phase, Plaintiffs have to prove the existence of racial bloc voting and at the totality of the circumstances phase, Plaintiffs have to show both past and present racial discrimination in Georgia that results in the voting process not being equally open to minority voters.

65

In summary, the Court finds that as a matter of law, to satisfy the second and third <u>Gingles</u> preconditions, Plaintiffs have to show (1) the existence of minority voter political cohesion and (2) that the majority votes as a bloc and usually defeats the minority voters' candidate of choice. As a part of these preconditions, Plaintiffs do not have to prove that race is the cause of voting differences between minority and majority voting blocs, nor must Plaintiffs disprove that other race-neutral reasons, such as partisanship, cause racial bloc voting. The Court rejects Defendants' arguments to the contrary.

### (2)    *Record evidence of racial bloc voting*

Turning to the Record evidence, the Court finds that there is sufficient Record evidence of both minority voter political cohesion and majority racial bloc voting to defeat Defendants' Motion for Summary Judgment.

Defendants argue that "Dr. Palmer's data [] only demonstrate two material facts: The race of the candidate *does not* change voting behavior of Georgia voters; and the party of the candidate *does*." Doc. No. [190-1], 33. And, "Plaintiffs' purported evidence of racial polarization is, in reality, nothing more than evidence of partisan polarization where a majority of voters support one party and a minority of voters support another party." <u>Id.</u> Finally, Defendants argue

66

that "all the Court has before it is evidence establishing that party, rather than race, explains the 'diverge[nt]' voting patterns at issue . . . Plaintiffs' failure to offer any other evidence ends this case." Id. at 34 (alternation in original) (quoting Gingles 478 U.S. at 100 (O'Connor, J., concurring)).

A defendant is entitled to summary judgment when it "shows that there is no genuine dispute as a material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A defendant can meet this burden in one of two ways: (1) no disagreement about a material fact or (2) "pointing out to the district court—that there is an absence of evidence to support [an essential element of] the [plaintiffs'] case." Celotex Corp., 477 U.S. at 325.

The Court has already determined that Plaintiffs do not have to prove the causes of racial bloc voting to satisfy the second and third Gingles preconditions. See Section III(A)(2)(b)(1)(a) supra. The Court finds, moreover, that there is sufficient evidence in the Record that the minority population is politically cohesive. The expert testimony and Record evidence submitted shows political cohesion amongst the APBVAP in the Proposed Districts and that the majority population typically votes as a bloc to defeat the minority voters' candidate of choice. Specifically, it is undisputed that in the 40 elections that Dr. Palmer

examined, 98.5% of Black voters supported their candidate of choice. Doc. No. [189-2], ¶ 89. Defendants' expert even testified that "Black voter support for their preferred candidate is typically in the 90 percent range and scarcely varies at all across the ten years examined from 2012 to 2022." Id. ¶ 87 (citing Doc. No. [178] ("Alford Dep. Tr."), Tr. 37:13–15). Accordingly, the Court finds that the testimony of both Plaintiffs' expert and Defendants' expert testimony provides evidence that Black voters are politically cohesive sufficient to defeat Defendants' Motion for Summary Judgment as to the second Gingles precondition.

Similarly, the Court finds that there is Record evidence that the white majority usually votes as a bloc to defeat the minority voters' candidate of choice for the third Gingles precondition. It is undisputed that, in the focus area, 8.3% of white voters, on average, supported Black-preferred candidates in the elections that Dr. Palmer examined, and support did not exceed 17.7%. Doc. No. [204], ¶ 92. Defendants' expert testified that "estimated white opposition to the Black-preferred candidate is typically above 80 percent" and "is remarkably stable." Id. ¶ 91. Accordingly, the Court finds that there is sufficient evidence that the white majority typically votes as a bloc and does not vote for the Black voters' preferred candidate.

