# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

ANNIE LOIS GRANT; QUENTIN T. HOWELL; ELROY TOLBERT; TRIANA ARNOLD JAMES; EUNICE SYKES; ELBERT SOLOMON; DEXTER WIMBISH; GARRETT REYNOLDS; JACQUELINE FAYE ARBUTHNOT; JACQUELYN BUSH; and MARY NELL CONNER,

          Plaintiffs,

    v.

BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State,

        Defendant.

CIVIL ACTION FILE
NO. 1:22-CV-00122-SCJ

## PLAINTIFFS' OBJECTIONS TO THE GEORGIA GENERAL ASSEMBLY'S REMEDIAL STATE LEGISLATIVE PLANS

## TABLE OF CONTENTS

INTRODUCTION ...............................................................................................1

BACKGROUND .................................................................................................2

   I.   This Court struck down Georgia's state legislative plans and provided the
State with clear guidance on proper remedies. ........................................................2

   II.  The Georgia General Assembly adopted remedial plans that defy this
Court's ruling. .........................................................................................................4

LEGAL STANDARD ..........................................................................................6

ARGUMENT .......................................................................................................7

   I.   SB 3EX does not sufficiently cure the vote dilution identified by the Court. .7

   II.  SB 1EX and HB 1EX defy this Court's ruling by denying minority electoral
opportunities elsewhere in Georgia. .................................................................13

CONCLUSION ...................................................................................................18

## INTRODUCTION

The Court's detailed ruling gave the General Assembly straightforward guidance on how to remedy the Section 2 violations in Georgia's state legislative maps: (1) create two additional majority-Black state senate districts from an explicitly defined vote-dilution area, and (2) create five additional majority-Black state house districts from an explicitly defined vote-dilution area. The Court was very clear that the "State cannot remedy the Section 2 violations described herein *by eliminating minority opportunity districts elsewhere in the plans*." Doc. 294 at 509–10 (emphasis added).

Rather than follow this Court's clear guidance, the General Assembly did exactly what the Court said it could not do in the remedial process: it reached *outside* of the vote-dilution areas to draw new majority-Black districts to the exclusion of Black voters *within* the vote-dilution areas, and in the process *eliminated* performing minority crossover districts. This leaves many of the Black voters who this Court found had suffered a Section 2 violation without a Section 2 remedy. Under the General Assembly's 2023 Plans, the pursuit for Black equal opportunity is a zero-sum game.

The General Assembly's state legislative plans fail to remedy the Section 2 violations found by this Court—as the Court expressly warned they would, if the General Assembly proceeded as it now has. This Court must accordingly enjoin the

new maps and proceed to adopt lawful state House and Senate plans in time for the 2024 elections.

## BACKGROUND

### I.    This Court struck down Georgia's state legislative plans and provided the State with clear guidance on proper remedies.

On October 26, 2023, the Court found that Georgia's 2021 enacted state legislative plans violate Section 2 of the Voting Rights Act. Order at 493, *Grant v. Raffensperger*, No. 1:21-CV-05339-SCJ (Oct. 26, 2023), Doc. 294. With respect to the Senate plan, the Court found that Georgia's Black population is sufficiently large and geographically compact to constitute a majority in two additional majority-Black Senate districts in south-metro Atlanta, and that such districts could be drawn while adhering to traditional redistricting principles (*Gingles* 1). *Id.* at 309–27. As for the House plan, the Court found that Georgia's Black population is sufficiently large and geographically compact to constitute a majority in two additional majority-Black House districts in south-metro Atlanta, an additional majority-Black House district in west-metro Atlanta, and two additional majority-Black House districts in the Macon-Bibb region (*Gingles* 1). *Id.* at 327–46, 382–96, 405–06.