### (3)     *Temporal limitations*

In supplemental briefing, Defendants argue that there are potential limitations about the temporal applicability of Section 2. Doc. No. [228], 21–22. Defendants argue first that courts are shifting focus away from preferences based upon the race of the candidate, which is a departure from Gingles. Id. As the Court noted above, eight of the nine Justices in Gingles agreed that the race of the candidate was not relevant at the Gingles preconditions phase of the inquiry. See Section III(A)(2)(b)(1)(c) supra. Additionally, the Eleventh Circuit and Supreme Court's more recent jurisprudence has expressly rejected a reliance on the race of the candidate when evaluating a potential Section 2 violation. See id. Thus, the Court finds this temporal argument unavailing.

Defendants also argue that "Justice Kavanaugh's concurring opinion—the *fifth* vote—makes abundantly clear that the constitutionality of the law is not at all settled into the future." Doc. No. [228], 21. In Allen, Justice Kavanaugh opined:

> Justice [Thomas] notes, however, that even if Congress in 1982 could constitutionally authorize race-based redistricting under § 2 for some period of time, the authority to conduct race-based redistricting cannot extend indefinitely into the future . . . . But Alabama did not raise that temporal argument in this Court, and therefore I would not consider it at this time.

69

143 S. Ct. at 1519. The Court finds this argument unavailing. As the precedent currently stands, five Justices agreed that the Gingles framework remains and affirmed the Allen three-judge court's decision finding that Alabama violated Section 2 of the VRA. Although the two dissents raised arguments about the constitutionality of the Gingles framework, neither stated that Section 2 of the VRA by itself should be deemed unconstitutional. See generally Allen, 143 S. Ct. at 1519–48 (Thomas, J., dissenting); id. 1548–57 (Alito, J., dissenting). In accordance with the binding majority opinion, the Court rejects Defendants' temporal argument. The Court finds that Plaintiffs may move forward with their Section 2 claims.

*    *    *    *    *

To summarize the foregoing analysis on the second and third Gingles preconditions in this case: the Court finds that, under the current binding precedent, these preconditions require Plaintiffs to show the existence of (1) political cohesion amongst minority voters and (2) that the white majority typically votes as a bloc to defeat the Black preferred candidate. The second and third Gingles preconditions specifically do not require that Plaintiffs prove that

70

race causes the bloc voting or disprove that race-neutral factors caused the bloc voting.

The Court also finds that Plaintiffs pointed to sufficient evidence in the Record of the existence of both minority voter cohesion and racial bloc voting to defeat Defendants' Motion for Summary Judgment as to the second and third <u>Gingles</u> preconditions. Accordingly, Defendants' Motion for Summary Judgment on the second and third <u>Gingles</u> preconditions is denied.

### 3.    Conclusions on Defendants' Motion for Summary Judgment

Consequently, the Court **DENIES** Defendants' Motion for Summary Judgment. The Court finds that there are triable issues of fact as it relates to standing, the <u>Gingles</u> preconditions, and proportionality. [36] Accordingly, the Court denies Defendants' Motion for Summary Judgment.

### B.    <u>Plaintiffs' Motion for Summary Judgment</u>

The Court now turns to Plaintiffs' Motion for Partial Summary Judgment. More specifically, Plaintiffs seek summary judgment as to six of the eight Proposed Districts drawn by their expert, Mr. Esselstyn. Doc. No. [189-1], 5. The

---

[36] Defendants did not move for summary judgment on the Senate Factors. The Court, however, discusses the totality of the circumstances inquiry in its analysis of Plaintiffs' Motion below. <u>See</u> Section (III)(B)(4) <u>infra</u>.

six districts at issue are described as follows: (1) **Senate District 25**, which is in the southeastern Atlanta metropolitan area; (2) **Senate District 28**, which is in the southwestern Atlanta metropolitan area;  (3) **House District 64**, which is in the western Atlanta metropolitan area; (4) **House District 117**, which is in the southern Atlanta metropolitan area; (5) **House District 145**, which is anchored in Macon-Bibb County; (6) **House District 149**, which also anchored in Macon-Bibb County.[37] Id. at 9–10.

Plaintiffs argue that there is no genuine dispute that they have satisfied the first of the three threshold preconditions established in Gingles, 478 U.S. at 50–51, as to these six Proposed Districts. Doc. No. [189], 3. Plaintiffs further argue that they have satisfied the second and third Gingles preconditions and that, considering the totality of circumstances, "the political processes leading to nomination or election in the State or political subdivision are not equally open to participation" by members of Georgia's Black community. Id. (citing 52 U.S.C. § 10301(b)).