The Court also found that the Black population was politically cohesive in each of these areas. Specifically, relying on the analysis of Plaintiffs' expert Dr. Maxwell Palmer and concessions from Defendant's expert Dr. John Alford—the Court found that "Black voters in south-Metro and west-Metro Atlanta support the

same candidate more than 98% of the time and in the Macon-Bibb region, Black voters supported the same candidate 98.1% of the time" and thus were very politically cohesive (*Gingles* 2). *Id.* at 414–16. The Court also determined that in each legislative district examined and in the focus areas as a whole, white voters "were highly cohesive in voting in opposition to the Black-preferred candidate" (*Gingles* 3). *Id.* at 421. The Court concluded that there was "'very clear' evidence of racially polarized voting" in the focus areas. *Id.* at 425–26 (*quoting Allen v. Milligan*, 599 U.S. 1, 22 (2023)).

In finding that the totality of the circumstances demonstrates that the political process is not currently equally open to Black Georgians in the focus areas, the Court endorsed Plaintiffs' expert Dr. Vernon Burton's observation "of a historical pattern that following an election, the General Assembly responsively passes voting laws that disproportionately impact Black voters in Georgia"—a pattern that continues to the present with the recent passage of SB 202. Doc. 294 at 230, 483 (Court incorporating *in toto* its analysis in the *Pendergrass* case above with respect to Senate Factors Three, Five, Six, Seven, and Eight). The Court observed that "[d]espite the growth in the Black population in the affected areas and the voter polarization between white and Black Georgians," the plans "did not increase the number of majority-Black districts" in the focus areas, which "in effect dilutes and diminishes the Black population's voting power in that area of the State." *Id.* at 272.

Based on the well-established legal standard, the Court concluded that "SB 1EX violates Section 2 of the Voting Rights Act as to the following districts/areas: Enacted Senate Districts 10, 16, 17, 25, 28, 30, 34, 35, 43, and 44." *Id.* at 514. And it concluded that "HB 1EX violates Section 2 of the Voting Rights Act as to the following areas/districts: Enacted House Districts 61, 64, 74, 78, 117, 133, 142, 143, 145, 147, and 149." *Id.* The Court provided the General Assembly more than six weeks to adopt remedial legislative plans "consistent with[ its] Order." *Id.* at 510; *see also id.* at 508–09 ("[T]he parameters and the instructions around what the State of Georgia is supposed to do to comply with Section 2 of the VRA is a critical part of this Court's order."). The Court held that an appropriate remedy involves "two additional majority-Black Senate districts in south-metro Atlanta; two additional majority-Black House districts in south-metro Atlanta, one additional majority-Black House district in west-metro Atlanta, and two additional majority-Black House districts in and around Macon-Bibb." Doc. 294 at 509. The Court further instructed that the "State cannot remedy the Section 2 violations described herein by eliminating minority opportunity districts elsewhere in the plans." *Id.* at 509–10.

## II.   The Georgia General Assembly adopted remedial plans that defy this Court's ruling.

On December 8, 2023, Georgia enacted proposed remedial plans SB 1EX and HB 1EX. Doc. 312 at 2. SB 1EX includes two additional majority-Black Senate districts in the Atlanta metropolitan area (new SD 17 and SD 28) and HB 1EX

contains five additional majority-Black House districts: one in the western Atlanta metropolitan area (new HD 64), two in the southern Atlanta metropolitan area (new HD 74 and HD 117), and two anchored near Macon-Bibb County (new HD 145 and HD 149). *See* Remedial Expert Report of Blakeman Esselstyn ("Esselstyn Remedial Rep.") ¶¶ 11, 31. However, many of the Black voters that make up the new majority-Black districts are from *outside* the vote dilution areas identified by this Court. For example, 43.18% of the Black voting-age population of the new majority-Black SD 28 was previously assigned to districts outside the Court's vote dilution area. *Id.* ¶ 13. The same is true for new HD 64 (67.45%), HD 74 (6.71%), HD 117 (65.86%), and HD 145 (22.57%). *Id.* ¶¶ 34–37.

Further, the maps dismantle existing minority-opportunity districts, such as old SD 42, which under the previous plan performed for Black-preferred candidates. *See* Remedial Expert Report of Dr. Maxwell Palmer ("Palmer Remedial Rep.") ¶ 17. In fact, the bill's sponsor admitted that new SD 42 encompasses "much of the territory of the prior District 17"—an area this Court found to be a Section 2 violation just weeks prior. Hr'g on SB 1EX Before the Georgia Senate on December 1, 2023 at 1:51:06, Gen. Assemb. (Ga. 2023) (statement of Senator Shelly Echols).[1] The same is true for new HD 40 and HD 81. Palmer Remedial Rep. ¶ 17.