---

[37] Plaintiffs state that at trial, they will still proceed on their other two Proposed Districts (SD-23 and HD-74). Plaintiffs recognize that Defendants' expert has "attempted" to meaningfully dispute the compactness of these two districts in his rebuttal report, such that a summary judgment motion would not be an appropriate as to said districts at this time. Doc. No. [189-1], 10–11 n.3.

For Plaintiffs to be successful, however, they must establish standing and affirmatively meet their burden of proof by showing that they are entitled to summary judgment on all three Gingles preconditions, as well as under the totality of the circumstances factors (i.e., the Senate Factors). The Court now addresses each of these requirements and ultimately concludes that questions of fact, outstanding credibility determinations, and the necessity for a trier of fact to weigh evidence on the Gingles preconditions and the Senate Factors preclude granting Plaintiffs' Motion on the grounds asserted.

### 1. *Standing*

Preliminarily, the Court addresses Defendants' opposition argument that Plaintiffs have failed to provide Record evidence of their standing to bring this Section 2 case. Doc. No. [203], 3. Defendants argue in response to Plaintiffs' Motion that because, in Section 2 cases, a plaintiff's injury is district specific, that Plaintiffs failed to provide adequate evidence of their residence for purposes of establishing a district-specific injury. Id. at 11–12. Defendants reject usage of the stipulated facts from the preliminary injunction phase as evidence of standing on summary judgment. Id. at n.4.

To establish standing in a vote dilution case, voter-plaintiffs must reside "in a district where their vote has been cracked or packed." Harding v. Cnty. of Dallas, 948 F.3d 302, 307 (5th Cir. 2020);[38] see also Robinson v. Ardoin, 605 F. Supp. 3d 759, 817 (M.D. La. 2022) ("[I]n the context of a vote dilution claim under Section 2, the relevant standing inquiry is not whether [p]laintiffs represent every single district in the challenged map but whether [p]laintiffs have made 'supported allegations that [they] reside in a reasonably compact area that could support additional [majority-minority districts].'") (some alterations in original) (quoting Pope v. Cnty. of Albany, No. 1:11-CV-0736 LEK/CFH, 2014 WL 316703, at *5 (N.D.N.Y. Jan. 28, 2014)).

In the case *sub judice*, Plaintiffs reply to Defendants' arguments by stating that they have shown they are registered voters in the districts where "their votes have been cracked or packed"[39] and where additional compact-majority-Black

---

[38]  "'Cracking' occurs when redistricting lines are drawn in order to 'divid[e] the minority group among various districts so that it is a majority in none.'" Fletcher v. Lamone, 831 F. Supp. 2d 887, 898 (D. Md. 2011) (quoting Voinovich v. Quilter, 507 U.S. 146, 153 (1993)). "'Packing' occurs when a redistricting plan results in an excessive concentration of minorities within a given district, thereby depriving the group of influence in surrounding districts." Fletcher, 831 F. Supp. 2d at 898 (quoting Voinovich, 507 U.S. at 153–54).

[39]  The Complaint alleges that the "packed" Senate Districts are: SD-10, SD-34, SD-35,

74

legislative districts could be drawn. Doc. No. [217], 4. In support of this argument, Plaintiffs submit declarations (and deposition excerpts) [40] from the named Plaintiffs about their residences and current voting districts under the Enacted Plan. Doc. Nos. [218-1]–[218-10]. Plaintiffs note that Defendants also included Plaintiffs' residence information in their own statement of undisputed of material facts. Doc. No. [217], 5 (citing Doc. No. [192], ¶¶ 16, 22, 28, 31, 35, 37, 41, 44, 50, 54).