---

[1]   Available at https://vimeo.com/showcase/9076378?video=890053539 (last accessed Dec. 12, 2023).

The General Assembly was well aware that these maps unnecessarily eliminated minority-opportunity districts elsewhere in the state, in conflict with this Court's directive. *See, e.g.*, Hr'g on HB 1EX, Ga. House of Reps. on Dec. 1, 2023 at 2:25:44, Gen. Assemb. (Ga. 2023) (statement of Rep. Sam Park) ("The Republican map creates 5 new majority-Black districts, but it takes away two majority-minority districts in fast growing Dekalb and Gwinnett counties" including House District 81).[2]

## LEGAL STANDARD

Section 2 violations require relief that "completely remedies the prior dilution of minority voting strength and fully provides equal opportunity for minority citizens to participate and to elect candidates of their choice." *United States v. Dall. Cnty. Comm'n*, 850 F.2d 1433, 1442 (11th Cir. 1988) (quoting S. Rep. No. 97-417, at 31 (1982)); *see also White v. Alabama*, 74 F.3d 1058, 1069 n.36 (11th Cir. 1996) (same). "This Court cannot authorize an element of an election proposal that will not with certitude *completely* remedy the Section 2 violation." *Dillard v. Crenshaw County*, 831 F.2d 246, 252–53 (11th Cir. 1987). "This will require the Court to evaluate a remedial proposal under the *Gingles* standard to determine whether it provides Black voters with [] additional opportunity district[s]." Doc. 294 at 511.

---

[2] Available at https://vimeo.com/showcase/8988696?video=889952451 (last accessed Dec. 12, 2023).

**ARGUMENT**

Because SB 1EX and HB 1EX unnecessarily reach outside of the vote-dilution areas to create the new majority-Black districts—excluding tens of thousands of Black Georgians with a Section 2 right from a Section 2 remedy—the General Assembly failed to adequately remedy the Section 2 violations identified by the Court. The plans should be enjoined and this Court should proceed to draw compliant plans to be used in the coming 2024 election.

**I.   SB 3EX does not sufficiently cure the vote dilution identified by the Court.**

Despite this Court's detailed ruling specifying the precise locations of the Section 2 violations—and thus the Section 2 remedies—the new majority-Black state legislative districts at best only partially remedy the vote dilution, failing to provide an opportunity district for those with a Section 2 right by drawing in voters outside of the vote-dilution areas, many of whom already had an opportunity to elect their preferred candidates.

This Court specifically defined the area of Georgia where the Section 2 violations occurred in the previous plans: (1) "Enacted Senate Districts 10, 16, 17, 25, 28, 30, 34, 35, 43, and 44"; and (2) "Enacted House Districts 61, 64, 74, 78, 117, 133, 142, 143, 145, 147, and 149." Doc. 294 at 514. The new majority-Black districts in SB 1EX and HB 1EX, however, only partially draw from these specified areas where unlawful vote dilution occurred and needed to be cured. Most of the new

7

majority-Black districts in the plans have large numbers of Black Georgians who lived *outside* of the vote dilution areas identified by the Court. In particular:

In the new Senate plan, 43.18% of Senate District 28's Black voting-age population lives outside of the vote-dilution area. Esselstyn Remedial Rep. ¶ 13.



Similar patterns are seen in four of the five new majority-Black House districts. In the new House plan, 67.45% of House District 64's Black voting-age population lives outside of the vote-dilution area. *Id.* ¶ 33.



6.71% of House District 74's Black voting-age population lives outside of the vote-dilution area. *Id.* ¶ 35.



65.86% of House District 117's Black voting-age population lives outside of the vote-dilution area. *Id.* ¶ 36.

22.57% of House District 145's Black voting-age population lives outside of the

vote-dilution                    area.            *Id.*              ¶                 37.