The Court determines that this evidence submitted along with Plaintiffs' reply brief is sufficient for purposes of standing on summary judgment as said evidence shows that each named Plaintiff is a registered voter in one or more of the Enacted House and Senate Districts alleged to be subject to cracking and

_____

SD-44 and the "cracked" Senate Districts are: SD-16, SD-17, SD-23, SD-24, SD-25, SD-28, and SD-30. Doc. No. [118], 19–20. The Complaint alleges that the "packed" House Districts are: HD-61, HD-64, HD-69, HD-75, HD-78, HD-142, HD- 143 and the "cracked" House Districts are: HD- 74, HD-117, HD-133, HD-144, HD-145, HD-147, and HD-149. Id. at 20–21.

[40] The Court notes that no declaration was submitted for Plaintiff Conner; however, her deposition testimony (Doc. No. [218-21]) shows that she resides in Henry County, a County in which Mr. Esselstyn drew Illustrative Senate District 25 and Illustrative House District 117. Doc. No. [216], ¶ 39; see also Esselstyn Dep. Tr. 149:14-150:14, 182:12-184:11, 185:5-8.

packing—or resides in the areas where the alleged additional compact majority-Black legislative districts could be drawn.

Admittedly there is typically great emphasis on "giving the nonmovant a meaningful opportunity to respond to a motion for summary judgment." Atl. Specialty Ins. Co. v. Digit Dirt Worx, Inc., 793 F. App'x 896, 901 (11th Cir. 2019) (quoting Burns v. Gadsden State Cmty. Coll., 908 F.2d 1512, 1516 (11th Cir. 1990)). This principle applies to "new evidence . . . submitted . . . in a reply brief." Id. Thus, the Court "should not consider the new evidence without giving the movant an opportunity to respond." Id. (quoting Provenz v. Miller, 102 F.3d 1478, 1483 (9th Cir. 1996)).

Here, Defendants had the opportunity to oppose the Court's consideration of Plaintiffs' reply brief evidence, both by filing a motion to strike or by raising it at the summary judgment hearing. Defendants did neither. They also had the opportunity to file supplemental briefing following the Supreme Court's Allen decision and did not raise any concern about Plaintiffs' evidence being submitted in the reply brief. Defendants, moreover, did not move to file a sur-reply, which is not expressly prohibited by the Court's Local Rules and within the Court's discretion to grant. Cf. Dynamic Depth, Inc. v. Captaris, Inc., No. 1:07-CV-1488,

76

2009 WL 10671407, at *1 (N.D. Ga. June 9, 2009) ("[T]he court will not allow such sur-replies as a routine practice and will only permit them in exceptional circumstances."); Chemence Med. Prod., Inc. v. Medline Indus., Inc., 119 F. Supp. 3d 1376, 1383 (N.D. Ga. 2015). ("Generally, surreplies are not authorized and may only be filed under unusual circumstances, such as when a party raises new arguments in a reply brief."). Indeed, the Court's consideration of new evidence in a reply brief has been affirmed by the Eleventh Circuit when an opposing party failed to move the Court for a sur-reply. Cf. United States v. Carter, 506 F. App'x 853, 860 (11th Cir. 2013).

Accordingly, considering the evidence in Plaintiffs' declarations and deposition testimony, the Court is satisfied that the Plaintiffs have shown district-specific injury for their Section 2 case.

### 2. The First *Gingles* Precondition: Numerosity and Compactness

Next, the Court considers Plaintiffs' argument that there is no genuine dispute that Plaintiffs satisfied the first Gingles precondition with respect to six of their eight illustrative districts. Doc. No. [217], 5.

As the Court has articulated, "the first Gingles precondition requires showings that the relevant minority population is 'sufficiently large and

geographically compact to constitute a majority in a single-member district[.]'" Alpha Phi Alpha, 587 F. Supp. 3d at 1252 (quoting LULAC, 548 U.S. at 425; De Grandy, 512 U.S. at 1006–07). For compactness, Plaintiffs must show that "it would be possible to design an electoral district, consistent with traditional districting principles, in which minority voters could successfully elect a minority candidate." Davis, 139 F.3d at 1425.