In reaching outside the vote-dilution area to assemble new majority-Black districts, hundreds of thousands eligible Black voters who actually reside in the vote-dilution areas continue to reside in districts in which they have no opportunity to elect their preferred candidates. *Id.* ¶¶ 14, 35. The end result is the creation of "new" majority-Black districts that provide a "remedy" for those who do not need one and deprive those whose Section 2 rights have been violated from the Section 2 remedy to which they are entitled.

Thus, rather than "*completely* remed[ying] the prior dilution of minority voting strength," *Dall. Cnty. Comm'n*, 850 F.2d at 1442 (emphases added), SB 1EX

and HB 1EX are at best *partial* remedies to the "significant harm" suffered by those Black voters in Georgia "whose voting rights have been injured by the violation of Section 2." Doc. 294 at 510. This Court should reject the General Assembly's state Senate and House plans for failing to fully remedy the Section 2 violations in the prior maps. *See, e.g.*, *Cane v. Worcester County*, 35 F.3d 921, 927 (4th Cir. 1994) (affirming rejection of Section 2 remedy that perpetuated challenged vote dilution).

## II.   SB 1EX and HB 1EX defy this Court's ruling by denying minority electoral opportunities elsewhere in Georgia.

This Court's ruling specified that "the State cannot remedy the Section 2 violation[]" identified in the state House and Senate plans "by eliminating minority opportunity districts elsewhere in the plans." Doc. 294 at 509–10. This instruction is consistent with "controlling precedent," which makes clear that the "appropriate remedy" in a Section 2 redistricting case "is a [legislative] redistricting plan that includes either an *additional* majority-Black [legislative] district, or an *additional* district in which Black voters otherwise have an opportunity to elect a representative of their choice." *Singleton v. Allen*, Nos. 2:21-cv-1291-AMM, 2:21-cv-1530-AMM, 2023 WL 6567895, at *1 (N.D. Ala. Oct. 5, 2023) (per curiam) (three-judge court) (emphases added) (citing *Bartlett v. Strickland*, 556 U.S. 1, 24 (2009) (plurality op.); *see also, e.g.*, *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 979 F.3d 1282, 1309 (11th Cir. 2020) (affirming Section 2 remedy that included "one more" minority opportunity district than afforded by the previous plan).

13

Rather than heed the Court's direction, however, the General Assembly adopted new state legislative plans that take electoral opportunities away from minority voters by eliminating several effective crossover districts across the state. Put differently, rather than create "*additional* legislative districts in which Black voters have a demonstrable opportunity to elect their candidates of choice," Doc. 294 at 510 (emphasis added), the General Assembly chose to remedy the vote dilution identified by the Court by limiting Black voting strength statewide.

The Supreme Court has instructed that "a 'crossover' district," is one "in which members of the majority help a 'large enough' minority to elect its candidate of choice." *Cooper v. Harris*, 581 U.S. 285, 287 (2017) (quoting *Bartlett*, 556 U.S. at 13 (plurality op.)). The new state Senate and House plans eliminate five crossover districts—Senate Districts 6 and 42 and House Districts 40, 81, and 82—largely through a wholesale restructuring of each district that increases the percentage of white voters in each:

- Under the 2021 Plan, Senate District 6's voting-age population was 57.79% white and 23.90% Black. Under the 2023 Plan, the district's voting-age population is 72.32% white and 17.28% Black. The old Senate District 6 performed for Black-preferred candidates, but the new Senate District 6 does not. Palmer Remedial Rep. ¶¶ 17–18.

- Under the 2021 Plan, Senate District 42's voting-age population was 51.39% white and 30.78% Black. Under the 2023 Plan, the district's voting-age population is 59.13% white and 32.56% Black. The old Senate District 42 performed for Black-preferred candidates, but the new Senate District 42 does not. Palmer Remedial Rep. ¶¶ 17–18.

- Under the 2021 Plan, House District 40's voting-age population was 51.14% white and 32.98% Black. Under the 2023 Plan, the district's voting-age population is 62.93% white and 26.41% Black. The old House District 40 performed for Black-preferred candidates, but the new House District 40 does not. Palmer Remedial Rep. ¶¶ 17–18.