Bearing the burden of proof, Plaintiffs must show undisputed evidence that the minority population is sufficiently numerous and compact to create an additional majority-minority district. Plaintiffs, moreover, must put forth an illustrative plan meeting these requirements that also could, as a legal matter, be entered as a remedial map. Nipper, 39 F.3d at 1530 ("[T]he issue of remedy is part of the plaintiff's prima facie case in [S]ection 2 vote dilution cases."); see also Section III(A)(2)(a)(3) supra.

In support of their Motion, Plaintiffs cite to their evidence showing that their map expert, Mr. Esselstyn, "concluded that it is possible to create three additional majority-Black State Senate districts and five additional majority-Black House districts, all in accordance with traditional redistricting principles" of population equality, contiguity, compactness, political

78

subdivisions, communities of interest, and incumbent pairings. Doc. No. [189-1], 8–13. Plaintiffs further assert that there is a lack of meaningful analysis or opinion from Defendants' expert, Mr. Morgan, to contest their expert's conclusions or to otherwise undermine their evidence as to the first <u>Gingles</u> precondition as to the six Proposed Districts at issue. Doc. No. [189-1], 14.

In opposition, Defendants reference the first prong of the <u>Celotex</u> summary judgment standard cited above, and assert that Plaintiffs (as movants) have not carried their initial burden of "showing there is no disputed material fact about every element they must prove at trial." Doc. No. [203], 13. Defendants further assert that "disputes exist for facts necessary to find for Plaintiffs regardless of whether an opposing expert has contested each point." Doc. No. [203], 3. In support of their argument that Plaintiffs have not carried their initial movant burden, Defendants cite to the testimony of Plaintiffs' map expert, which Defendants characterize as an "inability to explain the reasoning behind his districts beyond simply drawing more majority-Black districts." Doc. No. [203], 14 (citing Doc. No. [204], ¶ 33; Esselstyn Dep. Tr. 149:24–150:14, 152:25–153:4, 154:2–24, 180:16–23, 182:12–184:11, 185:5–8).

In response to Defendants' Statement of Additional Material Fact 17 and in reply to Defendants' opposition brief, Plaintiffs appear to concede that the deposition excerpts relied upon by Defendants demonstrate that Mr. Esselstyn "could not recall specific reasons for connecting part of Clayton County with Henry County, and that he could not recall some communities of interest at the time of his deposition." Doc. No. [217-1], 17; see also id. at 7.

Plaintiffs assert that Defendants' arguments are "red herrings" and that there is a lack of meaningful dispute on compactness and satisfaction of applicable redistricting criteria. Doc. No. [217], 8–11. The Court disagrees with this assessment. Mr. Esselstyn's inability to recall this information creates a credibility question for the Court and leads to the conclusion that summary judgment is not proper at this time. See Tippens v. Celotex Corp., 805 F.2d 949, 954 (11th Cir. 1986) ("Variations in a witness's testimony and any failure of memory throughout the course of discovery create an issue of credibility as to which part of the testimony should be given the greatest weight if credited at all. Issues concerning the credibility of witnesses and weight of the evidence are questions of fact which require resolution by the trier of fact."); United States

v. Weiss, 791 F. Supp. 2d 1183, 1196 (M.D. Fla. 2011) ("A failure to recall a fact and subsequent recollection of that fact goes to the witness's credibility . . . .").

A determination on whether the Proposed Districts are, in fact, compact cannot be decided as a matter of law under the circumstances of the case *sub judice*; it is a question of fact that the Court cannot determine at the summary judgment phase.

### 3. *The Second and Third* <u>Gingles</u> *Preconditions: Political Cohesion and Bloc Voting*

The Court now assesses Plaintiffs' arguments and evidence relating to the second and third <u>Gingles</u> preconditions. The second <u>Gingles</u> precondition analysis requires showing that Black Georgia voters, in the regions at issue, are politically cohesive. <u>Gingles</u>, 478 U.S. at 49. The Court looks to see if Black voters vote cohesively to "show[] that [B]lacks prefer certain candidates whom they could elect in a single-member, [B]lack majority district." <u>Id</u>. at 68. "The second [precondition] shows that a representative of its choice would in fact be elected." <u>Allen</u>, 143 S. Ct. at 1503.