- Under the 2021 Plan, House District 81's voting-age population was 47.01% white and 21.83% Black. Under the 2023 Plan, the district's voting-age population is 65.85% white and 25.18% Black. The old House District 81 performed for Black-preferred candidates, but the new House District 81 does not. Palmer Remedial Rep. ¶¶ 17–18..

- Under the 2021 Plan, House District 82's voting-age population was 62.46% white and 16.83% Black. Under the 2023 Plan, the district's voting-age population is 65.28% white and 25.46% Black. The old House District 82 performed for Black-preferred candidates, but the new House District 82 does not. Palmer Remedial Rep. ¶¶ 17–18..

To be sure, Section 2 does not *require* crossover districts. *See Bartlett*, 556 U.S. at 19 (plurality op.); *but see Concerned Citizens of Hardee Cnty. v. Hardee Cnty. Bd. of Comm'rs*, 906 F.2d 524, 526 (11th Cir. 1990) (recognizing that Section 2 does protect *coalition* districts). But that does not mean that crossover districts are not "minority opportunity districts." After all, crossover districts are by definition districts in which a minority group, "if receiving help from some white [voters], could elect their candidates of choice." *Cooper*, 581 U.S. at 305; *see also Bartlett*, 556 U.S. at 13 (plurality op.) ("[I]n a crossover district, the minority population, at least potentially, is large enough to elect the candidate of its choice with help from voters who are members of the majority and who cross over to support the minority's preferred candidate.").

Indeed, the elimination of performing crossover districts not only defies this Court's instruction at 509–10, but also undermines the purpose of the Voting Rights Act, *see Bartlett*, 556 U.S. at 25 ("Crossover districts are, by definition, the result of white voters joining forces with minority voters to elect their preferred candidate. The Voting Rights Act was passed to foster this cooperation."), and raises serious constitutional concerns, *see id.* at 24 ("[I]f there were a showing that a State intentionally drew district lines in order to destroy otherwise effective crossover districts, that would raise serious questions under both the Fourteenth and Fifteenth Amendments."). The Court should not sanction the General Assembly's willful disregard of the Court's order, particularly in the context of a purported "remedy" to voting discrimination.

There is no credible argument that destroying these crossover districts was in service of or at all necessary to remedy the identified Section 2 violations. Mr. Esselstyn's illustrative House plan, for instance, created a new majority-Black district in west-metro Atlanta, two new majority-Black districts in south-metro Atlanta, and two majority-Black districts in Macon-Bibb without making any changes to House Districts 40, 81, or 82. *See* Rebuttal Expert Report of John B. Morgan ("Morgan Rebuttal Rep."), Ex. 15 (Def's. Tr. Ex. 3). By contrast, under the new House plan, none of these districts retain any of their population. Esselstyn Remedial Rep. ¶ 46. And although Mr. Esselstyn's illustrative Senate plan made

changes to Senate Districts 6 42, they were minimal. Senate District 6 retained more than 97% of its population under the 2021 plan and Senate District 42 retained over 94%. Morgan Rebuttal Rep. at Ex. 15 at Ex. 8. By contrast, under the new plan, Senate District 42 retains none of its population.

Moreover, the redrawing of these districts disserves the General Assembly's own stated criteria. Mr. Esselstyn's remedial report demonstrates that in the Senate plan, SB 1EX, the "[m]ean Reock and Polsby-Popper scores in the 15 changed districts each drop by 20%" relative to the prior Senate plan, and that two districts, Senate Districts 38 and 39, become less compact than the least compact district in the previous plan. *Id.* ¶¶ 15, 16. In the House plan, HB 1EX, over 93% of the districts' Reock scores are lower than they were in the previous plan. *id.* ¶ 39, and over 87% of the districts' Polsby-Popper scores are lower in the new plan, *id.* ¶ 40. The changed districts in Mr. Esselstyn's illustrative Senate plan "solidly outperform" the changed districts in the new plans on compactness measures. *Id.* ¶ 18. The changed districts in Mr. Esselstyn's illustrative House plan outperform the changed districts in the new plans according to their mean Reock scores. *Id.* ¶ 41.