"The third precondition, focused on racially polarized voting, 'establish[es] that the challenged districting thwarts a distinctive minority vote' at least plausibly on account of race." <u>Id</u>. Put slightly differently, this analysis

81

looks at whether "the white majority votes sufficiently as a bloc to . . . usually to defeat the minority's preferred candidate." <u>Gingles</u>, 478 U.S. at 51 (citations omitted).

Thus, the second <u>Gingles</u> precondition focuses on the voting preferences of the minority group, while the third looks at preferences of the majority.

In support of their Motion for Partial Summary Judgment, Plaintiffs rely upon the analysis of Dr. Palmer, who utilized statistical methods to conclude that Black voters in the focus areas are extremely cohesive, with a clear candidate of choice in all 40 elections he examined. Doc. No. [189-1], 17 (citing Doc. No. [189-2], ¶ 87). As for the third <u>Gingles</u> precondition, Plaintiffs again rely on Dr. Palmer's analysis and indicate that their evidence in summary shows that "Black voters' candidates of choice are consistently defeated in the focus areas by white bloc voting, except where Black voters make up a majority of eligible voters . . . ." <u>Id.</u> at 19.

Defendants argue, however, that this data alone presents an incomplete assessment. Doc. No. [203], 22 ("[T]he polarization that Dr. Palmer found tells us little (if anything) about the existence and extent of legally significant racially polarized voting in Georgia elections."). It appears that Defendants contend that

Plaintiffs' evidence shows that while Black and white Georgians tend to vote for opposing candidates, this result can be attributed to partisanship. Id. at 17–24.

In an effort to explain this data and the empirical results at issue, Defendants first cite to the fact that Dr. Palmer assesses only general, not primary, elections. Doc. No. [203], 8 (citing Doc. No. [183] ("Palmer Dep. Tr."), Tr. 59:23–60:1). Defendants argue that primary elections would be the best method of controlling for partisanship in order to determine if race is causing the split between white and Black voters. Doc. No. [203-1] ¶ 37; Alford Dep. Tr. 156:1–5 (encouraging an analysis to disentangle the partisanship effect from the race effect by "look[ing] at some elections where that party signal is not going to be such as a strong driver," such as in primary elections).

Defendants also make a variety of legal claims in support of their partisanship argument. As far as Defendants' legal arguments are concerned, the Court has already rejected Defendants' argument that the causes of polarization are relevant to the second and third Gingles preconditions. See Section III(A)(2)(b)(1)(a) supra. The Court has also already rejected Defendants' suggestion that the VRA as applied by Plaintiffs is unconstitutional. See Section III(A)(2)(b)(1)(b) supra.

Despite the rejection of Defendants' legal arguments, Dr. Alford's criticisms of Dr. Palmer's conclusions and Defendants' overall contention that "Dr. Palmer's data is lacking in several key respects" (Doc. No. [203], 22), nevertheless presents a credibility determination that requires the Court to assess the weight of Dr. Palmer's conclusions. See Alford Dep. Tr. 156:1–157:22 (stating that Dr. Palmer's conclusions would be stronger if he had used a different data set that included primary elections evidence); Doc. No. [203], 22 (arguing that Dr. Palmer's analysis is incomplete because it fails to consider the United States Senate race between two Black candidates). These criticisms go toward the weight and credibility of both Dr. Alford's and Dr. Palmer's opinions; thus, the Court defers such determinations for trial. Cf. Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs, 775 F.3d 1336, 1343 (11th Cir. 2015) (encouraging "scrupulous[]" compliance with Rule 52(a)'s fact-finding requirement in bench trials because "sifting through the conflicting evidence and legal arguments and applying the correct legal standards is for the district court in the first instance" (alteration adopted) and in Section 2 cases, the deferential clear error review is afforded to the district court's findings (quoting McIntosh Cnty. Branch of the NAACP v. City of Darien, 605 F.2d 753, 759 (5th Cir. 1979))). Accordingly, the

84

Court denies Plaintiffs' Motion for Summary Judgment on the second and third Gingles preconditions.