Mr. Esselstyn's illustrative plans also outperform the new plans on core retention. The new House plan reassigns 1,684,564 Georgians to new House districts—more than twice the 695,686 Georgians assigned to new House districts under Mr. Esselstyn's illustrative plan. *Id.* ¶¶ 44, 45. The new Senate plan reassigns

1,539,468 Georgians to new Senate districts, whereas Mr. Esselstyn's illustrative Senate plan—which included a *third* new majority-Black Senate district— would have reassigned just 1,122,851 Georgians to new districts. *Id.* ¶¶ 23, 24. Many of the reshuffled voters in the new plans live in DeKalb and Gwinnett Counties, both of which are majority-minority counties that lie almost entirely outside of the vote-dilution areas. *Id.* ¶¶ 21, 47. The illustrative plans demonstrate that these changes were unnecessary: the General Assembly could have added the new majority-Black districts with "far less disruption" to the old plans. *Id.* ¶¶ 25, 48. But the General Assembly's continued insistence on diluting the votes of Black voters led it to create new plans that perform worse than both the illustrative plans and the plans struck down by this Court.

* * *

In short, the General Assembly's purported remedial plans continue to dilute Black voting strength and fail to fully remedy the Section 2 violation found by this Court.

## CONCLUSION

The General Assembly's task was clear: it must provide Black Georgians in the areas identified by the Court additional opportunities to elect their candidates of choice while preserving all existing minority opportunity districts. It has failed. Plaintiffs respectfully ask the Court to enjoin HB 1EX and SB 1EX for failing to

18

remedy the Section 2 violations.  Because the State has proven "unwilling to enact remedial plans . . . that satisfy [the Court's] requirements," this Court should "proceed to draw or adopt remedial plans," Doc. 294 at 511, to ensure Plaintiffs obtain relief in time for the 2024 election.

Dated: December 12, 2023

Respectfully submitted,

By: **Adam M. Sparks**
Joyce Gist Lewis
Georgia Bar No. 296261
Adam M. Sparks
Georgia Bar No. 341578
**KREVOLIN & HORST, LLC**
One Atlantic Center
1201 West Peachtree Street, NW,
Suite 3250
Atlanta, Georgia 30309
Telephone: (404) 888-9700
Facsimile: (404) 888-9577
Email: JLewis@khlawfirm.com
Email: Sparks@khlawfirm.com

Abha Khanna*
Jonathan P. Hawley*
Makeba A.K. Rutahindurwa*
**ELIAS LAW GROUP LLP**
1700 Seventh Avenue,
Suite 2100
Seattle, Washington 98101
Phone: (206) 656-0177
Facsimile: (206) 656-0180
Email: AKhanna@elias.law
Email: JHawley@elias.law
Email: MRutahindurwa@elias.law

Michael B. Jones
Georgia Bar No. 721264
**ELIAS LAW GROUP LLP**
250 Massachusetts Avenue NW,
Suite 400
Washington, D.C. 20001
Phone: (202) 968-4490
Facsimile: (202) 968-4498
Email: MJones@elias.law

*Counsel for Plaintiffs*

*Admitted *pro hac vice*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing **PLAINTIFFS' OBJECTIONS TO THE GEORGIA GENERAL ASSEMBLY'S REMEDIAL STATE LEGISLATIVE PLANS** has been prepared in accordance with the font type and margin requirements of LR 5.1, N.D. Ga., using font types of Times New Roman, point size of 14, and Century Schoolbook, point size of 13.

Dated: December 12, 2023          **Adam M. Sparks**
                                  Adam M. Sparks
                                  *Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that I have on this date caused to be electronically filed a copy of the foregoing **PLAINTIFFS' OBJECTIONS TO THE GEORGIA GENERAL ASSEMBLY'S REMEDIAL STATE LEGSLATIVE PLANS** with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to counsel of record.

Dated: December 12, 2023          **Adam M. Sparks**
                                  Adam M. Sparks
                                  *Counsel for Plaintiffs*

21