### 4.    The Senate Factors

After evaluating the Gingles preconditions, the final assessment to determine whether vote dilution has actually occurred requires "assess[ing] the impact of the contested structure or practice on minority electoral opportunities on the basis of objective factors." Gingles, 478 U.S. at 44 (cleaned up). To do so, the Court looks at the VRA's 1982 Amendments' Senate Report, which specifies the factors relevant for a Section 2 analysis. Id.[41] "[T]he totality of circumstances inquiry recognizes that application of the Gingles factors is 'peculiarly dependent upon the facts of each case.'" Allen, 143 S. Ct. at 1503 (quoting Gingles, 478 U.S. at 79). The totality of the circumstances inquiry is fact intensive and requires weighing and balancing various facts and factors, which is generally inappropriate on summary judgment. See Rose v. Raffensperger, No. 1:20-CV-02921, 2022 WL 670080, at *2 (N.D. Ga. Mar. 7, 2022) ("[T]he

---

[41]  These factors are sometimes referred to in the voting rights jurisprudence as "the Senate factors" or "the Gingles factors."

85

Court . . . cannot appropriately evaluate the totality of the circumstances before trial.").

In their Motion, Plaintiffs review their evidence as to each of the relevant Senate Factors and assert that under the totality of the circumstances, the Enacted Plans deny Black voters equal opportunity to elect their preferred legislative candidates. Doc. No. [189-1], 19. In response, Defendants assert that "Plaintiffs have not carried their heavy burden to show that they can prevail without this Court weighing any evidence at trial . . . ." Doc. No. [203], 31. The Court agrees as the Eleventh Circuit has found "some merit" to an argument that the "balancing" of the Senate Factors "appears to involve a weighing of the evidence—that is, accepting [plaintiff's] evidence of 'practices that enhance discrimination' as persuasive and rejecting [the other side's] evidence as unpersuasive . . . ." Ga. State Conf. of NAACP, 775 F.3d at 1347.

In light of this authority and after consideration of the argument and evidence that Plaintiffs have submitted in support of their Motion, the Court finds that resolution of the Senate Factors will involve weighing of evidence

86

(even if it is asserted to be undisputed) and credibility determinations. Accordingly, the Senate Factors will be resolved at trial.[42, 43]

## IV.   CONCLUSION

For the foregoing reasons, the Court **DENIES** Plaintiffs' Motion for Partial Summary Judgment (Doc. No. [189]) and **DENIES** Defendants' Motion for Summary Judgment (Doc. No. [190]). As the Court noted consistently throughout this Order, there are material disputes of fact and credibility determinations that foreclose the award of summary judgment to either Party. Additionally, given the gravity and importance of the right to an equal vote for all American citizens, the Court will engage in a thorough and sifting review of the evidence that the Parties will present in this case at a trial.

---

[42]  To the extent that additional merits analysis is required, the Court's analysis of the Senate Factors in the summary judgment order in the <u>Pendergrass</u> case controls.

[43]  While the Court denies both Parties' Motions for Summary Judgment, as noted, there were many undisputed facts in the Parties' Statements of Material Facts. Doc. Nos. [204]; [205-1]. For purposes of evidence at trial and in the interest of judicial efficiency, the Court encourages the Parties to stipulate to facts that are not in dispute. Additionally, the Court wants to ensure that the Parties are aware that Rule 65 of the Federal Rules of Civil Procedure provides another means for the Parties to efficiently present their case. <u>See</u> Fed. R. Civ. P. 65 ("[E]vidence that is received on the [preliminary injunction] motion and that would be admissible at trial becomes part of the trial record and need not be repeated at trial.").

Accordingly, the case will proceed to a coordinated trial with
<u>Alpha Phi Alpha Fraternity Inc., et al. v. Brad Raffensperger</u>, (1:21-cv-5337) and
<u>Coakley Pendergrass et al. v. Brad Raffensperger et al.</u>, (1:21-cv-5339). The
Second Amended Scheduling Order (Doc. No. [225]) shall govern the
forthcoming proceedings.

**IT IS SO ORDERED** this 17th day of July, 2023.

HONORABLE STEVE C. JONES
UNITED STATES DISTRICT JUDGE

88